# United States District Court
# For the Southern District of New York



LONNIE HARRELL,

*Petitioner*,

*v.*

MARK MILLER, SUPERINTENDENT,
GREEN HAVEN CORRECTIONAL FACILITY,

*Respondent*.



## MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

Robert S. Dean
Center for Appellate Litigation
*Attorney for Petitioner*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523

August 9, 2021

Matthew Bova (5073135)
mbova@cfal.org
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

INTRODUCTION ......................................................................................................3

STATEMENT OF FACTS .........................................................................................9

Accusations .............................................................................................................9

Trial......................................................................................................................10

    A.   Mr. Harrell was friends with the complainant and her family. .................10

    B.   Cell-Site-Locational Data.........................................................................12

    C.   DNA Evidence ...........................................................................................13

    D.   Charge Conference ...................................................................................15

    E.   Summations...............................................................................................15

    F.   Jury Deliberations....................................................................................17

    G.   Verdict.......................................................................................................18

Sentencing ...........................................................................................................19

    A.   Background: Throughout the trial, the court concluded that Mr. Harrell
       was disruptive, disrespectful, and had tried to "hijack" the proceedings...19

    B.   The Presentence Report ...........................................................................21

    C.   The October 2015 Sentencing Proceeding...................................................22

Direct Appeal to the Appellate Division.................................................................24

Post-Conviction Litigation ......................................................................................25

    A.   Petitioner's Claims ...................................................................................25

    B.   The 440 Decision .......................................................................................26

ARGUMENT ...................................................................................................31

POINT I.

The 440 court's decision applied legal standards and reasoning that violate clearly-established Supreme Court law, thus rendering the decision an unreasonable application of, and contrary to, clearly-established law. De novo review therefore applies. .......................................................................31

A.   Governing Standards ...................................................................31

B.   This Court should review the 440 court's no-deficient-performance finding de novo because the 440 court's "general-competency" analysis was both an unreasonable application of, and contrary to, *Strickland*. ..........................34

POINT II.

Regardless of the standard of review, the writ should issue because no fairminded jurist could find that counsel's errors were objectively reasonable...36

A.   The motion court's analysis of the Y-STR-preclusion blunder was an unreasonable application of *Strickland*. ......................................................36

B.   Counsel unreasonably overstated the probative value of the Y-STR evidence in summation. ...................................................................38

C.   Counsel unreasonably failed to request that impeachment evidence be included in the readback. ...............................................................39

D.   No reasonable jurist could find that counsel's failure to object to the State's prejudicial summation was objectively reasonable. Further, the motion court unreasonably rejected this claim on "strategy" grounds....................40

E.   The 440 court's determination that counsel reasonably failed to preserve a cell-site-data-suppression argument was an unreasonable application of, and contrary to, *Carpenter* and *Strickland*. ..................................................43

POINT III.

Trial counsel's blunders undermine confidence in this verdict. ..........................45

A.   The evidence that Mr. Harrell engaged in non-consensual sexual activity with complainant was underwhelming.......................................................46

B.   Counsel's blunders undermine confidence in the jury's verdict. .................47

C.   Counsel's failure to preserve the *Carpenter* claim deprived Mr. Harrell of a meritorious claim for reversible error on appeal...........................................50

POINT IV.

Sentencing counsel was ineffective. ........................................................................50

POINT V.

At a minimum, a hearing should be  ordered on the deficient-performance question...............................................................................................................57

POINT VI.

The Appellate Division unreasonably determined that Mr. Harrell lacked the right to be present when the court formulated a critical response to a readback of complainant's testimony. ...........................................................................58

A.   Clearly-Established Principles ...................................................................58

B.   The Appellate Division unreasonably applied clearly-established law........58

CONCLUSION.............................................................................................................62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LONNIE HARRELL,

    *Petitioner*,

          v.

MARK MILLER,
Superintendent of Green Haven
Correctional Facility,

    *Respondent.*

## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS

### PRELIMINARY STATEMENT

Lonnie Harrell petitions this Court under 28 U.S.C. § 2254 to vacate a New York State judgment, rendered October 21, 2015 in New York County Supreme Court, convicting him of first-degree criminal sexual act (Penal Law § 130.50(1)) and related charges and sentencing him to an aggregate sentence of 25 years to life in state prison and 15 years of post-release supervision (Merchan, J., at trial and sentence). Mr. Harrell is currently incarcerated at Green Haven Correctional Facility under that judgment.

The Appellate Division First Department affirmed the judgment on direct appeal on January 29, 2019.[1] A Judge of the New York Court of Appeals denied leave to appeal on April 8, 2019.[2]

---

[1] *People v. Harrell*, 168 A.D.3d 591.

[2] *People v. Harrell*, 33 N.Y.3d 976.

On June 25, 2020, Mr. Harrell moved to vacate his conviction and sentence under C.P.L. § 440.10 and § 440.20 ("440 motion"). By decision dated January 29, 2021, the post-conviction court ("440 court") summarily denied the motion without a hearing.[3] Mr. Harrell filed a timely motion for a certificate granting him permission to appeal.[4] A Justice of the Appellate Division, First Department, denied that application in an order entered on August 5, 2021.[*]

As shown below, Mr. Harrell's conviction and sentence violate the right to effective assistance of counsel and the due process right to be present during trial.[5] The state court decisions to the contrary—both the 440 motion and Appellate Division decisions—were contrary to, and unreasonably applied, clearly-established Supreme Court decisions.[6]  Accordingly, under 28 U.S.C. § 2254(d)(1), a writ of habeas corpus should issue.

---

[3] *See* 440 Decision 1-16 ("Decision").

[4] *See* Ex. H

[*] *See* Ex. I. This petition is timely filed. The period between June 25, 2020 (when the post-conviction motion was filed) and August 5, 2021 (when the motion for leave to appeal the denial of that motion was denied) tolls the deadline. Accounting for that tolled time, this petition has been filed within one year of July 8, 2019, when Petitioner's time to seek direct review in the United States Supreme Court expired. 28 U.S.C. § 2244(d)(1)(A),(d)(2); *Clay v. United States*, 537 U.S. 522, 527 (2003); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2000); *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999).

[5] U.S. Const. amend. 6, 14; *Strickland v. Washington*, 466 U.S. 668 (1984); *Snyder v. Massachusetts*, 291 U.S. 97 (1932).

[6] 28 U.S.C. § 2254(d)(1).

## INTRODUCTION

In this serious felony trial, Mr. Harrell was facing the rest of his life behind bars. He needed a lawyer to fight for him. Instead, his lawyer repeatedly dropped the ball. Counsel's persistent blunders throughout the pretrial, trial, and sentencing stages undermine confidence in the outcome of these proceedings, depriving Mr. Harrell of effective assistance of counsel.[7]

The post-conviction court's decision finding no deficient performance ("440 Decision") applied legal standards that violate *Strickland v. Washington*.[8] Accordingly, that decision was both "contrary to" and an "unreasonable application" of *Strickland*, requiring de novo review without deference to the state court's ultimate finding.[9] Alternatively, even if the state court applied the correct standards, it did so unreasonably.[10] Accordingly, AEDPA's standards are satisfied and the writ should issue.[11]

Similarly, the Appellate Division unreasonably determined that Mr. Harrell had no right to be present during a critical stage of the jury's deliberations where the

---

[7] *Strickland v. Washington*, 466 U.S. 668 (1984).

[8] *Id.*

[9] 28 U.S.C. § 2254(d)(1); *e.g.*, *Garlick v. Lee*, 1 F.4th 122, 135-36 (2d Cir. 2021) (no deference is owed to an unreasonable state-court decision;   a state-court decision is unreasonable when it applies a legal standard that the Supreme Court has rejected); *Williams v. Taylor*, 529 U.S. 362, 395-97, 405-06, 412-13 (2000) (when the state-court decision employs legal reasoning or standards that violate clearly-established law, the decision is an unreasonable application of, and is contrary to, clearly-established law, thus triggering de novo review without deference).

[10] *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (even if the state court applies the correct standards, the writ should issue if the state court unreasonably applied them).

[11] *See* 28 U.S.C. § 2254(d)(1). This memorandum occasionally refers to § 2254 as "AEDPA."

parties discussed a response to an important jury note. As Mr. Harrell could have meaningfully participated at this stage by providing valuable input, his due process right to be present was violated.[12]

* * *

Here, the State alleged that Mr. Harrell engaged in attempted rape and related charges. But its case was weak, resting exclusively on the 15-year-old complainant's testimony. Mr. Harrell knew the complainant, lived in her building, and was friends with her and her family. On the afternoon in question, the complainant claimed that she invited Mr. Harrell into her apartment for a snack and then, just before he left, he engaged in nonconsensual sexual activity with her.

Throughout these 2014 and 2015 proceedings, counsel was ineffective. First, counsel unreasonably failed to preclude the unfairly prejudicial and virtually irrelevant "Y-STR-DNA" evidence. The Y-STR profiles at issue, purportedly found in saliva and semen found on complainant's body, were consistent with those of millions of males. Nevertheless, the laboratory that analyzed the DNA misleadingly concluded that Mr. Harrell's profile was "the same" as the Y-STR profiles and that he "could not [be] exclude[d]" as a donor.[13] Despite this evidence's virtually non-existent probative value, and its obvious tendency to mislead and confuse, defense counsel unreasonably failed to move to preclude it on the grounds that it was more prejudicial than

---

[12] *Snyder v. Massachusetts*, 291 U.S. 97 (1932); U.S. Const. Amend. 14.

[13] Tamariz: A686-88; DNA Report: A1017-18.

probative.[14] Counsel did not do so because an expert whom he retained did not advise him to make this argument.[15] This blind reliance on a non-legal expert's "advice" regarding *legal* argument was deficient performance.

Counsel compounded this basic mistake by drastically overstating the Y-STR-DNA evidence's probative value in summation, mistakenly telling the jury that "1 in 685 African males" and thus "thousands of individuals in New York City" matched this Y-STR profile.[16] On the contrary, *millions* of males matched this profile. And the profile did not merely match "African American" males, but males of numerous races. Counsel inexplicably shrunk the suspect pool, to the detriment of his client.

Counsel also failed to preserve the argument that the State's acquisition of cell-site locational data without a warrant violated the Fourth Amendment. Although counsel spotted this argument, he consciously decided to omit it, for no valid strategic reason.[17] Had counsel preserved this argument, Mr. Harrell would have had a meritorious appellate claim for reversal under *Carpenter v. United States*,[18] decided

---

[14] *People v. Primo*, 96 N.Y.2d 351, 355 (2001) (courts must assess whether evidence's probative value is outweighed by the possibility of "undue prejudice," confusion, or "misleading the jury").

[15] Ex. F: Bova Affirmation Submitted in Support of 440 Motion ¶ 16 (June 25, 2020) ("Bova Aff.").

[16] A793-95.

[17] Ex. F: Bova Aff. ¶ 14.

[18] 138 S. Ct. 2206 (2018).

after his trial. Counsel's conscious decision to decline to preserve this issue was deficient performance too.[19]

During summations, counsel again stood mute while serious error occurred. Although the defense denied that Mr. Harrell engaged in sexual activity with complainant, the prosecutor repeatedly told the jury that the defense was admitting that element.[20] That false account of the defense's position deleted a critical element from the jury's deliberations. But counsel unreasonably failed to object. The prosecutor then added, again without objection, a flurry of prejudicial commentary which steered the jury away from its important task of weighing the evidence and assessing credibility.[21]

During jury deliberations, the blunders continued. Counsel's strategy throughout the case—and a major summation argument—relied on impeachment by omission: complainant claimed penile-vaginal contact at trial but did not tell the police or doctors about such contact after the incident. But when the jury requested complainant's testimony about this precise issue, counsel failed to request that the court also read back the impeachment evidence. Counsel unreasonably failed to arm the jury with the tools necessary to assess complainant's credibility.

Counsel was ineffective at sentencing too. Rather than advocate on Mr. Harrell's behalf, counsel did nothing at all. Instead, he made disparaging remarks about his

---

[19] A.B.A. Criminal Justice Standards for the Defense Function Standard 4-1.5 (4th ed.) (counsel must preserve the record for appeal); New York State Bar Association, Revised Standards for Providing Mandated Representation I-7(h) (2015) (same).

