# United States District Court
# For the Southern District

---

LONNIE HARRELL,

*Petitioner,*

*-against-*

MARK MILLER, Superintendent of Green
Haven Correctional Facility,

*Respondent.*

---

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HABEAS PETITION
## APPENDIX OF EXHIBITS
## VOLUME I of IV

---

Robert S. Dean
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
*Counsel for Petitioner*

Matthew Bova
*Of Counsel*
212-577-2523, ext. 543
mbova@cfal.org

---

## APPENDIX OF EXHIBITS

## TABLE OF CONTENTS

### VOLUME I

**EXHIBIT A** - New York County Supreme Court Decision & Order Denying Petitioner's Motion to Vacate the Judgment (January 29, 2021)

**EXHIBIT B** - Appendix Filed By Petitioner in Support of Motion to Vacate (A1-A294)

### VOLUME II

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A295-A666)

### VOLUME III

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A667-A968)

### VOLUME IV

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A969-A1074)

**EXHIBIT C** - Petitioner's Appellate Division Brief and Reply Brief

**EXHIBIT D** -Application for Leave to Appeal to the Court of Appeals

**EXHIBIT E** - Supplemental Letter Filed in Further Support of Application for Leave to Appeal to the Court of Appeals

**EXHIBIT F** - Petitioner's Motion to Vacate the Judgment (Filed June 25, 2020)

**Exhibit G** - State's Opposition to Motion to Vacate

**EXHIBIT H** - Petitioner's Reply in Further Support of Motion to Vacate

**EXHIBIT I** - Notice of Motion for a Certificate Granting Leave to Appeal

**EXHIBIT J** - Certificate Denying Leave to Appeal (August 5, 2021)

**EXHIBIT A**

**New York County Supreme Court Decision &
Order Denying Petitioner's Motion to Vacate
the Judgment (January 29, 2021)**

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK: CRIMINAL TERM: PART 59

------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,          :

                                                                                   DECISION
                                                                                   AND ORDER

                                                               :

              -against-

                                                                                   Indictment
                                                                                   Number:

LONNIE HARRELL,                                           :          4258-2014


                                         Defendant.       :

------------------------------------------------------------------------x

HON. JUAN M. MERCHAN, A.J.S.C.:


          On October 6, 2015, Defendant Lonnie Harrell was found guilty by a jury, after

trial, of two counts of Criminal Sexual Act in the First Degree (Penal Law §130.50 [1]),

two counts of Sexual Abuse in the First Degree (Penal Law §130.65[1]), and two counts

of Criminal Sexual Act in the Third Degree (Penal Law §130.42[2]).  On the following

day, October 7, 2015, he was found guilty by the same jury of one count of Attempted

Rape in the First Degree (Penal Law §130.35 [1]).  On October 21, 2015, Defendant was

sentenced as a second violent felony offender to determinate terms of twenty-five years

of imprisonment each on both counts of Criminal Sexual Act in the First Degree, a

determinate term of fifteen years of imprisonment on the count charging Attempted Rape

in the First Degree, determinate terms of seven years each on both counts of Sexual

Abuse in the First Degree, and determinate terms of four years each on both counts of

1

Criminal Sexual Act in the Third Degree. The sentences to be served concurrently, followed by fifteen years of post-release supervision. Defendant now moves, for a second time, pursuant to Criminal Procedure Law (hereinafter "C.P.L.") §440.10, to vacate his judgment of conviction. He also moves, pursuant to C.P.L. §440.20, to set aside his sentence, on the grounds that he received ineffective assistance of counsel.

## Procedural History

The convictions stem from allegations that on July 16, 2014, Defendant sexually assaulted his next-door neighbor, who was fifteen years of age at the time. Defendant was arrested on September 10, 2014, and on September 19, 2014, a Grand Jury voted to charge him with the offenses set forth above. A jury trial was commenced before this Court on September 22, 2015. Defendant was convicted and sentenced as set forth above.

Defendant filed a *pro se* motion to vacate his judgement of conviction previously, on or about July 29, 2017, in which he claimed that the counts charged in the indictment were multiplicitous, thus violating his constitutional right against double jeopardy. In a decision dated February 2, 2018, this Court denied the motion, on the grounds that it was procedurally barred because sufficient facts appeared in the trial record to permit adequate appellate review. C.P.L. §440.10(2)(b).

Defendant subsequently perfected an appeal, alleging that this Court had deprived him of his right to be present at trial and that the indictment contained multiplicitous counts. In a decision dated January 29, 2019, the Appellate Division, First Department

2

(hereinafter "A.D."), affirmed the judgment, holding that Defendant's right to be present at all material stages of the trial had not been violated.  The Court further held that in each of the three pairs of counts, two sex acts were alleged that were separate and distinct, and not multiplicitous.  *People v. Harrell*, 168 A.D.3d 591 (1st Dept. 2019).  The Court of Appeals denied Defendant's application for leave to appeal on April 8, 2019. *People v. Harrell*, 33 N.Y.3d 976 (2019).

The instant motion was filed on June 25, 2020.  The People responded on September 22, 2020, and a reply brief was filed by the defense on October 9, 2020.

### Contentions of the Parties

Defendant now moves to vacate his conviction and set aside his sentence, on the grounds that trial counsel, Theodore Herlich, Esq., was ineffective.  He claims, by way of motion counsel, that Mr. Herlich made a series of errors, which amounted to deficient representation and prejudiced Defendant.  Defendant argues that trial counsel: failed to move to suppress cell-site location information (hereinafter "CSLI") which placed Defendant at the scene of the alleged incident and indicated that he fled afterwards; failed to move to preclude "Y-STR" DNA evidence which purportedly linked Defendant's DNA profile to a profile found on swabs taken from the complainant's body; failed to object to the prosecutor's prejudicial summation which included repeated claims that Defendant had not denied that he engaged in sexual activity with the complainant; failed to request a readback of complainant's impeachment testimony; and failed to argue on behalf of his client at sentencing instead, referring to Defendant as "angry."

FEB 1 7 2021
DATE
I hereby certify that the foregoing
paper is a true copy of the original
thereof, filed in my office

3

The People argue that Defendant's motion should be denied on discretionary procedural grounds because Defendant could have raised the same issues in his first motion to vacate but failed to do so.  They further argue that Defendant's motion should be denied without a hearing, based on a lack of merit.  Specifically, the People argue that the evidence against Defendant was so overwhelming that trial counsel was limited in the arguments he could make.  They maintain that Defendant received effective assistance of counsel, as trial counsel "lodged vehement opposition to the People's position and consistently sought to undermine the People's case."  The People also maintain that defense counsel: filed a motion to dismiss alleged multiplicitous counts; moved to preclude the complainant's statements to police and to limit the number of prompt outcry and excited utterance witnesses; persuaded this Court to redact portions of the complainants narrative contained in medical records; elicited from the complainant on cross-examination that she had omitted certain details about the incident; hired and consulted with an expert on DNA and introduced statistics on the purported weakness of Y-STR DNA profiles; effectively cross-examined the DNA criminalist and elicited testimony that all paternal relatives of the Defendant would have the same Y-STR DNA profile and that thousands of individuals could have contributed that DNA to the labial and oral swabs; established that the People failed to obtain the mediation cell records and that the cell site data could not possibly provide the precise distance of the cell tower; cross-examined the doctor who examined the complainant and elicited that he did not observe any scratches on her neck.

In sum, the People contend that trial counsel continued to serve as a vigorous advocate even after his client refused to attend court proceedings, and that his overall performance exhibited competent representation.

## Discussion

C.P.L. §440.10 (1)(h) provides that, at any time after the entry of judgment, a defendant may move to vacate a judgment upon the ground that the judgment was obtained in violation of a right of the defendant under the Constitution of New York or of the United States. A motion filed pursuant to C.P.L. §440.10 is intended to address facts outside of the trial record which are unknown at the time of judgment and which undermine the judgment as a matter of law. *People v. Cooks*, 67 N.Y.2d 100, 103 (1986); *People v. Williams*, 286 AD2d 620 (1st Dept.), *lv. denied* 97 NY2d 659 (2001).

While a motion to set aside a judgment is a procedural device for challenging a judgment of conviction based upon matters that may not have been developed on the record, CPL §440.30 (4)(d) provides, in pertinent part, that a motion to vacate may be denied without a hearing if "an allegation of fact essential to support the motion (i) ...is made *solely* by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true." (Emphasis added). The court may deny a motion to vacate, without a hearing, where the moving papers do not contain allegations of fact tending to substantiate the claim being raised. CPL §440.30(4)(b); *People v. Ozuna*, 7 N.Y.3d 913 (2006).

I hereby certify that the foregoing paper is a true copy of the original thereof, filed in my office.

FEB 1 7 2021

5

Defendant's motion papers do not contain an affirmation from trial counsel attesting to his representation.  Motion counsel affirms that he made repeated attempts to access trial counsel's file, and that after a single phone conversation, trial counsel refused to sign an affirmation and ignored emails and phone messages.  This Court accepts motion counsel's explanation for his inability to include an affirmation from trial counsel and does not find this lack of evidence to be dispositive.  See *People v. Morales*, 58 NY2d 1008 (1983) and *People v. Scott*, 10 NY2d 380 (1961)]; see also *People v. Stewart*, 295 AD2d 249 (1st Dept.), lv. den., 98 NY2d 540 (2002), *cert.* den.538 U.S. 1003 (2003); *People v. Johnson*, 292 AD2d 284 (1st Dept.), lv. den., 98 NY2d 698 (2002);  *People v. Chen,* 293 AD2d 362 (1st Dept.), app. den., 98 NY2d 696 (2002)*; cf. People v. Bennett*, 139 AD3d 1350 (4th Dept. 2016) (rejected the People's contention that the trial court properly denied the motion because defendant failed to submit an affidavit from his former attorney corroborating his claim, and remanding the case for a hearing based on defendant's sworn allegations).

However, CPL §440.10 (3) provides, in pertinent part, that a court *may* deny a motion to vacate a judgment when: (c) upon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so. (Emphasis added).  The essential purpose of this procedural bar is to ensure, among other things, that courts are not unnecessarily burdened with multiple motions.  See, *People v. Cuadrado*, 9 NY3d 362 (2007); *People v. Cooks*, 67 NY2d 100 (1986); *People v. Brown*, 24 AD3d 271 (1st Dept 2005), *lv. denied* 6 NY3d 846 (2006); *People v. Rodriguez*, 4 Misc.3d 1003(A) (N.Y. Co. Sup. Ct.

2004).  The defense relies upon *People v. Allesandro*, 13 N.Y.3d 216 (2009), to support

his argument that it would be unjust to "trap a *pro se* defendant in this procedural bar."

In *Allesandro, supra*, defendant petitioned the A.D., First Department, in a second

*writ of error coram nobis*, on the grounds that his appellate counsel had been ineffective

for failing to raise a speedy trial argument on appeal.  The A.D. treated the application as

a motion to reargue the denial of his first *coram nobis* application (brought *pro se* and

decided nine years previously), and summarily denied the reargument ruling.  On appeal,

the Court of Appeals held that because defendant's application for a *writ of error coram*

*nobis* raised new arguments not raised in his previous application, the A.D. had erred in

characterizing the second application as a motion to reargue.  The claim, which contained

new questions which were not previously advanced could not have been "overlooked or

misapprehended," as is the standard for reargument under Civil Practice Laws and Rules

§2221 (d)(2).  An examination of a second *coram nobis* application which is sufficiently

meritorious is an appropriate use of the Court's discretion, and "...it would have been an

abuse of such discretion to refuse to entertain the second [*writ*] in this case, which was

brought by counsel nine years after the first application and raised different and much

more substantial arguments than those previously raised."  See *Allesandro* at 220.  See

also *Keating v. New York*, 708 F. Supp.2d 292 (E.D. New York 2010).  Consequently, the

Court of Appeals remitted the case back to the A.D. to consider the merits of the novel

arguments contained in the *writ*.

Here, motion counsel argues that Defendant "...was not in a position adequately to

raise the ineffective assistance issue[s] presented here, because it is inconceivable that a

lay defendant could identify, research, and develop this constitutional claim, especially

FEB 1 7 2021

7

when in prison...Similarly, unlike counsel who had resources to investigate this claim, Mr. Harrell could not meaningfully interview his former lawyer from prison (whom even appellate counsel had trouble getting in contact with); efficiently request medical records; or obtain court documents (as counsel was later able to do). To claim that Mr. Harrell, an incarcerated *pro se* defendant, was in position to adequately raise this claim is to blink reality."

While the Court of Appeals has consistently recognized that Article 440 was enacted, *inter alia*, to codify the relief formerly available under the common law *writ of error coram nobis,* Article 440 and its statutory restrictions on successive motions is nonetheless applicable here. The *Allesandro* Court "...cautioned against summary denial of a *coram nobis* petition simply because it is successive." *Keating, supra* at 300. There is no such caution contained in Article 440.

Moreover, this Court knows of no authority which supplants its discretion in the case of a *pro se* motion to vacate. In reviewing Defendant's initial *pro se* motion, this Court gave the motion and the Defendant's arguments the most liberal reading possible. Further, nothing in the instant motion presents a new claim that Defendant could not have raised in his first motion. Thus, *Allessandro* is not applicable here. This Court is not obligated to consider the issue, as the procedural bar found in CPL §440.10 (3)(c) makes that determination a matter for the Court's discretion. Defendant's previous *pro se* 440 motion to vacate should have raised trial counsel's alleged ineffectiveness, but failed to do so.

In the alternative, even if the procedural bar applies, a court may, in "the interest of justice and for good cause shown," exercise "its discretion [to] grant the motion if it is

8

otherwise meritorious." *Strickland*, 466 U.S. at 693-94.  In the interests of finality, this

Court will consider the merits of Defendant's ineffective assistance claim, which was this

time filed with the assistance of counsel.

A judgment of conviction is presumed valid, and a defendant moving to vacate his

conviction bears the "burden of coming forward with allegations sufficient to create an

issue of fact." *People v. Session*, 34 N.Y.2d 254, 255-256 (1974); *People v. Braun*, 167

A.D.2d 164, 165 (1st Dept. 1990).  Certainly, one of the rights contemplated by the

legislature in enacting C.P.L. §440.10 is the right to the effective assistance of counsel.

This right is guaranteed by the United States Constitution, 6th Amendment, and by the

New York Constitution, Article 1.  Under the federal standard, the question whether a

defendant has received effective assistance of counsel is evaluated by the principals set

forth in *Strickland v. Washington*, 466 US 668 (1984), in which the United States

Supreme Court adopted a two-part test for evaluating such claims.  In order to prove

ineffective assistance of counsel under the federal standard, a defendant must show that

counsel's performance "fell below an objective standard of reasonableness," and that

defendant was prejudiced, in that "there is no reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland, v. Washington*, 466 U.S. 668, 694 (1984); *People v. Ford*, 86 N.Y.2d 397, 405

(1995) (rev'd on other grounds).

As for the state requirement, New York adopted a standard of "meaningful

representation," as articulated in *People v. Baldi*, 54 NY2d 137 (1981) and its progeny.

"So long as the evidence, the law, and the circumstances of a particular case, viewed in

totality and as of the time of the representation, reveal that the attorney provided

9

meaningful representation, the constitutional requirement will have been met." *Baldi, supra* at 147. See also, *People v. Caban*, 5 N.Y.3d 143 (2005); *People v. Stultz*, 2 N.Y.3d 277 (2004); *People v. Henry*, 95 N.Y.2d 563, 565 (2000). New York's standard offers greater protection to a defendant than the federal test, as even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial. *Caban, supra* at 284. Under our State Constitution, a claim of ineffectiveness is most concerned with the fairness of the overall process. *People v. Benveneto*, 91 N.Y.2d 708 (1998). "Unlike the federal ineffective assistance of counsel standard, which requires a showing that but for counsel's inadequacy, the outcome of the trial would have been different, New York Courts do not conduct a strict prejudice inquiry." See *People v. Ennis*, 11 N.Y.3d 403, 412 (2008), *cert. denied* 556 U.S. 1240 (2009), *quoting People v. Benevento, supra*. Nevertheless, the Court of Appeals "...remain[s] skeptical of ineffective assistance of counsel claims where the defendant is unable to demonstrate any prejudice at all. See *People v. Stutz, supra* at 283-284.

In order to prevail on this motion, on these grounds, Defendant must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged deficiency. *People v. Satterfield*, 66 N.Y.2d 796, 799-800 (1985). This Court, in turn, must be careful not to "second-guess" counsel, or to assess counsel's performance with the "clarity of hindsight," effectively substituting its own judgment as to the best approach to the case. *Benevento, supra* at 712.

Defendant first argues that counsel failed to move to suppress certain cell-site location information which placed Defendant at the scene of the incident and indicated

that he fled after the commission of the crime.  At trial, the People introduced into

evidence CSLI which indicated that Defendant's mobile phone was near the scene of the

crimes at the time they were committed, and that Defendant's mobile phone moved away

from that location several minutes after the incident occurred.  Defendant argues that trial

counsel failed to move to suppress this evidence[1].

The CSLI was obtained by the People pursuant to a court-issued subpoena under

the Stored Communications Act (SCA) 18 U.S.C. § 2703(d).  Traditionally, in New York

and other jurisdictions, CSLI evidence was routinely obtained in this manner, and not

pursuant to a search warrant.  However, in 2018, the United States Supreme Court held

that probable cause must underlie a search warrant to obtain cell-site location data.

*Carpenter v. United States*, 138 S.Ct. 2206 (2018).  In *Carpenter*, law enforcement

obtained location-related data about the defendant's cell phone pursuant to a court order

issued under the SCA.  The order required the government to show "reasonable grounds

for believing that the records were relevant and material to an ongoing investigation."

The *Carpenter* Court held that the Government's acquisition of historical cell site records

which revealed the aggregated location information of a defendant constitutes a search

under the Fourth Amendment.  The Supreme Court noted that "cell phone location

information...is detailed, encyclopedic, and effortlessly compiled...An "individual

---

[1]Motion counsel affirms that he found copies of an affirmation in support of a cell site location data subpoena and a signed subpoena.  Motion counsel further affirms that a letter from the trial prosecutor indicates that trial counsel received the CSLI documents six months before trial, and that the documents were not part of the record on appeal.  Motion counsel also affirms that he had a telephone conversation with trial counsel on April 23, 2020, during which trial counsel stated that he did not move to suppress the cell site data because he thought the law in the First Department precluded the claim at that time.  The First Department did not preclude such motions, but trial counsel is correct in that the motion would likely not have been successful, for the reasons given below.

11

maintains a legitimate expectation of privacy in records of his physical movements as captured through CSLI." *Carpenter, supra* at 2216. The Court held that a warrant supported by probable cause must generally be obtained before acquiring such records, and that the allegations filed under the SCA fell "well short of the probable cause required for a warrant." *Carpenter, supra* at 2221.

The crime herein occurred in 2014 and the trial took place in 2015. Had trial counsel moved to suppress the CSLI in 2014 or 2015, there is little or no chance the motion would have been successful. New York Courts, pre-*Carpenter*, did not require a warrant to obtain CSLI. There were no Fourth Amendment implications because a defendant traveling in public had no expectation of privacy, nor did a defendant have any such reasonable expectation of privacy in information voluntarily disclosed to third parties. See *People v. Jiles*, 158 A.D.3d 75 (4th Dept. 2017), *leave den.* 31 N.Y.3d 1149 (2018); *People v. Sorrentino*, 93 A.D.3d 450 (1st Dept. 2012), *leave den.* 19 N.Y.3d 977 (2012); *People v. Hall*, 86 A.D.3d 450 (1st Dept. 2011), *leave den.* 19 N.Y.3d 961 (2012). Moreover, the language in *Carpenter* makes clear that its holding in not retroactive. Specifically, the Supreme Court noted that failure to object in 2011 to the prosecution's use of CSLI that was obtained without a warrant, *at a time when none was required*, did not render counsel's assistance ineffective. (Emphasis added). This Court finds that the same was true in 2014 and 2015. Thus, trial counsel's failure to so move does not constitute ineffective assistance of counsel. Furthermore, at trial, Mr. Herlich exhibited meaningful representation during his cross-examination of a technician when he established that the People had failed to obtain mediation cell records (the product of

I hereby cert... ... ... ...   FEB 1 7 2021
... is a tru... ... ...
thereof filed ... ...

12

more recent technology) and that the cell site data could not provide the precise distance of the cell tower, thus presumably, casting doubt on the reliability of the CSLI.

Defendant also argues that counsel failed to move to preclude "Y-STR" DNA evidence which purportedly linked Defendant's DNA to a profile found on swabs of the complainant's body.  However, according to the record, trial counsel hired and consulted with a DNA expert and introduced statistical evidence at the trial purportedly demonstrating the deficiencies of Y-STR DNA profiles.  Motion counsel affirms that trial counsel told motion counsel that he did not move to preclude the Y-STR DNA evidence on the grounds that it was more prejudicial than probative because the expert he hired did not advise him to file such a motion.  Trial counsel effectively cross-examined the DNA criminalist and elicited that all paternal relatives of the Defendant would have the same Y-STR DNA profile and that thousands of males could have contributed the DNA contained on the labial and oral swabs.

Defendant further argues that trial counsel failed to request a readback of complainant's impeachment testimony when the jury requested readback of her direct testimony.  However, according to the record, Mr. Herlich asked that the readback be limited so as to exclude the most damaging portion of the complainant's testimony.  That request was denied.  However, this Court agreed to the strategic page numbers and lines that counsel believed were responsive to the jury's note.

Defendant also argues that trial counsel failed to object to the prosecutor's allegedly prejudicial summation which included repeated claims that Defendant did not deny that he had engaged in sexual activity with the complainant.  However, trial counsel's decision not to object to these remarks did not amount to ineffective assistance.

13

See *People v. King*, 27 N.Y.3d 147 (2016).  Trial counsel's decisions regarding objections are strategic in nature and, in this instance, did not rise to the level of ineffective assistance.  See *People v. Wright*, 25 N.Y.3d 769 (2015).

Finally, Defendant argues that trial counsel failed to argue on his behalf at the sentencing hearing and instead referred to Defendant as "angry." That claim is a distortion of the record.  According to the record, Mr. Herlich spoke to his client in the pens behind the courtroom before the sentencing hearing commenced.  He then reported back to the Court that Defendant was upset, and that when counsel asked his client if he wanted to be present for sentencing, Defendant "...was angry, he stood up in the small interview booth that [they] were in together and walked out."  That is the only context in which Mr. Herlich characterized his client as "angry" before this Court.

Admittedly, Mr. Herlich's advocacy at sentence was brief.  However, he requested that his client receive an indeterminate minimum sentence of ten to fifteen years of imprisonment, followed by five years of post-release supervision.  This Court, having presided over the trial, stated that "If ever a case cried out for the maximum sentence this is it.  Not only because of the conduct that he demonstrated and was proven beyond a reasonable doubt to a jury of 12 people who unanimously found him guilty, but also by the conduct that he exhibited here in this courtroom as well as his criminal history."  After adjudicating Defendant a violent felony offender on the basis of a prior robbery conviction, this Court sentenced Defendant to concurrent maximum terms on each count for a total of 25 years incarceration, with fifteen years of post-release supervision.

In sum, there is nothing to demonstrate that the decisions trial counsel made were anything less than sound and strategic.  Since the commencement of the case, trial counsel's representation was meaningful.  In addition to the matters addressed above, trial counsel also moved to dismiss multiplicituous counts in the indictment;  moved to preclude all of the complainant's statements to police and to limit the number of prompt outcry and excited utterance witnesses; persuaded this Court to redact portions of the complainants narrative contained in the medical records;  elicited from the complainant on cross-examination that she had omitted certain details about the incident; and during cross-examination of the doctor who examined the complainant, elicited that the doctor did not observe any scratches on the complainant's neck.

All other grounds raised herein are conclusory, unsubstantiated, and lack a legal basis for granting the motion.  Defendant's list of errors that he claims occurred at trial do not contain allegations of fact tending to substantiate the claims raised.  Consequently, this Court denies the motion to vacate on those grounds, without a hearing, CPL §440.30(4)(b); *People v. Ozuna*, *supra*.  For the reasons set forth above, Defendant has failed to establish that trial counsel was deficient or did not provide meaningful representation.  The federal and state standards have been met.  Accordingly, the motion to vacate the conviction on the grounds of ineffective assistance of counsel is denied on both procedural and substantive grounds.

As for the motion to set aside his sentence, C.P.L. §440.20 provides, in pertinent part, that at any time after the entry of a judgment, the court may, upon motion of the defendant, set aside the sentence upon the ground that it was unauthorized, illegally imposed or otherwise invalid as a matter of law. A defendant's motion to set aside a

15

sentence must allege a legal basis and essential facts which support or tend to support the claim, whether from the personal knowledge of the defendant or another person, or upon information and belief, in which case the affiant must state the source of the information and the grounds for such belief.  CPL §440.30(1)(a).

A court may deny a motion to set aside a sentence, without a hearing, where the moving papers do not contain allegations of fact tending to substantiate the claim being raised.  *See* C.P.L. §440.30(4)(b); *People v. Ozuna*, 7 N.Y.3d 913 (2006).  "The party challenging the validity of the sentence bears the burden of coming forward with supporting allegations sufficient to create an issue of fact."  *People v. Session*, *supra* at 255-56 (1974).  Defendant has not demonstrated that his sentence was unauthorized, illegally imposed or otherwise invalid as a matter of law.  Thus, the motion to set aside his sentence is also denied.

## Conclusion

Based on the foregoing, the defendant's motion to vacate the conviction and set aside the sentence is denied in its entirety.

This opinion constitutes the Decision and Order of the Court.

Dated: January 29, 2021
New York, New York

Juan M. Merchan                    HON. JUAN M. MERCHAN
Judge of the Court of Claims

Acting Justice – Supreme Court

PART 59   JAN 2 9 2021

FEB 1 7 2021

DATE
I hereby certify that the foregoing
paper is a true copy of the original
thereof, filed in my office.

16

# EXHIBIT B

# Appendix Filed By Petitioner in Support of Motion to Vacate

# SUPREME COURT OF THE STATE OF NEW YORK
# CRIMINAL TERM

---

PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*-against-*

LONNIE HARRELL,

*Defendant-Movant.*

---

## APPENDIX IN SUPPORT OF MOTION TO VACATE THE JUDGMENT

---

Robert S. Dean
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
*Counsel for Defendant-Movant*

Matthew Bova
*Of Counsel*
212-577-2523, ext. 543
mbova@cfal.org

---

New York Cty. Ind. No. 4258/14

# TABLE OF CONTENTS

**1.** Indictment ......................................................................... A1

**2.** Verdict Sheet .................................................................... A5

**3.** Trial Transcript (September and October 2015) ................................ A9

**4.** Sentencing Transcript (October 21, 2015) ...................................... A939

**5.** Prosecution Trial Exhibit 21 (Medical Records) ............................. A954

**6.** Prosecution Trial Exhibit 22 (Medical Records) ........................... A995

**7.** Prosecution Trial Exhibit 13a-b and 14 (Photographs) .............. A1008

**8.** Prosecution Trial Exhibit 24 (Cell-Site Records) ........................ A1014

**9.** Excerpts of DNA Trial Exhibits .................................................. A1015

**10.** Pre-Sentence Investigation Report .............................................. A1024

**11.** Affirmation in Support of an Order to T-Mobile ......................... A1029

**12.** Order to the Cellular Service Provider ....................................... A1035

**13.** Excerpts of Lonnie Harrell Medical Records .............................. A1037

**14.** Pro Se CPL 440.10 Motion Papers .............................................. A1045

**\*** The following pages have been intentionally omitted from the Appendix: A4 and A6-A8.

**\*\*** The PDF of this Appendix is bookmarked and is text-searchable.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

-against-

LONNIE HARRELL,

Defendant.

