# United States District Court
# For the Southern District

---

LONNIE HARRELL,

*Petitioner,*

*-against-*

MARK MILLER, Superintendent of Green
Haven Correctional Facility,

*Respondent.*

---

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HABEAS PETITION

## APPENDIX OF EXHIBITS

## VOLUME II of IV

---

Robert S. Dean
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
*Counsel for Petitioner*

Matthew Bova
*Of Counsel*
212-577-2523, ext. 543
mbova@cfal.org

---

## APPENDIX OF EXHIBITS

## TABLE OF CONTENTS

## VOLUME I

**EXHIBIT A** - New York County Supreme Court Decision & Order Denying Petitioner's Motion to Vacate the Judgment (January 29, 2021)

**EXHIBIT B** - Appendix Filed By Petitioner in Support of Motion to Vacate (A1-A294)

## VOLUME II

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A295-A666)

## VOLUME III

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A667-A968)

## VOLUME IV

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A969-A1074)

**EXHIBIT C** - Petitioner's Appellate Division Brief and Reply Brief

**EXHIBIT D** -Application for Leave to Appeal to the Court of Appeals

**EXHIBIT E** - Supplemental Letter Filed in Further Support of Application for Leave to Appeal to the Court of Appeals

**EXHIBIT F** - Petitioner's Motion to Vacate the Judgment (Filed June 25, 2020)

**Exhibit G** - State's Opposition to Motion to Vacate

**EXHIBIT H** - Petitioner's Reply in Further Support of Motion to Vacate

**EXHIBIT I** - Notice of Motion for a Certificate Granting Leave to Appeal

**EXHIBIT J** - Certificate Denying Leave to Appeal (August 5, 2021)

# EXHIBIT B (continued)

# Appendix Filed By Petitioner in Support of Motion to Vacate

Voir Dire - The Defense

1   body of water?

2         A PROSPECTIVE JUROR:  There is -- if I may?  It

3   was a rock water.

4         MR. HERLICH:  Was it deep, hopefully?

5         A PROSPECTIVE JUROR:  Yeah.

6         MR. HERLICH:  And, Mr. Hunter, you indicated a

7   conflict with the law and can I ask what it was about?

8         A PROSPECTIVE JUROR:  Yeah.  I just had some

9   unpaid violations, other little incidents, and I didn't pay

10  my fine.  So I had warrants.  So I got picked up and taken

11  in.

12        MR. HERLICH:  Any problem with the burden of proof

13  remains with the prosecution and it's proof beyond a

14  reasonable doubt?

15        A PROSPECTIVE JUROR:  (Indicating.)

16        MR. HERLICH:  The burden never shifts to the

17  defense.  Any problems with that?

18        A PROSPECTIVE JUROR:  No problems, I understand.

19        MR. HERLICH:  Mr. Mazitto, any problem with the

20  fact that you indicated your company -- was it your company

21  that's being investigated by the Attorney General?

22        A PROSPECTIVE JUROR:  It is like an industry

23  global.  We're cooperating with them, for your information.

24        MR. HERLICH:  Anything about that have any impact

25  on your ability to be fair and impartial?

Joanne Fleming

A295

Voir Dire - The Defense

1          A PROSPECTIVE JUROR:  I don't believe so.

2          MR. HERLICH:  Okay.

3          And, Mr. Cohen, you indicated you were actually a

4    juror in a rape jury?

5          A PROSPECTIVE JUROR:  Yes.

6          MR. HERLICH:  It doesn't go to verdict, correct?

7          A PROSPECTIVE JUROR:  No, they -- the defendant

8    changed his plea.

9          MR. HERLICH:  And how do you know that?  Did the

10   judge tell that to you after you were discharged?

11         A PROSPECTIVE JUROR:  No, no.

12         MR. HERLICH:  Did you speak with the attorneys?

13         A PROSPECTIVE JUROR:  After -- yeah, the judge let

14   us know after a morning recess.

15         MR. HERLICH:  And did the -- what did the Judge,

16   --

17         If you can remember, what, if anything, did the

18   judge tell you that the case was resolved by a plea?

19         A PROSPECTIVE JUROR:  Oh, that -- that the

20   defendant changed his mind and he wanted to plead guilty and

21   the judge told us what he was probably going to sentence him

22   to.

23         MR. HERLICH:  He told you all of that?

24         A PROSPECTIVE JUROR:  Yeah.

25         MR. HERLICH:  Where was this, in the jury room?

Joanne Fleming

Voir Dire - The Defense

1        A PROSPECTIVE JUROR:  Yes.

2        MR. HERLICH:  Dr. Joseph, there will probably be a

3   doctor testifying in this case.  Maybe -- I don't know if

4   there will be any other hospital staff, social workers,

5   testifying, but there will be medical records in evidence.

6        If you're selected to be on the jury, all you can

7   draw on is your life experience but you can't be holding

8   yourself out to be a resident expert on medicine even though

9   you are.  You are a juror just like anyone else.  I don't

10  know how clear I'm making that.

11       Any problem with that?

12       A PROSPECTIVE JUROR:  No.

13       MR. HERLICH:  Okay, thank you.

14       Okay, Mr. Hargett, you have close friends in law

15  enforcement.  Would that, in any way, affect your ability to

16  be fair in this case in terms of assessing the credibility

17  of witnesses?

18       A PROSPECTIVE JUROR:  No.

19       MR. HERLICH:  Ms. Dee, anything -- I guess this

20  was already asked -- anything about your uncle's experience

21  with the criminal justice system that would affect you in

22  any way?

23       A PROSPECTIVE JUROR:  No.

24       MR. HERLICH:  Ms. Frenkel, you were employed by

25  Joseph Tacopina.  What did you do?

Joanne Fleming

1         A PROSPECTIVE JUROR:  Well, we had -- well, it was

2  an agency.  So my part of the business, I was on the

3  production side, casting, while he handled the call action

4  down.  We were not representing players, and so, we worked

5  with him while upholding his practice.  Our agency, we were

6  located in his office.  So there were a lot of -- always

7  something interesting was going on.

8         MR. HERLICH:  I hear A-Rod isn't very happy with

9  him, but that's another story.

10        Mr. Grove, you said that you have a friend who is

11  a Brooklyn -- assistant district attorney in Brooklyn?

12        A PROSPECTIVE JUROR:  Mm-hmm.

13        MR. HERLICH:  And you had a minor conflict with

14  the law.  Do you mind telling me what that was?

15        A PROSPECTIVE JUROR:  Sure.  It was an underage

16  drinking.

17        MR. HERLICH:  That's one of the rights of the

18  adolescent passage to do.

19        A PROSPECTIVE JUROR:  Six months shy to

20  twenty-one.

21        MR. HERLICH:  In New York?

22        A PROSPECTIVE JUROR:  No, this is in Pennsylvania.

23        MR. HERLICH:  How long ago, if I may ask?

24        A PROSPECTIVE JUROR:  I think fourteen, fifteen

25  years.

1          MR. HERLICH:  Okay.  When I was young in New

2    Jersey, the age was eighteen.

3          Mr. Kigel?

4          A PROSPECTIVE JUROR:  Sure.  I do have an issue

5    with a question that was posed to someone else.

6          MR. HERLICH:  Go ahead.

7          A PROSPECTIVE JUROR:  Someone not taking the stand

8    in their own defense.

9          MR. HERLICH:  Right.

10         A PROSPECTIVE JUROR:  Just thinking about it, as

11   you've gone through the line, I have a tough time -- I mean,

12   if I was accused of something I didn't do, I would be

13   standing up on the stand and letting everyone know I didn't

14   do it.  If someone doesn't do it and leaves it to someone

15   else to make that argument for him, if we're speaking

16   honestly, I think I will hold it against that person.

17         MR. HERLICH:  Okay.

18         I mean, when the Judge gave the preliminary

19   instructions, it's totally -- it's like one integrate

20   package where there's the presumption of innocence that's

21   connected to the burden of proof being exclusively of the

22   process.  Someone once called it a dialectical person, some

23   fancy person.

24         Quite frankly, the defendant doesn't have a burden

25   of proof.  It remains with the prosecution.  So it follows

1   from that alone that an accused has no obligation to put on

2   a case or to present evidence.  It's the People's

3   requirement to prove the charge beyond a reasonable doubt.

4   So, you cannot draw any inference unfavorable to Mr. Harrell

5   if he doesn't testify.

6            Despite your own personal beliefs that if you were

7   accused you would be on the witness stand in a heartbeat,

8   and Mr. Harrell may very well be on the witness stand but

9   that decision gets made later on in the case, and if you're

10  unable to follow the Judge's instruction that you cannot

11  draw an adverse inference against the accused if he doesn't

12  testify, now's the time to tell us.  Do you think that will

13  be a real problem?

14           A PROSPECTIVE JUROR:  I think it will be a

15  problem.  Because I understand the legal logic of what you

16  would have to -- why you would have an attorney and speak

17  for you the entire time.

18           I'm saying from a reality standpoint, if someone's

19  saying I've done something and I haven't, I will stand up

20  and say I haven't.  So, for me to -- I feel as if I cannot

21  be impartial regarding someone who doesn't share that.

22           MR. HERLICH:  Okay.

23           A PROSPECTIVE JUROR:  That's my honest view on

24  that.

25           MR. HERLICH:  Okay.

Joanne Fleming

A300

Voir Dire - The Defense

```
 1              Ms. Bowman, you indicated you were a criminal
 2   juror?
 3              A PROSPECTIVE JUROR:  Yes.
 4              MR. HERLICH:  Did that case, without telling us
 5   the verdict, did it go to verdict?
 6              A PROSPECTIVE JUROR:  It was a hung jury.
 7              MR. HERLICH:  Oh, it was a hung jury, okay.
 8              A PROSPECTIVE JUROR:  Yes.
 9              MR. HERLICH:  Was that frustrating for you?
10              A PROSPECTIVE JUROR:  Very.
11              MR. HERLICH:  Without telling me how people were
12   voting, how was it split, if you recall, the numbers?
13              A PROSPECTIVE JUROR:  It's been awhile.  So I
14   think it was more against than for.
15              MR. HERLICH:  Okay.
16              Okay, Mr. Kigel, you said you were a grand juror?
17              A PROSPECTIVE JUROR:  Yes.
18              MR. HERLICH:  You got to assure us you can erase
19   the instructions you were given as a grand juror because the
20   burden of proof here is a preponderence of the evidence that
21   a crime was committed and the accused committed the crime.
22   Here, it's proof beyond a reasonable doubt.
23              Can you assure us you will follow those
24   instructions?
25              A PROSPECTIVE JUROR:  Yes.
```

Joanne Fleming

A301

1     MR. HERLICH:  Without any problem?

2     A PROSPECTIVE JUROR:  Yes.

3     MR. HERLICH:  Okay.

4     Mr. McCabe, your brother is a state police

5 officer, is that right?

6     A PROSPECTIVE JUROR:  Yes.

7     MR. HERLICH:  Okay.

8     And that is so interesting, that you work with the

9 police horses, right?

10     A PROSPECTIVE JUROR:  Yes.

11     MR. HERLICH:  Anything about the fact that your

12 brother's in law enforcement, would that impair your ability

13 to be fair and impartial in any way?

14     A PROSPECTIVE JUROR:  No.

15     MR. HERLICH:  Mr. Downing, any problem with the

16 burden of proof rests on the prosecution, they have to prove

17 their case beyond a reasonable doubt, and unless -- if they

18 fail to do so, you must find the accused not guilty, and if

19 obviously they convince you beyond a reasonable doubt that

20 they have proven their case, you find the accused guilty?

21 Any problems with those legal principles?

22     A PROSPECTIVE JUROR:  Not at all.

23     MR. HERLICH:  Ms. Merrick, can you be fair and

24 impartial in this case in light of your professional work?

25     A PROSPECTIVE JUROR:  Yeah.

Voir Dire - The Defense                                    295

1      MR. HERLICH:  Okay, great.

2      Your brother's in NYPD?

3      A PROSPECTIVE JUROR:  Mm-hmm.

4      MR. HERLICH:  Right.

5      Like you said, you hear it from both sides.

6      A PROSPECTIVE JUROR:  Yes, yes.

7      MR. HERLICH:  Okay.

8      Thank you.

9      THE COURT:  Thank you.

10      Okay, jurors, at this time the law permits the

11  attorneys to take some time to review their notes and make

12  some decisions.  So I will ask you to please step outside

13  for a few minutes.  Thank you.

14      A COURT OFFICER:  Make sure you have all your

15  belongings and step this way, please.

16      (Whereupon, the prospective jury panel exited the

17  courtroom.)

18      (Whereupon, the prospective jurors in the box

19  exited the courtroom.)

20      THE COURT:  Okay, just before you look at your

21  notes, I believe that the defense has used six perempts, the

22  People have used one.

23      MS. PARK:  Yes.

24      THE COURT:  And I just want to remind you that we

25  only have about twelve or thirteen left in the audience.  We

Joanne Fleming

A303

1      do have six sworn jurors, okay?

2                  (Counsel conferring with defendant.)

3                  THE COURT:  Okay, we all set?

4                  MR. HERLICH:  Okay.

5                  THE COURT:  Looking at seats --

6                  A COURT OFFICER:  Excuse me, your Honor.

7                  (Court Officer Conferring with the Court.)

8                  THE COURT:  I was just informed Ms. Merrick, seat

9      sixteen, said she was feeling nervous and she's prone to

10     anxiety attacks.  She says she's okay, but she wanted us to

11     know that.

12                 Would you like me to bring her in and ask

13     additional questions?

14                 MR. HERLICH:  Yeah, I believe that will be --

15                 THE COURT:  So let's bring in Ms. Merrick, please.

16                 A COURT OFFICER:  Juror entering.

17                 (Whereupon, the prospective juror entered the

18     courtroom.)

19                 THE COURT:  Ms. Merrick, thank you for coming back

20     in.

21                 A PROSPECTIVE JUROR:  Yeah.

22                 THE COURT:  So the court officer just conveyed

23     you're a little nervous.

24                 A PROSPECTIVE JUROR:  I was a little panicky,

25     yeah.

Voir Dire - The Court

 1          THE COURT:  Do you suffer from panic attacks?

 2          A PROSPECTIVE JUROR:  Yeah, I'm in mental health

 3    treatment.  I take medication.  I thought I'd be okay, but I

 4    feel very nervous.  So I don't know if that's normal.

 5          THE COURT:  It's normal.  I think the attorneys

 6    feel nervous.

 7          A PROSPECTIVE JUROR:  I'm in courts a lot.  But

 8    this feels very stressful.  I feel very stressed out right

 9    now.

10          THE COURT:  Do you feel this is something you

11    could do?

12          A PROSPECTIVE JUROR:  No, but I don't think it

13    will be good for me.  I know that is a hard thing to say,

14    but...

15          MR. HERLICH:  Do you believe that it is the nature

16    of the case that may be having an impact on you?  I'm just

17    curious.

18          A PROSPECTIVE JUROR:  Maybe, maybe.  It is a lot

19    of potential violence.  Maybe sex.  I am a woman.  Like I

20    said, my sister was sexually assaulted.  So I think -- I

21    think it's -- yeah, I think my anxiety very hard for me to

22    be really fully present and logical.

23          THE COURT:  Alright.  Thank you.  You can step

24    out.

25          A PROSPECTIVE JUROR:  Okay.


                        Joanne Fleming


                           A305

```
 1              (Whereupon, the prospective juror exited the

 2      courtroom.)

 3              THE COURT:  Any objections to excusing her for

 4      cause?

 5              MR. HERLICH:  No, your Honor.

 6              MS. PARK:  No.

 7              THE COURT:  Alright.

 8              So looking at seats one through six, any

 9      challenges for cause, People?

10              MS. PARK:  Yes, Mr. Horneff, Juror Number 6.

11              MR. HERLICH:  I concur.

12              THE COURT:  We -- we have to make a record.

13              The reason is he indicated he will have a problem

14      with the statutory rape laws.  He thought it will be a

15      little bit unfair if a defendant was lied to about the age

16      of the person.  I grant the cause.

17              Any challenges for cause, one through six?

18              MR. HERLICH:  No.

19              THE COURT:  Any peremptory challenges, one through

20      six?

21              MS. PARK:  Yes, number two, Mr. Eric Anderson.

22  PEREM     THE COURT:  Mm-hmm.

23              MS. PARK:  And that's it.

24              THE COURT:  Okay.

25              Defense, one through six, perempts?
```

Joanne Fleming

1              (Counsel conferring with defendant.)

