PARK - DIRECT - C. SMITH

1   them off.

2       Q    How did he do that?

3       A    He grabbed them and pulled them down.

4       Q    I know earlier you told us that you were wearing shorts.

5   What kind of waist did you have?

6       A    A drawstring.

7       Q    So did the pants come off your shorts?

8       A    Yes.

9       Q    And what about your underwear?  Did you have any

10  underwear on?

11      A    Yes.

12      Q    What happened to them?

13      A    He took those off as well.

14      Q    Sorry.  I'm just going to ask you maybe if you can bring

15  the microphone a little bit closer to you?

16      A    Is this better?

17      Q    Yes.

18           What did -- what happened to the underwear?

19      A    He sat them on a table nearby.

20      Q    Who took them off?

21      A    Lonnie did.

22      Q    How did he do that?

23      A    He grabbed them by the waistband and pulled them down.

24      Q    Before that happened, did he touch you in any other way?

25      A    Yes.

PARK - DIRECT - C. SMITH

1    Q    Can you tell us about that?

2    A    He kissed me.

3    Q    Where?

4    A    On my mouth, and I kept shaking my head, and I kept my

5    mouth closed, and he told me to kiss him back, and I shook my

6    head again, and he told me to kiss him back, or he would choke me

7    again.

8    Q    So what happened?

9    A    So I opened my mouth, and he put his tongue inside of my

10   mouth, and then he told me to take off my pants.

11   Q    So now going forward after you said that he had taken

12   off both of your pants -- your shorts, and your underwear, what

13   happened to them?

14   A    He sat them on a table.

15   Q    Where was the table?

16   A    To my left.

17   Q    Was it within your reach?

18   A    Yes.

19   Q    And at that point are you naked from your waist down?

20   A    Yes.

21   Q    And what happened next?

22   A    After that he put his fingers inside of me.

23   Q    Do you know how many fingers or finger he put inside of

24   you?

25   A    I think two.

Amalia Hudson, SCR

A414

PARK - DIRECT - C. SMITH

1    Q    And what happened next?

2    A    It hurt.  I was crying, so I said that it hurt.  He said

3    --

4    Q    Sorry.  And you said?

5    A    I said it hurt, and he said that it wouldn't hurt if I

6    relax, and he said to relax, and I said that it hurt.  Then he

7    took his fingers out.

8    Q    Where did he put his fingers?

9    A    What do you mean?

10   Q    You said he took his fingers out.  Where was his

11   fingers?

12   A    In my vagina.

13   Q    And after he took his fingers out, what happened?

14   A    He showed them to me, and he said this means that you

15   like it.

16   Q    And what about his fingers did you notice?

17   A    They were wet.

18   Q    Did you like it?

19   A    No.  No, I didn't.

20   Q    How did you feel?

21   A    I was in pain.

22   Q    Do you need a moment?

23   A    I'm fine.

24   Q    So what happened next?

25   A    Then he put his mouth on my vagina and his tongue, and I

Amalia Hudson, SCR

A415

**PARK - DIRECT - C. SMITH**

1  kept telling him stop, and he kept saying that I like it, and
2  that I wanted this, and if I said, "No, I didn't.  Then he would
3  say, "Yes, you did."

4      Q     What do you mean?

5      A     If I say stop, he would say, "You wanted this."  And I
6  said, "No, I didn't.  And he said, "Yes, you did want it."  I
7  said "No, I didn't."  And he said, "Yes, you did again.

8      Q     Before he put his mouth on our vagina, did thing else
9  happen?

10     A     He took out his penis and he rubbed it against me.

11     Q     He rubbed it against you where?

12     A     On my vagina, and I asked him not -- I asked him not to
13  put it in because it would hurt.  He said, It won't hurt if you
14  relax again.

15     Q     Did his penis touch your vagina?

16     A     Yes.

17     Q     Did he -- did his penis go into your vagina?

18     A     No.

19     Q     And after he rubbed your vagina what happened?

20     A     Then he told me to stand up and he grabbed me at the
21  back of the neck.

22     Q     When he told you to stand up, what did you do?

23     A     I Scooched forward some, and he told me to stand up
24  again, so I did.

25     Q     What happened after you stood up?

**Amalia Hudson, SCR**
A416

PARK - DIRECT - C. SMITH

1    A    I tried to grab his testicles and twist because I
2  thought that would stop him.
3    Q    And what do you mean -- can you tell us how you did
4  that?
5    A    I think his pants were zipped again, and I tried
6  grabbing and twisting because it hurts, and so I thought it would
7  make him stop.
8    Q    How did you know that?
9    A    I think I learn it in karate or something when I was in
10  third grade.
11    Q    And did you do that over his pants?
12    A    Yes.
13    Q    Do you remember what he was wearing?
14    A    He was wearing a black shirt and khaki cargo shorts.
15    Q    How long did the shorts go to?
16    A    Knee length.
17    Q    And what happened when you -- what happened after you
18  tried to grab him or you grabbed him?
19    A    He grabbed my neck harder, and he told me to get on my
20  knees.
21    Q    Sorry.  He grab where?
22    A    The back my neck.
23    Q    With how many hands?
24    A    Just one.
25    Q    So his hand is behind your neck?

## PARK - DIRECT - C. SMITH

1      A      Yes.

2      Q      Is he in front of you?

3      A      Yes.

4      Q      And what happened next?

5      A      And he told me to get on my knees, and I said, "No.

6      Q      What happened when you said no?

7      A      He grabbed my hair with the other hand and pushed me

8   down.

9      Q      Pushed you down where?

10     A      To my knees on the floor.

11     Q      At this point are you on your knees?

12     A      Yes.

13     Q      And where is he?

14     A      Standing in front of me.

15     Q      And is he grabbing any part of your body?

16     A      Just my neck and my head.

17     Q      What happened next?

18     A      And he said to open my mouth.  He took out his penis

19   first, and then he said to open my mouth.

20     Q      What did you do?

21     A      I kept my mouth closed, and then he -- he took one of

22   his hands and put it on my cheeks.

23     Q      What do you mean, he put it on your cheek?

24     A      He had his fingers on my cheek, and then he pushed in so

25   my mouth could open.

### PARK - DIRECT - C. SMITH

1    Q     Can you just demonstrate for what you mean by that.

2                      (Indicating)

3                 MS. PARK:   Let the record reflect the witness has

4     grabbed either side of her mouth with one hand.

5    Q     And did he squeeze his hand together?

6    A     Yes.

7    Q     What happened when he did that?

8    A     My mouth opened.

9    Q     What happened next?

10   A     And then he put his penis in my mouth.

11   Q     And then what happened?

12   A     And he grabbed my neck harder and pushed my head down on

13   to him.

14   Q     What do you mean pushed your neck down on to him?

15   A     He made it go further into my mouth.

16   Q     Is he standing up?

17   A     Yes.

18   Q     And did his penis go further into your mouth?

19   A     Yes. Yes.

20   Q     And what happened next?

21   A     And then he told me to suck it, and I shook my head --

22   Q     Sorry?

23   A     He told me to suck his penis, and I shook my head no,

24   and then he kept pushing my head so that his penis would go

25   further into my mouth.

PARK - DIRECT - C. SMITH

1    Q    Did you feel anything inside of your mouth?

2    A    When he finished I felt, I guess a salty liquid inside

3    my mouth.

4    Q    Did he pull out his penis when you felt that?

5    A    Yes.

6    Q    So after you felt that what happened?

7    A    Then I grabbed my underwear from the table and I spit it

8    into my underwear.

9    Q    And when you say spit it, are you talking about the

10   salty liquid that you mentioned earlier?

11   A    Yes.

12   Q    And after you spit it out, what happened to your

13   underwear?

14   A    He took them and wiped the floor in front of me with

15   them, and he wiped his penis with them, and he zipped his pants

16   and put them in his pocket and said he is keeping them.

17   Q    The underwear?

18   A    Yes.

19              MS. PARK:  One moment.

20              (Pause in proceedings)

21   Q    How were you feelings while this was happening?

22   A    I was scared.

23   Q    Did he threaten you --

24   A    Yes.

25   Q    -- in anyway?

## PARK - DIRECT - C. SMITH

1   A     Yes.  He said that he would keep choking me.  He said
2   that he would choke me out.  He said that he would go berserk if
3   I didn't do what he said, and that he would hurt my mom as well.

4   Q     He would hurt your mom.  Can you explain what you mean?
5   What did he say?

6   A     He just said that he would come back and hurt my mom as
7   well if I didn't do what he said, or if I told anyone.

8   Q     Did he say both, or one, or the other?

9   A     He said that he would come back and hurt my mom if I
10  told anyone.

11  Q     Now, just going back before just -- I just want to
12  clarify something before we move on.

13        Before you got on your -- before you stepped out of the
14  stool, you told us that he put his mouth on your vagina?

15  A     Yes.

16  Q     What part of his body did you feel?

17  A     His mouth.  I guess his tongue as well.

18  Q     And where did his mouth and his tongue touch. What part
19  of your body?

20  A     My vagina.

21  Q     Now, just going forward going back to after the
22  defendant put your underwear in his pocket, what happened next?

