T. Devulpillieres - People - Direct                    190

```
 1   use of cell phone records through the National White Collar
 2   Crime Center and through the phone companies themselves.
 3       Q    About how many cell site records have you examined
 4   during your time with the District Attorney's Office?
 5       A    I couldn't even count.  It would be in the thousands.
 6       Q    In any given month, about how many do you do?
 7       A    In any given month, I analyze fifty cell phone
 8   records.
 9       Q    Did there come a time in which you analyzed cell site
10   records for phone number (646) 593-3203?
11       A    Yes.
12       Q    And can you just explain --
13            You mentioned cell site records.  What is that?
14       A    Cell site records are maintained by the cell phone
15   companies, and they include information about communications
16   that were made by a phone number, voice calls, sometimes text
17   messages, sometimes data packets, but the records include the
18   date and time of the communication, the number that was
19   communicating with the phone and also the cell site location
20   information, the cell site transmitted where the communication
21   is from.
22       Q    I'm going to show you what's already been admitted in
23   evidence as People's Exhibit 23.
24            A COURT OFFICER:  (Handing.)
25       Q    Do you recognize twenty-three?
```

Joanne Fleming

A542

1    A    Yes.

2    Q    What do you recognize it to be?

3    A    These are T-Mobile records that I used to create a map

4    for this case.

5    Q    And how do you know that it contains that information?

6    A    Because I reviewed it yesterday.  I initialed and

7    dated it.

8              MS. PARK:  May I have that back?

9              A COURT OFFICER:  (Handing.)

10   Q    And can you tell us, what did you do with the

11   information that is contained in this, in People's Exhibit 23?

12   A    I uploaded the information into a mapping program

13   called ArcGIS, which plots the longitudes and latitudes with

14   the cell sites referenced in the records.

15   Q    What do you mean by longitudes and latitudes in

16   plotting these records?

17   A    Latitudes and longitudes refer to fixed points on a

18   sphere.  So, every location on earth has a longitude and

19   latitude associated with it.  Those locations are in the

20   records from the phone company and that is what the mapping

21   program uses to plot the points.

22   Q    And you stated that you created a map?

23   A    Yes.

24   Q    I'm going to show you what's been premarked for

25   identification as People's Exhibit 24.

Joanne Fleming

A543

1          Do you recognize People's 24?

2     A    Yes.

3     Q    What do you recognize it to be?

4     A    This is a map I created for this case of all the

5    mappable T-Mobile calls for phone number (646) 593-3203 on July

6    25th, 2014 from 7:58:21 a.m. to July 16th, 2014 at 2:42:42 p.m.

7     Q    And did you plot all the calls that was contained in

8    the records?

9     A    Yes, for that time frame.

10     Q    And do those --

11          Does that information come from People's 23 that's

12    already in evidence?

13     A    Yes.

14          MS. PARK:  Your Honor, I offer People's 24 in

15     evidence.

16          MR. HERLICH:  No objection.

17          THE COURT:  People's 24 is accepted into evidence.

18          (Received and marked as People's Exhibit Number 24

19     in evidence.)

20          THE COURT:  You can probably set it right in front

21     of the television.

22          (Court officer complies.)

23          THE COURT:  Thank you.

24          MS. PARK:  And with the Court's permission, it

25     would be easier for you to step up?

Joanne Fleming

1          THE COURT:  Sure, sure.

2          (Witness complies.)

3     Q    I'm just going to ask you to explain what some of

4    those symbols mean on the map, and if you can start, like, left

5    to right or top to bottom, whatever you prefer.

6          A COURT OFFICER:  Everybody okay?  It curves.

7          (Jurors indicating.)

8     A    So this map has two types of symbols.  There are red

9    circles which represent the cell towers that transmitted

10   communications, actually voice calls.

11         Next to each of these red circles there is a text box

12   showing the date and time of the call, whether it's incoming or

13   outgoing and then the number that was called or calling.

14         In addition to the red circles, we have one blue

15   building footprint that I was asked to include on the map

16   indicating the address Sixty-Three or Ninety-Two St. Nicholas

17   Avenue, New York, New York.

18    Q    And how did you obtain that information, the

19   Ninety-Two St. Nicholas Avenue?

20    A    I was given the address by you, and the building

21   footprint and all of the map data comes from the City of New

22   York.

23    Q    Where does the map come from?

24    A    The New York Department of Information Technology and

25   Telecommunications maintains all of the map data for the city

T. Devulpillieres - Defense - Cross                    194

1    and this is where this data comes from.

2        Q    And, so, if you can just -- for example, if you can

3    just go through one of those calls, and I would like to focus

4    your attention to July 16th, 2014, a call at 2:23:30 p.m.?

5        A    So, on July 16th, 2014 at 2:23:30 p.m., the T-Mobile

6    phone number made an outgoing phone call to (646) 206-2485, and

7    the cell site that was used for that call is located here at

8    approximately West One Hundred Sixteenth Street and St.

9    Nicholas Avenue.

10               MS. PARK:  I have no further questions.

11               THE COURT:  Your witness.

12   CROSS-EXAMINATION BY

13   MR. HERLICH:

14       Q    So that the map that you created indicates the cell

15   phone tower that handled that call, correct?

16       A    Yes.

17       Q    It doesn't give you additional information about the

18   precise location of the cell phone itself?

19       A    Correct.

20       Q    So if I draw your attention to the red dot that's on

21   the lower left-hand portion where some calls were attributed to

22   that tower, you couldn't say where the caller was located, or

23   is there any approximate distance from the tower that you can

24   give us as far as the location of the phone at the time the

25   call was made, or not really?

Joanne Fleming

A546

1      A     To my knowledge, the general range of a cell site in

2   Manhattan is one to four blocks, but I couldn't tell you

3   exactly what the range for that tower is.

4                  MR. HERLICH:  Okay, thank you.

5                  THE COURT:  Anything else?

6                  MS. PARK:  No, your Honor.

7                  THE COURT:  Thank you, ma'am.  You can step down.

8                  (Whereupon, the witness exited the courtroom.)

9                  THE COURT:  Call your next witness.

10                  MS. PARK:  The People call Dean Delitta.

11                  A COURT OFFICER:  Witness entering.

12                  (Whereupon, the witness entered the courtroom.)

13                  A COURT OFFICER:  Remain standing, raise your

14     right hand and face the clerk.

15   D E A N     D E L I T T A, called as a witness, by and on behalf

16     of the People at the Trial, having been duly sworn or

17     affirmed, testified as follows:

18                  THE CLERK:  Thank you.

19                  A COURT OFFICER:  Please be seated.

20                  In a loud, clear voice, please state your name,

21     spelling your last name.

22                  THE WITNESS:  Dean Delitta, D-E-L-I-T-T-A.

23                  A COURT OFFICER:  County of residence?

24                  THE WITNESS:  Westchester County.

25                  A COURT OFFICER:  Thank you.

Joanne Fleming

A547

```
 1                    THE COURT:  Good afternoon.

 2                    You may inquire.

 3   DIRECT EXAMINATION

 4   BY MS. PARK:

 5        Q    Mr. Delitta, are you currently employed?

 6        A    Yes.

 7        Q    By whom are you employed?

 8        A    Sysco Systems, Incorporated.

 9        Q    What is Sysco Systems?

10        A    Sysco is a global technology company that builds both

11   hardware, like routers and phones, that operate across the

12   Internet, as well as software that runs large corporations and

13   Internet traffic and communications.

14        Q    How long have you been employed by Sysco?

15        A    Fifteen years.

16        Q    And what is your position there?

17        A    A service and support manager.  So, I manage large

18   global financial companies with their networks making sure that

19   they run correctly and teams of engineers that support them.

20        Q    When you say "networks," what are you referring to?

21        A    Networks refer to data communications or voice.  So it

22   could be their telecommunication systems, their phones from

23   their offices throughout the world, as well as what the data

24   network is to use -- is used to connect the computers together.

25        Q    Are you being compensated for being here today and for
```

Joanne Fleming

1   your work?

2       A    Yes, I am.

3       Q    How are you being compensated?

4       A    From the District Attorney's Office.

5       Q    Manhattan District Attorney's Office?

6       A    That's correct.

7       Q    And you're not here today in your capacity as an

8   employee of Sysco Systems, correct?

9       A    That is correct.

10      Q    Do you have your own consulting business?

11      A    Yes, I do.

12      Q    Can you tell us about that?

13      A    My consulting business specializes in

14  telecommunications to include cell phone communications, tower

15  analysis, call detail record analysis.  It could be things like

16  calling cards.  But analyzing passive phone calls, as well as

17  the call detail records that describe where a call was and how

18  a call was made.

19      Q    And are you here in that capacity, in your own

20  independent business?

21      A    Yes, I am.

22      Q    Can you please tell us your educational background and

23  all relevant experience that's relevant to cell sites and call

24  detail records?

25      A    I have a bachelor of technology from Binghamton

Joanne Fleming

1    University in electrical engineering technology.  I first

2    worked at MCI Telecommunications out of college.

3        Q    And just for those of us who might not know what MCI

4    is, what is MCI?

5        A    MCI was one of the first long-distance companies,

6    besides AT&T, back in the eighties.  They were the big push to

7    break up the old Ma Bell Telephone Company, as they called it,

8    which was AT&T, and that started competition in the

9    telecommunications industry.

