1    paperwork.

2        Q    That tape, I see white and blue tape on top of that

3    bag --

4        A    Yes.

5        Q    Let me finish the question.

6             Did you put that tape?

7        A    Yes, I did.

8        Q    How do you know that?

9        A    I signed the back of it.

10       Q    Is that in the same condition today as it was when you

11   vouchered them?

12       A    No, it's not.  It's ripped on the bottom.

13            MS. PARK:  May I have that, please?

14            THE WITNESS:  Sure.

15            A COURT OFFICER:  (Handing.)

16       Q    Other than this being ripped, is everything else in

17   the same condition?

18       A    Yes.

19       Q    Now, what about this tape down here, did you do that?

20       A    Let me see.

21       Q    The clear --

22            The red and clear tape, do you see that?

23       A    I don't believe -- I don't remember who did that.

24       Q    So you did not do that?

25       A    No.

Joanne Fleming

A612

1       Q     Other than this and this bag being ripped, is it in

2   the same condition?

3       A     Yeah, yeah.  Yes.

4             A COURT OFFICER:  (Handing.)

5       Q     And let's move onto People's 16.

6             Do you recognize People's 16?

7       A     Yes, I recognize it.

8       Q     And what is that?

9       A     It's -- it's the straw that I vouchered.

10      Q     How did Detective Barbato give that to you?

11      A     She gave me the vouchers -- the bags.

12      Q     You are referring to the envelope, the bag?

13      A     Yeah, the bags, yeah.

14      Q     And what did you do with that?

15      A     I vouchered it.

16      Q     What do you mean "vouchered it?"

17      A     I did the paperwork and sealed it and signed it and

18  sent it to the lab.

19      Q     And what did you use to seal it?

20      A     The tape.

21      Q     What color is the tape?

22      A     White.

23      Q     And did you also sign across the tape?

24      A     Yes, I signed across the tape.

25      Q     And is that how you recognized that that's the one?

1    A    Yes, yes.

2    Q    Is that in the same condition today as it was from the

3    last time -- let me finish the question -- is that in the same

4    condition today as it was from the last time that you saw it?

5    A    No, it wasn't.

6    Q    What's different?

7    A    The tape and the rip in the bag.

8    Q    What tape?

9    A    There is a -- there's evidence tape here on the

10   bottom.  It's got a -- it's got someone else's -- signed it.

11        MS. PARK:  May I have that back, please?

12   A    I don't know who did that.

13        A COURT OFFICER:  (Handing.)

14   Q    So, are you referring to the clear --

15   A    Yes.

16   Q    -- with red -- let -- officer, if I can just finish

17   the question.

18        You're referring to the clear tape with red writing?

19   A    Yes.

20   Q    So that does not belong to you?

21   A    That does not belong to me.

22   Q    Other than that tape and the bag being ripped here, is

23   it in the same condition?

24   A    No -- yeah, yeah.

25   Q    Yes?

Joanne Fleming

A614

| | | |
|---|---|---|
| 1 | A | It's the same condition. |
| 2 | Q | And, finally, I want you to look inside that box. |
| 3 | | That's People's 17. |
| 4 | A | Yes, it's the glass I vouchered. |
| 5 | Q | How do you know that that's the glass you vouchered? |
| 6 | | You can open it, officer. |
| 7 | A | (Witness complies.) |
| 8 | Q | I can help you, it's already -- |
| 9 | A | (Witness complies.) |
| 10 | | Yeah. |
| 11 | Q | So, do you recognize the bag? |
| 12 | A | Yes, I do. |
| 13 | Q | Okay. |
| 14 | | And what do you recognize it to be? |
| 15 | A | It's the glass from the -- it's the glass. |
| 16 | Q | And is there an evidence tape there -- |
| 17 | A | Yes, there is. |
| 18 | Q | -- that you placed? |
| 19 | A | Yes. |
| 20 | Q | Which one is that? |
| 21 | A | The white tape. |
| 22 | Q | Okay. |
| 23 | | And did you sign across -- |
| 24 | A | Signed across it, yes. |
| 25 | Q | Officer, if I can just finish my questions? |

Joanne Fleming

A615

PO B. Field - People - Direct

1    A    Yes.

2    Q    And did you put any writings on it?

3    A    Yes.  The writing -- I put down the voucher number,

4    the complaint number, my name -- no, no, I didn't put my name.

5    Q    Well, do you recognize your handwriting?

6    A    Yes, it's me.

7    Q    Do you recognize your handwriting, officer?

8    A    Yes, I do.

9    Q    And is that in the same condition today as it was from

10   when you vouchered it?

11   A    No, it's -- it looks like it's been taped.

12   Q    And can you feel the bag, officer?

13   A    Yes.

14   Q    And what does it feel like?

15   A    It feels like broken glass.

16   Q    When you received it, what condition was that glass

17   in?

18   A    I don't recall.

19   Q    Was it broken?

20   A    I don't remember.

21   Q    Was it broken?

22   A    I don't -- I don't remember.  I don't think -- I don't

23   remember vouchering a broken glass, so...

24   Q    And other than that red tape, is that bag in the same

25   condition today?

Joanne Fleming

A616

1     A     Yes.

2                 MS. PARK:   I'll take the evidence back.

3                 A COURT OFFICER:   (Handing.)

4     Q     Officer Field, did you receive any item from Officer

5     Hager that day?

6     A     Yes, I did.

7     Q     What did you receive?

8     A     Okay, sexual evidence kit.

9     Q     And where were you when you received that from Officer

10    Hager?

11    A     I was at the precinct.

12    Q     Twenty-Eighth Precinct?

13    A     Yes.

14    Q     Do you recall about what time you received that?

15    A     I think it was around nine o'clock, 9:00 p.m.

16    Q     What did you do with the kit?

17    A     I vouchered it, did the paperwork and --

18    Q     I'm going to show you People's 20 -- I'm sorry,

19    People's 19 -- premarked for identification only.

20                A COURT OFFICER:   (Handing.)

21    Q     Do you recognize People's 19?

22    A     Yes, I do.

23    Q     And what do you recognize it to be?

24    A     It's the sexual evidence kit.

25    Q     Is that the sexual evidence kit that you received from

Joanne Fleming

PO B. Field - People - Direct

```
 1   Officer Hager?

 2      A    Yes -- yes, I did.

 3      Q    How do you know that?

 4      A    Because it's signed by the Officer Hager.

 5      Q    And do you recognize the writing?

 6      A    I think it's Officer Hager's.  It's not mine.

 7      Q    But did you voucher it?

 8      A    I did the paperwork, and he was -- like, he collected

 9   it.  We both brought it down to the lab together.

10      Q    But you filled out the paperwork?

11      A    Yes.

12      Q    Was a voucher number assigned to that?

13      A    Yes, there was.

14      Q    What was the voucher number assigned?

15      A    I'm not -- I don't recall.  I don't have it.

16      Q    Do you have any paperwork that would help you refresh

17   your recollection?

18      A    There is a -- the voucher paperwork.  Do you have a

19   copy of that?

20      Q    Yes.

21           A COURT OFFICER:  (Handing.)

22      Q    What was the voucher number assigned, officer?

23      A    It's 1000524859.

24      Q    And when you received -- withdrawn.

25           MS. PARK:  Judge, I'll offer it subject to
```

Joanne Fleming

1     connection later on.

2                    THE COURT:  Number nineteen?

3                    MS. PARK:  Number nineteen.

4                    MR. HERLICH:  Yes, no objection subject to

5     connection.

6                    THE COURT:  Okay, People's 19 is accepted into

7     evidence subject to connection.

8                    (Received and marked as People's Exhibit Number 19

9     in evidence.)

