# United States District Court
# For the Southern District

---

LONNIE HARRELL,

*Petitioner*,

*-against-*

MARK MILLER, Superintendent of Green
Haven Correctional Facility,

*Respondent*.

---

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HABEAS PETITION
## APPENDIX OF EXHIBITS
## VOLUME III of IV

---

Robert S. Dean
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, NY 10005
*Counsel for Petitioner*

Matthew Bova
*Of Counsel*
212-577-2523, ext. 543
mbova@cfal.org

---

## APPENDIX OF EXHIBITS

## TABLE OF CONTENTS

### VOLUME I

**EXHIBIT A** - New York County Supreme Court Decision & Order Denying Petitioner's Motion to Vacate the Judgment (January 29, 2021)

**EXHIBIT B** - Appendix Filed By Petitioner in Support of Motion to Vacate (A1-A294)

### VOLUME II

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A295-A666)

### VOLUME III

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A667-A968)

### VOLUME IV

**EXHIBIT B (CONTINUED) -** Appendix Filed By Petitioner in Support of Motion to Vacate (A969-A1074)

**EXHIBIT C** - Petitioner's Appellate Division Brief and Reply Brief

**EXHIBIT D** -Application for Leave to Appeal to the Court of Appeals

**EXHIBIT E** - Supplemental Letter Filed in Further Support of Application for Leave to Appeal to the Court of Appeals

**EXHIBIT F** - Petitioner's Motion to Vacate the Judgment (Filed June 25, 2020)

**Exhibit G** - State's Opposition to Motion to Vacate

**EXHIBIT H** - Petitioner's Reply in Further Support of Motion to Vacate

**EXHIBIT I** - Notice of Motion for a Certificate Granting Leave to Appeal

**EXHIBIT J** - Certificate Denying Leave to Appeal (August 5, 2021)

# EXHIBIT B (continued)

# Appendix Filed By Petitioner in Support of Motion to Vacate

**PARK - DIRECT - TAMARIZ**

1        THE COURT:  You had already offered it subject to

2    connection.

3        MS. PARK:  I'm sorry.

4    Q    Now, turning to the case file what items were in the

5    kit?

6    A    So in the kit we received oral swabs, oral smear, a

7    buccal specimen, trace evidence, 1, 2, 3, 4, dry secretions from

8    the bilateral labia, fingernail scrapings, pubic hair combings,

9    vulvar swabs, vulvar smear, vaginal swab, vaginal smear, and in

10   addition to that a green tank top, red shorts, and a pink shirt.

11   Q    And you just mentioned the buccal specimen.  Did that

12   buccal specimen belong to Cypress Smith?

13   A    Yes.

14   Q    Was a DNA profile of Cypress Smith developed from that

15   specimen?

16   A    Yes, it was.

17   Q    Were each of those items sealed separately inside the

18   kit?

19   A    Yes, they were.

20   Q    What items were tested?

21   A    The items tested in this kit were the oral swab, oral

22   smear, buccal specimen, four dry secretion swabs, the vulvar

23   swabs, the vulvar smear, vaginal swab, vaginal smear.  That is

24   it.

25   Q    And does your lab test every single item submitted?

PARK - DIRECT - TAMARIZ

1    A    No.  We don't generally test certain items.

2    Q    And why not?

3    A    We start with items we expect to be the most probative

4  in this particular case.  For example the items here that we did

5  not test would be fingernail scrapings and the pubic hair

6  combings.  Those items can be a little bit more difficult to

7  recover results from, so we start with the easier ones.  For

8  example, the vaginal swab, the vulvar swab, the oral swabs.

9         Generally in a sexual assault, those are the swabs that

10  are going to generate more usable results.  However, if we don't

11  generate usable results from those samples, we then proceed to

12  the next ones that were not tested.

13    Q    And can you tell us the result of the analysis?

14    A    Semen was found on the oral swabs, amylase which is an

15  enzyme found in saliva was found on the dry secretion swab 1.41

16  from the bilateral labia as well as dry secretion swab 1.43 from

17  the bilateral labia.  Also amylase found on vulvar swabs.

18    Q    Before you move, you just mentioned some numbers 1.41

19  and 1.43.  What do those numbers means?

20    A    I previously mentioned there were four swabs, Four dry,

21  secretion swabs so 1.41 is the number we designated for the first

22  swab of that of area.  So they will all be named either 1.41,

23  1.42, 1.43, or 1.44.

24    Q    And you can continue with the results?

25    A    So we were able to do PCR testing specifically Y STR,

Amalia Hudson, SCR

**PARK - DIRECT - TAMARIZ**

1    PCR testing on four of the items.  The dry secretion swab 1.41

2    from bilateral labia, dried secretion swab 1.43 from bilateral

3    labia, vulvar swab, and the oral swab, swab remains fraction.

4        Q    If you could just explain some of the terms for us

5    before you move on.  You mentioned PCR DNA testing and Y string.

6        A    Sure. So PCR DNA typing is what we do to the samples to

7    generate the data that we look at to see the DNA profiles.

8            PCR stands for polymerase chain reaction, and

9    essentially it is the technique that we use to amplify the

10   starting amount of DNA that we get from that sample.  Why STR is

11   basically the test that we do specifically to the Y chromosome.

12           As I describe earlier we have autosomal DNA testing, and

13   we have Y STR DNA testing.  Autosomal is the testing that we do

14   to all of the information that we get from all of the other

15   chromosomes.  Not the sex determining chromosome, and the Y

16   testing is the result that we get just from the Y chromosome.

17       Q    And that exists only in males.

18       A    Correct that is only in males.

19       Q    And if you can continue with the results?

20       A    Sure.

21           So when we tested these four samples for Y, we were able

22   to find the DNA profile of one male, and at this time we don't

23   know who this male is, so we will call him male Donor A.  So we

24   found the DNA profile of male Donor A.  The Y profile on four

25   different items.

**Amalia Hudson, SCR**

A669

PARK - DIRECT - TAMARIZ

1    Q    And the four different items that you just mentioned?

2    A    That I just mentioned, yes.

3    Q    And can you talk to us about the oral swabs you said

4    oral swabs, swab remains fraction can you further elaborate on

5    that?

6    A    So when I first described the result.  I said that semen

7    was found on the oral swab, the swab collected from the mouth.

8    When we detect the presence of semen, we subject the sample to a

9    test called a differential extraction.  An extraction is a way to

10   get the DNA out of the cells in the sample.

11        A differential extraction is where we expect there to be

12   sperm cells, and sperm cells can be separated from the epithelial

13   cells when you do a differential extraction, and the reason why

14   we would want to do that is because you can actually get a

15   separation of the different contributors in this sample if you

16   separate the sperm cells from the epithelial cell.  The

17   epithelial cell is basically the name that we give a cell

18   collected from a skin or any other type of cell not sperm cell.

19        So we do this separation extraction in the hopes of

20   getting a clear distinction of the different contributors to this

21   sample.  However, sometimes if there are very low amounts of DNA

22   from any given contributor.  Generally if there is a low amount

23   of DNA from the potential contributor of the semen or sperm, you

24   won't get a very good separation because it will be too low to be

25   detected often.

## PARK - DIRECT - TAMARIZ

1      When we do the separation, we call it a fraction so we

2   have the epithelial fraction.  We have the sperm fraction, and we

3   have the swab remains fraction. So as I described earlier the

4   sperm fraction ideally has a fraction collected from the sperm

5   cell.  That's DNA.

6      The epithelial fraction ideally has the fraction

7   collected from the other cell.  In this case probably the female

8   cell, and the swab remains fraction is the of part of that

9   separation that has the swab.  As I described earlier a swab

10   looks like a Q-tip.  The way they collect these samples is they

11   rub the swab on the area.  So that last fraction has the remains

12   of the swab, and we keep that because sometimes if you don't

13   recover enough DNA from the epithelial or the sperm cell

14   fraction, you might have some cells that were caught between the

15   fiber of the swab, and you might be able to use that information.

16      In this case, we were able to do Y STR testing on the

17   swab remains fraction.  Usually we use the sperm remains

18   fraction, but that fraction had very low DNA.

19      Q    What does that mean when there is very low DNA for the

20   sperm fraction?

21      A    So when we did the separation, ideally it's the sperm

22   cells that are separated in this fraction.  There's probably no

23   sperm cells recovered or very little, too little to get enough

24   DNA from that fraction.  So that particular fraction for the oral

25   swab did not have sufficient DNA for further testing.

PARK - DIRECT - TAMARIZ

1    Q    And can you continue with the explanation of the results

2  from where you left off earlier?

3    A    So we also did autosomal tests on all of the samples

4  that had sufficient DNA for testing.  When we did the autosomal

5  testing, we were able to recover the DNA profile of Cypress Smith

6  on the oral swab, swab remain fraction, the dry secretion 1.41

7  from the bilateral labia, dry secretion swab 1.43 from the

8  bilateral labia, and the vulvar swab.

9    Q    And if those swabs were obtained from Cypress Smith

10  would you expect to see that?

11    A    Yes.

12    Q    Can you explain why?

13    A    As I described how they collected these swabs, for

14  example, the oral swabs, the cotton Q-tip is placed in her mouth

15  where she has saliva, and it's rubbed against her cheek cells.

16  So there is a lot of DNA and saliva and obviously a lot of DNA

17  and cheek cells since that is the preferred method that we use to

18  collect references samples in fact.  So you expect to see a lot

19  of DNA from that person there.  In addition, the dry secretion

20  swabs were collected in the same manner.  So for the area that

21  they listed the, bilateral labia, they take this cotton swab and

22  they rub it against a person's skin.  So you would also expect to

23  see more of a contribution from the individual than any DNA that

24  was deposited from another individual.

25    Q    What about the results for the oral swab epithelial cell

Amalia Hudson, SCR

A672

PARK – DIRECT – TAMARIZ

1    "Dear Judge Merchan, I am writing this to respectfully

2    ask that Dr. Micsh Resnick, a third year pediatric resident

3    at the Children's Hospital in Montefiore be relieved of his

4    current service on the case as part of his jury duty.  His

5    absence from his work, taking care of pediatric inpatients at

6    Children's Hospital at Montefiore has created a hostile

7    staffing hardship.  Thank you for considering this request."

8         I will hand it down so you can look at it.  I have to

9    tell it's the fist time I have ever been notified by

10   someone's employer.  Would you like me to bring him in?

11             MR. HERLICH:  Okay.  That would be great, Your

12   Honor.

13             COURT OFFICER:  One juror entering.

14             THE COURT:  Good afternoon, Dr. Resnick.  Are you

15   familiar with the letter that I have been handed.

16             JUROR:  Yes.

17             THE COURT:  So how do you peel about this?

18             JUROR:  Well, you know I didn't request it.  It was

19   on the request of my supervisor, and I know I had stated

20   during jury selection that it wouldn't be a conflict, so I

21   feel -- I don't know -- like I misled you guys, but I thought

22   there would be coverage, and there has been, but I don't know

23   what the hardship is right now that is going on.

24             THE COURT:  Well, would it present a hardship for

25   you if I were to stay with us?  Would this create a problem

**PARK - DIRECT - TAMARIZ**

1   for you with your employer?

2          We do have alternates.  If we have to relieve you, we

3   can, but I'm something that I don't do freely, you know.

4          JUROR:  Right.  I understand.  I don't want a

5   special exception to be made of myself, so, I mean I can deal

6   with the consequences.  I prefer to the stay on case, and

7   then I will just explain to my supervisor I'm staying on the

8   case, and I will deal with what comes.

9          THE COURT:  Are you sure that it's not going to

10  create a personal problem for you there?

11         JUROR:  I'm sure.

12         THE COURT:  Any followup question from either

13  attorney?

14         MS. PARK:  No, Your Honor.

15         COURT OFFICER:  No.

16         THE COURT:  Thank you.  I appreciate that.

17         JUROR:  She might give you a call later though,

18  okay.

