## PROCEEDINGS

1      discuss the matter with you.

2             MS. PARK:  Judge, if I may be heard.  I think at

3      this point we should do a force order and have him come out,

4      and if he proves to be disruptive, he will, in fact, have

5      forfeited his right to be present and his right to testify.

6      I just don't think -- I mean that is our position, and he

7      didn't have any problems coming out before with his hands

8      shackled.  I don't really see why he is now having problems

9      with his legs being shackled.

10            THE COURT:  Well, it goes back to what happened

11     last week.

12            (Pause in proceedings)

13            THE COURT:  There are several issues with the force

14     order.  One issue is that there is a team, one team, that

15     does this for the whole City.  They are not in the courthouse

16     just sitting around waiting for force orders.  They may be

17     here just out of share luck, but they could be in Staten

18     Island.  They could be anywhere.  So that is one of the

19     issues.

20            MS. PARK:  I have another suggestion.  I don't know

21     how amenable this would be, but if -- I mean I understand

22     that he is in the holding pends.  If Mr. Herlich Your Honor,

23     the Court Reporter, and myself can go back and put on the

24     record the condition of how he would have to come out to

25     court, and if he says that he is still refusing, it would be

## PROCEEDINGS

1    on the record.

2        THE COURT:  I see that the court reporter is

3    shaking her head no.

4        MS. PARK:  But I think he would behind bars.

5        THE COURT:  I am not going to make the court

6    reporter do anything she doesn't feel comfortable doing.

7        Yes, Sergeant?

8        SERGEANT GELORMINO:  The lieutenant is on his way

9    up.  My understanding is based upon the officers going back

10   inside that he refused in whole.

11       THE COURT:  The other issue now is can we do a

12   force.  So it's up to the lieutenant.

13       SERGEANT GELORMINO:  I believe they started putting

14   that in motion.

15       THE COURT:  How does Corrections feel, and how do

16   you feel about me going back there with defense counsel and

17   the prosecutor to talk to him.  Is that something that can be

18   done, or it's not permitted?  I don't know.

19       SERGEANT GELORMINO:  Security wise. I mean he is

20   behind bars, you're with me.  The only thing I would ask,

21   Judge, is that you don't stand directly in front of him in

22   case he decides to spit which seems to be a very common thing

23   that defendants do when they get this agitated.

24       THE COURT:  Right.  If we do that, then we'll come

25   back into the courtroom and make a record in the courtroom of

Amalia Hudson, SCR

A749

PROCEEDINGS

1    what happened in there because court reporter doesn't feel

2    comfortable going.

3              (Pause in the proceedings)

4              THE COURT:  Lieutenant, thank you for coming up we

5    are discussing two possibilities.  One is a force order, but

6    I'm not entirely sure I see what the benefit of a force order

7    would be.  It would just -- I guess it would document his

8    resistance but beyond documenting his resistance, I'm not

9    sure that a force order would get us anywhere, anywhere

10   productive.

11             The other possibility, and I don't know what the rules

12   are about this with Corrections and with court security, but

13   the possibility of me going in there with the defense counsel

14   and the prosecutor just to talk to him and see if we can make

15   a record when we come back in.  Is that something that we can

16   do?

17             LIEUTENANT McKEE:  We usually frown upon that only

18   because you don't what he's going to do.  If he gets angry

19   have being angry spit at you. You don't know what he's going

20   to do is there.  Corrections will be there.  I've seen it

21   done.  I've definitely seen it done.  I would have to check,

22   one, with them.

23             THE COURT:  Would you mind checking with them.

24             LIEUTENANT McKEE:  I would like to speak to my

25   captain because it's something usually we don't like to do

## PROCEEDINGS

1   because we want to make sure there are no safety issues,

2   security issues but I will look into.

3        THE COURT:  As always I defer to whatever you guys

4   think.

5        LIEUTENANT McKEE:  I will look into it right now.

6        THE COURT:  Thank you.  We'll wait.  So the

7   lieutenant is going to look into whether that is something

8   that can be done for the three of us to go in there and talk

9   to him.  It's frowned upon I'm told.  It's discouraged for

10  obviously reasons, but they are going to look into it any

11  way.

12       MR. HERLICH:  I know I had this once before, Judge.

13  It's been too long ago, so I don't remember the precise

14  details, but I think the whole crew went to speak to the guy

15  who was in the pens about some similar issue in a prior case,

16  but if that is permissible under the Corrections rules, I

17  would prefer that not this court reporter come if that makes

18  her feel uncomfortable but if it's going to happen if we can

19  get a court reporter that will feel comfortable, that's the

20  best way to do it otherwise.

21       THE COURT:  I don't think it critical that we have

22  a court reporter.  We can go in there.  Do what we have to do

23  and come back into the courtroom and make a record, and we

24  can all make a record of what happened.

25       At this point the more I think about it the more I feel

## PROCEEDINGS

1   that a force order is not going to result in anything

2   productive.

3         On the one hand, we can force him out here against his

4   will, and he will, if that is the case, he is just to going

5   to continue to be become a disruption, and I don't see how we

6   can stop him or prevent him from doing that.

7         On the other hand, we try it execute the force order,

8   people get hurt, and not just the defendant, but the court

9   officers get hurt, and he doesn't come out.  So I just don't

10  see the benefit to that.  I think right now, I'm much more

11  inclined to just go back there and try to talk to him, but I

12  think that all -- his behavior now and his insistence on

13  doing this just further demonstrates why it's important that

14  he remains shackled.  Although he has not been violent today,

15  he insists on doing things his ways, and he has definitely

16  not deferred to the authority of the court officers up to

17  this point.  He has challenged their authority on several

18  occasions, and again what was that language that he used,

19  Sergeant?

20        SERGEANT GELORMINO:  The statement in sum and

21  substance was, "If I don't get out of here, I am going to

22  spaz out and create a scene that will cause a mistrial."

23        THE COURT:  All right.  At this moment the

24  lieutenant is checking with Corrections to see if it should

25  be done.

## PROCEEDINGS

1      SERGEANT GELORMINO:  Just for your information,

2   Judge an Unusual Occurrence Report was filed which lead to

3   the increase in the security level based on that statement.

4      THE COURT:  So that was done last week?

5      SERGEANT GELORMINO:  That was done on Thursday of

6   last week.

7      THE COURT:  Okay. I see.

8      SERGEANT GELORMINO:  Basically we go progressive at

9   that point, bunting, shackles and the link.

10      THE COURT:  Again, I realize I made this record

11   several times, but I feel it's important to make it again.

12   He would not be handcuffed out here.  He would be sitting at

13   a table that has bunting all around it, and no one, no one in

14   the courtroom will know he is wearing shackles, and when the

15   time would come to testify, he would be escorted to the

16   witness stand out of the presence of the jury.  The jury

17   would never see him walking in shackles.  The jury would

18   never have reason to know, believe, suspect, he in shackles

19   because his hands would be free.

20      So he's just choosing to be obstructive at this point.

21      SERGEANT GELORMINO:  The initial was going to be

22   just leg shackles.  Based on his temperament, okay, the full

23   level of security which includes the D Belt.  The D belt

24   allows the hands to be in front of the body, but the wrists

25   are actually handcuffed to the belt, so his hand would be

### PROCEEDINGS

1  handcuffed.  They would be in front of the body.  He wouldn't

2  be rear cuffed.  So he could actually hold things in his

3  hands and hand them off to the lawyer, but the movement would

4  be some what restricted.

5            THE COURT:  Could he gesture if he wanted to with

6  his hands?

7            SERGEANT GELORMINO:  Above his midsection, no, and

8  the reason --

9            MR. HERLICH:  And his cuffs would be visible to the

10 jury I assume, right?

11           SERGEANT GELORMINO:  If he brought his hands up,

12 yes.

13           THE COURT:  But that is now -- that's where we are

14 at now because of what has been happening this morning?

15           SERGEANT GELORMINO:  Yes.

16           THE COURT:  That wasn't the plan this morning?

17           SERGEANT GELORMINO:  No.  That was not the plan

18 this morning.  This morning, it was going to be initially

19 just leg shackles to restrict his movement, but based on what

20 we were met with, and then his refusal to come out period,

21 even without the jury being present, the threat level was

22 escalated.

23           THE COURT:  Okay.

24      While we wait to hear back from the any lieutenant,

25 would you like to go over the proposed jury charges?

PROCEEDINGS

1        MR. HERLICH:  Yes.

2        THE COURT:  Are there any exceptions or requests?

3        MR. HERLICH:  Two requests, Your Honor.  With

4    regard to the credibility of witnesses, I observed that there

5    is the classic instructions on prior inconsistent statements.

6        As I indicated, I think on Friday I did attempt to

7    impeach the witness by -- the complaining witness by

8    omission.  In that she did not tell Detective Barbato certain

9    things that occurred during the course of the alleged crime

10   that she testify to at trial, and so I would request that the

11   jury may, for credibility purposes, consider impeachment by

12   omission.

13       The other thing that occurred to me --

14       THE COURT:  Sorry.  Let me just -- People would you

15   like to be heard on that?

16       MS. PARK:  No.

17       MR. HERLICH:  The other issue, Your Honor and, I'm

18   not a hundred percent sure it would cover attempted rape in

19   the first degree.  I'm still -- I think, Judge, will you make

20   a ruling before the summation as far as the motion to dismiss

21   based at the close of the People's case, or would you

22   reserve?

23       THE COURT:  Yes.  This is regarding your

24   application that the several charges were multiplicitous and

25   count five should be dismissed?

Amalia Hudson, SCR

A755

PROCEEDINGS

1      MR. HERLICH:  And count three, attempted rape

2  should be dismissed.

3      THE COURT:  Okay.  First of all, I believe that

4  Judge Solomon ruled on this already, and I believe that is

5  the law of the case, however, even if it were not the law of

6  the case after reviewing the papers and considering the

7  research that has been done, I agree with Judge Solomon that

8  the counts are not multiplicitous and count five should not

9  be dismissed.  Hold on a second.

10      (Pause in proceedings)

11      THE COURT:  If your client does not testify, I take

12  it we need to make a correction, or a change to the section

13  on interested and lack of interest?

14      MR. HERLICH:  Yes, as well as impeachment by

15  criminal history.  It really wouldn't apply in this case.

16      THE COURT:  Yes.  Anything else?

17      MR. HERLICH:  Yes, Judge, the one think I thought

18  of was a jury instruction on -- I think it's called

19  abandonment with -- regard to the count of attempted rape in

20  the first degree.  If you credit completely the testimony of

21  the complaining witness, she admitted that when she said

22  stop, he complied with her request.

23      So my request would be that the defendant, if he ever

24  intended to commit that crime, he abandoned that plan or that

25  intent and did not commit the crime.  The question is does

## PROCEEDINGS

1   abandonment would that cover attempted rape in the first

2   degree.  I think that is a close question, but that is my

3   request that he abandoned his plans to commit that crime.

4           THE COURT:  People?

5           MS. PARK:  Judge, I'm not really sure what charge

6   Mr. Herlich is referring to, but if he wants to argue that he

7   can.  I don't think the jury needs a special instructions on

8   his plan of abandonment, but by the time that he rubbed his

9   penis against her vagina, our position is the crime of

10  attempted rape in the first degree has been satisfied.  We

11  didn't charge him with a complete rape.

12          THE COURT:  Well, and he didn't just abandon it

13  because she asked him not to.  She said it hurt he was trying

14  to talk her into it by telling her if she relaxed, it

15  wouldn't hurt, and there was, as I call some evidence about

16  that type of conversation, if you can call it conversation,

17  going back and forth at that time.  Nonetheless, let me look

18  into the standard charge on that before I rule on it.

19          MR. HERLICH:  Okay.

20          THE COURT:  People, anything on the charges?

21          MS. PARK:  No, Your Honor.

22          THE COURT:  So just to go over what the changes

23  would need to be if he does not testify, revise the interest

24  lack of interest, revise the previous criminal conduct, and

25  add the section on omissions.  Right.

## PROCEEDINGS

1      MR. HERLICH:  Oh, based on my request?

2      THE COURT:  Yes.

3      MR. HERLICH:  Yes, yes.

4      SERGEANT GELORMINO:  Judge, I just spoke with

5  Captain Garele from Corrections.  Whenever you're ready,

6  we'll put it into motion.

7      THE COURT:  Okay. Let's just go in there.

8  (The Court, defense counsel and the prosecutor

9  proceeded to the pens to speak with the defendant)

10     (Proceedings later resumed's in open court)

11     THE COURT:  It's now 11:30.  I was permitted to go

12  into the pens where I tried to engage Mr. Harrell in a

13  reasonable conversation for about 10, maybe 15 minutes.  We

14  did talk.  He was agitated.  I was just trying my hardest to

15  convince him that I just wanted him to have a fair trial and

16  I want to preserve his right to testify, and I tried to

17  communicate that to him I don't know how many different ways,

18  but he is hung up on the fact that he feels that -- these are

19  my words not his, but he feels that he was disrespected on

20  Thursday.  That I was the reason he was agitated, and,

21  therefore, I assume he was kidding, but the Court Officer

22  should have restrained me and not him.  I did ask him at that

23  point about an anecdote I learned of while I was in the

24  hallway that he turned to one of the court officers last week

25  on Thursday and said, "Do you have to stand so close to me?