[20] STATE SUMMATION: A800, A806, A808; *see* DEFENSE SUMMATION: A791-99.

[21] A800, A815.

client, calling him "angry."[22] And because counsel did not diligently prepare for sentencing, he never read the presentence report, which stated: "[Defendant] informed while at liberty he was treated for paranoid schizophrenia and depression on a monthly basis."[23] Had counsel read the presentence report carefully, he would have requested medical records which confirm schizoaffective and bipolar disorder diagnoses.[24] These diagnoses would have mitigated an important factor upon which the State, and ultimately the sentencing court, relied: Mr. Harrell's purportedly disruptive courtroom behavior and his effort to "hijack" the proceedings by threatening to absent himself from trial.[25]

In a January 29, 2021 decision, the state post-conviction court summarily denied Mr. Harrell's ineffective-assistance claim without a hearing, finding no deficient performance.[26] The motion court's decision, the last state-court decision on the merits, "involved an unreasonable application of," and was "contrary to," clearly-established Supreme Court precedent because it employed legal standards that the Supreme

---

[22] A940.

[23] A1028; Ex. F: Bova Aff. ¶ 16

[24] Medical Records: A1037, A1043.

[25] STATE'S ARGUMENT IN SENTENCING A944 ("Many of us [here]," the prosecutor said, "witnessed the defendant's behavior. In the middle of trial when he did not get his way, we observed his behavior. At one point he said, I have this problem that when I get agitated it just blows. And that was here before Your Honor in a room full of uniformed court officers and court personnel."); SENTENCING COURT'S STATEMENT: A952 ("I think that if ever a case cried out for the maximum sentence this is it. Not only because of the conduct that he demonstrated and was proven beyond a reasonable doubt . . . *but also by the conduct that he exhibited here in this courtroom* as well as his criminal history.").

[26] Ex. A.

Court has already rejected.[27] Instead of analyzing whether the "identified acts or omissions" were objectively unreasonable—as *Strickland* commands[28]—the 440 court considered whether counsel did *other things* competently, such as "move[] to dismiss multiplicitous counts" and redact medical records.[29] As the Second Circuit has held, this "reliance on counsel's competency in all other respects fails to apply the *Strickland* standard at all."[30] As the state court applied a legal standard that contradicts settled Supreme Court precedent, this Court should review the deficient-performance issue without deference.[31]

In any event, as no reasonable jurist could find that counsel's blunders at the pretrial, trial or sentencing stages were objectively reasonable,[32] the motion court unreasonably applied *Strickland*.[33]

Furthermore, counsel's repeated blunders, whether viewed collectively or individually, prejudiced the defense under *Strickland*.[34] Thus, the writ should issue.

---

[27] 28 U.S.C. § 2254(d)(1); *Greene v. Fisher*, 565 U.S. 34, 40 (2011) (under AEDPA, the federal court must assess the last state decision on the merits, here, the motion court's January 29, 2021 decision); *Williams*, 529 U.S. at 390-91, 397, 405-06, 412-13.

[28] *Strickland*, 466 U.S. at 688, 690.

[29] Ex. A: Decision 13-15.

[30] *Henry v. Poole*, 409 F.3d 48, 72 (2d Cir. 2005); 28 U.S.C. § 2254(d)(1).

[31] Point I, below; *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (AEDPA deference does not apply to a decision that applies a legal standard that is contrary to the Supreme Court's clearly-established standards); *Williams*, 529 U.S. at 397, 405-06, 412-13 (same).

[32] *Strickland*, 466 U.S. at 687-90.

[33] 28 U.S.C. § 2254(d)(1); Point II & IV, below.

[34] Point III & IV, below; *Strickland*, 466 U.S. at 693-94 (when counsel's deficient performance undermines confidence in the proceeding's outcome, the prejudice standard is satisfied).

At a minimum, this Court should hold an evidentiary hearing on the deficient-performance question.[35]

Finally, the Appellate Division unreasonably applied Supreme Court law in finding that Mr. Harrell had no right to be present when the court formulated a response to the jury's important readback request.[36] The writ should issue on this ground as well.

## STATEMENT OF FACTS

### ACCUSATIONS

Based exclusively on the 15-year-old complainant's testimony, the State indicted Mr. Harrell with seven felony sex-offense counts: **(1)** two counts of 1st-degree criminal sexual act (oral-vulval and oral-penile contact [B-felony]); **(2)** one count of attempted 1st-degree rape (sexual intercourse [C-felony]); **(3)** two counts of 1st-degree sexual abuse (digital-vaginal and mouth-to-mouth contact [D-felony]); and **(4)** two counts of 3d-degree criminal sexual act (mouth-to-vulval and penile-oral contact [E-felony]).[37] Each count required forcible compulsion, except the two 3d-degree criminal sexual act counts, which required that the complainant be under 17.

Mr. Harrell, age 53 at the time of the 2015 trial, was facing the rest of his life in prison.

---

[35] Point V, below.

[36] Point VI, below.

[37] A1-A3.

## TRIAL

### A. Mr. Harrell was friends with the complainant and her family.

In 2014, Mr. Harrell lived in an apartment building in the Bronx. He had lived there since 2009, residing with his mother.[38] He worked as the maintenance man in the building and lived on the same floor as complainant and her family (her mother and brother).[39]

For years, Mr. Harrell had been family friends with the complainant's family.[40] By the summer of 2014, he knew the complainant's mother and the complainant, who was entering her sophomore year in high school, for several years and saw them regularly in the building.[41] They had a "friendly, familiar, [and] cordial" relationship.[42] Mr. Harrell had been in the complainant's apartment "many times."[43]

The complainant testified that on the 2014 summer day in question, Mr. Harrell knocked on her door in the early afternoon to ask her brother to hang out.[44] Her brother was not home, but she invited Mr. Harrell inside for a refreshment. They sat on her couch and talked while she ate her lunch.[45] Complainant then asked Mr. Harrell to leave so she could do chores.[46]

---

[38] A453-54.

[39] A453.

[40] A393-95, A439-40

[41] A393-95, A439-40.

[42] A395.

[43] A400-01.

[44] A400-01, A439.

[45] A401, A407.

[46] A407.

Complainant hugged Mr. Harrell but, complainant claimed, Mr. Harrell would not release her.[47] Complainant alleged that Mr. Harrell suddenly choked her, threatened her, kissed her, removed her clothing, digitally penetrated her vagina, performed oral sex on her, rubbed his penis against her vagina, and forced her to perform oral sex.[48] Complainant testified that during this encounter, she told Mr. Harrell not to penetrate her vagina and he complied.[49] Complainant called 911 and reported that a neighbor whom she trusted sexually assaulted her by going "into places [she] didn't want to be."[50]

When complainant was asked whether, when narrating the incident hours later to a Detective Susan Barbato, the complainant reported penile-vaginal contact, complainant responded that she "might not have" done so and could not remember.[51] Detective Barbato similarly testified that, during her interview of complainant at the hospital, complainant did not reference any such contact.[52] Hospital medical records also confirm no such allegation was ever made.[53]

After a comprehensive physical examination, doctors found no evidence corroborating complainant's allegations of forcible compulsion, such as choking.

---

[47] A408.

[48] A410-21.

[49] A415-16.

[50] A425-28; State Ex. 11 (audio recording of 911 call).

[51] A444-45.

[52] A594-95.

[53] State Ex. 21: Emergency-Room Record: A974.

Similarly, photographs taken after the purported incident don't support such a contention.[54]

Months later, after learning of the complainants' allegations, Mr. Harrell turned himself into the police.[55]

### B. Cell-Site-Locational Data

On December 11, 2014, nearly a year before the October 2015 trial, the State subpoenaed 57 days of Mr. Harrell's cell-phone-location information.[56] The court issued a subpoena under 18 U.S.C. § 2703(d), finding "reasonable grounds to believe" the records "are relevant and material to an ongoing criminal investigation."[57] The court never found probable cause that Mr. Harrell had engaged in criminal activity or that this search would uncover evidence of a crime.

The cell-site records indicate that Mr. Harrell was near the complainant's apartment at the time of the purported assault and then left the area moments later.[58] Defense counsel did not move to suppress this evidence.

At trial, the State introduced the cell-site-locational data into evidence.[59] A cellular-technology expert testified that Mr. Harrell's phone would access a cell tower

---

[54] Dr. Singh: A703-24; Photographs: A1008-13.

[55] A588-89.

[56] AFF. IN SUPPORT OF SUBPOENA: A1029-34 (requesting data from the day before the purported July 16, 2014 incident through September 10, 2014).

[57] A1035-36.

[58] A1014.

[59] A512-A566; A1014.

within a range of three or four New York City blocks.[60] The State introduced a chart demonstrating the cell-site towers accessed.[61] The chart indicates that Mr. Harrell's phone accessed a cell tower one block away from the scene of the purported offense at 2:25 p.m. and then accessed a tower across town about fifteen minutes later.[62]

### C. DNA Evidence

Before trial, the prosecution disclosed a July 30, 2015 DNA report (prepared by the Office of the Chief Medical Examiner ["OCME"]). That report summarized the results of comparing Mr. Harrell's DNA profile to DNA profiles found on a cup and straw found in complainant's apartment.[63]

To compare DNA profiles, OCME compares "alleles" at 15 locations on the DNA chain.[64] An allele, represented by a number (e.g., "13"), indicates the number of times a particular nucleotide sequence repeats. At each location of a DNA chain, a human being has two alleles, one from the mother and one from the father.[65]

An OCME "Criminalist" (Tamariz) testified at trial that DNA found on a cup and straw in complainant's apartment had the same DNA profile as Mr. Harrell's profile.[66] Specifically, 1 out of more than "6.8 trillion people" have that profile.[67]

---

[60] A547, A565.

[61] A1014.

[62] A1014.

[63] A1021-23.

[64] A658.

[65] A685, A689-90.

[66] A680.

[67] A683.

An April 1, 2015 OCME report, also disclosed before trial, explained the results of comparing the male alleles (found at 15 locations) in the profiles found on swabs of complainant's mouth/vaginal area to the male alleles from Mr. Harrell's DNA profile.[68] This analysis, known as "Y-STR" analysis, reduces the amount of comparable genetic information by half and thus a "match," by definition, has less probative value.

The Y-STR report, also admitted into evidence, concluded that the Y-STR profile found on complainant's labia  "is expected to be found in approximately . . . 1 in 685 African American males[,] 1 in 1330 Asian males[,] 1 in 562 Caucasian males [and] 1 in 400 Hispanic males."[69] As for the oral swab, OCME reported that the Y-STR profile "is expected to be found in approximately 1 in 321 African American males[,] 1 in 439 Asian males[,] 1 in 125 Caucasian males [and] 1 in 120 Hispanic males."[70]

Tamariz testified that Mr. Harrell could not be "excluded from being a contributor" because "all the numbers at all the [15] locations are the same."[71]

Counsel objected to the admission of the DNA evidence on chain-of-custody grounds but made no other objections.[72]

---

[68] A1017-18.

[69] A1017.

[70] A1018.

[71] A686-88.

[72] A679.

### D. Charge Conference

After the prosecution rested, counsel requested an instruction on impeachment by omission because complainant repeatedly omitted any reference to penile-vaginal contact when narrating the encounter after the incident.[73]

### E. Summations

In summation, defense counsel argued that the prosecution could not prove that Mr. Harrell (1) engaged in sexual activity with complainant or (2) did so without her consent.[74] Counsel conceded that the DNA evidence on the cup and straw (which was not Y-STR evidence) indicated that Mr. Harrell, at some point, used those items.[75] But counsel made no other concessions.

Counsel argued that the complainant had been impeached by omission and was thus unreliable.[76] He explained that the court would instruct the jury that "impeachment by omission" is one of the "tools" it could use to assess the complainant's credibility.[77] Counsel reminded the jury that, according to both the complainant and Detective Barbato, when the two spoke the night of the incident, there was no mention of "contact between penis and vagina."[78] Counsel added that the medical records also demonstrated that the complainant omitted critical details

---

[73] A755.