-----------------------------------

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE FIRST DEGREE**, in violation of Penal Law §130.50(1), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, engaged in oral sexual conduct, to wit, contact between defendant's mouth and the vulva of a person known to the Grand Jury, by forcible compulsion.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE FIRST DEGREE**, in violation of Penal Law §130.50(1), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, engaged in oral sexual conduct, to wit, contact between defendant's penis and the mouth of a person known to the Grand Jury, by forcible compulsion.

A1

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **AN ATTEMPT TO COMMIT THE CRIME OF RAPE IN THE FIRST DEGREE**, in violation of Penal Law §§110/130.35(1), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, attempted to engage in sexual intercourse by forcible compulsion with a person known to the Grand Jury.

FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **SEXUAL ABUSE IN THE FIRST DEGREE**, in violation of Penal Law §130.65(1), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, subjected a person known to the Grand Jury to sexual contact, to wit, contact between the defendant's finger and the vagina of said person, by forcible compulsion.

FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **SEXUAL ABUSE IN THE FIRST DEGREE**, in violation of Penal Law §130.65(1), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, subjected a person known to the Grand Jury to sexual contact, to wit, contact between the defendant's mouth and the mouth of said person, by forcible compulsion.

A2

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant

of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in violation of Penal

Law §130.40(2), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, being twenty-one

years old or more, engaged in oral sexual conduct, to wit, contact between defendant's mouth and

the vulva of a person known to the Grand Jury, who was less than seventeen years old.


SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant

of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in violation of Penal

Law §130.40(2), committed as follows:

The defendant, in the County of New York, on or about July 16, 2014, being twenty-one

years old or more, engaged in oral sexual conduct, to wit, contact between defendant's penis and the

mouth of a person known to the Grand Jury, who was less than seventeen years old.


                                        CYRUS R. VANCE, JR.
                                        District Attorney

Verdict Sheet
Court Exhibit _II_

# SUPREME COURT OF THE STATE OF NEW YORK

PART        59                          COUNTY    NY

THE PEOPLE OF THE STATE OF NEW YORK

against

INDICTMENT No.    4258-2014

JUSTICE    J MERCHAN

DATE    10-5-15

LONNIE HARRELL

Defendant.

| COUNT NUMBER | CRIME | GUILTY | NOT GUILTY |
|---|---|---|---|
| 1 | CRIMINAL SEXUAL ACT IN THE 1ST DEGREE (contact between defendant's mouth and the vulva of a person) | X | |
| 2 | CRIMINAL SEXUAL ACT IN THE 1ST DEGREE (contact between the defendant's penis and the mouth of a person) | X | |
| 3 | AN ATTEMPT TO COMMIT THE CRIME OF RAPE IN THE 1ST DEGREE | X | |
| 4 | SEXUAL ABUSE IN THE 1ST DEGREE (contact between the defendants finger and the vagina of a person) | X | |
| 5 | SEXUAL ABUSE IN THE 1ST DEGREE (contact between the defendants mouth and the mouth of a person) | X | |
| 6 | CRIMINAL SEXUAL ACT IN THE 3RD DEGREE (contact between defendant's mouth and the vulva of a person who was less than seventeen years old, and the defendant was over 21 years of age) | X | |
| 7 | CRIMINAL SEXUAL ACT IN THE 3RD DEGREE (contact between the defendant's penis and the mouth of a person who was less than seventeen years old, and the defendant was over 21 years of age) | X | |

TH

A5

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 59
2   ----------------------------------------x

3   THE PEOPLE OF THE STATE OF NEW YORK          Indictment
                                                 No. 4258/14
4
                -against-                        Crim. Sex Act 1
5
                                                 Jury Voir Dire
6   LONNIE HARRELL,                              and Jury Trial

7                              Defendant.

8   ----------------------------------------x

9                                    September 22nd, 24th,
                                      28th and 29th, 2015
10
                                     100 Centre Street
11                                   New York, NY  10013

12
    B e f o r e:
13

14               HONORABLE JUAN M. MERCHAN,

15                                      Justice.

16
    Appearances:
17

18               CYRUS R. VANCE, JR., ESQ.
                 District Attorney, New York County
19               BY:  JUNG PARK, ESQ.
                      Assistant District Attorney
20

21               THEODORE HERLICH, ESQ.
                 Attorney for Defendant
22

23

24

25                                   Joanne Fleming
                                     Senior Court Reporter

MAY 12 2016
SUP COURT. APP. D
FIRST DEPT.
A9

SCANNED
DATE:  MAY 13 2016
BY:  S. L. Owens

Proceedings                                    2

```
 1              (In open court)
 2              THE CLERK:  Calling number four, Lonnie Harrell,
 3      indictment number 4258 of 2014.
 4              THE COURT:  Your appearances, please.
 5              MR. HERLICH:  Theodore Herlich for Lonnie Harrell.
 6              MS. PARK:  Jung Park for the People.
 7              Good afternoon.
 8              THE COURT:  Good afternoon.
 9              Please have a seat.
10              So, I understand that we're getting Mr. Harrell,
11      right?
12              A COURT OFFICER:  As soon as an officer comes
13      back, Judge, I will go get him.
14              THE COURT:  Okay.
15              While we wait, off the record.
16              (Whereupon, a discussion was held at the bench and
17      off the record.)
18              THE COURT:  We'll stand in recess until
19      two-fifteen.
20                      (Luncheon recess held.)
21        * * * A F T E R N O O N    S E S S I O N * * *
22              THE CLERK:  Recalling calendar number four, Lonnie
23      Harrell, indictment number 4258 of 2013.
24              MR. HERLICH:  Theodore Herlich for Lonnie Harrell.
25              THE COURT:  As soon as we can get your client, we
```

Joanne Fleming

A10

Proceedings                                         3

```
 1         can get started.
 2                   MS. PARK:  Jung Park for the People.
 3                   THE COURT:  I know you need to leave by four
 4         o'clock.
 5                   MR. HERLICH:  That will be great, Judge.
 6                   THE COURT:  Sure.
 7                   A COURT OFFICER:  Coming in.
 8                   THE COURT:  Okay, we've been joined by Mr.
 9         Harrell.
10                   Is that how you pronounce your name?
11                   THE DEFENDANT:  Harrell.
12                   THE COURT:  Harrell.
13                   Alright, I know that the court officers are still
14         working on trying to get the jury panel.  We can go ahead
15         and get started on any motions in limine.
16                   MS. PARK:  Judge, before I start, I would like to
17         file some paperwork with the Court.
18                   THE COURT:  Okay.
19                   MS. PARK:  I have two letters that I've served on
20         Mr. Herlich.  One relates to a civil lawsuit that is
21         currently pending against one of the detectives who will be
22         testifying.  And the second letter refers to the ten dollar
23         witness fees that we provide to our witnesses when they come
24         down to speak to us.
25                   THE COURT:  Right.
```

Joanne Fleming

A11

1          MS. PARK:  And then I also have the witness list

2   that I'm going to file at this time.

3          THE COURT:  Thank you.

4          THE SERGEANT:  (Handing.)

5          MS. PARK:  And Rosario material that have been

6   provided to Mr. Herlich previously.

7          THE SERGEANT:  (Handing.)

8          THE COURT:  Thank you.

9          Okay, you acknowledge receipt, Mr. Herlich?

10         MR. HERLICH:  Yes, your Honor.

11         THE COURT:  Alright.

12         So, actually before we do the motions in limine,

13  that -- I have to ask:  Is there any possibility of a

14  disposition in this case?

15         MR. HERLICH:  I don't believe so, your Honor.  I

16  did discuss that possibility with my client in terms of any

17  kind of disposition that may be able to be worked out

18  between the defendant and the Court since the People's

19  recommendation is far in excess of the top count minimum,

20  but there is no interest.

21         THE COURT:  What has the People's recommendation

22  been up to this point?

23         MS. PARK:  Judge, our recommendation is twenty

24  years in light of the seriousness of the charges and his

25  prior -- his criminal history.

Joanne Fleming

1        THE COURT:  And this came from which judge?

2        MS. PARK:  Judge Solomon.

3        THE COURT:  Did Judge Solomon make any offer to

4   the defendant?

5        MS. PARK:  He did not.

6        I have been speaking with Mr. Herlich and he has

7   represented to me what Mr. Harrell is not interested in

8   pleading regardless of what the sentence is.

9        THE COURT:  Okay.

10        Well, Mr. Harrell, you certainly have the right to

11   a trial if that's what you wish to do.

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  I just want to make sure you

14   understand, though, my understanding of the law is that on

15   the top count, you could, after trial, be sentenced to up to

16   twenty-five years incarceration and you could receive up to

17   twenty-five years of post-release supervision on top of

18   that.

19        Do you understand that?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  Okay.

22        Alright, let's get started then.

23        MR. HERLICH:  Judge, shall I go first?

24        THE COURT:  It doesn't matter.

25        MR. HERLICH:  Okay.

Joanne Fleming

A13

Proceedings                                                     6

```
 1              Judge, I have a couple of motions in limine that
 2    with regard to some of the items that are in the medical
 3    records, on page one of seven -- and the way the records are
 4    numbered, there's one of seven, there's one -- one through
 5    six -- but in the pages numbered one through seven, on page
 6    one, it indicates that the patient appears as a reliable
 7    historian.  It mentions that twice.  I think that should be
 8    redacted, because ultimately that is truly the jury's
 9    province.
10              THE COURT:  Are you asking that that be stricken
11    once or both times?
12              MR. HERLICH:  Yeah, both times.  It just should be
13    redacted, that sentence.
14              THE COURT:  People?
15              MS. PARK:  Judge, I believe that the doctor will
16    testify that reliable historian simply means that she was
17    alert, oriented as to time, place and location.  I think
18    that will be made clear, that it doesn't necessarily mean
19    you can credit her testimony.  Of course that's not --
20    that's not --
21              THE COURT:  What does it add, if anything, to the
22    People's case?
23              MS. PARK:  It doesn't.
24              THE COURT:  It doesn't.  Then I don't see any harm
25    in going ahead and striking that both times.
```

Joanne Fleming

A14

Proceedings

1          MS. PARK:  If it's, like, redactions, we can work

2      that out before.

3          THE COURT:  Yes, it's redactions in the medical

4      records.  I am happy to help you out, but I would like to

5      see the two of you try to sort it out yourselves and

6      whatever you can't resolve, you can bring to me.

7          MR. HERLICH:  You want to do it that way?

8          THE COURT:  Yeah, you might be able to work it out

9      between the two of you.

10          MR. HERLICH:  Then the other motions, other than

11      that was the medical records, deal with outcry.  I believe

12      the prosecutor will seek to introduce the Nine-One-One call

13      and will play that for the Court and for the defendant as

14      well.

15          My position is the first outcry, which is

16      apparently immediate, is the Nine-One-One call.  After that,

17      I believe the complainant calls her mother.  Then she's

18      taken to the hospital where she speaks to the police and the

19      medical staff at St. Luke's Hospital regarding what

20      happened.

21          Her narrative is part of the medical records and

22      part of the narrative that is relevant to treatment is

23      obviously admissible as part of the business record.  But my

24      initial position would be, your Honor, that the Nine-Eleven

25      call is more than sufficient to establish the outcry and the

1    substance of what happened to this young lady, and that the

2    subsequent call to her mother and what she told Detective

3    Barbato at the hospital, who arrived from Manhattan Special

4    Victims Squad, is cumulative and ultimately prejudicial and

5    the outcry evidence should be limited to the Nine-Eleven

6    call.  That's my application.

7             THE COURT:  Okay.

8             People?

9             MS. PARK:  Judge, the statements that I am going

10    to seek to introduce through various police officers, I

11    would submit would not only fall under the prompt outcry

12    exception but they would fall under the excited utterance

13    exception.  So the entirety of the victim's statements to

14    those officers would come in.

15             I do have the Nine-One-One call here and I have

16    the transcripts for them.  It doesn't appear as if Mr.

17    Herlich is contesting the admission of those calls.

18             THE COURT:  It sounds like he's not contesting the

19    Nine-One-One call.

20             MS. PARK:  So, I don't know.

21             THE COURT:  I believe what he's saying, that the

22    outcry to the mother -- I take it, then, that there was a

23    phone call to the mother?

24             MR. HERLICH:  Yes.

25             THE COURT:  Was that immediately after the

Joanne Fleming

A16

Proceedings

1      Nine-One-One?

2              MR. HERLICH:  I am not quite sure, Judge.  The

3      D.A. would know.

4              MS. PARK:  So what happens is, she calls

5      Nine-One-One as soon as the defendant leaves the apartment,

6      and while she's talking to the Nine-One-One operator -- the

7      entire call is about ten minutes, maybe a little less, eight

8      minutes -- while she's on the phone with the Nine-One-One

9      operator, police are there towards the end of the call, the

10     police are there and you hear them knocking on the door

11     saying police.  So, that part, I think, it's relevant to

12     show how immediate the officers responded.

13             And the victim's initial statements to those two

14     police officers, and they are Officers Lora and Castillo,

15     they will describe her demeanor.  They will say she was

16     shaking, terrified, she kept insisting that they lock the

17     door because the defendant lives next door, and that she was

18     crying.

19             And when they asked her what happened, she said

20     Lonnie Harrell, the defendant, came in, he asked for a

21     Smoothie, and he came in and she gave him some, he grabbed

22     her, took off her panties, he put his private part in her

23     mouth, he wiped himself with her panties, and he took the

24     panties and he took pictures of her.  Those are the initial

25     statements to those two officers who responded maybe less

Joanne Fleming

A17

1    than ten minutes after the defendant left the apartment.

2         And then after they spoke with her, she's still

3    crying, and they thought she might feel more comfortable

4    with female officers.  So they called for female officers,

5    and, thankfully, female officers were already at the scene.

6    So they immediately went upstairs and then they spoke to the

7    victim, and I would also submit that the victim's statement

8    to those two female officers --

9         THE COURT:  And who are they?

10        MS. PARK:  They are Officers Mateo and

11   Semper-Martinez.

12        And what she told them was very similar:  That he

13   came in, asked if he could have some Smoothie, she gave him

14   some, he grabbed her, took her panties and, you know, put

15   his private part in her mouth.  Pretty similar statement

16   that she provided to officers -- to Officers Lora and

17   Castillo.  And that was within, maybe, two minutes after

18   Officers Lora and Castillo called for female officers.

19        And, your Honor, I will cite to the Court People

20   versus Brown, 70 NY 2d 1987.

21        THE COURT:  Sorry, just bear with me.

22        MS. PARK:  Sorry.

23        THE COURT:  People versus Brown?

24        MS. PARK:  Seventy NY 2d 1987 case where thirty

25   minutes --

Joanne Fleming

A18

Proceedings                                    11

1          THE COURT:  70 NY 2d?

2          MS. PARK:  Yes, NY 2d 1987 case.

3          THE COURT:  Okay, I thought that was a year.

4          MS. PARK:  It is the year, I'm sorry.

5          THE COURT:  So what's the page?

6          MS. PARK:  Oh, I'm sorry, Judge.

7          THE COURT:  Seventy NY 2d?

8          MS. PARK:  I forgot to write that down in my

9    paperwork.

10          NY 2d 513.

11          THE COURT:  Do you have copies for the Court?

12          MS. PARK:  Yes, I do.

13          THE COURT:  Oh, okay.

14          THE SERGEANT:  (Handing.)

15          MS. PARK:  And I have another copy for Mr. Herlich

16    too.

17          THE COURT:  Great.

18          MS. PARK:  In that case, the court found that

19    thirty minutes was found to be within the excited utterance

20    exception and that I would submit that the statements that

21    she made to both sets of officers would fall under the

22    excited utterance exception.

23          Now, while these officers are with the victim, one

24    of the officers called the victim's mother using the

25    victim's cell phone.

Joanne Fleming

A19

1    THE COURT:  Which officer did that, do you know?

2    MS. PARK:  I believe it was Officer Lora.

3    THE COURT:  Okay.

4    MS. PARK:  And he is the one who actually told her

5    that her daughter had been sexually assaulted.  That's when

6    the mother said:  I'm coming home right now.

7    And, Judge, I am asking that that statement be

8    elicited, and I would say that it's admissible not for its

9    truth but to show the effect on the listener.  It explains

10   why the mother left work in the middle of the day and she

11   rushed home, she came to be with her daughter.

12   And as to the statements that she made, that the

13   victim made to her mother, so when the mother -- so once the

14   mother came home, there were EMTs were there, police

15   officers were there and then they were taken to St. Luke's

16   Roosevelt Hospital.

17   THE COURT:  Alright, let me see if I understand

18   this so far.

19   It's your position that the Nine-One-One call is a

20   prompt outcry or an excited utterance?

21   MS. PARK:  Excited utterance.

22   A    The conversation that she did then had about police

23   officers lawyer and cast, the conversations that she had after

24   that with police officer mate and Semper Martinez, and then the

25   statements that she made to her mother.

```
 1          MS. PARK:  Yes.

 2          THE COURT:  It's your position all of those should

 3   be either prompt outcry or excited utterance but in some way

 4   they should be admitted?

 5          MS. PARK:  Yes -- the statement to her mother not

 6   as an excited utterance.  I mean -- I'm sorry -- that the

 7   statement the police officer made to the mother --

 8          THE COURT:  Right.

 9          MS. PARK:  -- not as an excited utterance or

10   prompt outcry, just because --

11          THE COURT:  You are arguing that's even hearsay

12   because that's not being offered for the truth?

13          MS. PARK:  Correct.

14          THE COURT:  Okay.

15          If I understood Mr. Herlich correctly, he doesn't

16   really have a problem with the theory that the Nine-One-One

17   call is a prompt outcry.  I think, if I understood you

18   correctly, the issue is that how many levels there are here

19   of prompt outcry.

20          So, you have the Nine-One-One call, the statements

21   made to Police Officer Lora and Police Officer Castillo,

22   that is a second level, the statements made to Police

23   Officer Mateo and Police Officer Semper-Martinez, that is a

24   third level, and then the statements made to the mother,

25   that is a fourth level.
```

Joanne Fleming

A21

```
 1              MS. PARK:  Judge, I'm actually arguing that they
 2   are excited utterance, not prompt outcry.
 3              THE COURT:  I see.
 4              MS. PARK:  And, you know, under the excited
 5   utterance exception, I believe the first three statements --
 6   not the statement made to the mother -- I believe the first
 7   three statements would qualify as an excited utterance.  She
 8   was under the stress of what had just happened, it was
 9   within minutes of her statement and she had no opportunity
10   to reflect.
11              And her statements, those first three statements,
12   -- we can listen to the Nine-One-One call -- she is crying,
13   you can tell that she is very scared, and the four officers,
14   they will describe her demeanor.
15              And, I understand that I do have to lay sufficient
16   foundation prior to eliciting the statement, but I
17   anticipate they will describe her as hysterically crying,
18   shaking, very scared and very upset.
19              THE COURT:  And the statements to the mother?
20              MS. PARK:  That I'm asking that they come in not
21   for its truth but to show why the mother did what she did.
22              THE COURT:  I'm confused.  I think that you said
23   you want to introduce the statement that an officer made to
24   the mother.
25              MS. PARK:  Correct.
```

Joanne Fleming

A22

1       THE COURT:  When the officer called the mother and

2   the mother came home.

3       MS. PARK:  Yes.

4       THE COURT:  But were you also seeking to elicit

5   the statements that the victim made to the mother?

6       MS. PARK:  That one as a prompt outcry, but I

7   mean -- and that one didn't get made until they were left

8   alone in the waiting room at St. Luke's Roosevelt Hospital.

9   And that was the first opportunity for the victim to be

10  alone with her mother and that's when she told the mother

11  what happened.

12      And I know under prompt outcry exception that I

13  can't elicit everything that the victim said, but at least I

14  should be permitted to elicit that the victim had disclosed

15  to her that she was sexually assaulted.

16      THE COURT:  Okay, I'm told that the jurors are

17  here.  I'm going to bring them, I will have them sworn in, I

18  will explain to them that there will be no proceedings

19  today, obviously because of the Jewish holiday, and there

20  will be no proceedings tomorrow because of the Jewish

21  holiday, but I will ask them to be back here at ten o'clock

22  on Thursday so we can commence jury selection.

23      Is that alright?

24      MS. PARK:  Yes.

25      MR. HERLICH:  Yes.

Proceedings                                                    16

```
 1                    THE COURT:  Okay, let's bring them in, please.

 2                    A COURT OFFICER:  Ready, Judge?

 3                    THE COURT:  Yes.

 4                    A COURT OFFICER:  Panel entering.

 5                    (Whereupon, the prospective jury panel entered the

 6          courtroom.)

 7                    THE CLERK:  Ladies and Gentlemen, please rise,

 8          raise your right hand.

 9                    (Whereupon, the prospective jury panel was sworn

10          or affirmed in by the Clerk of the Court.)

11                    THE CLERK:  Have a seat.

12                    THE COURT:  Thank you.

13                    Good afternoon, jurors.

14                    Welcome to New York County Supreme Court Part 59.

15          My name is Juan Merchan and I will be presiding over this

16          matter.

17                    As many of you know, the Jewish holiday begins

18          this afternoon and continues through tomorrow.  So all we're

19          going to do today is what we just did, we just swore you,

20          and I will ask you to please come back Thursday morning at

21          ten o'clock and at that time we will commence jury selection

22          in this case.

23                    You don't know anything about the case so there's

24          nothing for you to discuss.  I ask you to please continue

25          not to talk about this case or anything related to your jury
```

Joanne Fleming

A24

1    service.  Simply put it out of your mind.  You know nothing

2    about the case, as I said.

3              Again, the Jewish holidays start this afternoon

4    and I know that many of you observe that, as well as

5    tomorrow.  But I ask you to please be back Thursday morning

6    at ten o'clock.

7              When you arrive at ten o'clock, please do not

8    enter the courtroom, simply wait outside in the hallway, and

9    the court officers will go outside and invite you in when

10   we're ready for you.

11             A couple of jurors walked in a few minutes late.

12   I will ask you to stay behind so we can swear you.

13             It's okay.

14             The rest of you can step out.  I will see you

15   Thursday morning.

16             A COURT OFFICER:  You are jurors, you are at 100

17   Centre Street, sixteenth floor, Part 59.

18             (Whereupon, the prospective jury panel exited the

19   courtroom.)

20             THE COURT:  How many came in late, three or two?

21             THE CLERK:  Just two.

22             THE COURT:  Okay.

23             THE CLERK:  Raise your right hand.

24             (Whereupon, the two prospective jurors were sworn

25   or affirmed in by the Clerk of the court.)


                      Joanne Fleming

Proceedings                                    18

1        THE CLERK:  Thank you.

2        THE COURT:  Okay, you're official.

3    I will see you Thursday morning.

4        A PROSPECTIVE JUROR:  Thank you.  Have a good day.

5        (Whereupon, the two prospective jurors exited the

6    courtroom.)

7        THE COURT:  Okay, getting back to the motions in

8    limine.

9        Regarding the statements that were made to the

10   mother, those were made where, at the hospital?

11       MS. PARK:  By the victim?

12       THE COURT:  Yes.

13       MS. PARK:  Yes.

14       THE COURT:  How much time elapsed between the time

15   of the alleged incident and the statements to the mother?

16       MS. PARK:  At least an hour, Judge.

17       THE COURT:  At least an hour.

18       Okay, with regard to the excited utterance, I'm

19   going to say that there's three levels:  The Nine-One-One

20   call, the statements made to the first two officers, the

21   statements made to the next two officers.

22       As a threshold matter, you will obviously have to

23   lay a proper foundation for the excited utterance.  Without

24   hearing the foundation, I cannot rule whether the statements

25   will or will not come in as an excited utterance.

Joanne Fleming

A26

1              Assuming that you do lay the proper foundation,

2      though, I am going to have to research whether all three

3      sets of statements should come in.

4              You don't really see this very often.  Usually

5      when you see an excited utterance, it's made to one person

6      or one time.  It's not usually made more than once.  It's

7      not said it never happens, it does happen, but it's rare.

8      So, I will have to research the admissibility of an excited

9      utterance when it's made to a second person and then a third

10     person.

11             Jumping down to the prompt outcry, that's also

12     going to be fact sensitive in that you will have to lay the

13     foundation for that.  Of course, prompt outcry, there's no

14     minimum amount of time and no maximum amount of time, per

15     se, but once you're talking about a one hour lapse in time

16     which has been preceded by statements made to three other

17     people, it does complicate things a little bit.

18             So, if you want to try to lay the foundation now

19     for these statements, you can, or if you want to wait until

20     the trial, we can do that.  But obviously that's the first

21     step:  Can you lay the foundation for the excited utterances

22     and the prompt outcry.

23             Since -- why don't we go ahead and do it now?  We

24     have another fifteen or twenty minutes.  Tell me what the

25     foundation is for the Nine-One-One call -- well, Mr. Herlich

Joanne Fleming

A27

1    is not contesting the Nine-One-One call.  So let's just skip

2    to the statements made to Police Officer Lora and Castillo

3    and then after that the statements made to Mateo and

4    Semper-Martinez.

5             MS. PARK:  Judge, as to the statements made to the

6    first set of officers, as I had indicated, while the victim

7    was still on the phone with the Nine-One-One operator, these

8    two officers arrived at her apartment and you can actually

9    hear them knocking on the background.

10            When the victim opened the door, they saw her who

11   appeared to be --

12            THE COURT:  What's the matter, Abe?

13            A COURT OFFICER:  Doctor's a potential juror

14   traveling for holiday.  She says she may not be able to be

15   here Thursday at ten.

16            THE COURT:  I see.

17            What time can she be here?

18            A COURT OFFICER:  I didn't know.  I didn't

19   question her.

20            THE COURT:  See if you can find out.

21            Go ahead.

22            MS. PARK:  So, the statements to the officers

23   occurred within minutes, less than ten minutes since the

24   defendant left the apartment.  So, since the end of the

25   sexual assault.

Proceedings                                    21

1           And they will describe her as being hysterical,

2    terrified, that she was shaking and she was crying, and when

3    they asked her what happened, it's the statements that she

4    made to them while she's under that excited state.

5           THE COURT:  Okay.

6           MS. PARK:  They spoke to her for about maybe two

7    minutes.  She is --

8           A COURT OFFICER:  She said about

9    eleven-forty-five, twelve o'clock.

10          THE COURT:  That's fine.  Tell her to get here

11   when she can.

12          A COURT OFFICER:  And there are two men who speak

13   Spanish.  I am not sure if they speak English.  They spoke

14   to me in Spanish.  I told them they have to come back

15   because we didn't do anything at this point.

16          THE COURT:  Actually the one -- yeah, have that

17   person -- they're going to miss the preliminary

18   instructions.  Tell the person that cannot arrive until

19   about eleven-thirty that they don't need to report here.

20          Where should they report?

21          A COURT OFFICER:  Fifteenth floor.

22          THE COURT:  Or are they done with their service?

23          A COURT OFFICER:  They said when they're

24   dismissed, from the fifteenth floor, Brian.

25          THE CLERK:  Okay.

Joanne Fleming

A29

1          THE COURT:  And the other two, they say that they

2     don't speak English?

3          A COURT OFFICER:  Well, I don't know if they speak

4     any.  They spoke to me in Spanish.

5          THE COURT:  I see.

6          Is there any objection to just excusing those two

7     jurors?

8          MS. PARK:  None from the People.

9          MR. HERLICH:  No.

10          THE COURT:  Okay, we will excuse those two as

11     well.