2              MR. HERLICH:  Number four, Mr. Hill.

3              THE COURT:  Okay.  So, seat one becomes Juror

4    Number 7.  Seat three becomes Juror Number 8.  And seat five

5    becomes Juror Number 9.

6              Looking at seats seven, eight and nine, seven,

7    eight and nine, any challenges for cause, People?

8              MS. PARK:  Yes.

9              THE COURT:  For cause?

10             MS. PARK:  I'm sorry, not for cause.

11             THE COURT:  Okay.

12             How about the defense for cause, seven, eight,

13   nine?

14             MR. HERLICH:  No.

15             THE COURT:  Peremptory challenges, People?

16             MS. PARK:  Yes, Juror Number 7, Mr. Mazitto.

17             THE COURT:  Okay.

18             How about for the defense, eight or nine?

19             MR. HERLICH:  Yes, Judge, number eight and number

20   nine by the defense.

21             THE COURT:  Seats ten, eleven and twelve, ten,

22   eleven and twelve, any cause, People?

23             MS. PARK:  No, Judge.

24             THE COURT:  Defense for cause?

25             MR. HERLICH:  No.

Joanne Fleming

A307

1              THE COURT:  Peremptory challenges, People?

2              MS. PARK:  No.

3              THE COURT:  Defense, peremptory challenges, ten,

4    eleven and twelve?

5              MR. HERLICH:  One moment, your Honor.

6              (Counsel conferring with defendant.)

7              MR. HERLICH:  Number twelve, your Honor, Ms.

8    Frenkel, by the defense.

9              THE COURT:  Okay.

10             So seat ten becomes Juror Number 10.  Seat eleven

11   becomes Juror Number 11.

12             Looking at seat thirteen, only thirteen, challenge

13   for cause, People?

14             MS. PARK:  Yes.  I believe he is the one who had

15   the issue with the defendant testifying.

16             THE COURT:  Right.

17             You agree?

18             MR. HERLICH:  That's correct.

19             THE COURT:  I grant the challenge for cause as to

20   thirteen.

21             Seat fourteen, challenge cause, People?

22             MS. PARK:  No.

23             THE COURT:  Defense for cause?

24             MR. HERLICH:  No, your Honor.

25             THE COURT:  Peremptory challenge, People?

| | |
|---|---|
| 1 | MS. PARK:  Yes. |
| 2 | THE COURT:  Seat fifteen, challenge for cause, |
| 3 | People? |
| 4 | MS. PARK:  No. |
| 5 | THE COURT:  Defense for cause? |
| 6 | MR. HERLICH:  No. |
| 7 | THE COURT:  Peremptory challenge, People? |
| 8 | MS. PARK:  No. |
| 9 | THE COURT:  Defense, peremptory challenge? |
| 10 | MR. HERLICH:  Yes. |
| 11 | THE COURT:  Seat sixteen, challenge for cause, |
| 12 | People? |
| 13 | MS. PARK:  No. |
| 14 | THE COURT:  Defense for cause? |
| 15 | MR. HERLICH:  No. |
| 16 | THE COURT:  Peremptory challenge, People? |
| 17 | MS. PARK:  Yes. |
| 18 | THE COURT:  Seat seventeen is excused for cause. |
| 19 | Seat eighteen, any challenge, People? |
| 20 | MS. PARK:  No. |
| 21 | THE COURT:  Defense for cause? |
| 22 | MR. HERLICH:  No. |
| 23 | THE COURT:  Peremptory challenge, People? |
| 24 | MS. PARK:  No. |
| 25 | THE COURT:  Defense? |

Joanne Fleming

1           MR. HERLICH:  Yes, your Honor.

2           THE COURT:  Okay.

3           So, we have eleven jurors.  Let's swear them in

4    and then empanel the ones that are in the audience to see if

5    we can get our twelfth juror and our alternates.

6           Let's bring them back in, please.

7           A COURT OFFICER:  In the box or in the audience?

8           THE COURT:  In the audience.

9           A COURT OFFICER:  Jury panel entering.

10          (Whereupon, the prospective jurors in the box

11   entered the courtroom.)

12          (Whereupon, the prospective trial jurors entered

13   the courtroom.)

14          THE COURT:  Alright, jurors, please listen for

15   your name.  If your name is called, that means that you've

16   been selected as a juror to this trial.  Please come up with

17   your belongings, the court officer will show you where to

18   sit and that will be your seat for the remainder of the

19   trial.

20          THE CLERK:  Stephanie Oster.

21          A COURT OFFICER:  This way, please.

22          THE COURT:  She's Juror Number 7.

23          THE CLERK:  Lydia Zamm.

24          Colin Hunter.

25          Marcus Hargett.

1                    And Malu Dee.

2                    THE COURT:  If you were in the jury box and your

3       name was not called, please go back downstairs to the

4       fifteenth floor.

5                    If you were in the audience and you have not had a

6       chance to sit in the jury box, please remain in the

7       audience.

8                    (Whereupon, the prospective jurors in the box

9       exited the courtroom.)

10                   THE CLERK:  Swear them in, Judge?

11                   THE COURT:  Yes, please.

12                   THE CLERK:  Jurors, please stand and raise your

13      right hand.

14                   (Whereupon, the five prospective jurors were sworn

15      or affirmed in as trial jurors by the Clerk of the court.)

16                   THE CLERK:  Thank you.

17                   Be seated, please.

18                   THE COURT:  Alright, jurors, as you can see, you

19      are jurors seven through eleven.  We began jury selection on

20      -- late last week.  We have six sworn.  I believe we will

21      find our twelfth juror and alternate jurors from those who

22      remain in the audience.  We will continue jury selection.

23                   I ask you to come back tomorrow morning at

24      nine-thirty.  Tomorrow morning at nine-thirty, you will hear

25      the preliminary instructions from me and then you will hear

Proceedings

304

1     the opening statements from the attorneys.

2                 Between now and then, as I said, I ask you to

3     please not discuss this case either among yourselves or with

4     anyone else.

5                 Please continue to keep an open mind as to the

6     defendant's guilt or innocence.

7                 Please do not form or express an opinion as to the

8     defendant's guilt or innocence.  Basically just put this

9     case out of your mind.

10                I ask you to please be here promptly at

11    nine-thirty.  When you arrive, do not come into the

12    courtroom.  A court officer will come and get you when we're

13    ready for you.

14                If you are late for any reason, please give us a

15    call, tell us why you're delayed and when you expect to be

16    here.  Once we have our sworn jury panel, we can conduct no

17    business until every single juror is present.  Even if one

18    of you is late, we have to wait.  Please keep in touch with

19    us.  The court officer will take your contact information

20    and give you our contact information.

21                Ma'am, you have a question?

22                A SWORN JUROR:  There was one question I didn't

23    answer that on the back of the form when I was reading from

24    the form.

25                I have a hearing aid.  I don't believe it will be

Joanne Fleming

A312

1      a problem but I may need something repeated.

2                  THE COURT:  That is not a problem.  If you don't

3      hear something, if you need something repeated, just let us

4      know.

5                  A SWORN JUROR:  Okay.

6                  THE COURT:  That's no problem.

7                  Okay, jurors, please step out.

8                  A COURT OFFICER:  Jurors, this way, please.

9                  (Whereupon, the jury exited the courtroom.)

10                 THE COURT:  Okay, jurors in the audience, you've

11     seen how we do this.  Please listen for your name.  If your

12     name is called, just come on up.

13                 THE CLERK:  Seat number one, Theodoros Lardos,

14     L-A-R-D-O-S, first name T-H-E-O-D-O-R-O-S.

15                 Seat number two, Erica Langen, L-A-N-G-E-N.

16                 Seat number three, Micah Resnick, R-E-S-N-I-C-K,

17     first name M-I-C-A-H.

18                 Seat number four, Juliana Diaz, D-I-A-Z, first

19     name J-U-L-I-A-N-A.

20                 Seat number five, Alexandra Lavita, L-A-V-I-T-A,

21     A-L-E-X-A-N-D-R-A.

22                 Seat number six, Rosa Luciano, L-U-C-I-A-N-O,

23     first name R-O-S-A.

24                 Seat number seven, Samuel Cranin, C-R-A-N-I-N.

25                 Seat number eight, Dimitar Gologanov,

Joanne Fleming

1  G-O-L-O-G-A-N-O-V, first name D-I-M-I-T-A-R.

2              Seat number nine, Nicholas Gustin, G-U-S-T-I-N.

3              Seat number ten, Sheila Hernandes,

4  H-E-R-N-A-N-D-E-S.

5              Seat number eleven, Dashiell Feiler, F-E-I-L-E-R,

6  first name D-A-S-H-I-E-L-L.

7              Seat number twelve, Denise Plunkett,

8  P-L-U-N-K-E-T-T.

9              Seat number thirteen, Victoria Barton-Kang-Kang,

10  B-A-R-T-O-N hyphen K-A-N-G.

11              THE COURT:  Good afternoon, Mr. Lardos.  We will

12  start with you, sir.

13              A PROSPECTIVE JUROR:  Hi.

14              I live on the Upper East Side for the past five

15  years.

16              I'm not a native New Yorker.  I immigrated to the

17  United States from my native country about fifteen years

18  ago.

19              I have an M.B.A. degree.

20              I'm divorced originally.

21              My spare time, I play soccer, I go to gym.

22              I've never been on the jury before.

23              Nor relatives ever been victim of crime.

24              I've been an law enforcement officer myself.  My

25  father was a cop as well.  I have several friends that are

1   on duty.

2          THE COURT:  When you say you are law enforcement,

3   what did you do?

4          A PROSPECTIVE JUROR:  Military.

5          THE COURT:  Okay.

6          A PROSPECTIVE JUROR:  Military police.

7          THE COURT:  Was this back in your country?

8          A PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Which country was that?

10         A PROSPECTIVE JUROR:  Cypress.

11         I have close friends on NYPD and several cousins

12  in different states that either from local enforcement or

13  federal level.

14         That's it.

15         THE COURT:  Okay, thank you.

16         Good afternoon.

17         A PROSPECTIVE JUROR:  Hello.

18         I have lived on the Upper East Side for just over

19  two years now.

20         I'm not a native New Yorker.  I come from

21  Minnesota originally.

22         I am a medical laboratory scientist and I've been

23  doing that for over two years now.

24         I have a bachelor's degree.

25         I'm not married and I've never been married.

Joanne Fleming

1              And I have no children.

2              I have another adult and he is a musician.

3              In my spare time, I like to read, go running.  I

4      play piano.

5              I've never been a juror before.

6              And I've never been the victim of a crime, nor has

7      any of my relatives.

8              And none of my relatives or close friends are

9      employed by law enforcement agency or are attorneys or

10     anything like that.

11             And no for questions ten through fifteen.

12             THE COURT:  Thank you.

13             Good afternoon, Mr. Resnick.

14             A PROSPECTIVE JUROR:  Hi.

15             I have lived at my present address on the East

16     Side for about a year.

17             I am a native New Yorker.

18             I am a resident physician.  I am a pediatrician.

19     I'm in third year of training.

20             I have a medical degree.

21             I am married with one child.

22             My wife is a management consultant.  My child is

23     too young to work.

24             In my spare time, I enjoy watching the Mets and

25     practicing medicine.

1          I've never served on a jury before.

2          I have been a victim of crime and a relative has

3     been.  I was mugged when a teenager growing up in New York

4     and my brother had recently had a laptop stolen when he was

5     in the city.

6          THE COURT:  Would any of that affect your

7     ability to be impartial?

8          A PROSPECTIVE JUROR:  No.

9          I have a friend in -- that works for the FBI.

10         Ten through fifteen -- I have a family member who

11    is in law and it would not prevent me from being impartial.

12         Thirteen, currently I'm working two weeks at night

13    at my hospital.  That should not preclude me from fulfilling

14    my civic obligations if necessary.

15         THE COURT:  Thank you.

16         Good afternoon, Ms. Diaz.

17         A PROSPECTIVE JUROR:  Hi, good afternoon.

18         I am a native New Yorker.

19         I have lived on the west -- Upper West Side.  Been

20    there two years.

21         I am a homemaker.  I've been a homemaker for six

22    years.

23         I have a college degree.

24         I am married.  We've been together ten years.

25         We do have two children, two young to work.

Joanne Fleming

A317

1          My husband works in investment banking.

2          In spare time, I like to run, play tennis.

3          I have never served in a jury before.

4          I don't have -- I don't know anyone who has been

5     the victim of a crime.

6          I don't know anyone in law enforcement.

7          And my brother-in-law had a conflict with the law,

8     but it would not prevent me from being impartial and it's

9     not related to this case.

10         And eleven through fifteen, no.

11         THE COURT:  Thank you.

12         Good afternoon.

13         A PROSPECTIVE JUROR:  Hi.

14         I live in Midtown East for about three years.

15         I'm not a native New Yorker.  I'm from Indiana.

16         For a living, I'm in digital marketing and I've

17    done that for two and a half years.

18         I have a college degree.

19         Married.

20         No children.

21         My husband is a consultant.

22         In my spare time, I like to travel, photography.

23         I've never served on a jury before.

24         Let's see, I've been a victim of a burglary which

25    wouldn't, you know, affect in any way.

1              Let's see, I have two family members in law

2       enforcement.

3              And, let's see, I have had an uncle who has had a

4       conflict with the law, but won't affect in any way.

5              And then questions eleven through fifteen, no.

6              THE COURT:  Thank you.

7              Good afternoon.

8              A PROSPECTIVE JUROR:  Good afternoon.

9              Okay, first of all, I am a nervous wreck and it

10      has to do with my health.  I have high blood pressure.  I'm

11      taking medication.

12             I'm going through some situations right now with

13      my twenty-two year old.  I really don't want to get personal

14      right now, but I feel that this is not the correct time for

15      me to -- to -- I have served in the past and I don't think I

16      could do this.

17             THE COURT:  Any objections?

18             MR. HERLICH:  No.

19             MS. PARK:  No.

20             THE COURT:  We are going to excuse you, ma'am.

21      You can step out.

22             A PROSPECTIVE JUROR:  Thank you.

23             A COURT OFFICER:  Wait for me outside.

24             (Whereupon, the prospective juror exited the

25      courtroom.)

Voir Dire - The Court

1                    THE COURT:  Good afternoon, Mr. Cranin.

2                    A PROSPECTIVE JUROR:  Hello.

3                    I've lived on the Upper East Side for most of my

4          life.

5                    I guess technically I'm not a native New Yorker.

6          I was born in Chicago, although I've lived here for most of

7          my life.

8                    For a living, I do public relations and digital

9          marketing.

10                   I have a bachelor's degree.

11                   Not married.

12                   Don't have children.

13                   My spare time, I practice photography, music,

14         guitar and piano.

15                   I never served on a jury before.

16                   I've never been the victim of a crime.

17                   Never had a relative that has been either.

18                   A friend of -- the father of a close friend of

19         mine is a defense attorney for the NYPD.  But I don't

20         believe that would play a part in this.

21                   And for ten through fifteen, no for all of them.

22                   THE COURT:  Thank you.

23                   Good afternoon, sir.

24                   A PROSPECTIVE JUROR:  Good afternoon.

25                   I live in Battery Park for four and a half years.

1              I am a software developer for the last

2       twenty-eight years.

3              I have high school degree.

4              I am married.

5              And we have two childrens -- two children.  And

6       they are two kids.  They don't do anything.  I mean, they do

7       school.

8              My interests are Ping Pong, bicycling, kyacking.

9              No, I have never been a juror before.

10             Personally, multiple robberies of my house -- our

11      house.  My wife was stabbed, but that was before we met.

12             THE COURT:  Would any of that affect your ability

13      to be fair and impartial in this case?

14             A PROSPECTIVE JUROR:  I don't think so.

15             THE COURT:  Okay.

16             A PROSPECTIVE JUROR:  I don't have close relatives

17      or friends who are working in defense or in police.

18             From ten to fifteen, I'm having trouble hearing.

19      Most of the time I hardly can understand your questions.

20             THE COURT:  Was I too low?

21             A PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Okay.

23             Do you normally have a hard time hearing?

24             A PROSPECTIVE JUROR:  Yes.

25             THE COURT:  If there is anything that happens that

Voir Dire - The Court

1     you don't understand, please just raise your hand and let us

2     know so we can repeat it, okay?