23  A     He told me to go to the chair in the living room, black
24  chair.

25  Q     Did you do so?

PARK - DIRECT - C. SMITH

1 A Yes.

2 Q Why did you do so?

3 A Because I didn't want him to hurt me.

4 Q And when you -- did you go to the living room?

5 A Yes.

6 Q How were you dressed at that point?

7 A I was naked from the waist down, so I tried to cover

8 myself with my shirt.

9 Q How did you do that?

10 A I just tried pulling it down.

11 Q What happened when you got into the living room?

12 A He told me to sit down, and he took out his phone.

13 Q Did you see him take out the phone?

14 A Yes.

15 Q What happened after that?

16 A He told me to stop covering myself and to move my hands

17 and I shook my head no, and he came closer to me, and he said --

18 Q So when you say he came closer to you, how close did he

19 get to you?

20 A Like inches away from my face.

21 Q Are you standing up or sitting down at this point?

22 A I was sitting.

23 Q You was sitting on what chair?

24 A The black chair.

25 Q The leather chair in the living room that you told us

PARK - DIRECT - C. SMITH

1   about earlier?

2       A    Yes.

3       Q    And what how -- when he came closer to you where was he

4   in relation to where you were sitting?

5       A    He was standing in front of me.

6       Q    You said inches away?

7       A    Yes.  He came --

8       Q    When you say inches away, what do you mean?

9       A    He was standing further away and when he walked over, he

10  walked over until he was really, really close to my face, his

11  face was close to my face.

12      Q    Did he sit down, or did he bend down?  How was his face

13  close to your face?

14      A    He bent down.

15      Q    And can -- just show us about how close he was.  If you

16  can't describe the distance, you can use your hand?

17      A    About this close.

18           THE COURT:  Indicating about six inches.

19      Q    And then what happened?

20      A    And then he said that if I didn't do what he said, he

21  was going to go berserk.  And he said you don't want that, do

22  you?  So I shook my head no, and he said, "Then do what I say."

23  So I moved my hands and he told me to smile.

24      Q    When you moved your hands what happened?

25      A    He stood further away again and he told me to smile and

Amalia Hudson, SCR

A423

PARK - DIRECT - C. SMITH

1   he started taking pictures of me.

2       Q   Do you know how many pictures he took of you?

3       A   No.

4       Q   How did you know he took pictures of you?

5       A   I heard the camera click.

6       Q   And are you still naked from the waist down at this

7   point?

8       A   Yes.

9       Q   What happened after he took pictures?

10      A   And I said that my mom would was going to be home soon

11  so he would leave.

12      Q   Was that true that your mom was going to be home soon?

13      A   No.

14      Q   Why did you say that?

15      A   So he would leave.

16      Q   What happened after you said that?

17      A   Then he told me to give him my phone number, so I did,

18  and he called my phone.

19      Q   Why did you give him your phone number?

20      A   Because I didn't want him to find out it wasn't the real

21  number.

22      Q   Did you actually give him your correct number?

23      A   Yes.

24      Q   What happened after you gave him your number?

25      A   He called it, and my phone rang, and then he said that

Amalia Hudson, SCR

A424

PARK - DIRECT - C. SMITH

1    if I was good, he was going to come back, and he was going to let
2    me delete a picture.  He said he would know if I deleted more
3    than one.  He said that I wasn't going to tell anyone, so I shook
4    my head no, and he said, "Who are you going to tell?"  And I,
5    said, "Nobody."  And then he left.  Once he left, I put on my
6    shorts on and I call the police.

7        Q    Just going back you said that he said that you -- sorry.
8    If you can just clarify what he said to you about telling anyone
9    what did he say to you?

10       A    He said that if I told anyone he would come back and
11   hurt my mom, and he said that if I told anyone he would show
12   everyone pictures of me that he took and tell them what I did.

13       Q    You said after he left, you called 911?

14       A    Yes.

15       Q    Sorry.  Just going back when he left, did he take his
16   phone with him?

17       A    Yes.

18       Q    And what about underwear?  As far as you know, did he
19   take them with him?

20       A    Yes.

21       Q    I am going to show you what has been previously marked
22   for identification as People's Exhibit 10A.  I'm just going to --
23   Can you look at People's 10A and look at the first column, very
24   first column, the number entering in 2485, do you recognize that
25   phone number?

PARK - DIRECT - C. SMITH

1    A    Yes.

2    Q    Whose number is that?

3    A    Mine.

4         MS. PARK:  Can I have that back.

5              (Handing)

6    Q    And did you have that phone number back on July 16,

7    2014?

8    A    Yes.

9    Q    Is that the number that you gave Lonnie?

10   A    Yes.

11   Q    Now, I am going to show you what has been previously

12   marked for identification a People's Exhibit 11.  Do you

13   recognize People's 11?

14   A    Yes.

15   Q    What is it?

16   A    It's the recording of my police call.

17   Q    Did you listen it to it before coming to court today?

18   A    Yes.

19   Q    And does -- is that a accurate recording of your

20   conversation with the police operator on July 16, 2014?

21   A    Yes.

22        MS. PARK:  Your Honor, I offer People's 11 in

23   evidence.

24        MR. HERLLICH:  No objection.

25        THE COURT:  People's 11 is accepted into evidence.

Amalia Hudson, SCR

A426

## PARK - DIRECT - C. SMITH

1    COURT OFFICER:  People's 11 so marked.

2    MS. PARK:  I would like to publish it for the jury

3  and I have a transcript.

4    THE COURT:  Any objection to the transcript.

5    MR. HERLLICH:  Can we approach one second.

6    THE COURT:  Yes.

7       (Discussion held a the bench)

8    MR. HERLLICH:  I just ask for a jury instruction

9  that the transcript is an aid but not in evidence.

10    THE COURT:  Okay.

11      (Proceedings resumed in open court)

12    THE COURT:  Jurors, you're going to be handed a

13  transcript of a 911 call.  Please bear in mind the transcript

14  is just an aid to assist you in following the 911 call.  It

15  is not in evidence.  The evidence is the 911 call itself.

16      (Play of an audio tape)

17  Q    Cypress, I want to ask you a couple of questions about

18  that 911 call.  You mentioned that -- you said, "A man you

19  thought you could trust."  Do you remember that?

20  A    Yes.

21  Q    Can you tell us what you meant by that?

22  A    I meant that I thought it would be okay to let him in;

23  that nothing would happen.

24  Q    Are you referring to Lonnie?

25  A    Yes.

PARK – DIRECT – C. SMITH

1    Q    You also asked the operator to not send the sirens.
2   What did you mean?
3    A    I didn't want him to hear them and know that I called
4   the police.
5    Q    By him who do you mean?
6    A    Lonnie.
7    Q    Sorry.  Say it louder please?
8    A    By him I mean Lonnie.
9    Q    When the police got there -- I'm sorry.  Withdraw that
10   question.
11        Did the police arrive in your apartment?
12    A    Yes.
13    Q    And when they got there how many -- Withdrawn.
14        How much officers arrived in your apartment at first?
15    A    I don't remember.
16    Q    Where they in uniform?
17    A    Yes.
18    Q    How were you feelings at the time when the police
19   arrived?
20    A    Scared.
21    Q    Did you speak to the police officers about what
22   happened?
23    A    Yes.
24    Q    Did you direct them to any items in the apartment?
25    A    Yes.

Amalia Hudson, SCR

A428

PARK - DIRECT - C. SMITH

1   Q    What?

2   A    The coffee cup and the cup sitting on the counter.

3   Q    While the police were there, did you speak to your

4   mother?

5   A    Yes, I did.

6   Q    How did you do that?

7   A    I called her on my phone.

8   Q    Did you call her?

9   A    I think I gave a police officer my phone, and they

10  contact -- and they dialed her number.

11  Q    And did you see the police officer speak with your

12  mother?

13  A    Yes.

14  Q    Did you speak to your mother too?

15  A    Yes.

16  Q    And afterwards did your mother come home?

17  A    Yes.

18  Q    About how long after you spoke with your mother did your

19  mother arrive in your apartment, if you remember?

20  A    I don't remember.

21  Q    But did your mother come home?

22  A    Yes.

23  Q    Did you then go to a hospital?

24  A    Yes.

25  Q    With whom?

PARK - DIRECT - C. SMITH

1   A   With my mother and an E.M.T. and I think an officer.

2   Q   How did you get to the hospital?

3   A   In an ambulance.

4   Q   Which hospital did you go to?

5   A   St. Luke's Mt. Sinai I think.

6   Q   And when you got to the hospital did you see a doctor?

7   A   Yes.

8   Q   And did you speak a doctor too?

9   A   Yes.

10  Q   How were you feeling at the hospital?

11  A   Sore.

12  Q   Sore where?

13  A   In my neck.

14  Q   Can you describe the soreness that you were feeling?

15  A   I just felt bruised.

16  Q   Did you feel that way prior to the incident with Lonnie?

17  A   No.

18  Q   Did a doctor examine you?

19  A   Yes.

20  Q   Did she swab certain areas of your body?

21  A   Yes.

22  Q   Did you see her do that?

23  A   Yes.

24  Q   And before the doctor began her physical examination,

25  did you have anything to drink?