10            At MCI, I worked out of a switching facility which is

11   where all of the phone calls come in and out of.  This facility

12   was located in Westchester but handled calls out of all Long

13   Island, Westchester, parts of Manhattan, New York City.

14            From that point I went to Pepsi-Cola International

15   where I was the global telecommunications manager for their

16   global network.  We built a network that went into probably

17   more than a hundred fifty countries that operated the

18   Pepsi-Cola network.

19            After Pepsi, I worked at AT&T Solution where I created

20   a global product that was for voice video and data, and then

21   now at Sysco.

22       Q    Do you train others?

23       A    Yes.  As part of my consulting business, I also

24   provide training classes in this field of analyzing cell phone

25   records and call records and other computer type things.  I've

D. Delitta - People - Direct

 1  given classes to private symposiums for law -- not just law

 2  enforcement but attorneys.  Also, I've given classes to the

 3  NYPD in the FBI Joint Terrorism Task Force, as well as multiple

 4  District Attorney's Offices.

 5      Q     About how many cases have you worked in analyzing cell

 6  site data?

 7      A     I would say at -- between seventy-five and a hundred

 8  now.

 9      Q     Have you testified as an expert in the field of

10  cellular site data in courts of law?

11      A     Yes, I have.

12      Q     And before I move on, what is call routing?

13      A     Call routing is a term used to describe and document

14  how a call, a phone call, will route through a telephone

15  network.  It might be from your home as it goes through the

16  different switches, through the different telephone companies,

17  to get to the phone that you're calling, as well as it could be

18  a cell phone from the towers that it uses over the airwaves and

19  then the path that it takes to get to the other end that you're

20  calling.

21      Q     About how many times have you testified as an expert

22  in the field of cell site data and call routing?

23      A     Say approximately three dozen times.

24      Q     In which courts?

25      A     The New York State Supreme Court, Federal Court in the

1    Southern District of New York, as well as grand jury courts.

2              MS. PARK:  Your Honor, at this time I ask that Mr.

3        Delitta be qualified as an expert in the field of cell site

4        data and call routing.

5              THE COURT:  Any objection?

6              MR. HERLICH:  May we approach for one second?

7              THE COURT:  Yes.

8              (Whereupon, the following proceedings took place

9        on the record and outside the presence of the jury:)

10             MR. HERLICH:  Pardon my ignorance, will he be

11       asked to give an opinion about something?  If he's not

12       giving an opinion, there is no reason or basis to qualify

13       him as an expert.

14             MS. PARK:  I'm going to ask hypothetical

15       questions.

16             MR. HERLICH:  Oh, okay.

17             Alright, no objection.

18             (Whereupon, the following proceedings took place

19        on the record and in the presence of the jury:)

20             THE COURT:  Alright, there being no objection,

21       this Court will recognize Mr. Delitta as an expert in the

22       field of cell site data and call routing.

23   Q    Mr. Delitta, so you told us about cell sites and call

24   routing.  Can you just walk us through how they work?

25   A    Sure.

D. Delitta - People - Direct

1      When you have your phone powered on, it doesn't mean

2  that you're talking on it, but as long as it's powered on, it's

3  always communicating with cell towers, and, in most cases, it's

4  communicating with at least two and usually three different

5  towers at one time.

6      The tower that has the strongest signal to your phone,

7  and it's usually the closest tower, is what's called the

8  primary tower.  That's going to be the one that the cell phone

9  network will use to send a call to you and communicate to you.

10  Maybe it is a text message or sending data to you for your

11  e-mail, if you have a Smart phone.

12      As you move around, it might be on this side of the

13  courtroom to the other side of the hall, the phone and the

14  network is again analyzing what -- which signals are getting

15  stronger and which signals are getting weaker.  If you look at

16  the cell phone, you lose the bars for the antenna signal, how

17  it might drop from four bars to three to two and then suddenly

18  it jumps up to maybe four bars again.

19      What has occurred in that case, it's called a

20  hand-off, where the second or third signal became stronger

21  based on where you moved to and that becomes the new primary

22  signal.  So, that's the one that your phone is therefore

23  registered on the network.  So that, again, the phone network

24  will know where to find you if somebody's trying to call you or

25  send you a text message.

Joanne Fleming

A553

D. Delitta - People - Direct

1    So, as you're traveling around, that's always going

2 on, and when you place a call to somebody, the call detail

3 records capture the cell tower that you're communicating with,

4 and, in some cases, also the site of the cell tower that you're

5 identifying.  It depends on the phone carrier that you have.

6    And it will measure everything from the exact date and

7 the time that the call started on, who called whom, meaning did

8 somebody call you or did you call somebody, and then it will

9 measure the time that you're on the call, when it was

10 disconnected.  In some cases it will tell you what tower you

11 were using when it was disconnected, if you happen to be moving

12 from tower to tower, maybe walking down the street, inside of a

13 building or driving down the road.  And that's what's, again,

14 called the call detail record.

15    Now, if someone was looking to call you, the phone

16 call goes into a database, it finds out what cell phone carrier

17 you're using through a master database that everybody's

18 connected to, and then that -- that phone call gets sent to

19 that cell phone carrier.  Cell phone carrier gets that

20 information, looks at the phone number, goes to their database

21 and says:  What cell tower is this person currently at, and it

22 sends a call to that cell tower and therefore it rings your

23 phone.

24   Q    Turning to this case, were you provided with a set of

25 phone records from T-Mobile for telephone number (646)

Joanne Fleming

A554

D. Delitta - People - Direct

```
 1   593-3203?

 2        A    Yes.

 3        Q    And did they include cell sites for that phone number?

 4        A    Yes, it did.

 5        Q    I'm going to show you what's already in evidence as

 6   People's Exhibit 23.

 7             A COURT OFFICER:   (Handing.)

 8        Q    Do you recognize People's 23?

 9        A    Yes, I do.

10        Q    What is it?

11        A    It's a disk that contains the cell call detail

12   records, the cell site information.

13        Q    And are those the records that you used?

14        A    Yes.  It's got my initials and the date that I put on

15   it.

16             MS. PARK:   If I can have that back?

17             A COURT OFFICER:   (Handing.)

18        Q    I'm also going to ask you to take a look at the map

19   that's right next to you and that's already in evidence as

20   People's 24.

21             Do you recognize that?

22        A    Yes, I do.

23        Q    Did you review this map before coming to court today?

24        A    Yes, I did.

25        Q    And can you tell us what you did?
```

Joanne Fleming

A555

D. Delitta - People - Direct

1    A    I analyzed on the disk the call detail records which

2    lists every phone call, as well as the dates, the time of the

3    phone call, if it was placed from the phone or received from

4    the person calling, as well as the phone number, and it also

5    contains the cell tower information where that call was at the

6    time.  So, what tower it was using.

7         What I did was, I took a look at that information,

8    analyzed it.  It also includes what's called a latitude and

9    longitude, or a GPS coordinate, and that tells you where

10   specifically the cell tower was that was used for those phone

11   calls.  And I made sure that the phone calls listed on the map

12   matched up with the red dots where the cell towers are located.

13   Q    And did you determine whether they were accurate or

14   not?

15   A    Yes.  It was accurate.

16   Q    And the red dot that's on the map, those refer to

17   T-Mobile cell sites, correct?

18   A    That's correct.

19   Q    And if a person was making a phone call using a

20   T-Mobile phone from inside Ninety-Two St. Nicholas Avenue, what

21   tower would it most likely hit?

22   A    As I described before, it uses the strongest signal,

23   alright?  And, again, the reason why it uses the strongest

24   signal is for two things:  It will give you a better call

25   quality, it won't be broken up, as well as it will use less

Joanne Fleming

A556

D. Delitta - People - Direct

1    power from your cell phone because your cell phone adapts to

2    the closest towers, and the closer or stronger the signal is to

3    that tower, it will use less energy or wattage from your

4    transmitter or your cell phone which will save your battery

5    which is why the carriers do that so you can make more calls

6    and, in turn, they make more money because you're using it

7    more.

8         In this case, Ninety-Two St. Nicholas Avenue, the icon

9    or building is located in blue, it's about a block and a half

10   -- not even a block and a half to the cell tower, just before

11   it, just to the north, and that would be the one that has the

12   signal or closest signal since it's very close to the location.

13   Q    I'm going to ask you to focus your attention on the

14   phone call at 2:23:30 p.m. on July 16th of 2014.

15        Is that consistent with that phone being inside

16   Ninety-Two St. Nicholas Avenue?

17   A    Yes, it is.

18   Q    And now I'm going to ask you to direct your attention

19   to a call, same date, July 16, 2014 but at 2:25:23 p.m.

20   A    Okay, I see that one.  It's up on the -- using the top

21   tower.

22   Q    And can you tell us about that call, the call at

23   2:25:23 p.m. and the cell tower that's being used?

24   A    So the -- would it be okay if I got up and pointed to

25   it?

Joanne Fleming

A557

1          THE COURT:  Yes, of course.

2          THE WITNESS:  Okay, thanks.

3      A    So, the 2:25:33 call, which is listed in this top box,

4  that utilized the cell tower by a Hundred Eighteenth Street and

5  Lenox Avenue.  That tower, as you can see, is a further

6  distance away from Ninety-Two St. Nicholas Avenue located down

7  here.  The closest tower where many of the phone calls came in

8  and out of was located by a Hundred Sixteenth Street which,

9  again, is about a block away from Ninety-Two St. Nicholas.

10         So, what this would tell me in the analysis is that

11  most likely the phone was no longer located in the immediate

12  area of Ninety-Two St. Nicholas Avenue because it's suddenly

13  hitting a tower to the northeast of that location.

14     Q    Were there any calls where it uses more than one tower

15  during one phone call?