10                    MS. PARK:  May I see the kit, please?

11                    A COURT OFFICER:  (Handing.)

12    Q     And, officer, from the time that you received that kit

13    from Officer Hager until the time you vouchered it, you said

14    you took it to the lab?

15    A     Yes.

16    Q     Did it ever leave your possession?

17    A     No, no.

18                    MS. PARK:  I have no further questions.

19                    THE COURT:  Okay, Mr. Herlich.

20    CROSS-EXAMINATION

21    BY MR. HERLICH:

22    Q     So when you say you vouchered something, officer, you

23    mean you prepared a property clerk invoice?

24    A     Yes, property clerk invoice, yes.

25    Q     And with regard to the three items that you mentioned:

Joanne Fleming

1   The glass, the straw and the coffee cup, those were given to

2   you by Detective Barbato at Ninety-Two St. Nicholas Avenue,

3   apartment 2G, is that correct?

4       A    Yes.

5       Q    And at the time that you arrived at the apartment, I

6   believe it was your testimony that Detective Barbato had

7   already put these three items in three respective evidence

8   bags, correct?  Is that correct?

9       A    I think --

10      Q    Is that correct?

11      A    Not before I went there.  I think she came there a

12  little later.

13      Q    So you arrived first at Ninety-Two St. Nicholas?

14      A    Before --

15      Q    Detective, but you weren't the individual who actually

16  put on gloves and put the --

17      A    I think she was there before me.  Then she came back,

18  something like that.

19      Q    Okay.

20           At what point in time were the three items actually

21  put into the three paper bags that are in court today?

22      A    What time?

23      Q    Was it when Detective Barbato returned after your

24  arrival?

25      A    Yes, Detective Barbato put it in the bag and then we

1   -- and then gave it to me to voucher.

2       Q    In other words, you saw the three items prior to them

3   being placed in those three bags, is that fair to say?

4       A    I think, yes.  I looked into the trash can, I saw it,

5   yes, I did.

6       Q    So when you arrived, the coffee cup was still sitting

7   in the trash can?

8       A    Yes.

9       Q    And where was the glass and the straw?

10      A    I think they were on a counter.  I got it in my memo

11  book.  Can I look at my memo book?

12      Q    Please, whatever refreshes your recollection.

13      A    Yes.

14           The purple straw and glass were on a kitchen counter

15  and the coffee cup was in the kitchen garbage can.

16      Q    Okay.

17           Just so I'm clear, you were present when Detective

18  Barbato put each of the three items in the three separate bags?

19      A    Yes.

20      Q    And that took place at Ninety-Two St. Nicholas Avenue?

21      A    Ninety-Two St. Nicholas.

22      Q    Then you transported the bags back to the precinct?

23      A    Back to the precinct, did the vouchers and then

24  transported the --

25      Q    One second, okay?

Joanne Fleming

A621

```
 1              It was at nine o'clock that officer -- is it Officer

 2   Hager?

 3       A    Hager.

 4       Q    He came to the precinct and handed you what you

 5   described as the sexual forensic evidence kit?

 6       A    Yes.

 7       Q    And you indicated you prepared a separate invoice for

 8   that, correct?

 9       A    Yes.

10       Q    And the invoice --

11            You prepared one single invoice for the three items

12   recovered from Ninety-Two St. Nicholas Avenue, correct?  You

13   didn't prepare three separate vouchers; it's one invoice for

14   the three items, correct?

15       A    No, I think there was separate -- two separate

16   invoices, I believe.

17            MR. HERLICH:  I'd like to show the officer what

18       could be marked as Defense Exhibit, I believe D for

19       identification purposes.

20            THE COURT:  You're up to E.

21            MR. HERLICH:  For purposes of identification only.

22            THE COURT:  E for identification.

23            A COURT OFFICER:  (Handing.)

24       Q    Officer, please take a look at that and see if it

25   refreshes your recollection.
```

Joanne Fleming

A622

PO B. Field - Defense - Cross

```
 1        A    Yes.
 2        Q    Were the three items that were recovered from
 3   Ninety-Two --
 4        A    Ninety-Two St. Nicholas.  It says from the --
 5        Q    There was one invoice for these three items?
 6        A    Yes, and they --
 7        Q    That's all.
 8        A    And the second --
 9        Q    That's all.
10             Then a separate invoice for the sex forensic evidence
11   kit?
12        A    Yes.
13        Q    And did you also prepare requests for laboratory
14   examinations regarding --
15        A    Yes.
16        Q    -- all four of these items?
17        A    Yes, we did.
18        Q    And when you say you went to the lab, what lab did you
19   take these items to?
20        A    It's in Queens, the police lab.
21        Q    The New York City Police Department Lab?
22        A    Yes.
23             MR. HERLICH:  No further questions, your Honor.
24             MS. PARK:  Nothing further.
25             THE COURT:  Thank you, officer.  Please step down.
```

Joanne Fleming

1                (Whereupon, the witness exited the courtroom.)

2                THE COURT:  Next witness, People.

3                MS. PARK:  The People call Detective Randolff

4    Pinard.

5                (Whereupon, the witness exited the courtroom.)

6                A COURT OFFICER:  Witness entering.

7                (Whereupon, the witness entered the courtroom.)

8                A COURT OFFICER:  Remain standing, raise your

9    right hand and face the clerk.

10   R A N D O L F F    P I N A R D, called as a witness, by and on

11     behalf of the People at the Trial, having been duly sworn

12     or affirmed, testified as follows:

13             THE CLERK:  Have a seat.

14             A COURT OFFICER:  Have a seat.

15             In a loud, clear voice, please state your name,

16    spelling your last name, your shield and current command.

17             THE WITNESS:  Detective Randolff Pinard,

18    P-I-N-A-R-D; shield 5765; Manhattan Special Victims Squad.

19             A COURT OFFICER:  Thank you.

20             THE COURT:  Good afternoon, detective.

21             THE WITNESS:  Good afternoon.

22             THE COURT:  You may inquire.

23  DIRECT EXAMINATION

24  BY MS. PARK:

25    Q    Detective, how long have you been with the New York

Det. R. Pinard - People - Direct

1   City Police Department?

2      A      Thirteen years.

3      Q      How long have you been with the Manhattan Special

4   Victims Squad?

5      A      Four years.

6      Q      And can you just go through with us some of the other

7   commands that you've been assigned?

8      A      Well, when I first came out of the academy in 2003, I

9   went to the One-O-Five Precinct.

10     Q      I'm sorry, you went to where?

11     A      When I first came out of the academy, I went to the

12  One-O-Five Precinct in 2003.  I did three years patrol, six

13  years in domestic violence.

14            And in 2010, 2011, I was assigned to the detective

15  bureau Manhattan Special Victims.  And I became a detective in

16  December 2012.

17     Q      And what kind of cases do you currently handle?

18     A      Sex crime.

19     Q      Detective, I'm going to direct your attention to

20  December 15th of 2014.

21            Were you assigned to the Manhattan Special Victims?

22     A      Yes, I was.

23     Q      And were you working on that day?

24     A      Yes, I was working on that day.

25     Q      And at approximately 12:50 p.m. were you in this

Joanne Fleming

1    courthouse?

2        A    Yes, I was.

3        Q    For what purpose?

4        A    I was here to collect court-order sample, DNA swab,

5    from the defendant.

6        Q    Okay.

7             Well, from whom did you obtain the DNA swab?

8        A    From --

9        Q    Well, do you recall the person's name?

10       A    Yes, Lonnie Harrell, if I recall correct.

11       Q    Do you see Lonnie Harrell in the courtroom today?

12       A    Yes, he's --

13       Q    Can you please point to him and describe an article of

14   clothing that he's wearing?

15       A    He's sitting to my right with a gray beard and black

16   sweater, black sweatpants.

17            THE COURT:   Indicating Mr. Harrell.

18       Q    So you mentioned that you obtained a DNA sample.  How

19   did you do that?