19         THE COURT:  Okay.  Thank you.

20              (Juror exits)

21         THE COURT:  All right do we have all the jurors?

22         COURT OFFICER:  Yes.

23         THE COURT:  Okay.  Let's get the witness in first.

24         MS. PARK:  Judge at some point I can move in the

25  coffee cup, straw, and glass which was already -- which is in

**Amalia Hudson, SCR**

A674

PARK - DIRECT - TAMARIZ

1    evidence marked for identification as 15, 16, 17, and my

2    position is that the connection has been made for that

3    property.

4              THE COURT:  They were in evidence subject to

5    connection.

6              MS. PARK:  Yes.

7              MR. HERLICH:  My argument -- you want to hear

8    argument at this point, Your Honor.

9                   (Witness enters)

10             MS. PARK:  We can do it later.

11             THE COURT:  We'll, do it later.

12        I remind you, you are still under oath.  Let's bring the

13   jury in please.

14             COURT OFFICER:  Jury entering.  Please rise.

15             THE CLERK:  Continued case on trial.  People v.

16   Lonnie Harrell.  All parties are present. All jurors and

17   alternates are present.

18             THE COURT:  Good afternoon jurors.

19        Ms. Park.

20   DIRECT EXAMINATION CONTINUED

21   BY MS. PARK:

22        Q    Ms. Tamariz, before we broke for lunch we were talking

23   about some of the items from the rape kit and just to reiterate,

24   the Y strain, was there a Y strain DNA profile for a male

25   developed from any of items?

PARK - DIRECT - TAMARIZ

1    A    Yes.  There as was a Y Strain profile developed from the

2  dry secretion swab 1.41 from labia, dry secretion swab 1.43 from

3  bilateral labia, the vulvar swab, and the oral swab, swab remains

4  fraction.

5    Q    I am now going to show you People's Exhibit 26 that has

6  been premarked for identification.  Do you recognize People's 26?

7    A    Yes.

8    Q    And that is it?

9    A    It is a certified copy of one of the files that I have

10  in my case.

11    Q    And what is the file the FB number for that file?

12    A    It is FBS1500044.

13    Q    Can you tell you what that stand for FBS?

14    A    FBS is the designation that we give to samples that come

15  in as reference samples for suspects in a case.

16    Q    So is that Forensics Biology Suspect?

17    A    Correct.

18    Q    And is that a known exemplar?

19    A    Yes.  This a known sample.

20    Q    Who does that belong to?

21    A    It is a known sample from Mr. Lonnie Harrell.

22    Q    And was a DNA profile developed from Lonnie Harrell's

23  buccal swab?

24    A    Yes, it was.

25    Q    And were notes of each step of the testing kept in the

PARK - DIRECT - TAMARIZ

1   manner that you had to describe earlier before we broke for lunch

2   as business records?

3        A     Yes.

4        Q     And again People's 26 that is in front of you, that is a

5   certified copy, correct.

6        A     That's correct.

7        Q     Did you have an opportunity to compare the copy that is

8   in front of you to the original?

9        A     Yes.

10       Q     Is that an exact duplicate?

11             MS. PARK:  Your Honor, I offer People's 26 in

12       evidence subject to redaction.

13             MR. HERLICH:  No objection.

14             THE COURT:  People's 26 is accepted in evidence

15       subject to redactions.

16       Q     Now, I am going to show you People's Exhibit 20 that has

17   been marked for I.D. only.  Do you recognize People's 20?

18       A     Yes, I do.

19       Q     What is it?

20       A     This is the evidence packaging for the sample collected

21   for this case.

22       Q     And how do know it to be that?

23       A     Because it has the initials of the analysis who did the

24   testing, and it also has the indicative yellow evidence tape that

25   our laboratory uses to seal the package.

PARK - DIRECT - TAMARIZ

1    Q    And does that contain Lonnie Harrell's buccal swab?

2    A    Yes, it is does.

3    Q    And when did your lab receive that item?

4    A    If I may refer to my notes.

5         (Pause in proceedings)

6    A    This was received January 9, 2015.

7    Q    What condition was it in?

8    A    In a sealed package.

9    Q    And after the analysis, what happened to the envelope?

10   A    After the analysis it is resealed and then stored in a

11   locked cage.

12   Q    And you mentioned earlier that it's the yellow tape?

13   A    Correct.

14   Q    And can you look at the envelope that is inside that

15   bigger envelope.  Do you recognize that?

16   A    Yes, I do.

17   Q    What is that?

18   A    This is generally how they packaged the evidence, this

19   type of evidence.  They generally put it into two envelopes, and

20   this is just the inner envelope used to contain the swab, and I

21   also see the analyst's initials as well as the sticker generated

22   from our computer system with the case file number, and the

23   yellow evidence tape sealing the package.

24   Q    And is that in the same -- other than the exhibits being

25   opened, is that in the same condition as it was from the last

PARK - DIRECT - TAMARIZ

1    time?

2        A    Yes.

3            MS. PARK:  Your Honor, I offer People's 20 into

4    evidence connection having been made.

5            THE COURT:  Any objection?

6            MR. HERLICH:  Can we approach.

7            THE WITNESS:  Sure.

8        (Discussion held at sidebar)

9            MR. HERLICH:  My only objection would be, Your

10   Honor, I don't believe it was any testimony that that item of

11   evidence was transported from the laboratory from Jamaica

12   Queens to the Office of the Chief Medical Examiner in

13   Manhattan.  Other than that, that is the basis for the

14   objection.

15           MS. PARK:  I don't think that is necessary here

16   since two other officers, Pinard and Officer Barbato

17   testified as to the chain of custody.

18           THE COURT:  I believe the chain of custody has been

19   established.

20       (Proceedings resumed in open court)

21           THE COURT:  The objection is noted and I note the

22   Court finds the connection has been made as to People's 20.

23       Q    Ms. Tamariz, you stated earlier that you developed a DNA

24   profile for Lonnie Harrell.

25       A    Yes.

PARK - DIRECT - TAMARIZ

1      Q    Did you develop a Y strain DNA profile for Lonnie

2   Harrell?

3      A    Yes, we did.

4      Q    How do they differ partner?

5      A    The Y strain is specifically the DNA profile just for

6   the Y chromosome and the autosomal strain is the -- it has the

7   information, further DNA profile for all of other chromosomes

8   that we look at.

9      Q    Did you compare the Y strain DNA profile of Lonnie

10  Harrell with the Y strain DNA profile from some of the swabs from

11  the rape kit that you talked about earlier?

12     A    Yes, we did.

13     Q    What was your determination?

14     A    The Y DNA profile of Lonnie Harrell is the same DNA

15  profile as the Y DNA profile from male Donor A recovered from the

16  items in the kit.

17     Q    Did you test any other items in connection with this

18  case?

19     A    Yes, we did.

20     Q    What other items did you test?

21     A    There was additional evidence that came in, and the

22  additional evidence was a swab of the top of the straw, swab of

23  broken -- rim of broken drink glass, and swab of a rim mouth area

24  of cup.

25     Q    I am going to show you what has been previously marked

PARK - DIRECT - TAMARIZ

1   for identification as People's 18.  Do you recognize people's 18?

2        A    Yes, I do.

3        Q    And what is that?

4        A    This is the evidence packaging for the item collected

5   for this voucher.

6        Q    And what is the voucher number for that?

7        A    The voucher number is Z010129.

8        Q    When did your lab receive that item?

9        A    We received it July 29, 2014.

10       Q    What condition was it in?

11       A    It was sealed.

12       Q    And how was it sealed?

13       A    Sealed with tape.

14       Q    And what was contained in the envelope?  Sorry you.  You

15   said swabs, correct?

16       A    Yes.

17       Q    And after you tested the swabs, what happened to that

18   envelope?

19       A    It is sealed again, and it is put in a cage, locked cage

20   within our laboratory.

21       Q    And can you tell us by looking at that exhibit what tape

22   belongs to your lab?

23       A    Yes, I can.  It has the yellow evidence tape that we put

24   on the packaging as well as the initials of the analysts in

25   addition to the label that we print and place on the package.

## PARK - DIRECT - TAMARIZ

1    MS. PARK:  Your Honor, at this time, I offer

2  People's 18 in evidence connection having been made.

3    MR. HERLICH:  Other than the same objection made at

4  the sidebar, Your Honor.

5    THE COURT:  And your objection is noted, and

6  overruled.  People's 18 is fully in evidence.

7    Q    Ms. Tamariz, can you tell us the result of the tests for

8  those swabs?

9    A    So DNA sufficient for STR DNA testing was detected on

10  the swab of the top of the straw, and the swab of the rim mouth

11  area of cup.

12    Q    And what about the broken glass?

13    A    There was no DNA suitable for testing recovered from the

14  sample from the swab of the rim of broken drink glass.

15    Q    And what does that mean?

16    A    It means that when we sent this for testing and did the

17  whole extraction procedure to extract the DNA, the step after

18  extracting is quantitation.  We actually measure to see how much

19  DNA we recover from that swabbing.  In that particular case for

20  that item there was not enough DNA recovered to continue with

21  testing.

22    Q    And with respect to the swab from the top of the straw

23  and from the rim of the -- rim area of the cup, was that a single

24  source?

25    A    Yes.

PARK - DIRECT - TAMARIZ

1    Q    Can you explain what a single source means?

2    A    A single source verses a mixture.  A single source is

3    what we call when we see the DNA of only one person.  We call it

4    single source because often when we do this type of sampling, we

5    can get a mixture.

6         A mixture is when we detect the presence of more than

7    one individual on the item or on this sample, and this particular

8    case we were able to detect the presence of only one person, a

9    single source.

10   Q    And was a DNA profile developed from that?

11   A    Yes, it was.

12   Q    And was it a male or female?

13   A    It was a male.

14   Q    Did you compare the DNA profile from those swabs to the

15   DNA profile of Lonnie Harrell?

16   A    Yes, we did.

17   Q    What was you determination?

18   A    The DNA profile is the same as the DNA profile of

19   Mr. Harrell.

20   Q    And can you tell us how common or how rear that is?

21   A    Yes.  You would expect to find this DNA profile one in

22   greater than 6.8 trillion people.

23   Q    What does that mean?

24   A    It means that, for example the population of planet

25   Earth has about 6.8 billion people.  It means that in order to

PARK - DIRECT - TAMARIZ

1   randomly see this unique profile once, you would have to search

2   the population of over 1000 planet Earths, and once you

3   collectively look at the population of over 1000 planet Earths,

4   you would expect to randomly see this profile once.

5        Q    I'm now going to show you People's Exhibit 27 marked or

6   identification.  Do you recognize People's 27.

7        A    Yes.

8        Q    What do you recognize it to be?

9        A    It is a table with the information from my case file.

10       Q    And the case file that's is in evidence already as

11  People's Exhibit 27 and 28?

12       A    Yes.

13       Q    Sorry.  Not 27.  25 and 26?

14       A    Yes.

15       Q    And did you review that table prior to coming to court

16  today?

17       A    Yes, I did.

18       Q    And all the information that is contained on that table

19  than comes directly from the two exhibits that I just mentioned?

20       A    Yes.

21            MS. PARK:  Your Honor, I Offer People's 27 in

22       evidence.

23            MR. HERLICH:  No objection.

24            THE COURT:  People's 27 is accepted into evidence.

25       Q    If you can just look at chart or table and just explain

PARK - DIRECT - TAMARIZ

1   to us what we are looking at what those symbols mean and what

2   those number mean?

3        A      Sure.  If I may approach.

4               THE COURT:  Yes, of course.

5        A      Okay.  So in this table you will see the different

6   location on the Y chromosome that we test.  So this top row

7   described the name of the location, and this first column has the

8   name of each sample.  So here we have 1, 2, 3, 4 samples that we

9   tested for Y STR, and the data that we recovered for the Y STR

10  testing.

11              On the bottom you will also see the DNA sample from

12  Lonnie Harrell that we also tested for Y STR, and in this way you

13  can see the comparison, and a comparison is very simple.  You

14  basically start with the first location, and you look to see what

15  number was recovered.  This number represents the allele at that

16  location, and as I described before and allele is a variation on

17  a gene.