**Amalia Hudson, SCR**

A758

## PROCEEDINGS

1    I can feel your body.  Get away.  You're too close.  I can

2    feel you breathing."

3         So again he was trying to tell the court officers how to

4    do their jobs.  I was not even aware of that anecdote.

5              COURT OFFICER:  That was Wednesday.

6              THE COURT:  That was Wednesday the day before

7    anything even happen.  We were joined by a Captain from

8    Corrections who, in my opinion, did a terrific job of

9    communicating with the defendant.  I would ask the Captain if

10   you wouldn't mind making a record of what your dialogue was

11   with him?

12             CAPTAIN GARELE:  I'm Captain's Garele, Shield No.

13   133, and Mr. Harrell adamantly refuses to appear in the

14   courtroom.  The judge as well as the OCA sergeant tried

15   numerous time to get him to comply which he's still refusing

16   to appear in the courtroom.

17             MR. HERLICH:  Shackled.

18             THE COURT:  Shackled.

19             MR. HERLICH:  That's the whole beef.

20             THE COURT:  Yeah.  He does not want to come out in

21   shackles.  I explained to him over and over again how we

22   would do it.  How we would try to make this happen so that he

23   is not prejudiced in any way so that the trial is not tainted

24   in any way, and he was just not having any part of it.  He

25   refuses to come into the courtroom shackled.

PROCEEDINGS

1   Thank you.  Thank you, Captain.  I  appreciate it.

2   CAPTAIN GARELE:   Thank you.

3   THE COURT:  Mr. Herlich, Ms. Park, you were in

4   there as well.  Anything you want it add to the record?

5   MR. HERLICH:  I will just say, you know, to

6   paraphrase the defendant, "I want to testify at trial, but I

7   refuse to come to the courtroom if my legs are shackled."

8   Even though I explained to him and so did many other people

9   this morning that while he's in the witness stand, the jury

10   would not be able to even observe that his legs are shackled

11   so that is his position and he is not willing to compromise

12   on it.

13   THE COURT:  Ms. Park?

14   MR. HERLICH:  Nothing else except just the record

15   is clear that his tone that he was speaking loudly.  He seem

16   very upset.

17   THE COURT:  Yes.  He was agitated.  He cut me off a

18   number of times.  Communication with him was not easy, and

19   although I'm sure that other judges have done what I did,

20   it's not everyday that a judge will go into the pens to speak

21   to an incarcerated defendant.

22   I did that because I genuinely just want him to have his

23   day in court if he wants to testify.  I was trying to do

24   everything within my power to find a way to make that happen,

25   but there was no compromising with him.  His feeling was no

## PROCEEDINGS

1    shackles period.

2         I explained to him that this is a serious case.  He's

3    looking at significant jail time, that it would be in his

4    best interest for the jury to hear his story, if that's what

5    wants to do.  I told him that I felt that he was being a bit

6    foolish, that he was cutting off his nose to spite face, that

7    he was standing on principal here. I personally apologized

8    for anything I said and did on Thursday to upset him or to in

9    any way create the environment that ultimately resulted in

10   his leaving.

11        I reminded him that he asked to be excused Thursday and

12   we complied.  He was excused.  I reminded him that he asked

13   for trial to not continue on Friday because of his religious

14   observance, and I did that.  The trial not continue on

15   Friday.  There is just nothing else I can do at this point

16   it's.  Now 11:35.  I imagine most of the jurors are back.

17        So Mr. Herlich I will hear you now on how we should

18   proceed.

19             MR. HERLICH:  Given what has transpired, Judge, I

20   would like to move in front of the jury one piece of evidence

21   into evidence regarding the defendant's phone call history of

22   his phone records, and then I would rest and go into closing

23   arguments?

24             THE COURT:  And how are you going to lay the

25   foundation for those phone records?

**PROCEEDINGS**

1          MR. HERLICH:  I don't believe the prosecutor is

2      objecting to them.  Part of them -- I believe part of those

3      records are in evidence from certain dates.  I was going to

4      move in the entire record from February 6th, I believe, until

5      July 16, 2014.

6          THE COURT:  Okay?  People, anything else you would

7      like to add at this point.

8          MR. HERLICH:  Just one second, Your Honor.

9  (Defense counsel in discussion with the prosecutor)

10          MS. PARK:  Judge, just a couple of things.  I just

11      wanted the record to be clear that the defendant was told

12      that the trial will proceed if he refuses to come out in his

13      absence.

14          THE COURT:  Right.

15          MS. PARK:  Also I just wanted to file with the

16      Court an updated Rosario list.  Last week I neglected to move

17      in People exhibit 17A.  I told Mr. Herlich, and I don't think

18      he's going to object to it.  When People's 17 came in, 17A

19      should have come in.  It's a photograph of the broken glass.

20          THE COURT:  Any objection to any of that?

21          MR. HERLICH:  No.

22          THE COURT:  So you will introduce some phone

23      records.  You are going to introduce that.  Before we

24      continue.  Just on the -- we called it abandonment, but it's

25      really renunciation.

PROCEEDINGS

1       So I direct to your Penal Law section 40.10 (3).  "In

2   any prosecution pursuant to Section 110.00 for an attempt to

3   commit a crime, it is an affirmative defense that under

4   circumstance manifesting a voluntary and complete

5   renunciation of his criminal purpose, that defendant avoided

6   the commission of the crime attempted by abandoning his

7   criminal efforts, and if mere abandonment was insufficient to

8   accomplish some a avoidance by taking further and affirmative

9   steps which prevented the commission thereof."

10      I think that in looking at the evidence that was

11  presented at this trial, it's difficult to say that the

12  evidence supports this instruction of renunciation under

13  Subsection (3).  Again the subsection requires a voluntary

14  and complete renunciation of his criminal purpose.

15      So we are dealing obviously in that count just with the

16  attempted rape, but I don't think that it can be said that he

17  abandoned his complete criminal purpose.  What he did from

18  that when that didn't work, he then moved on to a different

19  sexual act which was the oral sex, and he actually completed

20  that act.  He actually ejaculated and then used the victim's

21  underwear to clean up afterwards.  I don't believe that this

22  is an appropriate charge in this case.

23      All right.  So I guess what we are going to do now is go

24  to summations.  I will give the jury a brief three-minute

25  instruction on what summations are, and then you can delivery

Amalia Hudson, SCR

A763

## PROCEEDINGS

1    your summations.

2              MR. HERLICH:  Can I have one minute, Judge?

3              THE COURT:  Sure.

4              COURT OFFICER:  Judge, jurors number one,

5    Mr. Alexander, and No. five, Mr. Morais wish to address.  One

6    is about his pay and his job, and the other one wants to

7    speak to you about a sermon I believe.

8              THE COURT:  A what?

9              COURT OFFICER:  A sermon.  He said he was supposed

10   to do it Sunday and they moved it to Wednesday, but at 1:30.

11             THE COURT:  Let's bring them in.  Would you mind

12   waiting let's bring in juror number one, and then juror

13   number five.

14                  (Juror enters)

15             THE COURT:  Good morning, sir how are you.  It's

16   my understand you wanted to speak to us.

17             JUROR:  Yes.

18             THE COURT:  Go ahead.

19             JUROR:  I was scheduled Sunday because this is

20   Laymen's week at our church to teach the congregation.  I

21   found out yesterday that they scheduled me for 1:30 on

22   Wednesday.

23             THE COURT:  Okay.

24             JUROR:  I didn't know -- I didn't know whether or

25   not that was something I needed to tell you, and if I would

PROCEEDINGS

1   be able to be excused for that day, and if not I just need to

2   know so that I can make a phone call.

3            THE COURT:  Yes. First of all, thank you for bring

4   this to our attention, and I apologize for the disruption to

5   your life during these proceedings.

6        At this point I don't know whether the jury is going to

7   be done with it's deliberations by Wednesday at 1:30, and

8   once a deliberating jury -- once a jury begins it's

9   deliberations, it's -- we can't just take time off.  You

10  know, we can't just take days off or afternoons off.  At that

11  point it becomes very, very difficult to replace a

12  deliberating juror with an alternate juror.

13       What I can tell you is I expect we're going to continue

14  this morning with the summation, so I expect that the jury

15  will get the case to begin it's deliberations no later than

16  this afternoon.  Sorry I can't give you a better answer than

17  that.

18            JUROR:  Thank you, sir.

19     (Juror No. 1 exits. Juror No. 5 enters)

20            THE COURT:  Good afternoon sir.  I understand you

21  want to speak to us.

22            JUROR:  Sure.  So my company just made me aware

23  that they're only going to pay for my first 10 days of jury

24  duty, and then afterwards they will not cover me.  So it may

25  be, you know, with the State only paying me like $40, it may

Amalia Hudson, SCR

A765

414

## PROCEEDINGS

1  be a financial hardship so-to-speak because I'm not going to

2  be getting paid when I'm accustomed to paying.

3       So I know we obviously made a lot progress.  I  already

4  used six of my days.  I just wanted to advise you of that.

5  Thank you.

6            THE COURT:  I appreciate that.  Is today your

7  seventh day?

8            JUROR:  Today would be my seventh, correct.

9            THE COURT:  So you could work through Thursday, if

10  necessary without that being a problems?

11            JUROR:  Right.

12            THE COURT:  You know, it's very difficult for me to

13  know in advance how long a jury is going to deliberate.  I've

14  had juries deliberate for 15 minutes.  I've had juries

15  deliberate for a week.  What I can tell you is that I expect

16  that the jury will receive the case and begin it's

17  deliberations this afternoon.  So if you can put this concern

18  out of your mind and deliberate and not be distracted, I

19  think we're doing okay on time as far as the 10 days.

20            JUROR:  Definitely.  It was just one of those

21  things I spoke with the jury clerk, and she advised me to

22  advise you rather to cover my basis.

23            THE COURT:  Okay, and you think you can put that

24  aside and just focus on your deliberations?

25            JUROR:  Absolutely.

**Amalia Hudson, SCR**

A766

## PROCEEDINGS

1       THE COURT:  Thank you for bring that to my

2   attention.

3       JUROR:  Absolutely.

4       THE COURT:  You can step out.  Thank you.

5           (Juror exits)

6       THE COURT:  Mr. Herlich, would you like me to give

7   the jury that instruction again that they are not to drawn

8   any inference against the defendant, or is it sufficient that

9   I gave it once?

10      MR. HERLICH:  I think it's sufficient that you gave

11  it once, Your Honor.

12      THE COURT:  Okay.  Let's bring the jurors in

13  please.

14      By the way the verdict sheet has been prepared.  I

15  believe the prosecutor has initialed it.  Mr. Herlich, can

16  you take a look at it, and if you approve, please initial it

17  as well.

18      MR. HERLICH:  Just one thing with regard to count

19  six and seven 7D, is it necessary to put in that the

20  defendant was older than 21 years old.

21      THE COURT:  Let me take a look.

22      (Pause in the proceedings)

23      THE COURT:  Well, that's an element of the offense,

24  and actual in six and seven, we don't put the defendant's

25  age.  We only put the victim's age.  Am I not reading --

**PROCEEDINGS**

1          MR. HERLICH:  No, no.  I am wondering if it's

2     necessary to.

3          THE COURT:  I thought you were questioning.

4          MR. HERLICH:  No.  Not at all.  Not that you put

5     that the age of the victim is under a certain age, but that

6     they must also find that the defendant's age, I believe, has

7     to be 21 or older.

8          THE COURT:  Well, that is an element of the

9     offense, and if you want us to add that, we can.

10          MR. HERLICH:  Okay.

11          THE COURT:  So we'll add and the defendant was over

12     21 years of age.  Ms. Park any observation to that?

13          MR. HERLICH:  No.

14          THE COURT:  So we'll make those changes, and we'll

15     continue now with the jurors. So I will allow you to

16     introduce 17A first, and then I will turn to you, Mr. Herlich

17     People, how long do you expect to be?

18          MS. PARK:  I think 45 minutes.

19          THE COURT:  Mr. Herlich how long do you expect

20     yours to be?

21          MR. HERLICH:  Not very long, Your Honor.

22          THE COURT:  Panel entering.  All rise.

23          THE CLERK:  Case on trial People vs. Lonnie

24     Harrell.  All parties are present except the defendant, and

25     the jurors are present.

**PROCEEDINGS**

1          THE COURT:  Good morning, Jurors.  Welcome back.  I

2     hope you had a good weekend.  I apologize for the delay this

3     morning.  I know that you were here and you were ready to go,

4     so I apologize for keeping you waiting, but at this time we

5     are ready to continue.