[74] A772-99.

[75] A791-92.

[76] A774-81.

[77] A774.

[78] A777 (citing Barbato: A594-95).

to which she later testified.[79] The jury could "consider that when you assess the credibility of the witness."[80]

Defense counsel's summation summarized the Y-STR evidence:

> 1 in 685 *African males*, thousands of individuals in New York City, could have contributed that DNA to the labia and vulva of the complaining witness if you want to speak scientifically about this. . . . 1 in 321 African males could have contributed the DNA to the Y chromosome of DNA. . . . Thousands of people in New York City could have made the contribution, okay?[81]

Counsel emphasized that the Y-STR results "don't rule out" Mr. Harrell or "any Hispanic male relatives and they don't rule out thousands of African males simply in the confines of New York City, let alone in the United States or in the world."[82]

Contrary to this recap, OCME had never found that the Y-STR evidence could only be found in "African" or "Hispanic male relatives." Instead, OCME had summarized the rate at which this Y-STR profile would be found in four races (including Caucasian and Asian males too).[83] Also, *millions of males* globally match this profile, not just "thousands."

In the State's summation, the State repeatedly told the jury that the question of whether Mr. Harrell engaged in sexual activity with complainant was "not really in dispute" and that "no one" was "saying" that Mr. Harrell came into the apartment

---

[79] A775.

[80] A777.

[81] A793-94.

[82] A795.

[83] A1017-18.

that day but did not engage in sexual activity with her.[84] The State also: (1) cited several irrelevant teenage milestones;[85] (2) described complainant's positive attributes and plans for her future, including college;[86] and (3) emphasized the complainant's parents' emotional reactions to her allegations.[87] Counsel did not object to any of the above statements.

### F. Jury Deliberations

During deliberations, the jury requested complainant's testimony "regarding the position of defendant's penis in relation to [complainant's] vulva slash vagina."[88] Before Mr. Harrell entered the courtroom, defense counsel, the court, and the

---

[84] *See* STATE SUMMATION: A800 ("He's not claiming that someone else did this. It was me but I did not do it."); STATE SUMMATION: A806 ("But is he suggesting that he came into the apartment, had the Smoothie, coffee cup with him and then someone else came in and sexually assaulted her? No, no one is saying that"); STATE SUMMATION: A808 ("Identity is not an issue."); DEFENSE SUMMATION: A791-99 (arguing that the prosecution could not prove identity or non-consent and never conceding anything beyond the fact that Mr. Harrell, at some point, touched the straw and the cup).

[85] A799 ("She hadn't even had her Sweet 16th yet. She wasn't even old enough to drive. She just finished her first year of high school. She was only [15].")

[86] A800 ("She . . . spent two weeks in Montana volunteering for senior center and a day-care center, building sheds in a Native American reservation. [She] wants to be productive even during her summer vacation. So after coming back from Montana, she had plans to go to summer camp. She's the girl who hopes to go to college after she finishes high school.").

[87] A815 ("Both [complainant] and her mother told you that her father, who at that time lived in Georgia, rushed to be by [her] side. Again, evidence that [she] was sexually assaulted."); A815 ("And [complainant's mother] broke down on the stand when she said that she has never seen her daughter in that state before. Can you imagine what a mother must have felt at that moment? Feeling so helpless, not having been able to protect her daughter? Watching the aftermath of her daughter having gone through something so horrific? [Her] reaction speaks volumes about the non-consensual nature of the sex acts.").

[88] A875.

prosecutor discussed a response to this note. Mr. Harrell was in the "holding pen right next door" and was "on his way up."[89]

Still in Mr. Harrell's absence, defense counsel unsuccessfully objected to including answers from complainant's redirect in response.[90] Only then did Mr. Harrell enter the courtroom.[91]

The stenographer read back complainant's testimony that Mr. Harrell rubbed his penis against her vagina but did not penetrate her because she told him not to.[92] Although counsel's summation argued that this precise testimony was impeached by repeated omission, counsel never requested that the court read back any impeaching evidence.[93]

### G. Verdict

The jury returned a verdict of guilty on six of seven counts (with the exception of attempted first-degree rape).[94] The trial court accepted a partial verdict and issued an *Allen* charge, after which the jury deliberated and returned a verdict of guilty on the attempted-rape charge.[95]

---

[89] A877-85.

[90] A877-85.

[91] A885.

[92] A416 (lines 8 through 18); A442 (lines 24-25); A443 (lines 1 through 12); A444 (lines 18 through 25); A445 (lines 1-6); A875-85; A891.

[93] Complainant: A444-45 (complainant testified that she "might not have" been subjected to such contact and could not remember whether she told the police about it); Det. Barbato: A594-95 (testifying that the complainant never made this allegation); *see also* State Ex. 21: Emergency-Room Record: A977 (same).

[94] A900, A905-13.

[95] A908-A913; A934-36.

**SENTENCING**

**A.** <u>Background</u>**: Throughout the trial, the court concluded that Mr. Harrell was disruptive, disrespectful, and had tried to "hijack" the proceedings.**

At several points during the trial, heated exchanges occurred between Mr. Harrell, court officers, and the court.

During jury selection, the court stated it had overheard "an argument taking place in the robing room" and ordered Mr. Harrell to stop arguing with court officers. The court believed Mr. Harrell was "challenging" the court and the officer's "authority."[96]

Days later, during the prosecution's case in chief, Mr. Harrell stated that he wanted to attend religious services on Fridays.[97] Mr. Harrell and the court discussed whether the court would accommodate his purportedly belated request. The court told Mr. Harrell he was: (1) not making his request "respectfully"; (2) being "selfish"; (3) interrupting the court; and (4) "inconvenienc[ing]" the jury.[98] Mr. Harrell responded that he wanted to leave the courtroom because "I have this problem that when I get agitated, it just blows, and I am not trying to blow. . . .  you're making me uncomfortable . . . [I am not] being selfish. That's [the court's] opinion . . . I take meds. I don't want to spaz out in here." Mr. Harrell left the courtroom.[99]

The court indicated further frustration with Mr. Harrell's behavior, stating that he was "really behaving aggressively, very aggressive," "turning his body" towards

---

[96] A165.

[97] A633-34.

[98] A635-40.

[99] A639-42.

the court and the officers, raising his voice, and "yelling above the Court."[100]  The judge said he would "hate to give into" Mr. Harrell's "threat[ ]" to disrupt the proceedings, adding that although the court was "prepared to give him tomorrow off exactly as he requested," Mr. Harrell was "still refusing to come in this afternoon."[101] In the court's view, Mr. Harrell was "hijacking the trial and directing when things are going to happen."[102]

The following week, Mr. Harrell refused to be shackled, prompting the court to state that "[h]e says he want to testify, but he wants to do it his way . . . beyond him getting in the face of the sergeant last week, and then later in a separate incident getting in the face of another sergeant and other court officers, he himself said last week[,] 'Get me out of here. I don't want to be here because I don't want there to be a mistrial.' Those were his words, and I can only interpret[ ] that to mean that he was going to cause a disruption."[103]

Next, the court went into the holding cell to speak to Mr. Harrell, but Mr. Harrell still refused to return to court. Yet again, the court expressed further frustration with Mr. Harrell's behavior: "[He said the court] was the reason he was agitated, and, therefore, I assume he was kidding, but the court officer should have restrained me and not him."[104] The court added that it had heard an "anecdote" from court officers

---

[100] A643.

[101] A641, A645, A647.

[102] A647.

[103] A745-46.

[104] A758.

that Mr. Harrell said to one of the officers, "'Do you have to stand so close to me? I can feel your body. Get away. You're too close. I can feel you breathing.' So again he was trying to tell the court officers how to do their jobs."[105] Defense counsel added, "the record is clear that his tone that he was speaking loudly. He seem[ed] very upset."[106] The court answered: "Yes. He was agitated. He cut me off a number of times. . . . there was no compromising with him." [107]

Mr. Harrell was ultimately absent during the charge conference, summations, final charge, the formulation of a response to a jury note, and the verdict.

### B. The Presentence Report

Before sentencing, the New York City Department of Probation prepared a presentence report[108] that (among other things) discussed psychiatric diagnoses: "[Defendant] informed while at liberty he was treated for paranoid schizophrenia and depression on a monthly basis."[109] Nevertheless, defense counsel "was never aware of any mental-health diagnoses."[110]

Medical records obtained during the subsequent post-conviction investigation confirm that Mr. Harrell had been diagnosed, in 2014 and 2015, with chronic

---

[105] A758-59.

[106] A760.

[107] A760.

[108] C.P.L. § 390.20(1).

[109] A1028.

[110] Ex. F: Bova Aff. ¶ 16.

schizoaffective disorder and bipolar disorder.[111] Sentencing counsel never requested any mental-health records.[112]

### C. The October 2015 Sentencing Proceeding

Before the sentencing proceeding formally began, a court officer indicated that Mr. Harrell was refusing to attend.[113] Defense counsel conveyed that he had spoken with Mr. Harrell who was "very upset" about the shackling requirement.[114] Defense counsel added that when he discussed Mr. Harrell's attendance at sentencing with him, Mr. Harrell became "angry" and exited the interview booth.[115] Sentencing continued in Mr. Harrell's absence.

Beyond discussing his client's anger, defense counsel merely said, "I would ask the Court to consider a sentence, the minimum [ ] on the B felonies are ten years, the maximum is 25 years. I ask that the sentence of this Court be in the range of ten years up to 15 years, plus the period of five years post release supervision."[116] Counsel offered no mitigating evidence and made no argument in support of a below-maximum sentence.

The prosecution sought a maximum sentence because of a prior robbery conviction, the offense's seriousness, and Mr. Harrell's courtroom "behavior."[117]

---

[111] Medical Records: A1037, A1043.

[112] Ex. F: Bova Aff. ¶ 16.

[113] A940.

[114] A940.

[115] A940.

[116] A943.

[117] A943-45.

"Many of us [here]," the prosecutor said, "witnessed the defendant's behavior. In the middle of trial when he did not get his way, we observed his behavior. At one point he said, I have this problem that when I get agitated it just blows. And that was here before Your Honor in a room full of uniformed court officers and court personnel."[118] Complainant's mother then read complainant's statement and her own statement.[119]

Before imposing sentence, the court summarized its negative view of Mr. Harrell's courtroom behavior and absences:

> [T]he record is clear as to everything Mr. Harrell did during . . . this trial and the ways that he basically tried to highjack these proceedings to make them his own, he wanted things done his way and only his way. And when that did not happen, he absented himself. And this Court, despite its greatest efforts to, could not compel Mr. Harrell to come back to court.

> So I am sorry that [complainant's mother was] not able to address those words directly to him and he was not here for that and he deprived [complainant's mother] of that.

> As [the State] said, we all had the opportunity to see Mr. Harrell during the course of this trial, we saw how he tried to intimidate the court officers in this courtroom, he tried to intimidate the sergeants, he even tried to intimidate the Court. It did not matter to him that the court officers outnumbered him or had weapons, it did not matter to him that the Court was wearing a black robe, it was still his way or the highway.[120]

The court then imposed a maximum sentence based in part on Mr. Harrell's courtroom conduct:

---

[118] A944.

[119] A945-50.

[120] A951-52.

> I think that if ever a case cried out for the maximum
> sentence this is it. Not only because of the conduct that he
> demonstrated and was proven beyond a reasonable doubt .
> . . *but also by the conduct that he exhibited here in this
> courtroom* as well as his criminal history.[121]

The court sentenced Mr. Harrell to the maximum prison sentence on each of the seven counts and ran them all concurrently, producing an aggregate sentence of 25 years in prison and 15 years of post-release supervision.[122] Under this sentence, Mr. Harrell will likely die in prison.