12          Okay, I'm sorry about the interruption.

13          MS. PARK:  And then after the victim spoke to the

14     first set of officers, they called for female officers to

15     get additional details about what happened, and the two

16     female officers then arrived within two minutes, and then

17     they will describe the victim in the same condition, as

18     shaking, crying, upset, visibly scared, and then when they

19     asked her what happened, she told them what I had said

20     earlier, your Honor.  So, I believe that the -- they will be

21     able to establish the sufficient foundation because they

22     will describe her in that state.

23          The incident -- I mean the statements -- came

24     within minutes of what happened, less than fifteen minutes

25     for the second set of officers and less than ten minutes for

1    the first set of officers, and the victim was still in that

2    excited state and she had no opportunity to reflect or

3    deviate from the truth.

4          So, I would submit that those first three

5    statements should come in as excited utterance exception to

6    the hearsay rule.

7          And as for the victim's later statement to her

8    mother, I would say that it falls under prompt outcry.  Our

9    position is that it falls under prompt outcry because it was

10   the first suitable opportunity that the victim had to be

11   alone with her mother.  She was with EMTs, with police

12   officers, with a lot of people who were in the apartment.

13         While the mother and the daughter were together,

14   but it was at the waiting room at the hospital that she had

15   that first opportunity to be alone with her daughter and

16   that's when she made the disclosure, and so, for those

17   reasons --

18         THE COURT:  Okay.

19         MR. HERLICH:  In response, briefly, your Honor.

20         With regard to the phone call from the officer to

21   the complainant's mother, I think it's sufficient to allow

22   the officer to testify that he or she called the

23   complainant's mother and pursuant to that phone call the

24   mother came home immediately without going into the

25   substance of what was said.

Joanne Fleming

A31

1      THE COURT:  I agree.  I think that's the way we

2  should handle that, that one conversation, particularly if

3  we admit the previous statements as excited utterances and

4  then the subsequent statement as a prompt outcry, there's

5  really no need to get into the substance of a conversation.

6  It's sufficient that the officer can testify that he or she

7  spoke with the mother and the mother then left work.

8      MR. HERLICH:  If your Honor is willing to hear the

9  Nine-One-One call now, maybe that will help the Court in

10  determining what should come in as a prompt outcry.  Like I

11  said, I've heard the Nine-One-One call.  I think it's --

12  obviously it's immediate and it's sufficient as a prompt

13  outcry.

14      So, I would object to the narrative that the

15  complainant gave to her mom at the emergency room of St.

16  Luke's Hospital an hour later to be cumulative and would

17  oppose its introduction into evidence.

18      MS. PARK:  Judge, as far as the statements to the

19  mother, I'm not seeking to elicit the narrative.  All I'm

20  asking -- all I would like to ask the mother is whether her

21  daughter told her that she was sexually assaulted.  I can't

22  go into details because it doesn't fall under any other

23  exception to the hearsay rule, other than our position it is

24  prompt outcry.

25      THE COURT:  So what exactly would you ask the

Joanne Fleming

A32

Proceedings                                          25

```
 1    mother and what do you expect the mother to say?
 2              MS. PARK:  I mean, I can ask her a leading
 3    question:  Whether her daughter disclosed to her that she
 4    had been sexually assaulted, and she'll say yes.
 5              THE COURT:  Mr. Herlich, do you have an objection
 6    to that?
 7              MR. HERLICH:  Well, I would stick to my initial
 8    position, your Honor.  I mean, there's no dispute that the
 9    outcry was immediate because, like I said, I heard the
10    Nine-One-One call.  Anything beyond that is cumulative.
11              It's the outcry is clearly established by the
12    Nine-One-One call.  Is it really necessary to reiterate that
13    the complainant told her mother what happened or that she
14    was sexually assaulted an hour later?
15              THE COURT:  How long is the Nine-One-One call?
16              MS. PARK:  It's about eight minutes.
17              THE COURT:  Alright, if we start now, I can listen
18    to it.
19              MS. PARK:  I have a transcript.
20              THE COURT:  Great, thank you.  I'll take that.
21              A COURT OFFICER:  (Handing.)
22              THE COURT:  By the way, where is Mr. Harrell being
23    housed?
24              (Counsel conferring with defendant.)
25              A COURT OFFICER:  RNDC at Rikers Island.
```

Joanne Fleming

A33

Proceedings                                    26

```
 1                THE COURT:  Okay.

 2                Brian, shall we put in a request that he be

 3    transferred to the Tombs?

 4                THE DEFENDANT:  (Indicating.)

 5                THE COURT:  Yes?

 6                THE DEFENDANT:  I would like to stay where I am.

 7                THE COURT:  I just want to make sure you're

 8    produced on time.

 9                THE DEFENDANT:  Yes.

10                THE SERGEANT:  Brian's not in here.

11                THE DEFENDANT:  I really ask not to be moved.

12    They're pretty efficient.

13                THE COURT:  Okay.

14                There's no problem with Friday proceedings?  Mr.

15    Herlich, there's no problem with Friday proceedings?

16                MR. HERLICH:  No, no problem.

17                THE COURT:  Okay.

18                (Whereupon, the Nine-One-One call was played in

19    open court.)

20                THE COURT:  Okay, thank you.

21                Alright, I will reserve decision on this.  I will

22    see you Thursday morning.

23                Just to get a sense of how many other issues we

24    have, can you tell me what else you have on your mind?

25                MR. HERLICH:  I guess I'll try to work out with
```

Joanne Fleming

A34

1   the Assistant D.A. certain things that are in the medical

2   records.  One example, Judge, was that on the tape where the

3   first thing she said was that she was raped.  I guess that

4   -- and what was noted in the medical records at some point

5   maybe when this is introduced or the records are introduced,

6   I ask for a jury instruction that obviously rape and sexual

7   abuse are specifically defined legal terms that the jury

8   will be instructed on at the close of the case, and when

9   they appear in the medical record and the Nine-One-One call,

10  to the extent that I can say what they mean, they're

11  referring to a sexual assault, but the colloquial use of

12  these words is different from the legal terms the jury will

13  get based on the charges in the indictment, is my point.

14          There is an attempted rape charge.  The two

15  charges are criminal sexual act in the first degree.

16  There's also two counts of sexual abuse of -- sexual abuse

17  in the first degree.

18          THE COURT:  We will take that up on Thursday.

19          MR. HERLICH:  Okay.

20          THE COURT:  Anything else?

21          MS. PARK:  Just Sandoval.

22          THE COURT:  Just Sandoval.

23          Now, you've both tried cases before me, I believe,

24  right?

25          MR. HERLICH:  I have, your Honor.


Joanne Fleming

A35

Proceedings

1      MS. PARK:  I had a hearing.

2      MR. HERLICH:  Twice.

3      THE COURT:  You did a hearing, okay.

4      The one thing I would ask the two of you when you

5   come back Thursday morning is to jointly write a short

6   description of the case using, you know, lay language.  I

7   just want to be able to read something to the jurors so they

8   know what the case is about and they can decide whether this

9   case is right for them or not.

10      It doesn't have to go into a lot of detail, but

11   just enough for the jury to know what the case is about.  So

12   you've done this before for me, Mr. Herlich.  It's something

13   like:  It's alleged that on whatever the date is, on July

14   16th, 2014, at approximately two-twenty in the afternoon,

15   inside an apartment located at Ninety-Two St. Nicholas

16   Avenue, that the defendant did X, Y and Z to the complaining

17   witness who is fifteen-years old at the time, the defendant

18   denies these allegations.  You know, something along those

19   lines.

20      I will see you at nine-thirty.

21      Mr. Herlich, you may want to speak to your client

22   and see to what extent he gives you consent for us to begin

23   discussing the other pretrial issues in the event that he's

24   produced late on Monday -- on Thursday, okay?

25      MR. HERLICH:  Okay.

Joanne Fleming

A36

Proceedings                        29

1              THE COURT:  Alright, thank you.

2              MS. PARK:  Your Honor, you have a calendar on

3    Friday morning?

4              THE COURT:  On Friday morning.  I expect to

5    proceed at two-fifteen.

6              MS. PARK:  On Friday afternoon?

7              THE COURT:  Yes.

8              (Whereupon, the trial was adjourned to Thursday,

9    September 24th, 2015.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joanne Fleming

A37

```
1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 59
2    ----------------------------------------x

3    THE PEOPLE OF THE STATE OF NEW YORK          Indictment
                                                  No. 4258/14
4
                  -against-                       Crim. Sex Act 1
5
                                                  Jury Trial
6    LONNIE HARRELL,

7                           Defendant.

8    ----------------------------------------x

9                                        September 24th, 2015

10                                       100 Centre Street
                                         New York, NY  10013
11

12   B e f o r e:

13
                     HONORABLE JUAN M. MERCHAN,
14
                                       Justice.
15

16   Appearances:

17
                     CYRUS R. VANCE, JR., ESQ.
18                   District Attorney, New York County
                     BY:  JUNG PARK, ESQ.
19                        Assistant District Attorney

20
                     THEODORE HERLICH, ESQ.
21                   Attorney for Defendant

22

23

24
                                         Joanne Fleming
25                                       Senior Court Reporter
```

A38

1             (In open court)

2             THE CLERK:  Continuing case on trial, People

3   versus Lonnie Harrell.

4             Regarding the other trial, I'm not aware of any

5   notes at this point.

6             MR. LEVY:  We had that one from the other night,

7   Judge, the one about the grand jury testimony.

8             THE COURT:  But I answered that one, didn't I?

9             MR. BROOKS:  You asked for clarification, your

10  Honor.

11            THE COURT:  Well, I answered that.  I told them

12  that the grand jury testimony was not in evidence.

13            MR. LEVY:  Judge, we --

14            THE COURT:  Mr. Levy, please let me finish.  We

15  keep going through this.

16            I explained to them that the grand jury testimony

17  was not in evidence -- you know what?  Let's call the other

18  case so we can go on the proper record.

19            (Whereupon, a recess was taken.)

20            THE CLERK:  Continuing case on trial, People

21  versus Lonnie Harrell.

22            MR. HERLICH:  Theodore Herlich for Mr. Harrell.

23            MS. PARK:  Jung Park for the People.

24            Good morning, your Honor.

25            THE COURT:  Okay, good morning.


                    Joanne Fleming

Proceedings                                    32

```
 1                    Defendant is present.

 2                    I had asked the jury panel to be here at ten.

 3     It's now five to ten.

 4                    Did you prepare that brief narrative that I

 5     requested?

 6                    MS. PARK:  Yes.

 7                    A COURT OFFICER:  (Handing.)

 8                    THE COURT:  Thank you.

 9                    It's typed and everything.

10                    The allegations are that on July 16th, 2015 --

11                    MS. PARK:  I'm sorry, that's 2014.  I was wrong.

12                    THE COURT:  -- inside an apartment at Ninety-Two

13     St. Nicholas Avenue, New York County, the defendant sexually

14     assaulted the complaining witness who is fifteen-years old.

15     Specifically, the People allege that the defendant forcibly

16     committed several different sex acts against the complaining

17     witness, some of which include attempted vaginal

18     penetration, digital penetration and oral sex.  The

19     defendant denies the allegations.

20                    You both are in agreement on this, right?

21                    MS. PARK:  Yes.

22                    MR. HERLICH:  Yes.

23                    THE COURT:  Okay, good.

24                    Regarding the -- please have a seat.

25                    MS. PARK:  Your Honor, if I may submit some case
```

Joanne Fleming

1    law?

2              THE COURT:  On what?

3              MS. PARK:  Regarding the issues that we've

4    discussed on Tuesday with excited utterance at multiple --

5    you had explained in multiple stages of excited utterance.

6              THE COURT:  Okay.

7              MS. PARK:  I have copies for the Court and Mr.

8    Herlich.

9              Can I just come up?

10             THE COURT:  Sure, of course.

11             MS. PARK:  (Handing.)

12             THE COURT:  Well, it's almost ten o'clock.  So

13   we're going to get started soon.

14             I realize that we haven't finished all of the

15   preliminary matters.  Do you want to go over Sandoval at

16   this time?

17             MS. PARK:  Sure.

18             MR. HERLICH:  Just so you know, Judge, I also have

19   some additional arguments and case law regarding all those

20   in limine issues that are still awaiting the Court's final

21   decision.

22             THE COURT:  Well, the issues that I have are

23   whether the -- well, with regard to the Nine-One-One call,

24   the defense is not contesting that as an excited utterance,

25   right?

1          MR. HERLICH:  Correct.

2          THE COURT:  Then there were the first two officers

3    who appeared, Police Officer Lora and Police Officer

4    Castillo.  The People seek to introduce that as an excited

5    utterance.

6          There was a second set of officers who arrived,

7    Police Officer Mateo and Police Officer Semper-Martinez.

8    People seek to introduce that as an excited utterance, that

9    the defense is contesting that.

10         Then, the People seek to introduce as a prompt

11   outcry the fact that at a later time inside the hospital the

12   complainant reported the incident to the mother.

13         There was also a call that was made from the

14   apartment by one of the police officers to the mother, and I

15   think that we resolved that, the fact that a phone call was

16   made by the police officer and to the mother and then the

17   mother left work and came home.  That's resolved.

18         Am I correct that those are the issues that are

19   outstanding?

20         MS. PARK:  Yes.

21         MR. HERLICH:  Well, maybe I'm not a hundred

22   percent clear.  I would argue that the statement to the

23   mother at the hospital is definitely not an excited

24   utterance.  I'm arguing it's not necessarily an outcry.

25   There was the outcry to the Nine-One-One operator and the

```
 1    two sets of police officers at the scene of the incident.

 2              And I have a Court of Appeals case that would

 3    support the fact that the statement to the mother at the

 4    hospital an hour later, when she's alert and oriented, is

 5    not an excited utterance.

 6              MS. PARK:  Judge, I agree.

 7              THE COURT:  It is a prompt outcry.  The People are

 8    seeking to introduce it not as an excited utterance but as a

 9    prompt outcry.

10              I agree with you, that it would not be an excited

11    utterance at that point.  Whether it is a prompt outcry, my

12    feeling on that statement at this point is that even if it

13    were a prompt outcry, and I don't even reach the issue, I

14    don't revolve the issue whether it was or was not a prompt

15    outcry, I believe at this point, given the excited

16    utterances and the Nine-One-One call and the fact that the

17    mother was with the complaining witness at the hospital, I

18    think that it's unnecessary for the People to go into it.

19              And, in an excess of caution, I'm going to

20    preclude the prosecution from asking the prompt outcry type

21    of question:  Did she report -- did the complaining witness

22    report to the mother what happened.

23              Of course it's going to be in evidence that the

24    mother was at the hospital with the complaining witness and

25    that why were they there.
```

Joanne Fleming

A43

1          Well, they were there because of the excited

2    utterances, right?  That the complaining witness made a

3    short time earlier.

4          MS. PARK:  Mm-hmm.

5          THE COURT:  So, I think it -- in an excess of

6    caution, to insure finality with the case, if we do this

7    with finality, I think it's unnecessary.

8          Now, if, if, the complaining witness or the

9    prosecution's case comes under attack in any way that this

10   was a recent fabrication or that the versions that were

11   given were different to different people, then as a

12   rebuttal, I would certainly permit you, and not even as a

13   rebuttal but as a redirect, I will permit the prosecution to

14   bring out that prompt outcry.  I think at this point it's in

15   excess.  It's not necessary.  So that's my ruling on that.

16         Before I rule on the second set of officers, Mateo

17   and Semper-Martinez, please remind me, tell me a little bit

18   more about the circumstances under which they arrive and how

19   much time had elapsed.

20         MS. PARK:  Judge, as you heard the Nine-One-One

21   call, you heard the first set of officers arriving on the

22   scene towards the end of that call, and that call was, I

23   believe, about eight minutes, and they spoke to the

24   complaining witness first.  They spoke to her --

25         THE COURT:  Lora and Castillo did?

Joanne Fleming

A44

1          MS. PARK:  Yes.

2          THE COURT:  Okay.

3          MS. PARK:  And they spoke to her for about two

4    minutes, two to three minutes, and they thought that she

5    would feel more comfortable with female officers because

6    they were both men.  The two first responders were both men.

7          THE COURT:  Right.

8          MS. PARK:  So, they called for female officers,

9    but by that point, Officers Semper-Martinez and Mateo were

10   already at the scene because they had also heard the radio

11   transmission.  So, as soon as they received a request for

12   female officers, they ran up to the second floor apartment.

13   And that's when they observed the complainant in that same

14   stage.

15         THE COURT:  Okay.

16         And did she say anything to Mateo and

17   Semper-Martinez that was different or more enhanced than

18   what had been said to Lora and Castillo?

19         MS. PARK:  Yes.

20         Judge, I think I may have misspoken the other day.

21   So, what she told Lora and Castillo was that Lonnie Harrell

22   put his hand in her private area, put his penis in her

23   mouth, took photos of her and said if she told anyone he

24   would show everybody the photos.

25         THE COURT:  Right.

Proceedings                                    38

1           MS. PARK:  That was the statement to the first

2    officers.

3           THE COURT:  Okay.

4           MS. PARK:  Her statements to the second set of

5    officers, the female officers, was that he asked -- is as

6    follows:  He asked if her brother was home so they can go

7    bike riding.  When she said no, he asked if -- he asked for

8    a Smoothie.  He came in, she gave him the Smoothie, he

9    grabbed her, took off her panties and put his private area

10   in her mouth and he wiped himself with her panties and took

11   the panties, he took pictures of her.

12          THE COURT:  Okay.

13          So, among other things, she provides to that

14   second set of officers the background as to how he entered

15   the apartment.

16          MS. PARK:  Yes.

17          THE COURT:  Okay.

18          MS. PARK:  And, Judge, just so the cases that I

19   did turn over, they are People v. Pham, 118 AD 3d 1159, it

20   is a Third Department case, but I believe that it's

21   persuasive here because the facts are similar in that that

22   case, it was proper to admit multiple levels of excited

23   utterance.

24          They admitted three excited utterance:  One,

25   victim's statement to a brother-in-law over the telephone,

Joanne Fleming

A46

1  and this was also a sexual assault case; two, again, when

2  the brother-in-law arrived at the victim's apartment five

3  minutes later, the statement she made at that point; and

4  third, the victim's statements to her sister, you know,

5  voice mail message that was left before the victim called

6  the brother-in-law.

7              THE COURT:  Okay.

8              MS. PARK:  And the court found all three

9  statements to be sufficient.

10             THE COURT:  Alright, let me just rule on a couple

11 of those things.

12             Please have a seat.

13             An excited utterance is an out-of-court statement

14 made when the declarant is quote under the stress of

15 excitement caused by an external startling event, depriving

16 the declarant the reflective capacity necessary for

17 fabrication and sufficiently rendering the observer's normal

18 reflection process inoperative.  In People v. Johnson, 1 NY

19 3d 132; People versus Nieves, 67 NY 2d 125; People v.

20 Edwards, 47 NY 2d 493; People v. Marks, 6 NY 2d 67.

21             The statement is so spontaneous and natural as to

22 exclude the idea of fabrication because a consideration of

23 self-interests cannot be immediately brought to bear.

24 People v. Chapman, 191 AD 660; People v. Caviness, that is

25 C-A-V-I-N-E-S-S, 38 NY 2d 227.

Joanne Fleming

A47

1          The touchstone of admissibility of an excited

2     utterance is its reliability.  People v. McCullough,

3     M-C-C-U-L-L-O-U-G-H, 73 AD 2d 310.

4          A statement cannot qualify under this exception if

5     it is the product of studied reflection.  People v. Johnson,

6     1 NY 3d at 306.

7          The foundation for the statement's admissibility

8     requires a showing of facts permitting an inference that the

9     declarant had personal knowledge of the event of which he or

10    she spoke.  People v. Fartello, F-A-R-T-E-L-L-O, 92 NY 2d

11    565.

12         So, at this time I'm prepared to rule that the

13    Nine-One-One call was an excited utterance.  I believe the

14    defense, again, has not really challenged that.

15         And just to make the record clear, we did listen

16    to the Nine-One-One call, and I'm completely satisfied that

17    the People made out the foundation necessary for the

18    admission of the Nine-One-One call as an excited utterance.

19         With regard to the statements made to Police

20    Officer Lora and Police Officer Castillo, once again, I'm

21    satisfied that those were excited utterances and that those

22    should be admitted as excited utterances.  Not only because

23    the witness, as we heard on the Nine-One-One, was still

24    clearly in that state of excitement, but because there was

25    even an overlap between the Nine-One-One call and the

Joanne Fleming

A48

Proceedings                                        41

```
 1    arrival of Police Officer Lora and Castillo.  In fact, you
 2    can hear them arriving and the exchange that took place
 3    while she was on the Nine-One-One call.
 4              With regard to the statements to Police Officer
 5    Mateo and Police Officer Semper-Martinez, I'm going to
 6    reserve decision on that until I read the decisions you
 7    handed up.
 8              Is there any objection to commencing jury
 9    selection without my ruling on that excited utterance?
10              MS. PARK:  None from the People.
11              MR. HERLICH:  No, your Honor.
12              THE COURT:  Okay, good.
13              MR. HERLICH:  Just one other thing.  At some point
14    we will have to bring to your attention the parts of the
15    medical records where we can't agree.
16              THE COURT:  That's fine.
17              MR. HERLICH:  Okay.
18              THE COURT:  So, what I see is that I still need to
19    rule on the statements made to the second police officers,
20    we still need to have Sandoval and we still need to go over
21    my pretrial checklist.
22              Is there any objection to commencing jury
23    selection without having resolved those issues?
24              MS. PARK:  None from the People.
25              THE COURT:  And certainly they would be resolved
```

Proceedings

 1     before you conduct your voir dire.

 2             MR. HERLICH:  Okay.

 3             THE COURT:  What I want to do is read to them my

 4     instructions and speak to those who want to be excused.

 5             So, is there any objection to that?

 6             MR. HERLICH:  No, your Honor.

 7             MS. PARK:  No.

 8             THE COURT:  Just very quickly, though, to go over

 9     how I conduct jury selection, I'm told we've gotten eighty

10     jurors.  You might recall on Tuesday we excused three --

11     actually, only excused one.  One said -- she already left.

12     So we will excuse one.  That leaves us with seventy-nine.

13             Because this is a very small courtroom, during

14     jury selection, we do use the jury box, at least for my

15     initial instructions.  My initial instructions will take

16     about twenty minutes or so.

17             Once I complete my instructions, I then ask the

18     jurors if there's any reason why they believe that they

19     cannot be fair based solely upon what they heard up to that

20     point and at that time I ask the jurors to approach the

21     bench one by one.  You will both be present at the bench, of

22     course, when we do that.

23             When we do that, I ask one of the attorneys be on

24     one side of the court reporter, the court reporter will be

25     directly in front of me and the other attorney will be on

Joanne Fleming

Proceedings                                      43

1    the other side of the court reporter.

2            We invite the jurors to come up and they stand

3    opposite me on the other side of the court reporter.  We

4    listen to what the juror has to say, why they believe they

5    should be excused.

6            And if it seems pretty clear based upon what they

7    are saying they should be excused, I will simply excuse them

8    if there is no objection.  If there is an objection, they

9    need to answer on the record.  If there is no objection, I

10   will excuse that juror.

11           If what the juror says is not very clear, I'm kind

12   of on the fence as to whether or not to excuse that juror, I

13   will ask both of you:  Do you have any follow-up questions,

14   and then you're free to ask follow-up questions, but they

15   must be related to what the juror brought up.

16           So, for example, if a juror says that they don't

17   trust police testimony, you know, that's the time to ask

18   them:  Would they hold it against your client if he didn't

19   testify.

20           We're going to lose a lot of people during that

21   stage.  One:  I think that these were second-day jurors,

22   they had already been through the process, I think through

23   other courts.

24           We know from experience, obviously, that these

25   type of cases are a bit unsavory to people.


                    Joanne Fleming

                         A51

Proceedings                                                    44

1              And, also, the length of the trial.  I'm going to

2     tell them it will be a two-week trial.  Just so we don't

3     have any problems.  I expect that we will lose many people,

4     and at this time, although I hope I'm wrong, I think we

5     might even need a second panel.

6              There will no panel today or tomorrow, right?

7              THE CLERK:  Right.

8              THE COURT:  That will push us to Monday.

9              After we go through that, we then seat eighteen

10    jurors.

11             The numbering for voir dire is different from the

12    numbering for sworn jurors.  During jury selection, seat

13    number one, farthest from one -- the seat farthest from me

14    in the front row is seat number one.  Second seat that's

15    farthest from me, that's number ten.

16             Those eighteen are handed a questionnaire.  I

17    believe you already received copies of the questionnaire.  I

18    ask the jurors to answer the questions aloud in narrative

19    form and then we continue that way.

20             Please don't look to me to clarify issues with the

21    jurors.  Don't look to me to really get too involved.  In

22    fact, I tend not to get too involved in jury selection.  If

23    someone says something interesting, I may ask.  If I'm

24    confused about something they said, I may ask a question.

25    Other than that, I leave it to you to follow up and ask any

Joanne Fleming

A52

Proceedings                                45

1    questions that are not clear.

2             During the first round of jury selection, I'm

3    going to give you about fifteen minutes each.  I ask you to

4    please look at the clock in the back of the courtroom.

5    That's the clock that I rely upon.  In subsequent rounds, I

6    will ask you to limit it to about ten minutes each.

7             Now, if you get to fifteen minutes and through no

8    fault of your own you just haven't been able to finish what

9    you wanted to ask, you need a couple of more minutes, just

10   ask me:  Judge, can I have a couple of more minutes.  I will

11   always give it to you unless you totally squandered your

12   time.

13            Same goes for the subsequent rounds, if you need a

14   few more minutes, I will give you the few more minutes if

15   you need that time.

16            That's how we conduct jury selection here.  Any

17   questions about that?

18            MR. HERLICH:  No.

19            MS. PARK:  No.

20            THE COURT:  I do want to go over the Antommarchi

21   issue with you.  Have you discussed Antommarchi with your

22   client?

23            MR. HERLICH:  Not yet, your Honor.

24            THE COURT:  Okay.

25            (Counsel conferring with defendant.)


                     Joanne Fleming

                         A53

Proceedings                                          46

```
 1                    THE COURT:  People, do you have a copy of the
 2    indictment?
 3                    MS. PARK:  Yes.
 4                    A COURT OFFICER:   (Handing.)
 5                    THE COURT:  Thank you.
 6                    How we doing out there?
 7                    A COURT OFFICER:  It looks like we're filling up.
 8                    THE COURT:  Do you think we should get started or
 9    we need a few more minutes?
10                    MR. HERLICH:  A few more minutes.
11                    (Counsel conferring with defendant.)
12                    MR. HERLICH:  The defendant will remain at the
13    defense table during the voir dire related bench
14    conferences.  To that extent, he's waiving his right under
15    People v. Antommarchi.
16                    THE COURT:  Okay, so Mr. Harrell, I understand
17    from watching you speak to your attorney and also from what
18    your attorney has just stated, that you understand your
19    rights.
20                    THE DEFENDANT:  Yes.
21                    THE COURT:  You understand that you have a right
22    to approach the bench and be present at bench conferences.
23                    THE DEFENDANT:  Yes.
24                    THE COURT:  But you have chosen to waive that
25    right during jury selection?
```

Joanne Fleming

A54

1    THE DEFENDANT:  Yes.

2    THE COURT:  Please review the document that's

3 before you and your attorney.  If you approve, please sign

4 it.

5    (Defendant complies.)

6    MR. HERLICH:  The waiver has been executed, your

7 Honor.

8    THE COURT:  Thank you very much.

9    A COURT OFFICER:  (Handing.)

10    THE COURT:  Let the record reflect that the

11 defendant has signed the waiver, and the Court is signing it

12 and defense counsel signed it as well.

13    Alright, I'm just very quickly going through my

14 pretrial checklist, being mindful that I still have one more

15 ruling on the excited utterance and we still have Sandoval

16 to go over.