3                    A PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  Okay.

5                    Okay, good afternoon.

6                    A PROSPECTIVE JUROR:  Good afternoon.

7                    I have been at my present address for two years.

8                    I live in Midtown East.

9                    I am a native New Yorker.

10                   I work in commercial merchandising for a living.

11                   I have a bachelor's degree.

12                   And no, I have not been married.  I have never

13    been married.

14                   And I don't have children.

15                   I do live with a partner and he works for the

16    educational system for a risk school.

17                   I enjoy working out and museums.

18                   I have served on a case before, in civil.

19                   I am a victim of two crimes.  One was a mugging

20    and the other one with -- I did originally come up to you.

21    I was touched as a child by an adult.

22                   THE COURT:  Would you be able to separate that

23    from what's happening in the courtroom?

24                   A PROSPECTIVE JUROR:  I didn't come up because I

25    didn't think to raise the issue.  I'm shaking right now

Joanne Fleming

A322

Voir Dire - The Court

1          thinking about it.  So I think it might impact me, yeah.

2                     THE COURT:  Okay.

3                     Any objections?

4                     MS. PARK:  No.

5                     MR. HERLICH:  No.

6                     THE COURT:  We're going to excuse you, sir.

7                     A PROSPECTIVE JUROR:  Thank you.

8                     THE COURT:  We will continue with Ms. Hernandes in

9          the second row.

10                     A COURT OFFICER:  Just wait for me outside.

11                     (Whereupon, the prospective juror exited the

12          courtroom.)

13                     A PROSPECTIVE JUROR:  I've lived in Washington

14          Heights for most of my life.

15                     I am a native New Yorker.

16                     I am a case manager.  I've been doing that at my

17          current location for about a year.

18                     I have a bachelor's degree.

19                     I am married.

20                     I have a child.

21                     My husband is a collections agent in another

22          country and my child goes to school.

23                     Spare time, I spend time with my son, and I read.

24                     I've never served on a grand jury, nor have I been

25          a juror.


Joanne Fleming

A323

1          I had a family member who was victim of a crime.

2          Number nine, no.

3          Number ten, I did have a brother-in-law that had

4    conflict with the law.

5          Eleven, twelve, thirteen and fourteen, no.

6          Number fifteen, might have problems due to my son.

7    I don't have much help at night.  I don't know.

8          THE COURT:  We generally don't work beyond

9    four-thirty.

10         Just getting back to you had someone in your

11   family had a conflict with the law?

12         A PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Anything about that that would affect

14   your ability --

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  -- to be fair and impartial?

17         You said you had been a victim of a crime?

18         A PROSPECTIVE JUROR:  My uncle.

19         THE COURT:  Your uncle.

20         Would that affect your ability to be fair and

21   impartial?

22         A PROSPECTIVE JUROR:  (Indicating.)

23         THE COURT:  Okay, thank you.

24         Good afternoon.

25         A PROSPECTIVE JUROR:  Good afternoon.

1          I've lived Upper West Side, five years.

2          I am not a native New Yorker.  I'm from

3   Pennsylvania.

4          I am a grants writer, not-for-profit, for three

5   years.

6          I have a bachelor's.

7          I am not married.

8          I live with another adult, my partner, who is a

9   grad student in a clinical psychology program.

10          I read.

11          I have not served in a jury.

12          I do not have a relative who is a victim of a

13   crime.

14          And to number nine, also no.

15          And from ten to fifteen, no.

16          THE COURT:  Thank you.

17          Good afternoon, Ms. Plunkett.

18          A PROSPECTIVE JUROR:  Good afternoon, your Honor.

19          I have lived at my present address for eight years

20   on the Upper West Side.

21          I'm not a native New Yorker.  I'm from Maryland.

22          I am an attorney.  I have been an attorney for

23   over twenty years.

24          I have a J.D.

25          I'm married with two small children.  I live with

1          my spouse and my kids.

2                    I spend time with my kids, read, cook and travel.

3                    I have served on a grand jury in 2007 for

4          twenty-one and a half days.  It was criminal.

5                    I can't think of any relatives that have been the

6          victim of a crime.

7                    I was not employed by a law enforcement, but when

8          I was a young associate, I was a special assistant district

9          attorney for the Norfolk County's D.A.'s Office in Dedham,

10         Massachusetts for four months prosecuting misdemeanors.

11         Currently, I'm in a law firm where quite a few of my

12         partners do criminal defense work.  I probably have.

13                   Cousin's a Secret Service agent.  I probably know

14         other people in -- former colleague is a prosecutor now in

15         the Manhattan D.A.'s Office.

16                   Let's see, my brother's had conflicts with the

17         law.

18                   THE COURT:  Would you be able to set that aside

19         and not let that affect you?

20                   A PROSPECTIVE JUROR:  Yes.

21                   My occupation as a lawyer does require me to work

22         occasionally at night, but it shouldn't be an issue.

23                   And I think that's it.  All the other answers are

24         no.

25                   THE COURT:  What kind of law do you practice?

Joanne Fleming

A326

Voir Dire - The Court

1              A PROSPECTIVE JUROR:  I am an antitrust litigator.

2              THE COURT:  Thank you.

3              A PROSPECTIVE JUROR:  Thank you.

4              THE COURT:  Good afternoon.

5              A PROSPECTIVE JUROR:  Hi.

6              I've lived at my present address in the Financial

7       District for two years.

8              I am in real estate investment since college.

9              I have a bachelor's degree.

10             I'm married.

11             No children.

12             My spouse is an administrator at an auction house.

13             I cook in my spare time.

14             Never been on a jury.

15             No relative victim of a crime.

16             No friends in law enforcement.

17             And I have a brother that's had conflicts with the

18      law but that wouldn't impair decision.

19             THE COURT:  Thank you.

20             Jurors, please pass the questionnaires to the

21      right, thank you.

22             As we did before, the attorneys will address you.

23      At this time they will address you for about ten minutes

24      each.

25             Ms. Park.

1          MS. PARK:  Thank you.

2          Good afternoon, everyone.

3          VOICES FROM JURY BOX:  Good afternoon.

4          MS. PARK:  So I know you were all sitting out

5     there when I was going through -- when we were both going

6     through questions with the first jurors, and we're going to

7     cover pretty much -- well, at least I'm going to cover

8     pretty much the same issues.  Before I do that, I do want to

9     follow up with some of the questions from the

10    questionnaires.

11         Mr. Lardos, I don't know if you said what you did

12    for a living.  I know you mentioned that you were in the

13    military.

14         A PROSPECTIVE JUROR:  I am a C.O.

15         THE COURT:  Sorry what?

16         A PROSPECTIVE JUROR:  Around the firm.  I am the

17    C.O.

18         MS. PARK:  Ms. Hernandes, you mentioned you are a

19    case manager?

20         A PROSPECTIVE JUROR:  Yes.

21         MS. PARK:  What kind of work -- I mean, what kind

22    of agency?

23         A PROSPECTIVE JUROR:  It is a SORA for ex-homeless

24    that have mental disability.

25         MS. PARK:  So, you heard me talk about the term

Joanne Fleming

A328

Voir Dire - The People

1    statutory rape, that we have two theories of the case, one

2    is that -- that it was non-consensual because some type of

3    force was used, but there's the other component that it was

4    not consensual because the complaining witness in this case

5    is under the age of sixteen.  And the Judge is going to

6    instruct you, I suspect, that if you're under the age of

7    sixteen, that you are incapable of consent.

8              And, again, whether you agree or disagree with

9    that law, is there anyone who has trouble accepting that law

10   and is unable to follow the Judge's instruction?

11             (Prospective jurors indicating.)

12             MS. PARK:  I don't see anyone's hands.

13             Ms. Barton-Kang?

14             A PROSPECTIVE JUROR:  (Indicating.)

15             MS. PARK:  Any problems with that?

16             A PROSPECTIVE JUROR:  No.

17             MS. PARK:  Sir, will you have any problem with

18   that?

19             A PROSPECTIVE JUROR:  I believe I can be

20   impartial, so I --

21             THE COURT:  I can't hear you.

22             A PROSPECTIVE JUROR:  I believe I can be

23   impartial.  So I think judgment is based on the --

24             THE COURT:  Let's use the microphone.  Sir, we

25   have to make sure we hear everything you are saying.

1          A PROSPECTIVE JUROR:  I believe I can be

2    impartial.  However, it is a social moral to take into

3    account most of the people or everybody who was part of

4    that.  I think I can follow the law.

5          THE COURT:  You can follow the law?

6          A PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.

8          MS. PARK:  Mr. Cranin?

9          A PROSPECTIVE JUROR:  Yes.

10          MS. PARK:  Can you give us an assurance that you

11    can follow the law?

12          A PROSPECTIVE JUROR:  Yes.

13          MS. PARK:  You also heard me talk about some of

14    the things that's related to the forcible component:  That

15    you might not hear the complaining witness in this case

16    fighting vigorously or fighting maybe the way that you would

17    expect someone, a victim of a sexual assault, might fight.

18          As you sit here today, can you keep an open mind

19    and listen to the witness' testimony before you make any

20    judgments about the credibility of that witness?

21          And I'm going to start with Ms. Lavita.  Can you

22    keep an open mind at this point?

23          A PROSPECTIVE JUROR:  Yes.

24          MS. PARK:  You can give us your assurance that you

25    will listen to the testimony of the witnesses and wait until

1    the end until you make your final determination?

2              A PROSPECTIVE JUROR:  Yes, I will try.

3              MS. PARK:  I'm sorry, you said you'll try?

4              A PROSPECTIVE JUROR:  Mm-hmm.

5              THE COURT:  Sorry, you said yes?

6              A PROSPECTIVE JUROR:  I said yes, I'll try.

7              THE COURT:  Okay.

8              MS. PARK:  Ms. Diaz, what about you, can you give

9    us an assurance?

10             A PROSPECTIVE JUROR:  Yes.

11             MS. PARK:  And, Mr. Resnick, what about you?

12             A PROSPECTIVE JUROR:  Yes.

13             MS. PARK:  And you also heard me talk about

14   people's reaction to the traumatic situations.  Can you all

15   accept that?

16             Let's start with Ms. Langen.

17             A PROSPECTIVE JUROR:  (Indicating.)

18             MS. PARK:  Can you accept different reactions of

19   people to certain traumatic experience?

20             A PROSPECTIVE JUROR:  Yes.

21             MS. PARK:  And what about the complaining witness,

22   can you give us the assurance and listen to her testimony

23   with an open mind?

24             A PROSPECTIVE JUROR:  Yes.

25             MS. PARK:  Any preconceived notions at this point?

1          A PROSPECTIVE JUROR:  No.

2          MS. PARK:  And what about you, Mr. Feiler?

3          A PROSPECTIVE JUROR:  Feiler.

4          MS. PARK:  I'm sorry, can you just --

5          A PROSPECTIVE JUROR:  Feiler.

6          MS. PARK:  What about you, can you give us your

7     assurance that you can listen to the victim's testimony?

8          A PROSPECTIVE JUROR:  Yes.

9          MS. PARK:  And the fact she might not react the

10    way you think a victim of a sexual assault should react,

11    would that preclude you from believing her?

12         A PROSPECTIVE JUROR:  No.

13         MS. PARK:  Ms. Plunkett, what about you?

14         A PROSPECTIVE JUROR:  No.

15         MS. PARK:  Any issues with what's been said so

16    far?

17         A PROSPECTIVE JUROR:  Nothing.

18         MS. PARK:  And I guess that goes for everybody, is

19    there something that was said that gives you pause about

20    being fair and impartial to this case both to the People and

21    also to the defense?

22         (Prospective jurors indicating.)

23         MS. PARK:  I thank you for your time.

24         THE COURT:  Thank you, Ms. Park.

25         Mr. Herlich.

```
 1              MR. HERLICH:  Mr. Lardos, you worked in law
 2     enforcement in the military.  Were you also a police officer
 3     in this country or was that in Cypress?
 4              A PROSPECTIVE JUROR:  That was Cypress, when I was
 5     a lieutenant.
 6              MR. HERLICH:  Do you feel that you can be fair?
 7     Will you always favor the law enforcement position in this
 8     case?
 9              A PROSPECTIVE JUROR:  I grew up in a family with
10     basically a lot of law enforcement, but I will respect the
11     old country values in this country.
12              Now, I have extended family here as well.  That's
13     through my professionalism.  We have a company and we have a
14     lot of people that work for the federal government and work
15     with us.  That goes with my partner.  His wife is military
16     secretary.  I tend to look at the law first and I trust the
17     law, people, then I get the facts.
18              THE COURT:  Can you give us your assurance --
19              Despite your background, can you give us your
20     assurance that you will not give the police witnesses any
21     greater credibility than any other witness until you've
22     heard them, you've seen them, you heard what they had to say
23     and you can form your opinion about that?
24              A PROSPECTIVE JUROR:  I can try my best.
25              THE COURT:  You're not sure?
```

1          A PROSPECTIVE JUROR:  I am not sure.

2          THE COURT:  Okay.

3          MR. HERLICH:  Ms. Langen.

4          A PROSPECTIVE JUROR:  Langen.

5          MR. HERLICH:  You work as medical laboratory

6    scientist.  What kind of work do you do?

7          A PROSPECTIVE JUROR:  Basically, when you get the

8    bloods drawn at the hospital, I do those tests.

9          MR. HERLICH:  Metabolic panels and all that stuff?

10         A PROSPECTIVE JUROR:  Yes, blood.

11         MR. HERLICH:  How long have you been doing that?

12         A PROSPECTIVE JUROR:  Just over two years.

13         MR. HERLICH:  And you probably heard from your

14   position in the audience that the burden of proof is on the

15   prosecution.  Any problem with that?  They have to prove

16   their case beyond a reasonable doubt.

17         A PROSPECTIVE JUROR:  No, no problem.

18         MR. HERLICH:  And if my client, who I believe is

19   going to testify in this case, but if he decides not to, you

20   can't hold that against him.  Any problem with that?

21         A PROSPECTIVE JUROR:  No problem.

22         MR. HERLICH:  Okay.

23         Dr. Resnick?

24         A PROSPECTIVE JUROR:  Yes.

25         MR. HERLICH:  You have friends in the FBI?

Joanne Fleming

A334

1          A PROSPECTIVE JUROR:  Yeah.

2          MR. HERLICH:  Any reason that would make you

3     favorable to law enforcement --

4          A PROSPECTIVE JUROR:  No.

5          MR. HERLICH:  -- when you assess witness

6     credibility in this case?

7          A PROSPECTIVE JUROR:  No.

8          MR. HERLICH:  The fact that you will be working at

9     night during the case --

10          A PROSPECTIVE JUROR:  I'm scheduled to be, but I

11     have back-up coverage if necessary.

12          MR. HERLICH:  In other words, will you be able to

13     stay awake during the trial?

14          A PROSPECTIVE JUROR:  Yes.  I will not be working

15     at night.  I will be here and at night someone else will be

16     doing it.

17          MR. HERLICH:  Okay, thank you.

18          Ms. Diaz, you indicated that it was your brother

19     who had a conflict with the law?

20          A PROSPECTIVE JUROR:  Brother-in-law.

21          MR. HERLICH:  Brother-in-law.

22          Anything about that that would affect your ability

23     to be fair in this case?

24          A PROSPECTIVE JUROR:  No.

25          Sorry, can you provide documentation that I am a

1   juror?

2                   THE COURT:  Yes.

3                   A PROSPECTIVE JUROR:  That should be fine.

4                   MR. HERLICH:  Ms. Lavita, you indicated you have

5   two family members in law enforcement?

6                   A PROSPECTIVE JUROR:  Yes.

7                   MR. HERLICH:  Will that have impairment, impair

8   your ability to be fair and impartial in this case?

9                   A PROSPECTIVE JUROR:  No, I don't believe so.

10                  MR. HERLICH:  Well, the magic words:  Can you

11  assure us that you won't?  Can you assure us that you will

12  judge police testimony the same you would a civilian witness

13  in terms of assessing credibility, or would you favor law

14  enforcement testimony by virtue of the fact that it is a law

15  enforcement official who's testifying?

16                  A PROSPECTIVE JUROR:  I mean, I would try to be

17  fair, but I think I would favor law enforcement.