Amalia Hudson, SCR

A430

PARK — DIRECT — C. SMITH

1    A    Yes.

2    Q    What?

3    A    Water.

4    Q    And did you drink the water prior to being swabbed?

5    A    Yes.

6    Q    Were you given any medication at the hospital?

7    A    Yes.

8    Q    Do you know what that was for?

9    A    Prophylactics and Plan B.

10   Q    Did you take the medication?

11   A    Yes.

12   Q    How did it make you feel?

13   A    Nauseous.

14   Q    And what happened when you felt nauseous?

15   A    I threw up.

16   Q    Did you throw up at the hospital?

17   A    Yes.

18   Q    And about how long -- about what time did you leave the

19   hospital that day or that evening?

20   A    Around 1 or 2 in the a.m.

21   Q    One or 2 a.m going into July 17, 2014.

22   A    Yes.

23   Q    And did you go back to the hospital?

24   A    Yes.

25   Q    When?

PARK - DIRECT - C. SMITH

1    A    The next day.

2    Q    For what purpose?

3    A    To get medication, prescription.

4    Q    And did the hospital give you any medication?

5    A    Yes.

6    Q    For what?

7    A    For HIV.

8    Q    And how long did take that medication?

9    A    About a month.

10   Q    How did what medication make you feel?

11   A    Nauseous.

12   Q    I am going to show you People's 14 marked for

13   identification.  Do you recognize People's 14?

14   A    Yes.

15   Q    What do you recognize it to be?

16   A    My face.

17   Q    Do you know if that photograph was taken at the

18   hospital?

19   A    Yes, it was.

20   Q    Does it fairly and accurately show your face as it

21   appeared on July 16th at the hospital?

22   A    Yes.

23        MS. PARK:  Your Honor, I offer People's 14 into

24   evidence.

25   VOIR DIRE EXAMINATION

Amalia Hudson, SCR

A432

PARK - DIRECT - C. SMITH

1   BY MR. HERLICH:

2          MR. HERLLICH:  That was taken at the time that you

3      first went to the hospital on July 16, 2014.

4          THE WITNESS:  Yes.

5          MR. HERLLICH:  No objection.

6          THE COURT:  People's 14 is accepted.

7   DIRECT EXAMINATION CONTINUED

8   BY MS. PARK:

9      Q    I am going to ask you look the the screen next to you.

10  Can you just explain to us what we are looking at?

11     A    That is my right cheek.  It's redness from where he

12  grabbed my face.

13         MR. HERLLICH:  I can't hear.

14         THE COURT:  Can you speak into the microphone,

15     please.

16     A    It's my cheek and there are marks from when he grabbed

17  my face.

18     Q    And you mentioned earlier that it was the right side?

19     A    Yes.

20     Q    When you say he grabbed, what do you mean?

21     A    Lonnie grabbed my cheeks.

22     Q    Did you have that redness prior to July 16?

23     A    No.

24     Q    I'm also going to show you People's 13A and 13B, do you

25  recognize 13A and 13B?

Amalia Hudson, SCR

PARK - DIRECT - C. SMITH

1   A    Yes.

2   Q    What do you recognize them to be?

3   A    A scratch on the back of my neck.

4   Q    And who took those photos?

5   A    I am not sure.  I think my mother.

6   Q    Do you know when those photographs were taken?

7   A    When I was at the hospital.

8   Q    And do you know if they fairly and accurately show you

9   the way your neck looked on at the hospital?

10  A    Yes.

11         MS. PARK:  I offer People's 13A and 13B into

12  evidence.

13         MR. HERLLICH:  One question.

14  VOIR DIRE EXAMINATION

15  BY MR. HERLICH:

16  Q    Your mom took them at St. Luke's during your initial

17  visit to the hospital?

18  A    Yes.

19  Q    Or was it at home after you got home?

20  A    Initial visit to the hospital.

21         MR. HERLLICH:  No objection.

22         THE COURT:  Thirteen A and B are accepted in

23  evidence.

24  DIRECT EXAMINATION CONTINUED

25  BY MS. PARK:

Amalia Hudson, SCR

A434

83

### PARK - DIRECT - C. SMITH

1          MS. PARK:  I'm just going to display People's 13A.

2     Q    Can you look at the screen that's next to you.  There is

3    a mark on the back, I guess, that would be your neck area on the

4    right side.

5          Did you have that mark prior to July 16, 2014, the

6    incident involving Lonnie Harrell.

7     A    No.

8     Q    And People's 13B what is 13B?

9     A    The same mark.

10    Q    It's just a close up?

11    A    I think so.

12    Q    I am showing you People's 12.  Do you recognize People's

13   12.

14    A    Yes.

15    Q    What is that?

16    A    A picture of me in August.

17    Q    August of when?

18    A    2014.

19    Q    Last year.

20    A    Yes.

21    Q    Does it fairly and accurately show you the way you

22   looked back in about a year ago?

23    A    Yes.

24         MS. PARK:  I offer People's 12 in evidence.

25         MR. HERLLICH:  I object, Your Honor.

PARK - DIRECT - C. SMITH

1          THE COURT:  Grounds.

2          MR. HERLLICH:  Relevance.

3          THE COURT:  Approach.

4        (Discussion held at the bench)

5          MS. PARK:  The officers who responded don't

6    remember her name, but they remember what she looks like, and

7    they will identify her, and also it shows the way she looked

8    about a year ago when this incident occurred.

9          THE COURT:  It will assist the officers with them

10   to identify who they helped?

11         THE WITNESS:  Yes.  They don't remember her name.

12         THE COURT:  Okay.

13     I don't see -- the photograph itself is not

14   inflammatory.  It's just her -- a picture of what she looked

15   like on that date I will allow it.

16       (Proceedings resumed in open court)

17         THE COURT:  People's 12 is accepted into evidence.

18   Q    Can you just look at the screen again.  That is the way

19   you looked about a year ago?

20   A    Yes.

21   Q    After this incident did any member of your family come

22   to see you?

23   A    Yes.

24   Q    Who?

25   A    My father.

Amalia Hudson, SCR

A436

PARK - DIRECT - C. SMITH

1    Q    And what is your father's name?

2    A    Alfonso Smith.

3    Q    And you mentioned that -- I don't remember whether you

4    said where he was, but where is he, or where was he back then?

5    A    Georgia.

6    Q    What is your relationship with your father like?

7    A    Close.

8    Q    I am going to ask you to you look at the screen that is

9    next to you, and this is People's 6.  Can you show us using this

10   exhibit where you and the defendant were when he gave you

11   initially the hug, when he gave you that hug?

12   A    At the end of the open door sort of in between the brown

13   door and the end of the white door.

14          MS. PARK:  Judge, may I have the witness step down?

15          THE COURT:  Yes.  Do you have a pointer also she

16   can use.

17                     (Handing)

18   Q    Can you just point to where you are referring to?

19   A    Here.

20                     (Pointing)

21   Q    By here, are you referring to that hallway?

22   A    Yes.

23          MS. PARK:  For the record you're looking at the

24   photograph immediately to the right of what appears to be a

25   white french door in the middle of the photograph.

Amalia Hudson, SCR

A437

PARK - DIRECT - C. SMITH

1        THE COURT:  Yes.

2    Q    You were both standing in that hallway though?

3    A    Yes.

4    Q    And People's 9.  You talked about a stool.  This was the

5  Learning Center, correct?

6    A    Uh, huh.

7    Q    You talked but a stool or a chair when he first took you

8  to.  Can you point to the chair or the stool that you're

9  referring to?

10   A    This one.

11                  (Pointing)

12        MS. PARK:  For the record, the witness has pointed

13   to a stool, what appears to be a stool, on the -- if you're

14   looking at the photograph, on the left-hand side of the

15   photograph.

16        THE COURT:  Yes.

17   Q    And People's 5 you told us earlier that it was the

18  kitchen counter?

19   A    Yes.

20   Q    And where did you leave the empty smoothie glass and the

21  plate?

22   A    Here.

23        MR. HERLLICH:  Pointing to what appears to be a

24   counter on the right hand side of the photograph if you are

25   looking at the photograph?

HERLICH - CROSS - C. SMITH

1          THE COURT:  Yes.

2          MS. PARK:  You can sit down.

3     I have no further questions.

4          THE COURT:  Your witness.

5   CROSS EXAMINATION

6   BY MR. HERLICH:

7     Q    Hello, Ms. Smith.

8     A    Hi.

9     Q    Let me talk to you briefly about your relationship or

10  acquaintanceship with Lonnie Harrell before July 16, 2014.  Do

11  you recall when you first met him?

12    A    No, not exactly.

13    Q    How long had you been living in that building?

14    A    About five years I think.

15    Q    Was he there the entire time as of when you moved in?

16    A    I think so.

17    Q    And you said he worked in maintenance, is that correct?

18    A    Yes.

19    Q    And he lived with his mother in Apartment 2H across

20  hallway?