16     A    There are a few phone calls, because the T-Mobile will

17  show you the beginning cell tower and the end cell tower, when

18  the call was placed and hung up -- when they hung up.  That

19  would always use either the tower to the north of Ninety-Two

20  St. Nicholas and the tower to the south.  I think there were a

21  couple that did that.

22         And, in that case, what that will usually tell me is

23  there could be a little bit of movement on the phone like I

24  described.  It could be as simple as the person is located on

25  the north side of an apartment building and then suddenly they

D. Delitta - People - Direct

1   moved to the south side of an apartment building.  It could

2   even be maybe a corner apartment and they have a window that

3   could be looking right down St. Nicholas Avenue and having a

4   cleaner shot to the tower to the south.

5        Again, what we see is, because St. Nicholas and the

6   way the building's and the towers are located, it's almost

7   another good shot right down the road.  So there's no buildings

8   blocking it to get to that apartment building.

9   Q    And if you were at Ninety-Two St. Nicholas Avenue,

10  would it possibly hit the tower that's located at, and I

11  believe that's --

12  A    One-Eighteen.

13  Q    No, the one blow it, St. Nicholas at -- and a Hundred

14  Twelfth Street.

15  A    Hundred Twelfth Street?

16  Q    Yes.

17  A    Yes.  There is the good chance it would also use this

18  tower, and, again, in some phone calls, I saw phone calls that

19  either started on this tower and ended in this one or started

20  in the top one on a Hundred Sixteenth Street and ended at

21  Hundred Twelfth.

22       And there are a couple of reasons that will also do

23  that, too.  The towers get busy at certain times of the day.

24  The phone calls were transitioned over to the next best

25  strongest signal which, again, both of these towers have a very

Joanne Fleming

A559

D. Delitta - People - Direct

1   good clear path to that building.

2       Q    So could the --

3           Could that phone also use the cell tower that's

4   located -- this --

5       A    One Hundred-Eighteenth Street and Lenox?

6       Q    -- Hundred Eighteenth and Lenox Avenue?

7       A    Lenox Avenue.

8           So if the phone is located in the area of Ninety-Two

9   St. Nicholas, it's very probable that it would not use that

10  cell tower for the reason if there are towers that are much

11  closer.  This one is very close.  In fact, looking at streets

12  -- from the street on Google Earth, you can actually see the

13  antennas of that building.  So this would definitely be a

14  primary cell tower used for calls in that area, and, again, the

15  one below is a secondary one and that also has a nice path.

16          If we look at the one up on a Hundred Eighteenth

17  Street, you can actually see from the map that there are rows

18  of apartment buildings that actually go across that would be --

19  at times, it could be a barrier to get that signal through

20  since it doesn't easily travel through buildings, to try to

21  make it one, two, three blocks away.  So it will be more

22  difficult.

23      Q    And can you tell us the significance of a call that

24  was -- the three calls, actually -- on July 15th, 2014, there

25  is a call at 9:37:47 p.m., 9:38:23 p.m. and 9:39:22 p.m.  They

1  are all about one minute apart.  Can you talk about those three

2  calls?

3      A    Yes.  I think I need to look at the notes for the call

4  detail records.  Is that okay?

5      Q    Yes.  I will actually put them up.

6      A    Okay.

7              MS. PARK:  Can you put the map down?

8              (Court officer complies.)

9      Q    It's starting with line 50.  Do you see that?

10     A    Okay, yes, line 50.

11     Q    Just tell me if you need me to scroll back and forth.

12     A    Sure.

13          Okay, so line 50, it's showing that it's an outgoing

14  call, which means the phone that we've analyzing placed a call

15  out, and it used cell tower 49163, which I believe is the one

16  on a Hundred Sixteenth Street above Ninety-Two St. Nicholas.

17          If you can slide to the right?

18     Q    To the right, okay.

19          (D.A. complies.)

20     A    Okay, and the call also -- when it completed its call,

21  it finished on the same cell tower, 49163, which again would be

22  the tower located above Ninety-Two St. Nicholas.

23     Q    And the call at -- that would be line 51?

24     A    Okay, line 51, that's again a voice call.  So it's not

25  a text message but it was an outgoing call.  So the person with

Joanne Fleming

1    the phone placed the call out.

2        Q     And I'm referring to the call at 9:38 p.m.?

3        A     Nine-thirty-eight-twenty-three, correct?

4        Q     Yes.

5        A     Yes.

6              And that used tower 15504, and when it finished, it

7    used tower one-five-five -- hold on -- 15504.  And that tower,

8    if I can look at my notes, I think it's the one below.  Is that

9    okay?

10             THE COURT:  Sure.

11       Q     Would that help you refresh your recollection?

12       A     Yes.

13             One-five-five-zero-four is the tower south of

14   Ninety-Two St. Nicholas Avenue.

15             MS. PARK:  So can we put the map back on?  We

16       don't need the records anymore.

17             A COURT OFFICER:  Okay.

18             (Court officer complies.)

19       Q     So, within a minute of each other it used both towers.

20   So, can you just explain the significance of that?

21       A     Sure.

22             So, in that example where we had a call that was

23   placed in a short distance time-wise apart, you can see that

24   the first call example is utilizing the tower about a block and

25   a half from Ninety-Two St. Nicholas, and then the second call,

Joanne Fleming

A562

1  which was a very short time afterwards, is utilizing the tower

2  that was three blocks, three and a half blocks, south at a

3  Hundred Twelfth Street.

4          So that would tell you that the phone isn't traveling,

5  you know, next to this tower, and, you know, seconds later it's

6  down in this tower.  It would generally tell you that it's

7  somewhere in between the towers, and it could be as simply

8  moving again from one side of the building to another side of

9  the building to change the towers.

10     Q     Now I want to focus your attention on the call at

11  2:42:42 p.m. on July 16th of 2014.

12     A     Okay, 2:42:42 p.m., yes.

13     Q     What is the likelihood of the phone being at

14  Ninety-Two St. Nicholas Avenue for that call?

15     A     So, since the tower's located all the way on First

16  Avenue and a Hundred Twentieth Street, it would be very

17  improbable, almost impossible, to say that a caller was located

18  on the side of the town reaching that tower.

19          And the reason being is, there are many more T-Mobile

20  towers in between this location that is not shown on the map

21  because they weren't used for phone calls.  As you can see, you

22  need an amount of towers to carry the cell phone capacity, and

23  to explain, that is, besides having towers that will cover an

24  area so that if you were in upstate New York, you can have a

25  tower on a mountain and it could probably go five to ten miles

Joanne Fleming

A563

D. Delitta - People - Direct

1   and they make them stronger up there where they have less

2   towers.

3          In the city, when the networks are designed, the

4   transmitting power of the towers are purposely lowered to a few

5   blocks and it's because they need more towers to handle call

6   capacity, and call capacity would be at any one time how many

7   of their cell phone customers are on that tower.

8          Because we're in Manhattan where there is a large

9   population, and as their network continues to grew, they need

10  to -- actually need to add more towers, and they will make them

11  work a shorter distance so that you can turn around and have

12  the capacity to handle the phone calls.

13         Now, even though a tower can reach five, ten miles,

14  you know, and, again, I use upstate as an example, the reason

15  why they don't have all the towers set up there that way is

16  there is a limited amount of channels or frequencies that the

17  government gives you to create a network.  So what they do is

18  they repeat using those over and over.

19         But the important thing is, they have to make sure --

20  if we said Channel 21 was being used on this tower, they have

21  to make sure there's not another Channel 21 that can be

22  operated in the same area, because otherwise your cell phone

23  will get confused, it will see two Channel 21s.  They wouldn't

24  know who it's talking to.

25         What they'll do, they will make more towers tighter

1  together to handle the capacity and they'll make the

2  transmission power shorter so that there's only about an

3  overlap of one, maybe two towers, so that if, say, this tower

4  on One-Eighteenth Street was busy, then the next closest tower

5  can use it.  But your phone wouldn't be able to reach towers,

6  you know, blocks away or especially all the way over here,

7  because then the network would get confused.

8      Q    What is the likely range of where that phone is if

9  it's hitting that cell tower on a Hundred-Twentieth Street and

10  First Avenue?

11     A    Based on what we see in T-Mobile's network, over on

12  the left side of the map where we have three towers well within

13  about two to three blocks, so that would probably carry, again,

14  through Manhattan since the density or the customer base is

15  large.

16         We would use that same interpretation where they would

17  probably have towers that would be another one or two blocks

18  away.  So, since they will overlap one or two towers to create

19  an area for your phone to work, I would, you know, roughly say

20  maybe three, four blocks to the north, three, four blocks to

21  the west and three, four blocks to the south.  So this general

22  area.

23             MS. PARK:  I have no further questions.

24             THE COURT:  Your witness.

25             MR. HERLICH:  Okay.

Joanne Fleming

A565

1   CROSS-EXAMINATION

2   BY MR. HERLICH:

3       Q    Mr. Delitta, can you give us, with any definite

4   number, as to the radius from a cell phone tower that a caller

5   is within when he makes such a call?

6       A    I can't give an exact radius, distance.  Only

7   approximate.

8       Q    Okay.

9            So, from all the calls listed that are, as you

10  indicated, in the vicinity of Ninety-Two St. Nicholas Avenue,

11  one can't say that the party utilizing the phone was either in

12  the building or somewhere within a couple of blocks of the

13  building, would that be fair to say?

14      A    That's fair to say.

15               MR. HERLICH:  Okay.  Thank you.

16               THE COURT:  Anything else?

17               MS. PARK:  Nothing further.

18               THE COURT:  Thank you, sir.  You can step out.

19               A COURT OFFICER:  Thank you.

20               (Whereupon, the witness exited the courtroom.)