20       A    I met him on the twelfth floor bridge --

21       Q    Detective, just tell us --

22       A    The process?

23       Q    The process.

24       A    It is Q-tips.  I wear gloves.  The Q-tips was inserted

25   in his mouth for thirty seconds, removed, put it into the

Joanne Fleming

A626

1    plastic tubing, closed it, sealed it and kept it as safekeeping

2    before it was invoiced.

3        Q    Did you seal it after you did that?

4        A    Yes.

5        Q    I'm going to show you what's been previously marked

6    for identification as People's Exhibit 20.

7             A COURT OFFICER:   (Handing.)

8        Q    You can look inside too, detective.

9        A    (Witness complies.)

10       Q    Do you recognize People's 20?

11       A    Yes.

12       Q    What do you recognize it to be?

13       A    I recognize it to be security paper envelope that

14   contained the buccal swab.

15       Q    What is a buccal swab?

16       A    The buccal swab is the Q-tips.

17       Q    And is that the buccal swab that you obtained from the

18   defendant?

19       A    Yes.

20       Q    How do you know that?

21       A    I recognize it from -- can I open it or --

22       Q    Yes, that would help.

23            MS. PARK:   Is there scissors?

24            A COURT OFFICER:   (Handing.)

25       A    Yes, I recognize it.

Det. R. Pinard - People - Direct

1    Q   How do you recognize it?

2    A   By -- by the -- there is a serial number on it that

3  matches one of the envelope that contained the swab.

4    Q   Are there writings in front of the envelope?

5    A   Yeah, there is a writing on this envelope which is my

6  handwriting.

7    Q   Okay.

8        Did you also sign it, the front of the envelope?

9    A   This envelope, no, it wasn't signed.  And that one,

10  that's not my signature.  That's Detective Barbato's

11  handwriting.

12    Q   But you also --

13        There are your writings on that as well?

14    A   Yes, my handwriting is on this envelope.

15    Q   And you recognize your handwriting?

16    A   Yes, I recognize.

17    Q   And after you collected it from the defendant, did you

18  do anything to seal that inside envelope?

19    A   Yes, it was sealed with red evidence tape.

20    Q   Okay.  If you can just --

21        The red evidence tape is yours?

22    A   Yes.

23    Q   Is that in the same condition today as it was from the

24  time that you sealed it?

25    A   Yes, same condition.

Det. R. Pinard - Defense - Cross

1    Q    Now, what about the yellow evidence tape, did you do

2    that?

3    A    No, that's not me.

4    Q    So that's different, correct?

5    A    Yes, it's different.

6    Q    Other than that yellow evidence tape, is that in the

7    same condition --

8    A    Same condition, yes.

9    Q    And, detective, did that buccal swab, People's, I

10   believe it was People's 20, did that remain in your custody

11   until you turned it over to Detective Barbato?

12   A    Yes.

13              MR. HERLICH:  Objection.

14              THE COURT:  Overruled.

15              MS. PARK:  I have no further questions.

16              THE COURT:  Your witness, Mr. Herlich.

17              MR. HERLICH:  Just one moment, your Honor.

18   CROSS-EXAMINATION

19   BY MR. HERLICH:

20   Q    Detective Pinard, good morning.

21   A    Good morning, sir.

22   Q    Did you prepare a property clerk invoice for the

23   buccal swab that you obtained from Mr. Harrell?

24   A    No, I did not.

25   Q    Okay.

Joanne Fleming

1          You merely obtained the sample and then brought it to

2    Detective Barbato?

3       A    Yes, it was.

4       Q    And where was that, at Special Victims Squad?

5       A    Yes, Special Victims.

6       Q    And, if you know, was that the responsibility of

7    Detective Barbato, to prepare a property clerk invoice?

8       A    Yes.

9       Q    So you didn't prepare any paperwork in connection with

10   your duty to obtain the buccal swab in this case, would that be

11   fair to say?

12      A    Yes.

13          MR. HERLICH:   Nothing further, your Honor.

14   REDIRECT EXAMINATION

15   BY MS. PARK:

16      Q    Detective, was it Detective Barbato's responsibility

17   to voucher that?

18      A    Because that's her case.

19      Q    And were you just assisting her?

20      A    I was just assisting her.

21          MS. PARK:   I have nothing further.

22          THE COURT:   Thank you.  You can step down,

23      detective.

24          THE WITNESS:   Thank you.

25          (Whereupon, the witness exited the courtroom.)