18              We see this data in numerical form.  So in this first

19  location, you will see a No. 15.  That is for the swab 1.41 from

20  the labia.  If you go down, you will also see swab 1.43 for the

21  labia also has a 15.  Vulvar swab also has a 15.  Oral swab also

22  a 15, and Mr. Lonnie Harrell also has a 15.

23              Now, we don't just look at one.  We have to look at all

24  of the locations.  So the first thing you do is you go sample by

25  sample and you see what profile you generated.

PARK - DIRECT - TAMARIZ

1    Notice how at all of these locations except for this one

2  DYS385 you only see one number.  That is because in this -- those

3  locations that we test on the Y chromosome you only expect to see

4  one number if it's a single source male.  At that location DYS385

5  you expect to see two numbers if it's a male.  So we evaluate

6  this.  We determine if it's one or more contributors, and in this

7  case we are able to conclude that it's one contributor, and we

8  also compared the evidence samples to each other and found that

9  they all consistent with each other.  Especially 1.41, 14.3, and

10  vulvar swab at every single location are the same exact numbers

11  recovered.

12    Here in the oral swab notice there are some blanks.

13  That means that there was insufficient data.  In other words some

14  data is missing, so we can only make comparison at the locations

15  where we have data, and we apply stats to the data that we

16  recovered.  So these first three samples that have the same exact

17  data will have the same stats and the oral swab will have it's

18  own stats because that is all we have to compare to.

19    Now, we take the swab for Lonnie Harrell, and we first

20  visually inspect it to see if there are similarities if they're

21  the same, and Y STRs are very useful especially for making

22  exclusions because if it's not the same DNA profile then that

23  answers that question.  It's not the same individual.

24    In this case, as you could see, all of the numbers at

25  all the locations tested are the same.  So we cannot exclude him

Amalia Hudson, SCR

A686

PARK - DIRECT - TAMARIZ

1   from being a contributor to this or this Y STR DNA profile.

2       Q    And you mentioned that -- you can have a seat -- with

3   particularly with the oral swab that there was not enough DNA?

4       A    Particularly with the oral swab and actually with all of

5   these swabs, there was not enough DNA for a male contributor to

6   do autosomal.

7           Now, autosomal STRs are more discriminating because we

8   look at more locations, and these location are all independent of

9   each other.  This is only one chromosome.  All the other

10  locations and Y STRs are independent and, therefore, you can

11  multiply the frequencies together and you can get a more

12  discriminating number.

13          In all of these samples, we were not able to do

14  autosomal.  We could only do Ys because there were so little male

15  contribution on all of these samples when we did the DNA

16  extraction, and in the oral swab you could see it was some

17  locations missing because it was a very low amount of DNA for the

18  male to begin with, so we don't have a full profile.

19      Q    But the fact that you were able to obtain a Y strain

20  profile means that there was a presence of male DNA?

21      A    Yes.

22      Q    And that DNA if you can tell us again how that DNA

23  matched or how that related to that of Lonnie Harrell's DNA, Y

24  strain profile?

25      A    So the profile that we recovered from the samples is the

Amalia Hudson, SCR

PARK - DIRECT - TAMARIZ

1   same as the profile from Mr. Harrell.

2       Q    And what is -- is there something particular about the

3   oral swab or the mouth area that might make it less likely to

4   leave a lot foreign DNA behind?

5       A    Sure.  Your constantly swallowing, talking, eating

6   spitting, so all of this stuff will increase the chances for you

7   to wash away whatever foreign DNA could be in there.

8            So generally we actually don't recover male DNA from an

9   oral swab because of the nature of the location that you're

10  testing, and also time could be a contributing factor depending

11  on how quickly they did the sampling of the oral after the

12  incident happened.  That also contributes to most of it getting

13  washed away before they even detect anything.

14      Q    Would drinking water affect that?

15      A    Sure, yes.

16      Q    I am now going to show you People's 28 marked for

17  identification.  Do you recognize People's 28?

18      A    Yes.

19      Q    What do you recognize it to be?

20      A    This is also a table with results that is also contained

21  in my case file.

22      Q    So all the information in there comes directly from

23  People's 25 and 26 that is already in evidence, correct?

24      A    Yes.

25      Q    And you had a chance to review that before coming to

PARK - DIRECT - TAMARIZ

1    court today?

2        A    Yes.

3            MS. PARK:  Your Honor, I offer People's 28 in

4        evidence.

5            MR. HERLICH:  No objection.

6            THE COURT:  People's 28 is accepted into evidence.

7        Q    If you can do the same thing just explain to us the

8    columns, the rows, the numbers?

9        A    So on the top here are all of the autosomal locations

10   that we test, and the top column, or row again, describes the

11   name of the 15 locations that we test, and down directly below

12   that you will see the DNA profile recovered from the sample of

13   the swab of top of straw, and then directly blow that is the

14   other sampling that we did the swab of rim mouth of cup, and

15   begin cross the table you will see all of the alleles that were

16   recovered in the locations that we test.

17           For autosomal DNA results, as I described earlier, DNA

18   is the genetic material we all have in our bodies, we get half of

19   our DNA from our mother and half of our DNA from our father.  So

20   you expect to see half of the contributions coming from mom; half

21   of the contribution coming from dad.

22           The reason why I am explaining that is that is the

23   reason why you see two numbers here at these autosomal locations

24   that we test, so if you are looking at a single source sample,

25   you expect to see up to two numbers at every location.  There are

Amalia Hudson, SCR

PARK - DIRECT - TAMARIZ

1    some locations, for example, here at D7S820 were you see that we

2    only put one number in the table.  That means that that person

3    received that same allele, in this case it's a 10 from mom and

4    from dad.  So we would only write it once.

5         Q    So rather than just write 10,10, 10,10?

6         A    Correct exactly.

7         Q    So this basically describes all of the alleles for the

8    persons DNA profile, and if you put all of this together, that is

9    where you get that unique serial number that everyone has.  No

10   two individuals are alike with the exception of identical twins.

11        So then we did the comparison of Mr. Harrell to the

12   sample to the DNA profiles that we recovered from the samples,

13   and like the comparison that I did for Ys, I go step by step

14   starting with the first location.  I see that in the sample I

15   have a 10 and a 14, and then I look at the DNA profile of

16   Mr. Harrell, and I have a 10 and a 14 also.

17        Again we cannot just look at one location, we have to

18   look at all of them because collectively that's where you get

19   that rarity of greater than 6.8 trillion.  So we look at all of

20   the locations, and, as you can see in this, every single location

21   has the same exact numerical string of numbers.  So this DNA

22   profile is the same as Mr. Lonnie Harrell.

23             MS. PARK:  I have no further questions?

24             THE COURT:  Your witness.

25   CROSS EXAMINATION

HERLICH - CROSS - TAMARIZ

1   BY MR. HERLICH:                                              .

2       Q    Go good afternoon.

3       A    Good afternoon.

4            MR. HERLICH:  Officer, could you put up the other

5   charts?

6            COURT OFFICER:  Sure.

7            MR. HERLICH:  Thank you.

8       Q    Let me begin by asking you could you tell all of us

9   precisely where and what is the labia?

10      A    Yes.  The labia is area in the vulvar.

11      Q    Which is?

12      A    Of the female genitalia.

13      Q    And there were two swabs of the labia of Cypress Smith

14  taken in this case, is that correct?

15      A    Actually there were four.

16      Q    Four swabs.  But two swabs that yielded biological

17  material for you to attempt to generate a profile?

18      A    Yes.

19      Q    And so I'm referring to those two and also to the vulvar

20  swab.  You indicated that -- first of all was Cypress Smith's DNA

21  mixed in with the DNA of male Donor A with regards to the labial

22  swab and the vulvar swabs?

23      A    I'm not sure what you mean by mixed in.

24      Q    Well, you said it was -- there was just one donor?

25      A    For the vulvar swab Y strain, yes.

Amalia Hudson, SCR

HERLICH - CROSS - TAMARIZ

1    Q    Of course.  So you did Y strain analysis because you

2  were you looking for a male?

3    A    We had reason to believe that there could be male DNA.

4    Q    Could you have done a standard DNA analysis on the

5  vulvar swab and the labia swabs?

6    A    Yes, and I think we did.

7         (Witness reviewing paperwork)

8    A    Yes, we did.

9    Q    And did you get a profile of a male donor?

10   A    When we did the standard autosomal DNA analysis of those

11  items, we got the DNA of only one individual Ms. Cypress Smith.

12   Q    Now, the biological material that you ultimately tested

13  using the Y chromosome analysis that was amylase, correct?  That

14  was the source?

15   A    We did identify the presence of amylase on the dry

16  secretion 1.41 and 1.43.

17   Q    And that -- does that indicate that saliva was the

18  source or the saliva could be the source of that amylase?

19   A    That is correct.

20   Q    Now, you pointed to the LOCUS DYS385.  Can you tell us

21  again why there are two numbers at that location?

22   A    It has to do with the primer that we use for the this

23  particular testing.  In this location we are able to

24  differentiate two alleles for that location.  As I showed you in

25  the other table, it's generally the more information you can get,

Amalia Hudson, SCR

A692

HERLICH - CROSS - TAMARIZ

1    the autosomal ones you all always get two alleles, the more
2    statistics you can apply to it.
3          So if we can get two from these other locations that
4    would great because then we could apply more frequencies,
5    however, it's very difficult when you are looking at one
6    chromosome.  You generally are going to expect to only see one
7    allele for that specific location that we test.  That is just the
8    nature of that particular location.  We can recover information
9    in the form of two alleles, and then we can apply statistics to
10   that.
11       Q    Is the reason for the two numbers the same as in the
12   standard analysis where there is a contributor from the mother
13   and contributor from the father, or is it a completely different
14   reason for having the two numbers?
15       A    It's a completely different reason because here we are
16   specifically looking at Y chromosomes which is only inherited
17   paternally.
18       Q    Now, you did -- you indicated what the statistics were
19   with regard to the standard DNA analysis that you performed on a
20   straw and the rim of the the coffee cup, correct?
21       A    Yes.
22       Q    And you indicated basically that Lonnie Harrell is the
23   only person on planet Earth that statistically speaking could
24   have been the individual that contributed that DNA?
25       A    Yes.

HERLICH - CROSS - TAMARIZ

1    Q    Now, with regard to the analysis done from the two

2  labial swabs 1.41 and 1.43 the statistics are extremely different

3  isn't that, correct?

4    A    The Y statistics.

5    Q    Yes?

6    A    Yes.

7    Q    And in fact one in 685 African American males would

8  statistically have that profile, is that fair to say?

9    A    That's fair.

10   Q    So hypothetically speaking thousand of individuals in

11 New York City could have contributed that DNA to that labial swab

12 ultimately?

13   A    Yes, and not only that actually anybody on his paternal

14 line.  So any paternal relative of Mr. Harrell could have also

15 contributed because they would have the same Y STR profile.

16   Q    And with regard to the oral swabs, swab remains fraction

17 which I believe is 1.1.1, is that correct?

18   A    Which sample are you talking about again?

19   Q    Again we are doing the Y chromosome analysis on the oral

20 swabs, swab remains fraction?

21   A    Yes.

22   Q    The statistics would be one in 321 African American

23 males, correct?

24   A    Yes.

25   Q    So again thousand of people in New York City alone could

HERLICH - CROSS - TAMARIZ

1  have contributed that DNA?

2      A     That and any of Mr. Harrell's paternal relatives.

3      Q     Now, is this analysis regarding the Y chromosome is that

4  the same as what is referred to as low copy number analysis?

5      A     No.  It's not.

6      Q     What is low copy number analysis?

7      A     Low copy analysis is a type of analysis that is done

8  when you're starting out with a very low amount of DNA, lower

9  than what generally speaking most of the country does for testing

10  or what we like to call the "standard DNA testing."