6          People, do you wanted to introduce 17A?

7          MS. PARK:  Yes, at this time the People are moving

8     in People Exhibit 17A connection having been made.

9          THE COURT:  And there is no objection to that,

10    right?

11         MR. HERLICH:  Correct.

12         THE COURT:  People's 17A is accepted into evidence

13    finding that the connection has been fully made, and you now

14    rests?

15         MS. PARK:  Yes.

16         THE COURT:  Okay.  Mr. Herlich.

17         MR. HERLICH:  Your, Honor the defense would like to

18    move into evidence the phone calls, the phone records of the

19    defendant from of February 6, 2014 to July 16, 2014.

20         THE COURT:  Any objection?

21         MS. PARK:  No, Your Honor?

22         THE COURT:  That will be defense?  What are we up

23    to?

24         THE CLERK:  F.

25         THE COURT:  Defense F.  Do you now rest?

## PRELIMINARY INSTRUCTIONS

1      MR. HERLICH:  Yes.

2      THE COURT:  Thank you please have a seat.

3  Members of the jury, you will now hear the summations of

4  the lawyers.  Following the summations I will instruct you on

5  the law, and then you will begin your deliberations.

6      Under our law, the defense counsel must sum up first and

7  the prosecutor must follow.  The lawyers may not speak to you

8  after that.

9      Provide each lawyer an opportunity to the review the

10  evidence and submit for your consideration the facts,

11  inferences, and conclusions that they contend may properly be

12  drawn from the evidence.

13      If you find that a lawyer has accurately summarized and

14  analyzed the evidence, and if you find that the inferences

15  and conclusions the lawyers asks you to draw from that

16  evidence are reasonable logical and consistent with the

17  evidence, then you may a adopt those inferences and

18  conclusions.

19      Members of the jury please bear in mind the following

20  points.  First, you are the finders of fact, and it is for

21  you to determine the facts from the evidence that you find to

22  be truthful and accurate.  Thus, whatever the lawyers say and

23  however they say it, you should remember what the lawyers say

24  is simply argument submitted for your consideration.

25      Second, remember the lawyers are not witnesses in this

## PRELIMINARY INSTRUCTIONS

1  case.  So if a lawyer asserts as fact something that is not

2  the based on the evidence, you must disregard it.  Remember

3  nothing the lawyers say at any time is evidence.  So nothing

4  the lawyers say in their summations is evidence.  You have

5  heard the evidence and must decide this case on the evidence

6  as you find it and the law as I explain it.

7      Third, during the summations one lawyer's recollection

8  of the evidence may in good faith differ from the

9  recollection of the other lawyer or from your own

10  recollection, and the lawyers will undoubtedly differ with

11  each other on the conclusion to be drawn from the evidence.

12  It is your own recollection, understanding, and evaluation of

13  the evidence, however, that controls regardless of what the

14  lawyers have said or will say about the evidence.

15      If during your deliberations you need to have your

16  recollection of the testimony refreshed, you may have all or

17  any portion of the testimony read back to you.

18      Four, remember under our law, I'm responsible for

19  explaining the law.  Not the lawyers.  If you think there is

20  any difference between what the lawyers may have said or what

21  I say the law is, your sworn duties as jurors is to follow my

22  construction on the law as you have promise you would.

23      And fifth, if during the summations I sustain an

24  objection to a comment of a lawyer, that comment will be

25  stricken from the record, and you must disregard it as it

**HERLICH - CLOSING**

1    were never said.  If I overrule an objection the comment will

2    stand.  Whether I sustain or overrule an objection, or on my

3    own indicate a comment must be disregarded, my ruling

4    indicates only that the comment does or does not violate one

5    of the rules of law set down for lawyers to follow during a

6    summation.

7          It is not an attempt to indicate that I have an opinion

8    on what is said, or of the facts of the case, or if whether

9    the defendant is guilty or guilty.  Remember under our law

10   you alone judge what facts, if any, are proven and whether

11   the defendant is guilty or not guilty.  Not I and not the

12   lawyers.

13         We turn now to the summations, Mr.  Herlich.

14         MR. HERLICH:  Let we begin by reminding you that

15   during voir dire I did mentioned to you that if Mr. Harrell

16   does not testify you can't hold that against him, and I just

17   want to remind you of that at this time.

18         You may have noticed, I assume, that I just moved into

19   evidence phone records of Mr. Harrell that go from February

20   of 2014 to July 16, 2014, and I just want to briefly go

21   through some of this to just show you that Mr. Harrell,

22   consistent with testimony of both Laketa Smith and Cypress

23   Smith, was sort of a family friend.

24         On April 22, 2014, there were a total of eight text

25   messages between Mr. Harrell's phone the number ending in

**HERLICH - CLOSING**

1  from 3203, and  Laketa Smith's phone ending in 7475, and I

2  will just go through it very you quickly.

3      On that date April 22 at 2:05 p.m. there was an outgoing

4  text from Mr. Harrell to Laketa Smith, and at 2:22 there was

5  an incoming text from Smith to the defendant.  Then at 2:50

6  p.m., there was an outgoing text from Harrell to Laketa.  At

7  2:52 there was another outgoing text from the defendant to

8  Laketa Smith.  At 2:53 Laketa Smith sent a text to the

9  defendant.  At 2:59 p.m. there was the text of the defendant

10  to Laketa Smith.  Another text only seconds later also at

11  2:59 p.m. from defendant to Laketa Smith, and last, and that

12  was it for -- Sorry.  One more.  There was an incoming text

13  from Laketa Smith to the defendant at 3:08 p.m.

14      Then on April 27, there was an outgoing voice call from

15  the defendant to Laketa Smith at 1:04 p.m.  It was a 44

16  second call.  On June 23, 2014 there was a incoming voice

17  call from Laketa Smith to the defendant at 2:36 p.m.  It

18  lasted 37 seconds.  On June 24th, there was an incoming call

19  from Laketa Smith to the defendant at 1:15 p.m.  That lasted

20  seconds, and on the same date June 24, 2014 there was an

21  outgoing voice call from the defendant to Laketa Smith at

22  1:17 p.m. that lasted 72 seconds.

23      Again on the same date June 24, 2014, Laketa Smith

24  called the defendant at 1:23  p.m.  That call lasted 67

25  seconds, and on June 25, 2014 it was an outgoing call from

HERLICH - CLOSING

1    the defendant to Laketa Smith at 10:42 a.m.  That is on

2    June 25 for 75 seconds.

3        On July 6, 2014 there was an incoming call, voice call

4    from Laketa Smith to the defendant at 3:39 p.m. that lasted

5    one minute and 54 seconds, and lastly on the same day July 6,

6    2014, there was an outgoing call from the defendant to Laketa

7    Smith at 7:11 p.m., and that lasted 16 seconds.

8        And this is just to demonstrate that there was a cordial

9    relationship between the defendant and Ms. Laketa Smith and

10   her daughter.  The phone communications were between mother

11   and Mr. Harrell, and perhaps that's the only part of this

12   case where there is consistent testimony regarding the fact

13   that prior to July 16, 2014 Mr. Harrell was a friend of the

14   family, and the communications make sense in the context of

15   the friendship between Lonnie Harrell and Journey who was and

16   is Ms. Smith's son, and as you heard Mr. Harrell took Journey

17   to play basketball and ride bikes, and so they had a

18   relationship, so it's only natural that mother and Mr.

19   Harrell had some way of communicating with each other.

20       Let me address the testimony of Cypress Smith who is the

21   complaining witness in this case.  The Judge will instruct

22   you at the end of the case on what tools you can use to

23   assess the credibility of a witness, and one of the tools is

24   called impeachment by omission.

25       In other words what I attempted to do during cross

## HERLICH — CLOSING

1      examination was to ask Laketa Smith —— I am sorry —— Cypress

2      Smith about the fact that she left out some information about

3      the events of July 16, 2014, and for you to consider the fact

4      that she had left out certain events from her narrative that

5      she gave to Detective Susan Barbato at St. Luke's Roosevelt

6      Hospital during the period of time that she was in the

7      hospital from approximately 3:40 —— some time after 3 p.m.

8      until shortly after midnight on July 17th, and the medical

9      records will also bear out that at some time during the

10     course of her being at the hospital, she similarly gave a

11     narrative that left out a certain portion of the event that

12     she did recall at trial.

13          So I want to focus on the testimony of Cypress Smith

14     that deals with the charge of attempted rape in the first

15     degree which is the third count of the indictment that you

16     will have to consider in this case.

17          Cypress Smith testified about how she let Mr. Harrell

18     into her house because he was a family friend, and they had a

19     smoothie together, and when she gets into the sexual contact

20     that took place between the two parties, she indicated at

21     first that he kissed her, and by her testimony it was by

22     force; that he also put, she believed two fingers into her

23     vagina, and after testifying about Mr. Harrell allegedly

24     putting two fingers into her vagina this is what she said.

25     Starting at the bottom of Page 63 of the trial transcript

**HERLICH - CLOSING**

1    Line 24:

2          "Q    So what happened next?

3          "A    Then he put his mouth on my vagina and his

4    tongue.  I kept telling him stop.  He kept saying that I

5    like it and that I wanted this, and if I say, "No, I didn't

6    he would say, "Yes, You did.

7          "Q    What do you mean?

8          "A    If I say, "Stop."  He would say, "You wanted

9    this.  I would -- and I said, "No, I didn't, and he said,

10   "Yes, you did want it.  I said, "No, I didn't, and he said,

11   "Yes, you did again."

12         So the point of me reviewing that part of the testimony

13   is to show that Ms. Cypress Smith indicated that she first

14   had experienced actually being kissed then having Mr. Harrell

15   put two fingers into her vagina, and then his mouth on her

16   vagina.  Then the prosecutor directed a question to her

17   because she left something out of the narrative.  At least in

18   the sequence that the prosecution has presented for your

19   consideration.  They're going to claim it happened in a

20   certain linear sequence, and on a number of occasions

21   Ms. Smith consistently left out certain portions or got the

22   order of things mixed up.

23         So the question was, "Before he put his mouth on your

24   vagina, did anything else happen?

25         "A    He took out his penis, and he rubbed it against

425

**HERLICH - CLOSING**

1   me.

2       So she had to be prompted to recall the penis to the

3   vagina content.

4       "Q    He rubbed it against you where?

5       "A    On my vagina, and I asked him not -- I asked him

6   not to put it in because it would hurt.  He said, it won't

7   hurt if you relax again.

8       "Q    Did his penis touch your vagina?

9       "A    Yes.

10      "Q    Did his penis go into your vagina.

11      "A    No."

12      So let me just remind you that when I examined Susan

13  Barbato, the detective from Special victims who interview

14  Cypress Smith at the hospital I asked the detective to review

15  the paperwork of an exhibit for the purposes of

16  identification to review it without reading it out loud, and

17  then I asked her, "Isn't it a fact that Cypress Smith never

18  mentioned to you any type of contact between penis and

19  vagina."  And she said, "Yes, that wasn't mentioned to me."

20  And I believe on redirect the prosecutor asked her "Well, you

21  just took a narrative statement from her.  You didn't --

22  meaning that you didn't question her step by step about every

23  detail.  You just took a narrative, and that was left out?"

24      So you can consider that when you assess the credibility

25  of the witness.  That portion of allege sexual assault wasn't

## HERLICH - CLOSING

1  mentioned to the Detective Barbato, and it will appear in the

2  medical records.

3        There is a number of things I want to discuss with you.

4  First, I want to stay on point regarding what the complaining

5  witness didn't say at certain times in the medical records.

6  Okay.  There is -- in the medical record there is a

7  pre-hospital care report summary which apparently is prepared

8  by the hospital.  Not the hospital the E.M.T.s the ambulance

9  guys or gals who transported Cypress Smith to the hospital,

10  and they took information from her before she was handed off

11  to treatment at the hospital, and on Page 2 of the

12  pre-hospital care report summary that is in evidence, they

13  took a narrative from the complaining witness that goes

14  through a great deal of what Ms. Smith said at trial, and I

15  can read it to you quickly:

16        "Fifteen-year old female, alert an oriented times three

17  again POS, is that positive, or is that possible, I Don't

18  Know.  POS ABC negative SOB.  SOB is shortness of breath.

19  Raped by adult male --

20        Again the Judge will instruct you on definitions of all

21  of the crimes in this case.  The defendant is not charged

22  with rape, but that is what was written down -- by a male

23  known to her from the building she lives.  Patient states she

24  was forced by a male to perform oral sex on him and forcibly

25  performed oral on the victim.

## HERLICH - CLOSING

1      Patient states the patient -- I guess it means

2   perpetrator choked her, pulled her pants down, placed her on

3   a stool.  Performed oral sex on the victim.  Forced her to

4   her knees and instructed the victim to perform oral sex on

5   him.