### DIRECT APPEAL TO THE APPELLATE DIVISION

Mr. Harrell appealed to the Appellate Division First Department, arguing (among other things) that his due process right to be present was violated when the court, in his absence, formulated a response to the jury note regarding complainant's testimony about penile-vaginal contact.[123]

The Appellate Division found "no violation of defendant's right to be present at all material stages of the trial. He was present during a requested readback of the victim's testimony, and although he was absent for a portion of the preceding discussion regarding the content of the readback, his right to be present did not extend to that discussion."[124]

---

[121] A952 (emphasis added).

[122] A952-53.

[123] Ex. C: Petitioner's App. Div. Br. 13-21.

[124] 168 A.D.3d 591, 591 (1st Dept. 2019) (citing *People v Rodriguez*, 76 N.Y.2d 918, 921 (1990)).

Petitioner renewed his due-process argument before the New York Court of Appeals.[125] A Judge of the Court of Appeals denied leave months later.[126]

## POST-CONVICTION LITIGATION

### A. Petitioner's Claims

On June 25, 2020, Mr. Harrell moved, in New York County Supreme Court, to vacate his judgment of conviction under C.P.L. § 440.10/440.20. Mr. Harrell argued that counsel was ineffective because he failed to:

- move to preclude Y-STR DNA evidence on prejudice/probity grounds, and then drastically overstated its probative value in summation;

- preserve the argument that the cell-site-locational data was unconstitutionally obtained without a probable-cause warrant, an argument that would have prevailed on appeal under *Carpenter v. United States*;[127]

- object to the State's prejudicial summation, including its repeated—and inaccurate—claim that Mr. Harrell conceded he engaged in sexual activity with complainant;

- request that important impeachment testimony be included in response to a readback; and

- make a mitigation argument at sentencing or investigate Mr. Harrell's mental-health history, instead referring to Mr. Harrell as "angry." [128]

Post-conviction counsel supplied his affidavit, which recounted his phone conversation with trial/sentencing counsel (Theodore Herlich).[129] Mr. Herlich stated that he did not move to suppress the cell-site data because he thought First

---

[125] Ex. D and E.

[126] 33 N.Y.3d 976 (April 8, 2019).

[127] 138 S.Ct. 2206 (2018).

[128] Ex. F: C.P.L. § 440.10 Motion Papers.

[129] Ex. F: Bova Aff. ¶ 13-18.

Department law precluded the claim. And he did not move to preclude the Y-STR evidence on prejudice/probity grounds because an expert, Dr. Lawrence Koblinsky, did not advise him to make such a motion.[130]

Finally, although the presentence report stated that Mr. Harrell had reported a paranoid schizophrenia diagnosis, counsel was unaware that Mr. Harrell had any mental-health disorders. Nor did he request any mental-health records.[131]

Post-conviction counsel requested Mr. Harrell's psychiatric records from 2014 and 2015. Those records, which were attached to the post-conviction motion, confirm bipolar-disorder and chronic-schizoaffective-disorder diagnoses.[132]

Defense counsel subsequently refused to sign an affidavit affirming an account of his representation in this case.[133]

## B. The 440 Decision

In a decision dated January 29, 2021, the motion court denied Mr. Harrell's motion without a hearing.[*]

The court first held it would not summarily deny the motion due to the absence of an affidavit from trial counsel because it "accept[ed]" post-conviction counsel's

---

[130] Ex. F: Bova Aff. ¶ 14-15.

[131] Ex. F: Bova Aff. ¶ 16.

[132] Ex. F: Bova Aff. ¶ 18; Ex. A: Medical Records: A1037-44.

[133] Ex. F: Bova Aff. ¶ 17.

[*] The court rejected the State's argument that the motion should be denied on the grounds that Mr. Harrell previously filed a *pro se* 440.10 motion (prior to his direct appeal), which raised a multiplicity argument that could only be raised on direct appeal. Ex. A: Decision 8-9 (invoking its discretionary power to review the merits of a successive motion under C.P.L. § 440.10(3)).

explanation for his inability to provide one, i.e., counsel stopped responding to emails and phone calls.[134]

The court then summarily denied the motion on deficient-performance grounds[135] and did not address prejudice.[136]

As for counsel's failure to challenge the cell-site data, the court held that "there is little or no chance the motion would have been successful. . . . Moreover, the language in *Carpenter* makes clear that its holding is not retroactive. Specifically, the Supreme Court noted that failure to object in 2011 to the prosecution's use of [cell-site-location data] that was obtained without a warrant, *at a time when none was required*, did not render counsel's assistance ineffective. This Court finds that the same was true in 2014 and 2015. Thus, [the] failure to so move does not constitute ineffective assistance."[137]

The court further found no deficient performance because defense counsel "exhibited meaningful representation during his cross-examination of [the cell-site] technician when he established that the People had failed to obtain mediation cell records (the product of more recent technology) and that the cell site data could not provide the precise distance of the cell tower . . . ."[138]

---

[134] Ex. A: Decision 6 (collecting state authority).

[135] Ex. A: Decision 11-16.

[136] *See Strickland v. Washington*, 466 U.S. 668 (1984).

[137] Ex. A: Decision 12 (emphasis in original).

[138] Ex. A: Decision 12-13.

27

As for counsel's handling of the Y-STR evidence, the court stated that "according to the record, trial counsel hired and consulted with a DNA expert and introduced statistical evidence at the trial purportedly demonstrating the deficiencies of the Y-STR DNA profiles. Motion counsel affirms that trial counsel [stated] he did not move to preclude the Y-STR DNA evidence on the grounds that it was more prejudicial than probative because the expert he hired did not advise him to file such a motion."[139]

The court again found counsel effective for failing to move to preclude the Y-STR evidence because counsel cross-examined the cell-site analyst: "Trial counsel effectively cross-examined the DNA criminalist and elicited that all paternal relatives of the Defendant would have the same Y-STR DNA profile and that thousands of males could have contributed the [profiles]."[140]

Next, counsel's failure to request that the court include impeachment evidence when responding to the jury note was not ineffective because "Mr. Herlich asked that the readback be limited so as to exclude the most damaging portion of the complainant's testimony. That request was denied. However, this Court agreed to the strategic page numbers and lines that counsel believed were responsive to the jury's note."[141]

---

[139] Ex. A:  Decision 13.

[140] Ex. A: Decision 13.

[141] Ex. A: Decision 13.

As for the failure to object in summation, the court found that "decisions regarding objections are strategic in nature and, in this instance, did not rise to the level of ineffective assistance."[142]

The court then addressed the sentencing claim. Although his advocacy was "brief," counsel "requested a sentence of ten to fifteen years . . . This Court, having presided over the trial, stated [at sentencing] that '[i]f ever a case cried out for the maximum sentence this is it. Not only because of the conduct that he demonstrated and was proven beyond a reasonable doubt to a jury of 12 people who unanimously found him guilty, *but also by the conduct that he exhibited here in this courtroom* as well as his criminal history.'"[143]

The court did not specifically address the claim that counsel failed to inform the court of Mr. Harrell's psychiatric condition or request his medical records.[144]

The court's opinion concluded by listing things counsel did throughout the trial that were not even the subject of the motion:

> In sum, there is nothing to demonstrate that the decisions trial counsel made were anything less than sound and strategic. Since the commencement of the case, trial counsel's representation was meaningful. In addition to the matters addressed above, trial counsel also moved to dismiss multiplicitous counts in the indictment; moved to preclude all of the complainant's statements to police and to limit the number of prompt outcry and excited utterance witnesses; persuaded this Court to redact portions of the complainant's narrative contained in the medical records; elicited from the complainant  on cross-examination that

---

[142] Ex. A: Decision 13-14 (citing *People v. Wright*, 25 N.Y.3d 769 (2015) and *People v. King*, 27 N.Y.3d 147 (2016)).

[143] Ex. A: Decision 14 (emphasis added).

[144] Ex. F: Bova Aff. ¶ 18 and Memo. of Law in Support of Motion at 34-35.

she had omitted certain details about the incident; and during cross-examination of the doctor who examined the complainant, elicited that the doctor did not observe any scratches on the complainant's neck.[145]

Mr. Harrell filed a timely application with the Appellate Division for a certificate granting leave to appeal.[146] That application renewed his ineffective-assistance claims in their entirety.[147] A Justice of the Appellate Division denied his application in an order entered on August 5, 2021.[148]

This timely habeas petition follows.

---

[145] Ex. A: Decision 15.

[146] Ex. I.

[147] Ex. I.

[148] Ex. J.

**ARGUMENT**

**POINT I**

**The 440 court's decision applied legal standards and reasoning that violate clearly-established Supreme Court law, thus rendering the decision an unreasonable application of, and contrary to, clearly-established law. De novo review therefore applies.**

## A. Governing Standards

### 1. Ineffective Assistance

Under *Strickland v. Washington*, counsel is ineffective if his deficient performance prejudices the defense.[149] The petitioner must establish that counsel's performance fell "below an objective standard of reasonableness."[150] Errors that are the result of "oversight, carelessness, ineptitude, or laziness" and not "'sound trial strategy'" constitute deficient performance.[151]

To establish prejudice, the defendant must show a "reasonable probability" of a different outcome, defined as a probability sufficient to "undermine confidence in the outcome."[152] A "defendant need not show that counsel's deficient performance more likely than not altered the outcome."[153] "'[T]he reasonable-probability standard is not

---

[149] 466 U.S. 668 (1984); U.S. Const. amend. VI.

[150] *Hinton v. Alabama*, 571 U.S. 263, 264, 273 (2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting in turn *Strickland*, 466 U.S. at 688)).

[151] *Cornell v. Kirkpatrick*, 665 F.3d 369, 377 (2d Cir. 2011) (quoting *Wilson v. Mazzucca*, 570 F.3d 490, 502 (2d Cir. 2009)).

[152] *Strickland*, 466 U.S. at 694.

[153] *Strickland*, 466 U.S. at 693.

the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different.'"[154] As a verdict must be unanimous, defendant need only show "a reasonable probability that at least one juror would have" voted to acquit.[155]

### 2. Section 2254(d)(1)'s Standards

A federal habeas court must issue a writ of habeas corpus if a conviction violates the federal constitution and 28 U.S.C. § 2254(d)(1)'s standards are overcome.[156]

Under § 2254(d)(1), the petitioner must show that the last state court decision on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."[157] "It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court.'"[158]

The habeas court must "train its attention on the particular reasons—both legal and factual—why state courts rejected [the] federal claims."[159] The "contrary-to" standard is satisfied when the state court applies a legal standard that violates clearly-established law or "arrives at a conclusion opposite to that reached by this

---

[154] *Wilson*, 570 F.3d at 507 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)).

[155] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

[156] 28 U.S.C. § 2241(c)(3), 2254(a),(d)(1).

[157] *Greene v. Fisher*, 565 U.S. 34, 40 (2011) (under AEDPA, the federal court must assess the last state decision on the merits, here, the Appellate Division's January 29, 2019 decision and the 440 court's January 29, 2021 decision).

[158] *Williams*, 529 U.S. at 391.

[159] *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (internal quotation marks omitted).

Court on a question of law."[160] Similarly, when the state court applies a legal standard that contradicts Supreme Court law, the unreasonable-application standard is satisfied.[161] When the state court applies a legal standard that violates clearly-established law, a federal court reviews the constitutional claim de novo—that is, without deference to the state court's decision.[162]

Alternatively, even if the state court correctly identifies the controlling standards, the writ must issue if the state court unreasonably applied those standards to the facts of the case.[163] Under this standard, Petitioner must show that no "fairminded jurist" could reach the conclusion that the state court reached.[164] The analysis requires deference, not "abdicat[ion]," of judicial review.[165]

When, as here, the state court resolves an ineffective-assistance claim on deficient-performance grounds alone, a federal habeas court reviews the prejudice determination de novo.[166]

---

[160] *E.g.*, *Williams*, 529 U.S. at 405-06, 412-13; *Lafler v. Cooper*, 566 U.S. 156, 173 (2012); *Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012).

[161] *Garlick v. Lee*, 1 F.4th 122, 135-36 (2d Cir. 2021); *Williams*, 529 U.S. at 395-397.

[162] *Garlick*, 1 F.4th at 133-36 (affording no deference to the state court's decision because it employed an unreasonable legal standard); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007); *Williams*, 529 U.S. at 405-06, 412-13 (a federal court is "unconstrained" by § 2254(d)(1) when the state court applies an invalidated legal standard).