17    Mr. Herlich, would you like me to inform the

18 jurors that the fact that a defendant does not testify is

19 not a factor from which any inference unfavorable to him may

20 be drawn?

21    MR. HERLICH:  Thank you, your Honor, I would ask

22 that you do indicate that.

23    THE COURT:  So there's fifteen perempts, right?

24 The top count is a B?

25    MS. PARK:  Yes.

Joanne Fleming

A55

Proceedings

```
 1              THE COURT:  Okay.
 2              I want to remind both sides that with regard to
 3   Batson challenges, I remind you that a motion on
 4   discriminatory conduct in the selection of jurors is a
 5   serious charge and a baseless motion should not be made just
 6   to gain a tactical advantage.  Unlike normal rulings made in
 7   a trial, a ruling that an attorney has engaged in the
 8   discrimination of the selection of a juror is a finding of
 9   misconduct.
10              Of course, if you believe that there has been a
11   Batson violation, by all means, you have every right to make
12   it, make a Batson challenge.  But I ask you not to do it to
13   gain a tactical advantage.  Dealing with a Batson challenge
14   is time consuming, it's complicated and I don't want to do
15   it just for gamesmanship, although I don't expect either one
16   of you to do that.
17              You can conduct your direct and cross-examination
18   from where you are or from your table, or you can use the
19   podium in the back of the well, it doesn't matter to me.  It
20   is -- that's entirely up to you.
21              What I do ask is you please not approach the
22   witnesses and this is especially true during
23   cross-examination.  Please don't approach the witnesses.
24              How long do you expect your opening statement to
25   be?
```

Proceedings

1      MS. PARK:  Maybe twenty minutes.

2      THE COURT:  Mr. Herlich, you intend to deliver an

3  opening statement?

4      MR. HERLICH:  A brief one, yes, your Honor.

5      THE COURT:  Okay.

6      With regard to stipulations, I ask you to please

7  not ask your adversary to stipulate to anything in the

8  presence of the jury.  If you would like to enter into a

9  stipulation, please wait until the jury's not present.

10     Same goes for asking the Court to take judicial

11 notice of anything.  Please don't ask me to do that in the

12 presence of the jury.  If you would like me to take judicial

13 notice, wait until the jury is not present.

14     The procedure for objections is pretty

15 straightforward.

16     I ask that you please rise when you object.

17     And I ask you to limit your objection to one word,

18 objection.  I may ask you for the legal basis of the

19 objection, and if I do, please provide only the legal basis,

20 hearsay, for example.  If I need more than that in order to

21 make my ruling, I'll ask you to please approach and we will

22 discuss it at the bench, but I want to avoid speaking

23 objections in the presence of the jury.

24     If you object and I make a ruling and you feel you

25 have not had the opportunity to preserve the record, I

Joanne Fleming

A57

1    promise you will have the opportunity to preserve the record

2    once the jury is no longer in the courtroom.

3           Please bring any proposed jury charges to my

4    attention as early as possible so that we can begin working

5    on them.

6           I understand that your client is presently

7    incarcerated but has he been Parkerized?

8           MR. HERLICH:  I don't believe so.

9           THE COURT:  Okay.

10          Mr. Harrell, you obviously have a right to be

11   present at your trial and that is a very important right

12   because it allows you to see what's going on and participate

13   in your defense.  It's very important for your attorney,

14   too, so that he can defend you as well as he possibly can.

15          But, I have an obligation to inform you that there

16   are ways that you can waive your right to be present at your

17   own trial, that you can lose your right to be present.  For

18   example, suppose you refuse to come to court tomorrow, you

19   know we're all here, I walk out and you're not there and

20   nobody knows why you're not here, that will force me to

21   conduct what's called a Parker hearing.  At the Parker

22   hearing we have to determine why you're not here.

23          If after conducting that Parker hearing we

24   determine that you're not here simply because you chose not

25   to be here, then I have the right to continue this trial in

Joanne Fleming

A58

1   your absence.  That would be a bad thing.  It will put you

2   at a real disadvantage and put your attorney at a real

3   disadvantage.

4              Do you understand that?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Likewise, if you in any way disrupt

7   these proceedings, you know, if you act out of turn, if you

8   speak out of turn, things of that nature, again, I have the

9   right to remove you from the courtroom and continue in your

10  absence.

11             Do you understand that?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Okay.

14             Alright, so the only thing that's left for me that

15  I would like to do for my pretrial checklist is Sandoval and

16  it's now ten-twenty.  So let's go ahead and bring the panel

17  in.

18             MS. PARK:  Judge, I just have an updated witness

19  list.

20             THE COURT:  Yes.

21             MS. PARK:  Because I forgot to add one witness'

22  name on the list.

23             THE COURT:  You can hand that up, please.

24             A COURT OFFICER:  (Handing.)

25             MS. PARK:  And just so everyone is clear, the

Joanne Fleming

A59

1    T-Mobile representative is listed as Ronald Witt.  It may

2    not be him because we had anticipated on starting last

3    Thursday, but so we might get a different representative.  I

4    just wanted everyone to know.

5                 THE COURT:  Okay, great.

6                 I think we can bring the panel in whenever you're

7    ready.

8                 THE SERGEANT:  Jury entering.

9                 (Whereupon, the prospective trial jurors entered

10   the courtroom.)

11                THE COURT:  Good morning, jurors, welcome back.

12                As you may recall from Tuesday afternoon, you were

13   briefly in here for a few minutes.  My name is Juan Merchan

14   and I will be the judge presiding over this matter.  Welcome

15   to New York County Supreme Court Part 59.

16                Some of you are about to be selected as a juror

17   for a trial in a criminal case, and I'm about to explain to

18   you what the trial involves and what your role will be and

19   what my role will be.

20                Before I continue, I do want to thank all of you

21   for being here.  You are about to participate in a trial by

22   juror or trial by jury.  The system of trial by jury is one

23   of the cornerstones of our judicial system.

24                Under the system of trial by jury, members of the

25   community, ordinary members of the community just like you,

Joanne Fleming

A60

1   are asked to determine whether another member of the

2   community, who has been accused of committing a crime, is

3   actually found guilty or not guilty.

4           The name of this case is the People of the State

5   of New York versus Lonnie Harrell.  The words "People of the

6   State of New York" in a title mean the government of the

7   State of New York.

8           The fact that this action is brought in the name

9   of the People or that the evidence is presented by a public

10  official does not in any way indicate that the public wants

11  a specific verdict.  The People are served by whatever

12  verdict is justified by the evidence of the People, that is,

13  the government, who is represented by the district attorney

14  of New York County, Cyrus Vance, Jr. and he, in turn, is

15  represented in this action by assistant district attorney

16  Jung Park who is seated to my left.

17          MS. PARK:  Good morning, everyone.

18          THE COURT:  The defendant, Mr. Lonnie Harrell, is

19  represented by his attorney Mr. Theodore Herlich who is

20  seated to my right.

21          MR. HERLICH:  Good morning.

22          THE DEFENDANT:  Good morning.

23          THE COURT:  The defendant is charged with the

24  crimes of criminal sexual act in the first degree and an

25  attempt to commit the crime of rape in the first degree,

1    sexual abuse in the first degree and criminal sexual act in

2    the third degree.

3          The allegations are, in substance, that on July

4    16th, 2014, inside of an apartment located at Ninety-Two St.

5    Nicholas Avenue, in New York County, the defendant sexually

6    assaulted the complaining witness who is fifteen-years old

7    at the time.

8          Specifically, the People will allege, or allege,

9    that the defendant forcibly committed several different sex

10   acts against the complaining witness, some of which included

11   attempted vaginal penetration, digital penetration and oral

12   sex.

13         These are allegations and the defendant denies

14   these allegations.  At the end of the trial, I will give you

15   detailed instructions on the crimes charged and it is upon

16   those instructions that you must base your decision.

17         I've given you this brief description of the

18   charges only for the purpose of allowing you to consider

19   whether there is anything about the nature of the charges

20   that would affect your ability to be a fair and impartial

21   juror.  You are not to use the description I've just given

22   to you for any other purpose.

23         This case comes to us by way of an indictment.  An

24   indictment is a document that contains an accusation.

25         Neither the indictment itself nor the fact that an

Joanne Fleming

A62

Voir Dire - The Court

1   indictment has been filed constitutes evidence.  The

2   indictment has been filed against the defendant and the

3   defendant has answered that he is not guilty.  The trial,

4   therefore, is to be conducted for you to decide whether the

5   defendant is guilty or not guilty.

6        A jury is composed of twelve people.  In addition

7   to the twelve jurors, we will also select alternate jurors.

8        An alternate juror is one who may serve in place

9   of one of the first twelve jurors should an unforeseen and

10  extraordinary emergency arise that makes it totally

11  impossible for one of the first twelve jurors to complete

12  the trial.

13        The first person called who is sworn as a juror

14  will serve as the jury's foreperson.

15        If you have participated in jury selection in a

16  criminal case before, you may notice that the method of jury

17  selection varies from judge to judge but the essence of the

18  procedure is the same.  It involves a combination of

19  explanations of the law and questions, all designed to help

20  each of you, as well as the lawyers, to decide whether you

21  can sit as a juror in this case and be fair in judging

22  whether the defendant is guilty or not guilty of the charged

23  crimes.

24        My jury selection procedure is as follows:

25        First:  I will explain some of the basic law that

Joanne Fleming

A63

1    applies to this case and all criminal trials.  I do this in

2    part because if you are selected as a juror, you will be

3    required to follow the law whether you agree with the law or

4    not.  Later I will ask you whether you understand the law I

5    have explained and whether you can accept it and follow it.

6           Second:  I, together with the attorneys, will

7    interview those jurors who have specific concerns about

8    their ability to serve on this case on the basis of what

9    you've heard up to this point.  As I will explain later,

10   each juror will be accorded a measure of privacy during that

11   interview.

12          Third:  The clerk of the court will call, at

13   random, the names of eighteen jurors who will take a seat in

14   the area on my left which is called the jury box.  Those

15   jurors will be handed a questionnaire.  I will then ask the

16   jurors in the jury box to answer the questions aloud in

17   narrative form and then each lawyer will address the jurors

18   in the jury box for approximately fifteen minutes.

19          Finally, after all of that, all of the jurors will

20   be excused for a few minutes, and, during that time, the

21   lawyers will be given an opportunity, as required by our

22   law, to excuse one or more of the jurors in the jury box.

23   Those jurors who are not excused become members.  And we

24   repeat that process until we've selected our twelve jurors

25   and our alternate jurors.

Joanne Fleming

A64

1          Again, the purpose of a trial is for a jury to

2     decide, on the basis of evidence presented in this

3     courtroom, whether a person who has been accused of a crime

4     by the government is actually found guilty or not guilty of

5     that crime.

6          The jury's responsibility is to evaluate fairly

7     the testimony and other evidence presented at trial in order

8     to judge what the believable and accurate facts are, if any.

9     The jury's, therefore, also known as the finders of the

10    facts or the judges of the facts.

11         After the jury has found or judged the facts, the

12    jury must apply the law as I explain it to those facts and

13    decide without fear, favor, bias, prejudice, sympathy or

14    consideration of a possible sentence or punishment whether

15    the People have proven the defendant guilty beyond a

16    reasonable doubt.

17         In your deliberations, you may not consider or

18    speculate about matters relating to sentence or punishment.

19    If there is a verdict of guilty, it will be my

20    responsibility to impose an appropriate sentence.

21         In reaching its verdict, guilty or not guilty, the

22    jury must be fair.  It's important, therefore, for you to

23    know what makes a person a fair juror so that you can decide

24    whether or not you can be a fair juror in this particular

25    case.  Later in the proceedings I will ask you whether you

1    can be a fair juror.

2              A fair juror is a person who will accept and apply

3    the law of New York, in particular, that the defendant is

4    presumed to be innocent and that the People, the government,

5    bears the responsibility of proving the defendant guilty

6    beyond a reasonable doubt.

7              A fair juror is a person who has no personal bias

8    or prejudice in favor of or against any party whether the

9    witness is a police officer or a civilian.

10             A fair juror is a person who will listen carefully

11   to all the testimony and other evidence and not make a final

12   decision on the verdict until the end of the case after the

13   juror has heard all the evidence, has heard the lawyers'

14   summations, has heard the Court's final instructions on the

15   law and has had an opportunity, after all of that, to

16   discuss the evidence with the other jurors and to consider

17   their views.

18             Finally, a fair juror is a person who, without

19   fear, bias, prejudice or sympathy, for either the People or

20   the defendant or any witness, whether the witness is a

21   police officer or a civilian, renders a verdict of guilty or

22   not guilty which the juror is convinced is consistent with

23   that juror's honest evaluation of the testimony and other

24   evidence and that juror's honest application of the law.

25             My role is to help assure a fair and orderly trial

Joanne Fleming

A66

1    in accordance with our law.  I do that by presiding over the

2    trial, deciding questions of law that arise between and

3    among the parties and explain to you, the jury, as I'm doing

4    right now, what the law is that the jury must accept and

5    follow.

6              Thus, we're both judges in this case, but it's

7    important to recognize that we judge different things.  You,

8    the jury, judge the facts of the case in order to reach a

9    verdict of guilty or not guilty and I judge the law, meaning

10   I decide questions of law and I instruct the jury on the

11   law.

12             It is not my responsibility to judge the facts

13   here.  I do not decide whether the defendant is guilty or

14   not guilty.  You are the judges of the facts and you are

15   responsible for deciding whether the defendant is guilty or

16   not guilty.

17             So, nothing I say, or how I say it, and no ruling

18   I make on the law is intended to be, nor should it be,

19   considered by you as an expression of my opinion on the

20   facts of the case or of whether the defendant is guilty or

21   not guilty.

22             We now turn to the fundamental principles of our

23   law that apply in all criminal trials:  The presumption of

24   innocence, the burden of proof and the requirement of proof

25   beyond a reasonable doubt.


                         Joanne Fleming

                            A67

1          Throughout these proceedings the defendant is

2     presumed to be innocent.  As a result, you must find the

3     defendant -- find the defendant not guilty unless, on the

4     evidence presented at this trial, you conclude that the

5     People have proven the defendant guilty beyond a reasonable

6     doubt.

7          That a defendant does not testify as a witness is

8     not a factor from which any inference unfavorable to the

9     defendant may be drawn.  The defendant is not required to

10    prove that he is not guilty.

11         In fact, the defendant is not required to prove or

12    disprove anything.  The People have the burden of proving

13    the defendant guilty beyond a reasonable doubt.  That means,

14    before you can find the defendant guilty of a crime, the

15    People must prove, beyond a reasonable doubt, every element

16    of the crime, including that the defendant is the person who

17    committed that crime.

18         The burden of proof never shifts from the People

19    to the defendant.  If the People fail to satisfy their

20    burden of proof, you must find the defendant not guilty.

21    And if the People satisfy their burden of proof, you must

22    find the defendant guilty.

23         The law uses the term "proof beyond a reasonable

24    doubt" to tell you how convincing the evidence of guilt must

25    be to permit a verdict of guilty.

Joanne Fleming

A68

1        The law recognizes that in dealing with human

2   affairs, there are very few things in this world that we

3   know with absolute certainty.  Therefore, the law does not

4   require the People to prove the defendant guilty beyond all

5   possible doubt.

6        On the other hand, it is not sufficient to prove

7   that the defendant is probably guilty.  In a criminal case,

8   the proof of guilt must be stronger than that, it must be

9   beyond a reasonable doubt.

10        A reasonable doubt is an honest doubt of the

11   defendant's guilt for which a reason exists based upon the

12   nature and the quality of the evidence.

13        It is an actual doubt.  Not an imaginary doubt.

14        It is a doubt that a reasonable person, acting in

15   a matter of this important, would be likely to entertain

16   because of the evidence that was presented or because of the

17   lack of convincing evidence.

18        Proof of guilt beyond a reasonable doubt is proof

19   that leaves you so firmly convinced of the defendant's guilt

20   that you have no reasonable doubt of the existence of any

21   element of the crime or of the defendant's identity as the

22   person who committed that crime.

23        In determining whether or not the People have

24   proven the defendant's guilt beyond a reasonable doubt, you

25   should be guided solely by a full and fair evaluation of the

Joanne Fleming

A69

1    evidence.  After carefully evaluating the evidence, each of

2    you must decide whether or not that evidence convinces you

3    beyond a reasonable doubt of the defendant's guilt.

4                Whatever your verdict may be, it must not rest

5    upon baseless speculation, nor may it be influenced in any

6    way by bias, prejudice, sympathy or by a desire to bring an

7    end to your deliberations or to avoid an unpleasant duty.

8                If you are not convinced beyond a reasonable doubt

9    that the defendant is guilty of a charged crime, you must

10   find the defendant not guilty of that crime.  And if you are

11   convinced beyond a reasonable doubt that the defendant is

12   guilty of a charged crime, you must find the defendant

13   guilty of that crime.

14               As judges of the facts, you alone determine the

15   truthfulness and accuracy of the testimony of each witness.

16   You must decide whether a witness told the truth and was

17   accurate, or instead, testified falsely or was mistaken.

18               You must also decide what importance to give to

19   the testimony you accept as truthful and accurate.

20               It is the quality of the testimony that is

21   controlling, not the number of witnesses who testify.

22               There is no particular formula for evaluating the

23   truthfulness and accuracy of another person's statements or

24   testimony.  You bring to this process all of your varied

25   life experiences.  In life, you frequently decide the

Joanne Fleming

1    truthfulness and accuracy of statements made to you by other

2    people.  The same factors used to make those decisions

3    should be used in this case when evaluating the testimony.

4    I will instruct you further on this subject at the end of

5    the trial.

6              In this case you will hear the testimony of police

7    officers.  The testimony of a witness should not be believed

8    solely and simply because the witness is a police officer.

9              At the same time, a witness' testimony should not

10   be disbelieved solely and simply because the witness is a

11   police officer; in other words, you must not believe or

12   disbelieve a police officer just because he or she is a

13   police officer.

14             You must listen to a police officer's testimony

15   just like you would listen to any other witness, and you

16   must evaluate a police officer's testimony for truthfulness

17   and accuracy in the same way you would evaluate the

18   testimony of any other witness.

19             Your verdict, whether guilty or not guilty, must

20   be unanimous.

21             Since twelve people seldom agree immediately on

22   anything, to reach a unanimous verdict, you must deliberate

23   with the other jurors.  That means you should discuss the

24   evidence and consult with each other, listen to each other,

25   give each other's views careful consideration and reason

1     together when considering the evidence.

2           And when you deliberate, you should do so with a

3     view towards reaching an agreement if that can be done

4     without surrendering individual judgment.  Each of you must

5     decide the case for yourself but only after a fair and

6     impartial consideration of the evidence.

7           You should not surrender an honest view of the

8     evidence simply because you want the trial to end or because

9     you're outvoted.  At the same time, you should not hesitate

10    to re-examine your views and change your opinion if you

11    become convinced that it was not correct.

12          The attorneys have informed me that they expect

13    this trial to last approximately two weeks.  Please bear in

14    mind that that's just an estimate.  The trial could be

15    shorter, it could be a little bit longer.  But, right now,

16    our best guess is that the trial would be about two weeks.

17          The attorneys have given me names of witnesses

18    that they expect to call to the stand as well as the names

19    that you might hear mentioned from the stand; in other

20    words, they may not actually be witnesses, but they will be

21    named anyway.

22          I'm going to read that list here right now.

23    Please pay attention as I read these names to you.  You will

24    be given an opportunity, in a little while, to let me know

25    if you recognize any of these people:

Joanne Fleming

Voir Dire - The Court

```
 1              Cypress Smith, Laketa Smith, Dr. Anjay Singh,
 2     A-N-J-A-Y, Jeannie Tamariz, J-E-A-N-N-I-E, T-A-M-A-R-I-Z,
 3     Alynka Jean, A-L-Y-N-K-A, Detective Susan Barbato, Detective
 4     Randolff Pinard, Officer Ariel Castillo, Officer Danny Lora,
 5     Officer Millicent Semper-Martinez, Officer Ruth Mateo,
 6     Officer Christopher Hager, Officer Bradley Field, Tanya
 7     deVulpullieres, I will spell that,
 8     D-E-V-U-L-P-U-L-L-I-E-R-E-S, Dean DeLitta, D-E-L-I-T-T-A,
 9     Ronald Witt and Winston Chambers.
10              Jurors, now that you have had an opportunity to
11     hear my preliminary instructions on this case, you will be
12     given an opportunity, in a few minutes, to let me know if
13     you believe that you cannot serve on the jury either because
14     you believe you cannot be fair and impartial or for some
15     other reason.
16              Please do not wait until you're selected as a
17     juror and you're sworn in as a juror to tell me that you
18     cannot serve.  The law gives me much greater latitude to
19     excuse perspective jurors than it does to excuse actual
20     sworn jurors.
21              At the same time, having said that, please bear in
22     mind that I cannot excuse you as a juror on this case simply
23     because you have work, school or child care
24     responsibilities.  Work, school or child care
25     responsibilities alone, without more, will not suffice to
```

Joanne Fleming

A73

Voir Dire - The Court

1    excuse you from jury duty.  You can imagine that if I

2    excused everyone who had that as an excuse, I will not ever

3    be able to pick a jury, but I pick juries all the time as do

4    my colleagues on the Supreme Court bench.

5              Again, if based solely on what you have heard up

6    to this point you have reason to believe that you cannot be

7    fair and impartial in this case or you cannot serve for some

8    other reason, you will be given an opportunity to tell me

9    about that in a few minutes.

10             The way we're going to do that is the court

11   officers are going to give you certain instructions.  I ask

12   you to please respect the court officers and follow their

13   instructions.  When they speak to you, they speak on behalf

14   of the Court.  But, in essence, what they will do is ask you

15   to line up at the rail only if you need to speak to me.

16   Then you can approach the bench one by one.  At the bench,

17   we will be joined by the assistant district attorney and by

18   defense counsel.

19             And everything that we discuss will be taken down

20   by the court reporter.  Everything that's said in Part 59 is

21   taken by the court reporter.

22             At this time I will ask counsel to please

23   approach.

24             (Whereupon, the following proceedings took place

25   on the record and outside the presence of the prospective

Joanne Fleming

A74

1    jury panel:)

2                THE CLERK:  This is Patricia King, K-I-N-G.

3                THE COURT:

4                A PROSPECTIVE JUROR:  Hi.

5                THE COURT:  How can I help you, Ms. King?

6                A PROSPECTIVE JUROR:  I just don't feel like -- as

7    a mother of a daughter -- two daughters, actually -- that

8    with this crime, I could be unbiased.

9                And also with the police being the witnesses.  You

10   know, they've kind of a bad rap lately.

11               And my daughter and I were in the subway one day

12   and we all had big bags like this, and I saw two black women

13   who had bags called over and they went through their bags

14   but --

15               THE COURT:  Please remain seated.  You will be

16   given an opportunity to --

17               A PROSPECTIVE JUROR:  But they did not go through

18   mine.  So I just on those two things.  I just don't know

19   that I can be unbiased.

20               THE COURT:  Okay.

21               Any objections?

22               MS. PARK:  No.

23               MR. HERLICH:  No.

24               THE COURT:  You're excused.

25               THE WITNESS:  Thank you.


                         Joanne Fleming

```
 1                  THE CLERK:  Take that down to the fifteenth floor
 2     jury room.
 3                  (Whereupon, the prospective juror exited the
 4     courtroom.)
 5                  THE CLERK:  This is Benjamin Luntz, L-U-N-T-Z.
 6                  THE COURT:  Yes, sir, how can I help you?
 7                  A PROSPECTIVE JUROR:  I'm concerned that I'm not
 8     going to be able to be a fair juror.
 9                  THE COURT:  Why is that?
10                  A PROSPECTIVE JUROR:  I have a younger sister, and
11     without going into details, there was a situation growing
12     up.  I just tell you right now, I am fundamentally biased
13     towards any type of sexual assault situation.
14                  THE COURT:  Any objections?
15                  MR. HERLICH:  No.
16                  MS. PARK:  No.
17                  THE COURT:  You're excused.
18                  A PROSPECTIVE JUROR:  Thank you.
19                  THE CLERK:  Take that down to the fifteenth floor
20     jury room.
21                  (Whereupon, the prospective juror exited the
22     courtroom.)
23                  THE CLERK:  This is Eliard Gurtenboim,
24     G-U-R-T-E-N-B-O-I-M.
25                  THE COURT:  Yes, sir, how can I help you?
```

Joanne Fleming

A76

Voir Dire - The Court

```
 1              A PROSPECTIVE JUROR:  Hello, Judge.

 2              It's not a matter of impartiality, I can be fair,

 3    Judge.  My father was admitted into the hospital last night.

 4    I have the discharge papers.  He's stable.  I don't know if

 5    they're going to ask him to come in.  In an emergency

 6    situation, if something happens during --

 7              THE COURT:  If you can tell me a little bit more

 8    about what the situation is.

 9              THE WITNESS:  Infection and dehydration.  He's

10    very elderly.  He's stable.  Someone is looking after him

11    during the day.  If somethings happens --

12              THE COURT:  How do you feel about staying here for

13    the time being?

14              A PROSPECTIVE JUROR:  I'm fine.

15              THE COURT:  And see where it goes.

16              A PROSPECTIVE JUROR:  I'm actually fine.

17              THE COURT:  You can have a seat.

18              THE CLERK:  Just have a seat.

19              This is Ann Santulli, S-A-N-T-U-L-L-I.

20              THE COURT:  Hi, how can I help you?

21              A PROSPECTIVE JUROR:  How are you?

22              THE COURT:  Good, thank you.

23              A PROSPECTIVE JUROR:  When I was a teenager, my

24    cousin was brutally beaten and raped at knife point.  I

25    don't think I will be able to tolerate that.
```

Joanne Fleming

A77

```
1              THE COURT:  Sure.

2              Any objections?

3              MR. HERLICH:  No.

4              MS. PARK:  No.

5              THE COURT:  You're excused, ma'am.

6              THE CLERK:  Take that down to the fifteenth floor

7    jury room.

8              (Whereupon, the prospective juror exited the

9    courtroom.)

10             THE CLERK:  This is Max Barros, B-A-R-R-O-S.

11             THE COURT:  Yes, sir, how can I help you?

12             A PROSPECTIVE JUROR:  Hi, your Honor.

13             My only concern is that I am a musician,

14   self-employed.  I make my money, you know, I teach at home

15   one through five.  That's the only time.

16             THE COURT:  What time do you teach?

17             A PROSPECTIVE JUROR:  Hm?

18             THE COURT:  What time do you teach?

19             A PROSPECTIVE JUROR:  One to five every day.

20   Because it is a co-op.  They allow me only to do it at those

21   times.

22             THE COURT:  Are there any objections?

23             MR. HERLICH:  I don't, no.

24             MS. PARK:  No, Judge.

25             THE COURT:  You're excused.
```

Joanne Fleming

A78

1          THE CLERK:  Take that back to the fifteenth floor

2     jury room.

3          (Whereupon, the prospective juror exited the

4     courtroom.)

5          THE CLERK:  This is Catherine Heintzelman,

6     H-E-I-N-T-Z-E-L-M-A-N.

7          THE COURT:  How can I help you, ma'am?

8          A PROSPECTIVE JUROR:  My only concern right now is

9     I am a part-time freelancer.  I don't get paid at all if I

10    don't work.  I work three days a week.  That is my only

11    income.

12         THE COURT:  Any objections?

13         MS. PARK:  No.

14         MR. HERLICH:  No.

15         THE COURT:  You're excused.

16         THE CLERK:  Take that down to the fifteenth floor

17    jury room.

18         (Whereupon, the prospective juror exited the

19    courtroom.)