18                  THE COURT:  Well, I can appreciate that that's how

19  you feel coming in.  Can you give us the assurance you will

20  follow my instruction that you are to treat all the

21  witnesses the same and not pass judgment on how credible

22  they are until after you've heard from them and listened to

23  what they had to say?  Can you do this, or you're already

24  coming in giving the police a --

25                  A PROSPECTIVE JUROR:  I can do that.

Joanne Fleming

A336

1          THE COURT:  You can do that, okay.

2          A PROSPECTIVE JUROR:  Yes.

3          MR. HERLICH:  Mr. Cranin, did I say it right?

4          A PROSPECTIVE JUROR:  Cranin.

5          MR. HERLICH:  You stated that the father of your

6   close friend is an attorney for the police department?

7          A PROSPECTIVE JUROR:  Correct.

8          MR. HERLICH:  Is that civil litigation?  Is it

9   lawsuits that he's defending what that person does, if you

10  know, or you're not even sure?

11         A PROSPECTIVE JUROR:  To be totally honest, I'm

12  not exactly sure what his role is specifically.

13         MR. HERLICH:  Right.

14         A PROSPECTIVE JUROR:  I think it's defending

15  lieutenants in the NYPD.

16         MR. HERLICH:  Okay.

17         A PROSPECTIVE JUROR:  I believe.

18         MR. HERLICH:  So, would anything about that in any

19  way affect your ability to judge every witness that appears

20  in this case using the same standards that you use to assess

21  credibility and accuracy and truthfulness without -- with

22  regard to whether they're law enforcement personnel or

23  civilians?

24         A PROSPECTIVE JUROR:  That relationship would not

25  affect that, no.

1          MR. HERLICH:  Ms. Hernandes, I have you also

2     indicated, was that your brother-in-law, who had a conflict

3     with the law?

4          A PROSPECTIVE JUROR:  (Indicating.)

5          MR. HERLICH:  Anything about that that would have

6     an affect on you how you sit in this case?

7          A PROSPECTIVE JUROR:  No.

8          MR. HERLICH:  As far as your ability to be fair?

9          A PROSPECTIVE JUROR:  No, it's fine.

10         MR. HERLICH:  Mr. Feiler, anything about the

11    Judge's instructions that you have any issues with if Mr.

12    Harrell elects not to testify, you can't hold it against

13    him?  Any problem with that?

14         A PROSPECTIVE JUROR:  No.

15         MR. HERLICH:  Ms. Plunkett, you were a grand

16    juror?

17         A PROSPECTIVE JUROR:  Yes.

18         MR. HERLICH:  Correct?

19         Okay, so whatever you learned there, forget it.

20    Because it is a different standard of proof.  Here, it's

21    proof beyond a reasonable doubt that remains with the

22    prosecution.

23         Can you assure us that you will hold the

24    prosecution to their burden of proof?

25         A PROSPECTIVE JUROR:  Yes, I can.

```
 1              MR. HERLICH:  And Ms. Barton-Kang, can your
 2    brother -- was it your brother who had a conflict with the
 3    law?
 4              A PROSPECTIVE JUROR:  My half brother, yes.
 5              MR. HERLICH:  Okay.
 6              Anything about that that would prevent you from
 7    being fair in this case?
 8              A PROSPECTIVE JUROR:  No, not at all.
 9              MR. HERLICH:  Thank you.
10              THE COURT:  Thank you.
11              Jurors, I ask you to please step outside for a few
12    minutes.
13              A COURT OFFICER:  Jurors, make sure you have all
14    your belongings and follow me.
15              (Whereupon, the prospective jurors in the box
16    exited the courtroom.)
17              THE COURT:  Why don't you take a few minutes to
18    look at your notes?
19              (Counsel conferring with defendant.)
20              THE COURT:  You ready?
21              MS. PARK:  Yes.
22              THE COURT:  We will take one at a time.
23              Seat number one, People, any challenge?  For
24    cause.
25              MS. PARK:  Yes.
```

Joanne Fleming

A339

1          THE COURT:  Okay.

2          You consent?

3          MR. HERLICH:  Yes.

4          THE COURT:  He said that he would favor police

5   testimony.  I grant the challenge for cause.

6          Seat number two, any challenge for cause by either

7   one of you?

8          MS. PARK:  No.

9          MR. HERLICH:  No.

10         THE COURT:  Peremptory challenge, People?

11         MS. PARK:  No.

12         THE COURT:  Peremptory challenge, Mr. Herlich?

13         (Counsel conferring with defendant.)

14         MR. HERLICH:  Yes, your Honor.

15         THE COURT:  Okay.

16         Seat number three, any challenge for cause by

17   either one of you?

18         MS. PARK:  No.

19         MR. HERLICH:  No.

20         THE COURT:  Peremptory challenge, People?

21         MS. PARK:  No.

22         THE COURT:  Defense, peremptory challenge?

23         MR. HERLICH:  No.

24         THE COURT:  Seat three becomes Juror Number 12.

25         Let's pick our alternates.  Seat four, any

1        challenge for cause?

2                    MS. PARK:  No.

3                    THE COURT:  Mr. Herlich, challenge for cause?

4                    MR. HERLICH:  No.

5                    THE COURT:  Peremptory challenge, People?

6                    MS. PARK:  No.

7                    THE COURT:  Defense, peremptory challenge?

8                    MR. HERLICH:  No.

9                    THE COURT:  No peremptory challenge.

10                   Juliana Diaz becomes Alternate Number 1.

11                   Seat five, challenge for cause, People?

12                   MS. PARK:  No.

13                   THE COURT:  Defense, for cause?

14                   MR. HERLICH:  No.

15                   THE COURT:  Peremptory challenge, People?

16                   MS. PARK:  No.

17                   THE COURT:  Defense?

18                   MR. HERLICH:  Yes.

19                   THE COURT:  Alright.

20                   Seat six was excused for cause.

21                   Seat seven, any challenge for cause by either

22       side?

23                   MS. PARK:  No.

24                   MR. HERLICH:  No.

25                   THE COURT:  Peremptory challenge, People?

```
 1              MS. PARK:  Yes.

 2              THE COURT:  Seat eight, any challenge for cause

 3    from either one of you?

 4              MS. PARK:  No.

 5              MR. HERLICH:  No.

 6              THE COURT:  Peremptory challenge, People?

 7              MS. PARK:  Yes.

 8              THE COURT:  Seat nine was excused for cause.

 9              Seat ten, any challenge for cause either one of

10    you?

11              MR. HERLICH:  No.

12              MS. PARK:  No.

13              THE COURT:  People are out of challenges

14    peremptorily for the alternate there.

15              Any peremptory challenge from the defense?

16              MR. HERLICH:  No.

17              THE COURT:  So seat ten becomes Alternate Number

18    2.

19              Seat eleven, any challenge for cause from either

20    one of you?

21              MR. HERLICH:  No.

22              THE COURT:  Peremptory challenge, People?

23              MS. PARK:  I don't have any, no.

24              THE COURT:  No, you do.

25              MS. PARK:  Oh, that's right.
```

Joanne Fleming

1              No, Judge.

2              THE COURT:  How about the defense, peremptory

3    challenge?

4              MR. HERLICH:  No.

5              THE COURT:  Okay, seat eleven becomes Alternate

6    Number 3.

7              Let's go for one more.  Seat twelve, any challenge

8    for cause from either one of you?

9              MR. HERLICH:  No.

10             MS. PARK:  No.

11             THE COURT:  Peremptory challenge, People?

12             MS. PARK:  No.

13             THE COURT:  Defense, peremptory challenge?

14             MR. HERLICH:  Yes your Honor.

15             THE COURT:  And then seat thirteen, any challenge

16   for cause from either one of you?

17             MR. HERLICH:  No.

18             MS. PARK:  No.

19             THE COURT:  Peremptory challenge, People?

20             MS. PARK:  No.

21             THE COURT:  Defense, peremptory challenge?

22             MR. HERLICH:  No.

23             THE COURT:  Alright, we have four alternates.

24             Let's bring them in, please.

25             What time did the defendant get here today?

1          THE SERGEANT:  He was in the building around nine

2     -- about ten o'clock, I would say.

3          THE DEFENDANT:  No.

4          THE SERGEANT:  They were telling us he was in the

5     building.  He went actually here.

6          THE DEFENDANT:  I was downstairs a quarter to

7     nine.

8          THE COURT:  You were downstairs at quarter to

9     nine?

10          THE DEFENDANT:  There was an alarm, something

11     happened in the pen.

12          THE SERGEANT:  That's not what they told us.

13          A COURT OFFICER:  Jurors entering.

14          (Whereupon, the prospective jurors in the box

15     entered the courtroom.)

16          THE COURT:  Jurors, please listen for your name.

17     If your name is called, it means that you've been selected

18     as a juror for this trial.

19          Please take all your belongings with you.  The

20     court officer will show you where to sit and this will be

21     your seat for the remainder of the trial.

22          Seat number twelve, Micah Resnick.

23          A COURT OFFICER:  This way, please.

24          THE CLERK:  Alternate 1, Juliana Diaz.

25          Alternate Number 2, Sheila Hernandes.

Proceedings                          337

1              Alternate 3, Dashiell Feiler.

2              Alternate 4, Victoria Barton-Kang.

3              THE COURT:  Those of you in the audience, thank

4     you very much.  You can go downstairs to the fifteenth

5     floor.

6              (Whereupon, the prospective jurors in the box

7     exited the courtroom.)

8              THE COURT:  Let's swear them in.

9              THE CLERK:  Raise your right hand, please.

10             (Whereupon, the five prospective jurors were sworn

11    or affirmed in as trial jurors by the Clerk of the court.)

12             THE CLERK:  Have a seat.

13             THE COURT:  Thank you.

14             Please have a seat.

15             You were here when I gave the other jurors my

16    instructions.  I will repeat them to you as well:

17             Please do not discuss the case either among

18    yourselves or with anyone else.

19             Please continue to keep an open mind as to the

20    defendant's guilt or innocence.

21             Please do not form or express an opinion as to the

22    defendant's guilt or innocence.

23             I ask you to please be back tomorrow at

24    nine-thirty.  Just wait outside in the hallway and we will

25    go outside and invite you in when we're ready for you.


                    Joanne Fleming

                        A345

Proceedings                                              338

1         If you're going to be delayed for any reason

2    whatsoever, please give us a call.  We have a total of

3    sixteen jurors and we can conduct no business until every

4    single juror is present.  If you're going to be delayed,

5    please call us and let us know what's going on so we can let

6    everybody else know.

7         I will see you tomorrow at nine-thirty.

8         (Whereupon, the five sworn trial jurors exited the

9    courtroom.)

10        THE COURT:  People, how long do you expect the

11   opening statement to be?

12        MS. PARK:  About twenty minutes.

13        THE COURT:  Mr. Herlich?

14        MR. HERLICH:  A few minutes, Judge.

15        Your Honor, I think maybe we should take up the

16   issue of what in the medical records is still in dispute

17   between the parties.

18        THE COURT:  Sure.

19        MR. HERLICH:  Okay.

20        Okay, in the medical records, Judge, on page four

21   of six --

22        THE COURT:  I don't have a copy, by the way.

23        MS. PARK:  I don't have an extra, but I can give

24   it to you.

25        MR. HERLICH:  I can read you the part that I was

Joanne Fleming

A346

1      objecting to.

2                  THE COURT:  Okay.

3                  MR. HERLICH:  It is a narrative from the

4      complainant about what happened to her, including scratches

5      to her right cheek, she said she was choked.  That's legally

6      proper for treatment and the diagnosis.

7                  But then she says quote:  And the perpetrator

8      threatened to kill her and her family if she didn't comply.

9      I would argue, from my point of view, your Honor, that's not

10     necessary for treatment or diagnosis.

11                 THE COURT:  Ms. Park, you don't agree?

12                 MS. PARK:  Yes, I don't agree with that.

13                 THE COURT:  Why?  How do you see it?

14                 MS. PARK:  I mean, she's there for treatment and

15     diagnosis.  The diagnosis here is the reason she's at the

16     hospital, is because she was a victim of a sexual assault.

17     The verbal threat is a part of that.

18                 THE COURT:  Okay.

19                 I disagree.  I think -- I think that the first

20     part having to do with the scratches and everything that

21     goes to the physical injury and the alleged crimes, I can

22     certainly see how that's necessary for treatment and

23     diagnosis.

24                 I don't see the additional statements that she was

25     threatened, that he was going to come back, I don't really

1      see that as any kind of an exception for going to treatment

2      or treatment and diagnosis.  You can strike that portion.

3            MR. HERLICH:  Okay.

4            And, your Honor, in the page two of six from the

5      comprehensive sexual assault assessment form, it's similar

6      language.  It says -- in addition to the actual details of

7      the alleged sexual assault, it says:  Patient was threatened

8      by neighbor.  So, my application would be that that's not

9      necessary for treatment or treatment and diagnosis.

10           MS. PARK:  Judge, I submit all the threats,

11     especially in this case -- I know there are cases where it

12     talks about, in a domestic violence relationship, the

13     threats are relevant to discharge planning, the safety plan

14     for the victim.  Here, the victim is being -- you know,

15     defendant is the victim's neighbor.  So, arguably, it's

16     relevant to her discharge plan, her safety.

17           THE COURT:  Can you tell me that that was in fact

18     considered when they put together the discharge plan?

19           MS. PARK:  I mean, I can't say that unless I speak

20     to the hospital.

21           THE COURT:  Alright.

22           So, for the time being, I will rule that should

23     also being stricken.  If at a later time you can represent

24     that those statements were considered and factored into

25     whatever discharge plan was put together, then I will

Proceedings

1    reconsider.

2          MS. PARK:  Judge, I will ask you to consider the

3    case that I've already submitted to this Court, in People v.

4    Pham, 118 AD 3d, 1159, where there, the entirety of the

5    medical records were admissible because the doctor in that

6    case testified that it assisted her with treatment and

7    diagnosis.

8          THE COURT:  Alright, but I just asked you if it's

9    your understanding that these statements were actually

10   useful in fact for putting together a discharge plan.  Can

11   you tell me that those statements were -- I mean, you've

12   spoken to the doctors.

13         MS. PARK:  Yes.

14         THE COURT:  Can you tell me about the additional

15   statements about the threats that were useful to the doctors

16   in treating this victim?

17         MS. PARK:  Judge, I can't give that answer now.  I

18   will ask the doctor.

19         THE COURT:  Okay.

20         Well, then, at this point the decision that you

21   cite is not applicable.  It's not on point, so...

22         MR. HERLICH:  Just a couple of more points, Judge.

23         THE COURT:  Okay.

24         MR. HERLICH:  On page two of six of the regular

25   medical record, it says -- and I'm not sure, let me just

Proceedings

1      check if Ms. Park agrees with me --

2              (Counsel conferring with counsel.)

3              MR. HERLICH:   There is a sentence in the record --

4      obviously when the complainant talks about the sexual

5      assault, that's part of the -- that's necessary for

6      treatment, your Honor, but patient told EMS slash NYPD that

7      man from her building sexually assaulted patient.   I think

8      it's hearsay.

9              THE COURT:   Well --

10             MR. HERLICH:   It's not clear.   Did the patient

11     tell this to the doctors or did they talk to the EMS

12     technicians when they brought her in?   I don't know.

13             THE COURT:   Based upon what you're representing to

14     this Court, that's the chief complaint, right, and that's

15     what she's being treated for.

16             MR. HERLICH:   Okay.

17             THE COURT:   So I don't have a problem with it.

18             MR. HERLICH:   Just two more things, your Honor.

19             On page four of six, she says the assailant's name

20     is Lonnie Harrell, and I have one case from the Court of

21     Appeals where a nurse testified that the parties basically,

22     or the Judge ruled, that the nurse was prohibited from

23     testifying regarding the identity of the perpetrator as not

24     necessary for treatment and diagnosis, so...

25             MS. PARK:   I mean, I'll redact Lonnie Harrell.

Joanne Fleming

A350

Proceedings

1        THE COURT:  I don't see any reason why that should

2   come in.  Besides, that was her position from the first

3   excited utterance.

4        MR. HERLICH:  Right.

5        THE COURT:  So there's nothing new there.

6        MR. HERLICH:  And the last thing I wanted to

7   bring, your Honor, to your attention, is the following day

8   the complaining witness and her mom went to the Spencer Cox

9   Center For Health part of St. Luke's.  I think primarily the

10  follow-up was for getting prophylactic medications for

11  transmitting sexual diseases, that's what I surmise, but

12  there are a number of statements that are in here that I

13  have not yet gone over with Ms. Park, but, for example,

14  quote patient's mother reported, and it goes on to say what

15  the mother --

16       THE COURT:  You haven't had a chance to go over

17  that with her.  I will encourage you to do that.  I will

18  encourage you to do that.