21    A    Yes.

22    Q    And did he play basketball with your brother or take him

23  to play basketball?

24    A    Yes, he did.

25    Q    For how many years was he friendly with your brother to

HERLICH - CROSS - C. SMITH

1    the extent that he took him places?

2        A    Two or three, maybe.

3        Q    And during any of those outings with your brother, did

4    you go along?

5        A    No.

6        Q    So he never went anywhere with you.  It is just Lonnie

7    going with your brother to play ball and riding bicycles, is that

8    fair to say?

9        A    Yes.

10       Q    Was he close to your mom in any way?

11       A    Not that I know of.

12       Q    Did he ever go places with your mom, or did she

13   accompany Lonnie with your brother to any kind of outing?

14       A    I think so.

15       Q    Do you know was it to eat or what kind of event they may

16   have gone to, if you know?

17       A    Probably just going to the park or to play Basketball I

18   think.

19       Q    Did Lonnie have keys to your apartment or anything of

20   that nature if you know?

21       A    Not that I can think of.

22       Q    If you know, did Lonnie have your moms phone number --

23       A    I think so.

24       Q    -- prior to July 16, 2014?

25       A    Yes.

Amalia Hudson, SCR

A440

HERLICH - CROSS - C. SMITH

1    Q   And do you know that because you heard them speaking on

2  the phone, or did you -- is that something you just learned from

3  your mom?

4    A   I assume that they had each other phone numbers.

5    Q   Prior to July 16, 2014, did Lonnie have your phone

6  number?

7    A   Not that I know of, no.

8    Q   And did you have his phone number?

9    A   No.

10    Q   And your brother, did Lonnie have -- first of all, does

11  your brother have a cell phone?

12    A   Not for some time.  Not for a long time.

13    Q   So as of July 16, 2014 had he had a cell phone by then?

14    A   I think so.

15    Q   If you know did Lonnie have his cell phone number?

16    A   I don't know.

17    Q   You say that after this happen, you went to the hospital

18  with your mom, correct?

19    A   Yes.

20    Q   And you indicated that your neck hurt, is that correct?

21    A   Yes.

22    Q   And where did it hurt?

23    A   Around the back of it I suppose.

24    Q   Is that where your scratch was as indicated in that

25  photograph, or was it --

Amalia Hudson, SCR

A441

HERLICH - CROSS - C. SMITH

1    A    Yes.

2    Q    So it was a scratch.  It wasn't muscle soreness.  I'm

3  just trying to clarify the nature of the injury?

4    A    I didn't feel the scratch as much as I felt the muscle

5  soreness and the back of my neck.

6    Q    It wasn't on the right side of your neck.  It was on the

7  back, the muscle soreness?

8    A    Yes.  General back area.

9    Q    And do you recall speaking to some health care provider

10  at the hospital on the day of this incident?

11    A    Yes.

12    Q    And do you -- isn't it correct that when you were

13  interviewed by a health care provider at the hospital you told

14  the provider that this person, referring to Lonnie Harrell, asked

15  you to undress, is that accurate?

16    A    Yes.

17    Q    And you told the health care provider that your neighbor

18  asked you to perform oral sex on him, and then the neighbor

19  performed oral sex on you, is that correct?

20    A    Yes.

21    Q    But you also indicated to the health care provider that

22  the neighbor threatened you, correct?

23    A    Yes.

24    Q    Now, you indicated during your direct testimony that

25  Mr. Harrell's penis had -- he rubbed his penis against your

HERLICH - CROSS - C. SMITH

1  vagina?  Did you see that, or you just felt the event?

2      A    I saw it.

3      Q    And to the extent I am able to demonstrate, was

4  Mr. Harrell's Penis rubbing against your vagina, as I am

5  demonstrating with my hands, or was it in a way where he was

6  trying to insert his penis into your vagina?

7      A    The first demonstration, and then as he moved to -- as

8  it seemed like he was trying to insert his penis into my vagina,

9  I asked him to stop.

10     Q    And when you asked him to stop, in fact, he did stop

11  isn't that fair to say?

12     A    Yes.

13              MR. HERLLICH:  One moment, Your Honor.

14              (Pause in the proceedings)

15     Q    When -- you went to the Spencer Cox Center for Health

16  the following date as followup treatment, correct?

17     A    Yes.

18     Q    And that is primarily where you were prescribed

19  prophylactic medications to prevent any possibility of sexually

20  transmitted diseases, fair to say?

21     A    Yes.

22     Q    And at that time you told the a health care provider

23  that you were feeling okay about the incident, is that fair to

24  say?

25     A    I don't remember saying that.

HERLICH - CROSS - C. SMITH

1      MR. HERLLICH:  Your Honor, I would like to show the

2   witness a document for the purpose of identification,

3   Defendant's A, Exhibit A.  I am showing it to counsel, and I

4   would ask the witness to just read to herself the first

5   sentence of the third paragraph.

6   A    The first sentence?

7   Q    Of the third paragraph?

8   A    Okay.

9   Q    Does that refresh your memory at all about what you told

10  a health care provider at the Spencer Cox Center for Health on

11  the following day July 17, 2014?

12  A    No, not really.

13  Q    When you testified earlier today you indicated that

14  Lonnie Harrell forcibly kissed you, correct?

15  A    Yes.

16  Q    And is that -- according to your testimony, is that the

17  first sexually related touching that took place during the course

18  of this event?  Is that the initial sexual contact, if you will?

19  A    Yes.

20  Q    Now, while you were at St. Luke's hospital, did there

21  come a point in time when Detective Susan Barbato, B-A-R-B-A-T-O

22  from the Special Victim's unit came to the hospital to interview

23  you?

24  A    Yes.

25  Q    And you also gave her a narrative of the events that

PARK - REDIRECT - C. SMITH

1    took place earlier that day, correct?

2        A    Yes.

3        Q    And isn't it true that when you spoke to Susan Barbato

4    detective Barbato, you never indicated to her -- you never told

5    her that Mr. Harrell rubbed his penis against your vagina?

6        A    May you repeat the question.

7        Q    Yes.  I'm asking if when you were interviewed by

8    Detective Barbato, you never mentioned to her that Mr. Harrell

9    rubbed his penis against your vagina?

10       A    I might not have told her that.  I don't remember

11   whether or not I did or didn't.

12       Q    You don't recall whether you did, or you didn't?

13       A    I don't remember whether or not I mentioned that he

14   rubbed his penis against me when I was talking to her.

15            MR. HERLLICH:  Just one moment, Your Honor.

16       (Defense counsel consulting with client)

17            MR. HERLLICH:  Nothing further, Your Honor.

18            THE COURT:  Any redirect?

19            MS. PARK:  Yes.

20   REDIRECT EXAMINATION

21   BY PARK:

22       Q    Mr. Herlich asked you whether you had -- whether you

23   knew your brother and your mom had ever been out with Lonnie

24   Harrell.  Do you remember that?

25       A            (Witness nods head up and down)

Amalia Hudson, SCR

A445

PARK - REDIRECT - C. SMITH

1    Q    Did you ever seen them all hanging out together?

2    A    No.

3    Q    And he also asked you about a statement in the medical

4    records regarding you saying you were feeling okay about the

5    incident.

6         How were you feeling about the incident after it

7    happened?

8    A    Still pretty shaken.

9    Q    How were you feeling emotionally?

10   A    Like numb.

11   Q    And how were you feeling physically?

12   A    Drained.

13   Q    You weren't physically hurt -- let me withdraw that

14   question.

15        How do you feel about the incident today?  Are you okay?

16        MR. HERLLICH:  Objection.

17        THE COURT:  Sustained.

18   Q    Mr. Herlich also asked you about the defendant's attempt

19   to insert his penis into your vagina.  Do you remember that

20   question?

21   A    Yes.

22   Q    And he also asked you when you asked him to stop, he

23   stopped.  Correct?

24   A    Yes.

25   Q    Did he stop -- did he stop with everything at that

Amalia Hudson, SCR

A446

PARK - REDIRECT - C. SMITH

1    point?

2        A    No.

3        Q    Did he continue?

4        A    Yes.

5        Q    What was the next incident after that?

6        A    He put his mouth on my vagina.

7            MS. PARK:  I have nothing further.

8            THE COURT:  Anything else?

9            MR. HERLLICH:  No, your Honor.

10           THE COURT:  Thank you, Ms. Smith.  You can step

11   out.

12               (Witness exits)

13           THE COURT:  You can pass the transcripts to your

14   right, please.

15               (Movement)

16           THE COURT:  All right jurors, we are going to take

17   our lunch recess at this time.  I would ask you to please be

18   back at 2:00 sharp.  Please wait outside when you return, and

19   I remind you of all of the instructions that I gave you

20   Earlier this morning, all of the admonitions.  Those

21   admonitions apply during every single recess, and you will

22   hear me repeat them many, many times.

23       I just instructed you on them a couple of hours ago, so

24   I am not going to do it at this moment, but I just reminder

25   you that they apply now, and they apply during all recesses.