21               THE COURT:  People, any other witnesses for today?

22               MS. PARK:  No, your Honor.

23               THE COURT:  Okay.

24               Alright, jurors, we're going ahead and calling it

25      a day.  Before I excuse you, I'm required by law to read to

Joanne Fleming

1    you these admonitions again.  So please bear with me as I

2    do.

3            Do not talk either among yourselves or with anyone

4    else about anything related to the case.

5            Please continue to keep an open mind.  Do not form

6    or express an opinion about the defendant's guilt or

7    innocence until all the evidence is in, I have given you my

8    final instructions on the law and I have directed you to

9    begin your deliberations.

10           Do not request, accept, agree to accept or discuss

11   with any person, the receipt or acceptance of any payment or

12   benefit in return for supplying any information concerning

13   the trial.

14           Report directly to me any incident within your

15   knowledge involving an attempt by any person improperly to

16   influence you or the jury.

17           Do not visit or view the locations discussed in

18   this case.

19           Do not read, view or listen to any accounts or

20   discussions of the case.

21           Do not attempt to research any fact, issue or law

22   related to the case.

23           Do not communicate with anyone about the case by

24   any means, including by telephone, text message, e-mail or

25   the Internet.

Joanne Fleming

1          And do not Google or otherwise search for any

2    information about the case or the law which applies to the

3    case or the people involved in the case.

4          I will see you tomorrow morning at nine-thirty.

5    Nine-thirty tomorrow.

6          Thank you.

7          A COURT OFFICER:  Leave your books on your chairs,

8    make sure you have all your belongings and step this way,

9    please.

10          (Whereupon, the jury exited the courtroom.)

11          THE COURT:  Okay, so People, again, let's go over

12    your witnesses who will be for tomorrow.

13          MS. PARK:  Yes.  So I have Detective Barbato --

14    just not in this order.

15          THE COURT:  Mm-hmm.

16          MS. PARK:  Detective Barbato, Detective Pinard,

17    Officer Lora, Officer Hager, Officer Field, Nine-One-One

18    operator Jeannie Tamariz and Dr. Singh.

19          THE COURT:  These will all be tomorrow?

20          MS. PARK:  Yes.

21          Most of them will be very short.

22          THE COURT:  And beyond those witnesses that you

23    have for tomorrow, are there any others?

24          MS. PARK:  No, Judge.

25          THE COURT:  So you expect that you could rest

1    tomorrow afternoon?

2              MS. PARK:  Yes.

3              THE COURT:  Mr. Herlich, if the People do rest

4    tomorrow afternoon, you should be prepared to put your

5    client on the stand.  I don't see any reason to adjourn or

6    recess in order to prepare for him to be on the stand.  The

7    case has been pending for awhile.  You should be ready to

8    get him on.

9              MR. HERLICH:  Okay.

10             THE COURT:  Thank you.

11             I will see you tomorrow.

12             MS. PARK:  You mean tomorrow or Friday?

13             THE COURT:  Well, it depends on what time we get

14   done tomorrow.  If we get done, say, at three o'clock or

15   three-thirty and you request that we adjourn, I'll do that.

16   But if you --

17             MR. HERLICH:  Sure.

18             THE COURT:  If we get done at two-thirty or three

19   o'clock, I will not waste an hour and a half, so I will ask

20   him to take the stand then.

21             MR. HERLICH:  Okay.

22             (Whereupon, the trial was adjourned to Thursday,

23   October 1st, 2015.)

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 59
 2   ----------------------------------------x

 3   THE PEOPLE OF THE STATE OF NEW YORK          Indictment
                                                  No. 4258/1₄
 4
                    -against-                     Crim. Sex Act 1
 5
                                                  Jury Trial
 6   LONNIE HARRELL,

 7                               Defendant.

 8   ----------------------------------------x

 9                                     October 1st, 2015

10                                     100 Centre Street
                                       New York, NY  10013
11

12   B e f o r e:

13
                     HONORABLE JUAN M. MERCHAN,
14
                                       Justice.
15

16   Appearances:

17
                     CYRUS R. VANCE, JR., ESQ.
18                   District Attorney, New York County
                     BY:  JUNG PARK, ESQ.
19                        Assistant District Attorney

20
                     THEODORE HERLICH, ESQ.
21                   Attorney for Defendant

22

23

24                                     Joanne Fleming
                                       Amalia Hudson
25                                     Senior Court Reporters
```

```
 1                    (In open court)

 2                    THE CLERK:  Continuing case on trial, People

 3          versus Lonnie Harrell.

 4                    A COURT OFFICER:  One in.

 5                    (Whereupon, the defendant entered the courtroom.)

 6                    THE COURT:  We're just waiting on one juror.

 7                    A COURT OFFICER:  We're good.

 8                    THE COURT:  We're good?

 9                    A COURT OFFICER:  Yes.

10                    THE COURT:  Okay, let's bring them in, please.

11                    A COURT OFFICER:  Panel entering.

12                    (Whereupon, the jury entered the courtroom.)

13                    THE CLERK:  Continuing case on trial, People

14          versus Lonnie Harrell.

15                    All parties and all jurors are present.

16                    THE COURT:  Good morning, jurors.  Welcome back.

17                    People, your next witness.

18                    MS. PARK:  People call Sherryann Brown.

19                    A COURT OFFICER:  Witness entering.

20                    (Whereupon, the witness entered the courtroom.)

21                    A COURT OFFICER:  Remain standing, raise your

22          right hand and face the clerk, please.

23    S H E R R Y A N N     B R O W N, called as a witness, by and on

24          behalf of the People at the Trial, having been duly sworn

25          or affirmed, testified as follows:
```

Joanne Fleming

```
 1                    THE CLERK:  Thank you.

 2                    A COURT OFFICER:  Please be seated.

 3                    In a loud, clear voice, please state your name,

 4       spelling your last name.

 5                    THE WITNESS:  Sherryann Brown, B-R-O-W-N.

 6                    A COURT OFFICER:  County of residence?

 7                    THE WITNESS:  Bronx County.

 8                    THE COURT:  Good morning, Ms. Brown.

 9                    THE WITNESS:  Good morning.

10                    THE COURT:  You may inquire.

11    DIRECT EXAMINATION

12    BY MS. PARK:

13       Q    Ms. Brown, by whom are you employed?

14       A    NYPD.

15       Q    That's New York City Police Department?

16       A    Yes.

17       Q    What division?

18       A    Communications division.

19       Q    And what kinds of things happen in the communications

20    division of NYPD?

21       A    I'm sorry, could you elaborate a little?

22       Q    What is your position there?

23       A    I am currently working in the tape and records unit as

24    a searcher.