Joanne Fleming

Proceedings

```
1              THE COURT:  Jurors, we're going to take our
2      morning recess.  We will take about ten or fifteen minutes.
3              Please remember all of my instructions to you.
4              I will see you in a few minutes.  You can step
5      out.
6              A COURT OFFICER:  All rise.
7              (Whereupon, the jury exited the courtroom.)
8              (Whereupon, a recess was taken.)
9              (Whereupon, Senior Court Reporter Amalia Hudson
10     took over the proceedings.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Joanne Fleming

## PROCEEDINGS

1    THE COURT:  When I came back from the recess, I was

2    informed by one of the court officers that juror, I think she

3    is number eight, Ms. Zamm, has a 3:45 appointment she would

4    like to make, but she can change it.  How do you feel about

5    me inviting her in and getting a sense of how important it

6    is?

7         MS. PARK:  That's fine.

8         MR. HERLICH:  That's fine judge.

9         THE COURT:  Bring her in, please.

10    How late do you think we'll go this afternoon?

11         MS. PARK:  I have the doctor, and one officer will

12    be very short this afternoon.

13         THE COURT:  So you think we will be done by 3:45

14    anyway?

15         MS. PARK:  I think so.  I think so.

16         THE CLERK:  Juror entering.

17         THE COURT:  Good morning, Ms. Zamm, and thank you

18    for coming in.  I understand you have an appointment today at

19    3:45.

20         JUROR:  Yes.  Which I can change, but I just want

21    to tell the doctor yes or no.

22         THE COURT:  If it's not a hardship for you, I would

23    ask if you can change it if at all possible.  We might even

24    end by that time.  It's just a little hard to anticipate.  I

25    also noticed you're limping today.

Amalia Hudson, SCR

A632

PROCEEDINGS

1          JUROR:  Yes. I had a fall.

2          THE COURT:  Is it related to your appointment

3     today?

4          JUROR:  No.

5          THE COURT:  Are you able to continue to serve?

6          JUROR:  Yes.  I'm it's just leg.  Not my head.  So

7     yesterday we left early I could have made that appointment.

8     That could happen today, but --

9          THE COURT:  It could happen, but I don't want to

10    promise you, and then have you not make it.

11         JUROR:  Is it unlikely.

12         THE COURT:  Unlikely we'll end by 3:45?

13         JUROR:  That it could end at 3:15.

14         THE COURT:  I don't think we'll end at 3:15.

15         JUROR:  I didn't think so.  No problem.  Thank you.

16         THE COURT:  Thank you.

17              (Juror exits)

18         MR. HERLICH:  Judge, one thing.  My client just

19    told me for the first time that he wants to go to Friday

20    prayers.

21         THE COURT:  He just told you that for the first

22    time?

23         MR. HERLICH:  Yes.  Obviously when we began the

24    trial he said we would come on Fridays.

25         THE COURT:  Right. I already told this jury we are

Amalia Hudson, SCR

### PROCEEDINGS

1   meeting on Fridays, and I factored that into my schedule.  I

2   asked.  You recall I specifically asked is there any problem

3   with Fridays, and I was told there was no problem with

4   Fridays.  The best I can do is perhaps he can go to Friday

5   prayer in the morning since we're not going to have

6   proceeding in the morning, we're only going to have

7   proceedings in the afternoon, but I don't know if that can be

8   done.  If he can go the morning and then have him produced in

9   the afternoon, but I think at this point after I specifically

10  asked if there was a problem, and I was told there wasn't a

11  problem, and I told the jurors we'll be meeting on Friday

12  afternoons, I don't think I am pull a change on the jury at

13  this late stage.  The best I can do again is perhaps he can

14  attend prayer in the Tombs or something in the morning.

15            MR. HARRELL:  It's in the afternoon.

16            THE COURT:  Sorry.

17            MR. HARRELL:  I have to be there.

18            THE COURT:  But you recall that I asked, right?

19            MR. HARRELL:  Yes, I do.  I can't change my mind?

20  Think is my religious thing.

21            THE COURT:  I asked you.

22            MR. HARRELL:  I understood what --

23            THE COURT:  Let me finish, okay.  The reason I

24  asked you was so that we can plan and schedule accordingly.

25  You can't change your mind.  No.

PROCEEDINGS

1      MR. HARRELL:  Why can't I change my mind?

2      THE COURT:  Because look around you.  How many

3  people are working here?  How many jurors are there here?

4      MR. HARRELL:  It's because -- that's why I can't

5  change my mind because of the jury, you're saying?

6      THE COURT:  Yes.  It's will be an inconvenience to

7  the jury.

8      MR. HARRELL:  Well, I think I want to go to

9  service.

10     THE COURT:  Okay.  Well, if you go to service

11  tomorrow and don't come to court, I am telling you right now.

12  we are going to proceed in your absence.

13     MR. HARRELL:  You're threatening me now?  I don't

14  get it.  I am trying to figure out what you're doing.

15     THE COURT:  That's what we are going to do.

16     MR. HARRELL:  I want to go to service.  I have to

17  be there tomorrow.

18     THE COURT:  When did you decide you had to be there

19  tomorrow?  When did you change your mind.

20     MR. HARRELL:  I didn't change my mind.  I was told

21  I had to be there on Friday, this Friday.

22     THE COURT:  Who told you that?

23     MR. HARRELL:  My religious leader.  I'm Muslim.  I

24  have to be there.

25     THE COURT:  So you changed your mind.  When did you

Amalia Hudson, SCR

PROCEEDINGS

1   do that?

2           MR. HARRELL:  I wanted this proceeding to go over

3   already.  I didn't even want to go this far, but, you know, I

4   want to go service.  That's all I'm asking you respectfully.

5           THE COURT:  First of all you're not doing it

6   respectfully.

7           MR. HARRELL:  How do you want me to ask you, sir.

8   May I go to service, please? Friday.

9           THE COURT:  Well, I want you to acknowledge first

10  of all when I asked you, you said no.  That you were not

11  going to go, right?

12          MR. HARRELL:  I understand that.

13          THE COURT:  Am I correct?

14          MR. HARRELL:  I was mistaken.

15          THE COURT:  You were mistaken, but we relied upon

16  that.

17          MR. HARRELL:  And I am sorry.

18          THE COURT:  I'm sorry too because now we have 16

19  jurors.  We have court officers, a court reporter, a

20  prosecutor, a defense attorney, and they are all scheduled to

21  be here.  I'm sorry.

22          MR. HARRELL:  Well, I am sorry too.

23          THE COURT:  If you go tomorrow to service, I am

24  telling now, we are going to continue in your absence.

25          MR. HARRELL:  I don't know what else to tell you.

PROCEEDINGS

1        THE COURT:  Okay.  Let's bring the jury in, please.

2        MR. HARRELL:  With all due respect.

3        THE COURT:  With all due respect, we'll continue in

4    your absence.

5        MR. HARRELL:  Why don't you have me leave now

6    before they come in?

7        THE COURT:  It's not Friday.

8        MR. HARRELL:  I want to leave now.  I don't want to

9    be here now, so you can continue without me.  I don't let

10   him -- I don't him to say I made a mistrial or nothing.  I

11   want to leave now.

12       THE COURT:  Why do you want to leave now?

13       MR. HARRELL:  Because you just threatened saying I

14   can't go because of them and yourself and everybody in the

15   courtroom, and that is not right.

16       THE COURT:  I'm insulting everybody in the

17   Courtroom?

18       MR. HARRELL:  No.  That is not what I said, you was

19   insulting anybody.  I said you said I can't attend because

20   everybody in the courtroom got to work.  It's like I don't

21   count.  My religious believe don't count.  Don't let them in

22   because I want leave.

23       THE COURT:  They count.  That is why --

24       MR. HARRELL:  I would like to leave, sir.

25       THE COURT:  You're interrupting me.  Your desires

## PROCEEDINGS

1   do count, and that is why my very first question to you the

2   time you came in was, is there any issue for Friday because

3   your religious beliefs do count, and the answer you gave me

4   was no.  No problem for Fridays.  So it does count, and I

5   relied upon your word, and I informed all the jurors of that.

6   You understand me?

7        MR. HARRELL:  Then I said I was Muslim, and I don't

8   worry about Friday coming here.  This what you're saying?

9        THE COURT:  I don't even understand what you're

10   saying.

11        MR. HARRELL:  I didn't understand what you're

12   saying.  You're saying that you relied on me and you told

13   them people what I said.

14        THE COURT:  I didn't tell them what you said.  What

15   I said is we're going to have proceedings on Fridays.

16        MR. HARRELL:  I don't want to disrupt your court,

17   so you can proceed without me, and I will be back, but I want

18   to attend service Friday.

19        THE COURT:  Are you saying that if I bring this