11      Q     And was low copy number testing performed in this case?

12      A     No.  It was not.

13      Q     The question about the swabs that you received from the

14  N.Y.P.D. laboratory with regard to the straws and the rim of the

15  coffee cup, did you also receive a swab from the plastic, the

16  swab the plastic top of the coffee cup, the tab that is opened in

17  order to enable a person to drink?

18      A     We did also receive swab of tab on lid of cup.

19      Q     Was there no recoverable biological material from that

20  swab?

21      A     That was not examined.

22            MR. HERLICH:  Thank you.

23            THE COURT:  Ms. Park?

24  REDIRECT EXAMINATION

25  BY MS. PARK:

Amalia Hudson, SCR

A695

PARK - REDIRECT - TAMARIZ

1      Q    Mr. Herlich asked you about low copy number, and that

2  that was not done in this case.  Why is that?

3      A    Because there was a lot of DNA recovered on this case a

4  lot of autosomal DNA and low copy is only for autosomal DNA when

5  you have a very low amount of DNA total recovered.  All of the

6  samples provided a lot of DNA a lot of female DNA in fact, so

7  there was way sufficient DNA for the normal autosomal testing.

8      Q    And you mentioned you talked about the mouth area but

9  can you also talk about the vaginal area and whether what factors

10  might affect the detection of any foreign DNA?

11     A    Sure.

12          If the individual -- first of all time.  Because as time

13  progresses your secretions also, you know, extract, and therefore

14  you can -- obviously things can get washed out over time.  DNA

15  can also degrade.  If it's foreign DNA it can also degrade over

16  time.  If the individual physically washed herself that could

17  contribute.  If she wiped herself clean that could also

18  contribute, and mainly time factor.

19     Q    And what about the presence of the woman's own DNA being

20  present down there.  Can you talk about that?

21     A    Sure.  Because in fact you are going to have a lot of

22  that person's own secretions down there.  There is an

23  overwhelming amount of DNA in your own secretions.  So often when

24  you are looking for foreign DNA, that contribution can be masked

25  by the overwhelming contribution of the person's own DNA.

Amalia Hudson, SCR

PARK - REDIRECT - TAMARIZ

1    Q    And just to -- just so we are clear.  There was not

2    enough male DNA to do a pull autosomal profile, right?

3    A    That's correct.  When we did the testing for autosomal

4    DNA, we actually only recovered the female DNA as a single

5    source.  The reason we proceeded for Y testing is because we had

6    a positive test for seminal fluid, and so knew that when you have

7    that situation if there is any male DNA present, you can detect

8    that only with Ys when have an overwhelming amount of female DNA

9    because the Y only targets the Y chromosome which woman do not

10   have.  So if there is any male DNA there even if it's being

11   masked by the female DNA, you will get it with the Y STRs.

12   Q    And seminal fluid meaning like semen?

13   A    Like semen, yes.

14   Q    And that was detected from the oral swab here?

15   A    Correct.

16        MS. PARK:  I have nothing further.

17        MR. HERLICH:  I just want to clarify that.

18   **RECROSS EXAMINATION**

19   **BY MR. HERLICH:**

20   Q    When you mentioned seminal fluid, you're talking about

21   the oral swab, correct.  You're not talking about the labial

22   swabs?

23   A    Right.  Semen was detected on the oral swab.

24        THE COURT:  Is that it?

25        MS. PARK:  I have nothing further.

Amalia Hudson, SCR

PARK - DIRECT - SINGH

1    THE COURT:  Thank you.  You can step down.  Next
2    witness, People.
3              (Witness exits)
4    MS. PARK:  The People call Dr. Singh, Anjay Singh.
5    COURT OFFICER:  Witness entering.
6    Remain standing. Raise your right hand.
7    THE CLERK:  Do you solemnly swear of affirm the
8    evidence you shall give to the Court shall be the truth, the
9    whole truth, and nothing but the truth?
10   THE WITNESS:  I do.
11   THE CLERK:  Have a seat, please.
12   COURT OFFICER:  For the record please, state your
13   full name last name and county of residence.
14   THE WITNESS:  Full name Anjay Singh.  Last name
15   Singh, S-I-N-G-H, Manhattan.
16   THE COURT:  Good afternoon, Doctor.
17   You may inquire.
18   DIRECT EXAMINATION
19   BY MS. PARK:
20   Q    Dr. Singh, by whom are you employed?
21   A    Mt. Sinai St. Luke's hospital.
22   Q    Where is that?
23   A    The upper west side, 1111 Amsterdam Avenue.
24   Q    About how long you have been employed by Mt. Sinai St.
25   Luke?

PARK - DIRECT - SINGH

1   A     Two years.

2   Q     What department are you in?

3   A     Emergency medicine.

4   Q     What is your possession there?

5   A     Attendings physician.

6   Q     How long you have held that possession?

7   A     At Mt. Sinai St. Luke's.  Two years.

8   Q     Are you licensed to practice medicine in the State of

9   New York?

10  A     Yes.

11  Q     And any other state?

12  A     Illinois as well.

13  Q     When did you receive your New York license?

14  A     November 2009.

15  Q     Can you please go through with us some of your

16  educational and professional background that lead you to your

17  current position?

18  A     So I attended medical school in India, and that was five

19  and a half years.  I did my residency in pediatrics that was

20  in -- at University of Illinois in Chicago.  That was three years

21  I did an Academic pediatric fellowship at University union of

22  Illinois as well.  That was two years.  I did a Master's in

23  public health.  That was has two years.  Again in University of

24  Illinois.  Then I did a fellowship in pediatric emergency

25  medicine.  That was three years.  That was at the University of

PARK - DIRECT - SINGH

1   Tennessee, Memphis, and Vanderbilt University, Nashville.

2          Then I initially was employed there for a year as an

3   attending physician, and then moved to New York.  I worked at

4   Kings County Hospital, Brooklyn as an attending for three years

5   as well, and then I moved to Mt. Sinai St. Luke's, and I've been

6   there two years.

7      Q    While you were with Kings County, what department were

8   you in?

9      A    Emergency medicine.

10     Q    Were you Board certified?

11     A    Yes.

12     Q    In what?

13     A    Pediatrics and pediatrics emergency medicine.

14     Q    When did you pass your Board?

15     A    Pediatrics was 2008.  Pediatrics emergency medicine was

16  2009.

17     Q    Is that your specialty?

18     A    Yes.

19     Q    And you mentioned that you worked in the emergency room

20  now at St. Luke's.  Do you work at -- do you work in the general

21  emergency room or pediatrics, or is that separate?

22     A    So the pediatrics emergency room is part of the general

23  emergency, but it's a separate area.

24     Q    And so where are you?

25     A    I'm in the pediatric emergency.

PARK - DIRECT - SINGH

1    Q    Do you do any teaching?

2    A    Yes, I do.

3    Q    Can you tell us about that?

4    A    So I supervise residents and medical students and

5    fellows when they are in the emergency during their clinical

6    shifts, and then I also do didactics with them.  I conference,

7    lectures.

8    Q    And the pediatric emergency room at St. Luke's what are

9    the age ranges or age cut off?

10    A    So we see from birth to 21 years.

11    Q    Can you describe your duties and responsibilities as an

12    attending?

13    A    So much of the same.  I mean I see patients so clinical

14    shifts where I see patients.  I supervisor residents and medical

15    students, and then I do other academic activities like lectures,

16    conference and then I am also the co-director of the students the

17    Sinai residents research associates.  They are students who do

18    research in the emergency room, so I work with them as well.

19    Q    And in your experience in working in the emergency room

20    at St. Luke's about how many patients have examined?

21    A    Just at St. Luke's.

22    Q    Just at St. Luke's.

23    A    It's hard to estimate but maybe like 500 a month.

24    Q    And you've been there for?

25    A    For two years.

PARK - DIRECT - SINGH

1    Q    And just in your career as a doctor during your
2    residency about how many patients have you conducted an
3    examination for who presented with sexual assault?
4    A    Probably hundreds.
5    Q    Are you familiar with the sexual offense forensic exam
6    kit?
7    A    Yes.
8    Q    And is that also known as a Safe Kit or Rape kit?
9    A    Uh, huh.
10   Q    About how many Safe Kits have you prepared?
11   A    I would say maybe roughly 10.
12   Q    And have you supervised other medical professional in
13   their preparation of Safe Kits?
14   A    Yes.
15   Q    About how many?
16   A    Some of that is included in the 10.  Like 10, 20
17   something like that.
18   Q    Have you ever testified as an expert in the Court of New
19   York State?
20   A    Yes.
21   Q    How many times?
22   A    Once.
23   Q    In what courts, or what court?
24   A    Manhattan court.  It was a sexual assault case.
25   Q    In Supreme Court?

PARK - DIRECT - SINGH

1   A    I don't recall.

2   Q    In what area were you qualified?

3   A    Emergency medicine and sexual assault.

4        MS. PARK:  Your Honor, at this time I ask the

5   witness be qualified as an expert in emergency medicine and

6   sexual assault forensics examine.

7        MR. HERLICH:  No objection.

8        THE COURT:  At this time the Court will recognize

9   Dr. Singh as an expert in the field of emergency medicine and

10  sexual assault.

11       MS. PARK:  I'm also going to move into evidence

12  People's Exhibit 21 and 22 the certified medical records and

13  they will be subject to redaction.

14       THE COURT:  Any objection?

15       MR. HERLICH:  No.

16       THE COURT:  People's 21 and 22 are accepted into

17  evidence.

18  Q    Doctor, I am going to ask you to turn attention to

19  July 16, 2014 were you working on this date?

20  A    Yes.

21  Q    Where were you working?

22  A    In the emergency room at Mt. Sinai St. Luke's.

23  Q    Did you an occasion to examine a patient by the name of

24  Cypress Smith?

25  A    Yes, I did.

Amalia Hudson, SCR

A703

PARK - DIRECT - SINGH

1      Q     Prior to coming to court today have you had an
2   opportunity to review her medical records?
3      A     Yes.
4      Q     How did Cypress Smith come to the hospital?
5      A     She came by ambulance, E.M.S.
6      Q     About what time was that?
7      A     Arrival was 1540.
8      Q     That would be 3:40 p.m.
9      A     Uh, huh.  Yes.
10     Q     How old was Cypress Smith as the time she came to the
11  hospital?
12     A     Fifteen.
13     Q     Do you know about what time you saw Cypress Smith?
14     A     So I saw her at around 7 p.m.
15     Q     Was she examined by another doctor prior to you seeing
16  her?
17     A     Yes.
18     Q     And was a physical examination conducted of Cypress?
19     A     Yes.
20     Q     What did that entail?
21     A     So the physical examine was done prior to my arrival,
22  but that usually entails head to toe examine starting with the
23  face exam the eyes, the mouth, the nose, the ears, and the skin.
24  Any evidence of trauma, external.  We examine the neck, the chest
25  the back, heart and lung exam.  Listen for breath sounds, exam

PARK - DIRECT - SINGH

1  the heart abdominal exam, and then we usually, for sexual assault

2  cases, defer the rest of the examine, the genital examination.

3       Q    And you mentioned trauma.  Are you.  You're referring to

4  physical trauma?

5       A    Yes.

6       Q    Physical injury?

7       A    Yes.  We examine the skin.

8       Q    And what did her physical examination show?  Were there

9  any injuries noted in the medical records?

10      A    So in the medical records it says there was an abrasion

11  to her right cheek.

12      Q    Were there any photographs taken of that?

13      A    Yes.

14      Q    You mentioned genital exam.  Who conducted that?

15      A    I did.

16      Q    Can you talk to us about how you conducted the genital

17  examine?

18      A    So the genital exam was part of the Safe exam that we

19  did.

20      Q    And did you do the Safe exam?

21      A    I did the safe examine.

22      Q    Did you do an evidence collection kit?

23      A    Yes.

24      Q    In the medical records if you look at Page 3.

25      A    Yes.

PARK - DIRECT - SINGH

1    Q    There is a notations where it says no lesion noted.  Do

2  you see?