6      Patient states she thinks the male ejaculated in her

7   mouth, but she is not sure is.  Patient is complaining of

8   pain to the right side of the neck, POS either positive or

9   possible redness to the right side of the neck.  Denies lost

10   of the consciousness.  Denies neck and back pain.  Denies

11   chest pain."

12      That narrative does not indicate any contact between the

13   defendant's penis and the complaining witness's vagina, and

14   in one other portion of the medical records is an area of the

15   report entitled Pages 1 through 6, and on Page 4 of 6 there

16   is another narrative section where there is a note.  I

17   believe from looking at the records the note was prepared by

18   a registered nurse, and the note says:

19      "Patient let neighbor in who is a friend of her brother.

20   Upon leaving assailant gave her a hug but wouldn't let go.

21   Forced her into chair.  Performed oral sex with her.  Then

22   made her perform oral sex on him with him ejaculating in her

23   mouth.  No vaginal penetration with penis.  Used fingers

24   only.  Presently with mother and police officer calm but

25   slightly teary.  Several scratches noted to her right cheek.

**HERLICH - CLOSING**

1        States he was choking her."

2                (Proceedings continued next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HERLICH:  So, that narrative, again, is a

2     second narrative in the medical record where the patient

3     failed to disclose that there was any contact between

4     defendant's penis and the complaining witness' vagina.

5          And I'm only submitting that to you as an omission

6     to consider the credibility of the witness who -- who

7     omitted twice in the medical records and two interviewers

8     and to Detective Barbato that she didn't mention that part

9     of it.  So that's something to consider whether anything of

10    that nature actually took place or not.

11         Now, let me discuss the count of attempted rape in

12    the first degree.  I already read you the complaining

13    witness' testimony on that.  I just want to read you the

14    cross-examination.  I mean, I hope you remember, and I don't

15    know if you can see from your position in the jury box, but

16    when I was questioning Cypress Smith, I was using my hands

17    because she had testified that he rubbed his penis against

18    her vagina.

19         And I said to her -- I asked her:  Was it like

20    this, meaning like penis against vagina like this, or was he

21    trying to insert his penis into her vagina.  I wanted her to

22    be very clear about that.  And this is what I asked her,

23    from page 90 at the bottom going forward:

24         "Question:  Now, you indicated during your direct

25    testimony that Mr. Harrell's penis had -- he rubbed his

Joanne Fleming

A781

1    penis against your vagina.  Did you see that or you just

2    felt the event?

3              "Answer:  I saw it.

4              "Question:  And to the extent I am able to

5    demonstrate, was Mr. Harrell's penis rubbing against your

6    vagina as I am demonstrating with my hands, or was it in a

7    way where he was trying to insert his penis into your

8    vagina?

9              "Answer:  The first demonstration, and then as he

10   moved to -- as it seemed like he was trying to insert his

11   penis into my vagina, I asked him to stop.

12             "Question:  And when you asked him to stop, in

13   fact he did stop, isn't that fair to say?

14             "Answer:  Yes."

15             So, if you fully credit the testimony of the

16   complaining witness, my argument to you at the end of the

17   case is that while there may have been penis to vagina

18   contact by the defendant going like this and she

19   acknowledged that by saying yes, the first demonstration,

20   meaning penis rubbing against vagina, I will repeat her

21   words:  "Then as he moved to -- as it seemed like he was

22   trying to insert his penis into my vagina, I asked him to

23   stop."

24             So, it wasn't clear to me from her answer how far,

25   if at all, he got in doing any type of penis to vaginal

1    contact which was directed or aimed at inserting his penis

2    in her vagina, but as soon as she asked him to stop, he --

3    unlike with regard to her testimony about every other act

4    that's alleged in the indictment, as to this particular act,

5    he -- he honored her request and did not try to use forcible

6    compulsion to have his penis inserted into her vagina.

7         So, based on that, I would ask that you return a

8    verdict of not guilty as to attempted rape in the first

9    degree even if you fully credit her testimony regarding

10   everything that happened in this case.

11        Let me just go through some other things in the

12   medical record that you will have an opportunity to review,

13   it's in evidence and you can review it in the jury room.

14        I believe when the complaining witness first comes

15   to the hospital, she did complain of pain.  I believe on

16   page three of six of the hospital record, on page three of

17   six, she tells a nurse:  Patient states man also choked her

18   and her throat hurts.

19        So, in the hospital record as distinct from the

20   ambulance record, as I already read, she complained of

21   possible pain to the right side of her neck.  In the

22   hospital record, the complaint is about a sore throat, and

23   the pain six.  On a scale of zero to ten, the pain was six.

24   And that was at 3:40 p.m., the pain at 9:28 p.m. was one out

25   of ten and shortly thereafter at -- prior to her discharge,

1    it was zero out of ten.  So, the sore throat pain that was

2    complained of initially had abated completely by the time

3    she was discharged.

4            May I see the photographs?

5            (Counsel conferring with counsel.)

6            MR. HERLICH:  Okay, on the part of the medical

7    record that is entitled pages one through seven -- one of

8    seven -- going to page one, there is an indication that

9    right cheek abrasion with a scratch.

10           Okay, with regard to genital exam, no lesions

11   noted.  No injuries to her vaginal area.  This is from the

12   comprehensive sexual assault assessment form which is one

13   through six of.

14           On page three, again it says abrasion to right

15   cheek, otherwise well appearing.  Abrasion, scratch on right

16   cheek.  I think it's in the ambulance report again where --

17   on the ambulance report, as I indicated, complains of pain

18   to right side of neck, possible redness to the right side of

19   the neck.

20           So here's a photograph taken at the hospital

21   regarding Cypress Smith's right cheek.  I mean, you're the

22   jurors, you'll decide what it shows.  It's hard for me to

23   say what it shows.  I don't know if it indicates a scratch

24   or some area of redness on her right cheek.  It appears to

25   me that there's absolutely no redness on the right side of

her neck which was mentioned in the ambulance report.

Now, when Dr. Singh testified, and let me just give you the comprehensive sexual assault assessment form narrative.  It is a little hard to read, but it says:

Patient was making Smoothie.  Allowed neighbor in who asked for Smoothie that patient was making.  Patient was threatened by neighbor.  Neighbor then asked patient to undress.  Neighbor asked patient to perform oral sex on him and then neighbor performed oral sex on patient.  Penis contacted vagina, no penetration.  Neighbor ejaculated during oral sex.  No penetration on exam or ejaculation.

So, in this narrative in the comprehensive sexual assault assessment form the complaining witness does mention that there was penis to vagina contact.  And that's the only place in the report that that's mentioned.  In the other two narrative parts of the hospital record, it was left out.

But Dr. Singh, who came into the hospital approximately 7:00 p.m., is when she came into contact with the complaining witness in this case, and she testified: Before my arrival, the intern who was working with me conducted the original physical examination of the complaining witness and the physical examination of the complaining witness, in Dr. Singh's own words, is a head-to-toe examination, and in this head-to-toe examination conducted by Dr. Singh's intern, there was no indication of

1    any kind of injury, scratch, abrasion to the back of Cypress

2    Smith's neck.

3         Now, as Cypress Smith then -- there's one little,

4    maybe not so little inconsistency, between the testimony of

5    Cypress Smith and her mom.  When I asked Cypress Smith about

6    the scratch on the back of her neck, she -- I asked her:  Do

7    you know -- your mom took that photograph, do you know when

8    your mom took the photo.  She said at the hospital.  And I

9    said:  Was this during your initial visit to the hospital

10   or, you know, the follow-up.  She said during the initial

11   visit, which isn't what mom said.

12        Mom said -- on the next day mom indicated --

13   that's Laketa Smith -- indicated that there were two

14   appointments.  There was one appointment where she went for

15   a medical examination or a medical follow-up, and that, by

16   the medical record itself from Spencer Cox Center For

17   Health, indicates that it took place at approximately -- the

18   medical --

19        I'm sorry, the social worker appointment was

20   first, and the social worker met with Laketa Smith and

21   Cypress Smith at approximately 1:31 p.m. and she took a

22   narrative, a brief narrative, of the events of July 16th.

23   This was the next day, July 17th, two-thirty-one in the

24   afternoon, and that's where it says:  Patient reports she's

25   feeling okay about the incident.  No particular concerns

Joanne Fleming

A786

1    reported or noted.

2           And apparently, according to mom's testimony, they

3    left, they had lunch somewhere, they came back for the

4    medical follow-up at approximately five-twenty-three in the

5    afternoon at the Spencer Cox Center For Health, which is

6    part of St. Luke's Roosevelt, and that's where they went

7    through the prophylactic medications that Ms. Smith, Cypress

8    Smith, would have to take to prevent any possibility of

9    sexually transmitted diseases.

10          And, for the first time, and this is, again,

11   around 5:23 p.m. on the seventeenth:  Skin warm, excoriation

12   on right cheek and another on back of neck right side, some

13   scabbing, neck supple, tenderness with palpation to the

14   posterior side.

15          So, on touching or probing the back of her neck

16   with the doctor's hands, palpation, there was some

17   tenderness, and, for the first time, there is a notation

18   about the scratch, and I submit the testimony of Laketa

19   Smith is that she brought that to the attention of the

20   doctor because she testified that she took the picture while

21   she and her daughter were walking on the sidewalk or on the

22   street to the Spencer Cox Center and she noticed this on the

23   back of her daughter's neck, but it was not noted during the

24   physical examination at the hospital on the day of the

25   incident.  It wasn't noted by the person who did the

1    physical exam.

2          And then when Dr. Singh performed the fifteen

3    steps of the sex offense forensic evidence kit, colloquially

4    known as the rape kit, she, on two independent occasions

5    during the course of the fifteen-step exam, Dr. Singh had

6    Cypress Smith disrobe completely and had an opportunity to

7    view her, and on neither of those two occasions did Dr.

8    Singh observe the scratch to the back of Cypress Smith's

9    neck.

10         So, there is a question, I submit, whether that

11    scratch existed or it was as a result of the events in the

12    apartment between Lonnie Harrell and Cypress Smith or

13    whether this scratch took place after she was discharged

14    from the hospital and prior to coming into the Spencer Cox

15    Center the next day.  It's impossible to know the answer to

16    that question, I submit to you.

17         Dr. Singh said it's easy to overlook a scratch on

18    someone if it hasn't scabbed up, it might not be observable,

19    but there were three opportunities to look during the

20    physical exam by the intern and twice during the two of the

21    steps of the forensic exam where Cypress Smith had to

22    disrobe.  There was that injury, alleged injury, that

23    scratch, was never observed.

24         And, finally, Laketa Smith, Cypress' mother, while

25    she testified that she took the picture on the seventeenth

1   while walking in the street, she did not share it with the

2   District Attorney's Office until September of 2015, over a

3   year after the incident in question.  So, I'm not sure what

4   to make of that, but I suggest that it's a possibility, it

5   is a reasonable inference, that this scratch didn't result

6   from what happened between the complainant and the defendant

7   in the apartment on July 16th, 2014 at approximately two to

8   two-fifteen to two-twenty in the afternoon.

9            I just have a few more comments to make on some of

10  the forensic evidence in the case.  Just briefly about the

11  phone records.  The phone records of the complaining witness

12  indicate there was one call where maybe it rang once, twice.

13  Nobody can know how many times it rang.

14           There is an alleged call between the defendant and

15  the complainant, and according to the complainant's

16  narrative, when the defendant was about to leave the

17  apartment, he asked for her phone number, she gave it to him

18  and he called it to make sure he had been given the correct

19  number, and as soon as the phone rang, the call ended.

20           In the complaining witness' phone records, that

21  brief call is noted to have taken place, I believe at

22  two-twenty in the afternoon.  In the defendant's phone

23  records, that call does not appear, although there are ten

24  calls from the defendant's phone to the complaining

25  witness', Cypress Smith's phone, beginning, I believe, at

Joanne Fleming

A789

1    2:23 p.m. and going to -- let me give you the precise time

2    -- there are ten phone calls of the records of the

3    defendant's phone to Cypress Smith's where the ten calls go

4    from 2:23 p.m. and thirty seconds until 2:28 p.m. and

5    thirty-five seconds.  The call that's at two-twenty and

6    fifty seconds doesn't appear.

7           And the phone, the original -- there were two

8    phone related witnesses at trial.  The first gentleman

9    testified ultimately on cross-examination that new

10   technology came into being prior to responding to a request

11   for Cypress Smith's phone records and that's why they were

12   able to get that call on Cypress Smith's phone.  The request

13   for the defendant's phone records was made back in January

14   of 2015.  The technology wasn't available at that time,

15   therefore, that call doesn't show up.

16          But, he also admitted that once this new

17   technology came on line which enabled them to get Cypress

18   Smith's phone records that included that call, there was not

19   a subsequent request for the defendant's records to sort of

20   confirm that on his records the same call shows up.  Maybe

21   it's much ado about nothing, but it's interesting that on

22   the defendant's records that initial call, which is a part

23   of the complaining witness' testimony of how things went

24   down in the apartment that day, that was not part of the

25   defendant's phone record.