[163] 28 U.S.C. § 2254 (d)(1). *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Ryan v. Miller*, 303 F.3d 231, 248 (2d Cir. 2002); *Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

[164] *Harrington v. Richter*, 562 U.S. 86 (2011).

[165] *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 256 n.83 (3d Cir. 2020).

[166] *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

**B. This Court should review the 440 court's no-deficient-performance finding de novo because the 440 court's "general-competency" analysis was both an unreasonable application of, and contrary to, *Strickland*.**

In assessing whether counsel was ineffective at trial and sentencing, the 440 decision employed legal standards and reasoning that violate clearly-established law. Thus, the decision was both an unreasonable application of, and contrary to, clearly-established law, requiring review without deference to the state court's decision.[167]

In his motion, Mr. Harrell identified numerous "acts and omissions" that constituted ineffective assistance.[168] Instead of analyzing whether those "identified acts or omissions" were objectively unreasonable—as *Strickland* commands[169]—the motion court veered off course and repeatedly considered whether counsel did *other things* competently, such as "move to dismiss multiplicitous counts," try to preclude hearsay, and redact medical records.[170] As the Second Circuit has held, this "reliance on counsel's competency in all other respects fails to apply the *Strickland* standard at all,"[171] thus rendering the decision "contrary to," and an unreasonable application

---

[167] *E.g.*, *Williams*, 529 U.S. at 390-91, 405-06, 412-13; 28 U.S.C. § 2254(d)(1).

[168] *Strickland*, 466 U.S. at 687-90.

[169] *Hinton*, 571 U.S. at 274 (an "objective standard of reasonableness" is the touchstone of the deficient-performance analysis); *Strickland*, 466 U.S. at 690 (after petitioner "identif[ies] the acts or omissions of counsel that [constitute ineffective assistance,] [t]he court must then determine whether, in light of all the circumstances, *the identified acts or omissions* were outside the wide range of professionally competent assistance.") (emphasis added).

[170] Decision 15 (offering a list of the things counsel purportedly did competently); Decision 14 (finding that counsel's failure to move to preclude the Y-STR evidence was not deficient performance because counsel later tried to cross-examine the analyst regarding the evidence's probative value); Decision 13 (rejecting the argument that counsel was deficient in failing to request that impeachment testimony be readback to the jury because he unsuccessfully tried to limit the response to exclude certain information).

[171] *Henry v. Poole*, 409 F.3d 48, 72 (2d Cir. 2005).

of, *Strickland*.[172] The Supreme Court made the same point in *Kimmelman v. Morrison*,[173] holding that the inquiry focuses on the "'identified acts or omissions'"; conduct beyond those acts/omissions is only relevant if it sheds light on whether the identified errors were reasonable.

Indeed, even a *single* prejudicial error may constitute ineffective assistance, regardless of whether counsel's overall performance "bespoke of general competency."[174] It would be, as *Rosario v. Ercole* held, "absurd" to suggest that a court can "look past" a prejudicial error if "counsel conducted himself in a way that bespoke of general competency throughout the trial."[175] Yet that is precisely the approach applied by the motion court here.[176]

As *Strickland* clearly rejects the motion court's theory that competency at some points of a proceeding can somehow offset deficient performance during others, the 440 decision unreasonably applied, and was contrary to, clearly established Supreme Court law.[177]

---

[172] 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06, 412-13; *see also Green v. Lee*, 964 F.Supp.2d 237, 258 (E.D.N.Y. 2013); *Kimmelman*, 477 U.S. at 386 (competent performance in one context cannot override deficient performance in others); *Ege v. Yukins*, 485 F.3d 364, 379 (6th Cir. 2007) ("[T]he fact that defense counsel chose to introduce counter-experts to [inadmissible] testimony does not insulate [from *Strickland* analysis] counsel's [failure to move to preclude that evidence in the first place]. There is no reason counsel could not simultaneously have objected to [that] testimony and attempted to rebut it with experts of his own."); *Strickland*, 466 U.S. at 690-91.

[173] 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

[174] *Rosario v. Ercole*, 601 F.3d 118, 124-26 (2d Cir. 2010).

[175] 601 F.3d at 124-26.

[176] Ex. A: Decision 13-15.

[177] 28 U.S.C. § 2254(d)(1).

And as shown below, either under de novo or deferential review, counsel's numerous blunders each constituted deficient performance.

## POINT II

**Regardless of the standard of review, the writ should issue because no fairminded jurist could find that counsel's errors were objectively reasonable.**

### A. The motion court's analysis of the Y-STR-preclusion blunder was an unreasonable application of *Strickland*.

No fairminded jurist could find that reasonable counsel would have omitted a Y-STR-preclusion argument on prejudice/probity grounds.[178]

The Y-STR-DNA evidence was obviously damaging. It was the *only* physical evidence corroborating the complainant's account of non-consensual sexual activity with Mr. Harrell. Any reasonable lawyer would have concluded that the defense had a lot to gain, and nothing to lose, by moving to preclude the Y-STR evidence.[179]

Counsel's omission was particularly unreasonable because a prejudice/probity argument was powerful.[180] This Y-STR evidence had virtually no probative value

---

[178] *See Panetti*, 551 U.S. at 953; *People v. Primo*, 96 N.Y.2d 351, 355 (2001) (courts must assess whether evidence's probative value is outweighed by the possibility of "undue prejudice," confusion, or "misleading the jury").

[179] *Kimmelman*, 477 U.S. at 385 (counsel was ineffective for failing to file a suppression motion for no valid strategic reason); *Ege v. Yukins*, 485 F.3d 364, 379 (6th Cir. 2007) ("[Where] physical evidence is presented linking a defendant to the crime scene, and it is the only physical evidence showing such a link, then defense counsel must object to its admission if no proper foundation has been laid by the presenter. Anything else is objectively unreasonable."); *White v. Thaler*, 610 F.3d 890, 907-08 (5th Cir. 2010) (failure to move to preclude evidence under state law was ineffective); *United States v. Hebshie*, 754 F.Supp.2d 89, 113 (D. Mass. 2010) (counsel was ineffective for failing to move to preclude forensic evidence).

[180] *Primo*, 96 N.Y.2d at 355.

because *millions* of males could have contributed the Y-STR profile that was located on complainant's body.

On the other hand, this DNA evidence was terribly misleading. Because DNA evidence can mislead the jury into believing that the prosecution's case is airtight, DNA evidence is "the most troubling forensic [evidence] to ever be used in a court of law."[181] And as the New York Court of Appeals recognized before Mr. Harrell's trial, Y-STR evidence has a particularly "powerful influence" on jurors and creates an "opportunity for juror confusion regarding [its] limited probative value."[182]

This case confirms the point. OCME's conclusion that Mr. Harrell's DNA "could not be excluded" because the Y-STR profiles were the "same" was likely to mislead the jury into finding a probative "match."[183] Furthermore, statistics like "1/685" and "1/321" made it appear that the Y-STR evidence thoroughly narrowed down the suspect pool.[184] But in reality, *millions* of males matched this Y-STR profile.

In sum, and especially given the "powerful influence of DNA evidence on juries," no reasonable attorney would have declined to seek preclusion on prejudice-probity grounds.[185]

Counsel's explanation for this omission—a scientific expert did not advise him to make this legal argument—reinforces the point.[186] Defense counsel, not DNA experts,

---

[181] *People v. Wright*, 25 N.Y.3d 769, 783 (2015) (internal quotations omitted).

[182] *Id.* at 771.

[183] Tamariz: A686-88; DNA Report: A1017-18.

[184] *Wright*, 25 N.Y.3d at 783.

[185] *Id.* at 771.

[186] Ex. F: Bova Aff. ¶ 16.

determine *legal* argument and strategy. Experts, on the other hand, provide scientific information that lawyers then use to make legal arguments.[187] Here, counsel had all the scientific information he needed to understand and advance a preclusion argument—in fact he specifically argued to the jury that the DNA evidence was "misleading."[188] Counsel just unreasonably failed to make that same argument in support of preclusion.

Finally, this record conclusively confirms that counsel did not make a strategic decision to *allow* the Y-STR evidence into evidence. Counsel specifically moved to preclude the DNA evidence on chain-of-custody grounds but omitted this powerful prejudice/probity argument.[189] Thus, counsel just missed this critical argument; he was not strategically seeking to have the jury learn about this damaging evidence. To the extent the motion court found otherwise, any such determination was an unreasonable determination of fact and law.[190]

### B. Counsel unreasonably overstated the probative value of the Y-STR evidence in summation.

The State has never contended, and no fairminded jurist could find, that a reasonable defense lawyer would overstate the probative value of DNA evidence by a magnitude of *thousands*.[191] In summation, counsel unreasonably argued that

---

[187] *E.g.*, *Harrington v. Richter*, 562 U.S. 86, 106 (2011); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001).

[188] A795.

[189] A679.

[190] *See* 28 U.S.C. § 2254(d)(1) & (2) ("an unreasonable determination of the facts" is not entitled to deference).

[191] A793-96.

"thousands" of New York City residents matched the Y-STR profile instead of arguing that *millions* of males throughout the world matched it.[192] Counsel further emphasized that the Y-STR results "don't rule out" Mr. Harrell or "any Hispanic male relatives and they don't rule out thousands of African males simply in the confines of New York City, let alone in the United States or in the world."[193] But OCME had never found that the Y-STR evidence could only be found in "African" or "Hispanic male relatives." Instead, OCME had summarized the rate at which this Y-STR profile would be found in four races (including Caucasian and Asian males).[194]

This was sloppy and damaging lawyering.[195] DNA evidence is devastating. But it's even more devastating when counsel senselessly leads the jury to conclude that it is far-more damaging than it really is. No reasonable lawyer proceeds in such a manner.

## C. Counsel unreasonably failed to request that impeachment evidence be included in the readback.

There "are few moments in a criminal trial more critical to its outcome than when the court responds to a deliberating jury's request. Indeed, the court's response may well determine whether a verdict will be reached, and what that verdict will be."[196] Here though, when the jury requested complainant's testimony regarding attempted

---

[192] A793-94 ("1 in 685 *African males*, thousands of individuals in New York City, could have contributed that DNA to the labia and vulva of the complaining witness if you want to speak scientifically about this. . . . 1 in 321 African males could have contributed the DNA to the Y chromosome of DNA [located in complainant's mouth]. . . . Thousands of people in New York City could have made the contribution, okay?").

[193] A795.

[194] A1017-18.

[195] *Cornell*, 665 F.3d at 377.

[196] *People v. Kisoon*, 8 N.Y.3d 129, 134-35 (2007).

penetration, counsel failed to argue that the court should read back testimony impeaching complainant's testimony on this very issue.[197] That impeachment testimony was critical as it undermined the credibility of the prosecution's star witness. Counsel even emphasized that impeachment point in summation and obtained an instruction regarding impeachment by omission. Nevertheless, he failed to ensure the impeachment testimony was read back during the critical deliberations stage, allowing the jury to only hear damaging testimony.[198] No fairminded jurist could find this senseless omission objectively reasonable.[199]

### D. No reasonable jurist could find that counsel's failure to object to the State's prejudicial summation was objectively reasonable. Further, the motion court unreasonably rejected this claim on "strategy" grounds.

In his 440 motion, Mr. Harrell alleged that counsel was ineffective for failing to object to the prosecutor's misconduct during summation:

- although the defense had never conceded that Mr. Harrell engaged in sexual activity with complainant and specifically contested that point, the prosecutor repeatedly stated that the question of whether Mr.

---

[197] *People v. Jones*, 297 A.D.2d 256, 257 (1st Dept. 2002) ("A request for a reading of testimony generally is presumed to include cross-examination which impeaches the testimony to be read back."); *People v. Smith*, 68 A.D.3d 1021, 1022 (2d Dept. 2009) (court's failure to read back impeachment material was reversible error); *compare* Complainant Direct: A410-21 (complainant testified to penile-vaginal contact ), *with* Complainant Cross: A444-45 (complainant testified that she "might not have" conveyed this allegation after the incident and could not remember whether she told the police about it), Barbato Cross: A594-95 (testifying that, during her interview of complainant at the hospital, complainant did not reference any such contact), *and* State Ex. 21: Emergency-Room Record: A974 (omitting such a reference).