20         THE CLERK:  This is Grace Minamoto,

21    M-I-N-A-M-O-T-O.

22         THE COURT:  Hi.

23         A PROSPECTIVE JUROR:  Hi.

24         THE COURT:  How can I help you?

25         A PROSPECTIVE JUROR:  So, I am a physician.  I

Joanne Fleming

A79

1    take care of about fifty-eight patients a week in Montefiore

2    in the Bronx, and a number of my patients are going to be

3    needing surgery in the next couple of weeks and I have to do

4    their preoperative clearance and the post-op care for them.

5              THE COURT:  Are there other doctors there that

6    work with you?

7              A PROSPECTIVE JUROR:  Excuse me?

8              THE COURT:  Are there other doctors there that

9    work with you?

10             A PROSPECTIVE JUROR:  There are about seven other

11   doctors in my clinic, but I've already -- I sort of cleared

12   the past three, four days to come in, you know, to stay here

13   and they are -- I actually plan to have clinic tomorrow and

14   they're all backed up, so...

15             THE COURT:  Are there any follow-up questions?

16             MR. HERLICH:  If you weren't there, would the

17   surgeries that have been scheduled be fouled up?

18             A PROSPECTIVE JUROR:  They probably have to get

19   put off.

20             THE COURT:  So there's nobody else that could --

21             A PROSPECTIVE JUROR:  Well, they -- generally the

22   person who is taking care of them do that.  I actually did a

23   couple of those before coming.

24             THE COURT:  Any objection?

25             MR. HERLICH:  No.

Joanne Fleming

A80

Voir Dire - The Court

1          MS. PARK:  No.

2          A PROSPECTIVE JUROR:  I'm sorry?

3          THE COURT:  You're excused.

4          THE CLERK:  Take that down to the fifteenth floor

5    jury room.

6          (Whereupon, the prospective juror exited the

7    courtroom.)

8          THE CLERK:  This is Janice Chen, C-H-E-N.

9          THE COURT:  Hi.

10         A PROSPECTIVE JUROR:  Hi, good morning.

11         I had a friend in college my senior year who had

12   someone break into her apartment in the middle of the night

13   and sleeping and raped her.  I just don't think I will be

14   fair in this trial.

15         THE COURT:  You don't think you can set that aside

16   and base this case on the evidence?

17         A PROSPECTIVE JUROR:  No.  She had to stay with me

18   for like a month after.  Because she was dealing with court

19   and everything, I think that's something that I would be

20   biased towards.

21         THE COURT:  Any objection?

22         MR. HERLICH:  No.

23         MS. PARK:  No.

24         THE COURT:  Alright, you're excused.

25         THE CLERK:  Take that down to the fifteenth floor

Joanne Fleming

A81

```
 1    jury room.
 2                (Whereupon, the prospective juror exited the
 3    courtroom.)
 4                THE CLERK:  This is Brandon Eum, E-U-M.
 5                THE COURT:  Yes, sir, how can I help you?
 6                A PROSPECTIVE JUROR:  My elementary school soccer
 7    coach was convicted of sexual assault and I -- he was --
 8                THE COURT:  I'm sorry?
 9                A PROSPECTIVE JUROR:  -- he was convicted of
10    assaulting some of my friends.  I feel like I would have a
11    hard time rendering an unbiased opinion.
12                THE COURT:  You don't think you can set that aside
13    and listen to the evidence and decide the case on the
14    evidence?
15                A PROSPECTIVE JUROR:  It would be a little hard
16    for me because --
17                THE COURT:  Any objections?
18                MR. HERLICH:  No objection.
19                MS. PARK:  No.
20                THE COURT:  You're excused.
21                THE CLERK:  Take that down to the fifteenth floor
22    jury room.
23                (Whereupon, the prospective juror exited the
24    courtroom.)
25                THE CLERK:  This is Robert McWhorter,
```

Joanne Fleming

A82

```
 1    M-C-W-H-O-R-T-E-R.

 2            THE COURT:  Yes, sir, how can I help you?

 3            A PROSPECTIVE JUROR:  Mines is travel, really.  So

 4    the week of October 9th I will be gone and then the week of

 5    October 12th.

 6            THE COURT:  Today is what?

 7            A PROSPECTIVE JUROR:  It seems like it's outside

 8    the range.

 9            MR. HERLICH:  The Friday.

10            A PROSPECTIVE JUROR:  It is a Friday and the

11    Monday after that.

12            THE COURT:  One week from today is the first.  Two

13    weeks is the eighth.

14            You're traveling the night --

15            A PROSPECTIVE JUROR:  On the night, yes.

16            THE COURT:  You know, I will ask you to stay with

17    us because the two week estimate is very far away.

18            A PROSPECTIVE JUROR:  That's fine.  I just wanted

19    to make sure.

20            THE COURT:  Thank you.

21            A PROSPECTIVE JUROR:  Thank you.

22            THE CLERK:  Just have a seat.

23            (Prospective juror complies.)

24            THE COURT:  Did you agree --

25            MS. PARK:  Yes.
```

Joanne Fleming

A83

```
 1                    THE COURT:  -- the two-week estimate was kind of

 2     long?

 3                    MS. PARK:  Yes.

 4                    THE COURT:  Okay.

 5                    THE CLERK:  This is Domingo Ramos, R-A-M-O-S.

 6                    THE COURT:  Yes, Mr. Ramos, how can I help you?

 7                    A PROSPECTIVE JUROR:  I can't stay here for long

 8     so my English not too good.

 9                    THE COURT:  It's okay.

10                    A PROSPECTIVE JUROR:  In another case --

11                    THE COURT:  Any objections?

12                    MR. HERLICH:  No.

13                    MS. PARK:  No.

14                    THE COURT:  You're excused.  You're excused.

15                    A PROSPECTIVE JUROR:  And my daughter is sick, is

16     depressed.  I have to take her --

17                    THE COURT:  You're excused.

18                    A PROSPECTIVE JUROR:  So I can go home?

19                    THE COURT:  Yes.

20                    THE CLERK:  Take that to the fifteenth floor jury

21     room.

22                    A PROSPECTIVE JUROR:  Fifteenth floor?

23                    THE CLERK:  Yes.

24                    (Whereupon, the prospective juror exited the

25     courtroom.)
```

Joanne Fleming

A84

1          THE CLERK:  This is Dennis Chow, C-H-O-W.

2          A PROSPECTIVE JUROR:  Correct.

3          THE COURT:  Yes, Mr. Chow?

4          A PROSPECTIVE JUROR:  I am not sure if this falls

5    into the qualification or not, but I am a pastor, and my

6    wife and I are looking -- going to the Philippines for a

7    mission starting next summer.  We're going to our home

8    church in October 10th or 13th, I think.

9          THE COURT:  It's not a problem.

10         A PROSPECTIVE JUROR:  So I didn't know what to

11   report back to the church because she used to teach overseas

12   and we're supported by them.  We're reporting back here on

13   time there and raising support for this summer coming over

14   this mission years.  I don't know if that counts or not.  I

15   thought I'd bring out.

16         THE COURT:  So you're traveling on October 10th?

17         A PROSPECTIVE JUROR:  Whatever that weekend is.  I

18   couldn't get my phone calendar.  Whatever that weekend is.

19         THE COURT:  If that's your concern that you're

20   traveling that weekend, it's not an issue.  We expect to be

21   done by that time.

22         A PROSPECTIVE JUROR:  Okay.

23         THE CLERK:  Just have a seat.

24         (Prospective juror complies.)

25         THE CLERK:  Doctor Catherine Logan, L-O-G-A-N.

1          THE COURT:  Hi, ma'am.

2          A PROSPECTIVE JUROR:  I think I have a bias

3    against the case because I was sexually abused around the

4    same age.

5          THE COURT:  Okay.

6          Any objections?

7          MR. HERLICH:  No.

8          MS. PARK:  No.

9          THE COURT:  You're excused, ma'am.

10          THE CLERK:  Take that down to the fifteenth floor

11    jury room.

12          (Whereupon, the prospective juror exited the

13    courtroom.)

14          THE CLERK:  This is Jodie Henry, H-E-N-R-Y.

15          A PROSPECTIVE JUROR:  Hi.

16          I just have severe anxiety.  I've been in three

17    impatient treatment centers and that's really -- I can't

18    really sit here.

19          THE COURT:  Any objections?

20          MR. HERLICH:  No.

21          MS. PARK:  No.

22          THE COURT:  You're excused.

23          A PROSPECTIVE JUROR:  Thank you.

24          THE CLERK:  Take that down to the fifteenth floor

25    jury room.

Joanne Fleming

A86

1          (Whereupon, the prospective juror exited the

2     courtroom.)

3          THE CLERK:  This is Kristen Sickler,

4     S-I-C-K-L-E-R.

5          THE COURT:  Hi.

6          A PROSPECTIVE JUROR:  I've been the victim of two

7     sex assaults.

8          THE COURT:  Okay.

9          Any objection?

10     MS. PARK:  No.

11     MR. HERLICH:  No.

12          THE COURT:  You're excused.

13          THE CLERK:  Take that down to the fifteenth floor

14     jury room.

15          (Whereupon, the prospective juror exited the

16     courtroom.)

17          THE CLERK:  This is Norman Ho.

18          THE COURT:  Yes, sir?

19          THE CLERK:  H-O.

20          A PROSPECTIVE JUROR:  So my --

21          THE COURT:  I can't hear you.

22          A PROSPECTIVE JUROR:  One of my friends from high

23     school was raped.  It is, like, a very emotional.

24          THE COURT:  I'm hearing you know somebody who was

25     raped?

Joanne Fleming

A87

1          A PROSPECTIVE JUROR:  Yeah, and this is just a

2    very emotional thing for me.

3          THE COURT:  Who was it?

4          A PROSPECTIVE JUROR:  So, it was one of my very

5    close friends, my girlfriend at the time, her little sister,

6    was raped in high school.

7          And it's just a very emotional topic for me.

8    Again, I mean, I know the whole impartial thing, but I don't

9    know that I can be.

10          THE COURT:  You're not sure if you can?

11          A PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Any objections?

13          MR. HERLICH:  No.

14          MS. PARK:  No.

15          THE COURT:  You're excused.

16          THE CLERK:  Take that down to the fifteenth floor

17    jury room.

18          (Whereupon, the prospective juror exited the

19    courtroom.)

20          THE CLERK:  This is Laura Steinberg,

21    S-T-E-I-N-B-E-R-G.

22          THE COURT:  How can I help you?  How can I help

23    you?

24          A PROSPECTIVE JUROR:  How can I help you?  I don't

25    know.

Joanne Fleming

A88

1          THE COURT:  Well, this line if for people who want

2   to be excused.

3          A PROSPECTIVE JUROR:  I would love to be excused.

4   I'm very emotional and I could not follow this at all.  And

5   I don't like child molesters, so I don't know.  Tell me what

6   to do.

7          THE COURT:  Any objection?

8          MS. PARK:  No.

9          MR. HERLICH:  No.

10         THE COURT:  You're excused.

11         THE CLERK:  Take that down to the fifteenth floor

12   jury room.

13         A PROSPECTIVE JUROR:  Fifteenth floor?

14         THE CLERK:  Yeah.

15         (Whereupon, the prospective juror exited the

16   courtroom.)

17         THE COURT:  Just for the record, it wasn't clear

18   if she even understood what was happening.

19         THE CLERK:  This is Pira Robson, R-O-B-S-O-N.

20         THE COURT:  Hi, how are you?

21         A PROSPECTIVE JUROR:  I cannot be impartial for

22   four reasons.  You can stop me at any point.

23         One, I have two small girls.

24         Two, this is my neighborhood.

25         THE COURT:  This is what?

Joanne Fleming

A89

1          A PROSPECTIVE JUROR:  My neighborhood.

2          Three, I am a nurse practitioner, so I take in all

3  the students who claim to have been raped.

4          And four, I've been raped.

5          THE COURT:  Okay.

6          Any objection?

7          MR. HERLICH:  No.

8          MS. PARK:  No.

9          THE COURT:  You're excused.

10         THE CLERK:  Take that down to the fifteenth floor

11  jury room.

12         (Whereupon, the prospective juror exited the

13  courtroom.)

14         THE CLERK:  This is Steve Shah, S-H-A-H.

15         THE COURT:  Yes, sir, how can I help you?

16         A PROSPECTIVE JUROR:  Good morning, sir.

17         Recently there has been a very drastic sexual

18  abuse case back home where I come from.  I come from

19  Pakistan.  And this was in a place called Kasur, K-A-S-U-R,

20  which was international.  It involved sexual abuse of young

21  children that I think this case reflects an underage

22  scenario, fifteen-year old young lady.

23         And since I've been following this case and some

24  of the people I know are pursuing this case, because it was

25  a horrible case, I will not be able to bring about a fair --

Joanne Fleming

A90

Voir Dire - The Court

1   a fairness which is required.

2            THE COURT:  Now, you don't have any personal

3   connection to that case, right, other than the fact that it

4   is in your country?

5            THE WITNESS:  No personal connection, yes, just to

6   the extent that I come from there and I know the society and

7   we live there.

8            THE COURT:  Right.  It seems to me --

9            A PROSPECTIVE JUROR:  And the system, we know the

10  system, and perhaps our generation failed to improve the

11  system.  Perhaps.  I don't know.

12           THE COURT:  Here we have a totally different

13  system, obviously, than you do in Pakistan.

14           A PROSPECTIVE JUROR:  I know that.  It is just a

15  question of bias which I have.  I don't know.  I leave the

16  judgment up to you, sir.

17           THE COURT:  Only you can tell me whether you will

18  be biased or not.  It seems to me that your situation is,

19  what you are talking about, is removed from what's happening

20  here in this courtroom.

21           A PROSPECTIVE JUROR:  It is removed, but I'm

22  following it and I think I may come with some element of

23  what you all are looking at this.

24           THE COURT:  Any follow-up questions?

25           A PROSPECTIVE JUROR:  Perhaps I leave it to you

Joanne Fleming

A91

1   guys.

2          MR. HERLICH:  Well, so the bottom line is, can you

3   be fair and impartial in judging whether the prosecutor

4   proves their case beyond a reasonable doubt?

5          A PROSPECTIVE JUROR:  I think I can, but I don't

6   know the fact that, you know, this case is at the back of my

7   -- back of my mind and may create airs on my judgment.

8          THE COURT:  Any objections?

9          MR. HERLICH:  No.

10          THE COURT:  Alright, you're excused.

11          THE CLERK:  Take that down to the fifteenth floor

12   jury room.

13          A PROSPECTIVE JUROR:  Thank you, sir.  I apologize

14   for the inconvenience.

15          (Whereupon, the prospective juror exited the

16   courtroom.)

17          THE CLERK:  This is Argese Simon, S-I-M-O-N.

18          THE COURT:  Hi, how can I help you?

19          A PROSPECTIVE JUROR:  As a child, I was sexually

20   abused by a trusted relative.  Not raped.

21          I have two granddaughters.  Even when you were

22   describing the allegations, I just felt my blood pressure go

23   up.  I don't think I could be --

24          THE COURT:  Any objections?

25          MR. HERLICH:  No.

1           MS. PARK:  No.

2           THE COURT:  You're excused.

3           THE CLERK:  Take that to the fifteenth floor jury

4   room.

5           A PROSPECTIVE JUROR:  Okay.

6           (Whereupon, the prospective juror exited the

7   courtroom.)

8           THE CLERK:  This is Lauren Farrell, Keane-Farrell

9   K-E-A-N-E hyphen F-A-R-R-E-L-L.

10          THE COURT:  Hi, how can I help you?

11          A PROSPECTIVE JUROR:  Hi.

12          I was hearing the case.  I don't think I will be

13  impartial.  It was a too much with experience with sexual

14  assaults of friends and such.

15          THE COURT:  Okay.

16          Any objections?

17          MR. HERLICH:  No.

18          MS. PARK:  No.

19          THE COURT:  You're excused.

20          A PROSPECTIVE JUROR:  Thank you.

21          THE CLERK:  Take that to the fifteenth floor jury

22  room.

23          (Whereupon, the prospective juror exited the

24  courtroom.)

25          THE CLERK:  This is Sherman Goldman,

1    G-O-L-D-M-A-N.

2              THE COURT:  Yes, sir, how can I help you?

3              A PROSPECTIVE JUROR:  I just want to disclose that

4    I was a young lawyer, 1965 to '69, I worked for the American

5    Civil Liabilities Union -- I didn't work for them, I was a

6    volunteer for them defending indigent clients after hours in

7    my law firm.  And I developed a pre-fear of prejudice

8    against police testimony --

9              THE COURT:  Okay.

10             A PROSPECTIVE JUROR:  -- in that experience.

11             THE COURT:  Well, I can respect that.

12             Could you give me an assurance that you will

13   withhold judgment on these police officers until after you

14   observed them and you hear what they have to say?  In other

15   words, can you assure me that when they enter the courtroom,

16   there will be a blank slate and you will not pass judgment

17   on their credibility until after you observed them and until

18   you hear them?

19             A PROSPECTIVE JUROR:  I can make every effort to

20   do so.

21             THE COURT:  When you say "I can make every

22   effort," does that mean you are not sure you can?

23             A PROSPECTIVE JUROR:  We have prejudices.  I can

24   make every effort, but I cannot tell you that.

25             THE COURT:  Okay.

1          Are there any objections?

2          A PROSPECTIVE JUROR:  Don't start with --

3          MR. HERLICH:  No.

4          MS. PARK:  No.

5          THE COURT:  You're excused.

6          A PROSPECTIVE JUROR:  I'm sorry.

7          THE CLERK:  Take that down to the fifteenth floor

8   jury room.

9          (Whereupon, the prospective juror exited the

10  courtroom.)

11         THE CLERK:  This is Matthew Little, L-I-T-T-L-E.

12         THE COURT:  Yes, sir, how can I help you?

13         A PROSPECTIVE JUROR:  I'm traveling to California

14  next Friday and the following Monday.

15         THE COURT:  Any objections?

16         MR. HERLICH:  No.

17         MS. PARK:  No.

18         THE COURT:  You're excused.

19         THE CLERK:  Take this down to the fifteenth floor

20  jury room.

21         A PROSPECTIVE JUROR:  Thank you.

22         (Whereupon, the prospective juror exited the

23  courtroom.)

24         THE COURT:  Can I have your card?

25         A PROSPECTIVE JUROR:  (Handing.)

Joanne Fleming

A95

1      THE COURT:  This is Debra Field, F-I-E-L-D.

2      Yes, Ms. Field, how can I help you?

3      A PROSPECTIVE JUROR:  This is my -- I just like to

4   be able to be fair juror.  This is a subject I can't be a

5   juror on due to the fact that I was forced against my will

6   in college.

7      THE COURT:  Any objections?

8      MR. HERLICH:  No.

9      MS. PARK:  No.

10      THE COURT:  You're excused.

11      A PROSPECTIVE JUROR:  Thank you.

12      THE CLERK:  Take that down to the fifteenth floor

13   jury room.

14      (Whereupon, the prospective juror exited the

15   courtroom.)

16      THE CLERK:  This is Chantel Soto, S-O-T-O.

17      THE COURT:  Yes, Ms. Soto, how can I help you?

18      A PROSPECTIVE JUROR:  Two of my family members

19   were molested as teens and I just don't think I can be

20   impartial.

21      THE COURT:  Any objections?

22      MR. HERLICH:  No.

23      MS. PARK:  No.

24      THE COURT:  You're excused.

25      A PROSPECTIVE JUROR:  Thank you.

1              THE CLERK:  Take this down to the fifteenth floor

2      jury room.

3              (Whereupon, the prospective juror exited the

4      courtroom.)

5              THE CLERK:  This is Joan Lewis, L-E-W-I-S.

6              THE COURT:  Hi, Ms. Lewis.

7              A PROSPECTIVE JUROR:  Hi.

8              I don't think I will have emotional strength

9      because my sister was molested as a child.

10             THE COURT:  Okay.

11             Any objections?

12             MR. HERLICH:  No.

13             MS. PARK:  No.

14             THE COURT:  You're excused.

15             THE CLERK:  Take that down to the fifteenth floor

16     jury room.

17             A PROSPECTIVE JUROR:  Fifteenth floor?

18             THE CLERK:  Yes.

19             (Whereupon, the prospective juror exited the

20     courtroom.)

21             THE CLERK:  This is Jeffrey Kindl, K-I-N-D-L.

22             THE COURT:  Yes, sir, how can I help you?

23             A PROSPECTIVE JUROR:  I have two concerns.  Number

24     one, I have a mandatory training conference next week that's

25     crucial to my work.


                              Joanne Fleming

                                   A97

1          And then I also -- I don't know if I could be an

2     impartial juror because I had a friend who was sexually

3     assaulted when I was young.

4               THE COURT:  Any objections?

5               MR. HERLICH:  No.

6               MS. PARK:  No.

7               THE COURT:  You're excused.

8               THE CLERK:  Take that down to the fifteenth floor

9     jury room.

10              (Whereupon, the prospective juror exited the

11    courtroom.)

12              THE CLERK:  This is Adam Yankauskas.

13              A PROSPECTIVE JUROR:  Yankauskas.

14              THE CLERK:  Sorry, Y-A-N-K-A-U-S-K-A-S.

15              THE COURT:  Yes, sir, how can I help you?

16              A PROSPECTIVE JUROR:  My younger sister is a

17    victim of a rape and sexual abuse.

18              THE COURT:  Any objections?

19              MR. HERLICH:  No.

20              MS. PARK:  No.

21              THE COURT:  You're excused.

22              THE CLERK:  Take that down to the fifteenth floor

23    jury room.

24              (Whereupon, the prospective juror exited the

25    courtroom.)

Joanne Fleming

A98

```
 1                 THE CLERK:  This is Elizabeth Graden, G-R-A-D-E-N.
 2                 THE COURT:  Hi, Ms. Graden, how can I help you?
 3                 A PROSPECTIVE JUROR:  I was sexually assaulted
 4      when I was a kid and I don't think I can be impartial.
 5                 THE COURT:  Any objections?
 6                 MR. HERLICH:  I don't.
 7                 MS. PARK:  No.
 8                 THE COURT:  You're excused.
 9                 THE CLERK:  Take that back to the fifteenth floor
10      jury room.
11                 (Whereupon, the prospective juror exited the
12      courtroom.)
13                 THE CLERK:  This is Jonathan Schindler,
14      S-C-H-I-N-D-L-E-R.
15                 THE COURT:  Yes, sir, how can I help you?
16                 A PROSPECTIVE JUROR:  Hi.
17                 My son is having an operation on Monday and he has
18      lung issues.  So we're getting cleared on Friday with his
19      pulmonologist.
20                 THE COURT:  Any objections?
21                 MR. HERLICH:  No.
22                 MS. PARK:  No.
23                 THE COURT:  You're excused.
24                 A PROSPECTIVE JUROR:  Thank you.
25                 THE CLERK:  Take that down to the fifteenth floor
```

1   jury room.

2            (Whereupon, the prospective juror exited the

3   courtroom.)

4            THE CLERK:  This is Kenneth Swezey, S-W-E-Z-E-Y.

5            THE COURT:  Yes, sir, how can I help you?

6            A PROSPECTIVE JUROR:  I have a close personal

7   friend of mine was arrested and pled guilty to child

8   molestation case.  That was involving getting bail and

9   getting him counsel.  I just watched the torment that he and

10  his family went through.  He was released.  I don't feel

11  like I will be an objective part in this.

12           THE COURT:  Any objection?

13           MS. PARK:  No.

14           MR. HERLICH:  No.

15           THE COURT:  You're excused.

16           THE CLERK:  Take that back to the fifteenth floor

17  jury room.

18           (Whereupon, the prospective juror exited the

19  courtroom.)

20           THE CLERK:  This is Sara Green, G-R-E-E-N.

21           THE COURT:  Hi, Ms. Green, how can I help you?

22           A PROSPECTIVE JUROR:  My daughters are two, ten

23  and thirteen.  It makes me just very uncomfortable.

24           THE COURT:  Any objection?

25           MS. PARK:  No.

1           MR. HERLICH:  No.

2           THE COURT:  You're excused.

3           A PROSPECTIVE JUROR:  Thank you.

4           THE CLERK:  Take that down to the fifteenth floor

5    jury room.

6           (Whereupon, the prospective juror exited the

7    courtroom.)

8           THE CLERK:  This is Che Leung, L-E-U-N-G.

9           THE COURT:  Hi, how can I help you?

10          A PROSPECTIVE JUROR:  I'm sorry, my English is

11   basic.

12          THE COURT:  Any objections?

13          MR. HERLICH:  No.

14          MS. PARK:  No.

15          THE COURT:  You're excused.

16          THE CLERK:  Take that down to the fifteenth floor

17   jury room.

18          (Whereupon, the prospective juror exited the

19   courtroom.)

20          THE CLERK:  This is Fernando Gongora,

21   G-O-N-G-O-R-A.

22          THE COURT:  Yes, sir, how can I help you?

23          A PROSPECTIVE JUROR:  Yeah, I'm -- I feel that I

24   can't really perform my duties here.

25          THE COURT:  Why?

```
 1              A PROSPECTIVE JUROR:  Because I have a pretty bad
 2    memory and I tend to forget a lot, and due to the fact that
 3    I served in the military for thirty years as I get my V.A.
 4              THE COURT:  Okay.
 5              Any objections?
 6              MR. HERLICH:  No.
 7              MS. PARK:  No.
 8              THE COURT:  You're excused.
 9              THE CLERK:  Take that back to the fifteenth floor
10    jury room.
11              (Whereupon, the prospective juror exited the
12    courtroom.)
13              THE CLERK:  This is Caitlin Olson, O-L-S-O-N.
14              THE COURT:  Hi, Ms. Olson, how can I help you?
15              A PROSPECTIVE JUROR:  I've been on the receiving
16    end of what he's charged with.
17              THE COURT:  Any objections?
18              MR. HERLICH:  No.
19              MS. PARK:  No.
20              THE COURT:  You're excused, ma'am.
21              A PROSPECTIVE JUROR:  Thank you.
22              THE CLERK:  Take that down to the fifteenth floor
23    jury room.
24              (Whereupon, the prospective juror exited the
25    courtroom.)
```

Joanne Fleming

A102

1              THE CLERK:  This is Jane Elliott, E-L-L-I-O-T-T.

2              A PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Yes, Ms. Elliott, how can I help you?

4              A PROSPECTIVE JUROR:  I was raped when I was a

5    junior in college.

6              THE COURT:  Any objections?

7              MR. HERLICH:  No.

8              THE COURT:  You're excused, ma'am.

9              A PROSPECTIVE JUROR:  Thank you.

10             THE CLERK:  Take that down to the fifteenth floor

11   jury room.

12             (Whereupon, the prospective juror exited the

13   courtroom.)

14             THE CLERK:  This is Erica Pascuito,

15   P-A-S-C-U-I-T-O.

16             THE COURT:  Yes, how can I help you?

17             A PROSPECTIVE JUROR:  My little sister was raped

18   at age fourteen, so I don't think I will be impartial.

19             THE COURT:  Any objections?

20             MR. HERLICH:  No.

21             THE COURT:  You're excused.

22             THE CLERK:  Take that to the fifteenth floor jury

23   room.

24             (Whereupon, the prospective juror exited the

25   courtroom.)

1      THE CLERK:  This is Terry Tinsley, T-I-N-S-L-E-Y.

2      THE COURT:  Hi, how can I help you, sir?

3      A PROSPECTIVE JUROR:  I don't think I will be a

4  good juror for this case.

5      THE COURT:  Why is that?

6      A PROSPECTIVE JUROR:  I -- I do not believe -- I

7  don't like what's going on.  I think I won't -- I think I

8  will be a really bad judge.