19       MR. HERLICH:  We will do that.

20       THE COURT:  I will see you tomorrow nine-thirty.

21       MS. PARK:  Judge, just before we are released, so

22  I don't know if you're aware about this week, they have a

23  thing going on at the UN.

24       THE COURT:  The general assembly.

25       MS. PARK:  Yes.

Joanne Fleming

A351

Proceedings                                                344

1            The NYPD is very reluctant, or actually refusing,

2     to give us the officers that I need, and I'm wondering if

3     you would sign a so-ordered subpoena so I can get them to

4     come here and testify.

5            THE COURT:  Yes, I'll sign it.  You have it with

6     you now?

7            MS. PARK:  Yes.

8            A COURT OFFICER:   (Handing.)

9            THE COURT:  Here you go.

10           A COURT OFFICER:   (Handing.)

11           THE COURT:  Thank you.

12           MS. PARK:  Thank you, your Honor.

13           MR. HERLICH:  Thank you, Judge.

14           (Whereupon, the trial was adjourned to Tuesday,

15     September 29th, 2015.)

16

17

18

19

20

21

22

23

24

25


Joanne Fleming

A352

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 59
 2   ----------------------------------------x

 3   THE PEOPLE OF THE STATE OF NEW YORK          Indictment
                                                  No. 4258/14
 4
                  -against-                       Crim. Sex Act 1
 5
                                                  Jury Trial
 6   LONNIE HARRELL,

 7                               Defendant.

 8   ----------------------------------------x

 9                                       September 29th, 2015

10                                       100 Centre Street
                                         New York, NY  10013
11

12   B e f o r e:

13
                     HONORABLE JUAN M. MERCHAN,
14
                                         Justice.
15

16   Appearances:

17
                     CYRUS R. VANCE, JR., ESQ.
18                   District Attorney, New York County
                     BY:  JUNG PARK, ESQ.
19                        Assistant District Attorney

20
                     THEODORE HERLICH, ESQ.
21                   Attorney for Defendant

22

23

24                                       Joanne Fleming
                                         Amalia Hudson
25                                       Senior Court Reporters
```

A353

Proceedings