Amalia Hudson, SCR

A447

PARK - REDIRECT - C. SMITH

1     I will see you at 2:00.  Thank you.

2                    (Jury exits)

3              THE COURT:  Okay, People who is your next witness?

4              MS. PARK:  Her mother, Laketa Smith.

5              THE COURT:  Okay.  And where do we stand on the

6     sentencing?

7              THE CLERK:  They are supposed to be coming over

8     quarter to one.

9              THE COURT:  Okay.  It's 10 to one.  They're both

10    suppose to come over.

11             THE CLERK:  Yes.

12             THE COURT:  I will wait a few minutes.  You can

13    take Mr. Harrell out.  Thank you.

14         (Proceedings continued next page)

15

16

17

18

19

20

21

22

23

24

25

Proceedings

```
 1              THE CLERK:  Continuing case on trial, People
 2    versus Lonnie Harrell.
 3              MS. PARK:  Judge, just in terms of scheduling, we
 4    have a stipulation regarding one of the witnesses.  So can
 5    we start at ten?  Just because I don't know if I will be
 6    able to fill the morning.
 7              THE COURT:  Tomorrow you want to start at ten?
 8              MS. PARK:  Yes.
 9              THE COURT:  That's fine.
10              A COURT OFFICER:  One coming in.
11              (Whereupon, the defendant entered the courtroom.)
12              THE COURT:  Okay, we can get the jurors, please.
13              As far as Friday, we should plan on us working in
14    the afternoon.
15              MR. HERLICH:  Okay.
16              THE COURT:  On Friday.
17              MR. HERLICH:  Okay.
18              Your Honor, you usually finish the Mental Health
19    Court in the morning?
20              THE COURT:  I finish it in the morning every time,
21    whether it's twelve or one.  It changes.  I generally go
22    ahead and schedule things for two o'clock.
23              MR. HERLICH:  Okay.
24              THE COURT:  I think this Friday calendar's light
25    so we shouldn't have any problem.  Two o'clock.
```

Joanne Fleming

A449

```
 1                  A COURT OFFICER:  Jury entering.

 2                  (Whereupon, the jury entered the courtroom.)

 3                  THE CLERK:  Continuing case on trial, People

 4          versus Lonnie Harrell.

 5                  All parties and all jurors are present.

 6                  THE COURT:  Good afternoon, jurors, welcome back.

 7                  People, your next witness, please.

 8                  MS. PARK:  The People call Laketa Smith.

 9                  A COURT OFFICER:  Witness entering.

10                  (Whereupon, the witness entered the courtroom.)

11                  A COURT OFFICER:  Remain standing, raise your

12          right hand and face the clerk.

13    L A K E T A    S M I T H, called as a witness, by and on behalf

14          of the People at the Trial, having been duly sworn or

15          affirmed, testified as follows:

16                  THE CLERK:  Have a seat.

17                  A COURT OFFICER:  Pull your chair up all the way.

18                  In a loud, clear voice, state your full name,

19          spelling your name, and the county you reside.

20                  THE WITNESS:  Laketa, L-A-K-E-T-A, Smith,

21          S-M-I-T-H.  New York County.

22                  THE COURT:  Good afternoon, Ms. Smith.

23                  THE WITNESS:  Thank you.

24                  THE COURT:  You may inquire.

25
```

L. Smith - People - Direct

1   DIRECT EXAMINATION

2   BY MS. PARK:

3       Q    Ms. Smith, who is Cypress Smith?

4       A    She's my daughter.

5       Q    When was she born?

6       A    April 21st, '99.

7       Q    Do you have any other children?

8       A    She has a brother, Journey, who's fourteen.

9       Q    How old are you?

10      A    Forty-three.

11      Q    Are you married?

12      A    Yes.

13      Q    Do you work?

14      A    Yes.

15      Q    What kind of work do you do?

16      A    I work in Benefits Administration.

17      Q    And what do you do for them?

18      A    I am an administrative assistant for an assistant

19  director.

20      Q    About how long have you worked for that place that you

21  are currently working for?

22      A    Well, the current position is a new one so I've been

23  there for about a year, but I've been in a different position

24  with the same organization for about five years, maybe close to

25  six.

Joanne Fleming

A451

1     Q     And what kind of work did you do prior to that, if

2  any?

3     A     I was the human resources manager at an aquarium.

4     Q     About how far in school did you go?

5     A     I have a bachelor's degree.

6     Q     Does any of your children live with you?

7     A     My daughter lives with me.  She's at school in

8  Massachusetts most of the year.  But her residence is with me.

9     Q     Does she go to a boarding school?

10    A     Yes.

11    Q     Why is that?

12    A     Because it is a good school.  It is a great

13  opportunity.

14    Q     Where does Journey live?

15    A     In Georgia with his father.

16    Q     Are you divorced from the children's father?

17    A     Yes.

18    Q     About how long ago did you separate?

19    A     We separated summer of 2010.

20    Q     Did Journey always live in Georgia?

21    A     He's shared residency with me and his father.  He

22  was -- he spent a year immediately after the divorce in 2011

23  with his father, and then he resided with me for the next three

24  years and he resumed living with his father this March.

25    Q     Of 2015?

L. Smith - People - Direct

1     A     Yes, of this year.

2     Q     So when you said you were married, you remarried, is

3  that right?

4     A     Yes, I'm remarried.

5     Q     I'm going to direct your attention to July 16th of

6  2014.

7     A     Okay.

8     Q     Was Journey living with you at that time?

9     A     Yes.

10    Q     Where?  Tell us your address.

11    A     It's Ninety-Two St. Nicholas Avenue.

12    Q     And what about Cypress, was she home at that time?

13    A     She was.

14    Q     Was there anyone else living with you at that time?

15    A     No.

16    Q     Do you know a person by the name of Lonnie Harrell?

17    A     Yes.

18    Q     Who is he?

19    A     He was a neighbor.

20    Q     How do you know him?

21    A     Well, because he lived in the building and he was on

22  the maintenance staff in the building.

23    Q     Do you know where he lived?

24    A     Next door in 2H.

25    Q     Is that immediately next door to your apartment?

L. Smith - People - Direct

1    A    It is.

2    Q    Do you know who he lives with?

3    A    His mom.

4    Q    About how long have you known him?

5    A    I've lived in the building since 2009.  So since a few

6    months after moving in.

7    Q    And from about sometime after 2009 to July of 2014,

8    how often did you see Lonnie Harrell?

9    A    Fairly regularly.  I mean, you can't get to my

10   apartment without passing that apartment.  And, again, he was

11   around the building because he was on the staff.

12   Q    What kind of work, if you know, did he do for the

13   building?

14   A    Routine maintenance, as far as I know.

15   Q    And during the times that you saw him, did you speak

16   with him?

17   A    I did.  It was cordial.

18   Q    Can you describe the conversations that you had with

19   him?

20   A    They were friendly exchanges.

21   Q    What kind of relationship did you have with him?

22   A    We were good neighbors.

23   Q    Has he ever been in your home before?

24   A    Yes.

25   Q    About how many times?

L. Smith - People - Direct

1    A    I would guess, over the years, maybe seven or eight
2  times.
3    Q    For what purpose?
4    A    Mostly for maintenance work.  A couple of times
5  because my son spent time with him, so he had come delivering
6  my son back home.  That's about it.
7    Q    You mean Journey?
8    A    Yes.
9    Q    Can you talk about some of the things that Journey did
10 with Mr. Harrell?
11   A    Sure.  Like I said, he was a good neighbor and Journey
12 was a robust, rambunctious boy.  So, he was really good.  If
13 Lonnie was in the building, he would be on the sidewalk
14 playing, you know, with other boys, or he would take him to the
15 basketball courts in our neighborhood.  I understand there was
16 a pool table in the basement of our building, and sometimes he
17 let Journey and some other boys in the building go down there
18 and play pool.  He was a good neighbor.  Keeps the kids busy
19 and looking out for them.
20   Q    How did you refer to Mr. Harrell?
21   A    I just called him Lonnie.
22   Q    And prior to July 16th, 2014, did you have a good
23 relationship with him?
24   A    Sure.  It was friendly.
25   Q    And, as far as you know, did your children have a good

Joanne Fleming

A455

L. Smith - People - Direct

1    relationship with him prior to July 16th, 2014?

2       A    Yes, mm-hmm.

3       Q    And, Ms. Smith, at this time I will ask you to take a

4    look around the courtroom.

5            Do you see Lonnie Harrell in the courtroom today?

6       A    Yes, there.

7            MS. PARK:  Your Honor --

8       Q    Can you describe an article of clothing that he's

9    wearing?

10      A    The gray shirt, long sleeves.

11           THE COURT:  Indicating Mr. Harrell.

12      Q    Did you ever go to any outings with your son Journey

13   and the defendant?

14      A    Not together, no.

15      Q    What do you mean "not together?"

16      A    Well, Journey hung out with him pretty much, either

17   the two of them or with other kids, or Journey may have, you

18   know, been in his home on several of the occasions.  But the

19   three of us never went out.

20      Q    Now, going back to July 16th of 2014.  Do you recall

21   what day that was?