25       Q    And can you tell us your duties as a searcher?
```

1    A    I search for Nine-One-One calls within the database

2    system, and when it's searched, it's then sent to a tape tech

3    where we reproduce the audio.

4    Q    When you say "a tape tech," do you mean a tape

5    technician?

6    A    Yes.

7    Q    What does a tape technician do?

8    A    Reproduce the audio of the Nine-One-One calls,

9    dispatcher calls.

10    Q    How long have you held that position?

11    A    Three and a half years.

12    Q    Did you hold any other positions with NYPD?

13    A    Yes.

14    Q    What other positions?

15    A    I was also a Nine-One-One operator and a police

16    dispatcher.

17    Q    And what were your duties as a Nine-One-One operator

18    and a police dispatcher?

19    A    I would take -- I would answer and handle Nine-One-One

20    calls and I would also dispatch.

21    Q    How long have you held that position?

22    A    For eight and a half years.

23    Q    Are you familiar with how a Nine-One-One call gets

24    recorded?

25    A    Yes.

S. Brown - People - Direct

222

1      Q      What happens when a person calls Nine-One-One?

2      A      When a person calls Nine-One-One, it's -- the call is

3  automatically recorded.

4      Q      How long does it get preserved?

5      A      The audio, six months, and the Sprint printout on the

6  new system, now six years.

7      Q      We will get to the Sprint in a minute.  Just continue

8  and tell us what happens when a person calls Nine-One-One.

9      A      Well, the operator will try to elicit all the

10  pertinent information as to the nature of the call, the

11  location, the time.  If an ambulance is needed, we will

12  transfer the call to an EMS operator.

13     Q      And depending on the nature of the call, might a

14  Nine-One-One operator have the caller speak directly to an

15  ambulance personnel?

16     A      Yes.

17     Q      And how does the NYPD preserve those Nine-One-One

18  calls?

19     A      It's preserved on a central database system.

20     Q      And you mentioned that it was automatic --

21     A      Yes, yes.

22     Q      -- as the call is being placed?

23     A      Once the call is answered, it's automatically

24  recorded.

25     Q      And you mentioned a Sprint report.  What is a Sprint

Joanne Fleming

A574

1  report?

2      A    A Sprint report is pretty much a printout -- printout

3  of that call, a printed out transcript of the Nine-One-One

4  call.

5      Q    What kind of information is contained in a Sprint

6  report?

7      A    The date of the incident, the location, time, the

8  nature of the call, if it is a crime or it's an ambulance case,

9  all that's recorded on there.   The telephone number, caller's

10 ID.

11     Q    What is an Ani, A-N-I, dash Ali, A L-I information?

12     A    Well, the Ani-Ali is basically the caller's ID that

13 holds the caller's address and the telephone number.

14     Q    When you say "the caller's ID," you mean the phone

15 number?

16     A    Yes.

17     Q    Phone number of the caller?

18     A    Yes, yes.

19     Q    Is that number visible to the Nine-One-One operator?

20     A    Yes.

21     Q    And how does that get recorded?

22     A    Automatically.

23     Q    And what about the date and time of the call, how does

24 that get recorded?

25     A    Automatically.

1    Q    And when you say "automatically," what do you mean?

2    A    Whatever we enter within the system, it's recorded

3 automatically.

4    Q    As the Nine-One-One call is being placed?

5    A    Yes.

6    Q    And does NYPD maintain these Sprint reports in the

7 regular course of its business?

8    A    Yes.

9    Q    I'm going to show you what I premarked for

10 identification as People's Exhibit 11A.

11            A COURT OFFICER:  Counselor?

12            MR. HERLICH:  I have it, thanks.

13            A COURT OFFICER:  (Handing.)

14    Q    Do you recognize 11A?

15    A    Yes.

16    Q    What is it?

17    A    This is a Sprint printout.

18    Q    And the Sprint printout that's in front of you, are

19 they maintained in the manner that you just described?

20    A    Yes.

21    Q    And is that Sprint printout -- sorry, withdrawn.

22        And I'm now going to show you People's 11 which is

23 already in evidence.

24            A COURT OFFICER:  (Handing.)

25    Q    Do you recognize People's 11?

1    A    Yes.

2    Q    And what is that?

3    A    This is a Nine-One-One recording.

4    Q    And how do you know that that is a Nine-One-One

5    recording?

6    A    Because I previously listened to it prior to

7    testifying today.

8    Q    Do you see your initials on it?

9    A    Yes, and it's dated.

10    Q    And is that Sprint report in People's 11A associated

11    with that Nine-One-One call in People's Exhibit 11?

12    A    Yes.

13             MS. PARK:  Your Honor, at this time I'm going to

14        offer People's 11A subject to redaction.

15             THE COURT:  Any objection?

16             MR. HERLICH:  Subject thereto, no objection.

17             THE COURT:  Very well.  People's 11A is accepted

18        into evidence.

19             (Received and marked as People's Exhibit Number

20        11A in evidence.)

21    Q    Ms. Brown, I'm going to ask you to look at the Sprint

22    report and People's 11A.

23    A    Okay.

24    Q    What was the date of that Nine-One-One call in

25    People's 11?

1      A      July 16th, 2014.

2      Q      What was the time of the call?

3      A      Fourteen-twenty-three-twenty-nine hours.

4      Q      And is that in military time?

5      A      Yes.

6      Q      So what is that in layman's terms?

7      A      Two-twenty-three p.m.

8      Q      And from what telephone number was that call made?

9      A      Do you want me to say the number?

10     Q      Yes.

11     A      (646) 206-2485.

12             MS. PARK:  I have no further questions.

13             THE COURT:  Okay.

14             Your witness.

15  CROSS-EXAMINATION

16  BY MR. HERLICH:

17     Q      You indicated that the Sprint report is a printed out

18  transcript of the phone calls, correct?

19     A      Yes.

20     Q      But it's not a verbatim transcript of what was said

21  between the complainant calling in and the Nine-Eleven

22  dispatcher, would that be fair to say?

23     A      Yes.

24             MR. HERLICH:  Nothing further.

25             MS. PARK:  No questions.


                        Joanne Fleming

                           A578

```
 1                    THE COURT:  Thank you.  You can step down.

 2                    THE WITNESS:  Okay.

 3                    THE COURT:  Next witness, People.

 4                    MS. PARK:  The People call Detective Susan

 5      Barbato.

 6                    (Whereupon, the witness exited the courtroom.)

 7                    A COURT OFFICER:  Witness entering.

 8                    (Whereupon, the witness entered the courtroom.)

 9                    A COURT OFFICER:  Remain standing, raise your

10      right hand and face the clerk, please.

11  S U S A N     B A R B A T O, called as a witness, by and on

12      behalf of the People at the Trial, having been duly sworn

13      or affirmed, testified as follows:

14                    THE CLERK:  Thank you.

15                    A COURT OFFICER:  Please be seated.

16                    In a loud, clear voice, please state your name,

17      spelling your last name.

18                    THE WITNESS:  Detective Susan Barbato,

19      B-A-R-B-A-T-O; tax number 926459; currently assigned to the

20      One-Eleven Precinct.

21                    A COURT OFFICER:  Thank you.

22                    THE COURT:  Good morning, detective.

23                    THE WITNESS:  Good morning, your Honor.

24                    THE COURT:  You may inquire.

25  DIRECT EXAMINATION
```

Joanne Fleming

A579

1  BY MS. PARK:

2      Q     Detective, how long have you been with the New York

3  City Police Department?

4      A     Fifteen years.

5      Q     And you stated that you are currently with the

6  One-Eleventh Precinct?

7      A     Yes.

8      Q     How long have you been there?

9      A     I've been there for approximately five months.

10     Q     Where is the One-Eleventh Precinct?

11     A     It's in Bayside.

12     Q     Queens?

13     A     Yes.

14     Q     And are you in the detectives squad there?

15     A     Yes, I am.

16     Q     What other commands have you been assigned during your

17 career with the NYPD?

18     A     I started my career with the NYPD in the Seven-Seven

19 Precinct where I did patrol duties.  I was then assigned to the

20 auto crime division in O.C.C.B.

21     Q     Okay, you will have to tell us what --

22     A     Organized Crime Control Bureau, I'm sorry, I

23 apologize.

24           And then from there, I was transferred to Manhattan

25 Special Victims where I worked for approximately three years.

Det. S. Barbato - People - Direct

1    Q    Were you at the Manhattan Special Victims prior to

2    One-Eleventh Precinct?

3    A    Yes, I was.

4    Q    And what types of cases did you work on while you were

5    with the Manhattan Special Victims?

6    A    We investigated sexual assaults.

7    Q    I'm going to direct your attention to July 16th of

8    2014.

9         Were you assigned to the Manhattan Special Victims at

10   that time?

11   A    Yes, I was.

12   Q    And were you working on that date?

13   A    Yes, I was.

14   Q    And on that day were you assigned to investigate an

15   incident which occurred at Ninety-Two St. Nicholas Avenue?

16   A    Yes, I was.

17   Q    What steps did you take in investigating the case?

18   A    Well, upon receiving the notification, I went to the

19   -- I believe -- if you don't mind me checking my notes -- I

20   went to St. Luke's Hospital where I interviewed the victim.

21   Q    Do you recall the victim's name?

22   A    Yes, Cypress Smith.

23   Q    So you went to the hospital?

24   A    Yes.

25   Q    Do you recall approximately what time you went to the

Joanne Fleming

A581

Det. S. Barbato - People - Direct

1   hospital?

2      A    It was sometime after three o'clock in the afternoon.

3      Q    Is there anything in your notes that might help you

4   refresh your recollection as to what time you were at the

5   hospital?

6      A    Yes.  I have my case notes with me, if you --

7              MS. PARK:  With the Court's permission?

8              THE COURT:  Sure, of course.

9              THE WITNESS:  Thank you, your Honor.

10     A    I received the notification at about three-ten in the

11  afternoon on that day.  And then from there, we went directly

12  to the hospital where we interviewed the victim at St. Luke's

13  at about five-forty-five in the evening.

14     Q    And did you speak with her?

15     A    Yes, I did.

16     Q    And at around that time, what was her demeanor?

17     A    She was visibly upset.  She was shaking.  She had

18  already seen the doctor and she had already seen a social

19  worker so she was -- she had calmed down a bit but she was

20  visibly shaking.

21     Q    After you spoke with her, did you leave the hospital

22  at some point?

23     A    Yes, I did.

24     Q    And after you left the hospital, where did you go?

25     A    We went over to her apartment at Ninety-Two St.

Joanne Fleming

1   Nicholas.

2       Q    Who's "we?"

3       A    My partner and Detective Skorzewski.

4       Q    Who is your partner?

5       A    Detective Skorzewski.

6       Q    What apartment did you go to?

7       A    We went to apartment two George, 2G.

8       Q    And when you got there, were there other officers in

9   the apartment?

10      A    There was one other officer there, yes.

11      Q    And who was that, if you recall?

12      A    I don't recall his name.

13      Q    And what did you do in the apartment?

14      A    From the story -- from the event that Cypress told me,

15  we walked through the apartment.  I was shown -- she told me

16  that there was a glass --

17              MR. HERLICH:  Objection.

18              THE COURT:  Sustained.

19      Q    Detective, don't tell us what she told you.  Just tell

20  us what you did in the apartment.

21      A    Okay.

22           I observed a glass on a counter with a straw which the

23  victim told me --

24      Q    Well, don't tell us what the victim said.

25      A    Okay.

Joanne Fleming

A583

Det. S. Barbato - People - Direct

```
1       Q    And did you observe any --

2            Did you take that?  Did you recover that?

3       A    Yes, I did.

4       Q    Did you collect any other items --

5       A    Yes.

6       Q    -- from the apartment.

7            What?

8       A    A coffee cup.

9       Q    From where did you recover the coffee cup?

10      A    The kitchen garbage can.

11      Q    How did you collect these items?

12      A    I had rubber gloves on.

13      Q    Why did you do that?

14      A    To inventory it or to recover it as evidence.

15      Q    Why did you wear gloves?

16      A    So as not to contaminate the evidence.

17      Q    What did you do with those items?

18      A    I placed them in a brown evidence collection bag.

19      Q    And then after you placed them in the bag, what did

20 you do?

21      A    I handed them to the officer on the scene.

22      Q    I'm going to show you what have previously been marked

23 as Exhibits 15, 16 and 17.  Detective, they've already been

24 opened.  So I'm just going to ask you to look inside.