20   jury in and I don't excuse, you are going to be disruptive?

21        MR. HARRELL:  I wouldn't do that.  I would like to

22   be excused now.  I'm not trying to disrupt that.  I don't

23   want that to mess up.  I don't want to say that you're going

24   to give me a mistrial because I -- I'm not acting out.  I'm

25   asking you now before they come in?

## PROCEEDINGS

1    THE COURT:  Mr. Herlich, would you like to be

2    heard?

3         (Defense consulting with client)

4         MR. HARRELL:  No.  I don't feel comfortable now

5    because, you know, I feel like you forcing me to do something

6    I don't want to do.

7         THE COURT:  But today is Thursday.  It's not

8    Friday.

9         MR. HARRELL:  Yeah, but I don't want to be here,

10   and I don't want to disrupt.  Like you said, if I disrupt

11   these proceedings while they here, I am going to be in -- I

12   am going to have a situation on myself.  Am I right?  I'm not

13   trying to do that.  They are not here right now.  I would

14   like to leave, please.

15   I am not comfortable right now.  I have this problem

16   that when I get agitated, it just blows, and I am not trying

17   to blow.  It's like you said, I'm complying to what you're

18   saying.  You told me that.

19        THE COURT:  Okay.  Mr. Herlich, would you like to

20   excuse him for a minute so we can discuss how to proceed?

21        MR. HERLICH:  Yes.

22        THE COURT:  We'll excuse him for a minute.

23        MR. HARRELL:  I'm not come back out here.

24        THE COURT:  Then have a seat if you're telling me

25   you're not coming back out --

## PROCEEDINGS

1           MR. HARRELL:  I just told you that, sir.  I don't

2     want to be disruptive in front of them.

3  I would like to leave before the jury come in.

4           THE COURT:  Your client is now telling me that if

5     he leaves the courtroom, he's not coming back.

6       Would you like to heard Mr. Herlich?

7     (Defense counsel consulting with client)

8           MR. HARRELL:  I don't feel comfortable.

9     (Defense counsel consulting with client)

10          MR. HARRELL:  How is it between you and me with all

11    these people standing around me.  I don't feel comfortable

12    now.

13          THE COURT:  You don't feel comfortable today,

14    Thursday.

15          MR. HARRELL:  No.  Right now what you're doing,

16    you're making me uncomfortable.

17          THE COURT:  I'm making you uncomfortable because I

18    don't want you to be selfish and affect everybody else.

19          MR. HARRELL:  That is not being selfish.  That's

20    your opinion.  That is not --

21          THE COURT:  All right.  People, would you like to

22    be heard?

23          MR. HARRELL:  It's not being selfish.  That's

24    yours.

25          MS. PARK:  Judge, I think if he's going to be

## PROCEEDINGS

1    disruptive with the jurors, he's forfeiting his right to be

2    present.

3            MR. HARRELL:  I am not being disruptive.  There is

4    no jury here right now.  I don't want to be agitated in front

5    of them.

6            THE COURT:  You're threatening that you are going

7    to be disruptive.

8            MR. HARRELL:  No.  I'm not threatening.  I am

9    saying I am getting agitated, and that don't look right.

10           THE COURT:  Let the record reflect the defendant is

11   yelling over the Court.  The Court can't even get a word in.

12           MR. HARRELL:  I am going to say it slowly.

13           THE COURT:  Are you saying that if the jury comes

14   in you're going to be disruptive?

15           MR. HARRELL:  That's not what I am saying.  I'm

16   saying I don't want them to see me in this state that I am

17   feeling agitated.  I don't want them to get the impression

18   that I am getting ready to do anything.

19           THE COURT:  So what you're saying is that you are

20   going to disrupt the proceedings.

21           MR. HARRELL:  I did not say that.  I said it three

22   times already.

23           THE COURT:  And you're yelling at the Court.

24           MR. HARRELL:  Please let me leave, man, please.

25           THE COURT:  All right.  Mr. Herlich anything else?

**PROCEEDINGS**

1          MR. HERLICH:  No, Your Honor.

2          THE COURT:  He is asking to be excused.

3          MR. HARRELL:  Yes.

4          THE COURT:  What I'm gathering from his words is

5   that his agitation will cause him to be become disruptive if

6   the jury --

7          MR. HARRELL:  I take meds.  I don't want to spaz

8   out in here.

9          THE COURT:  I think we have no choice but to excuse

10  him.

11         MS. PARK:  Judge, just so he knows if he choses to

12  be absence the case will go forward without him.

13         MR. HARRELL:  I am not choosing -- I don't want to

14  be here right now.

15         MS. PARK:  And a witness will testify in

16  Mr. Harrell's absence if he refuses to be present.  I just

17  wanted the record to be clear.

18         THE COURT:  That's crystal clear. I made that clear

19  to him as well.  The proceeding will continue tomorrow in his

20  absence.

21         MR. HARRELL:  That wasn't hard.

22  (Defendant is escorted out of the courtroom)

23         THE COURT:  You would like me to give a jury

24  instruction of any kind.

25         MR. HERLICH:  I would say no judge.  Just can we

## PROCEEDINGS

1    continue.

2          THE COURT:  You don't want me to tell them the

3    defendant is not present and not to draw any adverse

4    inference?

5          MR. HERLICH:  Okay.  You can do that.  May we

6    approach for a second?

7          THE COURT:  Sure.  On the record.

8      (Discussion held on the record at sidebar)

9          MR. HERLICH:  The defendant just told me when I

10   went to speak to him for a moment during the morning break

11   that he wants to go to prayers, and that's the first time I

12   ever heard.  In addition, Your Honor, to you talking to him

13   on the record if he is available Friday, I asked him that as

14   well in the pens before the trial started, and he said

15   Fridays were fine.  So it's surprise to me.

16         THE COURT:  It's a surprise to all of us.

17     The jury has already been told they're working Friday

18   afternoon.  It was put on the record.

19     Now what was not clear from the record just now is that

20   defendant was really behaving aggressively, very aggressive.

21   He was turning his body towards the officers.  He was turning

22   his body towards the Court.  He was leaning forward.  His

23   voice was raised.  He was yelling above the Court.  I wasn't

24   able to make my record, and he was asking to be excused

25   basically, if you read between the lines, because he believes

## PROCEEDINGS

1    that he would disrupt the proceeding if the injury were

2    brought in his presence.

3         I have no choice but to excuse him at this point.  As

4    far how we'll handle tomorrow, we'll have to deal with that,

5    I guess, later on, but it was made clear to him if he does

6    not come tomorrow we'll proceed without him.

7              MR. HERLICH:  I mean at the end of business today,

8    Judge, I will let him know that he may forfeit his right to

9    testify because if he doesn't come tomorrow, the only thing

10   left in the case is closings argument.  We'll have to figure

11   that out, but that is what it looks like.  I mean I'm just

12   saying that is I got to let him know -- I assume he may know

13   that, but I didn't tell them that because I didn't realize --

14             THE COURT:  Can you go tell him that now?

15             MR. HERLICH:  I can If you like.

16             THE COURT:  Yes.  You can go ahead and do that.

17             MR. HERLICH:  Okay.

18             MS. PARK:  Also speak to him just to make clear

19   that we're going to just go forward.

20             THE COURT:  It's important that you tell him he may

21   forfeit his right to testify.

22             MR. HERLICH:  Okay. Your Honor, I will tell them

23   right now.

24             (Pause in the proceedings)

25             THE COURT:  Mr. Herlich, I asked you to come in

### PROCEEDINGS

1   because I'm troubled that the only proceeding that we would

2   have tomorrow would be his testimony, and he would waive his

3   right to testify.  As you know that's a serious step, and

4   Courts would look at that with very close scrutiny, although

5   I hate to give into someone's whose behaving the way he is

6   behaving, I think that if all we have left for tomorrow is

7   his testimony, then I think, I would be prepared to adjourn

8   the proceeding until Monday.

9          What I would like to ask you to do is in light of

10   that -- in light of that is he willing to come out this

11   afternoon given that he is getting what he wants.  He gets

12   Friday off.  Would he be willing to come out this afternoon,

13   and just let me know.

14               MR. HERLICH:  Okay.  Thank you.

15               MS. PARK:  Not right now, Your Honor.

16               THE COURT:  Not -- right now before we bring the

17   jury in.

18               (Pause in the proceedings)

19               THE COURT:  Mr. Herlich, have you had a chance to

20   speak to your client.

21               MR. HERLICH:  Yes, your Honor.  This is his