3    A    Yes.

4    Q    Can you explain that section?

5    A    So.

6         MR. HERLICH:  Sorry.  Judge, just for clarification

7    indication, if says Page 3 of 6, or Page 3 of 8.  Could you

8    identify that?

9         THE COURT:  Please.

10   Q    It's Page 3 of the 6 of the Safe exam?

11        MR. HERLICH:  Thank you.

12   A    So on Page 3 of 6, so the genital exam is the external

13 examine in this case.  So lesions noted.  It's for the labia

14 majora.  So that means there is no evidence of any tears or

15 trauma bruising so essentially normal appearance.

16   Q    What labia majora?

17   A    It's part of the external genitalia of women.

18   Q    Did you do an evidence collection kit?

19   A    Yes.

20   Q    Is that the Safe Kit that you mentioned earlier?

21   A    Yes.

22   Q    I am going to show you People's 19.  Do you recognize

23 People's 19?

24   A    Yes.

25   Q    What do you recognize it to be.

PARK - DIRECT - SINGH

1    A    So that is the safe kit.

2    Q    Is that the safe kit that you did for Cypress Smith?

3    A    Yes.

4    Q    How do you know that it?

5    A    It has my name written on it, my handwriting.

6    Q    And after you prepared that kit, what did you do?

7    A    So we put a seal on at the side, put all the items

8    inside and put this orange seal on.

9    Q    And you said we.  Who are you referring to?

10   A    So I did the Safe exam with my resident.  So when we

11   were done, we finished, we put everything inside and sealed it.

12   Q    And is that kit in the same condition today as it was

13   when you -- Sorry withdrawn.

14        After you sealed it, what did you do with it?

15   A    So then we handed it to, or I handed it to the police

16   officer, Officer Hagen -- Hager.  Sorry.

17   Q    Officer Hager?

18   A    Hager.

19   Q    And is that -- now going back to the other question, is

20   that kit in the same condition today as it was when you turned it

21   over to Officer Hager?

22   A    No.  It has this yellow tape around it which wasn't

23   there before.

24   Q    So other than that is that in the same condition?

25   A    Yes.

PARK - DIRECT - SINGH

1        MS. PARK:  Your Honor, I offer People's 19 in

2    evidence connection having been made.

3        THE COURT:  Any objection?

4        MR. HERLICH:  Subject to connection.

5        MS. PARK:  Sorry. I withdrawn that.

6    Q    Doctor, if you can just go through with us the different

7    swabs that you collected from Cypress Smith and you can actually

8    open the box if that would help?

9    A    Yes.  That would help.

10       So typically once we open the kit, it has a series of

11   envelopes, and it has the individual steps on each envelope.  So

12   steps 1, to 15.  So typically I would take each envelope, read

13   the instructions each time and follow the instructions as given.

14   Open, remove the swabs from the envelope and do the steps step by

15   step each of the envelopes.

16   Q    And do you use one gloves for the entire exam, or how do

17   you do that?

18   A    So typically with each -- after doing each envelope, we

19   change gloves.  We seal the envelope.  We seal -- put the swab

20   back into the cardboard box, seal that.  Put it in the envelope,

21   seal that, and then change gloves and move on to the next

22   envelope.

23   Q    So once one envelope is completed, then you move on to

24   be second one?

25   A    Yes.

PARK – DIRECT – SINGH

1    Q    Just go through with us all the different swab that you

2    did for Cypress Smith?

3    A    Okay.  Step one included swabbing from the mouth, so the

4    inside of the mouth.  It's usually we don't wet it.  We just take

5    one swab from each side, and we take -- there is a slide in here

6    too.  You take the slide out.  It's written -- it's  clearly

7    marked oral, and we wait for the swab to be a little dry.  Place

8    it in the box.  Swab the slide as well, and place that inside.

9    Seal it, and then put it back into the envelope and seal that.

10   Q    And you said you label it oral?

11   A    It's already labeled oral, dry white oral on the slide.

12   Q    So the envelope is already labeled?

13   A    The slide is.  The slide is.

14   Q    And then what other swab did you do?

15   A    This is step two.  So this is another swab from the

16   buccal specimen.  So that is inside the mouth.  This is actually

17   the patient rinses their mouth out with water, and we use the

18   swab again, the swab marked inside the envelope, and then we

19   vigorously like swab inside the mouth, the cheek several times.

20   It's 15 to 20, so we count to 20, and then once the swab is a

21   little dry we wait for a couple seconds, and then we put it in

22   the box again.  Seal it.  Close it.  I typically seal it with the

23   one the stickers as well, the patient stickers, and then put it

24   in an envelope and close that as well.

25   Q    You can move on?

PARK - DIRECT - SINGH

1    A    So step three this was collected as well.  This is where

2    we have the patients -- I will read it as I go.  This is

3    typically what I will do.

4         Place one sheet of the exam table paper on the floor.

5    Place another piece of exam table paper on top of that, and we

6    usually have the patient disrobe on top standing on the piece of

7    paper, and then they step to the side.  We fold the top paper,

8    fold it several times and put it inside of the envelope, seal it.

9    So that is that.

10   Q    You mean the clothes that --

11   A    No.  So the patient stands on top of the sheet of paper,

12   and if anything falls.  So the intent is when they are standing

13   on top of the sheet of paper anything that is on their clothing

14   or on their person it gets collected on the sheet of paper.  So

15   we told that.

16   Q    Like trace evidence?

17   A    Trace evidence.

18        Step five it was not collect, so it is for wet or damp

19   underwear, which the patient did not -- the perpetrator had

20   taken, so that was not collected it's empty.

21        MR. HERLICH:  Objection.

22        THE COURT:  Sustained.

23   A    Step six.  So this is for collecting any debris that is

24   on the patients body.  So any foreign material, which the patient

25   did not have.  So it was not collected.

PARK - DIRECT - SINGH

1          Step seven.  So this again a swab specimen, so this

2    is -- we use the swab, which is actually moistened.  The swab is

3    moistened with a couple drops of tap water, and it's over any --

4    on the patient's body or any like dry secretion or bite marks.

5          Q    And what area was that done for?

6          A    That was done over the labia majora bilateral, which is

7    both sides.

8          Q    So bilateral labia?

9          A    Labia, yes.

10         Q    What is bilateral labia?

11         A    Bilateral means both side and labia is the labia majora,

12   so it's part of the external female genitals.

13         Q    Can you go on?

14         A    That was sealed again, swabbed and sealed.

15         Q    How many of those swabs did you collect?

16         A    For this one it has he two.

17         Q    Two, but one on each side, correct?

18         A    Yes.

19         Q    So that would be four swabs?

20         A    Yes. The additional swabs are if there are any dry

21   secretions anywhere else.  So just two.

22         Q    And what else?

23         A    The next one, Step 8.  So there is a bindle,

24   B-I-N-D-L-E, and basically it's a piece of paper, and there is

25   this wooden stick, and we kind of brush it under the nails of the

PARK - DIRECT - SINGH

1   patient, and that is allowed to fall on the piece of paper.

2       Q    Is that for fingernail scrapings?

3       A    Yes, scrapings.

4            So we do it both side left, right.  One for left.  One

5   for right and it's labeled.  We label it left and right, and fold

6   it, put it back in the envelope, seal it.  Step 9, this is —

7   this was not done.  This is for pulled hair samples which is no

8   longer done anymore for a Safe kit.

9            Step 10.  This was collected.  Again we removed a paper

10  bindle from the envelope, the sheet of paper and basically have

11  the patient, who is wearing a gown, that's disrobed at this

12  point, stand over the piece of paper, and there is a comb

13  provided in an envelope, and they comb the pubic hair and

14  whatever fall whatever debris or hairs, broken hairs falls on the

15  piece of paper that's collected, folded, placed in the envelope

16  and sealed, and the comb is followed inside it as well.

17           Step 11, pulled hair samples.  Again not collected.

18  Step 12, this was not done as well.  This was for anal and

19  perianal swab, so it was not done as well based on the patient's

20  history.

21           Step 13, this is again swabs were used moistened with

22  just a couple drop of tap water and again it's gently rubbed

23  against the labia majora and minora.  So there were two swabs and

24  both swabs are allowed to air dry like the previous swabs are

25  once it's dry we smeared it over the slide.  We allowed that to

PARK - DIRECT - SINGH

1  dry and then we put like patient's name sticker on both, and then

2  it's placed in a box, like a cardboard box that is closed, and we

3  usually seal what with the patient's name label as well.

4      Q    And is that also call the vulvar swab?

5      A    Yes. Vulvar in the case of females. So 14, it was

6  collected.  So these are two swabs as well, and this is from the

7  vaginal vault.

8      Q    What area is that?

9      A    That is inside the vagina of the patient.  It's more

10  internal. Both swabs are used.  There are not wet prior to doing

11  this.  We insert the swab into the vaginal canal and swab the

12  vault.  Allow it to air dry as well.  We make a smear for each of

13  these, put it on the slide, allow it to air dry.  Once those are

14  dry, we put the swabs in the cardboard container, seal that, put

15  the lid on the slide as well, seal that, and then put it in the

16  envelope and seal that.

17      Q    Did you also take the clothing that she had worn to the

18  hospital?

19      A    Yes.  They are all in -- garment clothing are in three

20  brown paper bags and sealed, and then the last Step 15 this was a

21  swab from the cervic, the cervical os.

22      Q    Sorry.  Cervical?

23      A    Os.

24      Q    Can you tell what that is?

25      A    That is the opening.  So at the end of the cervical

PARK - DIRECT - SINGH

1   canal that's an opening into the uterus.

2       Q    So that would be internal?

3       A    Internal but in her case, we just inserted the swab

4   inside of the vaginal canal, vaginal vault because she was not

5   sexually active.

6       Q    Were there test conducted for Cypress Smith?

7       A    Yes.  So we do routine blood tests in sexual assault

8   cases.  Just baseline blood count, liver function test, and a

9   urine pregnancy test as well.

10      Q    Was Cypress given any medication?

11      A    She was.  She was given post exposure prophylactics.  So

12  we give prophylactics for STDs, gonorrhea and chlamydia.  So that

13  includes a shot of Ceftriaxone, C-E-F-T-R-I-A-X-O-N-E, which is

14  an antibiotic for gonorrhea, and Azithromycin which is an

15  antibiotic chlamydia, and then she was given Plan B for avoiding

16  unplanned pregnancy, and I believe that's it.

17      Q    Are there any side effects for those medication?

18      A    Yes.  Most patients experience some nausea sometimes

19  vomiting which is usually rear, but nausea and a little bit of

20  abdominal discomfort is pretty common.

21      Q    About how long did your examination, Safe exam take?

22      A    It typically takes like one to two hours.  So the kit

23  was opened at 1855, and it was given to the officer at 2038.  So

24  approximately two hours.

25      Q    2038 is 8:38 p.m.

PARK - DIRECT - SINGH

1  A   Yes, yes.

2  Q   Doctor, in your opinion would you always -- would you

3  expect to see genital injury if fingers were inserted into a

4  vagina?

5  A   No.

6  Q   Can you explain why that is?

7  A   Typically for a number of reasons.  I mean the finger

8  might not cause any trauma, and secondly the general area tends

9  to, even post injury tends to heal very quickly.  So in most

10  cases of sexual assault it's very rear to see any evidence of any

11  external injuries, pretty rear.

12  Q   And can you talk to us about elasticity of muscle issues

13  around that area?

14  A   So typically the lining of the vagina is pretty elastic,

15  so it doesn't easily tear or get injured, but again signs of --

16  evidence of injuries is pretty rear.

17  Q   And if someone were to insert his finger or fingers

18  inside a woman's vagina and take it out, would you expect the

19  fingers to have moisture?

20  A   Yes because there's normal physiological discharge.

21  Q   Doctor, I am going to show you what is already in

22  evidence as well as Exhibit 13.  I'm just going to ask you to

23  look at the screen that is next to you.  Did you see this exhibit

24  before coming to court today?