Joanne Fleming

1          Let me also address the DNA evidence in this case.

2          Could I have this displayed, your Honor?

3          (Court officer complies.)

4          MR. HERLICH:  With regard to the straw that was

5   recovered from the glass on the kitchen counter, the DNA

6   analysis was a full analysis of, I believe, fifteen loci or

7   points on the chromosome that they're looking at or the

8   chromosomes that they're looking at, and using the

9   statistics that we used, Lonnie Harrell is the only person

10  on the planet earth that could have contributed that DNA to

11  the straw.

12         And, likewise to the rim of the coffee cup that

13  was recovered from the trash can, same thing, Lonnie Harrell

14  is the only person on planet earth that could have

15  contributed that DNA.

16         So, there is no dispute that Lonnie Harrell came

17  into her apartment and had a Smoothie with her and the DNA

18  evidence supports that a hundred percent.  The question:  Is

19  Lonnie Harrell -- well, there are a number of questions for

20  your consideration in this case, but question number one:

21         Is Lonnie Harrell the contributor to the DNA that

22  was recovered -- there was DNA from Lonnie -- not from

23  Lonnie Harrell but from the crime victim in this case, the

24  alleged victim, and there were three items:  Dried secretion

25  swab 1.4.1 from the bilateral labia, a dried secretion swab

1    1.4.3 from the bilateral labia and the vulva swab.  Those

2    three generated profiles that are up there and these are

3    from Y chromosome analysis.

4              As the expert DNA witness testified, doing a full

5    complement DNA analysis, the autosomal analysis, I believe,

6    was the phrase she testified to, test for fifteen loci

7    across the entire DNA double helix.

8              The labium and vulva swabs for the DNA of Cypress

9    Smith, whatever DNA may have been there as well was masked

10   by the overwhelming contribution of DNA from Cypress Smith.

11   So, what they did at the OCME lab was to do these swabs, the

12   vulva swab and labial swabs, and try to do special testing

13   only designed to look at various loci or points on the Y

14   chromosome that could only have come from a male, male donor

15   A, and they developed a genetic profile using the Y

16   chromosome analysis as to the labial which would be two

17   labia swabs and the vulva swab.

18             And the biological material on those swabs was

19   amylase, which is enzyme akin to saliva.  The oral swab,

20   which was from the swab remains fraction, and the actual --

21   they take part of the Q-tip swab and actually test that for

22   biological material, and that was positive for the presence

23   of semen and that's what gave actually less genetic

24   information for whatever reason.

25             As you see, there are a number of empty spaces in

Joanne Fleming

Summation - The Defense

1    the profile that was generated from the oral swab and the

2    statistics reflect that, okay?

3            The statistics indicate, and this was brought out

4    on cross-examination, and I'll note that the prosecutor

5    didn't ask her witness about these statistics, so I did.

6    She did ask about the statistics from the full complement of

7    fifteen point autosomal genetic profile because it showed

8    Lonnie Carrell was the only person on planet earth that

9    could have made that contribution to the straw and the

10   coffee cup.

11           But, with regard to the Y chromosome analysis,

12   with regard to the dried secretions from the bilateral labia

13   and the vulva, the analysis, the statistical analysis,

14   showed, okay, the Y STR.  DNA profile of Lonnie Harrell

15   matches the DNA profile of male donor A.  He or one of his

16   paternal male relatives could be the source of this DNA.

17           Then, when you look at the statistics, one in six

18   hundred eighty-five African males, thousands of individuals

19   in New York City, could have contributed that DNA to the

20   labia and vulva of the complaining witness if you want to

21   speak scientifically about this.

22           And the semen, the testing of the semen, the Y

23   chromosomal testing of the semen, because there was even

24   less points that they could actually determine in generating

25   a Y chromosomal profile, one in three hundred twenty-one

Joanne Fleming

1    African males could have contributed the DNA to the Y

2    chromosome of DNA.

3            So, those statistics are even worse from the

4    prosecutor's point of view.  Thousands of people in New York

5    City could have made the contribution, okay?  And this

6    record is in evidence and you can -- you will have a chance

7    to look at the statistics.

8            I just want to go through, very briefly, I mean,

9    one way of putting this very clearly is to say that as a

10   result of the Y chromosomal analysis, Lonnie Harrell cannot

11   be excluded as a contributor to that DNA profile.  As the

12   contributor, he can't be excluded but he can't be ruled in

13   either.  You can't rule him out, but it doesn't mean it's

14   him that made the contribution.

15           It's very different when it comes to the straw and

16   the coffee cup.  He's the only person on plant earth who

17   could have contributed the amylase, the saliva, to the

18   coffee cup and the straw.  And, in fact, Ms. Tamariz

19   indicated that the Y STR profiles are useful especially for

20   making exclusions of people, or, in this case, alleged

21   inclusion.  You can't rule him out.

22           So, I want to just give you one question and

23   answer from page 336 at the bottom, it's the direct

24   testimony of the expert DNA witness, Ms. Tamariz, and I'll

25   comment on it:


Joanne Fleming

1    "Question:  And that -- we're talking about the Y

2    chromosomal DNA analysis -- and that DNA, if you can tell us

3    again how that DNA matched, the word matched, or how that

4    related to that of Lonnie Harrell's DNA strain profile.

5    "So the profile that we recovered from the samples

6    is the same as the profile of Mr. Harrell."

7    So, my comment would be:  True, but it could be a

8    bit misleading.  Because if you look again at these numbers,

9    the Y chromosomal analysis from Lonnie Harrell, yes, it

10   matches the Y chromosomal analysis of the vaginal swabs, the

11   vulva swab and the labia swabs on all of the points that

12   were looked at, and on the oral swab, based on the swab

13   taken from the complaining witness' mouth, like I said,

14   there is a lot of missing data points.

15   But, all that can be said is that it does not

16   exclude Lonnie Harrell, but to call it a match is a

17   misleading term of art.  Because the only match in this case

18   with DNA is the match on the straw and the match on the

19   coffee cup, so...

20   I just ask you to take into consideration that the

21   Y chromosomal analysis gives you statistics that are almost

22   meaningless, or, put another way, they don't rule out Lonnie

23   Harrell and they don't rule out any Hispanic male relatives

24   and they don't rule out thousands of African males simply in

25   the confines of New York City, let alone in the United

Joanne Fleming

1  States or in the world.

2          So, you're going to have to determine a couple of

3  things:  One:  Did these acts take place.  Did they take

4  place by forcible compulsion.  And by forcible compulsion,

5  the Judge will instruct you on that meaning, but was it

6  either through the use of force or the threat of force.

7          And I submit, or I ask you, to take into

8  consideration the points I've made from the medical record

9  and the testimony of the Detective Barbato and Dr. Singh,

10  that the complaining witness, when she had given narratives

11  of the events, didn't always give the exact same story.  If

12  she was consistent about one thing, she consistently left

13  out the fact that there was even penis to vaginal contact at

14  all in this case.

15          Secondly:  I ask you to consider the fact that

16  she, herself, the complainant, admitted that with regard to

17  the alleged penis to the vagina contact, when she asked the

18  defendant not to do it, not to insert his penis into her

19  vagina, on that particular instance, he honored her request

20  and did not use force or threat of force.  He didn't in fact

21  insert his penis in her vagina.

22          And with regard to use of force, the medical

23  records should assist you in determining the credibility of

24  the witness.  She kept saying she was choked with two hands

25  by the defendant and that the choking took place on two

Joanne Fleming

A796

1    occasions, I believe.  From her testimony, it took place

2    twice during the course of the alleged sexual assault, and

3    to the ambulance people, at least, she complained of pain to

4    the neck, to the right side of her neck and redness, but the

5    photograph taken at the hospital only some hours later shows

6    absolutely no redness to the right side of the neck.

7         And, again, I can't tell you what the picture shows

8    shows you, but it doesn't appear to me to indicate scratches

9    to her cheek.  It's redness.  It could be pimples.  I can't

10   tell.  That's for you, the jury, to decide.  But the

11   photograph clearly shows no redness to the right side of her

12   neck.

13        And, again, I've already called your attention to

14   the fact that the scratch on her back, the upper back below

15   the right rear side of her neck, was not noted by -- during

16   the course of three examinations, one by the intern, two by

17   Dr. Singh where the complainant was completely unclothed at

18   the emergency room where they were looking specifically for

19   injuries, because if they found any indicia of injury, they

20   could photograph it, and the only photograph that's in

21   evidence from the hospital is of the right cheek of the

22   complaining witness.

23        So, look carefully at the medical records to

24   determine whether the force that Cypress Smith claims was

25   used during the course of this incident was in fact used.  I

Joanne Fleming

A797

1    submit to you that the evidence is consistent with the fact

2    that force was not used.

3         She said she had a sore throat, but the pain level

4    was zero when she was discharged from the hospital, and I

5    think the record is also clear that -- it's consistent with

6    the fact that she -- her genitalia were without any type of

7    trauma.  They were, and she appeared to be, other than the

8    alleged abrasion on the side of her face, she was normal

9    appearing or healthy appearing.  And, for those reasons,

10    that would be consistent with the findings that this was

11    consensual sex between Lonnie Harrell and Cypress Smith.

12         Of course, if you find that the sex act took

13    place, she was underage, and, as a matter of law, based

14    simply on her age, without any requirement of forcible

15    compulsion, the last two counts in the indictment, criminal

16    sexual act in the third degree dealing with the defendant's

17    mouth to the complainant's vulva and the defendant's penis

18    to the complainant's mouth, the defendant would clearly be

19    guilty of those two counts if you found that the sexual act

20    testified by the complainant took place.

21         But, when it comes to the forcible compulsion

22    issue, I ask you to look carefully at the medical record

23    before -- entered for you to determine whether the People

24    proved beyond a reasonable doubt that forcible compulsion

25    was used during the course of this event.

Joanne Fleming

1              And, if you find that there was no forcible

2    compulsion, then you must find the defendant not guilty of

3    all counts other than the last two counts that will be

4    submitted for your consideration.

5              Thank you.

6              THE COURT:  Thank you, Mr. Herlich.

7              Ms. Park.

8              MS. PARK:  She hadn't even had her Sweet 16th yet.

9    She wasn't even old enough to drive.  She just finished her

10   first year of high school.  She was only fifteen-years old.

11             She wasn't supposed to be calling Nine-One-One

12   crying that someone had sexually assaulted her.  She wasn't

13   supposed to be telling a room full of uniformed cops that

14   her neighbor had violated her.  She certainly wasn't

15   supposed to have swabs inserted in her vagina, and she

16   wasn't supposed to come before you, face her attacker and

17   tell you the intimate details of what happened to her that

18   one horrific day last summer.

19             This is not what a fifteen-year old should look

20   like.  But it's Cypress' reality because it happened to her

21   and evidence proves that the defendant is guilty.

22             My burden is twofold:  One, I have to prove all

23   the elements of all the crimes charged, and two, I have to

24   prove identification, that the defendant was the perpetrator

25   of all the crimes.

1       Let's start with the second one because this one

2    is easy.  I say it's easy because it's not really in

3    dispute.  This isn't a case involving a stranger.  Cypress

4    knows the defendant.  He has known her from about 2009, 2010

5    until this incident occurs.  He lived next door to her.

6    He's been to her apartment before.  He did maintenance work

7    inside for the family.  From the very beginning, Cypress

8    said Lonnie is my neighbor.  So identification, I submit to

9    you, is not really in dispute.  He's not claiming that

10   someone else did this.  It was me but I did not do it.

11       Next, all the elements of the crimes.  The

12   evidence in this case proves beyond a reasonable doubt each

13   and every element.  And let's start with who Cypress Smith

14   is.  Was she credible?  Was she accurate?  Was she reliable?

15       And the answer is a resounding yes, yes, yes.

16   She's that girl who does her homework in the room they call

17   The Learning Center.  She is the girl who spent two weeks in

18   Montana volunteering for senior center and a day-care

19   center, building sheds in a Native American reservation.

20   She's the girl who wants to be productive even during her

21   summer vacation.  So after coming back from Montana, she had

22   plans to go to summer camp.  She's the girl who hopes to go

23   to college after she finishes high school.

24       But, you all saw her here.  I ask you to go back

25   to that Tuesday of last week.  You know who she is.  You

1    remember the way she spoke, her demeanor, the way she

2    answered questions.  She was quiet.  Respectful.  And I

3    submit to you that she was credible.

4           You remember when she was on the stand at times

5    she had her head down.  When I asked her to talk about the

6    sex acts, she had her head down and she was in tears.  She

7    cried.  She could barely look in the defendant's direction,

8    having to recall that day, that afternoon, when she was

9    alone in the apartment being humiliated, violated, so

10   terrified.  It was a physical, visceral reaction to have to

11   relive that moment.