[198] *E.g.*, *People v. Kisoon*, 8 N.Y.3d 129, 134-35 (2007) (there "are few moments in a criminal trial more critical to its outcome than when the court responds to a deliberating jury's request. Indeed, the court's response may well determine whether a verdict will be reached, and what that verdict will be").

[199] *Strickland*, 466 U.S. at 687-88.

Harrell engaged in sexual activity with complainant was "not really in dispute" and that identity was "not an issue";[200]

- the prosecutor cited several irrelevant teenage milestones to elicit an emotional reaction from the jury;[201]

- the prosecutor focused on the complainant's irrelevant attributes and plans for her future;[202] and

- the prosecutor emphasized the complainant's parents' irrelevant and emotional reactions to her allegations—complainant's father "rushed" to be by her "side" and her mother cried on the stand—even asking the jury to draw the baseless inference that the parents' reactions somehow proved that a sexual assault occurred.[203]

This repeated and damaging misconduct was clear error that any reasonable lawyer would have discerned.[204] Had counsel objected and sought curative instructions or a mistrial, there is a reasonable probability those requests would have

---

[200] *See* STATE SUMMATION: A800 ("He's not claiming that someone else did this. It was me but I did not do it."), A806 ("But is he suggesting that he came into the apartment, had the Smoothie, coffee cup with him and then someone else came in and sexually assaulted her? No, no one is saying that"), A808 ("Identity is not an issue."); DEFENSE SUMMATION: A791-99 (arguing that the prosecution could not prove either identity or non-consent and never conceding anything beyond the fact that Mr. Harrell, at some point, touched the straw and the cup).

[201] A799 ("She hadn't even had her Sweet 16th yet. She wasn't even old enough to drive. She just finished her first year of high school. She was only [15].").

[202] A800 ("She . . . spent two weeks in Montana volunteering for senior center and a day-care center, building sheds in a Native American reservation. [She] wants to be productive even during her summer vacation. So after coming back from Montana, she had plans to go to summer camp. She's the girl who hopes to go to college after she finishes high school.").

[203] A815; *id.* ("[Complainant's mother's] reaction speaks volumes about the non-consensual nature of the sex acts."); *id.* ("Both [complainant] and her mother told you that her father, who at that time lived in Georgia, rushed to be by [complainant's] side. Again, evidence that [complainant] was sexually assaulted.").

[204] *E.g.*, *People v. Fisher*, 18 N.Y.3d 964, 967 (2012) (prosecutor cannot make emotional appeals or ask the jury to draw baseless inferences) (quoting *People v. Ashwal*, 39 N.Y.2d 105, 109-10 (1976)); *People v. LaPorte*, 306 A.D.2d 93, 96 (1st Dept. 2003); *People v. Pimentel*, 282 A.D.2d 280, 281 (1st Dept. 2001) (prosecutor cannot indicate that a defendant has "conceded issues that were in fact contested"); *People v. Levy*, 202 A.D.2d 242, 245 (1st Dept. 1994) (same).

been granted. No fairminded jurist could find that counsel's silence here was objectively reasonable.[205]

The motion court nevertheless found, with cryptic language, that "trial counsel's decision not to object to these remarks did not amount to ineffective assistance. Trial counsel's decisions regarding objections are strategic in nature and, in this instance, did not rise to the level of ineffective assistance."[206]

This finding was contrary to, and an unreasonable application of, *Strickland*. It does not matter whether an error *could* have been strategic or was "strategic in nature." Instead, the inquiry is whether the omission was as a factual matter, the product of a conscious strategic choice (e.g., not due to a lack of legal knowledge or laziness) *and* whether that conscious strategy was reasonable.[207] The motion court's legal error here was contrary to, and an unreasonable application of, *Strickland*.

---

[205] *E.g.*, *Stermer v. Warren*, 959 F.3d 704, 736 (6th Cir. 2020) ("The failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel under *Strickland*. This is because 'when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant.'") (quoting *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005); *Hodge*, 426 F.3d at 385-86 ("We are unable to articulate a sound professional reason why defense counsel did not object to this pattern of repeated misconduct, and accordingly we must conclude that counsel's failure to object was 'outside the wide range of professionally competent assistance'") (quoting *Strickland*, 466 U.S. at 690).

[206] Ex. A: Decision 13-14 (citations omitted).

[207] *E.g.*, *Hinton*, 571 U.S. at 273-75 (failure to consult an expert was ineffective assistance because, in the particular case at hand, counsel failed to do so because of mistaken legal analysis); *Williams*, 529 U.S. at 395; *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *see also Rivas v. Fischer*, 780 F.3d 529, 547-50 (2d Cir. 2015); *Cornell*, 665 F.3d at 377; *Wilson*, 570 F.3d at 501-06; *Wilson v. Mazzuca*, 119 Fed.Appx. 336, 338 (2d Cir. Jan 5, 2005) (unpublished).

**E. The 440 court's determination that counsel reasonably failed to preserve a cell-site-data-suppression argument was an unreasonable application of, and contrary to, *Carpenter* and *Strickland*.**

Counsel unreasonably failed to preserve the argument that the cell-site records should be suppressed.[208] Counsel spotted the argument that the State unconstitutionally obtained the cell-site evidence because it did not obtain a probable-cause warrant.[209] But although ample authority supported a suppression claim,[210] counsel consciously declined to preserve a suppression argument on Fourth Amendment/state-constitutional grounds.[211] Had counsel preserved the record, Mr. Harrell would have secured reversal on appeal under *Carpenter v. United States*.[212] Counsel's omission here was deficient performance.

The 440 court's determination that counsel reasonably sat silent was "contrary to" clearly-established law, thus requiring review without deference.[213] In the motion

---

[208] *Strickland*, 466 U.S. at 687-91.

[209] Ex. F: BOVA AFF. ¶ 14 (counsel stated that he chose not to raise this argument because it would not prevail under then-existing First Department Appellate Division precedent).

[210] *United States v. Graham*, 796 F.3d 332, 345-61 (4th Cir. August 5, 2015 [one month before trial]) ("[T]he government engages in a Fourth Amendment search when it seeks to examine historical CSLI pertaining to an extended time period like 14 or 221 days . . . Its inspection by the government, therefore, requires a warrant, unless an established exception to the warrant requirement applies."), *rehg. en banc granted after Mr. Harrell's trial*, 624 Fed. Appx. 75 (4th Cir. Oct. 28, 2015), *revd. en banc by* 824 F.3d 421 (May 31, 2016); *United States v. Davis*, 754 F.3d 1205, 1217 (11th Cir. June 11, 2014) (the State needs a warrant to request cell-site data), *revd. en banc*, 785 F.3d 498 (11th Cir. 2015); *In re United States for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F.Supp.2d 113 (E.D.N.Y. 2011); *see also People v. Weaver*, 12 N.Y.3d 433, 441-42 (2009) ("The massive invasion of privacy entailed by the prolonged use of the GPS device was inconsistent with even the slightest reasonable expectation of privacy.").

[211] *See* U.S. CONST. AMEND. 4; N.Y. CONST. ART. I § 6; Ex. F: BOVA AFF. ¶ 14 (counsel stated that he chose not to raise this argument because it would not prevail under then-existing First Department Appellate Division precedent); *see People v. Hall*, 86 A.D.3d 450 (1st Dept. 2011).

court's view, *Carpenter* held that counsel cannot be ineffective for failing to move to suppress cell-site evidence pre-*Carpenter*.[214] That basic misreading of *Carpenter* was contrary to *Carpenter* itself.[215] *Carpenter* did not address ineffective assistance at all. Instead, *Carpenter* considered whether the Fourth Amendment required the government to obtain a warrant before accessing cell-site data. The 440 court's rather egregious misreading of *Carpenter* was contrary to the plain text of that opinion.[216]

Similarly, it is irrelevant whether *Carpenter* suggested that its rule does not apply "retroactively" to cases on collateral review.[217] That retroactivity analysis does not control deficient-performance analysis.[218] The controlling question under *Strickland*, which the motion court did not even address, is whether an objectively reasonable attorney would have consciously failed to preserve this suppression argument for appeal.[219]

---

[212] 138 S.Ct. 2206 (2018) (the State cannot obtain cell-site-locational information without a warrant based upon probable cause, thus rendering 18 U.S.C. § 2703, which merely required reasonable suspicion and was employed here, unconstitutional); *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987) (federal constitutional decisions handed down during the pendency of a direct appeal govern the appeal).

[213] 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06, 412-13.

[214] Ex. A: Decision 11-12.

[215] *Williams*, 529 U.S. at 405-06, 412-13.

[216] *Williams*, 529 U.S. at 405-06.

[217] Ex. A: Decision 12 (noting this reotractivity point); *Teague v. Lane*, 489 U.S. 288 (1989).

[218] *Compare Teague*, 489 U.S. 288 *with Strickland*, 466 U.S. at 687-88.

[219] *Strickland*, 466 U.S. at 687-91; *Flores v. Demskie*, 215 F.3d 293, 305 (2d Cir. 2000) (counsel was ineffective for failing to preserve an argument for appellate review); A.B.A. CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION STANDARD 4-1.5 (4th ed.) (counsel must preserve the record for appeal); New York State Bar Association, REVISED STANDARDS FOR PROVIDING MANDATED REPRESENTATION I-7(h)

As the court's analysis of this claim was contrary to clearly-established Supreme Court law, de novo review applies.

In any event, Petitioner prevails regardless of the standard of review because any no-deficient-performance finding would be unreasonable.[220] Counsel had nothing to gain, and everything to lose, by staying quiet here. All counsel had to do was file a short motion to preserve the record for appeal. Only "oversight, carelessness, ineptitude, [ ] laziness," or a disregard for appellate rights, could explain this conscious omission.[221]

## POINT III

### Trial counsel's blunders undermine confidence in this verdict.

As the 440 court did not consider prejudice under *Strickland*, that issue is reviewed de novo.[222] Here, counsel's blunders, viewed collectively or individually, undermine confidence in the verdict.[223] Thus, the prejudice standard is satisfied.[224]

---

(2015) (same); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (relying on ABA standards as "guides to determin[e] what is reasonable") (quoting *Wiggins*, 539 U.S. at 524).

[220] 28 U.S.C. § 2254(d)(1).

[221] *Cornell*, 665 F.3d at 377; *Flores*, 215 F.3d at 305; A.B.A. Criminal Justice Standards for the Defense Function Standard 4-1.5; New York State Bar Association, Revised Standards for Providing Mandated Representation I-7(h); *Rompilla*, 545 U.S. at 387.

[222] *Rompilla*, 545 U.S. at 390.

[223] *Strickland*, 466 U.S. at 693-96.

[224] *Id.*

### A. The evidence that Mr. Harrell engaged in non-consensual sexual activity with complainant was underwhelming.

The State's evidence that Mr. Harrell engaged in non-consensual sexual activity with complainant was underwhelming, resting on a single witness.[225]  As in *Gersten v. Senkowski*, *Eze v. Senkowski*, and *Lindstadt v. Keane*—three AEDPA cases where the Second Circuit found that deficient performance in a sexual-assault case prejudiced the defense—this case centered on a single witness' credibility.[226]

And unlike in that trilogy of cases, there was a viable consent theory here. This case did not involve a young child complainant but a high-school-aged complainant who had a longstanding personal relationship with Mr. Harrell. The two were family friends, Mr. Harrell had previously been in complainant's apartment, and on the day in question she invited him into the apartment for a beverage. This factual background supported a viable defense theory: consensual sex occurred and then, due to shame or regret, the complainant accused Mr. Harrell of nonconsensual sex or overstated the extent of their sexual activity.

---

[225] *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Gersten v. Senkowski*, 426 F.3d 588, 613-14 (2d Cir. 2005).