9      THE COURT:  Any objections?

10      MR. HERLICH:  No.

11      THE COURT:  You're excused.

12      THE CLERK:  Take that down to the fifteenth floor

13  jury room.

14      (Whereupon, the prospective juror exited the

15  courtroom.)

16      THE COURT:  Just for the record, it was very

17  difficult to understand what he was saying.

18      THE CLERK:  This is Wanda Moses, M-O-S-E-S.

19      THE COURT:  Hi, Ms. Moses, how can I help you?

20      A PROSPECTIVE JUROR:  Good morning, Judge.

21      I have family around here in front of this area.

22  I heard the situation a little bit.  I do not want to be in

23  this case.

24      THE COURT:  Can you --

25      Any follow-up questions?

```
 1              MR. HERLICH:  This is in your neighborhood?

 2              A PROSPECTIVE JUROR:  It's around my family and

 3      friend's neighbor.  It's not my neighborhood.

 4              MR. HERLICH:  You heard about this?

 5              A PROSPECTIVE JUROR:  A little bit, and I don't

 6      want to be involved.

 7              THE COURT:  Any objection?

 8              MS. PARK:  No.

 9              THE COURT:  You're excused.

10              A PROSPECTIVE JUROR:  Thank you.

11              THE CLERK:  Take that back to the fifteenth floor

12      jury room.

13              (Whereupon, the prospective juror exited the

14      courtroom.)

15              THE CLERK:  This is Robert Conz, C-O-N-Z.

16              THE COURT:  Yes, sir, how can I help you?

17              A PROSPECTIVE JUROR:  First of all, does this stay

18      confidential what I'm about to say?

19              THE COURT:  Does it what?

20              A PROSPECTIVE JUROR:  Does it stay confidential?

21              THE COURT:  Everything is a public record, sir,

22      no.

23              A PROSPECTIVE JUROR:  Well, I was sexually

24      assaulted many times when I was child and I'm in therapy for

25      my entire freaking life.
```

Joanne Fleming

A105

```
 1                    THE COURT:  Any objections?

 2                    MR. HERLICH:  No.

 3                    MS. PARK:  No objection.

 4                    THE COURT:  You're excused, sir.

 5                    THE CLERK:  Take that down to the fifteenth floor

 6       jury room.

 7                    (Whereupon, the prospective juror exited the

 8       courtroom.)

 9                    THE CLERK:  This is Lesso Santora, S-A-N-T-O-R-A.

10                    THE COURT:  Yes, sir, how can I help you?

11                    A PROSPECTIVE JUROR:  So, I am -- I'm afraid I

12       have a bias in this situation.

13                    THE COURT:  Why?

14                    A PROSPECTIVE JUROR:  I have had many classmates,

15       as well as close friends, make me aware they were victims of

16       a sexual assault situation, and I know in a lot of cases

17       there's not evidence and it's completely unspoken.  So I am

18       a bit against the assaulting.

19                    THE COURT:  Any follow-up questions?  Any

20       questions?

21                    MR. HERLICH:  No.

22                    MS. PARK:  No.

23                    THE COURT:  You're excused.

24                    A PROSPECTIVE JUROR:  Thank you.

25                    THE CLERK:  Take that down to the fifteenth floor
```

Joanne Fleming

A106

1      jury room.

2                  (Whereupon, the prospective juror exited the

3      courtroom.)

4                  THE CLERK:  This is Erica Robinson,

5      R-O-B-I-N-S-O-N.

6                  THE COURT:  Hi, how can I help you?

7                  A PROSPECTIVE JUROR:  I travel every week for work

8      and I purchased non-refundable tickets for the next five

9      weeks.

10                 THE COURT:  Starting when?

11                 A PROSPECTIVE JUROR:  Starting Monday.

12                 THE COURT:  Any objections?

13                 MR. HERLICH:  I'm sorry, you travel what?

14                 A PROSPECTIVE JUROR:  I travel every week for

15     work.  I'm traveling to Denver.

16                 MR. HERLICH:  No objection.

17                 MS. PARK:  No.

18                 A PROSPECTIVE JUROR:  And the Philippines after

19     that.

20                 THE COURT:  Okay, you're excused.

21                 THE CLERK:  Take that down to the fifteenth floor

22     jury room.

23                 (Whereupon, the prospective juror exited the

24     courtroom.)

25                 THE CLERK:  This is George Brown, B-R-O-W-N.

1        THE COURT:  Yes, sir, how can I help you?

2        A PROSPECTIVE JUROR:  I am not going to be fair

3   about this.  I won't be fair, honest, because it -- what

4   happened here happened to some people in my family.

5        THE COURT:  Okay.

6        A PROSPECTIVE JUROR:  And my wife.

7        THE COURT:  Any objections?

8        MR. HERLICH:  No objection.

9        MS. PARK:  No.

10       THE COURT:  You're excused.

11       THE CLERK:  Take that down to the fifteenth floor

12   jury.

13       (Whereupon, the prospective juror exited the

14   courtroom.)

15       THE CLERK:  This is Jean Zhang, Z-H-A-N-G.

16       THE COURT:  Hi, how could I help you?

17       A PROSPECTIVE JUROR:  I was sexually assaulted

18   when I was in college in the bathroom and the library.

19       THE COURT:  Any objections?

20       MR. HERLICH:  No.

21       THE COURT:  You're excused.

22       THE CLERK:  Take that back to the fifteenth floor

23   jury room.

24       (Whereupon, the prospective juror exited the

25   courtroom.)

Joanne Fleming

A108

1          THE CLERK:  This is Josephine Pacquing,

2     P-A-C-Q-U-I-N-G.

3          THE COURT:  Hi, how can I help you?

4          A PROSPECTIVE JUROR:  My husband was molested when

5     he's a teenager, so I don't think I will be fair.

6          THE COURT:  Any objection?

7          MR. HERLICH:  No.

8          MS. PARK:  No.

9          THE COURT:  You're excused, ma'am.

10          THE CLERK:  Take that back to the fifteenth floor

11     jury room.

12          (Whereupon, the prospective juror exited the

13     courtroom.)

14          THE CLERK:  This is Karen Walker, W-A-L-K-E-R.

15          THE COURT:  Hi.

16          A PROSPECTIVE JUROR:  Hi.

17          I can barely tolerate being here, and the fact

18     that I have to now share this with the six of you, I got to

19     tell you, is really upsetting to me.  That -- can I just --

20     everyone can hear your whole conversations.  Can I write it

21     down?  I don't want to speak publicly.  I have been sexually

22     abused since --

23          THE COURT:  Okay, you're excused.

24          A PROSPECTIVE JUROR:  Okay.

25          THE CLERK:  Take that down to the fifteenth floor

Joanne Fleming

A109

```
 1    jury room.

 2              (Whereupon, the prospective juror exited the

 3    courtroom.)

 4              THE CLERK:  This is Nicholas Taylor, T-A-Y-L-O-R.

 5              THE COURT:  Yes, sir, how can I help you?

 6              A PROSPECTIVE JUROR:  I have a friend in school

 7    who was a victim of a similar sexual assault case and I

 8    don't think I am an impartial juror.

 9              THE COURT:  Okay.

10              Any objections?

11              MR. HERLICH:  No.

12              MS. PARK:  No.

13              THE COURT:  You're excused.

14              THE CLERK:  Take that back to the fifteenth floor

15    jury room.

16              (Whereupon, the prospective juror exited the

17    courtroom.)

18              THE CLERK:  This is Jeanine Saliba, S-A-L-I-B-A.

19              A PROSPECTIVE JUROR:  That was right.

20              THE COURT:  How can I help you?

21              A PROSPECTIVE JUROR:  Good morning.

22              I just have one concern.  I start a new job next

23    week and I have mandatory training out of state starting

24    Wednesday.

25              THE COURT:  Next week?
```

Joanne Fleming

A110

1          A PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  Any objections?

3          MR. HERLICH:  No.

4          MS. PARK:  No.

5          THE COURT:  You're excused.

6          Good luck.

7          A PROSPECTIVE JUROR:  Thank you.

8          THE CLERK:  Take that back to the fifteenth floor

9     jury room.

10          (Whereupon, the prospective juror exited the

11     courtroom.)

12          THE CLERK:  This is Gisela Ferradas,

13     F-E-R-R-A-D-A-S.

14          THE COURT:  Hi, how can I help you?

15          A PROSPECTIVE JUROR:  Hi.

16          My youngest is fourteen years old.  I have

17     daughters.  I think I'm not going to be strong enough to be

18     as impartial as you need me in this case.

19          THE COURT:  Any objections?

20          MR. HERLICH:  No.

21          MS. PARK:  No.

22          THE COURT:  You're excused.

23          THE CLERK:  Take that back to the fifteenth floor

24     jury room.

25          A PROSPECTIVE JUROR:  Fifteen?

Joanne Fleming

A111

1          THE CLERK:  Yeah.

2          (Whereupon, the prospective juror exited the

3    courtroom.)

4          THE CLERK:  This is Zeidra Lugos, L-U-G-O-S.

5          THE COURT:  Hi, Ms. Lugos, how can I help you?

6          A PROSPECTIVE JUROR:  When I was younger, this man

7    forced me down, I guess to try to rape me but I fought off.

8    So I think I will not be able to judge.

9          THE COURT:  Any objection?

10         MR. HERLICH:  No.

11         MS. PARK:  No.

12         A COURT OFFICER:  Take that down to the fifteenth

13   floor.

14         (Whereupon, the prospective juror exited the

15   courtroom.)

16         A COURT OFFICER:  This is Carolina Chaljub,

17   C-H-A-L-J-U-B.

18         THE COURT:  Hi.

19         A PROSPECTIVE JUROR:  Hi.

20         My mom was sexually abused by a family member when

21   she was young.  So I feel like it's too close to home.

22         THE COURT:  Any objections?

23         MR. HERLICH:  No.

24         MS. PARK:  No.

25         THE COURT:  You're excused.

Joanne Fleming

A112

```
 1                    A COURT OFFICER:  Back to fifteen.

 2                    (Whereupon, the prospective juror exited the

 3       courtroom.)

 4                    A COURT OFFICER:  This is Catalina Belliard,

 5       B-E-L-L-I-A-R-D.

 6                    THE COURT:  Yes?  How can I help you?

 7                    A PROSPECTIVE JUROR:  Me no speaky English.

 8                    THE COURT:  Any objections?

 9                    MR. HERLICH:  No.

10                    MS. PARK:  No.

11                    A PROSPECTIVE JUROR:  I don't understand too much.

12                    THE COURT:  You're excused.  You're excused.

13                    THE CLERK:  Take this down to the fifteenth floor

14       jury room.

15                    (Whereupon, the prospective juror exited the

16       courtroom.)

17                    THE CLERK:  This is Nadine Deleron, D-E-L-E-R-O-N.

18                    THE COURT:  Hi, how can I help you?

19                    A PROSPECTIVE JUROR:  I don't think I can be a

20       fair juror in this trial because I was sexually assaulted as

21       a little girl.

22                    THE COURT:  Any objections?

23                    MR. HERLICH:  No.

24                    MS. PARK:  No.

25                    THE COURT:  You're excused.
```

```
1              A PROSPECTIVE JUROR:   Thank you.

2              THE CLERK:   Take that back to the fifteenth floor

3     jury room.

4              (Whereupon, the prospective juror exited the

5     courtroom.)

6              THE CLERK:   This is Tanita Ramnarine,

7     R-A-M-N-A-R-I-N-E.

8              THE COURT:   Hi, how can I help you?

9              A PROSPECTIVE JUROR:   I am a victim of sexual

10    assault and I can't give fair judgment.

11             THE COURT:   Any objections?

12             MR. HERLICH:   No.

13             MS. PARK:   I don't.

14             THE COURT:   You're excused.

15             THE CLERK:   Take that back to the fifteenth floor

16    jury room.

17             (Whereupon, the prospective juror exited the

18    courtroom.)

19             THE CLERK:   This is Daniel Preston, P-R-E-S-T-O-N.

20             THE COURT:   Yes, sir, how can I help you?

21             A PROSPECTIVE JUROR:   I recently married my

22    girlfriend of fourteen years, and during the engagement, we

23    found out or it came to light that her father molested her

24    and three little cousins and we're currently paying for a

25    private investigation on it.
```

Joanne Fleming

A114

1          THE COURT:  Okay.

2          Any objections?

3          MR. HERLICH:  No.

4          MS. PARK:  No.

5          THE COURT:  You're excused.

6          THE CLERK:  Take that back to the fifteenth floor

7   jury room.

8          (Whereupon, the prospective juror exited the

9   courtroom.)

10          THE CLERK:  This is Chantel Johnson,

11   J-O-H-N-S-O-N.

12          THE COURT:  Hi, Ms. Johnson.

13          A PROSPECTIVE JUROR:  Good morning.

14          I was sexually assaulted when I was little.

15          THE COURT:  Any objection?

16          MR. HERLICH:  No.

17          MS. PARK:  No.

18          THE COURT:  You're excused.

19          THE CLERK:  Take that back to the fifteenth floor

20   jury room.

21          (Whereupon, the prospective juror exited the

22   courtroom.)

23          THE CLERK:  This is Peter Spring, S-P-R-I-N-G.

24          THE COURT:  Yes, sir?

25          A PROSPECTIVE JUROR:  Your Honor, I have a trip

1    out of state starting this afternoon.

2              THE COURT:  Sorry, I can't hear.

3              A PROSPECTIVE JUROR:  I have a trip out of state

4    that others are depending on me for.  I paid upfront so I

5    will lose all the money for it.

6              THE COURT:  Any objections?

7              MR. HERLICH:  No.

8              THE COURT:  You're excused.

9              A PROSPECTIVE JUROR:  Thank you, sir.

10             THE CLERK:  Take that down to the fifteenth floor

11   jury room.

12             (Whereupon, the prospective juror exited the

13   courtroom.)

14             THE CLERK:  This is Michael Cooley, C-O-O-L-E-Y.

15             THE COURT:  Yes, sir, how can I help you?

16             A PROSPECTIVE JUROR:  I just realized with the

17   schedule I will be out of the state on October 8th and

18   ninth.  I don't know if it's going to go to that long.

19             THE COURT:  I think that's okay.  I think that

20   should work out okay.  Thank you.

21             A PROSPECTIVE JUROR:  Okay.

22             THE CLERK:  Just have a seat.

23             (Prospective juror complies.)

24             THE COURT:  Before you step back, I received a

25   note on my other case that I have to deal with.  I will

Joanne Fleming

A116

1    excuse the jurors for about twenty minutes or so, deal with

2    that note and then deal with anything else that you feel we

3    need to wrap up before you can conduct your voir dire.  So

4    you can step back.

5              (Whereupon, the following proceedings took place

6    on the record and in the presence of the prospective jury

7    panel:)

8              THE COURT:  Alright, jurors, at this time we're

9    going to take about a twenty-minute break.

10             I ask you, during this break, to please not

11   discuss the case either among yourselves or with anyone

12   else.

13             Please continue to keep an open mind as to the

14   defendant's guilt or innocence.

15             Please do not form or express an opinion as to the

16   defendant's guilt or innocence.

17             If you happen to see me or the attorneys or the

18   defendant out in the public spaces and we don't talk to you,

19   please do not be offended.  We're prohibited from engaging

20   you during the course of the trial.  And in order to avoid

21   any appearance of impropriety, we may not greet you.

22             I will see you in about ten minutes.  You can step

23   out.

24             (Whereupon, the prospective jury panel exited the

25   courtroom.)

Proceedings                                    110

```
 1              THE COURT:  Okay, if you can please step out so I
 2     can handle the other matter?  But please come back in about
 3     five or ten minutes.  Because I would like to take care of
 4     Sandoval before you do your voir dire.
 5              MR. HERLICH:  Okay.
 6              (Whereupon, a recess was taken.)
 7              THE CLERK:  Recalling Lonnie Harrell.
 8              THE COURT:  Okay, we've been joined by Mr.
 9     Harrell.
10              The other jury panel is out on a break right now
11     -- well, this jury panel is out on a break right now, but I
12     wanted to wrap up the two outstanding issues which were my
13     ruling as to the second set of officers and Sandoval.
14              I had an opportunity to review the cases that were
15     handed up by the People and they are:  People versus Pham,
16     118 AD 3d 1159; People v. Fabian, First Department decision,
17     625 NY sub 2d 4; People v. Lionel Williams, First Department
18     decision, 181 AD 2d 474; and People v. Morales, 34 AD 3d
19     396.
20              Although some of these cases deal with a prompt
21     outcry and some deal with excited utterances, I find that
22     they are on point with regard to the second set of officers,
23     and at this time I'm going to rule that the statements made
24     to the second set of officers will be admissible as excited
25     utterances.  I believe that the foundation has been laid in
```

Joanne Fleming

A118

1    its own right, that those statements made to the second set

2    of officers were also excited utterances.

3           It's not that I'm piggybacking the foundation or

4    piggybacking the statements.  I believe it has been

5    established that the complaining witness was still under

6    this excited state as required by the law at the time she

7    spoke with those -- the second set of officers.

8           Further, I find that their testimony would not be

9    cumulative as certain statements were made to them that were

10   not made to others.  So they were made to them for the first

11   time.

12          I think in light of the fact that a foundation has

13   been laid, the statements were all made really within

14   minutes of each other.

15          The fact that the prompt outcry to the mother for

16   the time being is being precluded and that the details of

17   the conversation between the officer who called the mother

18   are also being precluded, I believe that this is a fair and

19   balanced ruling.  Of course, that's just my opinion.

20          Now let's deal with Sandoval.

21          MS. PARK:  Judge, the defendant has eight

22   misdemeanor convictions and two felony convictions, all

23   going back to 1982.  I am going to ask for the following:

24   He has --

25          THE COURT:  Can you start with the oldest one

Sandoval

1    first?  Or if that's not how you have it.

2                MS. PARK:  Yes, I do have it that way.

3                THE COURT:  Okay.

4                MS. PARK:  But he has several my -- he has a 1982

5    trespass in the third degree conviction.  1984 --

6                THE COURT:  I'm sorry, you got to go slower.  1982

7    trespass in the third?

8                MS. PARK:  Yes.

9                THE COURT:  1984?

10               MS. PARK:  Assault in the third degree.

11               And then 1986, criminal possession of stolen

12   property.  In 1986, jostling.  1989, attempted grand larceny

13   in the fourth degree.

14               I will not be seeking to cross-examine the

15   defendant about those incidents.

16               THE COURT:  Okay.

17               MS. PARK:  However, I am going to ask your Honor's

18   permission to ask about the following convictions should the

19   defendant testify:  His 1990 possession of burglars tools

20   where he took a razor blade and slashed the pants pockets of

21   victims while the victim was sleeping on -- inside a train.

22               THE COURT:  Okay.

23               MS. PARK:  He has another 1990 jostling

24   conviction, similar situation, where he was riding in the

25   train and he was caught going through the pockets of several

1    passengers.

2              THE COURT:  Mm-hmm.

3              MS. PARK:  And he has a 1991 robbery in the first

4    degree and assault in the first degree conviction where he

5    received an aggregate sentence of seven and a half to

6    twenty-six and a half years.

7              And, in that case, your Honor, the defendant and

8    three other cohorts approached four tourists who are on

9    their way to see the Statue of Liberty inside the Number 1

10   Train, and the defendant actually slashed one of the

11   victims' face leaving a large laceration on his face as well

12   as severing an optic nerve in his eye causing him to be

13   permanently blind in that eye.

14             THE COURT:  And how much time did he actually

15   serve on that?

16             MS. PARK:  Judge, for that crime, he served about

17   twenty years.

18             And while that conviction might --

19             THE COURT:  So approximately when was he released?

20             MS. PARK:  He was released on June 17th of 2009.

21             However, on July 30th of 2010, he went back to

22   jail and he was then released again on November 10th of

23   2010.

24             And while that 1991 robbery conviction might seem

25   remote, he has spent about twenty years -- the past twenty

1    years --

2              THE COURT:  So he spent --

3              MS. PARK:  -- incarcerated.

4              THE COURT:  He spent from 1991 to June 17th, 2009

5    behind bars?

6              MS. PARK:  Yes.

7              THE COURT:  And then again from July 30th of 2010

8    to November 10th, 2010?

9              MS. PARK:  Correct.

10             THE COURT:  Okay.

11             What other crimes?

12             MS. PARK:  And then while he was incarcerated, in

13   2004, he was convicted of possession of dangerous contraband

14   in prison in the first degree for being in possession of a

15   metal shank that was about six inches long.

16             And those are the four incidents that I am seeking

17   to introduce or inquire about.

18             THE COURT:  Okay.

19             MS. PARK:  And, Judge, with respect to the first

20   three, I would ask that since theft-related offenses are

21   highly relevant to his credibility, that the underlying

22   facts are relevant or lays the nature of the charges, and as

23   to the 2004 conviction, just that he was convicted of a

24   felony.

25             THE COURT:  Okay.

Sandoval

1        Mr. Herlich?

2        MR. HERLICH:  Just for clarification, could you

3    indicate the docket number or at least the arrest date of

4    the burglars tools conviction?  I'm trying to locate that.

5        THE COURT:  Well, you know what?  I'm not going to

6    permit that one anyway.  It's from 1990.  Don't worry about

7    it.

8        But I will hear you on the others.

9        MR. HERLICH:  The others being the felonies?  Or

10   was there another --

11       THE COURT:  The rob one and assault one from 1991.

12       MR. HERLICH:  Right.

13       THE COURT:  The jostling from 1990 and the

14   possession of contraband in the first degree from 2004.

15       MR. HERLICH:  So, I'm just trying to locate the

16   jostling count.  I think I see it.

17       Okay, that's from February -- or January 16th,

18   1990?

19       MS. PARK:  (Indicating.)

20       MR. HERLICH:  Okay.

21       Judge, my position would be with regard to that

22   misdemeanor conviction, that if the Court allows inquiry, it

23   should be limited to the fact that was the defendant

24   convicted of a misdemeanor at that time.  I would oppose

25   going into the underlying facts.

Sandoval

1    With regard to the felony convictions for robbery

2    one and assault one, my initial position would be to

3    preclude that inquiry.

4         Alternatively, that the inquiry should be:  Were

5    you convicted of a felony on the date of the conviction.

6         Thirdly, if that isn't successful, I would ask the

7    Court to limit inquiry to the crimes for which the defendant

8    was convicted:  Robbery in the first degree, assault in the

9    first degree, without eliciting testimony from the defendant

10   regarding the actual underlying facts of the cases.

11        THE COURT:  Okay.

12        MR. HERLICH:  And with regard to the most recent

13   felony, I would actually join the prosecutor.  If you're

14   going to allow inquiry, it should be limited to a felony

15   conviction without indicating that it was possession of

16   contraband or prison contraband, telling the jury that the

17   defendant was incarcerated at the time of that conviction.

18        THE COURT:  Now, that was a felony also, right?

19        MR. HERLICH:  Yes, your Honor.

20        MS. PARK:  Yes.

21        THE COURT:  Alright.

22        Well, out of the eight misdemeanors and two

23   felonies in the defendant's criminal history, the

24   prosecution has voluntarily chosen not to go into five of

25   the misdemeanors.

Joanne Fleming

A124

1    With regard to the first two misdemeanors that the

2    People would like to go into, the possession of burglars

3    tools and the jostling conviction from 1990, I find that

4    it's just too remote a time.  It's twenty-five years ago.

5    With regard to the felonies for the robbery in the

6    first degree and assault in the first degree, that was

7    twenty-four years ago.  It would appear on its face to be

8    too remote.  However, the defendant was actually

9    incarcerated and served twenty years for those convictions,

10   and what's more, he was convicted of another crime while he

11   was incarcerated.  So, I don't believe that these crimes are

12   all that remote if you engage in the sort of the quasi

13   tolling of the conviction.

14   So, if the defendant takes the stand, I will

15   permit the prosecution to ask if he was convicted of a

16   felony in 1991.  We won't go into the felony or the facts of

17   the felony, but just the fact that he was convicted of a

18   felony in 1991.

19   And you will be permitted to also ask whether he

20   was convicted of a felony in 2004.

21   So, the prosecution will be permitted to ask

22   whether he was convicted of those two felonies.

23   Mr. Harrell, this is a very favorable ruling in

24   your favor and I'm doing so so that you can take the stand,

25   if you choose to take the stand.  Please bear in mind, if

1    you take the stand and in any way try to mislead the jury as

2    to your criminal history, you know, if you try to deceive

3    them in any way, based on this ruling that I'm making in

4    your favor, I'm sure the prosecution is going to argue that

5    you have opened the door and I will then listen to arguments

6    and perhaps find that you have.

7              So, for example, if you take the stand and you say

8    that you've never been convicted of any crime involving

9    taking property from other people, well, that would be a

10   lie, that wouldn't be true.  You in fact were convicted of

11   jostling and possession of burglars tools, which are

12   related, so therefore, you would be deceiving the jury and I

13   would permit the People then to walk through this door which

14   you've opened.

15             I can't go through all the ways you can open the

16   door.  That's for you to discuss with your attorney.  Just

17   bear in mind you cannot use this ruling in your favor to

18   your unfair advantage.  Do you understand?

19             THE DEFENDANT:  Understood.

20             THE COURT:  Okay, very well.

21             Let's take five minutes.

22             (Whereupon, a recess was taken.)

23             THE CLERK:  Continuing case on trial, People

24   versus Lonnie Harrell.

25             THE COURT:  I received a note on the trial, the

Proceedings

```
1    other trial with the deliberating jury, and they've
2    requested a readback.  I would like to tend to that first.
3    So I think we should excuse this jury panel till
4    two-fifteen.
5              Is there any objection to me having one of the
6    court officers or the sergeant excuse them till two-fifteen
7    or would you prefer that I bring them in and I excuse them?
8              MR. HERLICH:  No objection, that's fine.
9              MS. PARK:  Yes.
10             THE SERGEANT:  I will do that.
11             THE COURT:  Okay, great, tell them to come back at
12   two-fifteen and tell them to remember all of the Judge's
13   instructions.
14             THE SERGEANT:  Admonitions.
15             THE COURT:  Then let's recall the other case.
16                  (Luncheon recess held.)
17    * * * A F T E R N O O N    S E S S I O N * * *
18             THE CLERK:  Continuing case on trial, People
19   versus Lonnie Harrell.
20             THE SERGEANT:  There is a problem.
21             THE COURT:  What's the problem?
22             THE SERGEANT:  The traveler, she wants to come up.
23             THE COURT:  When we bring the defendant, why don't
24   we bring in that person first?
25             I don't think you overheard.  We have only
```

Joanne Fleming

1    twenty-four or twenty-three in the audience.  We will call

2    them all.  We will go to eighteen and the rest will be in

3    the first row.

4              MR. HERLICH:  Okay.

5              MS. PARK:  Judge, when the defendant comes out, I

6    just have to make a brief disclosure.

7              THE COURT:  Okay.

8              (Whereupon, the defendant entered the courtroom.)

9              THE COURT:  Okay, we've been joined by the

10   defendant.

11             MS. PARK:  Judge, I just wanted to make a record

12   that when I spoke with the complainant's mother, there is no

13   pending lawsuit.  She has not consulted with an attorney,

14   but she did admit that she had thought about pursuing a

15   possible civil lawsuit against the building, primarily the

16   board, primarily because she was angry and upset that the

17   board would hire the defendant who she later found out,

18   after the incident, was a convicted felon.  So, this is

19   something that she told me that she might do.  Only time

20   will tell whether she will actually file the lawsuit.

21             THE COURT:  She hasn't consulted with a lawyer?

22             MS. PARK:  I wanted to let Mr. Herlich know and

23   the Court know, if that somehow that door gets opened, you

24   know, her motivation for filing a lawsuit, the reason might

25   come out.  I just wanted to put that on the record.