```
 1                    (In open court)
 2               THE CLERK:  Continuing case on trial, People
 3     versus Lonnie Harrell.
 4               THE COURT:  Good morning.
 5               MS. PARK:  Good morning.
 6               MR. HERLICH:  Good morning.
 7               THE COURT:  So, we're ready to get started?
 8               MS. PARK:  Yes.
 9               MR. HERLICH:  Yes.
10               Two things, Judge.  Is it possible to get daily
11     copy --
12               THE COURT:  Yes.
13               MR. HERLICH:  -- pursuant to 18B.
14               The other issue was:  Would the Court consider any
15     preliminary instruction, or, in the alternative, I can just
16     briefly address it in my opening, that sexual assault is the
17     generic term that characterizes this case, however,
18     throughout the medical records, and even the Nine-One-One
19     call, terms like rape and sexual abuse are used when they're
20     not the legal definitions?  I don't know --
21               THE COURT:  I think that you can definitely say to
22     them to keep an open mind as to what these things mean.
23               MR. HERLICH:  Right.
24               THE COURT:  And at the end of the trial, I will
25     instruct them on what the legal definition for these things
```

Joanne Fleming

A354

1  are.

2          MR. HERLICH:  That's fine, your Honor, thank you.

3          MS. PARK:  Judge, I do have one thing to put on

4  the record, but should I wait until the defendant comes out?

5          THE COURT:  Yes.

6          A COURT OFFICER:  One coming in.

7          (Whereupon, the defendant entered the courtroom.)

8          THE COURT:  Good morning, Mr. Harrell.

9          THE DEFENDANT:  Hello, sir.

10         THE COURT:  Yes, Ms. Park?

11         MS. PARK:  Judge, during the incident, the victim

12  is going to testify about the verbal threats that the

13  defendant made against her, and one of them involved:  If

14  you tell anyone -- if you tell anyone, I'm going to hurt you

15  and I don't care if I go to jail, I've done time.

16         I mean, I don't know how to remove that statement

17  from her testimony because it's part of what caused her to

18  comply with him and what caused her to be threatened by him.

19         THE COURT:  Right.

20         MS. PARK:  And, you know -- you know, you can give

21  an instruction that that's not being admitted for its truth.

22  You know, it's not necessarily that he actually has done

23  time but he used that to, you know, instill some kind of

24  fear in her.

25         THE COURT:  Mr. Herlich, how do you think we

1   should handle it?

2           MR. HERLICH:  Quite frankly, it seems to me, being

3   an old schooler, part of the res gestae, if it's part of the

4   criminal act or it is a verbal act, I don't know if I -- I

5   mean, I can ask it be redacted but it's part of the verbal

6   act that is an element of the crime charged.  I don't see

7   how that -- that it would be subject to redaction.

8           THE COURT:  Well, an argument can certainly be

9   made that it was part of the crime and an element in that it

10  constituted a part of the force, right?

11          MS. PARK:  Right.

12          THE COURT:  But I believe that in this case there

13  is a way to make just a slight redaction to it so that you

14  can use the statement without there being any undue

15  prejudice, and that is, simply, eliminate the very last line

16  where he says I've done time.  You can use the statement in

17  its entirety, you know, he's threatening I don't care if I

18  go to jail, but just exclude the part that says I've done

19  time.

20          MS. PARK:  And if I can just have a moment before

21  she testifies and she's going to be my first witness, Judge.

22          THE COURT:  Okay.

23          Why don't you go outside, then?  I'm about to

24  bring the jurors in.

25          MS. PARK:  She's in my office.  I wasn't sure

Joanne Fleming

1    whether there was a witness room here.

2              THE COURT:  We use a jury room for the witnesses.

3              MS. PARK:  Can I just have five --

4              THE COURT:  Actually, you know what?  My

5    preliminary instructions and your opening statements will

6    take us to our first break.

7              So let's just bring them in, please.

8              A COURT OFFICER:  Jury entering.

9              All rise, please.

10             THE COURT:  Please rise.

11             THE SERGEANT:  All rise, jury entering.

12             THE COURT:  You can remain seated.

13             (Whereupon, the jury entered the courtroom.)

14             THE COURT:  Please be seated.

15             Thank you.

16             THE CLERK:  Continuing case on trial, People

17   versus Lonnie Harrell.

18             All parties and all jurors are present.

19             THE COURT:  Thank you.

20             Good morning, jurors, welcome back.

21             VOICES FROM JURY BOX:  Good morning.

22             THE COURT:  Members of the Jury, we're about to

23   proceed with the trial of the People of the State of New

24   York versus Lonnie Harrell.

25             At the outset, I'm going to explain the various

1    stages of the trial and what you may expect to see and hear

2    so you may better understand what is taking place.  I will

3    also remind you of some basic principles of law which apply

4    to this and all criminal trials.  You heard some of these

5    instructions just a few days ago, so they will sound

6    familiar.

7         At the conclusion of these instructions, I will

8    again remind you of those principles, I will define the

9    crimes charged, explain the law that applies to those

10   charged crimes and list for you the elements the People must

11   prove beyond a reasonable doubt.

12        These preliminary instructions will take about

13   thirty minutes.

14        As you can see, a court reporter is taking down

15   everything that is being said.  What she takes down is

16   called the record of the trial.

17        Sometimes you will see a witness use his or her

18   hands to illustrate something.  So, for example, you may see

19   a witness -- you may hear a witness say that an object was

20   this far away, indicating with their hands.  You will

21   normally then hear one of the attorneys or the Court say

22   something to the effect of:  Let the record reflect that the

23   witness is indicating about a foot.

24        We do that because sometimes it becomes necessary

25   to have the court reporter read back what a witness says and

Joanne Fleming

1    what a witness indicates.  If someone does not state orally

2    for the record what a witness is indicating with his or her

3    hands, we may not recall what that was.  Of course, you are

4    here and you can see with your own eyes and hear with your

5    own ears and you can form your own opinions.

6         The trial formally begins with what the law calls

7    an opening statement by the prosecutor.  The law requires

8    the prosecutor to make an opening statement.  The law,

9    however, does not require that the defendant make an opening

10   statement.  If the defendant does not make an opening

11   statement, that is not a factor from which you may draw any

12   inference unfavorable to him.

13        What the lawyers say in an opening statement or at

14   any time thereafter is not evidence.  The lawyers are not

15   witnesses.  What I say is not evidence.  I am not a witness.

16   You must decide this case on the evidence only, and please

17   remember what the lawyers say at any time is not evidence.

18   After completion of the opening statements, the prosecutor

19   will proceed with her opening -- excuse me -- with her

20   presentation of evidence.

21        I remind you that the indictment is not evidence.

22   It is simply a document that contains an accusation.  The

23   defendant has pled not guilty to those accusations, and the

24   trial is for you to hear the evidence and decide whether the

25   defendant is guilty or not guilty.


                         Joanne Fleming


                              A359

Opening - The Court

1      I remind you also that evidence is the testimony

2  of witnesses, the stipulations, if any, which are agreed to

3  by the parties and documents or other physical objects which

4  are received in evidence.  Testimony is, of course, the most

5  common form of evidence and comes from the questioning of

6  the witnesses by the lawyers and perhaps by the Court.

7      A question by itself is not evidence.  It is the

8  question with the answer that is evidence.

9      Next:  Evidence may come in the form of a

10  stipulation.  A stipulation is information which both

11  parties agree to present to the jury as evidence without

12  calling a witness to testify to that information.

13      Last:  Evidence may come in the form of physical

14  objects such as documents, photographs, clothing or charts.

15      I advise you that it is common and permissible for

16  a lawyer or an investigator for a lawyer to speak to a

17  witness about his or her testimony before calling him or her

18  to the stand.

19      Also, a witness may review documents and other

20  material pertaining to the case before he or she testifies

21  at trial.

22      Generally, a witness scheduled to testify at trial

23  may not be present in the courtroom during the testimony of

24  other witnesses.

25      After the People have completed the presentation

Joanne Fleming

Opening - The Court

1    of their evidence, the defendant may, but is not required,

2    to present evidence.

3         I remind you that throughout these proceedings,

4    the defendant is presumed to be innocent.  As a result, you

5    must find the defendant not guilty unless, on the evidence

6    presented at this trial, you conclude that the People have

7    proven the defendant guilty beyond a reasonable doubt.  That

8    a defendant does not testify as a witness is not a factor

9    from which any inference unfavorable to the defendant may be

10   drawn.

11        The defendant is not required to prove that he is

12   not guilty.  In fact, the defendant is not required to prove

13   or disprove anything.  To the contrary.  The People have the

14   burden of proving the defendant guilty beyond a reasonable

15   doubt.  That means, before you can find the defendant guilty

16   of a crime, the People must prove beyond a reasonable doubt

17   every element of the crime, including that the defendant is

18   the person who committed that crime.

19        The burden of proof never shifts from the People

20   to the defendant.  If the People fail to satisfy their

21   burden of proof, you must find the defendant not guilty.

22   And if the People satisfy their burden of proof, you must

23   find the defendant guilty.

24        The law uses the term "proof beyond a reasonable

25   doubt" to tell you how convincing the evidence of guilt must

1  be to permit a verdict of guilty.  The law recognizes that

2  in dealing with human affairs, there are very few things in

3  this world that we know with absolute certainty.  Therefore,

4  the law does not require the People to prove a defendant

5  guilty beyond all possible doubt.

6       On the other hand, it is not sufficient to prove

7  that the defendant is probably guilty.  In a criminal case,

8  the proof of guilt must be stronger than that, it must be

9  beyond a reasonable doubt.

10       A reasonable doubt is an honest doubt of the

11  defendant's guilt for which a reason exists based upon the

12  nature and the quality of the evidence.  It is an actual

13  doubt, not an imaginary doubt.  It is a doubt that a

14  reasonable person, acting in a matter of this importance,

15  would be likely to entertain because of the evidence that

16  was presented or because of the lack of convincing evidence.

17       Proof of guilt beyond a reasonable doubt is proof

18  that leaves you so firmly convinced of the defendant's guilt

19  that you have no reasonable doubt of the existence of any

20  element of the crime or of the defendant's identity as the

21  person who committed that crime.

22       In determining whether or not the People have

23  proven the defendant's guilt beyond a reasonable doubt, you

24  should be guided solely by a full and fair evaluation of the

25  evidence.  After carefully evaluating the evidence, each of

Joanne Fleming

A362

1    you must decide whether that evidence convinces you beyond a

2    reasonable doubt of the defendant's guilt.

3         Whatever your verdict may be, it must not rest

4    upon baseless speculation, nor may it be influenced in any

5    way by bias, prejudice, sympathy or by a desire to bring an

6    end to your deliberations or to avoid an unpleasant duty.

7         If you are not convinced beyond a reasonable doubt

8    that the defendant is guilty of a charged crime, you must

9    find the defendant not guilty of that crime.  And if you are

10   convinced beyond a reasonable doubt that the defendant is

11   guilty of a charged crime, you must find the defendant

12   guilty of that crime.

13        Now, each witness, by whomever called, is first

14   examined, that is, they are asked questions by the lawyer

15   who calls the witness to testify.  That is called direct

16   examination.  When the direct examination is completed, the

17   other lawyer is permitted to ask questions of the witness.

18   And that is called cross-examination.

19        The lawyers are responsible for questioning the

20   witnesses.  The Court may, at times, ask a witness a

21   question.  Jurors may not ask questions of a witness.

22        You may, but are not required, to take notes.  If

23   you wish to take notes, we will provide materials to you for

24   that purpose.

25        If you decide to take notes, you must follow these

1    rules:  Remember, every word of every witness is recorded by

2    the court reporter, and, during deliberations, upon your

3    request, the testimony will be read back to you in whole or

4    in part.  So there is no need to take verbatim notes of a

5    witness' testimony.

6          Notes, by definition, are a brief written record

7    of something to assist the memory.  A note should not take

8    precedence over your own independent recollection.

9          Remember, also, you are the finders of fact who

10   are responsible for evaluating the believability and

11   accuracy of a witness' testimony.  It is, thus, important

12   that you be able to both fully comprehend what a witness is

13   saying and how the witness is saying it.  Accordingly, you

14   must not permit note-taking to distract you from the

15   proceedings.  If you make a note, it should be brief and not

16   distract you from what the next question and answer may be.

17         Any notes a juror takes are only for that juror's

18   own personal use in refreshing his or her recollection.

19   Thus, jurors who choose not to take notes must rely on their

20   own independent recollection and must not be influenced by

21   any notes that another juror may take.

22         Also, a juror's notes are not a substitute for the

23   recorded transcript of the testimony or for any exhibit

24   received in evidence.  If, during your deliberations, there

25   is a discrepancy between a juror's recollection and his or

1    her notes regarding the evidence, you should ask to have the

2    relevant testimony read back or the exhibit produced for

3    your inspection.

4          At the end of each trial day, until the jury

5    retires to deliberate, the notes will be collected from each

6    juror who takes notes.  A juror may only refer to his or her

7    notes during proceedings and during deliberations.

8          Any notes taken are confidential and will not be

9    available for examination or review by any party or other

10   person.  After the jury has rendered its evidence, we will

11   collect the notes and destroy them.

12         As judges of the facts, you alone determine the

13   truthfulness and accuracy of the testimony of each witness.

14   You must decide whether a witness told the truth and was

15   accurate, or instead, testified falsely and/or was mistaken.

16         You must also decide what importance to give to

17   the testimony you accept as truthful and accurate.  It is

18   the quality of the testimony that is controlling, not the

19   number of witnesses who testify.

20         There is no particular formula for evaluating the

21   truthfulness and accuracy of another person's statements or

22   testimony.  You bring to this process all of your varied

23   experiences.  In life, you frequently decide the

24   truthfulness and accuracy of statements made to you by other

25   people.  The same factors used to make those decisions

Joanne Fleming

A365

1 should be used in this case when evaluating the testimony.

2 At the end of the trial, I will give you some examples of

3 those factors.

4   There are rules for all stages of the trial,

5 including rules that govern whether certain evidence may be

6 introduced, and, if so, how and when.  Part of my job is to

7 enforce those rules.  Some of these rules you may understand

8 when you hear the ruling, but some of them you may not

9 understand unless you've studied the law.

10   The rules have been carefully developed over

11 hundreds of years for the sole purpose of guaranteeing a

12 fair and orderly trial.  The rules are not designed to

13 determine whether the evidence you hear and see is true or

14 false, accurate or inaccurate.  It is for you, not for me,

15 to evaluate the evidence and make those decisions.  The

16 rules are designed to insure that the evidence you hear and

17 see is relevant and in a form that permits you to evaluate

18 it fairly.

19   A witness usually can testify only about matters

20 the witness has personal knowledge of, that is, something

21 the witness has personally seen, heard, felt, touched or

22 tasted.  Thus, a witness is not permitted to guess or

23 speculate or say what he or she thinks another person may

24 have heard, seen, felt, touched or tasted.

25   Also, a witness is not permitted to give an

Joanne Fleming

1   opinion to matters for which a special expertise is

2   necessary unless, of course, the witness purports to be an

3   expert on the matter he or she is being questioned about.

4   With some exceptions, what a witness may have been thinking

5   when something was taking place is not relevant evidence.

6          Finally, a witness is often not permitted to

7   testify to hearsay, meaning, generally a witness cannot

8   testify to what the witness may have said before the trial

9   or what another person may have said to that witness. But

10  there are many exceptions to the hearsay rule. For a

11  variety of sound reasons, too numerous to detail for you

12  now.

13         During the presentation of evidence, the lawyers

14  for the parties will, in turn, be asking questions of the

15  witnesses. During that questioning, a lawyer is not

16  permitted to make comments on a witness' answer or on the

17  case. That is not allowed. It is at the end of the case

18  that the lawyers are permitted to address the jurors in what

19  is called a summation, and it is then that the lawyers may

20  comment on the witnesses, the testimony and other evidence.

21         During the questioning of a witness, if a lawyer

22  believes a question or some other presentation of evidence

23  is not in accord with a rule of law, that lawyer will

24  object. That objection will be one word, objection.

25         I may then ask for the basis of the objection and

1    the lawyer will then provide only the legal basis for the

2    objection.  The lawyers will not engage in argument or

3    colloquy when they object as that could result in an unfair

4    advantage.  When an objection is made, I will decide whether

5    the rules permit the question to be asked or the relevant

6    evidence to be introduced.

7         Making objections is part of a lawyer's job.  You

8    are not to draw any unfavorable inference because objections

9    are made.  They take place at every trial.

10        A lawyer may object before a witness answers a

11   question or after a witness answers a question.  When an

12   objection is made to a question before the witness answers,

13   if I overrule the objection, the witness will be permitted

14   to answer.  If I sustain the objection, there is no answer

15   and, therefore, no evidence.  Remember, the question alone

16   is not evidence.

17        If the lawyer objects after the witness has

18   answered the question and I overrule the objection, the

19   answer stands as evidence.  If I sustain the objection, the

20   answer is not evidence, the question and answer are stricken

21   from the record and you are to completely disregard the

22   answer.

23        Sometimes when I sustain an objection an answer

24   may have been inadvertently given.  In that case, whether or

25   not I formally say the question and answer are stricken from

1    the record, you must disregard them.  I tell you now that

2    the question and answer are stricken from the record and you

3    are to completely disregard them as though they were never

4    said.

5         Also, the Court has an obligation under the laws

6    of New York to make sure that certain fundamental rules of

7    law are followed even if one of the lawyers does not voice

8    an objection.  So, on occasion, you may hear me say

9    sustained, or words to that effect, even though no lawyer

10   has actually voiced an objection.  Any ruling by the Court

11   on an objection of counsel or otherwise is based on our law

12   and expresses no opinion about the facts of the case or

13   whether the defendant is guilty or not guilty.

14        Upon completion of the presentation of evidence,

15   the lawyers will address you in a closing statement or what

16   the law calls a summation.  What a lawyer says in summation

17   is not evidence.  The summations, however, provide each

18   lawyer an opportunity to review the evidence presented and

19   submit, for your consideration, the facts, inferences and

20   conclusions which they contend may be properly drawn from

21   the evidence.

22        After summations are concluded, I will instruct

23   you on the rules of law applicable to the case.  You must

24   accept and follow those rules.  You will then begin your

25   deliberations.

Joanne Fleming

A369

1    During your deliberations, your function as jurors

2  will be to decide what the facts are and to apply the rules

3  of law that I set out.  You will determine what the facts

4  are from all the testimony that you hear, the exhibits that

5  are submitted and any stipulations the parties have agreed

6  to.  The conclusion you reach from determining the facts and

7  applying the law will be your verdict, guilty or not guilty.

8    Under our law, Juror Number 1 will serve as the

9  foreperson.  During the trial, the foreperson has the same

10  responsibilities as any other juror except that during

11  deliberations, the foreperson will sign any note that the

12  jury sends to me, including that the jury has reached a

13  verdict.  The foreperson will also announce the jury's

14  verdict.

15    Thus, in sum, the stages of a criminal trial are:

16  The opening statements, the presentation of evidence,

17  summations, the final instructions of the Court to the jury

18  on the law and the deliberations of the jury and the

19  verdict.

20    During the trial, if you need to speak with me

21  about something relating to your jury service or the trial,

22  please tell a court officer that you need to speak to me.  I

23  will arrange a meeting with the parties here in the

24  courtroom.

25    Do not discuss with your fellow jurors whatever

Joanne Fleming

A370

1    you feel necessary to bring to my attention, and after we

2    have had our conversation, please do not discuss with your

3    fellow jurors whatever it is that we discussed.

4              During a trial, we do our best to avoid delays.

5    But, from experience, I know delays are inevitable for a

6    multitude of reasons through no one's deliberate fault.

7    When those delays occur, I ask for your understanding and

8    patience.

9              I also ask that you be here at the times I set so

10   that the absence or lateness of a juror is not the occasion

11   for the delay.  As I previously explained, we can conduct no

12   business until every single juror is here, including the

13   alternate jurors.  Thus, it is as necessary that the last

14   juror be as on time as the first juror.

15             If an emergency arises that will make you late or

16   prevent you from attending, please call the Court, leave a

17   number where you can be reached and explain the problem so

18   that we can minimize everyone's inconvenience.

19             In this trial, we have four alternate jurors.  An

20   alternate juror is expected to pay the same close attention

21   to the case as any one of the first twelve jurors.  The only

22   difference between an alternate juror and one of the first

23   twelve jurors is that the alternate juror does not know at

24   this time whether that juror will be called upon at some

25   point during the trial to substitute for one of the trial

Joanne Fleming

A371

1    jurors.  That substitution can take place only if an

2    unforeseen and extraordinary emergency arises that makes it

3    totally impossible for one of the first twelve jurors to

4    complete the trial.

5         Our law expects that the first twelve jurors who

6    begin the trial will be the twelve jurors who complete the

7    trial.  So, it takes an extraordinary emergency before there

8    may be a substitution of an alternate.

9         Finally, our law requires jurors to follow certain

10   instructions in order to help insure a just and fair trial.

11   I am required to give the following admonitions which you

12   are going to hear numerous times during the course of this

13   trial:

14        First:  Do not talk either among yourselves or

15   with anyone else about anything relating to the case.  You

16   may tell the people with whom you live and your employer

17   that you are a juror and give them information about when

18   you will be required to be in court, but you may not talk

19   with them or anyone else about anything related to the case.

20        Do not at any time during the trial request,

21   accept, agree to accept or discuss with any person, the

22   receipt or acceptance of any payment or benefit in return

23   for supplying any information concerning the trial.

24        You must promptly report directly to me any

25   incident within your knowledge involving an attempt by any

Joanne Fleming

A372

1    person improperly to influence you or any member of the

2    jury.

3         Do not visit or view the location where the

4    charged crime was allegedly committed or any other premises

5    or place involved in the case.

6         And you must not use Internet maps, Google Earth

7    or any other program or device to search for and view any

8    location discussed in the testimony.

9         Keep an open mind and refrain from reaching any

10   conclusions or decisions until all of the evidence is in, I

11   have instructed you on the law and I have directed you to

12   begin your deliberations.

13        Although I do not expect any media coverage of

14   this case, please do not read, view or listen to any

15   accounts or discussions of the case reported by newspapers,

16   television, radio, the Internet or any other news media.

17        Do not attempt to research any fact, issue or law

18   related to this case whether by discussion with others, by

19   research in a library or on the Internet, or by any other

20   means or source.

21        I want to emphasize that in addition to not

22   talking face to face with anyone about the case, you must

23   not communicate with anyone by any other means, including by

24   telephone, text messages, e-mail, Internet chatrooms, blogs

25   or social websites.

Joanne Fleming

A373

1    You must also not Google or otherwise search for

2    any information about the case or the law which applies to

3    the case or the people involved in the case, including the

4    defendant, the witnesses, the lawyers or myself.

5    As I mentioned yesterday, if you happen to see me

6    or any of the attorneys in the hallways or other public

7    places and we do not acknowledge you, please do not take

8    offense.  We are prohibited from engaging you during the

9    course of the trial, and, in an excess of caution, we will

10   avoid talking to you or even greeting you.  I know you

11   understand that we're only trying to comply with our ethical

12   obligations and avoid even the appearance of impropriety.

13   Now, I want you to understand why these rules are

14   so important.  Our law does not permit jurors to talk with

15   anyone about the case or permit anyone to talk to you about

16   the case because only jurors are authorized to render a

17   verdict.  Only you have been found to be fair.  And only you

18   have promised to be fair.  No one else has been so

19   qualified.

20   Our law does not permit jurors to talk among

21   themselves about the case until the Court tells them to

22   begin deliberations because premature discussions can lead

23   to a premature final decision.

24   Our law does not permit you to visit the place

25   discussed in the testimony because you cannot always be sure

Joanne Fleming

A374

1      that the place is in the same condition as it was on the day

2      in question, and even if it were in the same condition, once

3      you go to a place discussed in the testimony to evaluate the

4      evidence in light of what you see, you become a witness, not

5      a juror.  As a witness, you may now have an erroneous view

6      of the scene that may not be subject to corrections by

7      either party.  That would not be fair.

8             Finally, our law requires that you not read or

9      listen to any news accounts of the case and that you not

10     attempt to research any fact, issue or law related to the

11     case.  Your decision must be based solely on the testimony

12     and other evidence presented in this courtroom.  It would

13     not be fair to the parties for you to base your decision on

14     a reporter's view or opinion or upon information you acquire

15     outside of the courtroom.

16            These rules are designed to help guaranty a fair

17     trial and our law, accordingly, sets forth serious

18     consequences if the rules are not followed.  I know you

19     understand and appreciate the importance of following these

20     rules, and, in accord with your oath and promise, I know you

21     will do so.

22            Notebooks will be handed out after the opening

23     statements.

24            Having concluded my preliminary instructions, I

25     will now ask Assistant District Attorney Park to deliver her

Joanne Fleming

1    opening statement.

2              Ms. Park.

3              MS. PARK:  She was just fifteen-years old.  He was

4    fifty-one.  She was just a child and he was an adult.  They

5    were not equals.  He was bigger than she was.  He was so

6    much older than she was.  He was three times her years.

7    This wasn't supposed to happen.  It was a crime and it was a

8    horrific one.

9              It was the summer of 2014, Cypress Smith had just

10   turned fifteen in April of that year.  She had just finished

11   her freshman year of high school and she goes to a boarding

12   school outside of New York.

13             After the school year ended, she spent about two

14   weeks in Montana working on a service project.  After she

15   was done with that, she was home where she lived with her

16   mother and her younger brother when she was not in school

17   and that home was at Ninety-Two St. Nicholas Avenue here in

18   Manhattan.

19             Lonnie Harrell was fifty-one years old.  He lived

20   on the same floor as Cypress and her family.  He did some

21   maintenance work around the building, so the family knew the

22   defendant well.

23             On July 16th of 2014, Cypress was home.  She had

24   gotten up late, probably sometime after twelve, close to

25   one.  She decided to make herself some lunch.  She was home

1    alone.  It was a weekday, a Wednesday.  Her mother had

2    already left for work and her younger brother, Journey,

3    who's thirteen at the time, he had gone to The Boys' Club.

4           So, she was home alone.  She decided to make a

5    sandwich and a Smoothie.  She turns on the blender.  After

6    she finished making lunch, she heard a knock at the door.

7    She went to see who it was and it was the defendant.  She

8    recognized his voice.  She knew who he was because she ran

9    into him often.  Whenever she was home with her mother, she

10   would see him.

11          She noticed -- when she opened the door, she

12   noticed that he stood in the doorway.  He was holding a

13   coffee cup.  He asked her if her brother was home, that he

14   wanted to go for a bicycle ride.  You see, Journey and the

15   defendant spent more time together because Journey actually

16   lived at that address with his mother.  So they would go

17   bicycle riding together.  They spent time together.

18          Cypress told the defendant that her brother wasn't

19   home, and defendant said:  I heard the blender, heard you

20   making a Smoothie, can I have some?  And Cypress said:  Yes,

21   and invited him inside.

22          He came in and brought in with him that coffee

23   cup.  And this will become significant later on.  He threw

24   the coffee cup in the kitchen garbage can.  She handed him a

25   glass of Smoothie with a straw, which will also become

Joanne Fleming

A377

1    significant later on.

2         She took her lunch and they all moved to the

3    living room.  She sat down, he sat down, and they began

4    talking.  He asked her about school and they talked for

5    about fifteen minutes.

6         After they were done, she took the glass -- the

7    glasses with the Smoothie, when they finished, back to the

8    kitchen, put it on the kitchen counter.  She came back and

9    she told him it's time to go, I have to clean up.

10        He got up.  As they were walking, he reached out

11   to give her a hug.  To Cypress, up until that moment,

12   nothing seemed unusual.  Nothing happened that caused her to

13   be alarmed.  She had seen the defendant before and she knew

14   him.  She trusted him.  So, she returned the hug.  They were

15   friendly.  In all the years that she had known the

16   defendant, nothing warned her about what was about to

17   happen.

18        Defendant held on to Cypress.  He didn't let her

19   go out of that hug.  She got scared.  She tried to struggle

20   out of the embrace.  She squirmed but it didn't work, he

21   held onto her.  She kicked him on his shin.  Still didn't

22   work.

23        He then put his hands around her throat.  He

24   squeezed, he choked her, took her down to the ground,

25   covered her mouth, told her not to scream.  He threatened:

Joanne Fleming

A378

1    If you scream, I'm going to hurt you.

2           He then pulled her by her hair, pulled her into

3    the room that was adjacent to the living room, the room that

4    you will hear Cypress refer to as The Learning Center, and

5    she calls it The Learning Center because that's where her

6    and Journey, her brother, used to do their homework.

7           He drags her into that room.  He tells her to sit

8    on the chair and she complies.  He forced his mouth onto her

9    mouth.  He kissed her.  He then pulled down her shorts, her

10   underwear, placed his fingers inside of her vagina.  She

11   said it hurt.  She was in pain.  She begged him to stop.  He

12   continued.  He didn't care.

13          He pulled out his penis and then rubbed his penis

14   against her naked vagina, not penetrating her, but coming so

15   close to it.  She was still crying, pleading with him:

16   Please don't do this.  Defendant threatened that if she

17   didn't comply, I'm going to hurt you and your mother.

18          He then performed oral sex on her by putting his

19   mouth on her vagina, and afterwards, he ordered her to stand

20   up and to get on her knees.  She said no.  He then grabbed

21   her hair, pushed her down, put her on her knees and forced

22   his penis inside her mouth, eventually ejaculating inside of

23   her mouth.

24          Cypress spit out the ejaculate onto her underwear

25   that the defendant had taken off earlier.  Defendant grabbed

Joanne Fleming

1    the underwear, wiped himself and wiped the floor that was in

2    front of Cypress, and then he put that underwear in his

3    pocket and told her that he was going to keep it.

4         Defendant told her to go back into the living

5    room.  Cypress, who at this point is terrified, scared, did

6    as she was told.  She walked into the living room still

7    naked from the waist down.  She tried to pull down her shirt

8    to cover herself.

9         And when she got into the living room, she sat

10   down on the chair.  Defendant told her to remove her hands,

11   took out his phone, took pictures of her.  He told her:  If

12   you tell anyone about what happened, I am going to show

13   these pictures to people and they will know what you did.

14        He then asked for Cypress' phone number.  Afraid

15   that he would call her to make sure that she gave him the

16   accurate phone number, she gave him her number, and, in

17   fact, he did as expected, he did call her number.  Satisfied

18   that she had given him the accurate number, the defendant

19   left the apartment.  He left with the -- with Cypress'

20   underwear and with his phone, not wanting to leave any

21   evidence behind.  And you will see phone records that

22   corroborate the defendant calling Cypress.

23        What defendant will learn is that Cypress' words

24   and her body will later be evidence of the sexual assault.

25   As soon as the defendant left, Cypress called Nine-One-One

Joanne Fleming

A380

1  and you will hear that call.  You will hear the fear in her

2  voice, how she begs the Nine-One-One operator to please,

3  please, don't put on the sirens, afraid that the defendant

4  will hear the sirens and come and hurt her.

5       The police got there immediately and spoke to

6  Cypress about what happened.  One of the officers called

7  Cypress' mother and Cypress' mother left work immediately,

8  desperate to be by her daughter's side.

9       After Ms. Smith got home, she accompanied Cypress

10  to the hospital, St. Luke's Roosevelt Hospital, that same

11  day.  There, a doctor conducted an examination and collected

12  evidence from Cypress.  She swabbed certain areas of her

13  body, primarily her mouth, inside of her mouth, and her

14  vaginal area in an attempt to collect DNA evidence and

15  prepare what is commonly known as a rape kit.

16       The rape kit was tested by criminalists from the

17  Office of the Chief Medical Examiner, Department of Forensic

18  Biology, and you will learn that there was DNA consistent

19  with that of the defendant, not a full match, and you will

20  learn the difference when the criminalist testifies.

21       While the police were -- now going back to the

22  apartment, while the police were still in the apartment,

23  they recovered that glass with the straw that the defendant

24  had earlier drank from and that coffee cup that he threw out

25  in the garbage can, that same coffee cup the defendant had

Joanne Fleming

A381

1   with him when he first came into the apartment.  The straw

2   and the coffee cup, again, were swabbed in an attempt to

3   collect DNA evidence and you will learn that the DNA from

4   those swabs matched that of the defendant's DNA.

5           Defendant was not caught that day.  He fled from

6   his apartment and he would not be caught for another two

7   months.  You will hear from Detective Susan Barbato, who was

8   assigned to this investigation, she was a detective from the

9   Special Victims Squad, and she began the investigation, and

10  on September 10th of 2014, the defendant turned himself into

11  the police, he was arrested.

12          You're also going to see cell sites for the

13  defendant's phone, the phone that he used to call Cypress to

14  make sure that she gave him the correct number.  Cell sites

15  which -- that tells you the general vicinity of where that

16  cell phone is coming from.  And the cell site records will

17  show you that immediately after the incident, the defendant

18  fled his home.

19          Cypress Smith was only fifteen-years old at the

20  time of this incident.  She was attacked by a fifty-year old

21  man, the man sitting over there.  She let him into her

22  apartment because she trusted him and he violated that trust

23  in every way.  He violated her body and her sense of

24  security in her own home.  She will never regain the

25  innocence that she lost on July 16th of 2014.


Joanne Fleming

A382

1          And while this trial is not a lengthy one, you may

2    hear some of the witnesses out of order, and that's to

3    accommodate some of the witnesses' schedule and also to make

4    most of your time, but I hope that what I have just laid out

5    for you will give you the guideline as to what the evidence

6    will show in this case.  And, at the end of the case, I will

7    come back to you and ask you to find the defendant guilty

8    because the evidence will prove his guilt.

9          Thank you.

10         THE COURT:  Thank you, Ms. Park.

11         Mr. Herlich.

12         MR. HERLICH:  Yes.

13         Good morning, everyone.

14         VOICES FROM JURY BOX:  Good afternoon.

15         MR. HERLICH:  As you may know, the prosecution is

16   required to tell you what they intend to prove at a trial.

17   That is consistent with the fact that the burden of proof

18   rests on their shoulders.

19         I will reserve most of my comments on the evidence

20   to the concluding arguments because, like you, I haven't

21   heard the People's case yet, but there is a couple of things

22   I wanted to discuss with you before we begin.  I think it

23   would be important to just lay out the charges for you so

24   you're clear what they are.  So I'll, in part, read from the

25   indictment.


Joanne Fleming

1     The first two counts are criminal sexual act in

2  the first degree, and one accuses my client, Mr. Harrell, of

3  contact between his mouth and the vulva of Cypress Smith,

4  and the other count accuses Mr. Harrell of contact between

5  his penis and the mouth of Cypress Smith.

6     And both of those counts require forcible

7  compulsion as an element of the crime.  And I'm telling you

8  now that Mr. Harrell intends to testify in this case, that

9  he's contending that he did not use force or forcible

10 compulsion in this case and that it was a consensual act

11 that occurred between himself and Cypress Smith.  Those are

12 the first two counts.

13     The third count is attempted rape in the first

14 degree where the accusation is Mr. Harrell attempted to have

15 sexual intercourse with Cypress Smith by forcible

16 compulsion.

17     The fourth and fifth counts are called sexual

18 abuse in the first degree, and the first of those two

19 counts, count number four, accuses Mr. Harrell on July 16th

20 of 2014 with having contact between his finger and the

21 vagina of Cypress Smith by forcible compulsion.

22     And the fifth count, sexual abuse in the first

23 degree, alleges that Mr. Harrell had contact between his

24 mouth and the mouth of Cypress Smith; in other words, by

25 forcible compulsion, he kissed her.

Joanne Fleming

A384

1        The last two counts have something much in common

2    with the first two counts except there's no allegation of

3    forcible compulsion.

4        Count six and seven, again, allege contact between

5    my client's mouth and the vulva of Cypress Smith and contact

6    between my client's penis and the mouth of Cypress Smith.

7    There's no allegation or legal element regarding forcible

8    compulsion.  The element that the People must prove is that

9    my client was twenty-one years of age or older and that at

10   the time of this event Cypress Smith was less than

11   seventeen-years old, what we've called statutory rape.  And

12   those two counts are called criminal sexual act in the third

13   degree.

14       One reason I wanted to read you what the charges

15   are is because I want you to know that the legal

16   instructions defining these crimes, the elements of the

17   crimes in this case, will come to you from Justice Merchan,

18   and you're not to use your common sense notions of certain

19   words or terms but to take the law from the Judge, and the

20   reason I say that is because the medical records that will

21   come into evidence in this case refer to the words rape.

22       You've heard the prosecutor, in her opening

23   statement, mention the rape kit which is properly called

24   Sexual Assault Forensic Examination, SAFE Kit.  Sexual abuse

25   is a term that is used in the medical records, and on the

1    Nine-Eleven call, I believe the first thing that Cypress

2    Smith says is:  I was raped.  Well, my client's not even

3    charged with rape as a completed crime.

4            See, I just want to point out to you that the law

5    will come from the Judge, and the way it appears to me in

6    terms of the Nine-Eleven call, or the allegations in the

7    medical records, is the complaining witness' obviously

8    contending that there was a sexual assault.

9            Whether there was a rape or an attempted rape or

10   sexual abuse in this case is obviously something you're

11   going to have to decide during the course of your

12   deliberations, but the terms come from the Judge, and when

13   you see the terms bantered about in the medical records,

14   rape and sexual abuse, I'm asking you to disregard the

15   common sense term, in effect, it means sexual assault, but

16   the words are important because those are the words charged

17   in this indictment and will be defined to you by Justice

18   Merchan at the end of the case.

19           I will leave it at what I said during the voir

20   dire:  The People have to prove their case beyond a

21   reasonable doubt.  If they fail to do so, then you must find

22   the defendant not guilty of those charges.

23           Thank you.

24           THE COURT:  Thank you, Mr. Herlich.

25           Jurors, before we hear from our first witness,

Joanne Fleming

A386