22      A    It was a Wednesday.

23      Q    Did you go to work that day?

24      A    I did.

25      Q    What time did you leave your apartment, about?

```
 1      A     Around 8:15 a.m.

 2      Q     And what time were you supposed to come home that day?

 3      A     I usually arrive at home sometime between five-thirty

 4   and six.

 5      Q     Is that just generally?

 6      A     That's routinely.

 7      Q     What was Cypress doing when you left to go to work?

 8      A     She was sleeping.

 9      Q     What about Journey, what was he doing?

10      A     He was getting ready to head out to The Boys' Club for

11   the day.

12      Q     Did he go to Boys' Club every day?

13      A     He did, during the summer.

14      Q     And what time did he leave for The Boys' Club, if you

15   know?

16      A     Typically he leaves shortly after I do because the day

17   started there at 9:00 a.m. as well.  Some days he left around

18   the same time as I did.

19      Q     About what time did he return home?

20      A     That day --

21      Q     Not that day, just generally.

22      A     Oh, typically?

23      Q     Yes.

24      A     Sometimes four-thirty.  If he was staying later to

25   play basketball, it would be six.  I always made him be home
```

Joanne Fleming

```
 1    before it was dark, before dinner time.
 2        Q    I'm going to ask you to focus your attention to about
 3    two-thirty in the afternoon.  Where were you?
 4        A    I was at my office.
 5        Q    Did you receive a telephone call on your cell phone at
 6    about that time?
 7        A    I did.
 8        Q    And can you tell us the last four digits of your cell
 9    phone number?
10        A    It's seven-four-seven-five.
11        Q    And that was the last four digits back on July 16th of
12    2014?
13        A    Yes.
14        Q    Did you answer it?
15        A    I did.
16        Q    Who was it?
17        A    It was a man.  It was a police officer.
18        Q    Did you speak with the police officer?
19        A    I did.
20        Q    Without telling us about the conversation you had with
21    the officer, what happened after you spoke with him?
22        A    I spoke with my daughter very briefly after I spoke
23    with him and then I hung up, raced home.
24        Q    How did your daughter sound to you at that point?
25        A    She sounded scared, like she had been crying.  Her
```

L. Smith - People - Direct

1    voice was shaky and kind of broken.

2        Q    About how long did it take you to get home?

3        A    About a half an hour, maybe forty minutes, tops.

4        Q    And prior to getting that phone call, did you have any

5    idea what had happened to Cypress?

6        A    No.

7        Q    And prior to getting that phone call, did you have any

8    idea that the defendant had been inside your home?

9        A    No.

10       Q    Can you please tell us what happened -- what you

11   observed when you got home that day?

12       A    As I approached the building, there were police cars

13   and an ambulance outside.  I went right up to my apartment.  I

14   went inside and there were several officers in the apartment.

15            The way the apartment is laid out, from the front

16   door, there is a long hallway that goes straight down and all

17   of the rooms are off to the side.  And the farthest rooms are

18   where the kitchen are, living room and a room off to the left,

19   and I could only go as far as the entrance to the kitchen.

20   There were officers there, I'm sorry.

21       Q    You mentioned the room off to the left.  Has that --

22   what do you call that room?

23       A    We call it The Learning Center.

24       Q    Please continue.

25       A    So, like I said, there were several officers in the

L. Smith - People - Direct

1   apartment and I was just looking around for Cypress, and

2   because she was in the farthest room, The Learning Center, I

3   couldn't go in there right away.  I saw her and I saw that she

4   was okay but I didn't approach her right away.

5       Q    Why not?

6       A    I couldn't.  They were -- there was a paramedic

7   attending to her and there was an officer at the entrance of

8   that room that asked me questions.

9       Q    Did you --

10          At some point did you go to Cypress?

11      A    I did.

12      Q    About how long after you arrived in your apartment did

13  you go to Cypress?

14      A    Not long.  Maybe five minutes.

15      Q    What was she doing?

16      A    She was sitting on a chair.  There was a paramedic

17  taking her blood pressure and she was sitting there shaking.

18      Q    Can you describe her demeanor?

19      A    She was clearly scared.  Like I said, she was

20  physically shaking.  It was clear that she had been crying.

21  Her face was swollen and her eyes were red, and I just gave her

22  a big hug and --

23      Q    Have you seen her in that state before?

24          You have to answer out loud.

25      A    No.

Joanne Fleming

A460

L. Smith - People - Direct

1    Q    Did you stay with her?

2    A    I did.

3    Q    Do you need a minute?

4    A    I'm fine.

5         I stayed with her, yes.

6    Q    And did you go to the hospital?

7    A    Yes.

8    Q    Who went to the hospital?

9    A    We rode in an ambulance.  So, there of course was the

10   driver, there was a paramedic, Cypress and I, and I think there

11   was another officer that accompanied us.

12   Q    About how long were you home before you went to the

13   hospital?

14   A    Maybe fifteen minutes.

15   Q    Which hospital did you go?

16   A    We went to St. Luke's Roosevelt Hospital.

17   Q    Do you know where that hospital is?

18   A    It's -- it's near Columbia University.  It's on, I

19   think Hundred Fourteenth.  Hundred Thirteen, Hundred Fourteenth

20   and Amsterdam, I think.  There is a park.  It's on the west

21   side of Morningside Park.

22   Q    And when you got to the hospital, where did you go?

23   A    To a room.  I think they call it a SAFE room.

24   Q    Do you know what SAFE stands for?

25   A    No.

Joanne Fleming

A461

L. Smith - People - Direct

1    Q    And who was with you?

2    A    There was Cypress and I and there was an officer that

3  was in the room with us the whole time.

4    Q    And can you describe Cypress' demeanor throughout your

5  visit at the hospital?

6    A    She was tired and she was scared and she sort of --

7  she seemed anxious.  She shook a lot.  She seemed shocked and

8  dazed, like all of it was surreal.

9    Q    About how long were you in the hospital?

10    A    We were there for hours.  Hours and hours.

11    Q    Do you know about what time you left the hospital?

12    A    I would think just shortly before midnight.

13    Q    And where did you go after you left the hospital?

14    A    We went home.

15    Q    While you were at home, did you notice any injury on

16  Cypress?

17    A    Well, I noticed that she was moving very deliberately.

18  Her neck was really stiff.  But physically I didn't notice any

19  other injuries.

20    Q    And did you notice --

21         At any point after you left the hospital that evening,

22  did you notice anything on Cypress?

23    A    I did.  The next day we had an appointment for

24  follow-up at the crime victim treatment center, and on our way

25  there, we were -- I was standing behind her, because we were

Joanne Fleming

111

1   waiting to cross the street, and I noticed scratches on the

2   back of her neck.

3       Q    Before you move on, you said you had a follow-up

4   appointment.

5       A    Yes.

6       Q    Where was the appointment?

7       A    It was at a clinic.  I guess it is a satellite clinic

8   of St. Luke's Roosevelt.  It was at Spencer Cox Treatment

9   Center.

10      Q    And when you used --

11           You mentioned you noticed the scratches.

12      A    Mm-hmm.

13      Q    About what time was that, when you were walking to the

14   clinic?

15      A    It was after noon.

16      Q    And what did you do when you saw the scratches?

17      A    I took a photograph of her neck, and when we got to

18   the clinic, I brought it to the attention of the doctor that

19   attended to her.

20      Q    I'm going to show you People's 13A and 13B which is

21   already in evidence and I'm just going to ask you to take a

22   look at the screen that's next to you.

23      A    (Witness complies.)

24      Q    Thirteen A.  Do you recognize that?

25      A    Yes.

L. Smith - People - Direct

1    Q    What is it?

2    A    That's the photo of the back of her neck that I took

3  with my phone.

4    Q    So you took this yourself, correct?

5    A    Yes.

6    Q    And People's 13B.  What is that?

7    A    That's another photo that I took.

8    Q    Same day?

9    A    Same day.  I snapped two of her injuries.

10    Q    And just for clarification, that was the next day,

11  July --

12    A    This is the next day.

13    Q    -- July 17th?

14    A    Yes.  So basically just several hours after we left

15  the emergency room.

16    Q    And you mentioned that you were going to that clinic

17  for a follow-up.

18    A    Yes.

19    Q    What do you mean "follow-up?"

20    A    She saw a social worker there to receive counseling

21  for trauma victims.  She also needed medical treatment.  She

22  had to have a series of exams from Hepatitis C vaccination,

23  sorry, Hepatitis C, HIV test.  She had to have a battery of

24  follow-up.

25    Q    Did you go to work that day?

Joanne Fleming

L. Smith - People - Direct

1    A    No.

2    Q    Did you miss work any other days after the incident?

3    A    I was out of work for, somewhere between two and three

4    weeks.  Maybe two and a half weeks.

5    Q    Why?

6    A    For several reasons.  One, so that I could accompany

7    her to her follow-up visits.  Another is because the police

8    hadn't made an arrest and I didn't want her to be alone because

9    I was scared and stressed out and wanted to make alternate

10   arrangements in the event he did show up around our building.

11   Q    And, Ms. Smith, prior to July 16th of 2014, when was

12   the last time you saw the defendant?