25           A COURT OFFICER:  (Handing.)
```

Joanne Fleming

A584

Det. S. Barbato - People - Direct

1     Q     Let's start with People's 15.

2           Do you recognize People's 15?

3     A     Yes, I do.

4     Q     What is that?

5     A     It's the coffee cup that I recovered from the scene.

6     Q     And People's 16.  What do you recognize People's 16 to

7  be?

8     A     It is a plastic purple straw that was recovered from

9  the scene.

10    Q     Did you recover it?

11    A     Yes, I did.

12    Q     And, finally, People's 17.  That, you will have to

13 open this.

14    A     We have to open this one?

15          A COURT OFFICER:  (Handing.)

16          THE WITNESS:  A scissor and gloves, thank you.

17    Q     Actually, detective, before you open it, can you tell

18 just -- can you feel the bag and in what condition is that in?

19    A     It's not the condition that I recovered it in.

20    Q     So what condition is it in now?

21    A     It feels as if it was broken.

22    Q     When you recovered it, what condition was it in?

23    A     It was -- it was a solid glass.  It was not broken.

24 No chips.  No cracks.

25    Q     And where was that glass?

Joanne Fleming

Det. S. Barbato - People - Direct

1    A    That glass was on the kitchen counter.

2    Q    And you handed that glass to the officer who was

3  there?

4    A    Yes.

5              MR. HERLICH:  Objection.

6              THE COURT:  Sustained as to leading.

7              MS. PARK:  You don't have to open it, detective.

8              THE WITNESS:  Oh, okay.

9    Q    Detective, afterwards, did you continue your

10  investigation?

11    A    Yes, I did.

12    Q    And did you have a suspect?

13    A    Yes, I did.

14    Q    Who was that?

15    A    Lonnie Harrell.

16    Q    Can you tell us, what efforts did you make in

17  apprehending Mr. Harrell?

18    A    After -- the day after we took the complaint report

19  and the -- we had the victim come back to the --

20    Q    Let me stop you for a second.

21          Okay, you can continue.

22    A    Okay.

23          The victim came back to my office to do an interview

24  in our office.  We attempted what we call a controlled call.

25    Q    What is a controlled call?

1    A    A controlled call is where the victim calls the

2    suspect and it's -- it's recorded so I can hear it while the

3    victim is talking to the perpetrator.

4    Q    And what is the purpose of conducting a controlled

5    call?

6    A    To gather more evidence of the case, to get the

7    suspect to admit that the incident did take place.

8    Q    And were you successful?

9    A    No.  We made two attempts and it just went right to

10   voice mail.

11   Q    I'm going to direct your attention forward to August

12   19th of 2014.

13   A    Okay.

14   Q    Did you again go to Ninety-Two St. Nicholas Avenue

15   apartment two -- Ninety-Two St. Nicholas Avenue?

16   A    Yes, I did.

17   Q    What apartment did you go to?

18        THE WITNESS:  If you don't mind, again, me

19   referring to my notes?

20        THE COURT:  Sure.

21        THE WITNESS:  Thank you, your Honor.

22   Q    Well, just review it and if it refreshes your

23   recollection --

24   A    Okay, no, absolutely.

25   Q    -- look up.

Joanne Fleming

A587

```
 1        A    (Witness complies.)

 2        Q    And why did you go to Ninety-Two St. Nicholas Avenue

 3   on August 19th of 2014?

 4        A    To conduct -- to execute a search warrant.

 5        Q    And where were you going to execute the search

 6   warrant?

 7        A    At Ninety-Two St. Nicholas Avenue, apartment two

 8   Henry, 2H.

 9        Q    What were you looking for?

10        A    The victim's underpants that were taken and also the

11   suspect's phone, cell phone.

12        Q    And did you have a search warrant prior to going to

13   apartment 2H?

14        A    Yes, I did.

15        Q    Was anyone home?

16        A    Yes.

17        Q    Who was home?

18        A    Catherine Perry, the defendant's mother.

19        Q    Well, was it Mr. Harrell's mother?

20        A    Yes.

21        Q    And was Mr. Harrell home?

22        A    No, he was not.

23        Q    Did you find the items that you were looking for?

24        A    No, I did not.

25        Q    I'm now going to direct your attention to September
```

1     10th of 2014.

2              Did you arrest anyone in connection with this case?

3     A     Yes, I did.

4     Q     Who did you arrest?

5     A     Lonnie Harrell.

6     Q     And how did you come to arrest him?

7     A     He turned himself in to -- I don't remember if it was

8     the Three-Two or the Three-Three Precinct.

9     Q     At this time I'm going to ask you to take a look

10    around the courtroom.

11    A     (Witness complies.)

12    Q     Do you see Mr. Harrell in the courtroom today?

13    A     Yes, I do.

14    Q     Can you please point to him and describe an article of

15    clothing that he's wearing?

16    A     Mr. Harrell is sitting right next to the defense

17    attorney wearing a black shirt.

18              THE COURT:   Indicating Mr. Harrell.

19    Q     Now, detective, when you arrest someone, do you take

20    their pedigree information?

21    A     Yes, I do.

22    Q     Does that include his date of birth?

23    A     Yes, it does.

24    Q     Did you get Mr. Harrell's date of birth?

25    A     Yes, I did.

1    Q    And what was that?

2              THE WITNESS:  Again, if you don't mind me

3    refreshing my memory by my notes, your Honor?

4              THE COURT:  Of course.

5    A    His date of birth was 12/27/1962.

6    Q    And what was his approximate height and weight at the

7    time you arrested him?

8    A    He was approximately five foot six and a hundred

9    eighty-five pounds.

10   Q    I'm now going to draw your attention to January 7th of

11   2015.

12             Did you receive an item from Detective Pinard?

13   A    Yes, I did.

14   Q    And who is Detective Pinard?

15   A    He was my partner at the time.

16   Q    Was he also working for the Special Victims?

17   A    Yes, he was.

18   Q    And what did you receive from him?

19   A    A buccal specimen, a swab from the defendant's cheeks,

20   court-ordered swab.

21   Q    I'm going to show you People's Exhibit 20, premarked.

22             A COURT OFFICER:  (Handing.)

23             MS. PARK:  Mr. Herlich?

24             MR. HERLICH:  One moment.  I will object to part

25   of the answer.

Joanne Fleming

A590

1            THE COURT:  Which part are you objecting to?

2            MR. HERLICH:  The source of the swab.

3            THE COURT: ·Can I have the court reporter please

4      read back that part of the answer and the question that

5      preceded it?

6            (Whereupon, the requested testimony was read

7      back.)

8            THE COURT:  The objection's overruled.

9      Q    I'm just going to ask you to look at People's 20.

10     A    (Witness complies.)

11     Q    Do you recognize People's 20?

12     A    Yes, I do.

13     Q    What do you recognize it to be?

14     A    It's the buccal sample that was DNA from the

15     defendant.

16     Q    How do you know that it contains that information?

17     A    Because I wrote the information on the -- most of the

18     -- some of the envelope myself and this is the envelope that

19     was handed to me from Detective Pinard.

20     Q    And what did you do with that item when you received

21     it from Detective Pinard?

22     A    Invoiced it as evidence.

23     Q    When you say "invoiced it," what do you mean?

24     A    We secured it.

25     Q    How did you do that?

1      A    I placed it into the second envelope and I sealed it

2  with red tape, and I signed my initials and put my tax number

3  on it.

4      Q    And was there a voucher number assigned to that?

5      A    Yes.

6      Q    And what is a voucher number?

7      A    A voucher number is just a number that's given to each

8  item that's invoiced, just to keep an index.

9      Q    And what was the voucher number assigned to that --

10     A    One zero zero --

11     Q    -- assigned to People's Exhibit 20?

12     A    Sorry.

13          One-zero-zero-zero-five-nine-two-six-four-five.

14     Q    And does that appear to be in the same condition today

15  as it was from the last time that you saw it?

16     A    It is, but there's additional markings after it came

17  from the lab and the yellow tape is different.

18     Q    So the yellow tape was not yours?

19     A    No.

20     Q    What about the red tape?

21     A    The red tape is mine.

22     Q    And is your signature across the red tape?

23     A    Yes, it is.

24     Q    I'm going to ask you to open that and look inside.

25  Just be careful.

Joanne Fleming

A592

1    A     (Witness complies.)

2    Q     Do you recognize that?

3    A     Yes.

4    Q     And tell us, is that in the same condition as it was

5    from the last time you saw it?

6    A     Again, the yellow tape is different and also the

7    number on the back, it's teared on the back, but otherwise it's

8    in the same condition.

9    Q     That's how you received it from Detective Pinard?

10   A     Yes.

11         MS. PARK:  Your Honor, I offer the evidence

12   subject to connection.

13         MR. HERLICH:  Subject to connection, no objection.

14         THE COURT:  People's 20 is accepted into evidence

15   subject to connection.

16         (Received and marked as People's Exhibit Number 20

17   in evidence.)

18         MS. PARK:  I have no further questions.

19         THE COURT:  Your witness.

20         MR. HERLICH:  Okay.

21   CROSS-EXAMINATION

22   BY MR. HERLICH:

23   Q     Good morning, detective.

24   A     Good morning, sir.

25   Q     So, you first met the complaining witness, Cypress

Det. S. Barbato - Defense - Cross

1    Smith, at St. Luke's Roosevelt Hospital, correct?

2        A    Yes.

3        Q    And this was after she had been examined by doctors or

4    while she was awaiting the SAFE forensic examination, if you

5    know, if you recall?

6        A    She was in the SAFE room and she had already met with

7    the SAFE social worker.

8        Q    And without commenting on what she said, you had an

9    opportunity at that time to interview her about the event of

10   that day, earlier that day, at Ninety-Two St. Nicholas Avenue

11   in her apartment, correct?

12       A    Yes.

13       Q    And would it be fair to say that at that time and

14   place she did not inform you regarding contact between Mr.

15   Harrell's penis and her vaginal area, and you're welcomed to

16   review complaint follow-up number three.  If you need to

17   refresh your recollection, I can show it to you.

18           I'm marking it as Defense Exhibit, I believe D, for

19   purposes of identification only.

20               A COURT OFFICER:  (Handing.)

21               THE COURT:  Mr. Herlich, ready?

22               MR. HERLICH:  Oh.

23       Q    You may answer the question:  Is it fair to say that

24   she did not inform you at the time of that interview regarding

25   any contact between Mr. Harrell's penis and her vaginal area?

Joanne Fleming

A594

```
1        A     Yes.