22   position.  He says that he is too agitated and upset and he

23   doesn't want to come out today.  He wants to go back to his

24   jail immediately, and in the same breath he says he wants to

25   hear the DNA expert and doctor, but not today.  And I said,

### PROCEEDINGS

1   "Well, we are not talking now about your constitutional right

2   to practice your religion or your constitutional right to

3   testify in your own behalf.  Today is Thursday.  Can you calm

4   down and be present in court for those witnesses because the

5   case will proceed in your absence."  And he said, 'No.  I

6   cannot calm down but I am not giving up my right to be

7   present for those witness, but he refuses to come to court

8   for the balance of today.  Either this morning or after the

9   lunch break."  Those are his words.

10          THE COURT:  All right, and did he say anything

11  about coming back Monday so that he could testify?

12          MR. HERLICH:  Yes.  He agrees to come Monday for

13  his testimony.

14          THE COURT:  Okay. So it appears that what we have

15  here is he is upset and because he is upset he doesn't want

16  to be present in the courtroom.  He has certainly given every

17  indication in words and, indeed, that if he is in the

18  courtroom that he is going to act out.

19      He referred several times to a mistrial.  He doesn't

20  want to create a mistrial.  I think it would be foolish for

21  us to not heed those warnings.  He's given us the warnings.

22  He's told us, and we've seen first hand his demeanor, his

23  behavior, his body language.  There is every reason to

24  believe that he if is brought out today, he will act out, and

25  perhaps we'll have a situation that we don't want to have.

Amalia Hudson, SCR

A646

PROCEEDINGS

1        I'm informed by Mr. Herlich, and Mr. Herlich informed
2    the defendant that in recognition of the fact that all that
3    would happen tomorrow is for Mr. Harrell to testify that we
4    are prepared to give him tomorrow off exactly as he
5    requested.
6        Despite that, he's still refusing to come in this
7    afternoon.  Although at the same time he's saying he wants to
8    hear the DNA experts.  Well, he can't have it both ways.  He
9    can't hear the witnesses that he wants to hear and decide he
10   doesn't want to come in the courtroom.  In essence he's
11   highjacking the trial and directing when things are going to
12   happen.  So what we are going to do is we're going to
13   continue this afternoon in his absence.
14       There really is no reason for his absence now since the
15   reason for his upset was that he was going to be compelled to
16   come in tomorrow.  That's no longer the case.  He is no
17   longer being compelled to come in tomorrow.  The reason for
18   his upset has been addressed.  He is still choosing not to
19   come in, so we're going to continue this afternoon with the
20   witnesses that we have.  I will have to tell this jury there
21   will be no proceeding tomorrow, and then on Monday morning
22   we'll bring him back in for him to testify if that's what he
23   wishes to do.
24       Mr. Herlich, do you think there is any chance -- my main
25   concern, of course, is also the safety of security and the

296

## PROCEEDINGS

1   court personnel, and in particular the court officers.  They

2   are the ones that have to deal with the defendant.  Do you

3   think he could be brought out.  We need to tell him the

4   record that I just made.

5          MR. HERLICH:  Do you want me to suggest to him --

6   he was pretty adamant that he -- he's refusing to come into

7   the courtroom again today.  That was made very clear to me

8   when I spoke to him.

9          THE COURT:  How do you think we should handle that

10  Lieutenant?

11         LIEUTENANT McKEE:  Judge, when we get notice when

12  an attorney says someone is adamant about not coming to

13  court, that is S.R.T., Special Response Team.  You have to

14  order us to extract him out of his cell.  We bring a team

15  into to take him out.

16         THE COURT: I am not going to order an extraction

17  team.  Simply to tell him what I just told you and what I put

18  on the record, and which you already indicated to him.  So

19  we'll proceed without him.  Again, if you request I can

20  instruct the jury that they are not to draw any adverse

21  inference from the fact the defendant is not at the defense

22  table.

23         MR. HERLICH:  That would be find, Your Honor.

24         LIEUTENANT McKEE:  Judge, do you want a member of

25  the staff, the sergeant to inform him?

Amalia Hudson, SCR

A648

PROCEEDINGS

1      SERGEANT GELORMINO:  Judge, I will go tell him,

2   listen, the judge is basically giving you what you want

3   regarding tomorrow.  Are you willing to come out?  That way

4   the judge can hear from you.

5      THE COURT:  If you would he willing to do that

6   Sergeant, that would be excellent, and I will wait for you to

7   come back out.

8      (Pause in the proceedings)

9      THE COURT:  Sergeant?

10      SERGEANT GELORMINO:  In a one on one conversation

11   with the defendant, the defendant stated in no uncertain

12   terms he is not coming out under any conditions.  He wants to

13   go back to the facility, and it is what it is.

14      THE COURT:  He understands that Monday he will come

15   back?

16      SERGEANT GELORMINO:  I didn't give him the date he

17   was coming.  I just told him you were going to consent to his

18   right to observe his religious observances, and that you will

19   adjourn the case tomorrow, but the two witness that were

20   scheduled for today will be appearing today, and the only

21   purpose of my come in there was to see if he wanted exercise

22   his right to be present before the Court while those witness

23   took the stand.

24      THE COURT:  Thank you, Sergeant.  I appreciate

25   that.

Amalia Hudson, SCR

A649

## PROCEEDINGS

1    There you have it.  I think we've made as thorough a

2    record as we can possibly make.  He's been given every

3    opportunity to come in this afternoon, but even after he was

4    given what he wanted, which was not have proceeding tomorrow,

5    he is still refusing to come out this afternoon I will note

6    that we have a DNA expert this.

7         MS. PARK:  Yes.

8         THE COURT:  And who else?

9         MS. PARK:  The Safe Kit examiner, Dr. Singh, and

10   Officer Hager.

11        THE COURT:  And we subpoenaed that officer?

12        MS. PARK:  Yes.

13        THE COURT:  That officer is here pursuant to,

14   subpoena because right now New York City is hosting the

15   United Nations General Assembly, so officers are being

16   denied.  So I actually had to sign a so-ordered subpoena to

17   get that officer here today.  The DNA expert is here, a

18   doctor is here, and there is really no reason why the

19   defendant couldn't be here with us.  He is simply choosing to

20   act out, and I think that it's in his best interest frankly

21   because if he acts out in the presence of the jury, it can

22   only reflect poorly on him, and certainly we don't want to

23   endanger the safety and wellbeing of any of the court

24   personnel.

25        All right.  Let's bring the jurors in, please.

## PROCEEDINGS

1          THE CLERK:  Continue case on trial.  People v.
2     Lonnie Harrell.  All the parties are present. all jurors are
3     present.
4          THE COURT:  Good afternoon jurors, well comeback.
5     I apologize for the lengthy delay.  A matter came up that
6     required my attention, legal matter.
7          Jurors, I am sure you noticed Mr. Harrell is not sitting
8     at the defense table at the moment.  I ask you to not draw
9     any adverse inference from his not being present.  Just put
10    it out of your mind.  Don't speculate as to why that is.
11    We're going to continue with the proceeding at this time.
12         The only chances to the schedule now is that tomorrow
13    afternoon -- you may recall, we were going to start at 2:00
14    tomorrow afternoon.  We are not going to have proceedings
15    tomorrow at all.
16         Again, we are well ahead of scheduled.  There is a
17    possibility that the People may actually rest their case
18    today, maybe.  So tomorrow there will be no proceedings.
19    Once we adjourn today, we'll not meet again until Monday
20    morning at 9:30.
21         People?
22         MS. PARK:  The People call Jeannie Tamariz.
23         COURT OFFICER:  Witness entering.  Watch your step.
24    Remain standing in front of the chair raise your right hand
25    face the clerk.

**Amalia Hudson, SCR**

PARK - DIRECT - TAMARIZ

1      THE CLERK:  Do you solemnly swear or affirm the

2   evidence you shall give to the Court shall be the truth, the

3   whole truth, and nothing but the truth?

4      THE WITNESS:  I do.

5      THE CLERK:  Have a seat.

6      COURT OFFICER:  Have a seat.  State your full name

7   spelling your last name.

8      THE WITNESS:  Jeannie Tamariz of T-A-M-A-R-I-Z.

9      COURT OFFICER:  County of residence?

10      THE WITNESS:  Richmond County.

11      THE COURT:  Good afternoon.

12   You may inquire.

13      THE WITNESS:  Good afternoon.

14   **DIRECT EXAMINATION**

15   **BY MS. PARK:**