25  A   Yes.

PARK - DIRECT - SINGH

1      Q     And is that injury consistent with an injury occurring

2   about a day or 24 hours prior to taking of that photo?

3      A     Yes, it's possible.

4      Q     And Doctor, when you're treating -- when you were

5   treating or making treatment plans for Cypress Smith, is all the

6   inform that she provides about what happened to the incident, is

7   that relevant?

8      A     Yes.

9      Q     Why is that?

10      A     So the patient's report of what happened and the

11   occurrence of the instances, very relevant.  Any steps that we

12   take, the exam that we do it's all based on, you know, patient's

13   report.  So it's extremely relevant.

14      Q     And do you consider everything that was said in coming

15   up with a treatment plan for a discharge plan?

16      A     Yes.

17           MS. PARK:  I have no further questions.

18           THE COURT:  Mr. Herlich?

19           (Proceedings continued next page)

20

21

22

23

24

25

Dr. Singh - Defense - Cross

1    CONTINUED CROSS-EXAMINATION

2    BY MR. HERLICH:

3        Q    With regard to information provided to you by a

4    patient who indicates they were sexually assaulted, that

5    information is used by you to determine what prophylactics is

6    necessary, isn't that correct?

7        A    Yes.

8        Q    And where to focus your attention in terms of what

9    areas need to be swabbed, for example?

10       A    Yes.

11       Q    In other words, you didn't do any anal swabs in this

12   case because you had no information indicating a reason to do

13   so, would that be fair to say?

14       A    That's true.

15       Q    So I believe you said that you became involved in this

16   case around 7:00 p.m.?

17       A    Yes.

18       Q    Do you know who the physician was prior to your

19   arriving to see Ms. Smith?

20       A    Yes, the previous attending was Dr. Sunderwirth.

21       Q    And is that the doctor who did the initial physical

22   examination?

23       A    Yes.

24       Q    And did you take any narrative information from the

25   patient in this case regarding the allegation of sexual

Joanne Fleming

A717

Dr. Singh - Defense - Cross

1   assault?

2       A    Not personally, no.

3       Q    You relied on that in terms of what swabbing was done

4   pursuant to the sexual assault forensic examination?

5       A    Well, the resident who was involved from the very

6   beginning was with me.  So the resident who had seen the

7   patient from the very beginning was also present and who was

8   the one I supervised with the SAFE exam.

9       Q    And the SAFE examiner is usually a nurse, is that fair

10  to say?

11      A    We have a SAFE examiner and they typically do the SAFE

12  exams thirteen and over.

13      Q    Does your hospital have a SAFE examiner normally on

14  staff or are they independent contractors that have to be

15  called to the hospital?

16      A    I'm not sure if they're on staff but they're

17  definitely on call.

18      Q    And on this particular day you were unable to reach a

19  SAFE examiner, is that correct?

20      A    Yes.  They had made several attempts to prior to

21  coming on shift.

22      Q    So because of that, it fell upon you to conduct the

23  SAFE exam in this case?

24      A    Yes.

25      Q    Now, when you discussed the fifteen steps that you do,

Joanne Fleming

Dr. Singh - Defense - Cross                    368

1   I missed step four.

2       A    I have to look at the box again.

3       Q    Okay, please do.

4            A COURT OFFICER:   (Handing.)

5       A    I don't see the step four envelope in here.

6       Q    Do you have any independent recollection what step

7   four involves?

8       A    I believe the step four is the patient's garments, but

9   that's just my recollection.

10      Q    So on step three you indicated that the patient

11  disrobes and stands on a piece of paper and if there's any

12  trace evidence attached to the patient's body, that would fall

13  to the paper, correct?

14      A    Yes.

15      Q    So you had an opportunity to observe Cypress Smith at

16  the time that she had disrobed?

17      A    Yes.

18      Q    And the --

19           MR. HERLICH:   Can we have that image again, thank

20      you.

21           (D.A. complies.)

22      Q    Did you observe that scratch at the time that you were

23  with Cypress Smith when she disrobed during the sexual assault

24  forensic exam step three?

25      A    I did not.

Joanne Fleming

A719

Dr. Singh - Defense - Cross

1    Q    And I believe you said in step ten the patient

2    disrobes, stands over paper and combs their pubic hair, is that

3    correct?

4    A    Yes.

5    Q    So that is the patient disrobes a second time?

6    A    Yes.

7    Q    Okay.

8         And during that second period of Cypress Smith being

9    disrobed, did you observe any injury of that nature to the back

10   side of her neck?

11   A    No.

12   Q    And were you present when a photograph was taken in

13   the hospital of the right side of her cheek?

14   A    No, my resident took that picture.

15   Q    And that took place before you arrived?

16   A    After we finished the sexual assault kit and that was

17   then given to the officer.

18   Q    So the picture of the right side of Cypress Smith's

19   face was taken after your arrival but it was done by someone

20   else?

21   A    Yes, it was done by a resident.  I was not present

22   physically when she took the picture, yes.

23   Q    And no picture of that injury was taken in the

24   hospital?

25   A    No, correct.  It was not noted.

Joanne Fleming

A720

Dr. Singh - Defense - Cross

1          MR. HERLICH:  One moment, your Honor.

2          THE COURT:  Yes.

3          MR. HERLICH:  Could we show the doctor the picture

4     of the patient's right cheek?

5          (D.A. complies.)

6          MS. PARK:  It's People's 14.

7          MR. HERLICH:  Thank you.

8     Q    Do you recall making any observation of that?

9     A    Yes, we did note that.

10    Q    Right.

11         And did you notice any redness to her neck or the

12    right side of her neck during the course of your examination?

13    A    Not that I recall.

14         MR. HERLICH:  I would like to show the witness

15    page two of three of the prehospital care report summary.

16    Q    And I'd ask you to read to yourself the very last

17    paragraph.

18         THE SERGEANT:  (Handing.)

19    A    The brief narrative of assault that --

20    Q    Yeah, the final paragraph, just read it to yourself.

21    A    (Witness complies.)

22         MR. HERLICH:  May I have it back, sergeant?

23         THE SERGEANT:  (Handing.)

24    Q    Where the records indicate POS redness to right side

25    of neck, is that possible redness or positive redness, if you

1    know?

2        A     It could be either.

3        Q     Okay.  Thank you.

4                    MR. HERLICH:  Thank you.

5                    THE COURT:  Ms. Park.

6                    MS. PARK:  Yes.

7    REDIRECT EXAMINATION

8    BY MS. PARK:

9        Q     As a medical doctor, are you qualified to prepare a

10   SAFE kit?

11       A     Yes.

12       Q     And at the time you were collecting evidence, were you

13   looking for injuries?

14       A     Yes.

15       Q     And does the color of the person's skin affect the

16   visibility of an injury?

17       A     Yes, I mean --

18       Q     Can you explain?

19       A     So darker skinned individuals, sometimes injuries are

20   more difficult to see.  Bruises or abrasions, they can be

21   harder to identify.

22       Q     Going back to People's 13.  If you can look at the

23   screen?

24       A     (Witness complies.)

25       Q     Is that consistent with finger or actually fingernail

Dr. Singh - Defense - Recross

1    scratches?

2       A    Yes.

3              MS. PARK:   I have nothing further.

4    RECROSS EXAMINATION

5    BY MR. HERLICH:

6       Q    How long does it take for a scratch to scab up, if you

7    know?

8       A    It starts to scab up fairly quick.   Usually if it was

9    superficial, it will start scabbing up right away.   I mean,

10   it's -- it occurs fast.

11      Q    Would you see any kind of bleeding, even a small

12   amount, prior to the scabbing?

13      A    So, depending on the depth of the injuries.   So if

14   it's deep, there might be active bleeding.   Very often if it's

15   superficial, there's no active bleeding and the scabbing

16   process, the healing, has already started right away.

17      Q    So the scab itself isn't necessarily based upon the

18   fact that there was some bleeding even if it was minuscule?

19      A    I mean, it's possible there was some bleeding, but the

20   scabbing process and the healing process starts right away.   So

21   you might not have active bleeding at the time that we see

22   somebody.

23              MR. HERLICH:   Okay.   Thank you.

24              MS. PARK:   I have nothing further.

25              THE COURT:   Thank you, doctor.   You can step down.

Joanne Fleming

A723

1          (Whereupon, the witness exited the courtroom.)

2          THE COURT:  People, your next witness.

3          MS. PARK:  The People call police -- one second --

4     the People call Police Officer Hager.

5          Judge, can we approach briefly?

6          THE COURT:  Yes.

7          (Whereupon, the following proceedings took place

8     on the record and outside the presence of the jury:)

9          MS. PARK:  Judge, Officer Hager just gave me a

10    copy of one page of his memo book.  So I just turned it over

11    it Mr. Herlich.

12         THE COURT:  How long do you expect this witness to

13    be?

14         MS. PARK:  Maybe ten minutes, at most.

15         MR. HERLICH:  Yeah.

16         THE COURT:  Okay.

17         (Whereupon, the following proceedings took place

18    on the record and in the presence of the jury:)

19         A COURT OFFICER:  Witness entering.

20         (Whereupon, the witness entered the courtroom.)

21         THE SERGEANT:  Remain standing, raise your right

22    hand, face the clerk.

23    C H R I S T O P H E R    H A G E R, called as a witness, by and

24        on behalf of the People at the Trial, having been duly

25        sworn or affirmed, testified as follows:

Joanne Fleming

A724

```
 1                    THE CLERK:  Be seated.

 2                    THE COURT REPORTER:  Name, shield and command?

 3                    THE WITNESS:  Officer Christopher Hager, Two-Eight

 4       Precinct, 29807.

 5                    THE COURT:  Good afternoon, officer.

 6                    You may inquire.

 7   DIRECT EXAMINATION

 8   BY MS. PARK:

 9       Q     Officer, how long have you been with the New York City

10   Police Department?

11       A     Sixteen years.

12       Q     How long have you been with your current command?

13       A     Almost ten.

14       Q     Tell us some of your other commands that you've been

15   assigned to.

16       A     I worked in the Three-Two Precinct.

17       Q     Sorry, you have to speak up.

18       A     Thirty-Second Precinct, Three-Two Precinct, Manhattan

19   North Narcotics, Brooklyn South Narcotics.

20       Q     I'm going to direct your attention to July 16th of

21   2014.

22             Were you working on that day?

23       A     Yes.

24       Q     What was your shift?

25       A     Four to twelve.
```

PO C. Hager - People - Direct

```
 1    Q    4:00 p.m. to twelve midnight?

 2    A    Fifteen hundred start.  Three o'clock by

 3  eleven-thirty-five.

 4    Q    And that would be p.m., right?

 5    A    Yes.

 6    Q    And I'm going to draw your attention to about 7:10

 7  p.m.

 8         Were you at St. Luke's Roosevelt Hospital?

 9    A    Yes, I was.

10    Q    Why were you there?

11    A    I was sent there to pick up a kit from the doctor,

12  rape kit.

13    Q    And did you, in fact, pick up a kit from a doctor?

14    A    Yes, I did.

15    Q    I'm going to show you People's 19.

16         THE SERGEANT:   (Handing.)

17    Q    Do you recognize People's 19?

18    A    Yes.

19    Q    What do you recognize it to be?

20    A    Sexual evidence kit, rape kit.

21    Q    Is this the rape kit that you picked up from the

22  hospital on July 16th, 2014?

23    A    Yes, it is.

24    Q    How do you know that?

25    A    The doctor's name and my name are both on it.
```

Joanne Fleming

PO C. Hager - People - Direct

1    Q    And what did you do with that once you picked it up

2    from the doctor?

3    A    I brought it back to the command and gave it to

4    Officer Field.

5    Q    Why did you give it to Officer Field?

6    A    He had to take it to the police lab.

7    Q    Did he voucher it, meaning prepare the paperwork?

8    A    Yes.

9    Q    And when you received it from the doctor it was in a

10   sealed condition?