12          We asked her to go back to that day.  Tell us what

13   happened.  And she described every painful moment, both

14   physically and emotionally.

15          And you can rely on her words.  When I asked her

16   to take a look around the courtroom, point to him and

17   describe something that he is wearing, remember what she

18   did?

19          She couldn't point to him.  She barely looked in

20   his direction.  And she said black shirt.  It was the first

21   time she shed tears in this courtroom.  Again, a visceral

22   reaction to having to face her attacker.  You cannot fake

23   that, to face the man who violated her body in the worst way

24   possible.

25          The defense would have you believe, because she

1    may have gotten one or two things out of order, that she is

2    not to be credited.  A lot of things happened that day.  A

3    lot of different sex acts.  And she remembered each and

4    every one and she described them for you in details.

5             Now, what motive does she have to lie?  Did she

6    look like she was having a good time up there?  Do you think

7    she wanted to be here and be questioned about what happened?

8    Take a four-hour train ride from Massachusetts?  Miss

9    several days of school?  In the presence of complete

10   strangers?  In the presence of the defendant?  And then take

11   another four-hour train ride back to Massachusetts?

12            People lie for a reason.  They lie either to cover

13   up something when they get caught or to gain a benefit.

14   None of that exists here.  It's not as if her mother walked

15   in on them having sex and she had to cry rape to not get in

16   trouble.  No one would have known what happened inside that

17   apartment if Cypress didn't say anything.

18            Two:  She gains nothing by coming in here

19   testifying before you.

20            And Cypress also told you that she had a good

21   relationship with the defendant.  We all know before that

22   day the defendant was a good neighbor.  That is not in

23   dispute.  So, all the more reason she has no motive to lie

24   about what happened.  So you can credit her testimony.

25            Next:  Was Cypress reliable?  Was she accurate?

Joanne Fleming

A802

1     Again, the answer is yes, yes.  Everything Cypress

2     told you, almost everything, has been corroborated by other

3     evidence.

4     When Cypress answered the door, the defendant was

5     standing there with a blue -- with a coffee cup, and she

6     described it as blue paper and it had white writing on it.

7     She's careful.  She pays attention to details.

8     The coffee cup -- and the police recovered that

9     coffee cup from inside the kitchen garbage can.  The rim of

10    the coffee cup was swabbed and we obtained DNA that matched

11    the defendant's.  Again, corroborating the defendant.

12    She also told you that she made a Smoothie when

13    the defendant came inside.  She gave him some and she

14    described the color of the straw.  She said a purple straw.

15    Purple straw.

16    They swabbed the top of the straw and they got the

17    defendant's DNA.  And that was also recovered from the

18    counter of the kitchen where Cypress said that she had left.

19    Now, Ms. Alynka Jean from NYPD lab told you that

20    she also tried to swab the glass.  We don't know how the

21    glass broke, but it was intact when the cops recovered it

22    from Cypress' apartment, but when -- by the time it reached

23    the NYPD lab, it had shattered somehow.

24    Should the police have vouchered it better so it

25    won't break?  Probably.  But Ms. Jean was still able to tell

Joanne Fleming

A803

1  you that she was able to figure out the rim of the cup.

2          And the fact that they were not able to get any

3  DNA from the rim of the cup also corroborates her testimony.

4  Because he used the straw to drink out of the Smoothie.

5          Now, Cypress also told you that defendant choked

6  her.  Ms. Laketa Smith testified that the next day, after

7  the attack, she noticed the scratch on her neck.  And she

8  took a picture of it, and the defense attorney showed that

9  to you earlier.

10          Dr. Singh told you that that injury was consistent

11 with it occurring the day before the incident, that it was

12 also consistent with a scratch by finger, and I submit to

13 you that that injury was caused when the defendant had his

14 hands around her throat.

15          Now, I submit at the hospital that they simply

16 missed it.  It wasn't a significant injury.  They took note

17 of her face because it was on her face.

18          Now, Cypress also said that she recalls the

19 photograph of the neck injury being taken on July 16th at

20 the St. Luke's Roosevelt Hospital.  But a lot of what

21 happened to Cypress that day, especially at the hospital,

22 she went through physical exams, she was questioned by

23 doctors, by detectives.  She was simply mistaken.

24          But her mother, her mother remembered it.  She

25 told you she was very specific about it.  She told you they

1    were walking on their way to Spencer Cox Clinic and that's

2    when she noticed it and she took a photo of it.

3              Now, defense suggests that possibly somehow this

4    photo was not taken the day after.  Maybe it was fabricated

5    somehow.  She only told the hospital at the Spencer Cox

6    Clinic, but not the District Attorney's Office, until

7    recently.

8              But that makes sense.  Ms. Smith is a mother who

9    is concerned about Cypress' welfare.  She noticed the

10   physical injury so she's telling the hospital because they

11   are the ones who treat her.  She has no idea whether this

12   photograph has any value or any weight in a criminal case.

13   She is making concerns about her daughter's welfare.

14             You judge Ms. Smith's credibility.  She is a

15   working mother who raised Cypress and Journey.  You saw the

16   way she testified.  She could have made the defendant out to

17   be a monster, but she did not.  She called him a good

18   neighbor.  That he hung out with her son.  That she

19   appreciated that he spent time with her son.  So you can

20   rely on her testimony.

21             And about the phone contacts between Ms. Smith and

22   the defendant, that is of no moment.  We know he was

23   spending time with her son.  So, of course, she's going to

24   have his phone number.  And he did maintenance work for the

25   building.  So, of course, he's going to have her number.


                              Joanne Fleming


                                 A805

1        Now, you also heard Cypress tell you that the

2  defendant grabbed her cheeks and squeezed them together to

3  force his penis in her mouth.  I submit to you that injury

4  on her face, and if the photographs don't clearly show the

5  injuries, read the medical records.  The medical records

6  make note of it.  And that injury, I submit, was caused at

7  that time when he grabbed her cheeks.

8        Defendant put his penis inside Cypress' mouth and

9  ejaculated.  She told you she felt a salty liquid inside of

10  her mouth.  And Ms. Tamariz told you that there was presence

11  of semen.  There was not enough to do a full DNA chromosomal

12  profile like with the cup and the straw, but there was

13  presence of semen, there was presence of male DNA, from her

14  oral swab.

15        And she explained to you about the Y chromosome,

16  and it's true, that it's not a direct match to the

17  defendant.  And I told you that in my opening statement,

18  that it was simply consistent with his DNA, that it could be

19  him or any of his paternal relatives.

20        But is he suggesting that he came into the

21  apartment, had the Smoothie, coffee cup with him and then

22  someone else came in and sexually assaulted her?

23        No, no one is saying that.

24        And it makes sense that only a slight trace of the

25  semen was left in her mouth.  Let's think about what

Joanne Fleming

1    happened between the time defendant ejaculated in her mouth

2    and the time they swabbed her.

3         They took a swab from her mouth.  Cypress told you

4    that she spit out the ejaculate onto her underwear.  And we

5    know the defendant took the underwear with him because the

6    police did not recover it.  And Cypress told you that he

7    took it with him.  About four hours had past before the

8    swabbing.  And, lastly, she drank water before she was

9    swabbed.

10        Ms. Tamariz told you about the mouth area and why

11   they typically don't recover any foreign DNA.  You're

12   constantly swallowing, talking, eating, spitting.  So all of

13   this stuff will increase the chance for you to wash away

14   whatever foreign DNA could be in there.

15        But you know what?

16        You don't need an expert to tell you that.  You

17   don't need an expert to tell you that.  Think about it.

18   Close your mouth and don't swallow.  See how long you can

19   keep it there.  Because after a few minutes, saliva will

20   develop and you will have to either swallow or spit it out.

21        Cypress also told you that the defendant put his

22   fingers inside her vagina and rubbed his penis against her

23   vagina.  You heard testimony again from Ms. Tamariz about

24   the Y strain.  Presence of male DNA.  Male chromosome from

25   the vulva swab and the labia swabs.  Her genital areas.

Joanne Fleming

1        The forensic evidence isn't about proving who did

2  it.  We're not -- we're not saying if that -- that this

3  evidence, the Y strain evidence, proves that the defendant

4  is the person who perpetrated the crime.  Identity is not an

5  issue.  There is presence of male DNA and that's to show you

6  that sex acts occurred.  Every area that Cypress told you

7  that he touched, there is presence of male DNA, her oral

8  swab and the swabs from her vaginal area.

9        Cypress also told you that defendant asked for her

10  phone number and called to make sure that she gave the

11  correct number.  Once her phone rang, he hung up.  And you

12  all saw the phone records.  Cypress' phone records that

13  showed a call from the defendant's phone at 2:20 p.m., an

14  incoming from the defendant's call.

15        And Mr. Sierra from T-Mobile, he explained to you

16  about that call.  He demonstrated how it was as if a caller

17  called the number and hung up after the first ring.

18        And that he explained that the call did not appear

19  in Cypress' call detail records or the defendant's cell site

20  records or his call detail records because it never got

21  picked up by the device, meaning Cypress never picked up the

22  phone, nor did it ever go to his voice mail because he let

23  it ring, made sure she gave the correct number and hung up.

24        Cypress' records, which he called the media cell

25  site records, the technology didn't exist at the time the

1  defendant's cell site records were pulled.  So what's the

2  suggestion, that Cypress' media records, the cell site

3  records, have somehow been fabricated?

4  It's T-Mobile records.  It's in evidence.  You can

5  examine it.

6  Now, after defendant left Cypress' apartment, she

7  called Nine-One-One.  We know that Cypress called

8  Nine-One-One from her cell phone at 2:23:29 p.m.  You heard

9  that Nine-One-One call and that call lasted less than ten

10  minutes.

11  From 2:23:30 p.m. to 2:28:35 p.m., five minutes,

12  the defendant called Cypress' phone ten times, all going to

13  voice mail, and those calls are reflected in the defendant's

14  phone records because it made contact with Cypress' device.

15  It went to her voice mail and I believe it went to her voice

16  mail because she's on the phone with Nine-One-One.

17  I submit to you that Cypress' words alone convict

18  the defendant of every single charge that he's charged with.

19  Her testimony before you is all you need to find the

20  defendant guilty.

21  And, as compelling as she was, as convincing as

22  she was, you don't need to rely on her words alone because

23  you have all the other evidence which, of course, are her

24  words.  There are nine ways that we know that nothing

25  Cypress did or the defendant did to her was consensual.  She

1    was compelled to engage in sex against her will by force.

2           One:  Cypress' demeanor and manner in which she

3    testified in court.

4           Two:  The Nine-One-One call.

5           Three:  Officer Castillo and Lora's description of

6    Cypress.

7           Four:  Officer Semper-Martinez' description of

8    Cypress.

9           Five:  Cypress undergoing the SAFE exam.

10          Six:  Cypress' injuries.

11          Seven:  Her mother's actions.

12          Eight:  Her father's actions.

13          And, nine:  Defendant's flight.

14        I will start with the first one, Cypress' demeanor

15    and manner in which she testified here.  I already went over

16    it and I just ask you to recall the moment when she took the

17    stand.

18        Two:  Cypress' Nine-One-One call immediately after

19    the defendant left the apartment.  And I'm going to play a

20    portion of it in a minute.  And this time I ask you to just

21    not listen to her words, but to listen to how she is

22    speaking, what she must have been feeling, the way she is

23    whispering, the way she begs the operator:  Please, please,

24    don't send the sirens.  You can feel her fear.  She is

25    scared that the defendant will find out that she is calling

1   the police.

2            And the call is also so obvious that she is just a

3   child wanting her mother.  Can I please hang up and call my

4   mom?

5            (Whereupon, the Nine-One-One call was played in

6   open court.)

7            MS. PARK:  That is not a call of someone who just

8   had consensual sex.  That is a call for help by a child who

9   was just sexually assaulted.  If it was consensual, why

10   would Cypress call Nine-One-One?

11            How many people call Nine-One-One after having

12   consensual sex?

13            People don't do that.  They call Nine-One-One to

14   get help.

15            Defendant wants you to believe that somehow maybe

16   this was all an act.  That when he left the apartment, maybe

17   everything was fine.  But listen to that Nine-One-One call.

18   That is not an act.  That is the way she was feeling at that

19   moment, the fear you can feel.

20            And I can stop right here.  That Nine-One-One call

21   with her testimony is all you need to know that every single

22   thing that happened in that apartment was by force.  But

23   there's more.

24            Three:  We have Officer Castillo and Officer

25   Lora's testimony.  They were the first officers to arrive.

1    And you actually heard them knocking on the door in the

2    Nine-One-One call towards the end of that call.

3         When Cypress opened the door, Officer Castillo

4    described her to be crying uncontrollably and saying

5    repeatedly:  Is he gone, is he gone, come inside.

6         Officer Castillo told you that it was police

7    procedure to not lock the door for their safety.  But,

8    because she was shaking so much, he felt that he had to do

9    what she had asked and he allowed her to lock the door.