[226] *Gersten*, 426 F.3d 588, 613-14 (2d Cir. 2005) ("Respondent characterizes the evidence against petitioner as 'overwhelming.' On the contrary, the evidence . . . here was no stronger than it was in *Lindstadt*, which we characterized as 'a case of underwhelming evidence.' (quoting 239 F.3d 191, 205 (2d Cir. 2001)). In *Lindstadt*, as here, the prosecution presented the victim's eyewitness testimony, corroborative testimony from the victim's mother and the medical expert who examined her, and bolstering testimony from an expert on child psychology (citing *Lindstadt*, 239 F.3d. at 195). In *Lindstadt*, as here, the only direct evidence against petitioner consisted of the eyewitness testimony of the victim, which was not corroborated by testimony from any other eyewitnesses."); *Eze v. Senkowski*, 321 F.3d 110, 137-38 (2d Cir. 2003).

Not only that, but the State's single witness was repeatedly impeached. Her testimony regarding sexual activity was inconsistent with her account after the purported incident.[227] And her allegations of the use of force, such as choking, were inconsistent with the photographic and medical evidence.[228]

In this underwhelming case, counsel's blunders, either collectively or individually, undermine confidence in verdict.[229] As shown further below, counsel's blunders either resulted in lost opportunities to attack, or enhanced, the credibility of the State's sole witness. "In a case where the overall body of evidence against petitioner was 'underwhelming,' . . . petitioner was prejudiced by counsel's errors."[230]

## B. Counsel's blunders undermine confidence in the jury's verdict.

Counsel's numerous blunders significantly enhanced the State's theory that Mr. Harrell engaged in sexual activity with complainant.

First, counsel's failure to preclude the Y-STR evidence was particularly damaging because that misleading evidence helped the State convince the jury that Mr. Harrell engaged in sexual activity with complainant. Without the Y-STR evidence, the State's evidence of sexual activity would have rested exclusively on complainant's impeached

---

[227] Complainant: A444-45 (testifying that she might not have told the detective about penile-vaginal contact and did not recall whether she made that allegation); Det. Barbato: A594-95 (testifying that the complainant never made this allegation).

[228] *Compare* A409-10 (testifying that she was choked with two hands and could not breathe), A430 (testifying that her neck was "sore" and "felt bruised"), *with* Dr. Singh: A720 (testifying that there were no observed injuries on the neck and that he could not recall "any redness"), A1008-12 (three photographs that indicate, at best, a small scratch and no evidence of choking); A433-34.

[229] *See Gersten*, 426 F.3d at 613-14.

[230] *Id.* at 614.

testimony.[231] This blunder thus "go[es] to something as important as the [scientific] evidence in this case—the only objective evidence that a crime occurred and the only evidence directly corroborating any aspect of the victim's story."[232]

Counsel's drastic overstatement of the Y-STR evidence's probative value further enhanced the damage worked by this inadmissible DNA evidence. In reality, millions of males of all races matched the Y-STR profiles found on complainant's labia and mouth. But inexplicably, defense counsel limited the suspect pool to just "thousands" of "African-American" and "Hispanic" males.[233] Inflating the harm of DNA evidence by magnitudes of thousands is highly prejudicial.

Counsel's failure to object to the prosecutor's summation also undermines confidence in the verdict. In summation, the State repeatedly told the jury that the question of whether Mr. Harrell engaged in sexual activity with complainant was conceded.[234] In effect, the State's summation deleted a contested—and contestable— issue from the jury's deliberations. These repeated misrepresentations indicated to the jury that it should assume that: (1) Mr. Harrell engaged in sexual activity with complainant; and (2) Mr. Harrell did not merely engage in hugging and/or kissing

---

[231] *Gersten*, 426 F.3d at 613-14; *Hodge*, 426 F.3d at 386 ("The lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level."); *Wright*, 25 N.Y.3d at 783 ("The persuasiveness of DNA evidence is so great that as one commentator noted, '[w]hen DNA evidence is introduced against an accused at trial, the prosecutor's case can take on an aura of invincibility'") (quoting Aronson & McMurtrie, *The Use and Misuse of High-Tech Evidence By Prosecutors: Ethical and Evidentiary Issues*, 76 Fordham L Rev 1453, 1469 (2007)).

[232] *Gersten*, 426 F.3d at 613-14.

[233] A793-95.

[234] A800, A806, A808; *compare* Defense Summation: A791-99.

(thus rendering him not guilty of the B and C-felony counts). The State's summation deleted these factual issues from the case.

Counsel's blunders also undermine confidence in the jury's finding that the State disproved consent beyond a reasonable doubt. When the jury asked for the complainant's testimony about penile-vaginal contact—testimony that was repeatedly impeached at trial—counsel never asked for the impeachment testimony to be included in the readback. As complainant's credibility regarding the consent question was a critical issue, counsel's omission during the deliberations stage gravely damaged the defense.

The prosecutor's prejudicial summation commentary had a decided tendency to prejudice the defense on both contested elements. To bolster the complainant's credibility, the prosecution unfairly relied upon her reaching teenage milestones;[235] her positive attributes and plans for her future, including college plans and her volunteering during summers;[236] and her parents' emotional reactions to her allegations (her father "rushed" to be by her "side" and her mother cried on the stand).[237] In this close case, this prejudicial and emotional commentary likely moved the jury to convict.

In sum, counsel's repeated errors at trial undermine confidence in this verdict.

---

[235] A799.

[236] A800.

[237] A815.

### C. Counsel's failure to preserve the *Carpenter* claim deprived Mr. Harrell of a meritorious claim for reversible error on appeal.

Counsel's failure to move to suppress the cell-site evidence on Fourth Amendment grounds also prejudiced the outcome of these proceedings. Had counsel preserved this argument for appellate review, Mr. Harrell would have had a meritorious appellate claim requiring reversal on appeal.[238] As counsel's preservation blunder prejudiced the appeal, relief is required under *Strickland*.[239]

### POINT IV

### Sentencing counsel was ineffective.

### A. Governing Principles

The right to effective assistance of counsel at sentencing is fundamental.[240] "[T]he necessity for the aid of counsel in marshaling the facts, introducing evidence of

---

[238] *People v. Crimmins*, 36 N.Y.2d 230, 241-42 (1975) (constitutional error is not harmless unless the evidence is overwhelming and there is no reasonable possibility the error contributed to the verdict); A815-17 (prosecutor argued that the cell-site evidence (1) confirmed Mr. Harrell was inside complainant's apartment building at the time of the purported incident and (2) fled because he "knew that what he had done was wrong, that there was no consensual sex of any kind").

[239] *Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003) (where counsel unreasonably fails to preserve a claim for appellate review, the prejudice inquiry turns on whether there is a reasonable probability that the preserved issue would have prevailed on appeal); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (counsel's failure to protect appellate rights by filing a notice of appeal constitutes ineffective assistance of counsel).

[240] *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013); *Glover v. United States,* 531 U.S. 198, 202-04 (2001); *Mempa v. Rhay,* 389 U.S. 128, 134 (1967).

mitigating circumstances and in general aiding and assisting the defendant to present his case as to sentence is apparent."[241]

The Supreme Court and Circuit Courts have repeatedly held that sentencing counsel must diligently prepare and perform reasonable investigations.[242] If counsel forms a "strategy" without first conducting a reasonable investigation or failing to diligently prepare, that strategy is unreasonable.[243]

To establish prejudice in this context, a defendant must show a reasonable probability that counsel's deficient performance increased the sentence, even if just by a few days.[244]

**B. Sentencing counsel provided deficient performance.**

Sentencing counsel's performance was objectively unreasonable, a point the State never even contested in state court.[245]

---

[241] *Mempa*, 389 U.S. at 135; *Pepper v. United States*, 562 U.S. 476, 480 (2011) ("'highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'") (quoting *Williams v. New York*, 337 U.S. 241, 246-47 (1949)).

[242] *Rompilla*, 545 U.S. at 388-90 (counsel was ineffective for failing to analyze readily-available documents relevant to sentencing; "[i]t flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking"); *Wiggins*, 539 U.S. at 523-34 (sentencing counsel's failure to investigate mental-health records was deficient performance); *Williams*, 529 U.S. at 395-98; *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002) (counsel was ineffective for failing to investigate client's mental-health history); *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (where "counsel [was] confronted repeatedly with indications of Gray's mental impairment. . . . [C]ounsel ignored these red flags and failed to investigate").

[243] *Wiggins*, 539 U.S. at 527-28; *Strickland*, 466 U.S. at 690-91.

[244] *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Lafler v. Cooper*, 566 U.S. 156, 167-68 (2012).

[245] Ex. G: State's Opp. to Motion to Vacate.

51

A lot was on the line at this sentencing proceeding. A total of 15 years of incarceration was at stake as the minimum prison sentence was 10 years and the maximum was 25. Nevertheless, counsel's advocacy was "practically non-existent" as he did not "offer a shred of mitigating evidence."[246] Instead—confirming the court's already negative view of Mr. Harrell's misbehavior and character—counsel disparaged his client as "angry."[247]

Counsel's non-advocacy was particularly deficient because it was the direct result of incompetent preparation. Counsel committed the "amazing dereliction"[248] of failing to review the presentence report—the most basic step in sentencing advocacy.[249] Thus, he was unaware of the report's discussion of his own client's "paranoid schizophrenia" diagnosis.[250]

Had counsel reviewed the report, he would have taken the next logical step of requesting medical records. In turn, he would have uncovered critical information:

---

[246] *Patrasso v. Nelson*, 121 F.3d 297, 303 (7th Cir. 1997); *see also Miller v. Martin,* 481 F.3d 468, 473 (7th Cir.2007) (per curiam).

[247] *See* Memo. of Law, *above*, at 19-21 (detailing the arguments between the court, petitioner, and the court officers and the court's negative view of petitioner's behavior); SENTENCING TR: A940, A943 ("I asked him, don't you want to be present for sentencing. He was angry, he stood up in the small interview booth that we are in together and just walked out. . . . I ask that the sentence of this Court be in the range of ten years up to 15 years, plus the period of five years post release supervision.").

[248] *Lindstadt*, 239 F.3d at 201.

[249] *Constant v. Martuscello*, 119 F.Supp.3d 87, 132 (E.D.N.Y. 2015) ("'The presentence report may well be 'the single most important document at both the sentencing and correctional levels of the criminal process.'") (quoting *People v. Hicks*, 98 N.Y.2d 185, 189 (2002)).

[250] *See* Bova Aff. ¶ 16 (sentencing counsel stated that he was unaware of any mental-health diagnoses); PSI Report: A1028 ("[Defendant] informed while at liberty he was treated for paranoid schizophrenia and depression on a monthly basis").

Mr. Harrell had been formally diagnosed with bipolar disorder and chronic schizoaffective disorder.[251] Any reasonable lawyer would have viewed those diagnoses as critical because they would have mitigated Mr. Harrell's purportedly disruptive and disrespectful conduct—conduct that clearly disturbed the court.[252] But instead of locating this critical mitigating evidence, counsel offered *no* mitigation and offered only *aggravating* evidence regarding his client's anger. This was classic deficient performance.

The 440 court's vague no-deficient-performance finding was either contrary to, or an unreasonable application of, clearly-established law.[253] The 440 court suggested sentencing counsel was effective because although his advocacy was "brief," he "requested a sentence of ten to fifteen years." The court then quoted its statements

---

[251] Medical Records: A1037, A1043.