Joanne Fleming

A128

```
 1                  THE COURT:  Okay.

 2             Let's bring that one juror in, please.

 3             (Defendant conferring with counsel.)

 4             THE SERGEANT:  Juror entering.

 5             (Whereupon, the prospective juror entered the

 6    courtroom.)

 7             THE COURT:  Hi, how are you?

 8             A PROSPECTIVE JUROR:  Hi.

 9             THE COURT:  Can you state your name for the

10    record?

11             A PROSPECTIVE JUROR:  Sara Catano, spelled

12    C-A-T-A-N-O.

13             THE COURT:  How could I help you, Ms. Catano?

14             A PROSPECTIVE JUROR:  I didn't get a chance to

15    look at my schedule when we were in the courtroom.  I didn't

16    take my phone out.  When I did, this goes back to a trip I

17    planned on Columbus weekend.

18             THE COURT:  That will be the eleventh or the

19    twelfth?

20             A PROSPECTIVE JUROR:  I'm gone for a few days

21    onward.

22             THE COURT:  There's a couple of other people in a

23    similar situation.  We believe we will be done by then.

24             A PROSPECTIVE JUROR:  Okay.

25             THE COURT:  Thank you.
```

Joanne Fleming

A129

1          A PROSPECTIVE JUROR:  Thank you.

2          THE SERGEANT:  I might as well leave her here.

3          THE COURT:  Ms. Catano, you can stay.  We will

4     bring everyone else in.

5          Ms. Park, you did say three or four days?

6          MS. PARK:  Three or four days, right.

7          THE COURT:  And how many witnesses do you expect

8     to have?

9          MR. HERLICH:  One.

10          THE COURT:  Who is it?

11          MR. HERLICH:  (Indicating.)

12          THE SERGEANT:  Jury panel entering.

13          (Whereupon, the prospective trial jurors entered

14     the courtroom.)

15          THE COURT:  Good afternoon, jurors.  Welcome,

16     back.

17          At this time the clerk of the court is going to

18     call out eighteen names at random.  If your name is called,

19     please come up with your belongings, the court officer will

20     tell you where to sit.

21          You will be handed a questionnaire.  Look through

22     it so you will be able to answer the questions when we get

23     to you.

24          THE CLERK:  Seat number one, Jean Boyle,

25     B-O-Y-L-E.

```
 1                    Seat number two, Eric Vargas, V-A-R-G-A-S.

 2                    Seat number three, Timothy Alexander,

 3       A-L-E-X-A-N-D-E-R.

 4                    Seat number four, Dennis Chow, C-H-O-W.

 5                    Seat number five, Justin Watkins, W A-T-K-I-N-S.

 6                    Seat number --

 7                    THE SERGEANT:  What's the last name?

 8                    THE CLERK:  Justin Watkins?

 9                    No response.

10                    Seat number five, Kathleen Cuddihy, C-U-D-D-I-H-Y.

11                    Seat number six, Catherine Tajzler, T-A-J-Z-L-E-R.

12                    Seat number seven, Garrett Hall, H-A-L-L.

13                    Seat number eight, Peter Huitzacua,

14       H-U-I-T-Z-A-C-U-A.

15                    Seat number nine, Arelis Gresequet,

16       G-R-E-S-E-Q-U-E-T, first name A-R-E-L-I-S.

17                    Seat number ten, Julia Turner, T-U-R-N-E-R.

18                    Seat number eleven, Scott Wilson, W-I-L-S-O-N.

19                    Seat number twelve, Kyle Baldwin, B-A-L-D-W-I-N.

20                    Seat number thirteen, Aparna Bhattacharya,

21       B-H-A-T-T-A-C-H-A-R-Y-A, first name A-P-A-R-N-A.

22                    Seat number fourteen, Robert McWhorter,

23       M-C-W-H-O-R-T-E-R.

24                    Seat number fifteen, Ilya Gurtenboim,

25       G-U-R-T-E-N-B-O-I-M.  First name I-L-Y-A.
```

Joanne Fleming

A131

```
1                    Seat number sixteen, Doreen Salerno,

2    S-A-L-E-R-N-O.

3                    Seat number seventeen, Didier Morais, M-O-R-A-I-S,

4    first name D-I-D-I-E-R.

5                    Seat number eighteen, Eric Nietsch, N-I-E-T-S-C-H.

6                    THE COURT:  Brian, there are six left in the

7    audience.

8                    THE CLERK:  Yes.

9                    THE COURT:  Alright, let's hold off on that.

10                   THE CLERK:  Hold off?

11                   THE COURT:  Yeah.

12                   THE CLERK:  Okay.

13                   THE COURT:  Good afternoon, Ms. Boyle.

14                   A PROSPECTIVE JUROR:  Hi.

15                   THE COURT:  You can start.  You can start whenever

16   you're ready.

17                   A PROSPECTIVE JUROR:  Just answer the questions?

18                   THE COURT:  Just answer the questions.  You don't

19   have to read the questions.

20                   A PROSPECTIVE JUROR:  Okay.

21                   I've lived at my current address for two years.

22                   I live downtown in the Financial District.

23                   I am not a native New Yorker.  Originally from

24   Rhode Island.

25                   I work for a small company, in the financial
```

1    industry.

2              Have a bachelor's degree.

3              Not married.  Never been married.

4              No children.

5              Spare time is outdoor activities, hiking and stuff

6    like that.

7              No, I have not been on a jury before.

8              No relatives have been victims of crimes.

9              No to the law enforcement agency.

10             And no to the rest of the questions.

11             THE COURT:  Okay, thank you.

12             Good afternoon, Mr. Vargas.

13             A PROSPECTIVE JUROR:  Hi.

14             I've lived in Hell's Kitchen for the past year.

15             I'm originally from Florida.

16             I work in television production.  I've been doing

17   that for three years.

18             I have a bachelor's and master's in finance.

19             Not married.  Never been married.

20             I live with another adult.  He is a server.

21             No children.

22             Spare time, gym, movies.

23             Never been on a jury before.

24             And I do have a relative that's been the victim of

25   a crime.


Joanne Fleming

A133

1     THE COURT:  Anything about that situation with

2  your relative that would affect your ability to be fair and

3  impartial here?

4     A PROSPECTIVE JUROR:  No.

5     THE COURT:  Okay.

6     A PROSPECTIVE JUROR:  And no to number nine.

7     Yes, to number ten.

8     THE COURT:  What can you tell us about number ten?

9     A PROSPECTIVE JUROR:  My aunt had a conflict with

10  the law.  I don't -- she was in prison for a long time.

11     THE COURT:  Would that affect your ability to be

12  fair and impartial?

13     A PROSPECTIVE JUROR:  No.

14     And, you know, the television production, a lot of

15  stuff happens at night so that my occupation requires me

16  many times to work at night.

17     THE COURT:  Okay.  Thank you.

18     Good afternoon, Mr. Alexander.

19     A PROSPECTIVE JUROR:  Good afternoon, Judge.

20     I've lived in New York for five years.

21     I'm not a native New Yorker.  I'm from Patterson,

22  New Jersey.

23     I have a master degree in religious education.

24     I'm married.

25     I am currently unemployed.  I'm on disability.

Joanne Fleming

A134

1          My hobbies are music and singing.

2          I've never served on a jury before.

3          And no to number eight, I have not been the victim

4     of a crime.

5          I do have a stepson who is a U.S. marshal serving

6     in Virginia at this particular time.

7          And no to the rest.

8          THE COURT:  Thank you very much.

9          Good afternoon, Mr. Chow.

10         A PROSPECTIVE JUROR:  Good afternoon.

11         I've lived at my current address for only about

12    two months, but I've lived in Chinatown for about two and a

13    half years.

14         I'm not a native New Yorker.  I'm from

15    Pennsylvania.

16         I work at a church as a pastor.  I've been there

17    for two and a half years.

18         My educational background:  Bachelor's in business

19    management, master's in divinity.

20         I am married.  Been married for two months.

21         No kids.

22         My spouse was a teacher.  She served overseas, is

23    taking a break.

24         No children.

25         Spare time, sports, technology, reading, cooking,

Joanne Fleming

A135

1    etcetera.

2              I have not sat on a jury before.

3              No to number eight.

4              Number nine, my uncle did serve as a police

5    officer for a little bit.  I believe in Maryland.  I can't

6    remember much about that, though.

7              THE COURT:  Okay.

8              Mr. Chow, remind me, you have travel plans, right?

9              A PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  And when are you traveling again?

11             A PROSPECTIVE JUROR:  October 10th.  It should be

12   a Saturday.

13             THE COURT:  Yes, that's the tenth.

14             Okay, thank you.

15             Good afternoon.

16             A PROSPECTIVE JUROR:  Good afternoon.

17             I've lived at my present address thirty-six years.

18             I am a native New Yorker.

19             I am a retired registered nurse.

20             I have a RN degree and I have a college degree in

21   psychology.

22             I've been married fifty years this year.

23             I have five children and twelve grandchildren.  I

24   know you're not asking, but...

25             I play bridge.  I read.  Travel with my husband.

Joanne Fleming

A136

Voir Dire - The Court

1          Yes, I have served on juries before.  Two criminal

2     juries.

3          THE COURT:  Without telling us the verdict, did

4     you reach verdicts in those cases?

5          A PROSPECTIVE JUROR:  In both cases.

6          THE COURT:  Okay.

7          A PROSPECTIVE JUROR:  No, I've never had a

8     relative that's been involved in a crime.

9          No to number nine.

10          And no to number ten.

11          THE COURT:  Thank you.

12          A PROSPECTIVE JUROR:  And the rest.

13          THE COURT:  Good afternoon.

14          A PROSPECTIVE JUROR:  Hello.

15          I currently live in Harlem.  I've been there for a

16     year and a half.

17          I am a native New Yorker.

18          I work in finance.  I've been working at the same

19     company for about seven years.

20          My undergrad is in criminal justice.  I'm

21     currently getting my M.B.A. part-time.

22          Married for three years.

23          No children.

24          My husband is an architect.  He has no children.

25          In my spare time, I travel, go out to eat, go to

1     movies.

2                    Never served on a jury before.

3                    I have been a victim of a crime.

4                    THE COURT:   Would that affect your ability to be

5     fair and impartial?

6                    A PROSPECTIVE JUROR:   No.

7                    And I do have family in law enforcement.

8                    THE COURT:   Okay.

9                    A PROSPECTIVE JUROR:   And no to the rest.

10                   THE COURT:   Thank you.

11                   Good afternoon, Mr. Hall.

12                   A PROSPECTIVE JUROR:   Hi.

13                   So, I've lived at my present address for three

14    years.

15                   I live in Tribeca.

16                   I am not a native New Yorker.   I'm from

17    Pennsylvania.

18                   I work in private equity.   I've been for ten

19    years.

20                   I have a BMA.

21                   I am married.

22                   I have three children.

23                   My wife is a stay-at-home mom.

24                   In my spare time, I spend time with my family.

25                   I have not served on a jury before.

1          I don't have a relative who was convicted of a

2   crime, or victim, pardon me.

3          And the answer's no to nine.

4          And no to ten through fifteen.

5          THE COURT:  Thank you.

6          Good afternoon.

7          A PROSPECTIVE JUROR:  I've been at my current

8   address for the last five years.

9          I live up in Harlem.

10         I am not a native New Yorker.  I'm from southern

11  California.

12         I work in the performing arts industry.  I've been

13  with my current company for the last eight years.

14         I have two master's degrees, one in music and one

15  in administration.

16         I'm not married.

17         I do not have children.

18         I live alone.

19         Spare time, I really don't do much outside of

20  work.

21         I have served on a jury before.

22         THE COURT:  Was it criminal or civil?

23         A PROSPECTIVE JUROR:  It was criminal.

24         THE COURT:  Without telling us the verdict, did

25  you reach a verdict?

Joanne Fleming

1              A PROSPECTIVE JUROR:  Yes.

2         And no to eight and nine.

3         And my job does require me to work at night.  So,

4    that was the only one between ten and fifteen.

5              THE COURT:  Okay, thank you.

6         Good afternoon.

7              A PROSPECTIVE JUROR:  I've lived in New York for

8    twenty years.

9         I'm a CNA, nursing assistant.

10        I have a high school diploma.

11        And I'm married.

12        I have one son.

13        My hobbies, watch T.V.

14             THE COURT:  Please keep the microphone close to

15   your mouth, thank you.

16             A PROSPECTIVE JUROR:  I serve jury on civil.

17        Number eight is no.

18        And nine is no.

19        The other is no.

20             THE COURT:  Thank you.

21        We will call on Ms. Turner in the second row.

22        Good afternoon, Ms. Turner.

23             THE COURT:  Good afternoon, Judge.

24        I have had an apartment at my present address on

25   the Upper West Side for thirty years.  During eight of those

1    years, I was -- I don't know if it matters -- but I was an

2    expatriate in Asia.  So I was living in Japan and Hong Kong.

3              I'm not a native New Yorker.  I was born in Texas

4    and raised in southern California.

5              I'm retired.

6              Do you want to know what I did for a living

7    before?

8              THE COURT:  I do, yes.  I was wondering if you

9    were going to tell us.

10              A PROSPECTIVE JUROR:  I was thirty years in

11    financial services, and then I took early retirement and

12    went to seminary and I'm an ordained minister, but I only

13    worked in a church for about eighteen months.

14              THE COURT:  Okay.

15              A PROSPECTIVE JUROR:  And I'm not working any more

16    now.

17              So, I went to college and I have two graduate

18    degrees, an M.B.A. and a master's in divinity.

19              I am not married.

20              I don't have children.

21              I've never been married.

22              My spare time, singing, I have a couple of dogs

23    that take up a lot of time, the theater, reading, knitting

24    for my family.

25              Yes, I was on a criminal case.  We did come to a

1     verdict.

2              Yes, my sister and I were both victims of crimes.

3     They wouldn't affect.

4              THE COURT:  Okay.

5              A PROSPECTIVE JUROR:  No to number nine.

6              Number ten, yes.

7              THE COURT:  Okay.

8              Would anything about that affect your ability to

9     be fair and impartial?

10              A PROSPECTIVE JUROR:  No.

11              THE COURT:  Okay.

12              Thank you.

13              Good afternoon.

14              A PROSPECTIVE JUROR:  Good afternoon.

15              Is it on?

16              THE COURT:  It just went off.  To turn it on, you

17     have to press the button and hold it a little bit.

18              A PROSPECTIVE JUROR:  Sorry.

19              THE COURT:  It's okay, don't worry about it.

20              A PROSPECTIVE JUROR:  Good afternoon.

21              THE COURT:  It just went off again.

22              A PROSPECTIVE JUROR:  Yes.

23              THE COURT:  There it is.

24              A PROSPECTIVE JUROR:  Something's loose.

25              I am a native New Yorker.

1            THE COURT:  Okay.

2            A PROSPECTIVE JUROR:  I've lived at my present

3    address for twenty-five years.

4            I live in midtown Manhattan.

5            Presently I'm a substitute teacher for the D.O.E.

6    I worked in advertising most of my life before that.

7            I'm going for a master's of education.

8            I'm married.

9            My wife teaches kindergarten.

10           We're married for twelve years.

11           In my spare time, I do art and music.

12           I've served both criminal and civil.

13           I was mugged a million years ago.

14           No to number nine.

15           No to number ten.

16           No to eleven.

17           No to twelve.

18           And no to thirteen and all the rest.

19           THE COURT:  Okay, thank you.

20           Good afternoon, Mr. Baldwin.

21           A PROSPECTIVE JUROR:  Good afternoon.

22           I've lived at my current address for about a year

23    in the Upper East Side.

24           I work in the real estate for the past three

25    years.

1       I have a bachelor's degree from Villanova.

2       Not married.

3       Don't have any kids.

4       I live with another adult and he works in

5  marketing.

6       My spare time, I watch the Giants and lots of

7  football.

8       Never been on a jury before.

9       I have been the victim of a crime.  We were

10  robbed, about two years ago, all our belongings were taken.

11       THE COURT:  Would that affect you in any way in

12  this case?

13       A PROSPECTIVE JUROR:  I'm not really sure.  Maybe.

14  I'm not really sure.

15       THE COURT:  You're not sure?

16       A PROSPECTIVE JUROR:  Yeah.

17       THE COURT:  Before you move on, let's just resolve

18  that issue.

19       A PROSPECTIVE JUROR:  I mean, I don't think that

20  the police could have done anything, but nothing was

21  resolved out of it.  And it was just a really unfair

22  situation, I guess.

23       THE COURT:  Unfair to you?

24       A PROSPECTIVE JUROR:  Yes, to me and my roommate.

25       THE COURT:  Alright.

Joanne Fleming

A144

Voir Dire - The Court

```
 1          Well, if you were to be selected as a juror in
 2   this case, will you be able to set that aside and decide
 3   this case on the facts and the evidence as you find it here
 4   in the courtroom?
 5          A PROSPECTIVE JUROR:  I think so, yes.
 6          THE COURT:  Alright.
 7          When you say you think so, you're not sure?
 8          A PROSPECTIVE JUROR:  Yeah.
 9          THE COURT:  We're going to have to excuse Mr.
10   Baldwin.
11          Step down.
12          Replace seat twelve, please.
13          (Whereupon, the prospective juror exited the
14   courtroom.)
15          THE CLERK:  Seat number twelve, Michael Cooley,
16   C-O-O-L-E-Y.
17          THE COURT:  Good afternoon, Mr. Cooley.
18          You can get started as soon as you're ready.
19          A PROSPECTIVE JUROR:  I've lived at my current
20   address about eighteen years in Stuyvesant Town.
21          I am a civil engineer.
22          I have a bachelor's degree.
23          I'm divorced.
24          I have two children, one twenty-four, one
25   twenty-two.  And my children are both students in college.
```

Joanne Fleming

1          Spare time, reading mostly, music.

2              I have been on a jury, both criminal and civil and

3     grand jury.

4              THE COURT:  Did you reach a verdict in the

5     criminal case?

6              A PROSPECTIVE JUROR:  We did.

7              THE COURT:  Okay.

8              A PROSPECTIVE JUROR:  I have been a victim of a

9     crime, a mugging, sometime ago.

10             THE COURT:  Would that affect your ability to be

11    fair and impartial?

12             A PROSPECTIVE JUROR:  No.

13             No to number nine.

14             No to number ten.

15             No to number eleven.

16             No.

17             And no to the rest.

18             THE COURT:  Okay, thank you.

19             Good afternoon.

20             A PROSPECTIVE JUROR:  Hello.

21             I've lived at my current address for the past

22    three years.

23             I live downtown in the Financial District.

24             I am a native New Yorker.

25             I've worked for a financial company for the past

1   two years.

2            I have my bachelor's in mathematics.

3            I'm not married.  I've never been married.

4            I have no children.

5            In my spare time, I like to travel and to watch

6   T.V.

7            I've never served on a jury before.

8            I have had a relative that's been a victim of a

9   crime, but has no bearing on this situation.

10           For number nine, I have a family friend that has

11  been employed or engaged in criminal defense work.

12           I have had a close friend that has been in

13  conflict with the law.

14           THE COURT:  Okay, would that affect you in any

15  way?

16           A PROSPECTIVE JUROR:  No.

17           No to the rest, except for my job does require

18  nighttime work.

19           THE COURT:  Okay, thank you.

20           Good afternoon.

21           A PROSPECTIVE JUROR:  Good afternoon.

22           I've lived at my current address in Hell's Kitchen

23  for a year and a half.

24           I am not a native New Yorker.  I'm from all over

25  the place, but most recently Texas before I moved here.

```
 1                   I work in advertising at an agency here downtown.
 2        And I've done that since I moved here a year and a half ago.
 3                   My background is I have a bachelor degree in
 4        graphic communications and a master degree in advertising.
 5                   I'm not married.
 6                   Don't have any children.
 7                   I do have three roommates:  One's in marketing,
 8        one's in fashion and one is in retail.
 9                   And then spare time, I am an avid runner, I read a
10        lot, travel.
11                   And never served on a jury.
12                   I've never been the victim of a crime.
13                   And no law enforcement.
14                   And no to all the rest.
15                   THE COURT:  Thank you.
16                   Good afternoon.
17                   A PROSPECTIVE JUROR:  Good afternoon.
18                   I've lived at my current address in Gramercy for
19        the eleven years.
20                   I am not a native New Yorker.  I was born in the
21        Ukraine.
22                   I work in tech sales for the last sixteen years.
23                   I have a bachelor's degree in business.
24                   I'm married.
25                   No kids.
```

Joanne Fleming

A148

1          My spouse works for financial industry.

2          In spare time is travel and all sports.

3          I have not served on a jury before.

4          I have been the victim of a crime.  I've been

5    assaulted twice.

6          THE COURT:  Would you be able to set that aside

7    and base this case just on the evidence?

8          A PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.

10         A PROSPECTIVE JUROR:  No to number ten.

11         And no to the rest.

12         THE COURT:  Thank you.

13         Good afternoon.

14         A PROSPECTIVE JUROR:  Good afternoon.

15         I am a native New Yorker.

16         I live in the Upper East Side.

17         I've lived there for twenty plus years.

18         I oversee marketing and advertising for a global

19   specialty retailer.

20         I have a bachelor's in political science.

21         I'm not married.  Have not been married.

22         I do not have children.

23         In my spare time, I have a passion for

24   volunteering for many different groups as well as

25   equestrian.

Voir Dire - The Court

1          I have not served on a jury before.

2          For number eight, I have two really close friends

3  that have been victims of crimes.

4          THE COURT:  Would that affect your ability to be

5  fair here?

6          A PROSPECTIVE JUROR:  I think it might.

7          THE COURT:  Okay, we're going to have to excuse

8  you.  Thank you.

9          A PROSPECTIVE JUROR:  Okay.

10          (Whereupon, the prospective juror exited the

11  courtroom.)

12          THE CLERK:  Calling sixteen, Sheryl Spinner,

13  S-P-I-N-N-E-R.

14          THE COURT:  Good afternoon, Ms. Spinner.

15          A PROSPECTIVE JUROR:  Hi.

16          I have lived at my current address two and a half

17  years on the Upper West Side.

18          I am a native New Yorker.  Born in Brooklyn.

19          I am an accountant.  I've been at my current place

20  of employment for nine years.

21          I have a master's of applied statistics.

22          Not married.  Haven't been.

23          Don't have children.

24          Live alone.

25          My interests or hobbies, I am an avid runner.  I

```
 1        like to travel.  I like to read.  Love the Yankees.
 2                  I have never been on a jury.
 3                  I have been pickpocketed more than once.  Life in
 4        New York City.
 5                  THE COURT:  Would that affect you in any way in
 6        this case?
 7                  A PROSPECTIVE JUROR:  No.
 8                  THE COURT:  Okay.
 9                  A PROSPECTIVE JUROR:  No to the rest.
10                  THE COURT:  Okay, thank you.
11                  Good afternoon.
12                  A PROSPECTIVE JUROR:  Hi.
13                  I've lived at my current address for two years.
14                  I live in Washington Heights.
15                  I am originally from New Jersey.
16                  I used to be a journalist, now I transitioned into
17        public relations.  I was a journalist for two years, public
18        relations for three years.
19                  I went to college, got my bachelor's in
20        journalism.
21                  Not married.
22                  Don't have any children.
23                  I live with a roommate.  He does advertising.
24                  I watch and play sports.
25                  I have not served on a jury before.
```

1          I have not been the victim of a crime, or a family

2    member.

3          I have a friend who's been employed by an attorney

4    engaged in criminal defense work.

5          For twelve, I have a stomach ailment that could --

6    that I'm currently taking medication for.

7          THE COURT:  Would that affect your ability to be

8    fair if you are selected?

9          A PROSPECTIVE JUROR:  It could potentially impair

10   my efficiency.  It's -- it's a stomach ailment.

11         THE COURT:  Okay.  You want to come up for a

12   minute?

13         A PROSPECTIVE JUROR:  Yeah.

14         THE COURT:  Counsel, please approach.

15         (Whereupon, the following proceedings took place

16   on the record and outside the presence of the prospective

17   jury panel:)

18         THE COURT:  Sorry to have to ask you about this.

19         A PROSPECTIVE JUROR:  It's fine.

20         So I have an acid reflux.  Sometimes it warrants

21   me to go to the bathroom more often than --

22         THE COURT:  If that happened, you will raise your

23   hand and I will excuse you.  Would that be okay?

24         A PROSPECTIVE JUROR:  I'm sorry?

25         THE COURT:  If you need to go to the bathroom,

Joanne Fleming

A152

1    raise your hand and it would be okay.

2             A PROSPECTIVE JUROR:  I mean, it won't be a

3    problem.  I tend to go more frequently than most people and

4    I don't want to pass gas.

5             I definitely can be objective.

6             I don't know if somewhere down the road that

7    causes a problem.

8             THE COURT:  If you're willing to serve, I am

9    certainly happy to have you.

10            A PROSPECTIVE JUROR:  Yes.  I'll let you know if

11   it causes any problems.

12            THE COURT:  Okay, thank you.

13            (Whereupon, the following proceedings took place

14   on the record and in the presence of the prospective jury

15   panel:)

16            THE COURT:  Good afternoon.

17            A PROSPECTIVE JUROR:  Good afternoon.

18            I'm from Connecticut but I've lived in Tribeca for

19   about two years.

20            I am a financial analyst.

21            I have a bachelor's.

22            I'm not married but I live with my fiancée.

23            No children.

24            My spare time, I like to run and volunteer at my

25   church, homeless shelter and soup kitchen.

Joanne Fleming

A153

1              And never served on a jury before.

2              No relatives have been victims of crimes.

3              And the family in the military but not law

4     enforcement.

5              And no to the rest.

6              THE COURT:  Thank you.

7              Yes, ma'am?

8              A PROSPECTIVE JUROR:  I'm sorry, your Honor, two

9     weeks -- you said the trial might last two weeks?

10             THE COURT:  Yes, that's our estimate.

11             A PROSPECTIVE JUROR:  So that might mean the night

12    of the eighth.

13             It's just that I have an application to be a

14    volunteer and one of the training sessions is the Thursday

15    night before the weekend of the thirteenth.

16             THE COURT:  We don't work at night anyway.

17             A PROSPECTIVE JUROR:  Okay.  I was just thinking

18    about the weekday night deliberation.

19             THE COURT:  Thank you.

20             A PROSPECTIVE JUROR:  Sorry to --

21             THE COURT:  Not a problem.

22             Jurors, we're -- please call the remaining four.

23             Please pass your questionnaires to the right and

24    we're going to call the remaining four jurors into the front

25    row, okay?

1          THE CLERK:  Seat number nineteen, Juan Lee, L-E-E.

2          THE COURT:  Mr. Lee, why don't you sit further to

3     your right?

4          A COURT OFFICER:  This way or that way?

5          THE COURT:  We will go that way.

6          THE CLERK:  Number twenty, Audrey Sutton,

7     S-U-T-T-O-N.

8          Number twenty-one, Daniel Baldwin, B-A-L-D-W-I-N.

9          And seat number twenty-two, Sara Catano,

10    C-A-T-A-N-O.

11         THE COURT:  Okay, good afternoon, Mr. Lee.  We

12    will start with you.

13         A PROSPECTIVE JUROR:  I've lived at my present

14    address for about a year in the Upper West Side.

15         I was born in upstate New York, but I couldn't say

16    I was a native New Yorker.  I grew up in Colorado.

17         I am a lawyer.  Doing that for about a year now.

18         THE COURT:  What kind of law do you practice?

19         A PROSPECTIVE JUROR:  Corporate law.

20         I have a bachelor's, master's and Ph.D in

21    engineering, also a law degree.

22         I am married.  I've been married for about a year.

23         No kids.

24         I live with my wife and she is an architect.

25         In my spare time, I like outdoor activities,

1      sports, movies.