```
 1        let's take a short recess.  Let's take ten or fifteen
 2        minutes.
 3                    Please remember the instructions I just gave you.
 4                    You can step out.
 5                    A COURT OFFICER:  All rise.
 6                    (Whereupon, the jury exited the courtroom.)
 7                    A COURT OFFICER:  You can be seated.
 8                    THE COURT:  Okay, Ms. Park, you will speak to your
 9        witness at this time?
10                    MS. PARK:  Yes.
11                    THE COURT:  Thank you.
12                    (Whereupon, a recess was taken.)
13                    THE CLERK:  Continuing case on trial, People
14        versus Lonnie Harrell.
15                    A COURT OFFICER:  One coming in.
16                    (Whereupon, the defendant entered the courtroom.)
17                    THE COURT:  Okay, bring the jurors in, please.
18                    A COURT OFFICER:  Jury entering.
19                    (Whereupon, the jury entered the courtroom.)
20                    THE CLERK:  Continuing case on trial, People
21        versus Lonnie Harrell.
22                    All parties and all jurors are present.
23                    THE COURT:  Jurors, please raise your hand if you
24        would like writing materials?
25                    (Jurors indicating.)
```

Joanne Fleming

A387

Proceedings

1                        THE COURT:  Please keep your hands up, thank you.

2                        (Jurors indicating.)

3                        THE CLERK:  (Handing.)

4                        THE COURT:  Okay, anybody else?

5                        (Jurors indicating.)

6                        THE CLERK:  (Handing.)

7                        THE COURT:  Thank you.

8                        People, please call your first witness.

9                        MS. PARK:  The People call Cypress Smith.

10                       A COURT OFFICER:  Witness entering.

11                       (Whereupon, the witness entered the courtroom.)

12                       A COURT OFFICER:  Please remain standing, raise

13          your right hand and face the clerk.

14   C Y P R E S S    S M I T H, called as a witness, by and on

15          behalf of the People at the Trial, having been duly sworn

16          or affirmed, testified as follows:

17                       THE CLERK:  Thank you.

18                       A COURT OFFICER:  Please be seated.  Pull your

19          chair up.

20                       In a loud, clear voice, state your full name,

21          spelling your last name, and county you reside.

22                       THE WITNESS:  Cypress Smith, S-M-I-T-H.

23                       What else?

24                       A COURT OFFICER:  The county you reside.

25                       THE WITNESS:  New York.


                              Joanne Fleming

                                   A388

```
 1                    A COURT OFFICER:  That's fine.

 2                    THE COURT:  Okay.

 3                    Good morning, Ms. Smith.

 4                    THE WITNESS:  Good morning.

 5                    THE COURT:  You may inquire.

 6   DIRECT EXAMINATION

 7   BY MS. PARK:

 8        Q    Can you please tell the jury your full name?

 9        A    Cypress Eden Smith.

10        Q    How old are you?

11        A    Sixteen.

12        Q    What is your date of birth?

13        A    April 21st, 1999.

14        Q    Are you in school?

15        A    Yes.

16        Q    What grade are you in in school?

17        A    Eleventh.

18        Q    Do you go to school outside of New York?

19        A    Yes.

20        Q    What state is that?

21        A    Massachusetts.

22        Q    Do you live there in Massachusetts while you're in

23   school?

24        A    Yes.

25        Q    When did you start there?
```

C. Smith - People - Direct

```
 1      A    My freshman year.

 2      Q    So this would be your junior year?

 3      A    Yes.

 4      Q    And do you come to New York during the school year?

 5      A    Yes.

 6      Q    When do you come to New York?

 7      A    For major breaks.

 8      Q    Like what?

 9      A    Like Thanksgiving, Christmas, winter -- spring break

10   and summer.

11      Q    What do you plan on doing after you finish high

12   school?

13      A    Hopefully college.

14      Q    Did you already start your school year this year?

15      A    Yes.

16      Q    Are you missing school days because of this trial?

17      A    Yes.

18      Q    When did you come to New York?

19      A    On Saturday.

20      Q    How did you come here?

21      A    On a train.

22      Q    How long is your train ride, about?

23      A    Four hours, maybe.

24      Q    Are you going back to school as soon as you're

25   finished here?
```

Joanne Fleming

A390

1      A     Yes.

2      Q     Cypress, I want to focus your attention to last summer

3   of 2014.

4            What grade did you complete at that point?

5      A     Ninth.

6      Q     Ninth?

7      A     Yes.

8      Q     And that would be freshman, right?

9      A     Yes.

10     Q     What month was school finished?

11     A     June.

12     Q     What did you do after school finished?

13     A     I went on a service trip to Montana for two weeks.

14     Q     Can you just briefly tell us what you did?

15     A     It was a cultural immergent and service program.  So,

16  the group and I built sheds on a Native American reservation,

17  and we volunteered at a senior center and a day-care center as

18  well.

19     Q     About how long was the program?

20     A     Two weeks.

21     Q     Did you complete the program?

22     A     Yes.

23     Q     What did you do after?

24     A     I came back to New York and I started unpacking and

25  repacking to go to camp.

C. Smith - People - Direct                                    40

```
 1        Q     When you came to New York, where was that, the
 2   address?
 3        A     Oh, Ninety-Two St. Nicholas.
 4        Q     And what apartment?
 5        A     Two G.
 6        Q     Is that here in Manhattan?
 7        A     Yes.
 8        Q     And who lived with you at that time?
 9        A     My mother, my brother and what is my mother's now
10   husband.
11        Q     You mentioned a brother.
12        A     Yes.
13        Q     What is his name?
14        A     Journey Smith.
15              THE COURT:  Sorry, what is his name?
16              THE WITNESS:  Journey Smith.
17              THE COURT:  Thank you.
18        Q     How old is your brother?
19        A     He's fourteen.
20        Q     He's fourteen now?
21        A     Yes.
22        Q     And do you recall about when it was that you came back
23   home to your mother's apartment after the Montana project?
24        A     Could you repeat the request?
25        Q     Do you know when it was, about?
```

Joanne Fleming

1    A    I don't remember.

2    Q    Was that in July?

3    A    Yes.

4    Q    Do you remember if it was before or after the 4th of

5  July holiday?

6    A    After.

7    Q    And when were you supposed to return to school?

8    A    August 30th.

9    Q    I'm sorry, August?

10   A    Thirtieth.

11   Q    What was your plan for the rest of the summer?

12   A    I was going to a camp for three and a half weeks.

13   Q    And when were you going to go away for that camp?

14   A    About a week after I came back from Montana.

15   Q    So, just to be clear, you were going to be home for

16  about a week and staying with your mother, is that right?

17   A    Yes.

18   Q    I want to direct your attention to July 16th of 2014.

19        Were you at home with your mother?

20   A    I was at home but not with my mother, though.

21   Q    I'm sorry, yes.

22        But you were living with your mother at that time?

23   A    Yes.

24   Q    What about your father, where was he?

25   A    He's in Georgia.

Joanne Fleming

A393

```
 1      Q    Was he in Georgia back then?

 2      A    Yes.

 3      Q    Do you know what day July 16th was?

 4      A    Yes.

 5      Q    What day was it?

 6      A    Wednesday.

 7      Q    Do you know a man named Lonnie Harrell?

 8      A    Yes.

 9      Q    Who is he?

10      A    He did maintenance around the building.

11      Q    Around what building?

12      A    The building I live in.

13      Q    Ninety-Two St. Nicholas?

14      A    Yes.

15      Q    About how long have you known him?

16      A    Couple of years.

17      Q    When you say a "couple of years," what do you mean?

18      A    Two to three or so.

19      Q    Do you know where he lived?

20      A    I assume with his mother in the apartment next to

21    mine.