13   A    I couldn't give you a specific date.

14   Q    What do you mean?

15   A    Because he was just around the building.  That for me

16   to see him, you know, if I was on my way to work or coming home

17   from work, that it wasn't so remarkable or unusual that I would

18   remember a day.

19   Q    But prior to that date, did you see him in or around

20   the building?

21   A    Probably.  But, again, I couldn't give you the details

22   of that, but I mean, it was customary for me to see him around

23   the building.

24   Q    At any given month, prior to July 16th, how often

25   would you see the defendant?

1    A    Sometimes several hours -- sometimes several times a

2    week.  Sometimes I wouldn't see him for a month.  So if he

3    wasn't there, it wasn't unusual.  If he was, it wasn't unusual.

4    Q    Now, after July 16th of 2014 till about September 10th

5    of 2014, did you see the defendant in or around the building?

6    A    No.

7    Q    I'm going to show you what's already in evidence as

8    People's Exhibits 1 through 9.  I'm just going to ask you to

9    take a look at them.

10        A COURT OFFICER:  (Handing.)

11   Q    Just look through them and let us know when you're

12   done.

13   A    Alright.  (Witness complies.)

14        I'm done.

15   Q    Okay, what are People's 1 through 9?

16   A    These are photos of my apartment.

17   Q    And were you present when those photos were taken?

18   A    Yes.

19   Q    About when were those photos taken?

20   A    Couple of weeks ago, early September.

21   Q    And are the layout that's in those photos, are they

22   the same as from July 16th of 2014?

23   A    Yes.

24   Q    Was there anything different in those photographs?

25   A    The superficial differences.  The mirror that is on

1    the wall now was on the floor.

2          Q    Okay.  So before --

3                Can you just tell us the exhibit number that you're

4    looking at?

5          A    Oh, Exhibit Number 9.

6                Do I need to hold it up?

7                So this black mirror that is now on the wall was

8    leaning against the wall over here.

9          Q    And you see the stool and a table?

10         A    Yes.  These are in the same place that they always

11   were.

12               But these bins here that have, like, office supplies

13   and stuff were under the table over here.

14         Q    And what about the stool, was that about in the same

15   position back on July 16th?

16         A    Yes.

17         Q    Okay.  And I want you to look at -- you can put that

18   down.

19         A    Okay.

20         Q    -- a photograph of your living room.

21         A    Alright.

22         Q    If you can hold that up?

23         A    This is Exhibit 6.

24         Q    Is there anything different about that photograph?

25         A    The couch is different.  The placement of the

L. Smith - Defense - Cross

```
 1   furniture is the same but it's different furniture.

 2       Q    You can put it down.

 3       A    (Witness complies.)

 4       Q    And after the incident, did anyone come to see

 5   Cypress?

 6       A    Did anyone come to our home to see her?

 7       Q    Or just come to New York.

 8       A    Oh, her father came from Georgia and my then fiancé

 9   came.

10       Q    Where did your then fiancé live?

11       A    In Canada, in Vancouver.

12            MS. PARK:  I have no further questions.

13            THE COURT:  Okay, your witness.

14   CROSS-EXAMINATION

15   BY MR. HERLICH:

16       Q    Good afternoon, Ms. Smith.

17       A    Good afternoon.

18       Q    So, you indicated that you went to the hospital with

19   your daughter in the ambulance to St. Luke's Roosevelt,

20   correct?

21       A    Correct.

22       Q    And you were present with her in what is called the

23   SAFE room, is that correct?

24       A    Yes.

25       Q    And were you present for a physical examination of
```

Joanne Fleming

1    your daughter by a doctor or a nurse during the time period

2    that you were in the hospital?

3         A    Yes.

4         Q    And were you present when Dr. Singh, I believe, was

5    the individual who performed some swabbing of your daughter's

6    mouth and of her vaginal area?

7         A    Yes.

8         Q    And was she fully naked at that time or was she

9    wearing a hospital gown?

10        A    She was wearing a hospital gown.

11        Q    And was there a physical examination of the area

12   around her neck while you were present in the SAFE room?

13        A    Dr. Singh looked at it.

14        Q    Were you present when one of the hospital personnel

15   took a photograph of one of the sides of your daughter's face,

16   I believe it was on the right side, face and neck?

17        A    Yes.

18        Q    Would it be fair to say the hospital did not

19   photograph the scab or scratch that you photographed on the

20   rear part of her neck or upper back?

21        A    Yes.

22        Q    When you were in the hospital during all of these

23   physical examinations, did you observe that scabbing or scratch

24   to the area below the rear of her neck?

25        A    I didn't notice it right away, no.

L. Smith - Defense - Cross                           118

1     Q     So you first noticed it when you were -- withdrawn.

2           So, after all the forensic examinations were done, you

3     left sometime around midnight going into July 17th to go home

4     with your daughter, correct?

5     A     Yes.

6     Q     So the appointment was for what, two-thirty in the

7     afternoon that day back at the --

8     A     I don't remember the appointment time.  I just

9     remember it was after noon.

10    Q     Okay.  Did you walk from home or you took a bus?  How

11    did you get back to St. Luke's?

12    A     We -- we took -- we had two appointments that day.  We

13    took a taxi for the first one when she saw the social worker

14    and then we took the subway to have lunch, and so, we took the

15    subway or a bus going back in the afternoon for the physical

16    examination.

17    Q     So, was it while walking to the Spencer Cox Center for

18    Health that you first observed this scratching to the back of

19    her neck?

20    A     Yes.

21    Q     And what kind of clothing was your daughter wearing

22    that enabled you to see as you walked down the street?

23    A     She was wearing a crew neck shirt.

24    Q     And you took a photograph right in the street?

25    A     Right there on the curb where I saw it.

Joanne Fleming

A470

L. Smith - Defense - Cross                        119

1      Q     And was this with a cell phone or digital camera?

2      A     It was with my cell phone.

3      Q     And you indicated that you then made the examining

4    doctor or nurse at the center that you were going to, the

5    Spencer Cox Center for Health, aware of that scratch?

6      A     Yes.

7      Q     And is it fair to say, or is it accurate, that you

8    first shared that photograph with the D.A.'s Office -- one

9    moment -- on September 14th of 2015?

10     A     I first shared it with the D.A.'s Office, yes, then --

11   but I shared it with the doctor that day.

12     Q     Okay.  So you kept it in your cell phone but made the

13   district attorney aware of it on September 14th, 2015, over a

14   year after you took the photo, correct?

15     A     Correct.

16     Q     Had you spoken with the D.A.'s Office from during the

17   time period between July 16th of 2014 until the time that you

18   shared the photo with the District Attorney's Office?

19     A     I had.

20           MR. HERLICH:  One moment, your Honor.

21           THE COURT:  Sure.

22           MR. HERLICH:  Nothing further.

23           THE COURT:  Any redirect?

24           MS. PARK:  Yes.

25

Joanne Fleming

A471

L. Smith - People - Redirect

```
 1   REDIRECT EXAMINATION

 2   BY MS. PARK:

 3       Q    Ms. Smith, what drew your attention to her neck?

 4       A    When I went to push the button to cross the street I

 5   happened to be behind her then and she happened to be wearing

 6   her hair up in a top bun and that's when I noticed it on the

 7   back of her neck.

 8       Q    What was her hairstyle the night -- evening before you

 9   went to the hospital?

10       A    I don't remember.  I think it was up.  I think it was

11   up.

12            MS. PARK:  I have nothing further.

13            THE COURT:  Anything else?

14            MR. HERLICH:  No.

15            THE COURT:  Thank you, ma'am.  You can step down.

16            People, your next witness.

17            MS. PARK:  The People call Police Officer Ariel

18       Castillo.

19            (Whereupon, the witness exited the courtroom.)

20            A COURT OFFICER:  Witness entering.

21            (Whereupon, the witness entered the courtroom.)

22            A COURT OFFICER:  Remain standing, raise your

23       right hand and face the clerk.

24   A R I E L    C A S T I L L O, called as a witness, by and on

25       behalf of the People at the Trial, having been duly sworn
```

Joanne Fleming

A472

PO A. Castillo - People - Direct

1      or affirmed, testified as follows:

2                  THE CLERK:  Thank you.

3                  A COURT OFFICER:  Please be seated.

4                  In a loud, clear voice, state your full name,

5      spelling your last name.

6                  THE WITNESS:  PO Castillo, C-A-S-T-I-L-L-O.

7                  A COURT OFFICER:  Shield number and present

8      command.

9                  THE WITNESS:  One-one-seven-eight-seven, shield

10     number.  Command, Zero-Two-Eight Precinct.