2        Q     Okay.

3              And did you have an opportunity to speak to the

4    defendant -- I'm sorry -- the complainant's mother, Laketa

5    Smith, at St. Luke's Hospital?

6        A     Yes.

7        Q     And did you communicate to Ms. Smith, the mother,

8    Laketa Smith, that either that there was no evidence or there

9    was no physical evidence yet in the case and you would be

10   awaiting the results of the SAFE examination and swabbing?

11              MS. PARK:  Objection.

12              THE COURT:  Sustained.

13              MR. HERLICH:  May we approach, your Honor?

14              THE COURT:  Sure.

15              (Whereupon, the following proceedings took place

16       on the record and outside the presence of the jury:)

17              MR. HERLICH:  Judge, the only reason for the

18       question is because the hospital -- and the doctor didn't

19       testify -- the medical record fails to indicate anything

20       about a scratch to the back of the complainant's neck and

21       there was no photograph taken other than the one taken by

22       the mother the following day.  I want to, just for -- it's

23       not for the truth of the matter asserted but the mother's

24       state of mind.  If the mother was told by this detective

25       that there was no evidence or physical evidence yet because
```

1    there was no results from the swabbing --

2              THE COURT:  What is your objection?

3              MS. PARK:  Number one, the mother's state of mind

4    is completely irrelevant.  Whether the detective at that

5    point believed that there was enough evidence or not is not

6    relevant.

7              THE COURT:  I agree.  It's also hearsay.

8              Now, if you wanted to elicit the mother's state of

9    mind, you should have asked the mother, but you didn't.  So

10   for all those reasons, I would overrule the objection.

11             MR. HERLICH:  The follow-up the next day -- the

12   medical follow-up the next day, the mother said to the

13   medical provider that she was told that the police had no

14   evidence and she is awaiting the results of further tests.

15   That's the good-faith basis for even asking the question.

16             THE COURT:  Okay, I accept that.  Thank you.

17             (Whereupon, the following proceedings took place

18   on the record and in the presence of the jury:)

19             THE COURT:  The objection is sustained.

20   Q    If you know, detective, do you know, did you or any

21   fellow officers, if you know, communicate with Mr. Harrell to

22   arrange for him to surrender to one of the precincts in the

23   area?

24   A    I don't recall.

25   Q    You don't know the details?

Joanne Fleming

1         A     No, I don't know the details.

2                     MR. HERLICH:  Okay.

3                     Nothing further.

4                     THE COURT:  People?

5    REDIRECT EXAMINATION

6    BY MS. PARK:

7         Q     Detective, when you were speaking with Cypress at the

8    hospital, was she giving you a narrative of what happened?

9         A     Yes.

10        Q     And Mr. Herlich just asked you whether you had

11   communicated with another detective about the defendant turning

12   himself in.

13                    Do you recall that?

14        A     Yes.

15        Q     Were you in communications with the warrant squad?

16        A     Yes.

17        Q     Is that how the defendant came to be arrested?

18        A     Yes.

19                    MS. PARK:  I have nothing further.

20                    THE COURT:  Anything else?

21                    MR. HERLICH:  No.

22                    THE COURT:  Thank you, detective.  You can step

23        down.

24                    (Whereupon, the witness exited the courtroom.)

25                    THE COURT:  People, your next witness.

Joanne Fleming

```
 1                  MS. PARK:  The People call Officer Danny Lora.
 2                  (Whereupon, the witness exited the courtroom.)
 3                  A COURT OFFICER:  Witness entering.
 4                  (Whereupon, the witness entered the courtroom.)
 5                  A COURT OFFICER:  Raise your right hand, remain
 6        standing and face the clerk.
 7    D A N N Y    L O R A, called as a witness, by and on behalf of
 8        the People at the Trial, having been duly sworn or
 9        affirmed, testified as follows:
10                  THE CLERK:  Thank you.
11                  A COURT OFFICER:  Please be seated.
12                  In a loud, clear voice, please state your name,
13        spelling your last name.
14                  THE WITNESS:  First name Danny, last name Lora,
15        L-O-R-A.
16                  A COURT OFFICER:  Shield and command.
17                  THE WITNESS:  Twenty-Eighth Precinct; shield
18        number 27990.
19                  A COURT OFFICER:  Thank you.
20                  THE COURT:  Good morning.
21                  THE WITNESS:  Good morning.
22                  THE COURT:  You may inquire.
23    DIRECT EXAMINATION
24    BY MS. PARK:
25        Q    Officer Lora, how long have you been with the New York
```

Joanne Fleming

PO D. Lora - People - Direct

1  City Police Department?

2      A    Over a little -- over four years, four and a half.

3      Q    How long have you been with your current command, the

4  Twenty-Eighth?

5      A    Three years.

6      Q    Were you in any other commands?

7      A    Yes, I was.

8      Q    Which other one?

9      A    The Four-Six and the Four-Eight.

10     Q    And where are they?

11     A    Four-Six and the Four-Eight, in the Bronx.

12     Q    I'm going to direct your attention to July 16th of

13  2014.

14          Were you working on that day?

15     A    Yes, I was.

16     Q    What was your shift?

17     A    7:05 a.m. till 3:40 p.m.

18     Q    And what was your assignment that day?

19     A    Patrol -- patrol the precinct, sector.

20     Q    Did you have a partner with you?

21     A    Yes, I did.

22     Q    Who was your partner?

23     A    Officer Castillo.

24     Q    Were you in uniform or plain clothes?

25     A    Uniform.

Joanne Fleming

PO D. Lora - People - Direct

```
 1      Q    Were you in a car or were you on foot?

 2      A    I was in a car, NYPD car.

 3      Q    Marked car?

 4      A    Marked car.

 5      Q    And directing your attention to approximately 2:27

 6  p.m., did you hear a radio transmission?

 7      A    Yes, I did.

 8      Q    And after hearing that transmission, did you go

 9  somewhere?

10      A    Yes, I did.

11      Q    Where did you go?

12      A    Ninety -- can I recall on the -- I -- it's on my memo

13  book.

14      Q    Would looking at your memo book help you refresh your

15  recollection?

16      A    Yes, it does.

17      Q    So, just look at it and put it down if that helps,

18  with the Court's permission?

19           THE COURT:  Yes.

20      A    Ninety-Two St. Nicholas Avenue.

21      Q    What apartment did you go to?

22      A    Two G.

23      Q    What happened when you got to apartment 2G?

24      A    Victim, Cypress Smith, opened the door and she was

25  crying, nervous, shaking.
```

```
 1      Q    Did you go inside the apartment?
 2      A    Yes, I did.
 3      Q    And did you speak with her about what happened?
 4      A    Yes, I did.
 5      Q    And while you were speaking with her, what was her
 6   demeanor?
 7      A    At first it was harder to understand because she
 8   couldn't really get the words out of her mouth, she was
 9   shaking.
10      Q    She was shaking?
11      A    She was scared.
12      Q    Was there anyone else inside the apartment?
13      A    No.  No, there wasn't.
14      Q    Was she alone?
15      A    Yes.
16      Q    And after you spoke with her, did you call -- what did
17   you do next?
18      A    We called the patrol supervisor, my sergeant.  We also
19   called female officers to make her feel more comfortable.
20      Q    Did any female officers show up?
21      A    Yes.
22      Q    Do you recall who they were?
23      A    Officer Mateo from the Twenty-Eighth Precinct.
24      Q    And do you know who else showed up or if anyone else
25   did, do you remember?
```

```
1      A      More officers showed up.  I don't recall who else.

2      Q      And after the female officer showed up, what happened?

3   What did you do?

4      A      We can -- my partner and I, Castillo, we canvassed the

5   neighborhood looking.

6      Q      What do you mean "canvassed?"

7      A      Canvass, we got on the police car, we drove around to

8   see if we saw the defendant around.

9      Q      You mean --

10            Do you mean the suspect?

11     A      The suspect, sorry.

12     Q      And did you return to the apartment?

13     A      Yes, I did.

14     Q      And at some point did --

15            You mentioned Cypress Smith.  Did she show you any

16  items?

17     A      Yes.

18     Q      And what did she show you?

19     A      Coffee cup and a glass, a Smoothie glass with a straw.

20     Q      Where were those items?

21     A      The coffee cup was in the garbage and the Smoothie

22  glass was on the counter.