16   Q    Ms. Tamariz, by whom are you employed?

17   A    By the New York City Office of Chief Medical Examiner,

18   Department of Forensic Biological.

19   Q    What agency is that affiliated with?

20   A    We are under the umbrella of the Department of Health

21   and Mental Hygiene.

22   Q    Is that part of the New York City Police Department or

23   New York City District Attorney's offices?

24   A    No.  It is not part of the N.Y.P.D. or the District

25   Attorney's office.

Amalia Hudson, SCR

A652

PARK - DIRECT - TAMARIZ

1    Q    And it's a lab, correct?

2    A    It is a laboratory, yes.

3    Q    Is your lab accredited?

4    A    Yes, we are.

5    Q    By whom?

6    A    We are accredited by the American Society of Crime

7    Laboratory Directors Laboratory Accreditation Board and also by

8    the New York State Commission on Forensics Science DNA

9    Subcommittee.

10   Q    Can you tell us what does accreditation means?

11   A    Accreditation mean that our laboratory meets or exceeds

12   guideline set forth by this accrediting body.

13   Q    What does the Department of Forensics Biology do?

14   A    The Department of Forensics Biology receives evidence

15   collected from criminal cases in and New York City, and we look

16   at the evidence.  We examine it for the presence of biological

17   substances.

18   Q    What part of the City does your lab cover?

19   A    We cover all the five boroughs, so Manhattan, Brooklyn,

20   Bronx, Queens, and Staten Island.

21   Q    What is our current title?

22   A    I'm a Criminalist Level 3 which is a Senior Interpreting

23   Analysis level criminalist.

24   Q    Can you go through with us the different levels of

25   criminalist in your lab?

Amalia Hudson, SCR

A653

PARK - DIRECT - TAMARIZ

1    A    Sure.  There is a Level 1, Level 1s generally are in the

2   laboratory doing a lot of the bench work.  Level 2s are

3   interpreting analyst level criminalist which basically means that

4   they're able to make conclusions, write reports, and testify in

5   court.

6        A Level 3 is a senior level interpreting analyst. Level

7   4s supervise and sign our timecards for all the levels blow them,

8   and then we have management.

9    Q    What are your duties as a Level 3 criminalists?

10    A    As a Level 3 criminalist, I examine evidence, collect it

11   at crime scenes.  I look for biological substances, I submit

12   samples from the evidence for further testing.  I actually also

13   go into the laboratory and perform the tests myself.  I then look

14   at the data that's collected from the samples that were

15   processed, and then interpret the data, evaluate the case, and I

16   then issue a report, and testify in court as needed.

17    Q    How long been with the Department of Forensics

18   Biological?

19    A    Over 11 years.

20    Q    Can you tell us about your background, your education,

21   and relevant training that lead to your current positon?

22    A    Yes.  I have a degree in biological from the State

23   University of New York College at Oneonta.  So basically with a

24   degree in biological, you can enter into laboratory.  I actually

25   started at the bottom most level at the time which was a

Amalia Hudson, SCR

PARK - DIRECT - TAMARIZ

1    Laboratory Associate, and I essentially worked my way up the

2    levels to where I am now.

3            What was the rest?

4        Q    Some of other training or any relevant experience you

5    may have had?

6        A    Sure.  So upon being hired as a criminalist, you also

7    have to undergo an extensive six months training.  During that

8    training you attend lectures where you learn about the science of

9    what is conducted in the case work.  You then go into the

10   laboratory, observe scientists actually doing the work.

11           You then practice the work yourself.  Upon completion of

12   that training you do what is called a competency, and a

13   competency is basically a sample that you treat as if were real

14   case work, and they can determine whether you are competent or

15   able to perform these tests on actually cases.

16           Upon completing the competency because, I'm an

17   interpreting analyst, I then also undergo a four hour oral

18   examination for the senior scientist and management level, and

19   then we also do courtroom training.

20       Q    Have you passed all of those tests that you just

21   referred to?

22       A    Yes.

23       Q    Did you receive any statistics train?

24       A    Yes, we did.

25       Q    Can you talk about that?

PARK - DIRECT - TAMARIZ

1      A    The statistics training is basically also with the

2  in-house training that I described.  There are lecture that come

3  to our laboratory, outside lecture of professional in the

4  statistics world.  In addition to that, I also attend outside

5  conferences where I regularly attend lectures on mixtures, DNA

6  and statistics.

7      Q    Have you examined items of evidence in your lab?

8      A    Yes, I have.

9      Q    Approximately how much times?

10     A    Thousand of times.

11     Q    Are have you developed DNA profiles?

12     A    Yes, I have.

13     Q    About how many times?

14     A    Thousand of times.

15     Q    Have you had occasion to testify as an expert about DNA

16  analysis, DNA profiles, and the statical significance of them?

17     A    Yes, I have.

18     Q    How often or how many times and in what courts

19  approximately?

20     A    Over 25 times and all of the five boroughs of New York

21  City, so Manhattan, Brooklyn, Bronx, Queens and Staten Island.

22          MS. PARK:  Your Honor, at this time, I ask that

23     this witness be deemed an expert in the field of DNA

24     analysis, DNA profiles and their statistical significance.

25          MR. HERLICH:  No objection, Your Honor.

**Amalia Hudson, SCR**

PARK - DIRECT - TAMARIZ

1      THE COURT:  Very well.  At this time, the Court
2    will recognize the witness as an expert in the field of DNA
3    analysis, DNA profiles and it's statistical significance.
4    Q    Ms. Tamariz, tell us what is DNA?
5    A    DNA is the genetic material we all have in your body.
6    It's what makes us who are as humans.  Most of the DNA that we
7    have in our bodies are the same from one individual to the next
8    because we are all humans, and we all have two eyes and one nose.
9    However, there is a region in the DNA that we specifically look
10   at in the testifying that we do, and it extremely unique amongst
11   individuals.
12       Actually no two individuals have the same DNA at this
13   location that we look at with the exception of identical twins.
14   Q    And are those the regions that your lab looks at?
15   A    Yes.
16   Q    What is a DNA profile?
17   A    A DNA profile looks a lot like a string of numbers.
18   It's sort of like your own genetic serial number. it is a unique
19   string of numbers.  It consists of 15 autosomal,
20   A-U-T-O-S-O-M-A-L, locations that we look at, and it's unique
21   amongst individuals.  No two individuals have the same DNA
22   profile with the exception of identical twins.
23   Q    Can you explain what an autosomal locations is?
24   A    Yes.  So we have many chromosomes in your body, so
25   basically an autosomal locations is a location that is not the

Amalia Hudson, SCR

PARK - DIRECT - TAMARIZ

1  sex chromosome.  The sex Chromosome is basically giving us

2  information as whether we are have male or female.  Females have

3  an XX, and males have an XY.

4      Q    What is an allele?

5      A    An allele is a variation on a gene.  The way we look at

6  alleles in our testing is it looks like a number, and so alleles

7  make up the string of numbers that we see in someone's DNA

8  profile.

9      Q    And you mentioned that you looked at locations when you

10  were talking about DNA profiles.  How many locations or loci are

11  you looking at?

12      A    We are looking at 15 autosomal loci and one sex

13  determining location.

14      Q    Does a person's DNA profile change over that person's

15  lifetime?

16      A    No, it does not.

17      Q    And is the person's DNA the same throughout the person's

18  body whether it be semen, blood, saliva?

19      A    Yes.  It is same in your skin cells as it is in your

20  saliva, as it is in your blood, on your head, or on feet,

21  throughout your body.

22      Q    Can you describe for us how is evidence handled in your

23  lab?

24      A    Evidence is delivered to our laboratory by the N.Y.P.D

25  it is then signed into what we call our team of people which

1    consist of our Evidence Unit.

2         These people are trained in receiving evidence and

3    starting what we all a chain of custody.  All of that is

4    documented in our computer system, and then the evidence is put

5    into a locked facility until it's ready for us to examine.

6    Q    Is there quality control testing in your lab?

7    A    Yes, there is.

8    Q    Can you describe what that is?

9    A    Basically every time a test is conducted, we do quality

10   control tests.  We can do quality control tests on the chemicals

11   that we use to perform these tests, and we can do quality control