11   A    Yes.

12   Q    And was it in your possession until the point you

13   turned it over to Officer Field?

14   A    Yes.

15         MS. PARK:  Your Honor, at this time I offer

16   People's 19 into evidence, connection having been made.

17         THE COURT:  Any objection?

18         MR. HERLICH:  No.  Other than what I stated at the

19   prior beach conference, no.

20         THE COURT:  Alright, the Court finds the

21   connection has been made.  People's 19 is in evidence.

22         (Received and marked as People's Exhibit Number 19

23   in evidence.)

24         MS. PARK:  I have no further questions.

25         THE COURT:  Mr. Herlich?

1   CROSS-EXAMINATION

2   BY MR. HERLICH:

3        Q    Good afternoon, officer.

4        A    Good afternoon.

5        Q    Did you accompany Officer Field to the police lab?

6        A    Yes, I did.

7        Q    And where is the police laboratory?

8        A    In Queens.

9        Q    Where in Queens?

10       A    I don't know the exact address offhand.

11       Q    Okay.

12       A    It's in Jamaica.

13            MR. HERLICH:  Okay.  Thank you.

14            MS. PARK:  Nothing further.

15            THE COURT:  Thank you, officer.  You can step

16   down.

17            (Whereupon, the witness exited the courtroom.)

18            THE COURT:  People, any other witnesses?

19            MS. PARK:  I have no further witnesses, but I

20   would like to admit a copy of a birth certificate certified.

21            THE COURT:  Okay, go ahead.

22            MS. PARK:  Your Honor, at this time, pursuant to

23   CPLR 45.20, I am going to admit People's or I offer into

24   evidence People's Exhibit 29, a certified copy of a birth

25   certificate for Cypress Smith.

Joanne Fleming

Proceedings

```
 1              THE COURT:  Any objections?

 2              MR. HERLICH:  Let me just have a look, your Honor?

 3              THE COURT:  Yes.

 4              MS. PARK:  (Handing.)

 5              MR. HERLICH:  No objection.

 6              THE COURT:  Okay, People's 29 is accepted into

 7     evidence.

 8              (Received and marked as People's Exhibit Number 29

 9     in evidence.)

10              THE COURT:  Anything else, People, on your direct

11     case?

12              MS. PARK:  We had that one issue with the coffee

13     cup.  That has to be resolved.

14              THE COURT:  Please approach.

15              (Whereupon, the following proceedings took place

16     on the record and outside the presence of the jury:)

17              THE COURT:  I am not sure of the problem with the

18     coffee cup.

19              MS. PARK:  I never formally moved it into

20     evidence.

21              THE COURT:  Okay.

22              MS. PARK:  And I think he objected.  So -- before

23     the jurors came in, remember?

24              THE COURT:  What's the objection?

25              MR. HERLICH:  I don't remember.  The only
```

Joanne Fleming

A729

1  objection I made was that there was nobody who discussed

2  picking the stuff up from Jamaica, Queens and bringing it to

3  the Medical Examiner's Office.

4          MS. PARK:  Okay.

5          MR. HERLICH:  That was it.

6          MS. PARK:  Then I would like to move it in.

7          MR. HERLICH:  Nothing specific to the coffee cup.

8          THE COURT:  Okay.

9          (Whereupon, the following proceedings took place

10  on the record and in the presence of the jury:)

11          THE COURT:  Are you offering something into

12  evidence?

13          MS. PARK:  Yes, I am offering People's Exhibits

14  15, 16 and 17 in evidence, connection having been made.

15          THE COURT:  Very well.  Those items are now in

16  evidence.

17          (Received and marked as People's Exhibit Numbers

18  15, 16 and 17 in evidence.)

19          THE COURT:  Anything else?

20          MS. PARK:  No, your Honor, the People have no

21  further witnesses.

22          THE COURT:  Okay.

23          So the People rest?

24          MS. PARK:  Yes.

25          THE COURT:  Okay, jurors, the People have rested

Joanne Fleming

1   on their direct case.  At this time the defense may, if they

2   choose to, present evidence but they don't have to.  As

3   you've heard numerous times, the burden of proof lies upon

4   the prosecution and that burden never shifts to the defense.

5          We're going to adjourn proceedings now until

6   Monday morning.  I will ask you to please be here ten

7   o'clock on Monday morning, and I expect that if everything

8   goes according to the plan, the jury will receive the case

9   to begin its deliberations either Monday or Tuesday of next

10  week.

11         Before I excuse you, I remind you to please not

12  talk either among yourselves or with anyone else about

13  anything related to the case.

14         Please continue to keep an open mind.  Do not form

15  or express an opinion as to the defendant's guilt or

16  innocence until all the evidence is in, I have given you my

17  final instructions on the law and I have directed you to

18  begin your deliberations.

19         Do not request, accept, agree to accept or discuss

20  with any person, the receipt or acceptance of any payment or

21  benefit in return for supplying any information concerning

22  the trial.

23         Report directly to me any incident within your

24  knowledge by any person improperly to influence you or any

25  member of the jury.

Joanne Fleming

A731

1          Do not visit or view the location where this

2    incident allegedly took place.

3          Do not read, view or listen to any accounts or

4    discussions of the case.

5          Do not attempt to research any fact, issue or law

6    related to the case.

7          Do not communicate with anyone about the case by

8    any means, including by telephone, text messages, e-mail or

9    the Internet.

10         And do not Google or otherwise search for any

11   other information about the case or the law which applies to

12   the case or the people involved in the case.

13         I will see you Monday at ten o'clock.  Have a

14   great weekend.

15         A COURT OFFICER:  All rise.

16         (Whereupon, the jury exited the courtroom.)

17         THE COURT:  Okay, it's five after four, and so, as

18   to not make you come back tomorrow, why don't we have our

19   precharge conference now?  We can revisit it and have

20   another precharge conference on Monday if you wish when your

21   client is present.  But, for the time being, are there any

22   special requests to charge from either side?

23         MR. HERLICH:  Judge, may I make my motions at the

24   end of the People's case briefly?

25         THE COURT:  You can, or you can reserve them, it's

Joanne Fleming

A732

1    up to you.

2              MR. HERLICH:   It's somewhat connected to the

3    charge conference.

4              THE COURT:   Okay.

5              MR. HERLICH:   Just give me a half a second.

6              THE COURT:   Yes.

7              MR. HERLICH:   Two things.   The two motions I

8    wanted to make at the end of the People's case concern the

9    count of attempted rape in the first degree.

10             The complaining witness, if you credit her

11   testimony, she testified that the defendant rubbed his penis

12   against her vagina, and I asked her on cross-examination:

13   At first, was it like this and she said yes.   And then I

14   asked her:   Well, did he then -- was he going to then insert

15   his penis in your vagina and she said he told -- something

16   to the effect:   He told me to relax and it won't hurt, and I

17   said no.   And I said:   And he honored your request, and she

18   said yes.   And I would argue that the crime of attempted

19   rape in the first degree has not been made out and would

20   move to dismiss that count.

21             Secondly, the count of sexual abuse in the first

22   degree dealing with the mouth on mouth kissing, just so the

23   Court is aware, before trial I had filed a motion in front

24   of Judge Solomon which was denied with leave to make it

25   again either during the trial or after the trial, and in a

1    nutshell, Judge, hopefully it's in the court file, but I can

2    hand up a copy along with the People's response.

3              THE COURT:   If you could please hand it up?

4              MR. HERLICH:   Yes, sure.

5              A COURT OFFICER:   (Handing.)

6              MR. HERLICH:   The second motion that I'm handing

7    up deals with what could be strewn as the Court of Appeals

8    to say a mouth to mouth kiss on an unconscious person at a

9    bar seat, bar stool, did not constitute sexual contact.   In

10   that case, then that count should be dismissed on those

11   grounds.

12             THE COURT:   And do you have a copy of the Court's

13   decision?

14             MR. HERLICH:   I wrote it pretty much verbatim in

15   my motion papers.

16             THE COURT:   I mean, Judge Solomon's.

17             MR. HERLICH:   Oh no, it was oral.

18             THE COURT:   It was oral, okay.

19             MR. HERLICH:   Right.

20             And having said that, the last thing I'll say is,

21   that leads us into one issue on the charge conference which

22   is the first item in that motion.   It was about multiplicity

23   counts also relying on a Court of Appeals case.   That's

24   where Judge Solomon said it is a close one, he's not going

25   to grant it.

Joanne Fleming

A734

Precharge Conference

1      But I had argued, Judge, that there should really

2   be one count of criminal sexual act first degree.  Although

3   there were two types of oral contact, the defendant's mouth

4   to the complaining witness' vulva and the defendant's penis

5   with the complaining witness' mouth, it was a single event,

6   and I thought that based on the Court of Appeals case that

7   is cited and quoted pretty extensively in the motion, that

8   there should just be one count of criminal sexual act

9   because it was one event or one crime committed in two ways.

10      And if the Court denies the motion to dismiss the

11   count regarding the mouth to mouth kissing, the same

12   argument would be made that the two counts of sexual abuse

13   first degree, one is defendant inserting his fingers in the

14   complaining witness' vagina by forcible compulsion and the

15   other a kiss, would be two different ways of carrying out

16   the offense of sexual abuse first degree.  So there should

17   be one count of that.

18      And, lastly, the two statutory criminal sexual act

19   in the third degree counts I argue should be charged as one

20   count because it's two ways of committing the same crime in

21   one single event as distinct from many cases.

22      THE COURT:  But they can be distinguished.  The

23   acts can be distinguished in the verdict sheet such that the

24   jury -- we do not run the risk that the jury, by returning a

25   verdict of guilty on one, is unknowingly or unwittingly

Joanne Fleming

A735

1   returning a guilty verdict on all of them, am I right?

2              They are distinguished in the indictment and they

3   will be distinguished in the verdict sheet.  So, I don't

4   think we run that risk.  That's the concern, of course, when

5   you deal with multiplicitous counts, that by virtue of

6   mistake or ignorance or confusion, a finding of guilt as to

7   one is always a finding of guilty of two or three, such that

8   at the end, a court does not know which act it is that the

9   jury is convicting of.  That's not very artfully stated but

10  --

11             MR. HERLICH:  No, I understand that.  No, it was

12  artfully stated.

13             I think that analysis applies more to duplicitous

14  than multiplicitous.  One can drive oneself crazy trying to

15  figure out if what I'm saying is even -- if my argument is

16  correct or partially correct.  It then raises a duplicity

17  question.  It's like -- I don't know, I ask you to read the

18  Court of Appeals cases.

19             THE COURT:  Okay.

20             And you raised this before Judge Solomon?

21             MR. HERLICH:  Yes.

22             THE COURT:  And that's included in your papers

23  here?

24             MR. HERLICH:  Yes.

25             THE COURT:  And the People's response is also

Joanne Fleming

1    included here?

2                    MR. HERLICH:  Yes.

3                    THE COURT:  And the Court's decision was oral?

4                    MR. HERLICH:  Yes, it was, your Honor.

5                    THE COURT:  Okay.

6                    Would you like to be heard?

7                    MS. PARK:  Judge, as to the attempted rape count,

8    I believe it's sufficiently been made.  The fact that he

9    rubbed his exposed penis on her naked vagina, I don't know

10   how much closer you can come to the actual penetration.

11                   And as for counsel's arguments regarding

12   multiplicitous counts, I believe he's referring to the Court

13   of Appeals in Alonzo, and that case is very different than

14   our case, because in that case the defendant was actually

15   fondling the victim's breasts and her buttocks and he was

16   just moving his hands back and forth without any

17   interruption, without a break.

18                   Here, there is clearly a break.  He moved from

19   kissing her and then he took off her pants, her underwear,

20   and then he inserted his fingers inside her vagina.  It's

21   two separate acts.  Completely different body parts.