10        Officer Castillo also told you that she could

11   barely speak, speaking almost in a whisper.  Tears on the

12   side of her face.  Boogers coming out of her nose.  Can you

13   picture it?

14        Officer Lora described her as crying, nervous,

15   shaking.  She couldn't really get the words out of her

16   mouth.  She was shaking.  She was scared.  You can feel the

17   fear that Cypress felt at that moment.  And, again, those

18   actions are not someone who just had consensual sex but

19   someone who was sexually assaulted.

20        Four:  Officer Semper-Martinez' testimony.  She

21   and her partner, Officer Mateo, arrived shortly after the

22   first two officers.  They thought a female officer would

23   make Cypress feel a little more comfortable.

24        And Officer Semper-Martinez described Cypress as

25   follows:  Shaken up, she was crying, her voice was very low,

Joanne Fleming

A812

1     she was shaking.

2              And Mr. Herlich asked these two officers about

3     notes.  How can you remember this from over a year ago

4     without taking any notes?   The question is:  Not how can

5     you remember this.  The better question is:  How can you

6     forget her?

7              Five:  Cypress undergoing the SAFE exams.  Cypress

8     arrived at the hospital about 3:40 p.m., left about

9     midnight, one o'clock.  She was in the hospital for over

10    eight hours.

11             In addition to undergoing physical exams for about

12    two hours, she had to undergo the SAFE exams.  It was a very

13    invasive SAFE exam which included getting her private areas

14    swabbed, getting her pubic hair combed, standing in front of

15    a doctor naked, full exposed.

16             And Dr. Singh went over with you all the fifteen

17    steps that had to be done.

18             I submit to you that someone who just had

19    consensual sex is not subjecting herself to that.  Someone

20    who was sexually assaulted is.

21             Six:  Cypress' injuries.  While her injuries were

22    not significant, she had injuries that was consistent with

23    what the defendant did to her.

24             And I don't have to prove to you physical

25    injuries.  The scratch on the back of her neck right side,

1   her medical records says that patient is complaining of pain

2   to the right side of the neck, possible or positive redness

3   to the right side of the neck, abrasion, scratch to the

4   right cheek, all consistent with the defendant's hands on

5   Cypress.

6         There was no injuries to Cypress' vagina.  Cypress

7   told you that he never penetrated her with his penis.

8   However, he did penetrate her with his fingers.

9         And remember what Dr. Singh told you about that?

10  That you would not expect to see genital injury with finger

11  penetration.  She said that the finger might not cause any

12  trauma.  The area tends to heal very quickly.  In most cases

13  of sexual assault, it's very rare to see any evidence of

14  injury.  And she also said the lining of the vagina is

15  pretty elastic so it doesn't easily tear or get injured.

16        Seven:  Cypress' mother's actions.  Ms. Laketa

17  Smith testified that she rushed home after she received that

18  phone call from the police officer and Cypress.  And you can

19  see from Cypress' call detail records, which is in evidence,

20  that at 2:37:13 p.m., she called her mother and her mother's

21  phone number ends in seven-four-seven-five.  Ms. Smith told

22  you that Cypress sounded scared, like she had been crying,

23  her voice was shaky and kind of broken.

24        When Ms. Smith saw Cypress in the apartment, she

25  described her as physically shaking, it was clear that she

1    had been crying.  Her face was swollen and her eyes were

2    red.

3              And Ms. Smith broke down on the stand when she

4    said that she has never seen her daughter in that state

5    before.  Can you imagine what a mother must have felt at

6    that moment?  Feeling so helpless, not having been able to

7    protect her daughter?  Watching the aftermath of her

8    daughter having gone through something so horrific?

9              Ms. Smith's reaction speaks volumes about the

10   non-consensual nature of the sex acts.

11             She also told you that she took about two and a

12   half to three weeks off from work to make sure that Cypress

13   went to all of her appointments and not wanting Cypress to

14   be alone.  Again, you are not going to appointments if the

15   sex was consensual.

16             Eight:  Cypress' father's reaction.  Both Cypress

17   and her mother told you that her father, who at that time

18   lived in Georgia, rushed to be by Cypress' side.  Again,

19   evidence that Cypress was sexually assaulted.

20             And finally, nine:  Defendant's flight.  We know

21   from defendant's cell sites that he's still at Ninety-Two

22   St. Nicholas Avenue.  So I'm going to ask you to look at the

23   cell sites with me.

24             We know from his cell sites that at 2:23:30 he's

25   still at Ninety-Two St. Nicholas Avenue.  You heard from Mr.

Joanne Fleming

Summation - The People

1   Delitta, the cell site expert, that these five calls were

2   hitting the cell tower right here at One-Sixteenth and St.

3   Nicholas Avenue -- actually, between One-Sixteenth and

4   One-Fifteenth and St. Nicholas Avenue, and if you're at

5   Ninety-Two St. Nicholas Avenue, you would most likely hit

6   that tower or possibly through this tower.

7          When I asked him about this cell tower, the one at

8   One-Eighteenth and Lenox Avenue, he said it most likely

9   would not hit that tower if you were at Ninety-Two Second

10  Avenue.

11         So, we know by 2:25:23 p.m., which is after five

12  calls to Cypress' phone, all going to voice mail, that he is

13  starting to move.  And by 2:42:42 p.m. he is on the other

14  side of Manhattan, and he's using the tower that's located

15  at One-Twentieth and First Avenue, and Mr. Delitta told you

16  about the range of that cell tower, three to four block

17  radius.

18         So, the defendant is somewhere in this area, not

19  here.  And that's two forty-two, which is about fifteen

20  minutes after he left the apartment.

21         Now, what do these cell sites tell you?

22         I submit that after he left Cypress' apartment, he

23  gets concerned.  He thinks maybe Cypress will call someone

24  and that's why he starts making that call.  And he panics,

25  she's not picking up.

Joanne Fleming

A816

1    And we all know from having cell phones, or having

2    used cell phones, that when you're trying to call someone,

3    there is a specific ring tone that the other side makes.  If

4    that person is on the line, it will just ring and go beep or

5    something like that.  And that's what he heard.  So he knew

6    she was on the phone.  And that's why they are -- in that

7    five minute time period, he's calling Cypress ten times.

8    And he's starting to make his way across town.

9    I submit to you that the defendant realized that

10   it's only a matter of time before the police arrive at the

11   apartment and that's why he ran, because he knew what he had

12   done was wrong, that there was no consensual sex of any

13   kind.

14   Now, there's something else that is noteworthy

15   about that call at 2:42:42 p.m.  That was the last call on

16   that phone.  There are no more phone calls from that phone.

17   Why is the defendant all of a sudden not using that phone?

18   I submit to you he doesn't want to be tracked.  He

19   has to get rid of that phone.  It contains the evidence that

20   he committed a crime.  It has naked photos of Cypress and it

21   has calls that he made to Cypress.

22   And we know that the defendant had that phone at

23   least as far back as February of 2014, and, all of a sudden,

24   at 2:42:02 p.m., fifteen minutes after the assault, the

25   phone goes dead?

Joanne Fleming

A817

Summation - The People

1    You might be asking:  And why would the defendant

2  have done this?

3        And I don't have to prove motive to you.  But who

4  knows why people do what they do.  Who knows why people

5  commit crimes.  Why people do such horrible things.

6        And I submit to you that, here, the defendant saw

7  an opportunity.  He went -- he saw Cypress was alone, and

8  having been so close to the family, he knew the mother

9  wasn't home.  He knew she wasn't going to be home for hours.

10  He knew Journey wasn't home.  He knew Journey wasn't going

11  to be home.  And he thought he could get away with it.  He

12  thought he had sufficiently silenced her by threatening her,

13  by saying:  If you tell anyone, I'm going to hurt your mom.

14  If you tell anyone, I'm going to show these naked pictures

15  of you and everyone will know what you have done.

16        Cypress was overcome with fear that day and she

17  did what her instinct told her to do, and that was to call

18  Nine-One-One.

19        There you have it, nine ways that we know the sex

20  acts was not consensual.  You didn't need them all, but you

21  have them.

22        Now I'm going to go through the elements of the

23  crime and I'm going to start backwards.  I'm going to start

24  with the statutory counts.

25        Now, count seven, that's criminal sexual act in

Joanne Fleming

1    the third degree.  This is the penis to mouth contact.  And

2    was there contact between the defendant's penis and Cypress'

3    mouth?

4              Cypress testified that he put his penis in her

5    mouth -- yes, that he grabbed her mouth and put his penis in

6    her mouth.  So, for this charge, no force is necessary.

7              Defendant was twenty-one years old or older.

8    Detective Barbato told you that when she arrested the

9    defendant, she took pedigree information from him and that

10   included his date of birth.  His date of birth was December

11   27, 1962 which makes him fifty-one at the time of the crime.

12             And you saw the defendant when he was in court.

13   He appears to be his stated age.  So there is no doubt that

14   the defendant was twenty-one years old or older at the time

15   of the crime.

16             Cypress was less than seventeen-years old.

17   Cypress told you that her date of birth was April 21st,

18   1999.  Her mother told you that she was born on April 21st,

19   1999.  The birth certificate prove that she was born on

20   April 21st, 1999.  Which makes her fifteen on July 16th,

21   2014.  So that element has been satisfied.

22             Count six, criminal sexual act in the third

23   degree, and this will be the mouth to vulva contact.  Was

24   there contact between the defendant's mouth and Cypress'

25   vulva?

Joanne Fleming

A819

1    Cypress testified that she felt his mouth and his

2    tongue in her vagina.  And although Cypress never used the

3    word vulva, we know as adults what that term refers to, the

4    external area, and I submit that at fifteen she doesn't know

5    -- she doesn't know the difference between a vulva and a

6    vagina.

7         And common sense tells us that in order to get to

8    the vagina, you have to touch the vulva.  You have to get

9    past it.  It's like -- I hate to be so graphic -- but it's

10   like the Tootsie Roll candy.  You can't get to the jelly

11   part inside until you go through the hard part.

12        Again, for this charge, there is no requirement

13   that any force be used.

14        Two:  The defendant was fifty-one years old.

15        And, lastly, Cypress was fifteen-years old.

16        And for these charges, I don't have to prove to

17   you that the defendant knew Cypress was fifteen-years old at

18   the time of the crime, but I submit to you that he did know.

19   He knew the family.  He first met the family in 2009, 2010

20   and Cypress was only ten-years old at the time.  He spent

21   time talking to her about her school.  He knows the family.

22   So, I submit to you he knew she was fifteen-years old.

23        Count five, sexual abuse in the first degree.

24   This would be the mouth to mouth contact.  Did the defendant

25   subject Cypress to sexual contact?  Is the mouth an intimate

part of a body?  And was it for the purpose of gratifying
sexual desire?

Mouth by itself is not necessarily an intimate
part.  You use it to eat, talk or kiss the baby.  That's not
considered an intimate body part.  But, when the mouth is
being used to kiss another person on the mouth in a way that
it happened here, it is an intimate part.

This wasn't an innocent platonic kiss between
Cypress and the defendant.  She told you that he kissed her
and put his tongue inside of her mouth.  This is an intimate
act so it involves an intimate body part.  When you're
kissing someone and that person's tongue is inside your
mouth, there is no question that it's for a sexual
gratification.

Two:  Was there forcible compulsion?

Before he kissed her, a lot happened.  He held
onto her and wouldn't let go of the hug.  She tried to push
him away, but he held onto her.  She told him to let her go,
but he did not.  She kicked his shin.  He grabbed her
shoulders.  He choked her.  Brought her down to the ground.
She couldn't breath.  He covered her mouth, told her not to
scream.  He threatened her, if she screamed, I'm going to
choke you out.

When she tried to get away, he grabbed her ankle,
pulled her towards him.  He then grabbed her by her hair,

1    pulled her into The Learning Center where he forced her to

2    sit on the stool.

3         In determining forcible compulsion, I also ask you

4    to think about Cypress' age and her size compared to the

5    defendant.  She was only a child.  He was an adult.  She was

6    five feet tall, hundred twenty pounds.  He was at least

7    five-six, hundred eighty-five pounds.  She was alone,

8    trapped in her apartment.

9         Cypress told you that she kept her mouth closed

10   and he threatened to kiss -- he threatened her to kiss him

11   back or he would choke her again.  Of course she's going to

12   be in fear that he would cause her physical injury.  He

13   already did.  He was older, bigger, stronger.  He

14   overpowered her.  He used physical force.  He threatened her

15   with physical force.

16        Any one of those acts alone constitute forcible

17   compulsion.  When you have them altogether, there is no

18   doubt that forcible compulsion was used here.

19        Count four, sexual abuse in the first degree,

20   finger to vagina.  Now, was there contact between the

21   defendant's fingers and Cypress' vagina?

22        I think we can all agree that a vagina is a sexual

23   part of a person's body, and it might be stating the

24   obvious, but when you stick your fingers inside someone's

25   vagina, it's for sexual gratification.