[252] *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS V at p. 105 (eff. 2013) (the symptoms of "schizoaffective disorder" include: "**A.** An uninterrupted period of illness during which there is a major mood episode (major depressive or manic) concurrent with Criterion A of schizophrenia [cited below]"; "**B.** Delusions or hallucinations for 2 or more weeks in the absence of a major mood episode (depressive or manic) during the lifetime duration of the illness. **C.** Symptoms that meet criteria for a major mood episode are present for the majority of the total duration of the active and residual portions of the illness. **D.** The disturbance is not attributable to the effects of a substance (e.g., a drug of abuse, a medication) or another medical condition."); DSM V at p. 99 ("Schizophrenia. Diagnostic Criteria. **A.** Two (or more) of the following, each present for a significant portion of time during a 1-month period (or less if successfully treated). At least one of these must be (1), (2), or (3): **1.** Delusions. **2.** Hallucinations. **3.** Disorganized speech (e.g., frequent derailment or incoherence). **4.** Grossly disorganized or catatonic behavior. **5.** Negative symptoms (i.e., diminished emotional expression or avolition)."); DSM V at p. 123 ("Bipolar I Disorder. Diagnostic Criteria. For a diagnosis of bipolar I disorder, it is necessary to meet the following criteria for a manic episode. The manic episode may have been preceded by and may be followed by hypomanic or major depressive episodes. Manic Episode. A. A distinct period of abnormally and persistently elevated, expansive, or irritable mood and abnormally and persistently increased goal-directed activity or energy, lasting at least 1 week and present most of the day, nearly every day (or any duration if hospitalization is necessary).").

[253] 28 U.S.C. § 2254(d)(1).

on the record and never explained why they bore on deficient performance.[254] At no point did the court ever consider whether an objectively reasonable lawyer, given prevailing professional norms, would have failed to review the presentence report and/or make no mitigation argument.[255] As the court never applied *Strickland*'s deficient-performance standards, *de novo* review applies.[256]

In any event, no fairminded jurist could find it reasonable to: (1) fail to read the presentence report; (2) miss the obvious and important mental-health lead provided there; (3) make no argument in mitigation due to an incomplete investigation; and then (4) describe the client as "angry" just before sentence was imposed. Accordingly, regardless of the standard of review, § 2254(d)(1) is satisfied.[257]

### C. Counsel's deficient performance requires vacatur of the sentence.

As the motion court did not reach prejudice, de novo review applies.[258]

First, this was *Cronic* error and is immune from prejudice analysis.[259] Under *Cronic*, prejudice is presumed where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."[260] Here, counsel's utter silence

---

[254] Ex. A: Decision 14.

[255] *Strickland*, 466 U.S. at 687-91.

[256] *E.g.*, *Lafler*, 566 U.S. at 173 ("By failing to apply *Strickland* to assess the ineffective-assistance-of-counsel claim respondent raised, the state court's adjudication was contrary to clearly established federal law. And in that circumstance the federal courts in this habeas action can determine the principles necessary to grant relief."); *Henry*, 409 F.3d at 72; *Williams*, 529 U.S. at 405-06, 412-13.

[257] *Panetti*, 551 U.S. at 953.

[258] *Rompilla*, 545 U.S. at 390.

[259] *United States v. Cronic*, 466 U.S. 648, 658-60 (1984); *Patrasso*, 121 F.3d at 303-05.

[260] 466 U.S. at 659.

meets this standard. Counsel did not even try to "mitigate his client's punishment."[261] This fundamental breakdown in the adversarial process constituted a total "fail[ure] to subject the prosecution's case to meaningful adversarial testing."[262] Sentencing counsel was "in effect absent."[263]

In any event, counsel's blunders here undermine confidence in the outcome, thus establishing prejudice under *Strickland*.[264] Had counsel presented the powerful mitigating mental-health evidence that basic preparation would have uncovered, an important component of the State's request for a maximum sentence would have been seriously undermined.[265] The court would have been hard-pressed to enhance Mr. Harrell's sentence based on courtroom "misbehavior" and "disrespect" had it known of his serious mental-health diagnoses. There is thus a reasonable probability that effective lawyering would have reduced the sentence by at least a year. And that's all that matters as far as prejudice goes.[266]

The sentencing court's "comments during sentencing reveal the prejudice that flowed from [counsel's] failure to provide the court with evidence of [Mr. Harrell's] schizophrenic [and bipolar] history."[267] As the motion court recounted in its 440

---

[261] *Patrasso*, 121 F.3d at 303-04 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir. 1996)).

[262] *Cronic*, 466 U.S. at 659.

[263] *Patrasso*, 121 F.3d. at 303-05

[264] 466 U.S. at 693-94.

[265] A944, A952.

[266] *Glover*, 531 U.S. at 203-04 ("any amount of actual jail time has Sixth Amendment significance" and can constitute prejudice under *Strickland*).

[267] *Brown v. Sternes*, 304 F.3d 677, 697 (7th Cir. 2002).

decision, "This Court, having presided over the trial, stated that 'If ever a case cried out for the maximum sentence this is it. Not only because of the conduct that he demonstrated and was proven beyond a reasonable doubt to a jury . . . *but also by the conduct that he exhibited here in this courtroom* as well as his criminal history."[268] The motion court expressly justified its sentence by citing the "conduct that he exhibited here in this courtroom," precisely the factor counsel's deficient performance failed to mitigate. The court's on-the-record justifications for its sentence "reveal the prejudice" worked by counsel's sentencing blunders.[269]

As sentencing counsel was ineffective, the writ should issue and the State must hold a de novo sentencing proceeding.

---

[268] A952.

[269] *Brown*, 304 F.3d at 697.

## POINT V

### At a minimum, a hearing should be ordered on the deficient-performance question.

At a minimum, to the extent there are any outstanding issues of material fact, a hearing should be ordered so counsel can testify.[270]

"Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court."[271] Here, Mr. Harrell requested a hearing at every stage of the state post-conviction litigation and was denied one.[272] This Court now has the power to order a hearing on this meritorious claim of ineffective assistance and should, if it finds there are outstanding issues of fact, do so here.

---

[270] *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) ("'Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court.'") (quoting *Townsend v. Sain*, 372 U.S. 293, 312 (1963)); *Cox v. Donnelly*, 387 F.3d 193, 201 (2d Cir. 2004) ("We concede that it is unlikely that counsel will be able to offer an explanation to defeat the conclusion that his performance was a result of ignorance, inattention or ineptitude. Nevertheless, our cases require that except in highly unusual circumstances, the assertedly ineffective counsel should be afforded an opportunity to present evidence, in the form of live testimony, affidavits, or briefs.") (internal quotation marks and citations omitted); *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992) ("When the factual allegations of a habeas petition, if proved, would entitle a petitioner to relief, a federal court is required to hold an evidentiary hearing if the petitioner did not receive an adequate state court evidentiary hearing, that is, one that is full and fair."); *Maddox v. Lord*, 818 F.2d 1058, 1061 (2d Cir. 1987); *cf. Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004) (under AEDPA, a federal habeas court "is required to give deference to findings of fact made by the state *court after a full and fair hearing* at which the material facts were adequately developed") (emphasis added).

[271] *Townsend v. Sain*, 372 U.S. 293, 312 (1963).

[272] Ex. F: Petitioner's Memo. of Law at 36; Ex. I: Motion for Certificate Granting Leave to Appeal at 24, 32.

**POINT VI**

**The Appellate Division unreasonably determined that Mr. Harrell lacked the right to be present when the court formulated a critical response to a readback of complainant's testimony.**

### A. Clearly-Established Principles

"A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."[273] The due process right to presence is "scarcely less important to the accused than the right of trial itself."[274]

A defendant has the right to "be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."[275] Similarly, the right applies where absence "might" "thwart" "fundamental fairness."[276] The right does not apply where the defendant's "presence would be useless, or the benefit but a shadow."[277]

### B. The Appellate Division unreasonably applied clearly-established law.

Here, on direct appeal, the Appellate Division unreasonably determined that Mr. Harrell had no right to be present when the court formulated a response to the jury's note requesting complainant's testimony "regarding the position of defendant's penis

---

[273] *Lewis v. United States*, 146 U.S. 370, 372 (1892).

[274] *Diaz v. United States*, 223 U.S. 442, 455 (1912).

[275] *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1932).

[276] *Faretta v. California*, 422 U.S. 806, 816 (1975).

[277] *Snyder*, 291 U.S. at 106-07.

in relation to [complainant's] vulva slash vagina."[278] Far from "useless," Mr. Harrell could have played an important role at the response-formulation proceeding held in his absence.[279] Mr. Harrell was present during the complainant and Detective Barbato's testimony and specifically heard both confirm that the complainant never reported any penile-vaginal contact after the incident. Thus, Mr. Harrell could have: (1) understood nuances in the jury's question that counsel missed; (2) suggested alterations to the response; (3) requested clarifications of the question; or (4) informed counsel of responsive testimony, such as testimony impeaching the testimony requested (testimony that complainant did not report penile-vaginal contact). As Mr. Harrell's presence "ha[d] a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," he had the right to be present.[280]

The obvious differences between this case and *Snyder v. Massachusetts*[281] and *United States v. Gagnon*[282] reinforce the point. In *Snyder*, the accused claimed a right to be present during a jury's inspection of the crime scene. During the inspection, "nothing is said by any one to direct the attention of the jury to one feature or another."[283] As the accused could "do nothing" to help the defense, he had no presence right.[284]

---

[278] A885; 28 U.S.C. § 2254(d)(1).

[279] *Snyder*, 291 U.S. at 105-06.

[280] *Snyder*, 291 U.S. at 105-06.

[281] 291 U.S. 97 (1932).

[282] 470 U.S. 522 (1985).

[283] 291 U.S. at 108.

[284] *Id.* at 108.

*Gagnon* is to the same effect. *Gagnon* held that the defendant had no right to be present when the court asked a juror about the juror's reaction to the defendant's drawing sketches of the jury during the trial.[285] Gagnon "could have done nothing" and would not have "gained anything by attending."[286]

The proceeding at issue here is significantly distinct from those in *Snyder* and *Gagnon*. Here, Mr. Harrell had a role to play at the response-formulation stage because he sat through the testimony of more than a dozen witnesses and could have, among other things, highlighted important responsive testimony that counsel failed to spot. As this proceeding would determine what the jury would hear while deliberating, and as Mr. Harrell could have impacted that result, "his presence ha[d] a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."[287]

This due-process violation is structural error, immune from harmless-error analysis. An error is structural when it "affect[s] the framework within which the trial proceeds" and renders a trial "fundamentally unfair."[288] A defendant's presence during important stages of a trial goes to the heart of the trial's framework and affects

---

[285] 470 U.S. at 527.

[286] *Id.*

[287] *Snyder*, 291 U.S. at 105-06.

[288] *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991); *Rose v. Clark*, 478 U.S. 570, 577 (1986)

its fundamental fairness.[289] No reasonable person dubs it "fair" to decide important matters of life and liberty in the absence of the very person whose liberty is at stake.

Further, the "effects of [this] error are simply too hard to measure" as a court must speculate whether a defendant would personally have impacted the proceeding's result.[290] "Because the government will, as a result, find it almost impossible to show that the error was 'harmless beyond a reasonable doubt,' the efficiency costs of letting the government try to make the showing are unjustified."[291]

In any event, the State cannot carry its "significant burden" of proving harmless error.[292] As the State cannot disprove that Mr. Harrell would have informed his counsel that impeachment evidence should have been read back to the jury in response to the note, the prosecution cannot carry its harmless-error burden.[293]

---

[289] *Fulminante*, 499 U.S. at 309-10; *Rose*, 478 U.S. at 577; *Lewis*, 146 U.S. at 372 ("A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner.").

[290] *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1908 (2017); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149, n. 4 (2006) (a violation of the right to counsel of one's choosing is structural error because assessing prejudice would constitute "a speculative inquiry into what might have occurred in an alternate universe"); *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (an error is structural where the precise "effect of the violation cannot be ascertained").

[291] *Weaver*, 137 S.Ct. at 1908 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[292] *Alvarez v. Ercole*, 763 F.3d 223, 233 (2d Cir. 2014) (internal quotation marks omitted); *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

[293] *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995) (on habeas review, if "a judge has 'grave doubt' about whether an error" substantially affected a jury, the error is not harmless); *Chapman*, 386 U.S. at (any doubts in the harmless-error question must be resolved against the State, that is, the "beneficiary of the error.").

## CONCLUSION

The petition for a writ of habeas corpus should be granted.
At a minimum, an evidentiary hearing should be ordered.

Respectfully submitted,
Robert S. Dean (RD-0772)
*Attorney for Petitioner*
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523
rdean@cfal.org

BY:

_____
Matthew Bova (5073135)
*Of Counsel*
mbova@cfal.org

August 9, 2021