2                 Never served on a jury before.

3                 Never had a relative, or I've, never been the

4      victim of a crime.

5                 No to number nine.

6                 No to number ten and eleven.

7                 No to number twelve.

8                 Thirteen, yes.  I would say sometimes I'm required

9      to work at night.

10                And fourteen and fifteen no.

11                THE COURT:  Okay, thank you.

12                Good afternoon, Ms. Sutton.

13                A PROSPECTIVE JUROR:  Good afternoon.

14                I've lived at my present address about twenty-six

15     years.

16                I live in East Harlem.

17                I am a native New Yorker.

18                I am a principal pro-socialist to assisting

19     commissioner secretary.

20                I've been on my job for forty-one years.

21                I have a high school diploma.

22                I'm not married.  Never been married.

23                I have one son.

24                In my spare time, I work around my church.

25                My hobbies is listening to music, cooking.


                       Joanne Fleming

                          A156

1          I've never served on a criminal -- I've served on

2     a criminal jury before.

3          I have relative that has been convicted of a

4     crime.

5          THE COURT:  Would anything about that affect your

6     ability to be fair and impartial?

7          A PROSPECTIVE JUROR:  Not at all.

8          THE COURT:  Okay.

9          A PROSPECTIVE JUROR:  I have a cousin that was a

10    correction officer.  I don't know --

11         THE COURT:  Mm-hmm.

12         A PROSPECTIVE JUROR:  And it's no to the rest.

13         THE COURT:  Okay, thank you.

14         Good afternoon, Mr. Baldwin.

15         A PROSPECTIVE JUROR:  Good afternoon, your Honor.

16         Okay, I live on the Upper West Side for the last

17    three years.

18         I am a native New Yorker.

19         I am a retired lawyer.  I mostly did corporate and

20    transactional law.

21         I have a bachelor's in English and a law degree.

22         I'm married.

23         I have three children, two grown sons and a

24    daughter who just started college.

25         I'm married.

1          My wife is a legal recruiter.

2          My hobbies are I serve on the board of Care For

3    the Homeless, which is a non-profit, and I listen to a lot

4    of classical music and jazz, study piano, read.

5          I've never served on a jury.

6          I was mugged when I was a teenager.  Would not

7    affect my impartiality.

8          Well, I worked for the summer between second and

9    third year of law school in the Southern District of New

10   York.

11         Let's see, number ten, my younger brother is

12   homeless and he was arrested for disorderly conduct.

13         THE COURT:  Would that affect you in any way?

14         A PROSPECTIVE JUROR:  No, no.

15         No to eleven, twelve, thirteen, fourteen and

16   fifteen.

17         THE COURT:  Okay.

18         Good afternoon, Ms. Catano.

19         A PROSPECTIVE JUROR:  Good afternoon.

20         I've lived at my present address for six months in

21   the East Village.

22         I am not a native New Yorker.  I'm from

23   Massachusetts.

24         I work in advertising for about five years.

25         I have a bachelor's degree from NYU.

1    I'm not married.  I have never been married.

2    I don't have children.

3    I live with my boyfriend.  He works in finance.

4    My spare time, travel, go out to eat.

5    I have never served on a jury before.

6    I have been the victim of a crime.

7    THE COURT:  Would anything about that affect your

8    ability here?

9    A PROSPECTIVE JUROR:  It may.

10   THE COURT:  Okay.

11   A PROSPECTIVE JUROR:  I'm not sure.

12   THE COURT:  You are not sure you can set it aside?

13   A PROSPECTIVE JUROR:  No.

14   THE COURT:  Okay.

15   Any objections?

16   MR. HERLICH:  No.

17   MS. PARK:  (Indicating.)

18   THE COURT:  We're going to excuse you, ma'am.

19   Thank you.

20   (Whereupon, the prospective juror exited the

21   courtroom.)

22   THE COURT:  Jurors, before the attorneys address

23   you, I know that there are a couple of you that mentioned

24   you had travel plans.  If you can please raise your hand if

25   you were one of these people?

Joanne Fleming

A159

```
 1                         (Prospective jurors indicating.)

 2                         THE COURT:  I know about you, Mr. Chow.

 3                         A PROSPECTIVE JUROR:  I do, but not until October

 4     29th.

 5                         THE COURT:  Okay, that's not a problem.

 6                         Yes?

 7                         A PROSPECTIVE JUROR:  I do from October 8th.

 8                         THE COURT:  You have to leave October 8th?

 9                         A PROSPECTIVE JUROR:  In the evening of October

10     8th, yes.

11                         THE COURT:  You're number eight.

12                         In the second row?

13                         (Prospective jurors indicating.)

14                         THE COURT:  Yes?

15                         A PROSPECTIVE JUROR:  Yes, October 12th.

16                         THE COURT:  That is a Monday, that's Columbus Day.

17                         (Prospective jurors indicating.)

18                         THE COURT:  Yes?  You are number two.  Yes, sir?

19                         A PROSPECTIVE JUROR:  I also on October 18th.

20                         THE COURT:  Okay, that's not a problem.

21                         A PROSPECTIVE JUROR:  The fifteenth.

22                         THE COURT:  Not a problem.

23                         Second row?

24                         A PROSPECTIVE JUROR:  October 8 and ninth.

25                         THE COURT:  Okay.
```

1          Next?

2          A PROSPECTIVE JUROR:  I leave -- my flight out is

3   October 8th in the evening and it's through the week of the

4   twelfth.

5          THE COURT:  Okay.

6          Yes, sir?

7          A PROSPECTIVE JUROR:  I'm spoke to you.  I have a

8   conference in Chicago the thirtieth and the first.

9          THE COURT:  Of September?

10         A PROSPECTIVE JUROR:  Yes.

11         Maybe I can get a colleague to substitute.

12         THE COURT:  If you can do that, that will be

13  terrific.  For the time being, should we keep you here with

14  us?

15         A PROSPECTIVE JUROR:  I should know by the end of

16  the day.

17         THE COURT:  Okay, great.

18         Okay, jurors, what I've been doing and trying to

19  do so as not to inconvenience you too much, is that I've

20  been juggling a jury, I have a deliberating jury, and I've

21  just been told that they've reached a verdict.

22         So, I'm going to take that verdict and excuse you

23  for just a few minutes.  I will ask you to please step

24  outside for about fifteen minutes and then we will bring you

25  back in.

```
 1              Please remember where you're seated.  You need to
 2      take the same seat when you come back.
 3              Thank you.
 4              A COURT OFFICER:  Jurors, make sure you have all
 5      your belongings.  Remember your seat.
 6              Step this way.
 7              (Whereupon, the prospective jurors in the box
 8      exited the courtroom.)
 9              THE COURT:  You can ask him to make a phone call
10      during this break, number eighteen, because he's going to
11      see if he can get a colleague to cover for him.
12              A COURT OFFICER:  Okay.
13              THE COURT:  And let's call the other case.
14              THE CLERK:  The attorneys are on the way.
15              THE COURT:  Alright, the attorneys are on their
16      way.
17              Before you step out, Mr. Herlich --
18              MR. HERLICH:  Oh yes.
19              THE COURT:  -- I just want to encourage you and
20      Ms. Park to, you know, seriously think long and hard how
21      long you expect this trial to go.  Because the jury starts
22      to deliberate, you know, it's out of my hands and I don't
23      want to have a mistrial because of somebody's traveling,
24      can't stay.
25              Right now I've got a count of five people, three
```

```
 1    of them who can work through the eighth, and the eighth is

 2    exactly two weeks from today.  I think we will continue

 3    picking a jury on Tuesday.

 4              MS. PARK:  Not Monday?

 5              THE COURT:  On Monday, I'm sorry.  I think we're

 6    going to continue picking a jury on Monday.  I don't think

 7    we will start the trial till Tuesday.  So we will be

 8    finished --

 9              (Whereupon, the defendant started yelling at the

10    sergeant.)

11              THE COURT:  So, just give it some thought and see

12    if we excuse those who can only work through the eighth.

13              But then there's two others that can only work one

14    more day.

15              (Whereupon, the defendant continues yelling at the

16    sergeant.)

17              THE COURT:  Alright?

18              Thank you.

19              (Whereupon, a recess was taken.)

20              THE COURT:  After consulting with my court

21    attorney, who is much better with this than I am, he thinks

22    we should let go the ones that have to leave on the ninth as

23    well.

24              MR. HERLICH:  I agree.

25              THE COURT:  Couple of things.  It's
```

Joanne Fleming

A163

1   three-thirty-five.  I was going to give you a little extra

2   time because you were going to be conducting your voir dire

3   for twenty-two people.  However, you're not.  Because we're

4   going to actually release five people.

5           Now, we're going to release seats number eight,

6   two, twelve, fourteen and eighteen.  And that comes

7   following an off-the-record discussion that we had about the

8   length of the trial and when these people had to travel.

9           So, seat eight is traveling, can only work through

10  the eighth.  Seat two can only work through the ninth.  Seat

11  twelve, fourteen and eighteen can only work through the

12  eighth.  And I think that it's just too close, making it too

13  close for you guys to complete the trial and for them to

14  deliberate.

15          So, is there any objection at this time to

16  releasing those five people?

17          MS. PARK:  Then what about -- I'm sorry.

18          No, Judge.

19          MR. HERLICH:  No.

20          MS. PARK:  What about Juror Number 4, Mr. Chow?  I

21  thought he had travel plans on the tenth.

22          THE COURT:  Mr. Chow also.

23          What was number eighteen -- no, number eighteen

24  was going to get somebody to cover for him.

25          MS. PARK:  Yes.

Joanne Fleming

1          THE COURT:  So it was actually seat four, eight,

2     two, twelve and fourteen.

3          Alright, so we're going to bring them in and we're

4     just going to excuse them so you can conduct your voir dire

5     and not waste time on them.  I will ask number eighteen if

6     he was able to get that change.

7          Before we continue, Mr. Harrell, I overhead --

8          THE DEFENDANT:  I apologize.

9          THE COURT:  Let me finish.

10         I overhead an argument taking place in the robing

11    room.  I don't know what it was about.  But all I know, you

12    got loud enough that I was unable to continue to do in here

13    what I had to do in here.

14         I don't want you arguing with my court officers.

15    I don't want you arguing with the sergeant.  When you do

16    that, you're challenging their authority.  When you're

17    challenging their authority, you're challenging my

18    authority.  We can't have that, okay?

19         THE DEFENDANT:  (Indicating.)

20         THE COURT:  You agree with me?

21         THE DEFENDANT:  Yes, I do.

22         THE COURT:  Good.

23         Let's bring the jurors in, please.

24         THE CLERK:  Are we excusing the five off the bat?

25         THE COURT:  We will bring them in, we will seat

Joanne Fleming

A165

 1          them and then I will excuse them.

 2                    THE CLERK:  Okay.

 3                    A COURT OFFICER:  Panel entering.

 4                    (Whereupon, the prospective jurors in the box

 5          entered the courtroom.)

 6                    THE COURT:  Okay, sir, were you able to reach out

 7          to anyone?

 8                    A PROSPECTIVE JUROR:  I was.  They are looking

 9          into it, but it's unlikely.

10                    THE COURT:  It's unlikely they can help you out?

11                    A PROSPECTIVE JUROR:  I think all the efforts have

12          been made.

13                    THE COURT:  Okay.  We appreciate your efforts.

14          We're going to excuse you at this time, okay?

15                    A PROSPECTIVE JUROR:  Thank you.

16                    (Whereupon, the prospective juror exited the

17          courtroom.)

18                    THE COURT:  Seat number two, Mr. Vargas, you can

19          only work through the tenth?

20                    A PROSPECTIVE JUROR:  Right.

21                    THE COURT:  Right?

22                    Okay, upon further consideration, we're going to

23          go ahead and excuse you as well.

24                    A PROSPECTIVE JUROR:  Okay.

25                    (Whereupon, the prospective juror exited the

1        courtroom.)

2                THE COURT:  Seat number four, Mr. Chow, you can

3        only work through the ninth.  So we're going to excuse you

4        as well, sir.

5                A PROSPECTIVE JUROR:  Okay.

6                (Whereupon, the prospective juror exited the

7        courtroom.)

8                THE COURT:  Seat number eight, sir, you are

9        unavailable only the evening of the eighth?

10                A PROSPECTIVE JUROR:  No, I'm out of town.

11                THE COURT:  You're out of town.

12                We're going to excuse you as well, sir.  You can

13        step out.

14                (Whereupon, the prospective juror exited the

15        courtroom.)

16                THE COURT:  Mr. Cooley?

17                A PROSPECTIVE JUROR:  Yes.

18                THE COURT:  Sir, you can only work through the

19        eighth, right?

20                A PROSPECTIVE JUROR:  Right.

21                THE COURT:  Alright, we will excuse you.

22                (Whereupon, the prospective juror exited the

23        courtroom.)

24                THE COURT:  Mr. McWhorter?

25                A PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Okay, sir, you can only work through

2  the eighth?

3      A PROSPECTIVE JUROR:  Yes.

4      THE COURT:  We're going to excuse you.

5      (Whereupon, the prospective juror exited the

6  courtroom.)

7      THE COURT:  And I believe that's it.

8      THE SERGEANT:  Your Honor (indicating.)

9      THE COURT:  That's it.

10  Now I will mess up everybody's paperwork.  I will

11  ask those jurors to come and sit in the box.

12      MS. PARK:  Judge, we would not be able to keep up.

13      THE COURT:  You will not be able to keep up.

14  Would you rather they remain where they are?

15      MS. PARK:  Yes.

16      MR. HERLICH:  (Indicating.)

17      THE COURT:  That will be nineteen, twenty and

18  twenty-one.  Alright, very well.

19  Jurors, at this time the attorneys are going to

20  address you for about fifteen minutes each.  The law says

21  that the assistant district attorney speak to you first.

22  Please remember that whatever the lawyers say to

23  you at any time is not evidence.  So what the lawyers are

24  about to say to you now is not evidence.

25  Now, we're going to try to do this without the

Joanne Fleming

A168

1    microphone.  It's just much faster if we do it without the

2    microphone.  I ask everyone to project, please, because the

3    court reporter has to hear every word.  She's taking down

4    every word that's being said.  If it becomes too difficult

5    and we can't hear you, then we'll have to switch to the

6    microphone.

7            Okay, Ms. Park.

8            MS. PARK:  Good afternoon, everyone.

9        I hope I don't forget the three of you over there.

10   It will be a little complicated to talk to everyone.

11           So, before I start asking you some questions, I

12   just want to follow up on some of the questions that you

13   answered using the questionnaire.

14           Mr. Alexander, you said that you lived in New York

15   for five years?

16           A PROSPECTIVE JUROR:  Yes.

17           MS. PARK:  You didn't mention what area of

18   Manhattan.

19           A PROSPECTIVE JUROR:  Oh, I'm sorry.  On the Upper

20   East Side.

21           THE COURT:  Again, even though Ms. Park is

22   standing right in front of you, make sure that the court

23   reporter can hear you, okay?

24           MS. PARK:  You also mentioned that you were

25   unemployed.  What kind of work did you do prior to that?

Joanne Fleming

1          A PROSPECTIVE JUROR:  I was a mechanic at New

2     Jersey Transit.

3          MS. PARK:  Miss -- that's Ms. Gresequet, did I say

4     your name correctly?

5          A PROSPECTIVE JUROR:  Yes, Gresequet.

6          MS. PARK:  You also mentioned that you lived in

7     New York for about twenty years.  What part?

8          A PROSPECTIVE JUROR:  I live at that address, my

9     address, for more than twenty years.

10         MS. PARK:  Can you tell us what neighborhood?

11         A PROSPECTIVE JUROR:  It's Harlem, New York.

12         MS. PARK:  Now, you know from the Judge already

13    what the allegations are, that it's about a sexual assault

14    of a young girl.

15         Now, we, the People, have two theories of sexual

16    assault.  One, that it was not consensual because some type

17    of force was used.  And, two, it was not consensual because

18    the girl was fifteen-years old at the time of the crime.

19         Now, our law says that if you are under

20    sixteen-years old, whether you are a willing participant or

21    not, you are unable to consent.  You are incapable of

22    consent.

23         And I believe some of you might know the term

24    that's used frequently, it's statutory rape.

25         Now, does anyone have any trouble following the

Joanne Fleming

1    law as the Judge instructs you, if the Judge tells you,

2    regardless of whether you are a willing participant or not,

3    that someone who's under sixteen is incapable of consent?

4    Does anyone have trouble with that law?

5                    (Prospective jurors indicating.)

6                    MS. PARK:  No.

7                    And Miss -- let me just pick someone.

8                    Ms. Boyle, do you have any trouble following the

9    law?

10                    A PROSPECTIVE JUROR:  No, I do not.

11                    MS. PARK:  And, Mr. Alexander, what about you?

12                    A PROSPECTIVE JUROR:  No, I do not.

13                    MS. PARK:  Some of you might also have

14    preconceived notions about what a rape or a sexual assault

15    might be.  You might picture a woman coming home late at

16    night, she's confronted by a stranger, pulled in an alley

17    and she's raped at knife-point, gun-point, what have you.

18                    Unfortunately, those things do happen, but that is

19    not this case.  You will learn that the complaining witness

20    in this case and the defendant, Mr. Lonnie Harrell, knew

21    each other, that they were neighbors.  They were friendly

22    with each other.

23                    Ms. Turner, can you agree that a person can be

24    sexually assaulted by someone that she knows?

25                    A PROSPECTIVE JUROR:  Oh yes.

Joanne Fleming

A171

1      MS. PARK:  And what about you, Mr. Wilson?

2      A PROSPECTIVE JUROR:  Yes.

3      MS. PARK:  Yes.

4           Does anyone have an issue with that concept?  You

5      can be sexually assaulted by someone that you know?

6           (Prospective jurors indicating.)

7      MS. PARK:  And knowing that the complaining

8      witness and the defendant were friendly, they knew each

9      other, would that preclude anyone from believing that the

10     complainant was sexually assaulted?

11          (Prospective jurors indicating.)

12     MS. PARK:  I don't see any hands up.

13          Now, you're also going to learn that the victim

14     invited the defendant into her apartment.  They were

15     neighbors, as I mentioned.  So you'll learn that she

16     actually invited him into the apartment.

17          Did you have your hand up?

18     A PROSPECTIVE JUROR:  No.

19     MS. PARK:  You were just scratching.

20          So since I saw you, I'm going to ask you, Ms.

21     Sutton, is that right?

22     A PROSPECTIVE JUROR:  Yes.

23     MS. PARK:  If you learn that the complaining

24     witness in this case, a young girl, invited the defendant in

25     her apartment, would that preclude you from considering that

Joanne Fleming

A172

Voir Dire - The People

1       she was sexually assaulted?

2                       A PROSPECTIVE JUROR:  No.

3                       MS. PARK:  Any issues with that?

4                       A PROSPECTIVE JUROR:  No.

5                       MS. PARK:  What about you, Mr. Lee?

6                       A PROSPECTIVE JUROR:  No.

7                       MS. PARK:  Any problems with that whatsoever?

8                       A PROSPECTIVE JUROR:  No.

9                       MS. PARK:  And, Mr. Baldwin, would that be a

10      problem?

11                      A PROSPECTIVE JUROR:  No.

12                      MS. PARK:  Anyone in this panel?

13                      (Prospective jurors indicating.)

14                      MS. PARK:  And some of you might expect a victim

15      of a sexual assault to fight back vigorously.  You might

16      say:  Well, if that was me, I would have fought back harder.

17                      If you learn that the complaining witness in this

18      case did not fight back, would you automatically think that

19      she was not sexually assaulted?

20                      MR. HERLICH:  Objection, your Honor.

21                      THE COURT:  Sustained.

22                      Please approach.

23                      (Whereupon, the following proceedings took place

24      on the record and outside the presence of the prospective

25      jury panel:)

Joanne Fleming

A173

1      THE COURT:  What is your objection?

2          MR. HERLICH:  The prosecutor is talking about not

3   just foreshadowing the facts of the case but going into the

4   law to such an extent where in that particular instance

5   there's no requirement that a victim of sexual assault fight

6   back.

7          THE COURT:  Well, I don't have a problem with the

8   question in a vacuum.  My concern is I feel that some of

9   your questions are actually presenting a scenario that's not

10  what we have here.  For example, the victim didn't invite

11  him in, he knocked on the door and asked if the brother was

12  home.

13         MS. PARK:  Right, then she invited him.

14         THE COURT:  Well, that is a little different,

15  okay?  I just --

16         I don't want to excuse people because they

17  misunderstood the facts because they misunderstood the

18  question.  I want to make sure we remain true to the facts

19  of this case, to the extent that you get into any facts,

20  okay?

21         MS. PARK:  Okay.

22         You sustained the objection or --

23         THE COURT:  Well, the objection's overruled.

24         (Whereupon, the following proceedings took place

25  on the record and in the presence of the prospective jury

Joanne Fleming

A174

1       panel:)

2              MS. PARK:  So, just to pick up where I left off,

3       if you learn that the complaining witness here did not fight

4       back vigorously, would that make some of you or all of you,

5       or maybe one or two of you, automatically think that the

6       complainant was not sexually assaulted?

7              Mr. Morais -- Ms. Morais?

8              A PROSPECTIVE JUROR:  Mister.

9              MS. PARK:  Mr. Morais, I'm sorry.

10             Can you tell of some reasons why a victim of a

11      sexual assault might not fight back?

12             A PROSPECTIVE JUROR:  She could have been drugged.

13             THE COURT:  She could have been drugged?

14             A PROSPECTIVE JUROR:  Yes, ma'am.

15             MS. PARK:  But you wouldn't have a problem if the

16      complainant in this case did not fight back as you would

17      expect someone to?

18             A PROSPECTIVE JUROR:  (Indicating.)

19             MS. PARK:  What about you, Ms. Spinner?

20             A PROSPECTIVE JUROR:  I guess so.  You said that

21      they're under sixteen.  It doesn't matter if they --

22             MS. PARK:  There's also a forcible component in

23      this case.  In addition to her being under sixteen, we are

24      also alleging that there was force used.  So there will be

25      two different theories of the case.

Joanne Fleming

A175

```
 1              A PROSPECTIVE JUROR:  Okay.

 2         MS. PARK:  So, if you knew that, the fact that she

 3    didn't fight back hard enough, would that preclude you from

 4    believing that she wasn't sexually assaulted?

 5              A PROSPECTIVE JUROR:  Preclude me, no.

 6         MS. PARK:  Sorry?

 7              A PROSPECTIVE JUROR:  Preclude me?

 8         MS. PARK:  Yes.

 9              A PROSPECTIVE JUROR:  No.

10         MS. PARK:  Ms. Bhattacharya?

11              A PROSPECTIVE JUROR:  Bhattacharya.

12         MS. PARK:  Bhattacharya.

13         What about you?

14              A PROSPECTIVE JUROR:  No.

15         MS. PARK:  Now, I know you already know what the

16    charges are, and would everyone here agree that people react

17    differently to traumatic situations?  Yes?

18              (Prospective jurors indicating.)

19         MS. PARK:  For example, Mr. Wilson?

20              A PROSPECTIVE JUROR:  Yes.

21         MS. PARK:  If, for example, if the complaining

22    witness took the stand and she did not shed a tear, would

23    that -- would that preclude you from believing her

24    testimony?

25              A PROSPECTIVE JUROR:  No.
```

```
 1                  MS. PARK:  And I expect the Judge will instruct

 2      you that you can consider the witness' demeanor in

 3      determining their credibility, but is there anyone here, as

 4      you sit here today, unless I see some tears from that

 5      witness, I cannot credit her testimony?  Does anyone feel

 6      that way?

 7                  (Prospective jurors indicating.)

 8                  MS. PARK:  Mr. Hall?

 9                  A PROSPECTIVE JUROR:  No, I don't feel that way.

10                  MS. PARK:  Ms. Tajzler?

11                  A PROSPECTIVE JUROR:  Tajzler.

12                  MS. PARK:  Tajzler, sorry.

13                  A PROSPECTIVE JUROR:  No.

14                  MS. PARK:  I will not be able to say it, miss --

15                  A PROSPECTIVE JUROR:  Cuddihy.

16                  MS. PARK:  Cuddihy.

17                  A PROSPECTIVE JUROR:  No.

18                  MS. PARK:  Is there anything that's been said so

19      far that gives you pause as to being a fair and impartial

20      juror in this case?

21                  (Prospective jurors indicating.)

22                  MS. PARK:  Yes, Miss --

23                  A PROSPECTIVE JUROR:  Bhattacharya.

24                  MS. PARK:  Yes.

25                  A PROSPECTIVE JUROR:  Can I approach?
```

1        THE COURT:  Sure, come on up.

2        (Whereupon, the following proceedings took place

3   on the record and outside the presence of the prospective

4   jury panel:)

5        THE COURT:  Yes?

6        A PROSPECTIVE JUROR:  Hi.

7        So there was a question about whether you or your

8   relative was a victim of a crime.

9        THE COURT:  Right.

10       A PROSPECTIVE JUROR:  But I had a close friend who

11  was drugged and assaulted by two men.

12       THE COURT:  Okay.

13       A PROSPECTIVE JUROR:  And it's very traumatic

14  experience for me.

15       THE COURT:  Sure.

16       A PROSPECTIVE JUROR:  So I'm not sure whether or

17  not --

18       THE COURT:  There will not be any allegations in

19  this case that anybody was drugged.

20       A PROSPECTIVE JUROR:  Okay.

21       THE COURT:  As the prosecutor said, there's going

22  to be the statutory rape component.

23       A PROSPECTIVE JUROR:  Right.

24       THE COURT:  And it's going to be another theory

25  that there was force used.

1          A PROSPECTIVE JUROR:  Right, which is the idea of

2     rape is pretty traumatic to me with my friend.

3          THE COURT:  It's just occurring to you now for the

4     first time?

5          THE WITNESS:  Well, I didn't -- before when you

6     were asking people to come up, I thought people were coming

7     up if something had happened to them, not a friend.

8          THE COURT:  Okay.

9          So, are you unable to set that aside and be fair

10    and impartial?

11         A PROSPECTIVE JUROR:  I don't think so.

12         THE COURT:  Okay.

13         Any objections?

14         MR. HERLICH:  No.

15         MS. PARK:  No.

16         THE COURT:  We'll excuse you.

17         (Whereupon, the following proceedings took place

18    on the record and in the presence of the prospective jury

19    panel:)

20         (Whereupon, the prospective juror exited the

21    courtroom.)

22         THE COURT:  Was that seat thirteen?

23         MS. PARK:  Yes.

24         THE COURT:  Yes, it was seat thirteen.

25         MS. PARK:  During the earlier questionnaire, I

Joanne Fleming

1    know some of you mentioned that you had relatives or friends

2    who had been victims of crimes.

3              And I believe, Mr. Baldwin, you mentioned that

4    your brother was arrested for disorderly conduct?

5              A PROSPECTIVE JUROR:  (Indicating.)

6              MS. PARK:  Thinking about that, would you hold

7    that against the People?

8              A PROSPECTIVE JUROR:  No.

9              MS. PARK:  Against the prosecutor?

10             A PROSPECTIVE JUROR:  No.

11             MS. PARK:  Now, Ms. Sutton, you also mentioned a

12   relative that was convicted of that crime.  Were you

13   involved in that?

14             A PROSPECTIVE JUROR:  No.

15             MS. PARK:  Do you know what was going on at that

16   time?

17             A PROSPECTIVE JUROR:  No.

18             MS. PARK:  Would you hold that against the

19   prosecution?

20             A PROSPECTIVE JUROR:  No.

21             MS. PARK:  Ms. Turner, I think you also mentioned

22   you knew someone who had a conflict with the law.  Were you

23   -- I don't know whether --

24             When that person was going through that, were you

25   a part of it?