22      Q    I'm sorry?

23      A    In the apartment next door with his mother.

24      Q    Do you know what apartment number that is?

25      A    Two H.
```

Joanne Fleming

C. Smith - People - Direct

1    Q    And did you see him when you came home when you were

2  not in school?

3    A    Yes.

4    Q    About how often would you say you saw him prior to

5  July 16th?

6    A    Couple of times a week.

7    Q    And can you describe for us, prior to July 16th, what

8  kind of relationship you had with him?

9    A    Friendly, familiar, cordial.

10   Q    When you saw him, did you speak to him?

11   A    Yes.

12   Q    What kinds of things would you two talk about?

13   A    School, things like that.

14   Q    Prior to July 16th of 2014, do you remember the last

15  time that you had seen him?

16   A    No.

17   Q    How did you refer to him?

18   A    Lonnie.

19   Q    Did you know his last name back then?

20   A    No.

21   Q    Did you only know him as Lonnie?

22   A    Yes.

23   Q    At this time, in a moment, I'm going to ask you to

24  take a look around the courtroom, and then please tell us if

25  you see Lonnie in the courtroom today and can you describe --

Joanne Fleming

1    point to him and describe something that he's wearing?  Can you

2    do that now?

3        A     Black shirt.

4               MS. PARK:  Judge, if the record can reflect that

5        the witness looked over in the defendant's direction and has

6        identified the article of clothing that he's wearing?

7               THE COURT:  Yes.

8        Q     Now, I want to focus your attention again to July 16th

9    of 2014.

10              You said you were home?

11       A     Yes.

12       Q     About what time did you wake up?

13       A     Around noon, closer to one.

14       Q     Was anyone home when you woke up?

15       A     No.

16       Q     Do you know where everybody went?

17       A     Yes.

18       Q     Where did they go?

19       A     My mother was at work and my brother was at The Boys'

20   Club.

21       Q     How do you know that?

22       A     Because my mom goes to work every weekday and during

23   the summer my brother went to The Boys' Club.

24       Q     After you got up, what did you do?

25       A     I went in the kitchen and I made a sandwich.

1    Q    What did you make?

2    A    Grilled cheese.

3         THE COURT:  Ms. Smith --

4    Q    Did you make anything else?

5         THE COURT:  -- can you pull the microphone to your

6    mouth and perhaps speak up a little bit?

7         THE WITNESS:  Sure, sorry.

8         THE COURT:  I appreciate it.

9         THE WITNESS:  Is this better?

10        THE COURT:  Yes, thank you.

11        THE WITNESS:  Sorry, go ahead.

12   Q    You said you made a grilled cheese sandwich?

13   A    Yeah.

14   Q    Did you make anything else?

15   A    A Smoothie.

16   Q    How did you do that?

17   A    With a blender.

18   Q    Were you home alone at that point?

19   A    Yes.

20   Q    And what happened after you made what you just talked

21   about?

22   A    I turned on the T.V. and I went to watch T.V. and I

23   heard a knock at the door.

24        MS. PARK:  I think you might have to raise the

25   microphone just a little bit.

Joanne Fleming

A397

C. Smith - People - Direct

1                    THE WITNESS:  Okay.

2                    Is this okay now?

3                    MS. PARK:  Yes, yes.

4                    THE WITNESS:  Okay, sorry.

5       Q     Now, can you tell us what you did after you prepared

6    lunch?

7       A     I turned on the T.V., and I went to sit down in the

8    living room and then I heard a knock at the door.

9       Q     What did you do when you heard the knock at the door?

10      A     I asked who it was.

11      Q     Were you expecting anyone?

12      A     No.

13      Q     And when you asked who it was, were you still inside

14   your apartment?

15      A     Yes.

16      Q     Did you open the door at that point?

17      A     No, I -- I went in my room to grab a sweater, I think.

18      Q     And when you asked who it was, did you hear any voice

19   coming from outside of the door?

20      A     Yes.

21      Q     And what happened?

22      A     He said it was Lonnie and I recognized the voice so I

23   opened the door.

24      Q     I'm sorry?  You recognized his voice?

25      A     Yes.

Joanne Fleming

C. Smith - People - Direct                                    47

| | | |
|---|---|---|
| 1 | Q | And then? |
| 2 | A | I opened the door. |
| 3 | Q | Now, you mentioned you went into your room. |
| 4 | A | Yes. |
| 5 | Q | At what point did you go into your room? |
| 6 | A | I think after I asked who it was. |
| 7 | Q | And then you went into your room? |
| 8 | A | Yes. |
| 9 | Q | Had you opened the door at that point? |
| 10 | A | No. |
| 11 | Q | And why did you go into your room? |
| 12 | A | I don't remember. |
| 13 | Q | What were you wearing at that time? |
| 14 | A | Pajamas. |
| 15 | Q | Can you describe the pajamas you were wearing? |
| 16 | A | Red shorts and a pink tee, tee shirt, I think. |
| 17 | Q | And did you put anything on when you went to your |
| 18 | | room? |
| 19 | A | I think so, yeah. |
| 20 | Q | What did you do? |
| 21 | A | I think I put on a bra. |
| 22 | Q | And then what happened? |
| 23 | A | And I answered the door and Lonnie asked if my brother |
| 24 | | was home. |
| 25 | Q | When you say you answered the door, do you mean you |

Joanne Fleming

A399

1   opened it?

2        A    Yes.

3        Q    And who was on the other side?

4        A    Lonnie was.

5        Q    And what happened?

6        A    He asked me if my brother was home because there were

7   bikes downstairs and he wanted to go for a bike ride.

8        Q    And what, if anything, did you say?

9        A    I said that he wasn't home yet but he would be soon.

10       Q    And then what happened?

11       A    And then Lonnie asked -- he said that he heard the

12  blender outside, and I said I made a Smoothie and he asked to

13  come in and have some.  So I said yes.

14       Q    And then what happened after you said yes?

15       A    He came inside and he threw away the coffee cup he had

16  been holding.

17       Q    So tell us about this coffee cup.

18       A    It was blue and paper and it had white writing on it.

19       Q    When did you first notice this coffee cup?

20       A    When I answered the door.

21       Q    Was he holding it?

22       A    Yes.

23       Q    So, after he had come in, what did he do with that

24  coffee cup?

25       A    He threw it away.

Joanne Fleming

C. Smith - People - Direct

1   Q   Where?

2   A   In the trash can in the kitchen.

3   Q   Prior to that date, has the defendant, Lonnie, has he

4   ever been inside your apartment before while you were there?

5   A   Yes.

6   Q   About when was that?

7   A   Many times before, doing maintenance work sometimes.

8   Q   And when he asked you for some Smoothie, did you think

9   -- what did you think?

10   A   I didn't think much of it.  I was just being friendly.

11   Q   I'm sorry?

12   A   I didn't think much of it.  I just thought he was

13   being friendly.

14   Q   And after he threw the coffee cup in your garbage can,

15   what happened next?

16   A   I gave him a cup and I poured some of the Smoothie in

17   it and I gave him a straw, and I sat down in the living room

18   and he sat across from me.

19   Q   And you mentioned you gave him a cup with a straw?

20   A   Yes.

21   Q   Do you remember the color of the straw?

22   A   Yes.

23   Q   What color was it?

24   A   Purple.

25   Q   At this point I'm going to show you what I've

Joanne Fleming

A401

1    previously marked for identification as People's Exhibits 1

2    through 9.

3                THE SERGEANT:   (Handing.)

4        Q    I'm just going to ask you to look at all of the

5    pictures that's in front of you and just look up when you're

6    done.

7        A    (Witness complies.)

8        Q    Do you recognize People's 1 through 9?

9        A    Yes.

10       Q    What are they?

11       A    Pictures of my apartment.

12       Q    Do they fairly and accurately show the layout of the

13   inside of your apartment --

14       A    Yes.

15       Q    -- on July 16th, 2014?

16       A    There is a different couch now.

17       Q    Okay.

18            Other than the different couch, is the layout the

19   same?

20       A    Yes.

21            MS. PARK:   Your Honor, at this time I offer

22       People's 1 through 9 into evidence.

23            MR. HERLICH:   Just brief voir dire, your Honor?

24            THE COURT:   Yes.

25

```
 1  VOIR DIRE EXAMINATION

 2  BY MR. HERLICH:

 3              MR. HERLICH:  Do you happen to know when the

 4      photographs were taken?

 5              THE WITNESS:  I assume recently but I don't

 6      exactly know when.

 7              MR. HERLICH:  And, in addition to the photographs

 8      of the apartment, are there any photographs of you in there?

 9              THE WITNESS:  No.

10              THE COURT:  Any objection?

11              MR. HERLICH:  No.

12              THE COURT:  There being no objection, People's 1

13      through 9 are accepted into evidence.

14              (Received and marked as People's Exhibit Numbers 1

15      through 9 in evidence.)

16              MS. PARK:  May I publish?

17              THE COURT:  Yes.

18  CONTINUED DIRECT EXAMINATION

19  BY MS. PARK:

20      Q    So, I'm just going to ask you to look at the screen

21      that's right behind you.

22              You see that?

23      A    Yes.

24      Q    You can turn your chair around if that's easier.

25      A    (Witness complies.)
```

1      Q      And I'm going to go through each one and just tell us

2    what we're looking at.

3             This is People's Exhibit 1.

4      A      That's the hallway of my apartment.

5      Q      So, in the center of the photograph there is a door.

6    Is that the door, main door, that leads into your apartment?

7      A      Yes.

8      Q      And where is your room?

9      A      My room is to the immediate right of it.

10     Q      So there is a door that appears right next to that

11   center door to the right of it if you're looking at the

12   photograph.

13            Is that your room?

14     A      Yes.

15     Q      I'm showing you People's 2.

16            What is this?

17     A      It's the hallway and entrance to the kitchen.

18     Q      And can you tell us where the entrance to the kitchen

19   is in this picture?

20     A      It's where the trash can is.

21     Q      So, if you're looking at the photograph on the lower

22   left-hand corner there is a trash can.  Is that the entrance to

23   the kitchen?

24     A      Yes.

25     Q      People's 3.

Joanne Fleming

A404

1      A    That's the kitchen looking out into the hallway.

2      Q    And looking at People's 3, can you show us where the

3  defendant threw out the coffee cup?

4      A    In the red trash can next to the refrigerator.

5      Q    People's 4.

6      A    That's the kitchen from the doorway of the kitchen.

7      Q    So this would be looking into the kitchen from the

8  hallway, right?

9      A    Yes.

10     Q    And People's 5.

11     A    That's the kitchen counter and sink.

12     Q    People's 6?

13     A    It's the living room and the kitchen --

14          MR. HERLICH:  I didn't hear you.

15     A    It's the living room and the kitchen from The Learning

16  Center.  It's where my brother and I used to do homework.

17     Q    Is that what you call that room, The Learning Center?

18     A    Yes.

19     Q    And I want you to look at the picture, kind of the

20  center.  Little bit towards on the left side there is a grayish

21  brownish couch there.  Was that there on July 16th of 2014?

22     A    No.

23     Q    So, can you tell us what was there back then?

24     A    There was a red couch underneath the circular mirror,

25  and there was a big black recliner that sat across from it and

1    a coffee table in the middle.

2        Q    So where that brown couch is right now, what was in

3    its place?

4        A    Which one?

5        Q    The brown couch where it is.

6        A    There is a red couch.

7        Q    And the leather chair was where?

8        A    In place of the other brown couch.

9        Q    Okay.

10           So, just to clarify, right under the mirror, the red

11   chair was underneath that mirror, right?

12       A    Yes.

13       Q    And the leather chair was where the other side of that

14   couch is?

15       A    Yes.

16       Q    And the coffee table was in front of it?

17       A    Yes.

18       Q    And People's 7.

19           What is this?

20       A    The same view of the living room.

21       Q    People's 8?

22       A    That's The Learning Center from the living room.

23           THE COURT:  I'm sorry?

24           THE WITNESS:  It is a picture of The Learning

25   Center from the living room.

Joanne Fleming

A406

1          THE COURT:   Thank you.

2     Q    And People's 9?

3     A    That's still The Learning Center.

4     Q    Is that inside of The Learning Center?

5     A    Yes.

6     Q    I'm just going to go back to People's 6.

7          So, can you tell us where you sat and where the

8   defendant sat?

9     A    I sat down in the black leather chair.

10    Q    Mm-hmm.

11    A    He sat across from me on the red couch.

12    Q    So he sat directly below where that mirror is?

13    A    Yes.

14    Q    What happened after you and Lonnie sat down?

15    A    We talked about school.  He asked me how things are

16   going.  I said fine.  And I was still eating and drinking my

17   Smoothie, and then once I finished, he finished his as well, I

18   took the dishes to the kitchen, and I came back and said that I

19   had chores to do and that I had to clean, it would be best if

20   he left.

21    Q    Before you move on, where did you take the empty

22   glasses and the dish?

23    A    To the kitchen counter.

24    Q    Is that where you left it?

25    A    Yes.

Joanne Fleming

A407

C. Smith - People - Direct

1    Q    And then you said you came back, and tell us again

2  what happened?

3    A    I came back to the living room and I said that I had

4  chores to do and I had to clean.

5    Q    I'm sorry?

6    A    I said that I had chores to do and that it would be

7  best if he went.  And he said okay.  So, he stood up and we

8  were walking to the door and he gave me a hug.

9    Q    How did that come about?

10   A    He outstretched his arms as he was leaving and I gave

11  him a hug.

12   Q    Why did you hug him back?

13   A    Because he was familiar and it -- just a normal thing

14  to do if someone's leaving, to give them a hug.

15   Q    Did you think anything of it?

16   A    No.

17   Q    What happened next?

18   A    I started to pull away and he didn't let go.

19   Q    When you say "he didn't let go," what do you mean?

20   A    He kept his arms around me and he asked me why I was

21  being so shy and why I was pulling away.  And I told him to let

22  me go and he didn't.  And I tried pushing away.

23   Q    How did you do that?

24   A    I pushed my arms away from him.

25   Q    What happened when you did that?

1        A     He held me by the shoulders and he asked me why I was

2   pushing him away.  So I kicked him in the shin and he asked me

3   why I was trying to kick him.  Then he grabbed my neck and he

4   started choking me and I tried to knee him.  Then he shoved me

5   to the ground and I couldn't breath.

6        Q     Do you need a minute?

7        A     No, I'm fine.

8        Q     And he put a hand over my mouth and he told me not to

9   scream, and he said that -- he said that if I did, he would

10  choke me out and I nodded that I won't scream, and when he took

11  his hand off my mouth, I tried to get away.

12            (Whereupon, Senior Court Reporter Amalia Hudson

13      took over the proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

Joanne Fleming

PARK - DIRECT - C. SMITH

1    Q    How did you do that?

2    A    I turned over on my stomach, and I tried crawling

3    towards the kitchen, but he grabbed my ankle, and brought me back

4    toward him.

5    Q    What happened after?

6    A    And he pulled me over by the hair to a stool that was in

7    the Learning Center.

8         THE COURT:  Ms. Park, if you can just pause for a

9    minute so the court reporter can come around and sit in front

10    of me.

11         (Pause in the proceedings)

12    Q    I want to stop you for one minute and go back to when

13    he -- you said that he choked you?

14    A    Yes.

15    Q    Can you tell us how he did that?

16    A    With both hands.

17    Q    Did he put both hands around your neck?

18    A    Yes.

19    Q    And what did you feel?

20    A    He squeezed.

21    Q    How did that make you feel when he squeezed?

22    A    Scared.

23    Q    You also said that he took you down.  Can you describe

24    what he did?

25    A    He pushed me backwards until I was laying on my back on

Amalia Hudson, SCR

A410

### PARK - DIRECT - C. SMITH

1   the ground.

2   Q    So that is you're face up at this point?

3   A    Yes.

4   Q    You also said that he had put his hand over your mouth?

5   A    Yes.

6   Q    Where was he when he did that?

7   A    He was kneeling over me.

8   Q    And back then in July 16, 2014, about how tall were you?

9   A    I'm 5 feet.

10   Q    And how much did you weigh?

11   A    Like 120 pounds maybe.

12   Q    Sorry?

13   A    120 pounds, I think.

14   Q    Are you about the same size today as you were about a

15   year ago?

16   A    Yes.

17   Q    What about the defendant?  How much -- what was his

18   height, if you know?

19   A    He was at least half a foot taller than me.

20   Q    How about his build?  What was he like back in July of

21   last year?

22   A    Like stocky, I guess.

23   Q    Sorry.  Stocky, did you say?

24   A    Yeah.

25   Q    You also mentioned that he grabbed your hair can you

PARK - DIRECT - C. SMITH

1 tell us what kind of hair did you have last year in July?

2    A    I had my hair in a bun like.

3    Q    Is that how you had it on July 16 that day?

4    A    Yes.

5    Q    Did you have long hair?

6    A    I had medium length hair.  It's about the same length.

7    Q    And how did he take you to the Learning Center?

8    A    He lead me by my hair.

9    Q    And where in the Learning Center did he lead?

10    A    To a stool that was sitting in front of a closet.

11    Q    What happened when you got to that stool?

12    A    He told me to sit down.

13    Q    Did you do so?

14    A    Yes.

15    Q    Why?

16    A    I didn't want him to choke me again.

17    Q    So what happened after you sat down?

18    A    He told me to take off my pants, and I said, "No." And

19 he told me to do it again.

20           THE COURT:  I know this is very difficult, but we

21    have to be able to hear you.  So please keep your voice up

22    and speak into the microphone.  Okay.

23           THE WITNESS:  Okay.  Sorry.

24    A    He told me to take off my pants, and I said, "No."  And

25 he told me to do it again.  I shook my head no, and then he took