11                 THE COURT:  Good afternoon, officer.

12                 THE WITNESS:  Good afternoon.

13                 THE COURT:  You may inquire.

14     DIRECT EXAMINATION

15     BY MS. PARK:

16     Q     Officer, how long have you been with the New York City

17     Police Department?

18     A     Going on my eleventh year.

19     Q     You stated that you were with the Twenty-Eighth

20     Precinct?

21     A     Yes.

22     Q     How long have you been with the Twenty-Eighth?

23     A     Ten and a half years.

24     Q     What other commands were you in?

25     A     The academy.

PO A. Castillo - People - Direct

1    Q    What area of Manhattan does the Twenty-Eighth Precinct
2  cover?
3    A    Hundred Tenth Street to Hundred Twenty-Seventh Street,
4  from Morningside to Mt. Morris.
5    Q    I'm going to direct your attention to July 16th of
6  2014.  Were you working that day?
7    A    Yes.
8    Q    What was your shift that day?
9    A    O-seven-o-five by three-thirty, 3:40 p.m.
10    Q    So, o-seven-o-five in the morning, correct?
11    A    Yes, o-seven-o-five in the morning.
12    Q    What was your assignment?
13    A    I was doing patrol in the lower end of the precinct.
14    Q    When you say "patrol," were you in uniform?
15    A    Yes, in uniform.
16    Q    Did you have a partner with you?
17    A    Yes.
18    Q    Who was that?
19    A    Officer Lora.
20    Q    Were you in a car or on foot?
21    A    We were in a marked RMP, patrol car.
22    Q    What does "RMP" mean?
23    A    Radio motor car.
24    Q    And is that a police car that we see out in the
25  street?

Joanne Fleming

A474

PO A. Castillo - People - Direct

1    A    Yes, the white and blue one.

2    Q    I'm going to direct your attention till about 2:27

3  p.m.  Did you hear a radio transmission?

4    A    Yes.

5    Q    What is a radio transmission?

6    A    It's when a person calls Nine-One-One requesting

7  police assistance and the person that they speak to dispatches

8  us or tells the NYPD where to respond to.

9    Q    When you say "us," you mean NYPD?

10   A    Yes.

11   Q    Without telling us the content of that radio

12 transmission, after hearing that, what, if anything, did you

13 do?

14   A    We turned our lights and sirens on and we immediately

15 responded to the location given.

16   Q    When you say "we," who are you referring to?

17   A    Officer Lora and myself.

18   Q    Where did you go?

19   A    We went to Ninety-Two St. Nicholas Avenue.

20   Q    About how much time passed from the radio transmission

21 until when you arrived at Ninety-Two St. Nicholas?

22   A    I would say less than two minutes.  About a minute.

23   Q    And what kind of a building is Ninety-Two St. Nicholas

24 Avenue?

25   A    Residential building.

1    Q    Where did you go when you got there?

2    A    We went to the second floor.

3    Q    Did you and Officer Lora go together?

4    A    Yes, we did.

5    Q    And when you got to the second floor, what happened?

6    A    We approached the apartment in question, and we

7  knocked and she opened the door.

8    Q    And today, do you remember the apartment number?

9    A    No.

10    Q    So, you did go to an apartment on the second floor,

11  correct?

12    A    Yes.

13    Q    So, tell us what happened.

14    A    When we knocked on the door, the door was opened --

15  was opened, and I remember seeing a girl, about fourteen to

16  fifteen-years old, crying uncontrollably.  She had her -- she

17  had glasses on and she was just telling me to please come

18  inside, please come inside, and saying repeatedly over:  Is he

19  gone, is he gone, please come inside.

20        So, our procedure is to go.  I started to follow her.

21  She wanted to lock the door immediately.  Our procedure is not

22  to lock a door for our safety.

23    Q    So, what did you do?

24    A    We -- since she was shaking tremendously, so I decided

25  to let her lock the door and we started to walk down a long

Joanne Fleming

1    hallway into the living room.

2       Q    And did you and Officer Lora both go to the living

3    room?

4       A    Yes.

5            I asked her is anybody else here.  She said no, she

6    was by herself.

7       Q    Were you and Officer Lora the first officers to arrive

8    at the apartment?

9       A    Yes.

10      Q    And when you got to the living room, can you describe

11   her demeanor to the jury?

12      A    She was shaking.  It looked like she was almost

13   hyperventilating.  She can barely speak.  She was speaking

14   almost, like, in a whisper.  She had tears in her eyes.  Tears

15   on the sides of her face.  She had, like, boogers coming out of

16   her nose.

17      Q    What did you do?

18      A    I was just trying to ask her and give her time just to

19   explain to me what occurred, what happened.  Not asking her too

20   many questions at a time.

21      Q    Did she talk to you?

22      A    Yes, she started speaking to me.

23      Q    What did she tell you?

24      A    She told me her neighbor that she knows, and also her

25   mother, knocked on the door, asked if her mother was home and

PO A. Castillo - People - Direct

1   started asking her how she was and he proceeded to come inside

2   the apartment.  She was making a Smoothie or drinking

3   something, and they went to around the kitchen area, living

4   room area, and she offered him something to drink or a Smoothie

5   to drink, and when he was done with it, he threw it in the

6   garbage.

7          And before he left is when she states that he grabbed

8   her around the neck, put his hands in around her panty area,

9   put his penis in her mouth.  She said he ejaculated, took the

10  panties and threw it somewhere and took a picture of her and

11  told her:  If you tell anybody, I will show this picture and I

12  will show it to everybody, and he left the apartment.

13     Q     While she was talking to you, can you describe her

14  demeanor?

15     A     She didn't say it all right away.  It was very hard

16  for her to say one part at a time.  That's why it took awhile.

17     Q     Why is that?

18     A     Because she kept crying, shaking.  So we just took our

19  time.  We took our time getting little bits and pieces of who

20  it was, what apartment.

21     Q     After you spoke to her, what happened?

22     A     I asked over the radio, over my radio, if I can have

23  two female officers respond to the scene, and I requested my

24  supervisor as well to the scene.

25     Q     Why did you request female officers?

Joanne Fleming

PO A. Castillo - People - Direct

1    A    I requested two female officers because of the state

2    that she was in and what had just occurred to her.  From a

3    man -- I wanted to see if she was more comfortable speaking to

4    a female or to a male officer.

5    Q    And did any female officers arrive at the apartment?

6    A    Yes, two female officers arrived.

7    Q    And who were they?

8    A    It was Officer Mateo and Officer Semper.

9    Q    How much time passed from when you arrived at the

10   apartment to when the two female officers showed up?

11   A    I would say they arrived pretty swiftly as well.  In

12   about a minute to no more than two minutes.

13   Q    What happened when they showed up?

14   A    When they showed up, I approached them, I gave them a

15   quick little run-down of what just happened, and they went to

16   speak to her in the living room and I stepped away to give --

17   to give the female officer and the girl some privacy.

18   Q    So, you mentioned talking to this girl.  Do you know

19   her name?

20   A    I do not remember her name, no.

21   Q    I'm going to show you what's in evidence as People's

22   Exhibit 12.  This is already in evidence.  I'm just going to

23   ask you to take a look at the screen that's next to you.

24        Do you recognize People's 12?

25   A    Yes, I do.

Joanne Fleming

PO A. Castillo - People - Direct                    128

1    Q    What do you recognize it to be?

2    A    That's the victim.  I recognize her by her glasses.  I

3    remember the glasses clearly.

4    Q    Do you recognize her face also?

5    A    Yes, also her face.  And her.

6    Q    And at some point did the mother of the girl that you

7    see in People's Exhibit 12, did she come home?

8    A    Yes.  I asked the victim if she called her mother.

9    She said yes, she's on her way.  And her mother did arrive.

10   Q    And did they go to a hospital?

11   A    Yes.

12   Q    Did you accompany them to the hospital?

13   A    Yes.

14   Q    Which hospital?

15   A    We went to St. Luke's.

16   Q    About what time did you all go to the hospital?

17   A    I would have to look -- refer to my memo book for that

18   time.

19   Q    Would that refresh your recollection?

20   A    Yes.

21        A COURT OFFICER:  (Handing.)

22   Q    Just look at it and put it down if it refreshes your

23   recollection.

24   A    Yes, we went to the hospital.  About 3:00 p.m. we left

25   for the hospital.

Joanne Fleming

A480

PO A. Castillo - Defense - Cross

```
 1    Q    And how long did you stay in the hospital, about?

 2    A    We stood in the hospital for about four hours.

 3    Q    Who's "we?"

 4    A    Myself, the mother and the victim.

 5    Q    Did the mother and the victim leave with you?

 6    A    Yes.

 7         To the hospital?

 8    Q    No, I'm saying, what time did you leave the hospital?

 9    A    Oh, I left at seven o'clock, like around seven

10 o'clock.

11    Q    And why did you leave at that point?

12    A    I was relieved by another officer.

13    Q    And who was that?

14    A    Officer Hager.

15         MS. PARK:  I have no further questions.

16         THE COURT:  Mr. Herlich.

17 CROSS-EXAMINATION

18 BY MR. HERLICH:

19    Q    Officer Castillo, you don't remember the apartment

20 number, correct, that you responded to at Ninety-Two St.

21 Nicholas Avenue?

22    A    I don't remember the apartment number, but I remember

23 the apartment, the location, the hallway, everything about it.

24    Q    And your memo book entry indicates -- well, withdrawn.

25         You went to St. Luke's with the complaining witness,
```

Joanne Fleming