23     Q      And what did you do after she showed you those items?

24     A      Secure the scene basically.

25     Q      What does that mean, to secure the scene?
```

| | | |
|---|---|---|
| 1 | A | No one is allowed to touch it or go near it. |
| 2 | Q | And at some point did you leave the apartment? |
| 3 | A | Yes, I did. |
| 4 | Q | Were you relieved by any other officer? |
| 5 | A | Yes, I was. |
| 6 | Q | Who was that? |
| 7 | A | Officer Fields. |
| 8 | Q | I'm going to show you People's 15, 16 and 17. |
| 9 | | A COURT OFFICER:   (Handing.) |
| 10 | Q | I'm just going to ask you to look at People's 15 and |
| 11 | | 16.  Look inside, they're already opened. |
| 12 | A | Fifteen and sixteen. |
| 13 | Q | It's at the bottom.  Look inside the bag. |
| 14 | A | Oh, I can open it? |
| 15 | Q | It's already opened. |
| 16 | A | Oh, okay. |
| 17 | | Okay. |
| 18 | Q | Do you recognize fifteen? |
| 19 | A | Yes. |
| 20 | Q | And what is that? |
| 21 | A | That is a coffee cup. |
| 22 | Q | And is that the coffee cup that was in the garbage |
| 23 | | can? |
| 24 | A | Yes. |
| 25 | Q | And People's 16?  Do you recognize People's 16? |

Joanne Fleming

A603

PO D. Lora - People - Direct

```
 1    A    That's the straw.

 2    Q    And where was that?

 3    A    Inside of the Smoothie glass.

 4    Q    And where was that?

 5    A    On top of the counter.

 6    Q    And was the glass, when you saw it, what condition was

 7  it in?

 8    A    What condition?  It was --

 9    Q    Was it intact or was it broken?

10    A    It wasn't broken.  It was intact.

11    Q    I'm going to show you People's 5 which is already in

12  evidence.  I'm just going to ask you to look at the screen

13  that's next to you.

14         This is People's 5.  Do you recognize People's 5?

15    A    Yes.

16    Q    And what do you recognize this to be?

17    A    The kitchen.

18    Q    And do you recall where that -- where any of the items

19  that you talked about was?

20    A    Yes.

21    Q    Where was it?

22    A    This glass with the Smoothie --

23         THE COURT:  You can step over if you need to.

24         (Witness complies.)

25    A    -- in this area.
```

Joanne Fleming

PO D. Lora - Defense - Cross

1      Q     Pointing to the top of the counter?

2      A     On top of the counter.

3            And garbage can, you can't see it.

4      Q     Okay.

5            I'm going to show you People's 3, or actually,

6      People's 4.

7            Can you tell us where the coffee cup was?

8      A     It was inside the garbage can.

9                  MS. PARK:  You can have a seat, officer.

10                 (Witness complies.)

11     Q     Going back to when you were still inside the

12     apartment, at some point did you go to another apartment?

13     A     Yes, I did.

14     Q     Which apartment did you go to?

15     A     Apartment 2H.

16     Q     And was --

17           Did you make any arrests that day?

18     A     No.

19                 MS. PARK:  I have no further questions.

20                 THE COURT:  Your witness.

21     CROSS-EXAMINATION

22     BY MR. HERLICH:

23     Q     Officer Lora, approximately what time did you go to

24     apartment 2H, if you recall?

25     A     Approximately if -- if I recall -- I don't recall.  It

Joanne Fleming

A605

PO D. Lora - Defense - Cross

```
1   was within -- I can't really say a time.  Within the half hour,
2   maybe within that time range.  I can't really say.  I know it's
3   not two hours later.
4      Q    And did you knock on the door?
5      A    Yes, with other officers.
6      Q    Who were you with at that time?
7      A    My partner, Officer Castillo, and other officers.
8      Q    And was anyone home?
9      A    Yes.
10     Q    Who was home?
11     A    I believe it's the gentleman's son.
12     Q    And what did you do next?  Did you enter the
13  apartment?
14     A    I did not enter the apartment.
15     Q    Did Officer Castillo?
16     A    My partner didn't enter the apartment.
17     Q    Did you see any police officers enter the apartment?
18     A    Yes.
19     Q    And what did you observe?  What did they do, if you
20  know?
21     A    Well, they entered the apartment, they were looking
22  for the suspect.  The suspect wasn't in the apartment.
23            MR. HERLICH:  Nothing further.
24            MS. PARK:  No further questions.
25            THE COURT:  Thank you, officer.  You can step
```

Joanne Fleming

1        down.

2                        (Whereupon, the witness exited the courtroom.)

3                        THE COURT:  Next witness, People.

4                        MS. PARK:  The People call Police Officer Bradley

5        Field.

6                        A COURT OFFICER:  Witness entering.

7                        (Whereupon, the witness entered the courtroom.)

8                        A COURT OFFICER:  Remain standing, raise your

9        right hand and face the clerk.

10   B R A D L E Y    F I E L D, called as a witness, by and on

11       behalf of the People at the Trial, having been duly sworn

12       or affirmed, testified as follows:

13                        THE CLERK:  Have a seat.

14                        A COURT OFFICER:  Please be seated.

15                        In a loud, clear voice, please state your name,

16       spell your last name, give your shield and command.

17                        THE WITNESS:  Officer Bradley Field; shield number

18       30276; Two-Eight Precinct.

19                        A COURT OFFICER:  Spell your last name, please.

20                        THE WITNESS:  F-I-E-L-D.

21                        THE COURT:  Good morning.

22                        You may inquire.

23   DIRECT EXAMINATION

24   BY MS. PARK:

25       Q    Officer Field, how long have you been with the New

Joanne Fleming

A607

PO B. Field - People - Direct

1   York City Police Department?

2       A    Approximately thirteen and a half years.

3       Q    How long have you been with the Twenty-Eighth

4   Precinct?

5       A    Approximately ten and a half years.

6       Q    Can you tell us some of the other commands that you've

7   been assigned to?

8       A    Yeah.  I was in task force in the Two-Five Precinct.

9       Q    What is a task force?

10      A    Task force is, they like to have separate cops,

11  probably.  They have, like, extra cops, for a case -- in case

12  they need extra cops or something.

13      Q    Are you acting as a backup to other precincts?

14      A    Like -- yeah, like a backup.  Yeah, like a backup.

15      Q    I'm going to direct your attention to July 16th of

16  2014.

17           Were you working on that date?

18      A    Yes, I was.

19      Q    What was your shift that day?

20      A    Fifteen hundred by twenty-three-thirty-five.

21      Q    That's military time, right?

22      A    Yes, yes.

23      Q    Can you tell us in layman's terms?

24      A    It's 3:00 p.m. to eleven-thirty-five.

25      Q    What was your assignment that day?

Joanne Fleming

PO B. Field - People - Direct

```
 1      A    I was first assigned to patrol.  Then they moved me to
 2  TS.
 3      Q    What's TS?
 4      A    The telephone -- the -- answering the phones at the
 5  precinct.
 6      Q    And were you in uniform that day?
 7      A    Yes, I was.
 8      Q    I'm going to direct your attention to about 5:20 p.m.
 9  on July 16th of 2014.
10           Did you go to Ninety-Two St. Nicholas Avenue?
11      A    Yes, I did.
12      Q    What apartment did you go to?
13      A    Two G.
14      Q    What brought you to that location?
15      A    I was sent by the precinct.
16      Q    For what purpose?
17      A    To go to a crime scene.
18      Q    And you did in fact do that?
19      A    Yes, I did.
20      Q    And when you got there, what did you do?
21      A    I collected evidence -- I got evidence from a
22  Detective Barbato.
23      Q    And do you recall what precinct she was assigned to at
24  that time?
25      A    I'm not sure.  I think maybe, like, Special Victims.
```

Joanne Fleming

A609

PO B. Field - People - Direct

```
1      Q    Were you present when the detective collected the
2  evidence?
3      A    Yes, yes.
4      Q    And what did she collect -- I'm sorry.
5           You said you were present, correct?
6      A    Yes.
7      Q    Did you observe that?
8      A    I don't know if I, like, watched her pick it up, but I
9  know they handed me the bags to voucher.
10     Q    So Detective Barbato handed you the bags?
11     A    Yes.
12     Q    And what did she hand you?
13     A    It was a straw, cup, glass -- I mean glass and -- can
14 I look at my memo book?
15     Q    If that would help you refresh your recollection.
16     A    Yes, it would.
17          MS. PARK:  With the Court's permission?
18          THE COURT:  Yes.
19     A    Purple straw, a glass from the kitchen counter and a
20 coffee cup from the kitchen garbage can.
21     Q    I'm going to show you People's 15, 16 and 17.  They've
22 already been opened at the bottom.  So I'm just going to ask
23 you to look inside.
24          A COURT OFFICER:  (Handing.)
25     Q    Let's start with People's 15.
```

Joanne Fleming

A610

PO B. Field - People - Direct

```
 1              Do you recognize People's 15?

 2     A    Yes, I did.

 3     Q    What is that?

 4     A    It's -- it's one of the vouchers I did.

 5     Q    Do you want to look inside?

 6     A    It's the coffee cup.

 7     Q    And is that the coffee cup that you received from

 8  Detective Barbato?

 9     A    Yes.

10     Q    And how did she hand that to you?

11     A    In a bag.

12     Q    In that bag?

13     A    Yes.

14     Q    And how do you know that that is the bag that she

15  handed to you?

16     A    I signed it and she -- and I wrote her -- yeah, I

17  signed it -- not signed it but put my name down, the voucher

18  number and put my name -- her name on it.

19     Q    Do you recognize your handwriting?

20     A    Yes, I do.

21     Q    And what did you do with People's 15?

22     A    I vouchered it.  Then we -- me and Officer Hager took

23  it to the lab later on that evening.

24     Q    And how did you voucher it?

25     A    I put it in -- in this bag, we taped it and we do the
```

Joanne Fleming