12   tests as we are performing the tests.  An example of that would

13   be when I have a test, and I have what is called a positive and a

14   negative control.

15        The positive control is used so that I know that the

16   test is giving a result because I know what the positive control

17   data is supposed to look like, and a negative control is used to

18   insure that there is no contamination, and the negative control

19   is supposed to give me no results.

20   Q    Can you describe how the result and analysis are

21   documented in your lab?

22   A    Every time we examine a package, open it up, we are

23   documenting that in your notes, and our notes are collected

24   within the computer system.

25   Q    Is there a rotation system within your lab?

PARK - DIRECT - TAMARIZ

1    A    Yes, there is.

2    Q    Can you tell us about that?

3    A    Because we are a very large lab and we collect evidence

4    from all five boroughs, there are many cases to examine and a

5    very short period of time.  We have a system called the rotation

6    system where we have analysts that are designated to certain

7    parts of the process for a given period of time.

8         So, for example, there is a group of analysts who are

9    solely performing evidence examination.  So they are in charge of

10   processing as many cases as they can, and they move their samples

11   then to the next process because they are examining, they can

12   examine multiple cases at one time throughout the week, and then

13   the samples that they collect, the send it to another  group of

14   scientists who that same week can be in charge of actually

15   extracting the DNA from that sample.  So in this way we can

16   manage -- we manage to process thousands of cases in a any very

17   short period of time.

18   Q    And are the results supervised and reviewed?

19   A    Yes, they are.

20   Q    How is that done?

21   A    Every -- at every process there is review step.  So

22   before any given sample can go the next level, it does get

23   reviewed.  Upon completion of the testing for the entire case,

24   all of evidence in that case it is especially reviewed by the

25   interpreting analyst, the person who's going to then make the

Amalia Hudson, SCR

A660

PARK - DIRECT - TAMARIZ

1  conclusions and decide if further testing needs to be done or if
2  the case is ready to be reported.

3   Q Ms. Tamariz, what is an evidentiary sample?

4   A An evidentiary sample is a sample that I would collect
5  from the evidence.

6   Q The evidence that is submitted by the N.Y.P.D. or
7  another law enforcement agency?

8   A Correct?

9   Q What about an exemplar?  What is that?

10  A An exemplar is a reference sample from an individual.
11 Generally and exemplar is in the form of an oral swab, a swab is
12 basically a Q-tip, a stick with a cotton ball at the end of it,
13 and the way we collect exemplars from individuals is we take this
14 swab and we rub the inside of their cheek cells in their mouth,
15 and there we can collect sufficient DNA to then process it and
16 see what their DNA profile is for purpose of comparing it to the
17 evidence.

18  Q Is that also called a buccal swab or a buccal specimen?

19  A Yes, it is.

20  Q And are exemplars and evidentiary samples tested in the
21 same area?

22  A Generally exemplars are taken from the mouth.  They are
23 exceptions.  If the individual is deceased, then sometimes at the
24 autopsy they will take samples of blood, but generally exemplars
25 are taken from the mouth.

310

## PARK - DIRECT - TAMARIZ

1   Q    I am sorry. I meant in your lab when you do testing of
2   evidentiary samples and testing of exemplar such as oral swabs.
3   Are they done in the same area?

4   A    No, they're not.  So exemplars because their reference
5   samples they are known samples.  They are processed entirely
6   separate and actually even in separate rooms from where the
7   evidence is being processed.

8   Q    Why is that?

9   A    Well, because we don't want to -- we want to decrease
10  the chances where samples can get mixed up.  So exemplar samples
11  are always processed together with other exemplars and evidence
12  sample are always processed with evidence samples.

13  Q    And whenever you or anyone else in your lab does DNA
14  analysis, is it required that each step of the process be
15  documented from the receipt of the evidence through the
16  conclusion of the testing, and to the return of that evidence?

17  A    Yes.  All of that is documented in the chain of custody
18  contained in the case file.

19  Q    Is it required that the results be recorded.

20  A    Yes.

21  Q    And are those notations made at or about the time of the
22  observation they record?

23  A    Yes.

24  Q    Are those notes and reports made and kept in the regular
25  and ordinary partner course of business of the Office of Chief

311

PARK - DIRECT - TAMARIZ

1    Medical Examiner Department of Forensic Biology lab?

2         A    Yes.

3         Q    Just from now on I am going to call it OCME for short

4    and do these reports include all raw data generated by the

5    testing?

6         A    Yes.

7         Q    Does the lab have a business duty to make keep these

8    results and records?

9         A    Yes, we do.

10        Q    Is each DNA case file given a unique identifying

11   numbers?

12        A    Yes, it is.

13        Q    And turning to this case was evidence tested in the case

14   of complaining witness Cypress Smith?

15        A    Yes, there was.

16        Q    Did that case receive a unique file number?

17        A    Yes, it did.

18        Q    I'm showing you what I have previously marked for

19   identification as People's Exhibit 25.  Do you recognize People's

20   25?

21        A    Yes, I  do.

22        Q    What is it?

23        A    This is a certified copy of my case file.

24        Q    And what does that case file contain?

25        A    It contains all of the examination notes and the raw

PARK - DIRECT - TAMARIZ

1   data in also including the reports for this particular case.

2      Q    And would that case file contain the evidentiary sample

3   that we talked about earlier?

4      A    Yes.

5      Q    And were notes of each step of the test kept in the

6   manner that you describe -- that was just described earlier?

7      A    Yes.

8      Q    And the exhibit that is in front you said it was

9   certified copy, correct?

10     A    Yes.

11     Q    Did you compare People's 25 with the original?

12     A    Yes, I did.

13     Q    And is an exact duplicate?

14     A    Yes, it is.

15          MS. PARK:  Your Honor, I offer People's 25 in

16     evidence and subject to redaction?

17          THE COURT:  Any objection?

18          MR. HERLICH:  No objection.

19          THE COURT:  People's 25 is accepted into evidence

20     subject to redactions.

21     Q    Ms. Tamariz, a number of items were received for test

22   under this case number, correct?

23     A    Yes.

24     Q    And was a sexual offense evidence collection kit one of

25   them?

Amalia Hudson, SCR

A664

PARK - DIRECT - TAMARIZ

1    A    Yes, it was.

2    Q    What was the voucher number on that kit?

3    A    If I may refer to.

4         THE COURT:  Please.

5    A    The voucher is 1000524859.

6    Q    When did your lab receive the kit?

7    A    We received it July 17, 2014.

8    Q    I am going to show you People's 19 for identification.

9  Did you recognize people's 19?

10   A    Yes, I do.

11   Q    What is it?

12   A    This is a sexual assault kit that was collected for this

13  case.

14   Q    How do you know that?

15   A    I know that because I see the analyst's initials on the

16  box.

17   Q    Analyst meaning analyst within your lab?

18   A    Yes.

19   Q    Are there any other markings that identify what this kit

20  is that you recognize?

21   A    Yes, sure.

22   Q    What are they?

23   A    There are stickers as well that we apply from your

24  computer system that we print, and we also affixed to the box.

25   Q    And is there a forensic biological number attached to

PARK - DIRECT - TAMARIZ

1   it?

2       A   Yes.

3       Q   And what is the unique file number for this case file?

4       A   It's FB1404050.

5       Q   And is that number contained on that rape kit?

6       A   Yes, it is.

7       Q   And when your lab received that kit what condition was

8   it in?

9       A   It was sealed.

10      Q   How was it sealed?

11      A   With tape.

12      Q   And after the testing, what happened to the kit?

13      A   It's sealed again and put back into a locked cage.

14      Q   Can you show us which seal was done by your lab, and how

15  you know that?

16      A   So these boxes can pretty much generally open in this

17  one direction.  You flip this lid up.  So what we do is we cut

18  the tape that is in the perimeter of the top portion of this box,

19  and then -- to open it, and then to seal it we then seal it again

20  with our yellow evidence tape, and on the tape the analyst will

21  initial the tape.

22      Q   So the yellow evidence tape belongs to your lab?

23      A   Correct.

24          MS. PARK:  Your Honor, I am going to offer People's

25  Exhibit 19 subject to connection.

Amalia Hudson, SCR

A666