22                   And as to the other arguments about the oral sex,

23   again, same thing, it was from his penis to her mouth and

24   then his mouth to her vagina.  It's very, very different, I

25   submit, than Alonzo, because there are sufficient breaks and

Joanne Fleming

A737

1          interruptions between each act in our case.

2                    And as to whether the kissing is considered sexual

3          contact, I'm going to rely upon my written response.  There

4          are many cases where courts have found mouth to mouth

5          contact is sufficient.

6                    THE COURT:  Okay, thank you.

7                    I'll hear you on the applications to charge,

8          either one, doesn't matter who goes first.

9                    MR. HERLICH:  Obviously I ask for the standard

10         criminal instructions for the counts.

11                   THE COURT:  Okay.

12                   MR. HERLICH:  I don't know if -- I don't believe

13         there were any prior inconsistent statements.  The only kind

14         of impeachment I attempted, your Honor, with regard to the

15         complainant was a question posed to Detective Susan Barbato

16         was that the complainant, by omission, left out a portion

17         of -- she left out the part about having the defendant rub

18         his penis against her vagina when he -- when she gave her

19         narrative to Detective Barbato.  So, to the extent that's

20         impeachment by omission, any kind of charge regarding the

21         credibility of a witness, that's one of the tools that can

22         be used to assess a witness' credibility.

23                   THE COURT:  Okay.

24                   MR. HERLICH:  Or accuracy.

25                   THE COURT:  Alright, that's part of the standard

1   charge.

2              MR. HERLICH:  Yeah.

3              MS. PARK:  Judge, if the defendant shows up on

4   Monday and he testifies, I will ask for the interested

5   witness charge --

6              THE COURT:  Right.

7              MS. PARK:  -- as to the defendant.

8              And I don't know if the charge about witness

9   preparing is in your Honor's --

10             THE COURT:  It is a standard charge, yes.

11             Alright, if between now and Monday morning you

12  think of anything, just e-mail Jason Whitehead.  Okay, he

13  will give you his e-mail address.

14             I ask you to come to my chambers on Monday,

15  nine-thirty, so I can give you a copy of the proposed

16  charges.

17             MS. PARK:  Not here?

18             THE COURT:  No, not here.  Because I asked the

19  jury to come back at ten.  I'm upstairs.

20             MR. HERLICH:  It's not where the Mental Health

21  Court conferences are?

22             THE COURT:  It is, but they're upstairs.

23             MR. HERLICH:  I didn't know, okay.

24             (Whereupon, the trial was adjourned to Monday,

25  October 5th, 2015.)

3884

10/5-15

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NEW YORK          PART  59
    ----------------------------------------
3   THE PEOPLE OF THE CITY OF NEW YORK       Indict. No.
                                             4258/2014
4

5                  -VS-

6

7   LONNIE HARRELL, DEFENDANT                CONTINUED TRIA[
    ----------------------------------------
8                        October 5, 2015
                         100 Centre Street
9                        New York County

10  B E F O R E:

11               HONORABLE JUAN MERCHAN
                 JUSTICE OF THE SUPREME COURT
12

13  A P P E A R A N C E S:

14       FOR THE PEOPLE

15               Cyrus R. Vance, Jr.
                 District Attorney
16               One Hogan Place
                 New York, New York
17               By: JUNG PARK
                 Assistant District Attorney
18

19       FOR THE DEFENDANT

20               THEODORE HERLICH
                 New York, N.Y.
21

22                        JOANNE FLEMING
                          OFFICIAL COURT REPORTER
23
                          AMALIA HUDSON
24                        OFFICIAL COURT REPORTER

25

                    Amalia Hudson, SCR
                         A740

**PROCEEDINGS**

1        THE CLERK:  Come to order.

2        THE COURT:  I would like to make a record before we

3   bring --

4        THE CLERK:  Continue case on trial People v. Lonnie

5   Harrell.

6        THE COURT:  Mr. Herlich, I would like to make a

7   record.  Last week as discussed with the sergeant and the

8   court officers based upon the comments that were made by your

9   client, and actually let he make a thorough record.

10       Earlier on in the trial there was a verbal confrontation

11  between the defendant and a prior sergeant that took place in

12  what we call the robbing room, and it became so loud that I

13  actually was unable to proceed with what I was doing, and I

14  had to stop, but I did observe, from my vantage point, the

15  defendant, for lack of a better term, getting in the face of

16  the sergeant.

17       Then last week we had a situation which is already on

18  the record where he basically said that needed to be removed

19  from the courtroom because he didn't want a mistrial.  He

20  also at that time was challenging the authority of the Court

21  officers and the sergeant.

22       Based upon those representations that he made and other

23  things that have happened, it was determined that for the

24  safety of everyone the bunting would be put down underneath

25  the tables, and I just want to make clear that the way it's

PROCEEDINGS

1    put down, and I want to thank the Court officers and the

2    sergeant for doing this, and the clerk.  It's really not

3    offensive or nice or any way.  It doesn't call attention.

4    It's not sitting on the edge of the table.  Rather it's under

5    the table, and it goes around, and the reason for that is

6    because for safety reasons.  The defendant is going to

7    remained shackled, right.  Is that the plan, Sergeant?

8            SERGEANT GELORMINO:  If he testifies we're going to

9    bring the lieutenant into the conversation.  He probably will

10   go -- if he testifies in front of the jury it would probably

11   be without the shackles.

12           THE COURT:  Probably without the shackles if he

13   testifies, but while he's sitting at the table, he will

14   remain shackled, right?

15           SERGEANT GELORMINO:  We're also going to see what

16   his demeanor is this morning.

17           THE COURT:  Okay.  That's even better.  So we'll

18   play it by ear, but I do want to make to clear the bunting is

19   around not only the defense table but around the

20   prosecution's table as well.  So both tables look identical

21   to the jurors.  Okay.  At this time let's bring the defendant

22   out and see how he's doing today, and while they do that,

23   just for the record, both defense counsel and the prosecutor

24   were provided copies of the proposed jury charges this

25   morning at about 9:30 or so.

**PROCEEDINGS**

1          MS. PARK:  Yes.

2          MR. HERLICH:  Yes.

3          THE COURT:  We'll have a chance to go over that

4     before your summation.

5          MR. HERLICH:  Okay.

6          THE COURT:  At this time it's still your intent to

7     have your client testify?

8          MR. HERLICH:  I will find out shortly, Judge.  On

9     Thursday he had for the first time raised the possibility of

10    him not testifying in addition to everything else that was

11    going on, and we didn't really get to talk about it too much,

12    but I don't really know what his intentions are until I hear

13    from him now.

14         THE COURT:  If he's not going to testify, then

15    we'll need to go over the proposed jury charges.  Obviously

16    if there is any objections or concerns.

17         You can let him know if he is going to testify, he won't

18    be shackled obviously.

19         (Pause in the proceedings)

20         SERGEANT GELORMINO:  In a very real somewhat

21    hostile conversation he did advise me he is looking to

22    testify.  I am going to notify the lieutenant based on his

23    demeanor, which was somewhat agitated from the minute I

24    walked in, at a minimum I am going to request that leg

25    shackles be put on so we can somewhat restrict his movement

PROCEEDINGS

1    at least this way his hands would be -- I will discuss it

2    with my Lieutenant, and we'll take it from there.

3              THE COURT:  S is speaking to his attorney now.

4              SERGEANT GELORMINO:  Yes.

5              THE COURT:  If you can please ask him to come in.

6         (Mr. Herlich enters the courtroom)

7              THE COURT:  Mr. Herlich.

8              MR. HERLICH:  I believe the defendant does wish to

9    testify.

10             THE COURT:  Let's bring him out please.  While you

11   were in talking to your client the sergeant did go on the

12   record and indicate that he had an exchange, a conversation

13   with your client, and that your client did seem agitated and

14   he informed the sergeant he did wish to testify.

15             MR. HERLICH:  He did.

16             THE COURT:  He does wish to testify?

17             MR. HERLICH:  Yes.

18             THE COURT:  So the issue now is how do we do this n

19   a way that it in know way is prejudicial to your client ad it

20   seems to me that -- well, I want to discuss it with the

21   lieutenant but the suggestion that was is he would not be

22   handcuffed.  He would remain shackle at the ankle and take

23   the stand before the jury comes in and he wouldn't get of the

24   stand until after the jury leaves.  This is, of course, a

25   closed witness stand.  No nobody can see he is shackled and

## PROCEEDINGS

1   his hand would be free.  There is no for anyone to suspect he

2   is shackled, but let's see what the lieutenant's stand on

3   that.

4            (Pause in proceedings)

5            MR. HERLICH:  At this point Judge, the defendant is

6   refusing to be shackled and won't come into the courtroom

7   shackled.  So the court officer are having a discussion I

8   think with their lieutenant right now, and they will let you

9   know.

10           COURT OFFICER:  He is Refusing, Judge he's not

11   coming out here shackled.  He said it in no uncertain terms.

12   I tried to explain it different ways.  I tried to tell him

13   that the belt is just to handcuff him in the front.  The same

14   as he would be handcuffed in the rear.  We're going to remove

15   them.  He is just going to have the shackles on the stand.

16   He don't want it.  He's going to be on the stand before the

17   jury comes.  They will be dismiss, and we'll take him back to

18   the table.  He said, no.  He said no three times.

19       After that I told him if he refuses, but he still wants

20   to testify there are other ways it can happen including a

21   force order, and he absolutely refuses be shackled.

22           THE COURT:  How do you want to handle this, Mr.

23   Herlich.  He says he wants to testify, but he wants to do it

24   his way, and again just to be clear on the record beyond him

25   getting in the face of the sergeant last week, and then later

## PROCEEDINGS

1   in a separate incident getting in the face of another

2   sergeant and other court officers, he himself said last week

3   Thursday afternoon or Thursday morning, "Get me out of here.

4   I don't want to be here because I don't want there to be a

5   mistrial."  Those were his words, and I can only interpreter

6   that to mean that he was going to create a disruption.  I

7   mean it's clear that that is what the threat meant.  "Get me

8   out of here, I don't want a mistrial.  Get me out of here in

9   other words, I don't want a disruption, or I will cause a

10  disruption that will result in a mistrial.

11       I'm not entirely sure how to proceed at this time. I

12  will hear from the People as to their suggestion.

13            SERGEANT GELORMINO:  His statement was, "I'm going

14  to spaz out and create a scene and cause a mistrial."

15            THE COURT:  That was on Thursday, right, Sergeant?

16            SERGEANT GELORMINO:  Yes.

17            THE COURT:  I'm going to spaz out and create a

18  scene.

19            SERGEANT GELORMINO:  Uh, huh.

20            THE COURT:  Okay.  I will tell you what.  Any

21  objection to my having one of the court officers telling the

22  jurors they should feel free to take a break and come back at

23  11:30?

24            MR. HERLICH:  That's fine.

25            MS. PARK:  No, Judge.

**Amalia Hudson, SCR**

A746

## PROCEEDINGS

1      THE COURT:  So if somebody can do that, please.

2      MR. HERLICH:  I obviously take no position on

3  whatever the court officers feel is necessary for security.

4  That's outside of my job description, so I don't have any

5  input in that.  I defer to what they think is necessary,

6  Judge.

7      THE COURT:  And I do too when is comes to matters

8  of safety and security.  I don't ever suppose to tell the

9  court officers what to do, however, in this instance I agree.

10  I agree with their position.  I also think we're trying to

11  come up with a reasonable solution.  His hands would not be

12  handcuffed.

13      MR. HERLICH:  Right.

14      THE COURT:  It would just be shackles around his

15  ankles.  The jury would not see him shackled.  They would

16  have no clue that he was even shackled because, as I said

17  there this is a witness stand.

18      MR. HERLICH:  I told him that just a few moments

19  ago.

20      THE COURT:  Can you ask him if he is willing to

21  come out shackled for a minute just to talk to me?

22      MR. HERLICH:  I will find out.

23      (Pause in the proceeding)

24      MR. HERLICH:  Your Honor, the defendant said he

25  would refuse to come out shackle at his feet even to simply