Joanne Fleming

Summation - The People

1    Two:  Was there forcible compulsion?

2    I just went over the forcible compulsion with you.

3    And all of the defendant's actions are relevant here.

4    Even though the kiss came before the finger to the

5    vagina contact, it's not as if she forgot about what the

6    defendant did.  It is still fresh inside Cypress' mind.  She

7    knows what he is capable of.  She is compelled to do what

8    the defendant tells her to do because of that fear.

9    But, what else is happening during this act?

10    Cypress cried.  She told the defendant that it

11    hurt.  And he told her if you relax, it wouldn't hurt.  She

12    is crying and expressing pain.  He is continuing to do this

13    act.  Telling a fifteen-year old to relax.  All of that

14    combined, there was lack of consent by forcible compulsion.

15    Count three, attempted rape in the first degree.

16    Did the defendant attempt to engage in sexual intercourse

17    with Cypress?

18    And the Judge will define sexual intercourse for

19    you, but it's any penetration, however slight, of the penis

20    into the vaginal opening.

21    Cypress told you that the defendant's exposed

22    penis rubbed against her vagina.  She told you, very

23    honestly, that his penis did not go in.

24    Defense argues that she said stop and he did.

25    That's not how it went.  What she also said was she said it

Joanne Fleming

A823

1   seemed to -- it seemed like the defendant was trying to

2   insert his penis in her vagina.  She asked him to stop

3   because it hurt.  He told her it won't hurt if you relax.

4   And that's when he stopped and he didn't penetrate her.  And

5   that's why -- and that's why he's only charged with the

6   attempted rape in the first degree.

7         Is there any doubt that he was trying to penetrate

8   her?

9         Do you think his intent was to simply rub his

10   penis against her and that's it?

11         Absolutely not.  Rubbing your naked penis against

12   someone's vagina is as close as you can come to penetrating

13   them.

14         Defense pointed out that Cypress never told

15   Detective Barbato this and she didn't tell the hospital

16   personnel, one of the hospital personnel.  But keep in mind

17   that Detective Barbato's interview took place three hours

18   after she had been sexually assaulted.

19         Ms. Laketa Smith's description of Cypress at the

20   hospital is as follows:  She was tired and she was scared

21   and she sort of -- she seemed anxious.  She shook a lot.

22   She seemed shocked and dazed, like all of it was surreal.

23   This was Cypress' condition when the detective and the

24   doctors were interviewing her.

25         And Detective Barbato also told you that she was

Joanne Fleming

A824

1   simply giving you a narrative of what happened.  It's not
2   like a trial like here where I was asking her specific
3   questions for a specific charge.  They weren't asking for
4   those details.
5       Besides, a lot happened inside the apartment.
6   Starting with the Smoothie, the physical force, the threats,
7   the many, many different sex acts, taking pictures, the
8   phone calls and so on.  To suggest that Cypress is somehow
9   lying or not being truthful about something because she left
10  out that he rubbed his penis against her vagina is absurd.
11      And the medical records that Mr. Herlich pointed
12  out for you earlier where she said -- where it said no
13  vaginal penetration with penis but used fingers.  And she's
14  right.  She never said that he penetrated her.
15      I submit to you that Cypress doesn't know, nor
16  does she care, what elements are necessary for rape, for
17  criminal sexual act.  All she knows is what happened to her,
18  and to her it's as simple as what she told the Nine-One-One
19  operator:  I was raped.  She's not thinking about what
20  constitutes element of rape in the first degree.  She was
21  violated.  And like -- and you know the term rape is just
22  commonly used for any sexual violation of a person's body,
23  and that's what she was relating to the Nine-One-One
24  operator and to the hospital personnel.
25      Two:  Was there forcible compulsion?

Joanne Fleming

A825

1        Again, you have to consider all of the defendant's

2   actions and I won't go through it.  And, as I said under the

3   sexual abuse counts, Cypress knows very clearly what the

4   defendant is capable of and she is still under that fear.

5        Count two, criminal sexual act in the first

6   degree.  This would be the penis to mouth contact.  Was

7   there oral sexual conduct?

8        Of course.  The defendant put his penis in

9   Cypress' mouth.  That's oral sexual conduct.

10        Was there forcible compulsion?

11        In addition to the force and threats that the

12   defendant employed up to this point, there was additional

13   force used for this contact.  Cypress told you that the

14   defendant told her to stand up, he grabbed the back of her

15   neck, then we saw Cypress attempting to fight back.  She

16   said that she tried to grab his testicles and twist.  She

17   saw it and she learned it in self-defense or karate class.

18   She thought that would stop him.

19        Unfortunately, it didn't work, because it caused

20   him to grab her neck harder.  When she refused to get on her

21   knees, the defendant grabbed her hair and pushed her down to

22   her knees.  While she was on her knees in front of him, he

23   grabbed her face, and she demonstrated for you, putting his

24   fingers on both sides of her cheeks and he squeezed, causing

25   her mouth to become open and he shoved his penis in her

Joanne Fleming

A826

1    mouth, then he grabbed her neck harder, pushing her head

2    down so his penis would go further.  That's what she told

3    you.  That he kept pushing her head so his penis would go

4    deeper.

5            Finally, count one, criminal sexual act in the

6    first degree.  This would be the mouth to vulva contact.

7            Now, as we went over under count six, Cypress

8    testified that the defendant put his mouth and his tongue on

9    her vagina.

10           Was there forcible compulsion?

11           Again, we went over this many times, but what else

12   did she say while the defendant -- while the defendant's

13   mouth was on her vagina?

14           In Cypress' words:  If I say stop, he would say

15   you wanted this.  And I said no, I didn't.  And he said yes,

16   you did want it.  I said no, I didn't.  He said yes, you

17   did.

18           Now, about forcible compulsion, during jury

19   selection we talked about whether you would expect the

20   victim of a sexual assault to fight back.  Now, you also

21   said you would keep an open mind.

22           Cypress was alone in the apartment with the

23   defendant.  She was only fifteen, just a child.  He was an

24   adult, bigger and stronger.  He had already shown her that

25   he could overpower her, that he could hurt her.  He had

1     instilled in her fear that he would hurt her even more if

2     she did not comply.

3          She told you that she was scared.  He had

4     threatened her during the assault.  He would keep choking

5     me.  He would choke me out.  He would go berserk if I didn't

6     do what he said.  She had no choice.  Don't fault her for

7     not fighting back hard enough.  She did what she thought was

8     necessary to survive, and she did.

9          But, you know what?

10          She did fight back.  She called Nine-One-One, she

11     told the police what happened and she came before you and

12     told you what the defendant did to her.

13          When Cypress Smith took the stand last week, she

14     was only sixteen-years old.  It's not easy getting on the

15     witness stand and having to testify in front of strangers,

16     and we saw some of that in some of the police officers.  But

17     Cypress told you what happened to her.  And you all know it

18     wasn't easy for her because she had tears in her eyes.

19          When we began this trial, the defendant stood

20     before you presumed innocent and I told you in my opening

21     statement what I expect the evidence would show.  But what I

22     said in my opening is not evidence.  It only became evidence

23     when witnesses took the stand and when the physical evidence

24     came in.

25          The defendant had his fair trial.  He is no longer

Joanne Fleming

A828

1   presumed innocent because the evidence proves his guilt

2   beyond a reasonable doubt.  Cypress' testimony alone proves

3   his guilt.  Every single one.  If you believe her, the

4   defendant is guilty, as I submit you should.

5        But, rest assured in knowing that this evidence

6   corroborates her testimony:  Nine-One-One call, Officer

7   Castillo and Officer Lora, Officer Semper-Martinez, her

8   mother, the medical records, irrefutable forensic evidence,

9   the cell site records.

10       Now the time has come to do what you have all

11  promised to do, what you have all been chosen to do, and to

12  do what the evidence commands you to do, and that is to tell

13  Cypress we heard you, we believe you, the defendant is

14  guilty.  Find him guilty.

15       Thank you.

16       THE COURT:  Thank you, Ms. Park.

17       Okay, jurors, you heard the summations, however,

18  you're still required to continue to follow my instructions

19  and my admonitions to you because you have not yet heard the

20  jury charges; in other words, you don't know how to apply

21  the facts as you find them to the law as I give it to you

22  because I haven't given you the law yet.

23       We're going to take our lunch recess now and I

24  will ask you to please be back at three o'clock.  When you

25  come back at three o'clock, I will give you the jury charges

Joanne Fleming

1   and then I expect that you'll have at least half an hour, if

2   not more, to begin your deliberations this afternoon.

3          I remind you again to please continue to follow my

4   instructions.  It may be really tempting now that you have

5   heard the summations and heard both sides rest to begin to

6   discuss this case or express an opinion.  I ask you to

7   resist that temptation and just put the case out of your

8   mind and I will see you at three o'clock sharp.

9          Thank you.

10          A COURT OFFICER:  Leave your books on the chairs,

11   make sure you have all your belongings and step this way,

12   please.

13          (Whereupon, the jury exited the courtroom.)

14          THE COURT:  Okay, thank you.

15          See you at three.

16          (Luncheon recess held.)

17   * * * A F T E R N O O N    S E S S I O N * * *

18          THE CLERK:  Continuing case on trial, People

19   versus Lonnie Harrell.

20          MR. HERLICH:  Your Honor?

21          THE COURT:  Yes?

22          MR. HERLICH:  The only other thing that I'd ask

23   you to charge is that, again, what you said at the beginning

24   of the case, that in the event the defendant didn't testify

25   they can't hold an adverse inference.

Joanne Fleming

1        THE COURT:  Sure.

2        THE SERGEANT:  Judge, Abe is outside waiting for

3   all the jurors.

4        THE COURT:  Okay.

5        A COURT OFFICER:  (Indicating.)

6        THE COURT:  We're good, let's go.

7        A COURT OFFICER:  Panel entering.

8        (Whereupon, the trial jury entered the courtroom.)

9        THE CLERK:  Continuing case on trial, People

10  versus Lonnie Harrell.

11       All parties, except for the defendant, and all

12  jurors are present.

13       THE COURT:  Good afternoon, jurors, welcome back.

14       Members of the Jury, I will now instruct you on

15  the law.  I will first review the general principles of law

16  that apply to this case and all criminal cases.  You have

17  heard me explain some of those principles at the beginning

18  of the trial.  I'm sure you appreciate the benefits of

19  repeating those instructions at this stage of the

20  proceedings.

21       After that, I will define the crimes charged,

22  explain the law that applies to those definitions and spell

23  out the elements of each charged crime.  Finally, I will

24  outline the process of jury deliberations.  These

25  instructions will take forty-five minutes to an hour.  You

1  will not receive copies of these instructions, but I can

2  repeat them for you as many times as you wish.

3      During these instructions, I will not summarize

4  the evidence.  If necessary, I may refer to portions of the

5  evidence to explain the law that relates to it.

6      My reference to evidence or my decision not to

7  refer to evidence expresses no opinion about the

8  truthfulness, accuracy or importance of any particular

9  evidence.  In fact, nothing I have said, and no questions I

10  have asked, in the course of this trial were meant to

11  suggest that I have an opinion about a witness, the evidence

12  or of whether the defendant is guilty or not guilty.  If you

13  have formed an impression that I do have an opinion, you

14  must put it out of your mind and disregard it.

15      The level of my voice or intonation may vary

16  during these instructions.  If I do that, it will be done to

17  help you understand.  It is not done to communicate any

18  opinion of the law or the facts of the case or whether the

19  defendant is guilty or not guilty.  Remember, it is not my

20  responsibility to judge the evidence here.  It is yours.

21  You are the judges of the facts and you are responsible for

22  deciding whether the defendant is guilty or not guilty.

23      In your deliberations you may not consider or

24  speculate about matters relating to sentence or punishment.

25  If there is a verdict of guilty, it will be my

Joanne Fleming

1 responsibility to impose an appropriate sentence.

2   The fact that the defendant did not testify is not

3 a factor from which any inference unfavorable to the

4 defendant may be drawn.

5   When you judge the facts, you are to consider only

6 the evidence.  The evidence in the case includes the

7 testimony of the witnesses, the exhibits that were received

8 in evidence and the stipulation by the parties.

9   Testimony which was stricken from the record or to

10 which an objection was sustained must be disregarded by you.

11   Exhibits that were received in evidence are

12 available upon your request for your inspection and

13 consideration.  Exhibits that were just seen during the

14 trial or marked for identification but not received in

15 evidence are not evidence and are, thus, not available for

16 your inspection and consideration.

17   The testimony based on those exhibits that were

18 not received in evidence may be considered by you.  It is

19 just that the exhibit itself is not in evidence.

20   In evaluating the evidence, you may consider any

21 fact that is proven and any inference which may be drawn

22 from such fact.

23   To draw an inference means to infer, find,

24 conclude that a fact exists or does not exist based upon

25 proof of some other fact or facts.  For example, suppose you