Since *Rodriguez*, this Court has not addressed the right to be present during the critical response-formulation stage. The Appellate Divisions, however, are split. Erroneously relying on *Rodriguez*, the Fourth and now First Departments have rejected the right to be present during the formulation stage. *People v. Harrell*, 168 A.D.3d 591, 591 (1st Dept. 2019); *People v. Clark*, 128 A.D.3d 1494, 1495 (4th Dept. 2015). The Second Department, however, has held that "the absence of the defendant from the proceedings in which the question was received and the answer framed and delivered to the jury was a fatal error which cannot be deemed waived even in the absence of a contemporaneous objection. The defendant had an absolute right to be present, with counsel, at all proceedings concerning the court's charge, admonishments, instructions to the jury and responses to jury questions during deliberations." *People v. Mehmedi*, 118 A.D.2d 806, 806-07 (2d Dept. 1986) (citing *People v. Ciaccio*, 47 N.Y.2d 431, 436-37 (1979)), *aff'd on other grounds*, 69 N.Y.2d 759 (1987); *see also People v. Hewlett*, 133 A.D.2d 417, 418 (2d Dept. 1987) (the court violated the right to be present when it "formulated a written response to the jury inquiry in consultation with the prosecutor and defense counsel, but the defendant was not present").

Besides misreading *Rodriguez*, the First and Fourth Department's holdings violate C.P.L. § 260.20, C.P.L. § 310.30, and due process (U.S. Const. Amend. 14; N.Y. Const. Art. I § 6). Your Honor should grant leave to resolve these important questions of law regarding the "fundamental" right to be present. *Rivera*, 23 N.Y.3d at 831.

## B. The Criminal Procedure Law and Due Process Clause require that the accused be present during the formulation of a response to a substantive jury note.

### 1. C.P.L. § 260.20

C.P.L. § 260.20 broadly guarantees, without exception, the right to be "personally present during *the trial* of an indictment." This Court has interpreted this broad statute to cover all "material stages of trial," regardless of the defendant's ability to contribute. *People v. Harris*, 99 N.Y.2d 202, 212 (2002); *People v. Spotford*, 85 N.Y.2d 593, 596 (1995); *People v. Turaine*, 78 N.Y.2d 871, 872 (1991); *People v. Mullen*, 44 N.Y.2d 1, 4 (1978); Preiser, C.P.L. Commentaries, C.P.L § 260.20 (updated through 2018) ("For New York, the statutory term 'trial' incorporates . . . any 'material stage' of the trial.").

Under C.P.L. § 260.20, the accused has the right to be present during the formulation of a response to a jury note. That stage is not merely "material"—it is, as this Court has repeatedly held, "critical" and often

outcome determinative. *Ciaccio*, 47 N.Y.2d at 436. As *Kisoon* observed, there are "*few moments* in a criminal trial *more critical* to its outcome than when the court responds to a deliberating jury's request." 8 N.Y.3d at 134-35; *O'Rama*, 78 N.Y.2d at 277-79 (the inquiry-formulation stage is "critical"). If a stage is "critical" and perhaps outcome determinative, it is paradoxical to suggest that is not a material part of "the trial." C.P.L. § 260.20.

### 2. C.P.L. § 310.30

C.P.L. § 310.30 similarly supports the right to be present. That statute requires that the court "give" a response to a jury note "in the presence of the defendant." While harsh literalism could perhaps justify reading C.P.L. § 310.30's presence right to cover a note *response* but not the *formulation* of the response itself, basic principles of statutory construction cut the other way. After all, slicing and dicing the statute in this manner would produce an absurd and unreasonable anomaly. *People v. Wallace*, 31 N.Y.3d 503, 507 (2018) (courts must reject an interpretation of a statute that "lead[s] to unreasonableness or absurdity"); *Long v. State of New York,* 7 N.Y.3d 269, 273 (2006) ("Although statutes will ordinarily be accorded their plain meaning, it is well settled that courts should construe them to avoid objectionable, unreasonable or absurd consequences."). Under that anomaly, a defendant can be present to "listen" to the court's response but cannot be present during the more *important* proceeding that determines what the response will be. No one, and certainly not the Appellate Divisions or Respondent, has ever explained why the Legislature could have intended that absurd result.

Rejecting the right to be present during the formulation stage clashes with the discrete purpose of the C.P.L. § 310.30 presence right: to allow the defendant to personally object to the fairness and accuracy of a response to a jury note. *Wallace*, 31 N.Y.3d at 507 ("inquiry must be made of the spirit and purpose of the legislation.") (internal quotation marks omitted). A natural corollary of that right is the right to be present during the formulation stage so the defendant can notify counsel of the unfairness/inaccuracy of a response *before* it is provided. If not, C.P.L. § 310.30's right to be present is a hollow one—a right that allows a defendant to highlight unfairness *after* it has occurred while denying him the right to prevent that unfairness from working prejudice in the first place.

This Court has previously rejected similar efforts to water down the rights guaranteed by C.P.L. § 310.30. *O'Rama*, 76 N.Y.2d at 276-77 (rejecting the government's argument that C.P.L. § 310.30's right to "notice" of a jury note does not require meaningful notice of the precise

contents of the jury note because such an interpretation would thwart the statute's purpose: to maximize counsel's participation at the response-formulation stage). It should do so here too.

### 3. Due Process

Defendants also have a due process right to be present during the formulation of a response to a factual inquiry because they can almost always, as here, "assist counsel" and meaningfully contribute to the proceeding. *E.g.*, *Williams*, 85 N.Y.2d at 947; U.S. Const. Amend 14; N.Y. Const. Art. I § 6. As Appellant heard the evidence/testimony and observed the jury's reaction, Appellant may have: (1) understood nuances in the jury's factual inquiry that counsel missed; (2) suggested alterations to the response; (3) requested clarifications of the question; or (4) informed counsel of responsive testimony. *People v. Sloan*, 79 N.Y.2d 386, 392 (1992) (a defendant has the right to be present during *voir dire* because he can "assess the jurors' facial expressions [and] demeanor"); *Williams*, 85 N.Y.2d at 947 (the defendant has the right to be present when he could "assist counsel in evaluating and acting upon events which unfold during the course of the proceeding"); *see also People v. Enrique*, 165 A.D.2d 13, 16 (1st Dept. 1991) (emphasizing the "essential" value of "discourse between lawyer and client").

Specifically here, Appellant could have informed counsel that important impeachment testimony should have been provided in response to the readback request. Letter, *above*, at 2-3; Complainant Cross: A69; Barbato Cross: A88-89. But because the court failed to wait a few minutes for Appellant to enter the courtroom, Appellant could not play that role.

### C. This issue implicates the fair administration of justice.

Guaranteeing the right to be present at the response-formulation stage honors the fundamental right to be present and harms no government interests.

The government has identified no interest in conducting these proceedings in the defendant's absence. None exists.

On the other hand, this needless rejection of the presence right diminishes individual rights and undermines the fair administration of justice. A criminal conviction has a destructive impact on the liberty, financial, and social interests of the accused. It is therefore important that the person standing trial be present during critical stages. Denial of that right creates the appearance that our system is more interested in quickly processing convictions than in ensuring that the accused has his day in court.

The sooner this Court decides this recurring issue, the sooner courts can comply. Because of the unfortunate difficulties of transporting defendants from holding cells to court, it is common for courts to succumb to the temptation to speed things along by forming a response in the defendant's absence. But this procedure violates statutory and constitutional requirements. The sooner this Court decides this issue, the sooner trial courts can adjust their procedures to ensure compliance and the reversible error that occurred below.

### D. By granting leave, this Court can bring clarity to an area of law that is currently marked by conclusory Appellate Division memorandum decisions.

This Court's intervention is particularly important because the Appellate Divisions have stubbornly refused to offer *any* reasoned analysis of the important arguments raised above.[2] Instead, they have just cited a narrow and ultimately irrelevant decision (*Rodriguez*) without providing any statutory or constitutional analysis. By granting leave, this Court can provide the reasoned and comprehensive analysis that these important statutory and constitutional questions deserve.

---

[2] The Appellate Divisions' longstanding practice of issuing cursory and unreasoned decisions is unfortunate. That practice undermines the clarity of the law, confuses the bench and bar, and creates the appearance that the Appellate Divisions are not carefully scrutinizing important questions of law. Justice Andrias, who sat on the First Department for more than two decades, has recognized the problem. Justice Richard Andrias, *Why the Appellate Division Shouldn't Have To Speak in a Unified Voice*, New York Law Journal (Jan. 23. 2019) ("Notwithstanding the workup and attention each case receives, given the immense volume of work, the vast majority of First Department cases . . . are issued as unanimous unsigned memorandum decisions . . . Considering the great amount of time expended by the lawyers during the lengthy appeals process, it is not surprising that they and their clients . . . are often disheartened by the courts' seemly cursory disposition of the appeal in the brief unsigned memorandum decisions. Given this state of affairs, the practice of issuing lengthy, signed opinions, often accompanied by signed dissents, is an important counterbalance to the prevalence of unsigned memorandum decisions. When signed majority and dissenting opinions are published, the final product is on full public display and helps dispel the impression that the court is merely cranking out 'a result.' Everyone knows that both sides have been heard and no argument was ignored. Where there is a signed published opinion, not only are the parties reassured, but the members of the bar read the decision not only for its reasoning but to see how it might affect their matters or future clients.").

Appellant's appeal is simply one of the thousands of appeals that has resulted in a "cursory disposition" in the First Department.

### E. This case is a good vehicle for resolving this presence claim.

This case is a good vehicle for resolving this important presence issue. The Appellate Division squarely resolved this issue on the merits. Further, preservation, harmless error, and prejudice analysis do not apply to presence claims. *Rivera*, 23 N.Y.3d at 831; *People v. Cain*, 76 N.Y.2d 119, 124 (1990); *Mehmedi*, 69 N.Y.2d at 760. Finally, as the presence right is personal, counsel's consent to proceeding in the defendant's absence is irrelevant. *E.g.*, *Mehmedi*, 69 N.Y.2d at 760.[3]

## CONCLUSION

For the reasons stated above, Your Honor should grant leave so the Court can determine whether a defendant has a statutory and/or due process right to be present during the formulation of a response to a jury note. Your Honor should also grant leave so the Court can review the additional claims raised below, including Appellant's contention that:

- the court violated his federal and state due process right to be present during the introduction of evidence, summations, the charge conference, the formulation of a response to two (other) jury notes, the provision of supplemental jury instructions, and the verdict's rendition (Appellant's App. Div. Brief: A193-205; U.S. Const. Amend. 14); and

---

[3] The Government argued below that the error was harmless ("*de minimis*") because, after the court had already formally decided its response in Appellant's absence, the court "apprised [Appellant] of the content of the conversation between the court and the attorneys" and Appellant "had the chance to contribute to the proposed response to the note if he wanted to." A257. The Appellate Division did not embrace this argument, as it clashes with settled precedent holding that to cure a presence violation, the court must conduct the proceeding *de novo* (which did not happen here). Appellant's Brief: A201; Reply Brief: A283-84; *People v. Roman [Starks]*, 88 N.Y.2d 18, 27 (1996) ("[A]bsence from a hearing will not deprive [the accused] of the opportunity to give meaningful input when the court essentially *holds a de novo hearing* on the same matter at which defendant is present."); *id.* at 29 (error was "*de minimis*" because the court "replicated *de novo* in [defendant's] presence the sidebar conference"); *People v. Rodriguez*, 20 A.D.3d 355, 356-57 (1st Dept. 2005) ("*de novo* replication" of the proceeding is required) (citing *People v. Madera*, 216 A.D.2d 89, 90 (1st Dept. 1995) (same)). A mere post-violation "chance" to participate is insufficient, particularly when, as here, the court only gives counsel a moment to bring Appellant "up to speed" but never even asks Appellant if he wants a *de novo* proceeding. A162-63.

- the charges were multiplicitous, thus violating the federal double jeopardy clause (U.S. Const. Amend. 5; Appellant's App. Div. Brief: A206-10).

Appellant respectfully requests an in-person or phone conference to discuss this application for leave to appeal.


Sincerely,


*Matthew Bova*

Matthew Bova
*Counsel for Defendant-Appellant*

CC: Hon. Cyrus R. Vance
New York County District Attorney
1 Hogan Place
New York, New York 10013
ATTN: Appels Bureau, A.D.A. Aaron Zucker

# EXHIBIT F

# Petitioner's Motion to Vacate the Judgment (Filed June 25, 2020)

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: CRIMINAL TERM

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | Notice of Motion to Vacate the Judgment of Conviction and Sentence |
| -against- | |
| LONNIE HARRELL, | New York County Indictment Number 4258/14 |
| *Defendant-Movant.* | |

PLEASE TAKE NOTICE that upon counsel's affirmation, counsel's memorandum of law, the annexed appendix, and all prior proceedings, defendant-movant Lonnie Harrell will move this Court, at the Courthouse, 100 Centre Street, New York, New York, 10013, at a date and time set by the Court, for an order vacating his October 21, 2015 judgment of conviction and sentence, as amended December 3, 2015, under C.P.L. § 440.10(1)(h) and § 440.20(1) (Merchan, J.).

Dated:        New York, New York
             June 25, 2020

FROM: ROBERT S. DEAN                    TO:   MOTIONS CLERK
*Attorney for Defendant-Movant*               Supreme Court
Center for Appellate Litigation                New York County
120 Wall St, 28th Floor                        100 Centre Street
New York, New York 10005                       New York, New York 10013 (by
                                               E.D.D.S)

MATTHEW BOVA
*Of Counsel*                                   CYRUS R. VANCE, JR.
(212) 577-2523 (ext. 543)                      New York Cty. District Attorney
mbova@cfal.org                                 1 Hogan Place
                                               New York, New York 10013
                                               ATTN: A.D.A. Jung Park
                                               parkju@dany.nyc.gov

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: CRIMINAL TERM

THE PEOPLE OF THE STATE OF NEW YORK,

        *Respondent,*                          AFFIRMATION

        *-against-*

LONNIE HARRELL,

        *Defendant-Movant.*

STATE OF NEW YORK, COUNTY OF WESTCHESTER:

    MATTHEW BOVA, an attorney at law, duly admitted to practice in New York, affirms, under penalty of perjury, that the following statements of fact are true or, if stated on information and belief, that he believes them to be true:

    **1.**    I am associated with the office of Robert S. Dean, Center for Appellate Litigation, which was assigned to represent defendant-movant Lonnie Harrell on his appeal from a October 21, 2015 judgment of conviction, as amended December 3, 2015, convicting Mr. Harrell, after a jury trial, of 1st-degree criminal sexual act (two counts), attempted 1st-degree rape, 1st-degree sexual abuse (two counts), and 3d-degree criminal sexual (two counts), and sentencing him, as a second violent felony offender, to an aggregate term of 25 years (N.Y. Cty. Ind. No. 4258/14).[1]

    **2.**    I make this affirmation in support of Mr. Harrell's motion to vacate the conviction and sentence under C.P.L. § 440.10/440.20.

---

[1] Appendix 939-53 ("A"). A numbered appendix, which includes, among other things, transcripts, trial exhibits, medical records, and cell-site-locational-data materials, has been provided with this motion.

## **Trial and Sentence**

3.      Based exclusively on the teenaged complainant's testimony, the State indicted Mr. Harrell with seven Article 130 counts, including two counts of 1st-degree criminal sexual act and two counts of 1st-degree sexual abuse. Each count required forcible compulsion, with the exception of the last two (3d-degree criminal sexual act), which required that the complainant be under the age of 17.

4.      Mr. Harrell, age 53 at the time of trial, was facing the rest of his life in prison for these charges.

5.      The relevant facts, including the trial evidence, are summarized in the annexed memorandum of law.

6.      Throughout the 2015 pretrial, trial, and sentencing proceedings, counsel committed a steady stream of blunders:

- he failed to move to suppress cell-site-locational data which placed Mr. Harrell at the scene of the purported incident and indicated that he fled the scene thereafter;

- he failed to move to preclude "Y-STR" DNA evidence (purportedly linking Mr. Harrell's DNA profile to a profile found on swabs of complainant's body) on the grounds that it was more prejudicial than probative, and then drastically overstated this evidence's probative value in summation;

- he failed to object to the prosecutor's prejudicial summation, including her repeated—and incorrect—claim that Mr. Harrell was not denying he engaged in sexual activity with complainant;

- he failed to request a read back of complainant's impeachment testimony in response to an important request for a readback of her testimony even though that impeachment was an important element of his summation; and

- he failed to make any argument at sentencing and instead disparaged his own client as "angry."

7.      In 2017, Mr. Harrell filed a *pro se* C.P.L. § 440.10 motion, arguing that the counts charged in the indictment were multiplicitous, thus violating double jeopardy.[2]

8.      On February 2, 2018, supreme court (Merchan, J.) found that motion procedurally barred because the claims could be raised on direct appeal.[3]

9.      In 2018, Mr. Harrell appealed to the Appellate Division, arguing that the counts were multiplicitous and violated double jeopardy, and that his right to be present was violated during several stages of the trial. The Appellate Division affirmed the judgment in January 2019[4] and the Court of Appeals denied leave.

**Post-Conviction Investigation**

10.      Throughout November 2019, December 2019, and January 2020, undersigned counsel made repeated attempts to access defense counsel's (Theodore Herlich) file in this case. For months, I was ignored, only to be provided the trial file after the administrator of the assigned counsel plan directed Mr. Herlich to provide it in late January.

11.      In that file, I found copies of an affirmation in support of a cell-site-locational-data subpoena under 18 U.S.C. § 2703(d) and a signed subpoena for same.[5] These materials were not in the record on appeal.

12.      A letter from the trial prosecutor (also in the file) indicates that defense counsel received these materials as early as April 2015, six months before trial.

13.      On April 23, 2020, undersigned counsel discussed this case with Mr. Herlich by phone.

---

[2] A1045-55.

[3] A1074.

[4] 168 A.D.3d 591.

[5] A1029-36.

14.     Mr. Herlich stated that he did not move to suppress the cell-site data because he thought that First Department law at the time precluded the claim.

15.     Mr. Herlich also stated that he did not move to preclude the Y-STR DNA evidence on the grounds that it was more prejudicial than probative because an expert, Dr. Lawrence Koblinsky, did not advise him to make such a motion.

16.     Next, although the pre-sentence investigation ("PSI") report indicates that Mr. Harrell was diagnosed with paranoid schizophrenia,[6] Mr. Herlich stated that he was never aware of any mental-health diagnoses. His file does not indicate that he requested any of Mr. Harrell's medical records.

17.     Defense counsel subsequently refused to sign an affidavit affirming the above account of his representation as he ignored my subsequent e-mail and phone messages regarding this matter.

18.     On June 16, 2020, undersigned counsel received Mr. Harrell's medical records from the New York State Department of Corrections. They indicate, consistent with the PSI report,[7] that Mr. Harrell has previously been diagnosed with schizoaffective and bipolar disorder.[8]

* * *

19.     As established in the annexed memorandum of law, Mr. Harrell's conviction and sentence must be vacated on the grounds of ineffective assistance of counsel. C.P.L. § 440.10(1)(h) and C.P.L. § 440.20(1).

DATED:  Westchester, New York
              June 25, 2020

*Matthew Bova*
_____
MATTHEW BOVA

---

[6] A1028.

[7] A1028.

[8] A1037-44.

4

Ind. No. 4258/14

_____

Supreme Court of the State of New York
New York County

_____

PEOPLE OF THE STATE OF NEW YORK, *Respondent*,

*v.*

LONNIE HARRELL, *Defendant-Movant*.

_____

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE THE JUDGMENT OF CONVICTION

_____

Robert S. Dean
Center for Appellate Litigation
*Counsel for Defendant-Movant*

Matthew Bova
*Of Counsel*
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523 ext. 543
mbova@cfal.org

_____

June 25, 2020

## MEMORANDUM OF LAW

## SUMMARY OF ARGUMENT

In this serious felony trial, Mr. Harrell was facing the rest of his life behind bars. He needed a lawyer to fight for him. Instead, his lawyer repeatedly dropped the ball. Counsel's persistent blunders throughout the pretrial, trial, and sentencing undermined the fairness of these proceedings, depriving Mr. Harrell of his fundamental right to effective assistance of counsel.

* * *

The State alleged attempted first-degree rape and related charges. But its case was weak, resting exclusively on the 15-year-old complainant's testimony. Mr. Harrell knew the complainant, lived in her building, and was friends with her family. On the day in question, the complainant claimed she invited Mr. Harrell into her apartment for a snack and then, just before he left, he engaged in nonconsensual sexual activity with her.

To fill the holes in its case, the prosecution relied on Mr. Harrell's cell-phone-locational data, which indicated that he was at the scene of the purported offense and then "fled" shortly thereafter. It also relied upon Y-STR DNA analysis—which compared male-chromosomal alleles found on swabs of semen and saliva uncovered from the complainant's body—to Mr. Harrell's male-chromosomal alleles.

Had counsel diligently protected his client's rights, this would have been a very different trial.

First, counsel failed to move to preclude the cell-site data, which was obtained without a warrant in violation of the Fourth Amendment.[9] Rather than advance a suppression claim that had already been endorsed by numerous federal courts, counsel stood mute.

Counsel also failed to preclude the unfairly prejudicial Y-STR-DNA evidence. The Y-STR profiles at issue were consistent with those of hundreds of thousands of American males and *millions* of males globally. Nevertheless, OCME misleadingly concluded that Mr. Harrell's profile was "the same" as the Y-STR profiles and that Mr. Harrell could "not be excluded" as a donor.[10] Further, the OCME report offered statistical analysis in a misleading manner. The DNA report indicates the rate at which males of certain races (Caucasian, Hispanic, African American, and Asian) match the Y-STR profiles, indicating that anywhere from 1/100 to 1/1300 males of certain races would match the profile. But these misleading fractions obscure the real—and only relevant—statistical reality: millions of males possess this Y-STR profile.

Although this DNA evidence had virtually no probative value and was obviously misleading, counsel did not even try to preclude it. Counsel compounded that basic mistake by drastically overstating this evidence's probative value in summation, mistakenly telling the jury that "1 in 685 African males" and thus "thousands of individuals in New York City" matched this Y-STR profile. On the contrary, millions of males matched it. And the profile did

---

[9] *Carpenter v. United States*, 138 S.Ct. 2206 (2018).

[10] A687-88.

not merely match "African" males, but males of numerous races. Counsel inexplicably shrunk the pool of potential suspects, to the detriment of his client.

During summations, counsel again stood mute while serious error occurred. Although the defense denied that Mr. Harrell engaged in sexual activity with complainant, the prosecutor repeatedly told the jury that the defense was admitting that element. That false account of the defense's position deleted a critical element from the jury's deliberations. But counsel sat silent and did not object. The prosecutor then added, again without objection, a flurry of prejudicial commentary which steered the jury away from its important task of weighing the evidence and assessing credibility.

During jury deliberations, the blunders continued. Counsel's strategy throughout the case—and a major summation argument—relied on impeachment by omission: complainant claimed penile-vaginal contact at trial but never told the police or doctors about such contact after the incident. But when the jury requested complainant's testimony about this precise issue, counsel failed to request that the court also read back the impeachment evidence. Counsel unreasonably failed to arm the jury with the tools necessary to assess complainant's credibility and the defense's theory of the case.

Counsel's final string of errors occurred at sentencing, where, rather than advocating on Mr. Harrell's behalf, counsel did nothing at all. Instead, he made disparaging remarks about his absent client, calling him "angry." The Constitution demands more of sentencing counsel, especially when the client is facing the rest of his life behind bars.

As the adversarial system broke down in this serious felony case, this Court should vacate the judgment and order a new trial.

STATEMENT OF FACTS

**Indictment**

Based exclusively on complainant's testimony, the State indicted Mr. Harrell with seven felony sex-offense counts, including two counts of first-degree criminal sexual act (oral-vulval and oral-penile contact), attempted first-degree rape (sexual intercourse), and two counts of first-degree sexual abuse (digital-vaginal and mouth-to-mouth contact).[11] Each of the seven counts required forcible compulsion, with the exception of the last two (third-degree criminal sexual act [mouth-to-vulval and penile-oral contact]), which required that the complainant be under 17.

Mr. Harrell, age 53 at the time of trial, was facing the rest of his life in prison for these charges.

**Pretrial Proceedings**

### A.  The Warrantless Cell-Site-Informational Search

On December 11, 2014, nearly a year before the October 2015 trial, the prosecution moved for a subpoena for 57 days of Mr. Harrell's cellular-phone-location information.[12] The court issued a subpoena under 18 U.S.C. § 2703(d), finding "reasonable grounds to believe" the records "are relevant and material to an ongoing criminal investigation."[13] The court never found probable cause

---

[11] A1-A3.

[12] Affirmation in Support of Subpoena: A1029-34 (requesting data from the day before the purported July 16, 2014 incident through September 10, 2014).

[13] A1035-36.

that Mr. Harrell had committed an offense or that the cell-site data would reveal incriminating information.

### B.  The DNA Evidence

A July 30, 2015 OCME report explained the results of comparing Mr. Harrell's DNA profile to DNA profiles found on a cup and straw found in complainant's family's apartment. Mr. Harrell's DNA profile matched those profiles.[14]

Another lab report (dated April 1, 2015) explained the results of comparing male DNA information—that is, "Y-STR"—found on swabs of complainant's mouth and vaginal area.[15] This Y-STR analysis compared the Y-chromosomal alleles (genetic information) at 15 locations of the DNA chain. Although the Y-STR profiles uncovered were consistent with the profiles of *millions* of males, OCME reported the information much differently, stating that the Y-STR profile found on complainant's labia would be "expected to be found in approximately . . . 1 in 685 African American males, 1 in 1330 Asian males, 1 in 562 Caucasian males [and] 1 in 400 Hispanic males."[16] And as for the oral swab, OCME reported that the Y-STR profile "is expected to be found in approximately 1 in 321 African American males, 1 in 439 Asian males, 1 in 125 Caucasian males [and] 1 in 120 Hispanic males."[17]

---

[14] A1021.

[15] A1017-18.

[16] A1017

[17] A1018.

### C. Trial

The prosecution's case centered on complainant's testimony.[18] Complainant testified that on July 16, 2014, Mr. Harrell—who lived in her building and had been in her apartment "many times before"—knocked on her door to ask her brother to ride a bicycle.[19] Her brother was not home, but she invited Mr. Harrell inside for a smoothie and they sat on her couch and talked while she ate her lunch.[20] She then asked Mr. Harrell to leave so she could do chores.[21]

Complainant hugged Mr. Harrell but he would not release her.[22] Complainant further alleged that Mr. Harrell choked her neck, threatened her, kissed her, removed her clothing, digitally penetrated her vagina, performed oral sex on her, rubbed his penis against her vagina, and forced her to perform oral sex.[23] Complainant testified that during this encounter, she told Mr. Harrell not to penetrate her vagina, so he stopped.[24] Mr. Harrell purportedly pocketed her underwear, took partially nude photos of her on his cell phone, and then departed.[25] Complainant called 911 and reported that a neighbor whom she trusted sexually assaulted her by going "into places [she] didn't want to be."[26]

---

[18] A389-A448.

[19] A400-01, A439.

[20] A401, A407.

[21] A407.

[22] A408.

[23] A410-A421.

[24] A415-16.

[25] A420, A424.

[26] A425-28; Pros. Ex. 11 (audio recording of 911 call).

On cross, defense counsel asked the complainant whether, when providing a narrative of the incident (to a Detective Barbato), she reported any penile-vaginal contact. Complainant testified that she "might not have" not done so and could not remember. [27] Detective Barbato similarly testified that, during her interview of complainant at the hospital, complainant did not reference any such contact.[28] The hospital medical records also confirm no such allegation was ever made.[29] After a comprehensive physical examination, doctors found no evidence corroborating complainant's allegations of forcible compulsion, such as that she was choked. Similarly, photographs taken after the purported incident don't support such a contention.[30] Months later, Mr. Harrell turned himself into the police after learning of the complainants' allegations.[31]

The prosecution introduced cell-site-locational data that purported to show the cell towers Mr. Harrell's phone contacted on July 15, 2014 and July 16, 2014.[32] A cellular-technology expert testified that Mr. Harrell's phone would access a cell tower within a range of three or four New York City blocks.[33] The prosecution introduced a chart demonstrating that Mr. Harrell's phone was: (1) near the scene of the purported offense at the time of its purported commission;

---

[27] A444-45.

[28] A594-595.

[29] Pros. Ex. 21: Pre-Hospital Care Report: A955 (providing a detailed account of complainant's statement, which does not reference penile-vaginal contact); Pros. Ex. 21: Emergency-Room Record: A974 (same).

[30] A703-24; A1008-13.

[31] A588-89.

[32] A512-A566; A1014.

[33] A547, A565.

and (2) moved away from the scene in the minutes following the incident (the blue location below is the location of the alleged offense):



An OCME Criminalist (Tamariz) testified that DNA found on a cup and straw in complainant's apartment had the same DNA profile as Mr. Harrell's profile.[34] Specifically, 1 out of more than "6.8 trillion people" have that profile.[35]

As for the Y-STR profiles developed from swabs of complainant's mouth (semen) and vaginal area (saliva)—reflecting the Y-chromosomal "alleles" present at 15 locations of the DNA chain—Mr. Harrell could not be "excluded" because "all the numbers at all the [15] locations are the same."[36] The prosecution introduced the OCME file into evidence, which contained the rates at which the recovered profile would be observed in particular demographics (summarized above and again below).[37] Counsel objected to the admission of this DNA evidence on chain of custody grounds but made no other objections.[38]

On cross, the OCME criminalist confirmed that "1 in 685 African American males would statistically have [the Y-STR] profile" found on complainant's labia.[39] She agreed that "thousands of individuals in New York City" could have contributed DNA to the labial swab.[40] As for the oral swab, "1 in 321 African American males" could have contributed DNA, that is, "thousands of people in New York City."[41]

---

[34] A680.

[35] A683.

[36] A686-87.

[37] A1017-18.

[38] A679.

[39] A694.

[40] A694.

[41] A694.

After the prosecution rested, counsel requested an instruction on impeachment by omission because complainant repeatedly omitted any reference to penile-vaginal contact when narrating the encounter. [42] The court later provided an instruction on impeachment by omission.[43]

In summation, defense counsel argued that the prosecution could not prove Mr. Harrell engaged in sexual activity with complainant or non-consent.[44] Counsel never conceded anything, beyond the fact that the DNA evidence on the cup and straw indicated that Mr. Harrell, at some point, used those items.[45] Counsel argued that the complainant had been impeached by omission and was thus unreliable.[46]

Defense counsel's summation reduced, by a significant magnitude, the pool of individuals who could have matched the Y-STR profile. He told the jury that "1 in 685 *African males*, thousands of individuals in New York City, could have contributed that DNA to the labia and vulva of the complaining witness if you want to speak scientifically about this. . . . 1 in 321 *African* males could have contributed the DNA to the Y chromosome of DNA."[47] Counsel emphasized that the Y-STR results "don't rule out" Mr. Harrell or "any Hispanic male relatives and they don't rule out thousands of African males simply in the confines of New York City, let alone in the United States or in the world."[48]

---

[42] A755.

[43] A839-40.

[44] A791-799.

[45] A791-92.

[46] A774-81.

[47] A793-94.

[48] A795.

Contrary to this recap, OCME had never found that the Y-STR evidence could *only* be found in "African" or "Hispanic male relatives." Instead, OCME had summarized the rate at which this Y-STR profile would be found in four races (including Caucasian and Asian males too).[49] Also, there were millions of males globally that could have matched this profile, not just "thousands of African males."

In summation, the prosecution incorrectly told the jury that the factual question of whether Mr. Harrell engaged in sexual activity with complainant was "not in dispute":

> Let's start with [proving identity] because this one is easy. I say it's easy because it's not really in dispute. . . . From the very beginning, [complainant] said Lonnie is my neighbor. So identification, I submit to you, is not really in dispute. He's not claiming that someone else did this. It was me but I did not do it. . . .

> And [the OCME analyst] explained to you about the Y chromosome, and it's true, that it's not a direct match to the defendant. And I told you that in my opening statement, that it was simply consistent with his DNA, that it could be him or any of his paternal relatives. But is he suggesting that he came into the apartment, had the Smoothie, coffee cup with him and then someone else came in and sexually assaulted her? No, no one is saying that . . .

> Identity is not an issue.[50]

During jury deliberations, the jury requested complainant's testimony "regarding the position of defendant's penis in relation to [complainant's] vulva slash vagina."[51] The stenographer then read back complainant's direct

---

[49] A1017-18.

[50] A800, A806, A808.

[51] A885.

testimony that Mr. Harrell rubbed his penis against her vagina but did not penetrate her because she told him not to.[52] Although counsel's summation argued that this precise testimony was impeached by repeated omission, counsel failed to request that the court also read back any impeachment testimony.[53]

## Verdict

The jury returned a verdict of guilty on six of seven counts (with the exception of attempted first-degree rape).[54] The trial court accepted a partial verdict and issued an *Allen* charge, after which the jury deliberated and returned a verdict of guilty on the attempted-rape charge.[55]

## Sentencing

At several points during the trial, Mr. Harrell absented himself from court because (1) he was frustrated that he could not attend religious services and did not want to be disruptive in the jury's presence; and (2) he objected to being shackled.[56]

Before sentencing, a court officer indicated that Mr. Harrell was refusing to attend the sentencing proceeding.[57] Defense counsel stated he had spoken with

---

[52] A416 (lines 8 through 18); A442 (lines 24-25); A443 (lines 1 through 12); A444 (lines 18 through 25); A445 (lines 1-6); A875-85; A891.

[53] Complainant: A444-45 (testifying that she might not have told the detective about penile-vaginal contact and that she did not recall whether she made that allegation); Det. Barbato: A594-95 (testifying that the complainant never made this allegation); *see also* Pros. Ex. 21: Pre-Hospital Care Report: A958 (detailed account of complainant's statement, which does not reference penile-vaginal contact); Pros. Ex. 21: Emergency-Room Record: A977 (same).

[54] A900, A905-17.

[55] A908-A913; A934-36.

[56] A165, A633-50, A745-46, A760, A897-98.

[57] A940.

Mr. Harrell who was "very upset" about the shackling requirement.[58] Counsel supplied no explanation for Mr. Harrell's behavior, despite (1) the PSI report's reference to a "paranoid schizophrenia" diagnosis[59] and (2) Mr. Harrell's prior in-court statement that he was on "meds" and did not want to "spaz out" in court.[60] Instead, defense counsel told the court that when he discussed Mr. Harrell's attendance at sentencing with him, Mr. Harrell became "angry" and exited the interview booth.[61] Sentencing continued in Mr. Harrell's absence.

Defense counsel requested a sentence in the range of 10-15 years, without making any argument whatsoever in support of that request.[62] The prosecution sought a maximum 25-year sentence because of a prior robbery conviction, the present offense's seriousness, and Mr. Harrell's prior "behavior" in court.[63] Complainant's mother read complainant's statement and her own statement.[64]

Referring to Mr. Harrell's courtroom behavior and absences, the court stated that "the record is clear as to everything Mr. Harrell did during . . . this trial and the ways that he basically tried to highjack these proceedings."[65] The court found a maximum sentence warranted because of the seriousness of the offense,

---

[58] A940.

[59] A1028 ("[Defendant] informed while at liberty he was treated for paranoid schizophrenia and depression on a monthly basis").

[60] A642.

[61] A940.

[62] A943.

[63] A943-45.

[64] A945-50.

[65] A951-52.

Mr. Harrell's criminal record, and the "conduct that he exhibited here in this courtroom."[66]

The court sentenced Mr. Harrell to the maximum prison sentence on each of the 7 counts and ran them concurrently, thus producing an aggregate sentence of 25 years in prison and 15 years of post-release supervision.[67]

### D. Direct Appeal

Mr. Harrell appealed to the First Department, arguing that the counts were multiplicitous and that the court violated his right to be present during several stages of the trial. The court affirmed the judgment in January 2019 and the Court of Appeals denied leave months later.[68]

### E. Post-Conviction Investigation into Counsel's Performance

On April 23, 2020, post-conviction counsel discussed this case with defense counsel, Theodore Herlich, by phone. Mr. Herlich stated that he did not move to suppress the cell-site data because he thought that First Department law at the time precluded the claim. He did not move to preclude the Y-STR evidence on the grounds that it was more prejudicial than probative because an expert, Dr. Lawrence Koblinsky, did not advise him to make such a motion. Finally, he was unaware that Mr. Harrell had any diagnosed mental-health disorders.[69]

Defense counsel subsequently refused to sign an affidavit affirming an account of his representation in this case.[70]

---

[66] A952.

[67] A952-53.

[68] 168 A.D.3d 591 (1st Dept. 2019), *leave denied* 33 N.Y.3d 976 (April 8, 2019).

[69] Bova Aff. ¶ 14-16.

[70] Bova Aff. ¶ 17.

## ARGUMENT

### FROM START TO FINISH, COUNSEL WAS INEFFECTIVE.

Because a criminal conviction triggers a massive deprivation of liberty, the state and federal constitutions guarantee the right to effective assistance of counsel.[71] To show ineffective assistance, the accused must first show deficient performance. The federal and state deficient performance tests are identical, both requiring that counsel perform unreasonably.[72]

Once the accused establishes deficient representation, he must show prejudice. The state and federal prejudice tests diverge. The federal prejudice test focuses on the impact of the lawyer's error, requiring a "reasonable probability" that, absent the error, the accused would have secured a better outcome.[73] *Strickland* defines "reasonable probability" as one "sufficient to undermine confidence in the outcome."[74] Thus, "a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*."[75]

The state prejudice standard is "more favorable" to the accused.[76] Under that test, "even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is

---

[71] U.S. Const., Amends. 6, 14; N.Y. Const. Art. I § 6.

[72] *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *People v. Turner*, 5 N.Y.3d 476, 480 (2005).

[73] *Strickland*, 466 U.S. at 694.

[74] *Strickland*, 466 U.S. at 694.

[75] *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).

[76] *Turner*, 5 N.Y.3d at 480.

deprived of a fair trial" or "meaningful representation."[77] "New York 'refuse[s] to apply the harmless error doctrine in cases involving substantiated claims of ineffective assistance. Although whether a defendant would have been acquitted but for counsel's errors is relevant, a state claim of ineffective assistance 'is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case.'"[78]

Counsel's failure to advance "colorable" arguments for the preclusion of evidence is, absent a reasonable strategic justification, deficient performance.[79] Indeed, the Court of Appeals has found counsel ineffective for failing to seek suppression even though the issue was "close" under a "complex" jurisprudence.[80]

* * *

Here, as shown below, counsel was ineffective from start to finish:

- he failed to move to suppress the inculpatory cell-site data;

- he failed to move to preclude the Y-STR evidence and then drastically overstated its probative value in summation;

- he failed to object to the prosecutor's prejudicial summation;

- he failed to request that the court read back impeachment testimony in response to a read-back request even though that impeachment was an important element of his summation; and

---

[77] *People v. Caban*, 5 N.Y.3d 143, 156 (2005).

[78] *People v. Mercado,* 147 A.D.3d 613, 616 (1st Dept. 2017) (quoting *People v. Benevento*, 91 N.Y.2d 708, 714 (1998)).

[79] *People v. Carver*, 27 N.Y.3d 418, 420-21 (2016) (quoting *People v. Garcia*, 75 N.Y.2d 973, 974 (1990)); *People v. Major*, 96 A.D.3d 677, 678 (1st Dept. 2012) (same); *People v. Cyrus*, 48 A.D.3d 150, 160 (1st Dept. 2007) (same).

[80] *People v. Clermont*, 22 N.Y.3d 931, 934 (2013) ("[T]he parties have presented substantial arguments for and against suppression and the issue is close under our complex *De Bour* jurisprudence.").

16

- he made *no* argument on his client's behalf in sentencing and instead disparaged him as "angry."

Counsel's blunders undermined the "proper functioning of the adversarial system," depriving Mr. Harrell of his state and federal right to effective assistance of counsel.[81]

## A. The cell-site-suppression blunder.

The prosecution obtained Mr. Harrell's cell-site data without a warrant finding probable cause. In turn, the prosecution used cell-site data to establish that Mr. Harrell (1) was inside complainant's apartment building at the time of the purported incident; and (2) fled because he "knew that what he had done was wrong, that there was no consensual sex of any kind."[82]

In obtaining the damaging cell-site data without a warrant, the State violated the Fourth Amendment.

### 1. The Fourth Amendment Violation

In *Carpenter v. United States*, the Supreme Court held that the State cannot acquire cell-site data without a warrant finding probable cause.[83] Americans maintain "a legitimate expectation of privacy in the record of his physical movements as captured through" cell-site-locational data.[84] In so holding, *Carpenter* found 18 U.S.C. § 2703(d)—which merely requires "reasonable

---

[81] *Strickland*, 466 U.S. at 698 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial system."); *Caban*, 5 N.Y.3d at 156.

[82] A815-17.

[83] 138 S.Ct. at 2212-21.

[84] *Id.* at 2217.

grounds" to believe cell-site data will be "relevant and material to an ongoing investigation"—unconstitutional because that "showing falls well short of the probable cause required for a warrant."[85] "The Court usually requires some quantum of individualized suspicion before a search or seizure may take place. Under the [§ 2703(d) standard,] however, law enforcement need only show that the cell-site evidence might be pertinent to an ongoing investigation—a gigantic departure from the probable cause rule . . . Consequently, [a § 2703(d) order is] not a permissible mechanism for accessing historical cell-site records. Before compelling a wireless carrier to turn over a subscriber's [cell-site data], the Government's obligation is a familiar one—get a warrant."[86]

Here, as in *Carpenter*, the State requested cell-site data from Mr. Harrell's phone from July 15, 2014 to September 10, 2014 without a judge first finding probable cause and issuing a warrant.[87] Counsel sat on his hands and never objected.

### 2. Counsel's blunder was deficient performance.

Counsel's critical failure to move to suppress was deficient performance. Although this 2015 trial occurred before *Carpenter* (June 2018), by the time of

---

[85] *Id.* at 2221; *see also Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

[86] *Id.* at 2221 (internal quotations omitted); *In re United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 707 F.3d 283, 287 (4th Cir. 2013) (18 U.S.C. § 2703(d) imposes a mere "reasonable suspicion standard").

[87] A1029-36.

this October 2015 trial, three federal courts had already held that the State must get a warrant to access cell-site data.[88] Further, the Court of Appeals had already held, in *People v. Weaver* (which analyzed GPS tracking of an automobile), that an individual has a reasonable expectation of privacy in his/her public movements.[89] Given this supporting authority, counsel was ineffective for failing to advance a colorable and readily-available suppression argument.[90] At a minimum, as the law was clearly evolving in the appellate courts, any reasonable lawyer would have preserved this argument for appellate review.[91] Competent lawyers routinely make colorable (but not "slam dunk")

---

[88] *United States v. Graham*, 796 F.3d 332, 345-61 (4th Cir. August 5, 2015 [one month before trial]) ("[T]he government engages in a Fourth Amendment search when it seeks to examine historical CSLI pertaining to an extended time period like 14 or 221 days . . . Its inspection by the government, therefore, requires a warrant, unless an established exception to the warrant requirement applies."), *rehg. en banc granted after Mr. Harrell's trial*, 624 Fed. Appx. 75 (4th Cir. Oct. 28, 2015), *revd. en banc by* 824 F.3d 421 (May 31, 2016); *United States v. Davis*, 754 F.3d 1205, 1217 (11th Cir. June 11, 2014) (the State needs a warrant to request cell-site data), *revd. en banc*, 785 F.3d 498 (11th Cir. 2015); *In re United States for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F.Supp.2d 113 (E.D.N.Y. 2011).

[89] *People v. Weaver,* 12 N.Y.3d 433, 441-42 (2009) ("The massive invasion of privacy entailed by the prolonged use of the GPS device was inconsistent with even the slightest reasonable expectation of privacy.").

[90] *Carver*, 27 N.Y.3d at 420-21; *Cyrus*, 48 A.D.3d at 160; *see also Government of Virgin Islands v. Vanterpool*, 767 F.3d 157, 168-69 (3d Cir. 2014) (counsel performs unreasonably where he/she fails to advance an argument supported by persuasive appellate precedent); *Jansen v. United States*, 369 F.3d 237, 241-44 (3d Cir. 2004) ("At the time of sentencing the . . . the Seventh and Ninth Circuits had [adopted the omitted argument]. The conclusion that counsel's performance was ineffective is not based on hindsight. The decisions [of other appellate courts] were readily available to him."); *United States Franks*, 230 F.3d 811, 814 (5th Cir. 2000) (failure to advance argument backed by persuasive authority is deficient performance).

[91] *People v. Nesbitt*, 20 N.Y.3d 1080, 1082 (2013) (where law was "open" at the time of the trial, counsel was ineffective for failing to advance argument on his client's

arguments to protect appellate rights.[92] A "reasonable defense lawyer…could not have reasonably determined that the argument was 'so weak as to not be worth raising.'"[93]

Mr. Herlich's *post hoc* explanation for his failure to raise this argument was objectively unreasonable.[94] Mr. Herlich has claimed that he spotted this argument but did not raise it because he believed the First Department's decision in *People v. Hall*[95] precluded it.[96] But *Hall* would not have induced a reasonable lawyer to fail to even preserve a constitutional argument. In *Hall*, unlike here, the subpoena only requested three days of information—not the 55 days of information requested here. Indeed, *Hall* expressly left open the

---

behalf); *People v. Santiago,* 22 N.Y.3d 740, 750 (2014) (counsel can be ineffective for failing to preserve a viable argument for appellate review); *Flores v. Demskie*, 215 F.3d 293, 305 (2d Cir. 2000); *Gross v. State*, 134 Md. App. 528, 581 (2000); A.B.A. Criminal Justice Standards for the Defense Function Standard 4-1.5 (4th ed.) (counsel must preserve the record for appeal); New York State Bar Association, *Revised Standards for Providing Mandated Representation* I-7(h) (2015) (same).

[92] *People v. Cyrus*, 48 A.D.3d 150, 160 (1st Dept. 2007) (counsel was ineffective for failing to advance arguments that, while not "clear-cut winners," were "certainly [ ] colorable").

[93] *People v. Heidgen* [*McPherson*], 22 N.Y.3d 259, 278 (2013) (quoting *Turner*, 5 N.Y.3d at 483).

[94] *Hinton v. Alabama*, 571 U.S. 263, 264 (2014) (objectively unreasonable strategic or legal decisions constitute ineffective assistance of counsel); *People v. Rivera*, 2006 WL 1389820, *14 (Sup. Ct. N.Y. Cty. May 18, 2006) (same); *People v. Berroa*, 99 N.Y.2d 134, 138 (2002) (same).

[95] 86 A.D.3d 450, 452 (1st Dept. 2011).

[96] Bova Aff. ¶ 14.

question of whether a subpoena for more than three days of records was a search under the Fourth Amendment.[97]

In any event, *Hall* does not change the reality that the law was clearly in flux and would, no doubt, be settled by a higher court (as it ultimately was in *Carpenter*). Thus, counsel had an obligation to, at a minimum, preserve this argument for appellate review. Only sheer laziness, or ignorance of the need to protect appellate rights, would explain this omission.

### 3. This important mistake prejudiced Mr. Harrell's trial and appeal.

Counsel's failure to suppress the cell-site data undermines confidence in the outcome of this trial.[98] As the "prosecution's entire case rested on the credibility of the alleged victim," counsel's failure to suppress key forensic evidence corroborating her testimony worked serious prejudice.[99] The prosecution effectively used the cell-site data to (1) place Mr. Harrell at the scene of the incident (at the time of the incident) and (2) show he fled the scene due to consciousness of guilt. As the prosecutor argued in summation, Mr. Harrell fled "because he knew what he had done was wrong, that there was no consensual

---

[97] 86 A.D.3d at 452 ("To the extent that prolonged surveillance might require a warrant under federal law (citing *United States v. Maynard,* 615 F.3d 544 (D.C. Cir.2010)), we find that three days of [cell-site-locational-information] records does not constitute a protracted surveillance.").

[98] *Strickland*, 466 U.S. at 694.

[99] *Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005).

sex of any kind."[100] The map itself, *above*, was a compelling visual aid that corroborated the prosecution's damning version of events.

Counsel's blunder was particularly prejudicial because the State's case was assailable in light of important contradictions. Complainant's testimony was impeached by omission and her claim that she was choked was inconsistent with the photographic exhibits/physical examinations, which did not support such a claim. These inconsistencies paved the way for a valid defense: complainant invited Mr. Harrell into the apartment and engaged in consensual sexual activity with him. But the inadmissible cell-site data seriously damaged that defense.

Furthermore, counsel's blunder prejudiced Mr. Harrell's appellate rights. Had counsel protected this record by making a simple objection, Mr. Harrell would have secured reversal under a preserved constitutional claim.[101] After all, when his appeal was decided in January 2019, *Carpenter* was the law.[102] Counsel thus, for no valid strategic reason, deprived his client of a winning appellate claim.

---

[100] A815-A817; *see also* Opening: A382 ("[The cell cites tell] you the general vicinity of where that cell phone is coming from. And the cell site records will show you that immediately after the incident, the defendant fled his home.").

[101] *E.g.*, *Gross*, 134 Md. App. at 581 (in assessing prejudice caused by the failure to preserve, courts should look "for a reasonable likelihood of *a* different appellate result, not a different trial result."); *Flores*, 215 F.3d at 304 (counsel was ineffective for failing to preserve a winning appellate argument).

[102] *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987) (federal constitutional decisions handed down during the pendency of a direct appeal apply to the appeal).

**B. Counsel's handling of the DNA evidence was ineffective.**

### 1. The pretrial-preclusion error

Counsel was ineffective for failing to preclude Y-STR DNA evidence (found on complainant's body) on the grounds that it was far-more prejudicial than probative.[103]

Any reasonable attorney would have argued that the Y-STR evidence was inadmissible because its risk of unfair prejudice far outweighed whatever minimal probative value it may have had.[104] There was a powerful argument for preclusion of the Y-STR evidence here.[105]

Here, hundreds of thousands of American males—and millions of males globally—could have contributed the Y-STR evidence in this case. Thus, this evidence had no probative value. Viewed objectively, this evidence was as valuable as evidence that the male suspect had blue eyes and was over 5 foot 8 inches tall, a description that also applies to millions of males.

On the other hand, the Y-STR evidence was misleading. Because DNA evidence can mislead the jury into believing that the prosecution's case is

---

[103] *People v. Scarola*, 71 N.Y.2d 769, 777 (1988).

[104] *People v. Primo*, 96 N.Y.2d 351, 355 (2001) (courts must assess whether evidence's probative value is outweighed by the possibility of "undue prejudice," confusion, or "misleading the jury"); *People v. Feldman*, 296 N.Y. 127, 137 (1947) (evidence is inadmissible if "the danger of undue emphasis being attached to the testimony outbalances [its] legitimate probative force"); *People v. Cassala*, 130 A.D.3d 1252, 1256-57 (3d Dept. 2015) (counsel was ineffective for failing to object to testimony that was more prejudicial than probative); *People v. Watson*, 965 N.E.2d 474, 481 (Ill. App. 2012) ("[E]ffective counsel . . . engage[s] evidentiary rules to shield his or her client from a decision based on unreliable [DNA] evidence."); *United States v. Hebshie*, 754 F.Supp.2d 89, 113 (D. Mass. 2010).

[105] *Carver*, 27 N.Y.3d at 420-21; *Major*, 96 A.D.3d at 678; *Cyrus*, 48 A.D.3d at 160.

airtight, DNA evidence is "the most troubling forensic [evidence] to ever be used in a court of law."[106] And as the Court of Appeals has recognized in a case involving Y-STR evidence, Y-STR evidence has a "powerful influence" on jurors but creates an "opportunity for juror confusion regarding [its] limited probative value."[107]

Here, captivated by DNA evidence's "aura of invincibility,"[108] the jury was likely misled by the Y-STR evidence.  OCME's "could not be excluded"[109] conclusion and statistics like "1/685" and "1/321" made it seem as if Y-STR evidence thoroughly narrowed down the suspect pool. But in reality, millions of males matched this Y-STR profile.

The Y-STR evidence was particularly misleading given the manner in which OCME reported the conclusions. OCME's DNA report indicates the rate at which males of certain races (Caucasian, Hispanic, African American, and Asian) match the Y-STR profiles, indicating that anywhere from 1/120 to 1/1300 individuals of certain races match the profile.[110] But these fractions obscure the real and only relevant reality: millions of males match this DNA profile.

In sum, and especially given the "powerful influence of DNA evidence on juries," no reasonable attorney would have declined to seek preclusion on prejudice-probity grounds.[111]

---

[106] *People v. Wright*, 25 N.Y.3d 769, 783 (2015) (internal quotations omitted).

[107] *Wright*, 25 N.Y.3d at 769, 771.

[108] *Wright*, 25 N.Y.3d at 783.

[109] A686-87.

[110] A1017-18.

[111] *Wright*, 25 N.Y.3d at 771.

Counsel's excuse for failing to move to preclude—an expert did not tell him to do so—is objectively unreasonable.[112] An expert's role is to provide scientific analysis, not to offer legal analysis or dictate trial strategy.[113] Whether to preclude evidence was a legal decision reserved for counsel.[114] Counsel understood the science well enough to argue to the jury in summation that the Y-STR evidence was "misleading,"[115] yet inexplicably omitted the same argument in support of preclusion.

### 2. Counsel also drastically overstated the inculpatory value of the Y-STR evidence in summation.

During summation, counsel inaccurately summed up the results of the DNA report, presenting them as far-more probative of guilt than they were. Counsel told the jury that "1 in 685 *African males*, thousands of individuals in New York City, could have contributed that DNA to the labia and vulva of the complaining witness if you want to speak scientifically about this. . . . 1 in 321 *African* males could have contributed the DNA to the Y chromosome of DNA."[116] He further emphasized that the Y-STR results "don't rule out Lonnie Harrell and they don't rule out any *Hispanic male relatives* and they don't rule *out thousands of African*

---

[112] Bova Aff. ¶ 15; *Hinton v. Alabama*, 571 U.S. 263, 264 (2014) (objectively unreasonable strategic decisions constitute ineffective assistance of counsel); *People v. Rivera*, 2006 WL 1389820, *14 (Sup. Ct. N.Y. Cty. May 18, 2006) (same); *People v. Berroa*, 99 N.Y.2d 134, 138 (2002) (same).

[113] *E.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001).

[114] *See generally People v. Colville*, 20 N.Y.3d 20 (2012).

[115] A795.

[116] A793-794.

*males* simply in the confines of New York City, let alone in the United States or in the world."[117]

Contrary to this odd recap, OCME had never found that only "African" males or "Hispanic male relatives" could have this Y-STR profile. Instead, OCME had summarized the rate at which this Y-STR profile would be found in African American, Asian, Caucasian, and Hispanic males.[118] Inexplicably, counsel presented the evidence to the jury as if only a Hispanic or African American male had sexual interaction with complainant, a baseless assumption that damaged Mr. Harrell's defense by drastically narrowing the pool of suspects.

More importantly though, it was not simply "thousands" of males in "New York City" that could have contributed this DNA. Instead, *millions* of males globally could have done so. There was no conclusive evidence that the suspect was from "New York." By significantly narrowing the suspect pool, counsel drastically—by a magnitude of at least 1,000—enhanced the Y-STR evidence's inculpatory value.

Counsel's performance here was worse than in *People v. Wright*,[119] where the Court of Appeals found counsel's handling of Y-STR evidence ineffective. There, counsel failed to object to the prosecutor's misleading account of the Y-STR evidence's probative value. Specifically, the prosecutor stated that the defendant's DNA conclusively matched the profile when in fact the Y-STR evidence only indicated a possible match.[120] *Wright* held that counsel's failure

---

[117] A795.

[118] A1017-18.

[119] *Wright*, 25 N.Y.3d 769

[120] *Id.* at 781-84.

to object to the prosecutor's misrepresentations regarding the Y-STR evidence was ineffective assistance.[121]

Here though, counsel did not simply fail to object to the *prosecutor*'s misrepresentations—*he personally* misrepresented the probative value of the Y-STR evidence to the jury. That was inexcusable, violating his important "responsibility to take extra care in describing DNA evidence, particularly when it comes to statistical probabilities."[122] It is one thing for the defendant's adversary to misrepresent DNA evidence against the accused. It is quite another for *defense* counsel to do so to the detriment of his own client.

### 3. These DNA errors prejudiced the defense.

Again, counsel's blunders undermine confidence in this verdict. Had the Y-STR evidence been excluded, the prosecution's theory that Mr. Harrell had sexual activity with complainant would have rested primarily upon the impeached complainant's credibility. But instead, the prosecution introduced misleading Y-STR-DNA evidence whose "mystical aura" of "invincibility" has the power to convince a jury that a case is airtight.[123] Counsel's blundering summation, which drastically reduced the suspect pool, then transformed inadmissible DNA evidence into harmful proof of guilt.

---

[121] *Id.*

[122] *Whack v. State*, 433 Md. 728, 748 (2013).

[123] *Wright*, 25 N.Y.3d at 783.

### C. Counsel's failure to request that impeachment testimony be read back to the jury was ineffective.

Counsel was also ineffective in failing to request that impeaching testimony—testimony that was *central* to the defense strategy—be read back in response to a note requesting inculpatory testimony.

#### 1. Relevant Record

During complainant's cross, complainant testified that she did not recall whether she reported penile-vaginal contact to responding officers and medical personnel.[124] Detective Barbato later testified that complainant did not allege any penile-vaginal contact during her interview of complainant at the hospital.[125] The hospital records (from the day of the purported incident) also make no reference to this allegation.[126]

In his summation, defense counsel discussed this omission for about five transcript pages, arguing that it undermined the complainant's credibility.[127]

Towards the end of the jury's deliberation, the jury requested complainant's testimony about the position of Mr. Harrell's penis in relation to complainant's vagina.[128] Counsel did not request that the court read back any impeachment testimony. The court thus only read back complainant's inculpatory testimony that Mr. Harrell's penis contacted her vagina.[129]

---

[124] A445.

[125] A594-595.

[126] A955, A974.

[127] A774-A781.

[128] A875-76.

[129] A875-91.

### 2. **Counsel was ineffective.**

Counsel's failure to request that the court include impeachment testimony in the readback was unreasonable. There "are few moments in a criminal trial more critical to its outcome than when the court responds to a deliberating jury's request. Indeed, the court's response may well determine whether a verdict will be reached, and what that verdict will be."[130] Nevertheless, despite his strategy of impeaching complainant with her prior omissions regarding this precise issue,[131] counsel failed to request that the court read back impeachment testimony.[132]

Counsel's blunder here was particularly unreasonable because he had relied heavily on complainant's impeachment throughout this case. Counsel sought, and obtained, impeachment-by-omission instructions. He then pressed an impeachment-by-omission argument in summation, emphasizing that this impeachment was an important "tool [to] assess the credibility" of the

---

[130] *People v. Kisoon*, 8 N.Y.3d 129, 134-35 (2007) (internal quotations omitted); *People v. O'Rama*, 78 N.Y.2d 270, 277-79 (1991).

[131] A775-A781 ("The Judge will instruct you at the end of the case on what tools you can use to assess the credibility of a witness, and one of the tools is called impeachment by omission… I'm only submitting [the medical records narrative] to you as an omission to consider the credibility of the witness who[ ] omitted twice in the medical records and two interviewers and to Detective Barbato that she didn't mention that part of it. So that's something to consider whether anything of that nature actually took place or not.").

[132] *People v. Jones*, 297 A.D.2d 256, 257 (1st Dept. 2002) ("A request for a reading of testimony generally is presumed to include cross-examination which impeaches the testimony to be read back."); *People v. Smith*, 68 A.D.3d 1021, 1022 (2d Dept. 2009) (court's failure to read back impeachment material was reversible error).

29

complainant.[133] Nevertheless, counsel failed to even try to supply this critical impeachment testimony to the jury during the critical deliberations stage.

Again, counsel's unreasonable failure prejudiced Mr. Harrell. The government's theory of forcible compulsion relied exclusively on complainant's account. The fact that the jury deliberated without access to critical impeachment evidence—an important element of the defense—harmed the defense.[134]

Further, this impeachment was central to the charge of attempted rape, on which the jury initially could not reach a verdict.[135] The jury was clearly troubled by the complainant's claim that Mr. Harrell tried to penetrate her but then stopped.[136] As the jury clearly had doubts about this allegation, it is "reasonably probable that a little more doubt"—which a proper readback would have supplied—"would have been enough."[137]

---

[133] A774-81.

[134] *People v. Cassala*, 130 A.D.3d 1252, 1254 (3d Dept. 2015) ("Counsel's failings were magnified by the fact that the People's only direct evidence . . . was the victim's testimony, making counsel's efforts to undermine her credibility of paramount importance").

[135] A908-13; A935.

[136] A415-16.

[137] *People v. Hunter*, 11 N.Y.3d 1, 6 (2008).

### D. Counsel's silence during the prosecutor's prejudicial summation was ineffective.

"[D]efense counsel's failure to object to any, let alone all, of the prosecutor's egregiously improper departures during summation" was also ineffective assistance.[138]

Counsel unreasonably failed to object when the prosecutor, in summation, unfairly deleted the "identity" question from this case. The prosecutor's summation repeatedly stated that the question of whether complainant engaged in sexual activity with Mr. Harrell was "not really in dispute" and that identity was "not an issue."[139] This was an egregious misstatement of the defense position. In summation, defense counsel argued that the prosecution could not prove that Mr. Harrell engaged in sexual activity with complainant and/or lack of consent.[140] Defense counsel never conceded anything, beyond that the DNA

---

[138] *People v. Fisher*, 18 N.Y.3d 964, 967 (2012); *Wright*, 25 N.Y.3d at 783 ("[C]ounsel's inaction in the face of prosecutorial misconduct made during closing argument is subject to the same 'meaningful representation' standard applicable to other trial errors. Under that standard, where defense counsel fails to object when faced with a pattern of prosecutorial misstatements far afield from acceptable argument . . . defendant has been deprived of meaningful representation and the constitutional right to a fair trial."); *Stermer v. Warren*, 959 F.3d 704, 737 (6th Cir. 2020).

[139] A800 ("He's not claiming that someone else did this. It was me but I did not do it."); A806 ("But is he suggesting that he came into the apartment, had the Smoothie, coffee cup with him and then someone else came in and sexually assaulted her? No, no one is saying that"); A808 ("Identity is not an issue.").

[140] A791-800.

evidence on the cup and straw indicated that Mr. Harrell, at some point, used those items.[141]

By incorrectly claiming that "identity" was not in dispute, the prosecution prejudicially removed that issue from the jury's deliberations, conveying that the *only* question for deliberations was forcible compulsion.[142] These prejudicial statements also shifted the burden to the defense, suggesting that because Mr. Harrell did not testify and deny sexual conduct with the complainant, such conduct was not "in dispute."[143]

Counsel also failed to object to the prosecutor's prejudicial emotional appeals:[144]

- the prosecutor cited several irrelevant teenage milestones to elicit an emotional reaction from the jury;[145]

- the prosecutor described complainant's irrelevant, positive attributes and plans for her future;[146] and

---

[141] A791-92.

[142] *People v. Pimentel*, 282 A.D.2d 280, 281 (1st Dept. 2001); *People v. Levy*, 202 A.D.2d 242, 245 (1st Dept. 1994).

[143] *E.g.*, *People v. Rupnarine*, 140 A.D.3d 1204, 1205 (3d Dept. 2016).

[144] *E.g.*, *Fisher*, 18 N.Y.3d at 967; *People v. LaPorte*, 306 A.D.2d 93, 96 (1st Dept. 2003).

[145] A799 ("She hadn't even had her Sweet 16th yet. She wasn't even old enough to drive. She just finished her first year of high school. She was only [15].").

[146] A800 ("She . . . spent two weeks in Montana volunteering for senior center and a day-care center, building sheds in a Native American reservation. [She] wants to be productive even during her summer vacation. So after coming back from Montana, she had plans to go to summer camp. She's the girl who hopes to go to college after she finishes high school.").

- the prosecutor emphasized the complainant's parents' irrelevant and emotional reactions to her allegations (her father "rushed" to be by her "side" and her mother cried on the stand).[147]

Counsel's failure to shield his client from this prejudicial commentary injected a serious risk of a conviction founded on sympathy and emotion, not the evidence.[148]

### E. Counsel was ineffective at sentencing.

Counsel's final round of ineffective assistance occurred during sentencing.[149] Although at least 15 years of incarceration were at stake, counsel's advocacy on behalf of his client was "practically non-existent."[150]

Instead of advocating for his client, counsel made no argument whatsoever in support of a below-maximum sentence and told the court that Mr. Harrell was "angry."[151]  Sentencing is not an empty ritual after trial; it is a critical stage

---

[147] A815 ("Both [complainant] and her mother told you that her father, who at that time lived in Georgia, rushed to be by [her] side. Again, evidence that [she] was sexually assaulted."); A815 ("And Ms. Smith broke down on the stand when she said that she has never seen her daughter in that state before. Can you imagine what a mother must have felt at that moment? Feeling so helpless, not having been able to protect her daughter? Watching the aftermath of her daughter having gone through something so horrific? Ms. Smith's reaction speaks volumes about the non-consensual nature of the sex acts.").

[148] *Fisher* 18 N.Y.3d at 967.

[149] *People v. Jones*, 181 A.D.3d 714, 714 (2d Dept. 2020) ("A defendant is entitled to an opportunity to be represented by counsel sufficiently familiar with the case and the defendant's background to make an effective presentation on the question of sentence") (quotation marks omitted); *People v. Edmond*, 84 A.D.2d 938, 938 (4th Dept. 1981); *People v. Gonzalez*, 43 A.D.2d 914, 914 (1st Dept. 1974).

[150] *Patrazzo v. Nelson*, 121 F.3d 297, 303 (7th Cir. 1997); *see also Jones*, 181 A.D.3d at 714.

[151] A940.

where, as here, decades in prison are often at stake.[152] But here, counsel did not even try to "mitigate his client's punishment" and disparaged his client just as he was about to be sentenced.[153] This fundamental breakdown in the adversarial process was a "total failure to present the cause of the accused in any fundamental respect."[154]

This "non-existent" advocacy rendered the sentencing proceeding inherently unreliable and is thus immune from any prejudice analysis.[155] When counsel "entirely fails to subject" the State's case to "meaningful adversarial testing," the adversary process itself is "presumptively unreliable" and prejudice is presumed.[156] Sentencing counsel was "in effect absent."[157]

In any event, counsel's failure to even try to advocate for his client was harmful because there were important points to make at sentencing.

Counsel should have argued that Mr. Harrell should not be punished for his absence or "disruptions" and certainly not with an additional *15 years* beyond the minimum.

Counsel should have also provided insight into Mr. Harrell's diagnosed mental illness, which was (1) specifically referenced in the PSI report, (2)

---

[152] *Mempa v. Rhay*, 389 U.S. 128, 135 (1967) ("[T]he necessity for the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case as to sentence is apparent.").

[153] *Patrasso*, 121 F.3d at 303-04 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir. 1996)).

[154] *People v. LaBree,* 34 N.Y.2d 257, 260 (1974).

[155] *See, e.g.*, *Mercado*, 147 A.D.3d at 616; *Patrasso*, 121 F.3d at 305.

[156] *United States v. Cronic*, 466 U.S. 648, 659 (1984).

[157] *Patrasso*, 121 F.3d at 303-05.

confirmed by medical records that counsel never requested, and (3) cited by Mr. Harrell in open court.[158] Had counsel prepared, he could have argued that this diagnosed mental illness mitigated his disruptive behavior, thus rendering any sentencing increase due to courtroom misbehavior unjust.

And finally, counsel should have informed the court that Mr. Harrell, 53 at the time, was unlikely to commit an offense if released after the age of 65 (thus justifying a 15-year sentence instead of a 25-year sentence).[159]

Instead of advancing any of these readily-available arguments, counsel said nothing in his client's favor and disparaged him as "angry."

In sum, the right to counsel "guarantees more than just a warm body to stand next to the accused during critical stages of the proceedings; an accused is entitled to an attorney who plays a role necessary to ensure that the proceedings are fair."[160] That did not happen here.

---

[158] PSI Report: A1028; Medical Records: A1037 (citing a "chronic" "schizoaffective disorder" diagnosis); A1043 (citing a bipolar disorder diagnosis); *see also* Trial Transcript: A642 ("I take meds. I don't want to spaz out in here").

[159] *See* Osborne Association, *The High Costs of Low Risk: The Crisis of America's Aging Prison Population* at 5 (2014) (available at http://www.osborneny.org/resources/resources-on-aging-in-prison/osborne-aging-in-prison-white-paper/.) (nationwide, 43.3% of all released individuals recidivate within 3 years; but for those ages 50 to 64, that number plummets to 7%; "4 percent of those over 65 are returned to prison for new convictions—the lowest rates among all incarcerated demographics").

[160] *Patrasso*, 121 F.3d at 304 (quotation marks omitted); *Strickland*, 466 U.S. at 696 ("The ultimate focus of the inquiry must be on the fundamental fairness of the proceeding").

### F. This breakdown in the adversarial process requires vacatur.

Counsel's steady stream of prejudicial pretrial, trial, and sentencing blunders deprived Mr. Harrell of meaningful representation and undermine confidence in the outcome of these proceedings.[161] Whether viewed collectively or independently, counsel's numerous errors constitute ineffective assistance of counsel under the Sixth Amendment and Article I § 6.

This Court should vacate the judgment in its entirety. At a minimum, this Court should hold this motion in abeyance and order a cell-site-locational-data suppression hearing[162] and a Y-STR-preclusion hearing.[163] Further, at a minimum, this Court should order a *de novo* sentencing hearing.[164] To the extent this Court determines that there are outstanding issues of fact, including issues of fact involving counsel's performance, C.P.L. § 440.30 mandates a hearing.[165]

Respectfully Submitted,

Robert S. Dean
Center for Appellate Litigation
*Attorney for Defendant-Movant*

Matthew Bova
*Of Counsel*
June 25, 2020

---

[161] *Strickland*, 466 U.S. at 694, 696; *Caban*, 5 N.Y.3d at 155-56.

[162] *Major*, 96 A.D.3d at 678.

[163] *Id.*

[164] *Jones*, 181 A.D.3d at 714.

[165] C.P.L. § 440.30(1)(a), 440.30(4)-(5); *People v. Brown*, 160 A.D.2d 256, 257 (1st Dept. 1990); *see also People v. Martin*, 179 A.D.3d 428, 429 (1st Dept. 2020); *People v. Mebuin*, 158 A.D.3d 121 (1st Dept. 2017).

# Exhibit G

# State's Opposition to Motion to Vacate

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>Lonnie Harrell,<br><br>Defendant. | AFFIRMATION AND MEMORANDUM OF LAW IN SUPPORT OF THE PEOPLE'S RESPONSE TO DEFENDANT'S MOTION TO VACATE THE JUDGMENT OF CONVICTION AND SENTENCE<br><br>Ind. No. 04258/2014 |

JUNG PARK, an attorney admitted to practice before the Courts of this State, affirms under penalty of perjury that:

1. I am an Assistant District Attorney in the New York County District Attorney's Office and am assigned to the prosecution of the above-captioned case. This affirmation is based upon my personal knowledge, review of the District Attorney's files, transcript of the trial and sentence, and defendant's motion papers dated June 25, 2020.

2. Defendant moves this Court to vacate the judgment of conviction and sentence under Criminal Procedure Law §§ 440.10 and 440.20 on the ground that his trial

1

attorney, Theodore Herlich, Esq., deprived him of effective assistance of counsel. Specifically, he asserts that his trial counsel was ineffective because: (i) he failed to move to suppress cell site data from being admitted at trial; (ii) he failed to move to preclude Y-STR DNA evidence; (iii) he failed to object to some of the prosecutor's summation remarks; (iv) he failed to request a read back of the victim's "impeachment testimony;" and (v) he failed to make arguments at defendant's sentence. See Defendant's Motion to Vacate the Judgement of Conviction and Sentence pursuant to CPL 440.10 and 440.20, p. 2 ("defendant's 440 motion"). Defendant received effective assistance of counsel, and thus, his motion to vacate must be rejected summarily.

## **FACTS**

3.  In 2014, 15-year-old Cypress Smith attended high school in Massachusetts, but her permanent residence was in Manhattan, where she lived in an apartment with her mother, Laketa Smith, and her brother, Journey (Cypress: 37-40; Laketa: 99-100). Defendant lived in the apartment next door to Cypress and "did maintenance" in the building (Cypress: 42, 87; Laketa: 100-03). Having lived next door to defendant for about five years, Cypress and her family had developed a "friendly" relationship with him (Cypress: 42-43, 87-88; Laketa: 102-04, 113-14).

4.  In June, after the school year had ended, Cypress went on a two-week service trip to Montana to do volunteer work (Cypress: 39). In early July, Cypress returned to her apartment in Manhattan, 92 St. Nicholas Avenue, for summer break (Cypress: 39-41).

5.  On July 16, 2014, at about 8:15 a.m., Laketa and Journey went out for the day, leaving Cypress home alone (Cypress: 41, 44; Laketa: 104-06). Around 1:00 p.m., Cypress woke up, prepared lunch and used the blender to make herself a smoothie (Cypress: 44-45). Shortly thereafter, Cypress heard a knock on the door; she asked who it was, and defendant identified himself (Cypress: 45-46). Cypress opened the door, and defendant asked her if Journey was available to go for a bike ride (Cypress: 46-48). When Cypress told defendant that Journey was not home, defendant commented that he had heard her using the blender (Cypress: 47-48). Cypress explained that she used it to make herself a smoothie, and defendant asked her if he could come in and have some (Cypress: 48-49). Cypress invited him inside. Defendant had been holding a blue paper coffee cup, and upon entering the apartment, he threw it in a garbage can in the kitchen (Cypress: 48-49). Cypress poured him a glass of smoothie with a purple straw, and talked to him about school (Cypress: 48-49, 55). After they finished their smoothies, Cypress told defendant that he should leave because she "had chores to do" (Cypress: 55-56). Defendant said, "okay," and Cypress walked him to the door (Cypress: 56).

3

6.   On the way, defendant gave Cypress a hug (Cypress: 56). When Cypress tried to pull away from defendant, he refused to let go; he kept his arms "around" her and asked her "why [she] was being so shy and why [she] was pulling away" (Cypress: 56). Cypress told defendant to let go and tried to push him away, which prompted defendant to grab her by the neck and "chok[e]" her (Cypress: 56-58). Cypress—who could not breathe—tried to free herself by "knee[ing]" defendant, but he "shoved" her to the ground, put his hand over her mouth, and told her that he would "choke [her] out" if she screamed (Cypress: 57-59). When defendant took his hand off of Cypress' mouth, Cypress tried to crawl away from him, but he grabbed her ankle, gripped her by her hair, and pulled her into another room (Cypress: 57-60).

7.   There, defendant sat Cypress down on a stool and kissed her on the mouth (Cypress: 62). When Cypress kept her mouth closed and refused defendant's demand that she kiss him back, defendant told her that he would "choke [her] again" if she did not comply (Cypress: 62). Afraid, Cypress opened her mouth and allowed defendant to "put his tongue inside" (Cypress: 62, 92).

8.   After defendant removed his tongue from Cypress' mouth, he repeatedly told her to take off her pants and underwear (Cypress: 58, 60-62, 90). Cypress refused, so defendant pulled them down himself and placed them on a nearby table (Cypress: 61-62). Defendant then "put [two of] his fingers inside" of Cypress' vagina (Cypress: 62-63). Cypress "cr[ied]" in pain and told defendant "that it hurt," but he refused to stop,

4

telling her that "it wouldn't hurt if [she] relax[ed]" (Cypress: 63). Eventually, defendant removed his fingers from Cypress' vagina, showed her that they were "wet," and told her that that meant that she "like[d] it" (Cypress: 63).

9. Defendant then "took out his penis" and "rubbed it against" Cypress' "vagina" (Cypress: 64, 90-91). At some point, defendant "tr[ied] to insert his penis into [Cypress'] vagina" (Cypress: 91). Cypress asked defendant "not to put it in because it would hurt," but defendant told her that it would not hurt if she "relax[ed]" (Cypress: 64). Ultimately, defendant stopped what he was doing and "put his mouth [and tongue] on [Cypress'] vagina" (Cypress: 63-64, 90-91, 94-95). Cypress pleaded with defendant to stop, but he kept saying, "'[y]ou wanted this,'" despite Cypress repeatedly telling him that she did not (Cypress: 64).

10. Eventually, defendant stepped away from Cypress, put his penis back into his pants, and told Cypress to stand up (Cypress: 64-65). When she did, defendant grabbed her by the back of her neck; simultaneously, Cypress unsuccessfully "tried to grab [defendant's] testicles and twist" them in order to make him stop (Cypress: 64-65). Defendant tightened his grip on Cypress' neck and told her to get on her knees (Cypress: 65-66). Cypress refused, so defendant pushed her down onto her knees (Cypress: 66). Defendant then positioned himself directly in front of Cypress, "took out his penis," and told her to open her mouth (Cypress: 66). When Cypress did not comply, defendant forced her mouth open by squeezing her cheeks together, at which

5

point he "put his penis in [her] mouth" and "pushed [her] head down on to him" in order to make his penis "go further into [her] mouth" (Cypress: 66-67, 90). From that position, defendant told Cypress to "suck his penis," and when Cypress "shook [her] head no," defendant repeatedly "push[ed]" her head down onto his penis until he ejaculated (Cypress: 67-68).

11. Cypress grabbed her underwear from the nearby table and spit defendant's ejaculate into them (Cypress: 68). Defendant then wiped his penis with Cypress' underwear, put the underwear in his pocket, and told Cypress to sit in the living room (Cypress: 68-69). Cypress—who was still naked from the waist down—followed defendant's order because she "didn't want him to hurt [her]" (Cypress: 70).

12. While in the living room, Cypress tried to cover the bottom half of her body with her hands (Cypress: 70). Defendant took out his phone and told Cypress to stop covering herself, but she did not listen (Cypress: 70). Defendant told Cypress "that if [she] didn't do what he said, he was going to go berserk" (Cypress: 70-71). When Cypress moved her hands, defendant used his phone to take pictures of her (Cypress: 71-72). Before leaving, defendant asked Cypress for her phone number, and when she gave it, he called the number to make sure she gave the correct number. Defendant called the number and when Cypress' phone rang, he hung up (Cypress: 72). Afterward, defendant told Cypress that he "would come back and hurt [her] mom if [she] told anyone." He also threatened that if she told anyone, he would "show

everyone pictures of [her] that he took and tell them what [she] did" (Cypress: 68-69, 71-73, 90). Defendant left the apartment, at which point Cypress, who was "crying," called the police and her mother (Cypress: 73-77; Laketa: 106; *see* People's Ex. 11:911 Call).[1]

13. At trial, defendant's phone records, 646-593-3203 (Sierra: 163-4; People's Ex. 23: defendant's phone records)[2] and Cypress' phone records, 646-206-2485 (Sierra: 163-164; People's Exs. 10A-10C: Cypress' phone records), were admitted as evidence. From defendant's phone records, there was an outgoing call to Cypress' number at 2:20 pm. However, Cypress' phone records did not reflect this call. Mr. Joseph Sierra, a custodian of records for T-Mobile, explained that phone number ending in 3203 (defendant's phone) called 2485 (Cypress' phone) but that it did not "connect to the device," meaning a phone call was made but "probably on the first ring hung up" (Sierra: 161, 175-178). Further, the phone records showed that between 2:23:30 pm and 2:28:35 pm on July 16, 2014, which was about the time when Cypress was speaking with a 911 operator, there were ten outgoing calls from defendant's phone to Cypress' phone, going straight to Cypress' voicemail (Sierra: 169-170, 178-179). The records further revealed that the last call from defendant's cell phone was at 2:42 pm on July 16, 2014 and that there were no further calls after that time (Sierra: 168-169). Moreover, cell site records showed that at about 2:23:30 pm on July 16, 2014, defendant's phone was consistent with being inside 92 St. Nicholas Avenue, the crime

location (Delitta: 204-206; People's Ex. 24: cell site map). Shortly thereafter, at about 2:25:33 pm, defendant's phone began to move away from 92 St. Nicholas Avenue, and at 2:42:42 pm, the phone was using a tower located at 120th Street and First Avenue, which was on the east side of Manhattan (Delitta: 211-213; People's Ex. 24: cell site map).

14. Police Officers Ariel Castillo, Danny Lora, Millicent Semper-Martinez, and Ruth Mateo arrived on the scene (Castillo: 122-24, 127; Semper-Martinez: 134-39; Lora: 247-49). When they entered the apartment, Cypress was "crying uncontrollably" and "shaking tremendously" (Castillo: 124-27; Semper-Martinez: 134-39; Lora: 248-49). Eventually, Cypress told the officers what defendant had done to her (Castillo: 126-27; Semper-Martinez: 134-39; Lora: 249). The police also recovered a coffee cup from inside a garbage can and a "smoothie" glass with a purple straw on top of the counter in the kitchen (Lora: 250-253; Field: 258-264) and submitted them for DNA testing.[3]

15. Cypress' mother arrived shortly thereafter, and she and Officer Castillo accompanied Cypress to St. Luke's Hospital (Cypress: 77-83; Laketa: 109-10, 116; Castillo: 128). There, an emergency room doctor conducted a physical examination, which showed that Cypress suffered abrasion to her right cheek (Singh: 352-54; *see* People's Ex. 14: Picture of Cypress' cheek; Ex. 21: Medical Records from St. Luke's Hospital[4]). After the physical examination, for about two hours, Dr. Anjay Singh

performed a Sexual Assault Forensic Examination ("SAFE") to collect DNA and other evidence indicative of sexual assault. As a part of the SAFE, Dr. Singh took oral, labia[5], vulva, vaginal, and cervical swabs, as well as buccal specimen (Singh: 354-63). Also at the hospital, Detective Susan Barbato interviewed Cypress, during which Cypress told her what defendant had done (Barbato: 229-31, 242, 245).

16. The next day, on July 17, 2014, Cypress and her mother went to a clinic affiliated with St. Luke's Roosevelt Hospital for follow-up treatment. On their way to the clinic, Cypress' mother noticed scratches on the back of her neck and took pictures of them (Laketa: 110-112; People's Exs. 13A and 13B [photographs of Cypress' neck]; Ex. 22 [medical records from Spencer Cox]).

17. On September 10, 2014, Detective Barbato arrested defendant (Barbato: 236-38). After the arrest, Detective Randolff Pinard took a buccal swab from defendant (Barbato: 238-39; Pinard: 273-75).

18. Jeannie Tamariz, a criminalist from the Office of Chief Medical Examiner Department of Biology ("OCME"), testified that the lab performed DNA testing on various swabs from Cypress' SAFE kit (Tamariz: 311-313, 315-316) and determined that semen was found on the oral swabs and amylase, which is an enzyme found in saliva, was found on the labia and the vulvar swabs[6] (Tamariz: 315-316). The lab conducted autosomal DNA testing and "Y STR DNA testing" on Cypress' SAFE Kit. Y-STR testing is used to determine if there is male DNA present in the specimen

9

being tested, and thus, only looks at one allele in each location (Tamariz: 311-13, 315-17, 320, 325, 327-29, 335-36)[7]. OCME's tests revealed that there was male DNA present in Cypress' labia, vulva, and oral swabs from one contributor (Tamariz: 316-18, 325, 335-36). After OCME developed a Y-STR DNA profile for that single male contributor, she compared it to the Y-STR profile she had developed for defendant from his buccal swab (Tamariz: 325, 328-29). The comparison revealed that the profiles were a match (Tamariz: 329, 334, 336-37; *see* People's Exs. 25-27 [DNA Reports]). Moreover, any paternal relative of defendant could have the same Y-STR profile, and that "thousands" of people in New York City "could have contributed to the DNA" on the labial and the oral swabs from the SAFE kit (Tamariz: 343-344).

19. Additionally, OCME tested the swabs from the top of the straw, the rim of the drinking glass and the rim of the cup recovered from the crime scene and developed a single source DNA profile from the swabs of the straw and the cup. Ms. Tamariz determined that the DNA profile developed from the straw and the cup matched the DNA profile of defendant (Tamariz: 329-333).[8]

## PROCEDURAL HISTORY

20. By New York County Indictment Number 4258/14, filed on September 19, 2014, a grand jury charged defendant with two counts of Criminal Sexual Act in the First Degree (Penal Law § 130.50[1]: mouth to vagina and penis to mouth), one count

of Attempted Rape in the First Degree (Penal Law §§ 110.00/130.35[1]), two counts of Sexual Abuse in the First Degree (Penal Law § 130.65[1]: finger to vagina and mouth to mouth), and two counts of Criminal Sexual Act in the Third Degree (Penal Law § 130.40([2]). On September 22, 2015, defendant proceeded to a jury trial before the Honorable Juan M. Merchan. On October 6, 2015, the jury rendered a partial verdict, convicting defendant of both first-degree criminal sexual act counts, both first-degree sexual abuse counts, and both third-degree criminal sexual act counts. On October 7, 2015, the jury convicted defendant of the remaining attempted first-degree rape count. On October 21, 2015, defendant was sentenced, as a second violent felony offender, to an aggregate prison term of 25 years, to be followed by 15 years of post-release supervision ("PRS").

21. By papers dated July 29, 2017, defendant filed a *pro se* motion to vacate his judgment of conviction under CPL § 440.10 on the ground that the indictment contained multiplicitous counts. On October 2017, the People filed a response opposing defendant's motion. On February 2, 2018, this Court denied defendant's 440 motion.

22. While the 440 motion was pending, defendant, through the same appellate counsel as the instant post-judgment counsel--Matthew Bova of Center for Appellate Litigation--had appealed his conviction to the Appellate Division First Department. He alleged that the trial court deprived him of his right to be present at trial and that the indictment contained multiplicitous counts. On January 29, 2019, the First Department

11

unanimously affirmed defendant's conviction. *People v. Harrell*, 168 A.D.3d 591, *leave denied*, 33 N.Y.3d 976 (2019).

23. Defendant now claims that his trial attorney was ineffective for failing to raise certain issues as outlined above. The People submit that the trial attorney provided effective representation, and urge this Court to summarily deny defendant's motion in its entirety.

## MEMORANDUM OF LAW

As an initial matter, defendant's 440 motion should be denied on procedural grounds. A trial court may, in its discretion, deny a motion to vacate when the defendant previously submitted a 440.10 motion and "was in a position to adequately raise the ground or issue underlying the present motion but did not do so." CPL § 440.10(3)(c). *See People v. Brown*, 24 A.D.3d 271 (1st Dept. 2005); *People v. Dominguez*, 257 A.D.2d 511, 512 (1st Dept. 1999) ("The [trial] court properly denied defendant's CPL 440.10 motion alleging ineffective assistance of counsel, on the ground that defendant had filed a previous CPL 440.10 motion and could have raised the issues set forth in the second application on the first but failed to do so"). As noted above, all the issues raised in defendant's second 440 motion could have been raised on his first 440 motion but he failed to do so.[9] As such, this Court may deny defendant's motion.

However, even on its merits, defendant's instant motion should be denied in its entirety. A defendant must make a two-part showing to establish that he was denied his federal right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the defendant must demonstrate that "counsel's performance was deficient." *Id.* Second, the defendant must show that there was a "reasonable probability that, but for" counsel's deficient performance, "the result of the proceeding would have been different." *Id.* at 694. In analyzing the effectiveness of counsel's representation under this standard, counsel's performance must be judged "in light of all the circumstances" and "the facts of the particular case." *Id.* at 690.

Similarly, under New York law, a defendant complaining of ineffective assistance must show that, in light of the "totality" of the "circumstances of [the] particular case," he did not receive "meaningful representation." *People v. Benevento*, 9 N.Y.2d 708, 712 (1998) (internal quotation marks omitted); *see People v. Hobot*, 84 N.Y.2d 1021, 1022 (1995); *People v. Baldi*, 54 N.Y.2d 137, 146 (1981). Like the federal standard, New York's "meaningful representation" test contains a "prejudice component." *People v. Henry*, 95 N.Y.2d 563, 566 (2000); *see People v. Honghirun*, 29 N.Y.3d 284, 289 (2017); *People v. Benevento*, 91 N.Y.2d at 713-14. In that regard, an ineffective assistance claim will be sustained only when counsel's "conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial." *Benevento*, 91 N.Y.2d at 713 (internal quotation marks omitted).

13

Under both standards, the defendant must overcome the strong presumption that counsel rendered adequate assistance and exercised professional judgment. *See Strickland*, 466 U.S. at 689-90; *Honghirun*, 29 N.Y.3d at 289. In order to satisfy that requirement, the defendant "must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged shortcomings." *Honghirun*, 29 N.Y.3d at 289 (internal quotation marks omitted); *see Strickland*, 466 U.S. at 688-89; *People v. Berroa*, 99 N.Y.2d 134, 138 (2002); *Benevento*, 91 N.Y.2d at 712.

Moreover, a defendant may not "second-guess[]" counsel's efforts "with the clarity of hindsight to determine how the defense might have been more effective." *Benevento*, 91 N.Y.2d 712; *see Strickland*, 466 U.S. at 689-90; *People v. Satterfield*, 66 N.Y.2d 796, 798 (1985); *Baldi*, 54 N.Y.2d at 146. Indeed, "'a simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after the [hearing], does not suffice'" to sustain an ineffective assistance claim. *Benevento*, 91 N.Y.2d at 713, quoting *People v. Flores*, 84 N.Y.2d 184, 187 (1994); *see Strickland*, 466 U.S. at 689-90. Rather, "[c]ounsel's performance should be objectively evaluated to determine whether it was consistent with strategic decisions of a reasonably competent attorney." *Benevento*, 91 N.Y.2d at 712 (internal citations and quotation marks omitted); *see Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *Strickland*, 466 U.S. at 689-90. In the end, as long as counsel's "defense reflect[ed] a reasonable and legitimate strategy under the circumstances and evidence presented, even if

14

unsuccessful, it will not fall to the level of ineffective assistance." *Benevento*, 91 N.Y.2d at 712-13; *see Harrington v. Richter*, 562 U.S. 86, 107 (2011); *Baldi*, 54 N.Y.2d at 147.

Judged by the standards delineated above, defendant received effective assistance of counsel at trial. The People's case against defendant was overwhelming, which constrained the plausible arguments available to defendant's trial attorney. Counsel could not put forth an identification defense as the victim and defendant were known to each other. They were neighbors for about five years, and defendant did maintenance for the building, as well as having spent time with the victim's family. Irrefutable DNA evidence from the coffee cup and the straw that defendant used to drink the smoothie fully corroborated the victim's testimony that defendant was in the victim's apartment immediately before the police responded to the 911 call. Defendant's cell sites placed him squarely within the crime location at the time of the sexual assault. Further, trial counsel could not advance a defense that the victim lied and no sex acts occurred. There was presence of male DNA in the victim's oral, labia and vulvar swabs from the SAFE kit, an examination that the victim endured for at least two hours after the assault. There were notations in medical records and photographs of injuries to her face and neck. Trial counsel had listened to the victim's heart-wrenching and compelling 911 call immediately after the sexual assault, where she cried that her neighbor had sexually assaulted her and begged the 911 operator to tell the police that they should not ring their sirens. The jury had every reason to

credit the victim's account of the incident, as it was corroborated by substantial independent evidence, including the testimony of those witnesses who observed her actions and demeanor in the immediate aftermath of her ordeal. Police officers who responded to the victim's 911 call observed that she was "crying uncontrollably" and "shaking tremendously," and when the victim was able to speak, she detailed the account of the attack. Faced with the overwhelming evidence of defendant's guilt, the trial attorney provided more than adequate representation under both the state and federal standards.

The trial attorney lodged vehement opposition to the People's position and consistently sought to undermine the People's case. For instance, even before the parties were sent out for trial, trial counsel filed a written motion to dismiss certain counts of the indictment arguing that they were multiplicitous under *People v. Alonzo*, 16 N.Y.3d 267 (2011). *See* Defendant's Motion to Dismiss dated September 16, 2015. During the pre-trial stage, trial counsel anticipated the People's *in limine* motions and moved to preclude all of the victim's statements to police officers and her mother while acknowledging the admissibility of the single 911 call. It was clear that he would not prevail on a motion to preclude the 911 call, and rather than make a frivolous motion, he successfully persuaded the Court to limit the number of prompt outcry witnesses and excited utterances (Proceedings: 7-15). Counsel effectively convinced the Court to redact portions of the narrative of the victim in the medical records

(Proceedings: 6, 338-343). At trial, he continued to vigorously advocate for his client. He was sensitive to the victim because he knew attacking a quiet, teary-eyed teenage sexual assault victim would win no points with the jury. Yet, through cross examination, he was able to elicit that at the hospital, she omitted certain aspects of the sex act in her narrative about the incident. It was the trial counsel who brought up the statistics of Y-STR DNA profile during cross examination and pointed out its weakness (Tamariz: 343-344). Even prior to trial, he had hired and consulted with a DNA expert to assist him with the case. *See* Defendant's 440 Motion, p. 4 (affirmation) and p. 25 (memorandum). Counsel also brought out that the People failed to obtain the "mediation cell site records," which was a more complete cell site report for defendant's phone, after new technology made them available (Sierra: 183-184). Further, counsel established that the cell site data could not provide "exact radius, distance" of the cell tower being used and that the caller could have been within blocks of the crime location (Delitta: 214). Given all the crushing evidence, defendant had little, if any, viable defenses available to him.

Even after defendant's outburst in court and his decision to absent himself from part of the trial, the trial counsel continued to advocate for his client. Notably, after both the victim and the victim's mother testified, defendant, for the first time, insisted that he would not come to court on Friday because of "Friday prayers" (Proceedings: 281-82). However, prior to jury selection, this Court confirmed that

17

there was "no problem with Friday proceedings" and again noted that because the Court had a calendar on Friday morning, the trial was going to proceed at 2:15 in the afternoon (Proceedings: 26, 29). When the Court reminded defendant that he had already agreed to Friday proceedings and warned him that the trial would proceed in his absence, defendant became upset and demanded to leave the court room. Defendant "threaten[ed]" and "yell[ed]" that he was going to be "disruptive" in front of the jury so the Court excused defendant (Proceedings: 282-90). After further discussion between Justice Merchan and the attorneys, the judge learned that defendant's testimony was the only thing that was scheduled to take place at trial the next day, which was Friday. Justice Merchan agreed to adjourn the Friday proceedings to Monday, thereby allowing him to attend his religious service. Despite the Court's willingness to adjourn the case as defendant had asked, defendant refused to return to the courtroom and the trial continued that day in his absence (Proceedings: 293-95)

On Monday, October 5, 2015, despite numerous attempts by the Court, the trial attorney and the court staff to persuade defendant to attend the trial, including visiting him in the pens, defendant refused to return to the courtroom (Proceedings: 396-401; 406-410). Even when the trial counsel did not have the benefit of defendant's assistance, he continued to advocate for his client. He effectively cross examined the DNA criminalist and elicited that all paternal relatives of defendant would have the same Y-STR DNA profile and that "thousands of individuals in New

York City could have contributed that DNA to th[e] labial swab" and the oral swab (Tamariz: 343-344). Trial counsel's cross examination of Dr. Singh stressed that she did not observe any scratches on the victim's neck (Singh: 368-370). In his summation, counsel raised doubts about the victim's credibility and argued that Y-STR DNA evidence was "meaningless." As the foregoing collectively demonstrates, trial counsel's overall performance certainly exhibited competent representation. See *People v. Oathout*, 21 N.Y.3d 127, 128 (2013) ("The test is reasonable competence, not perfect representation") (internal quotations omitted). In sum, defendant was afforded meaningful representation and his complaints about ineffective assistance of trial counsel should be rejected.

Finally, as it will be demonstrated below, defendant is not entitled to a hearing because the trial record and the motion/response papers are sufficient to permit the Court to decide the motion. *People v. Wright*, 27 N.Y.3d 516 (2016); *People v. Del*, 81 A.D.3d 468 (1st Dept. 2011) (trial record and parties' submissions sufficient to decide motion and there was no factual dispute requiring a hearing). Thus, defendant's instant motion should be denied summarily.

19

<u>DEFENDANT'S TRIAL COUNSEL WAS NOT INEFFECTIVE FOR
FAILING TO MOVE TO SUPPRESS CELL SITE DATA.</u>

Trial counsel did not err when he did not object to the admission of the cell
site data because he would not have prevailed as the cell site order in issue was based
on probable cause, and even if it was supported by the standard set forth in 18 U.S.C.
2703(d) order, the People relied on the existing law. In deciding whether Mr. Herlich
was ineffective for not moving to preclude the cell site evidence, the Court must
determine whether such a motion would have had any likelihood of success. A
defense counsel's failure to bring a motion which is without merit or unlikely to
succeed cannot be considered ineffective assistance of counsel. *People v. Ferreiras*, 222
A.D.2d 202 (1st Dept. 1995). Here, trial counsel cannot be faulted for failing to
advance an unavailing application to preclude the cell sites where the motion, at the
time, would have had no basis in the law. The trial began on September 22, 2015 and
ended on October 7, 2015, which was about three years before the Supreme Court
decided *Carpenter v. United States*, 138 S. Ct. 2206 (2018). Under New York law as it
existed during the trial, the People were entitled to obtain cell site records through a
court order pursuant to 18 U.S.C. 2703(d), which required them to make the lesser
showing that there were "specific and articulable facts showing" that there were
"reasonable grounds to believe" that those records would be "relevant and material to
an ongoing criminal investigation."

Under *Carpenter v. United States*, 138 S. Ct. at 2221, the People are required to obtain a warrant supported by probable cause before acquiring cell site records. When probable cause is established through a court order pursuant to 18 U.S.C. 2703(d), the order becomes "effectively a warrant." *People v. Sorrentino*, 93 A.D.3d 450, 451 (1st Dept. 2012); *People v. Burgos*, Indictment Number 4114/2017 (Sup. Ct. N.Y. Co. 2018, J. Ward) (*see* attached Exhibit A: Decision and Order).

In *People v. Sorrentino*, 93 A.D.3d at 450, cell site records were obtained by a court order under 18 U.S.C. 2703(d). The defense argued in that case that a warrant, and therefore probable cause, was needed for the prosecution to obtain this information. The trial court ruled, and the Appellate Division affirmed, that they believed a warrant on probable cause was not necessary (citing *People v. Hall*, 86 A.D.3d 450, 451, *leave denied*, 19 N.Y.3d 961 [2012]), but that even though the issuing judge had not made a finding of probable cause, the evidentiary showing within the affidavit made out probable cause, and therefore the order was "effectively a warrant." *People v. Sorrentino*, 93 A.D.3d at 451.

Applying that holding to the instant facts, the order in the case at bar was effectively a warrant and so satisfied *Carpenter's* holding. After all, the People's affirmation detailed the sexual assault that occurred inside the victim's apartment on July 15, 2014. The victim identified defendant, her attacker, by his name and age, and that they lived on the same floor. The affirmation further noted defendant's use of his

21

cell phone while inside the victim's apartment, how the People came to learn the cell phone number of defendant and that he was arrested on September 10, 2014. *See* Defense Appendix, A1029-A1036: Affirmation and Order for Cell Sites, ¶¶ 5-8. The affirmation established that there was probable cause that defendant committed the crimes charged by a New York County Grand Jury, *see* People's Affirmation ¶ 7, and the fact that a grand jury charged defendant demonstrated that there was probable cause defendant committed the charged crimes. In fact, this Court's decision in *People v. Cutts*, 62 Misc. 3d 411 (Sup. Ct. N.Y. 2018, J. Merchan) is instructive. In *Cutts*, 62 Misc. 3d at 415, although Justice Merchan found that the 440 motion was procedurally barred, he went on to state that even if *Carpenter* applied, the "result would remain unchanged, as the court order in this case was indeed supported by probable cause."

As noted, during the application in the instant matter, ample information was provided within the order to provide the issuing judge with probable cause that the information sought by the order would constitute evidence of the crime of Criminal Sexual Act in the First Degree and related crimes. The Supreme Court's decision in *Carpenter* holds that the Fourth Amendment requires a search based on probable cause in order to obtain cell site information. The original cell site affidavit in support of an application for a cell site order established probable cause and thus satisfies the

*Carpenter* requirements. Therefore, the original order was effectively a warrant and the search was lawful under *Carpenter*.

Nevertheless, even if this Court were to find that *Carpenter* applied and the People failed to comply with the *Carpenter's* holding, the exclusionary rule should not apply to defendant's cell site data. "The exclusionary rule 'was originally created to deter police unlawfulness by removing the incentive' to disregard the law, but also 'serves to insure that the State itself, and not just its police officers, respect the constitutional rights of the accused.'" *People v. Jones*, 2 N.Y.3d 235, 241 (2004), quoting *People v. Payton*, 51 N.Y.2d 169, 175 (1980). The Court of Appeals has "consistently . . . refused to suppress relevant evidence if little or no deterrent benefit could be anticipated from the exclusion." *People v. Drain*, 73 N.Y.2d 107, 110 (1989).

"Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987). "When the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Davis v. United States*, 564 U.S. 229, 250 (2011).

At the time of defendant's trial, state and federal law authorized law enforcement to obtain defendant's cell site data through a court order. The Supreme Court had not yet decided *Carpenter* and would not for the next three years. The New York courts had repeatedly held that obtaining defendant's cell site data without a warrant did not violate the Fourth Amendment because defendants have no reasonable expectation of privacy (i) while traveling in public or (ii) in information voluntarily disclosed to third parties. *People v. Hall*, 86 A.D.3d 450, 451 (1st Dept. 2011); *People v. Sorrentino*, 93 A.D.3d at 451; *People v. Jiles*, 158 A.D.3d 75, 79 (4th Dept. 2017).

As Justice Ward held in *People v. Burgos*, Ind. 4114/2017 (Sup. Ct. N.Y. 2018, J. Ward) (*see* attached Ex. A), the People acted in compliance with New York law as it stood when they requested a court order pursuant to 18 U.S.C. 2703(d) to obtain cell site data. Under the circumstances, the court held that suppressing cell site data would neither remove an incentive nor deter unlawful searches in the future.

The trial counsel, as well as the People, relied on the appellate precedent which existed at the time, and thus, the records would not have been suppressed even if defense moved to preclude it. *See United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (denying suppression of cell site records obtained pre-*Carpenter*); *United states v. Elmore*, 917 F.3d 1068 (9th cir. 2019) (same); *United States v. Goldstein*, 914 F.3d 200 (3d Cir. 2019) (same); *United States v. Curtis*, 901 F.3d 846 (7th Cir. 2018) (same); *see*

*generally Davis v. United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule"). In 2011, the First Department held that law enforcement could obtain cell site records without procuring a warrant, *People v. Hall*, 86 A.D.3d 450, 451-52 (1st Dept. 2011), and the Court of Appeals denied leave to appeal the following year, 19 N.Y.3d 961 (2012). In 2012, the First Department reaffirmed that rule in *People v. Sorrentino*, 93 A.D.3d 450 (1st Dept. 2012), and the Court of Appeals again denied leave, 19 N.Y.3d 977 (2012). Thus, trial counsel's actions were reasonable in light of the existing law at the time.

Defendant now suggests that trial counsel should have anticipated the *Carpenter* decision. See Defendant's 440 Motion, pp. 19-21. However, unlike the current appellate counsel who has the benefit of the 2018 *Carpenter* decision, trial counsel in 2015 relied on the existing law. Defendant is engaging in the prohibited practice of attempting to assess counsel's performance "with the clarity of hindsight to determine how the defense might have been more effective," *Benevento*, 91 N.Y.2d at 712, 721, and he should not be permitted to do so.

Defendant further contends that trial counsel's failure to preserve the cell site issue prejudiced him because he would have prevailed on appeal. *See* Defendant's 440 Motion, pages 21-22. This is simply not true. As demonstrated above, defendant

would not have succeeded even if he objected to the introduction of the cell site evidence.

Finally, even had trial counsel objected to the admission of the cell site evidence, defendant would still be unable to prevail. That is because any error was harmless. Defendant's guilt was overwhelmingly proven by the victim's powerful testimony, which was corroborated by her chilling 911 call, police officers' testimony about her demeanor, and the DNA evidence. The medical records and the photographs of her injuries further supported the sexual assault. Even the call detail records for defendant's and the victim's phones supported the victim's version of the assault: defendant's repeated attempts to call the victim while she was on the phone with a 911 operator proven by ten phone calls that went to the victim's voicemail (Sierra: 178-179); and the outgoing phone call at 2:20 pm that appeared on defendant's phone records but did not appear on the victim's phone records corroborating the victim's testimony that defendant called her phone and hung up to make sure she gave him the correct number (Cypress: ; Sierra: 174-177). Critically, too, the cell site data only provided the general vicinity of the location of the phone and given that defendant lived in the same building as the victim, the absence of cell site data could hardly be said to have resulted in an acquittal.

Besides, defendant claims that the sexual encounters was consensual. Cell site evidence corroborates the identity of the perpetrator. To suggest that someone else

sexually assaulted the victim immediately after defendant was in her apartment having a smoothie would be absurd. And, even without the cell site evidence, the People would have been able to demonstrate that defendant fled the location. Police Officer Castillo and Lora testified that they went to the victim's apartment responding to a 911 call and spoke with a shaken and scared teenage victim. The victim told them that her neighbor "Lonnie" had sexually assaulted her and while female officers were speaking to the victim, Officers Castillo and Lora "canvassed" the neighborhood to look for the suspect and that they later went to Apartment 2H, which was defendant's apartment, but did not make an arrest that day (Castillo: 125-127; Lora: 249-253). Accordingly, even without the cell site data, defendant's guilt was proven beyond a reasonable doubt.

## TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO MOVE TO PRECLUDE Y-STR DNA EVIDENCE.

Defendant claims that his lawyer was ineffective because he failed to preclude the Y-STR testimony as being more prejudicial than probative, and because he understated the number of people who could have the same Y-STR DNA profile as defendant. He is wrong.

There were two types of DNA statistics generated from the two types of DNA testing conducted in this case. Testing of the cup and straw used by defendant and

27

recovered by police generated a single source "autosomal" DNA profile and a statistic called a Random Match Probability ("RMP"). The oral swabs collected from the victim in the sexual assault evidence kit showed the presence of semen.  The vulvar and labial swabs collected from the victim in the sexual assault evidence kit showed the presence of amylase, a component of saliva.  DNA testing on these three samples yielded a single source Y-STR DNA profile. Y-STR statistics are generated differently than RMPs. It is useful to understand why.

The DNA from the straw and cup was sufficient to generate a single source DNA profile. The testing used for those items was autosomal (non-sex determinant chromosome) STR (Short Tandem Repeats) DNA testing. Random Match Probability statistical analysis was conducted on this DNA profile. In a single source profile, there are two alleles at each locus, or location, one each from the mother and the father (Tamariz: 305-306, 317-319, 338). Because forensic DNA alleles at each location are inherited independently of each other, RMP statistics are generated by multiplying the probability of getting a particular profile at Locus 1 times the probability of getting a particular profile at Locus 2 times the probability of getting a particular profile at Locus 3, all the way up to the 15 loci that OCME used to test (they now test 22 locations). This would generate a spectacularly huge number, such as 1 in greater than 6.8 trillion people, that would demonstrate the rarity of a particular profile. OCME stops counting at this number. The actual number is much larger. That is because 1 in

greater than 6.8 trillion people is the threshold for Source Attribution. The DNA analyst will say that the defendant is the source of the DNA if the statistic meets or exceeds Source Attribution and the known sample from the defendant matches. Since the report stated that we would expect to see the DNA profile on the evidence - approximately 1 in greater than 6.8 trillion people (exceeded Source Attribution) and the profile matched that of the defendant, he is the source of this DNA.

Y-STR DNA testing is different from autosomal DNA testing, in that Y-STR loci are located on the "Y" chromosome inherited from the father, while autosomal testing looks at the DNA inherited from both mother and father. This can be especially useful in sexual assault cases when the amount of female DNA overwhelms or "masks" the male DNA in a sample. This frequently occurs because of the type of samples that are collected in a sexual assault case with a female victim- an area of the victim's body is swabbed, which typically collects a significant amount of the female victim's DNA, sometimes overwhelming any male DNA that might be present (Taramiz: 345-346). In order to find the male DNA among the greater amount of female DNA, OCME uses a testing process that targets only the Y chromosome and ignores the female DNA. Y-STR DNA testing can also determine whether DNA from more than one male is present. In this case, a single source Y-STR DNA profile from one male was determined.

29

Because the Y chromosome is passed down the paternal line, every male in that line will have the same Y-STR DNA profile, so that fathers, sons, uncles and brothers from the same line will have the same Y-STR DNA profile. The appendix of OCME DNA reports states: "Y-chromosome STRs (Y-STR) are male- specific STRs, not present in females, and are inherited from father to son. Y-STRs should be identical for all male relatives of the paternal line. For example, brothers who share the same father will have the same Y-STR type" (People's Ex. 25: DNA [evidence] file; People's Ex. 26: DNA [suspect] file). In other words, a Y-STR DNA profile may be used to include or exclude a person, but cannot be used to identify someone absolutely as the source of the DNA. OCME statistics are generated by looking at databases of Y-STR DNA profiles divided into four racial groups, African Americans, Caucasians, Hispanics and Asians. The frequency of any particular Y-STR DNA profile is determined by counting the number of times it appears in a database, then applying some statistical techniques to take into account features of population genetics, to arrive at an estimate of the frequency of that profile in the population. In other words, the strength of the statistic is directly correlated to the size of the database; the strongest Y-STR statistic that OCME can report is 1 in 1330 people.  In this case, the report admitted into evidence showed the results were:

From the labial and vulvar swabs-
The DNA profile of **Male Donor A** is expected to be found in approximately:

16 locus result (dried secretion swab 1.4.1 from "bilateral labia", dried secretion swab 1.4.3 from "bilateral labia", vulvar swab)
1 in 685 African American males
1 in 1330 Asian males
1 in 562 Caucasian males
1 in 400 Hispanic males

From the oral swab-
The DNA profile of **Male Donor** A is expected to be found in approximately:
10 locus result (oral swab, swab remains fraction)
1 in 321 African American males
1 in 439 Asian males
1 in 125 Caucasian males
1 in 120 Hispanic males

Therefore, testimony that the DNA could have come from defendant or any one of his male relatives, and that statistics for finding this Y-STR profile were 1 in 685 African American males (for the labial/vulvar swabs) and 1 in 321 African American males (for the oral swab) were accurate.

Defense counsel elicited the following testimony from the criminalist:

Q: Now, with regard to the analysis done from the two
labial swabs 1.41 and 1.43 the statistics are extremely different
isn't that [referring to the RMP from the straw and glass], correct?
A: The Y statistics.
Q: Yes?
A: Yes.
Q: And in fact one in 685 African American males would statistically have that profile, is that fair to say?
A: That's fair.
Q: So hypothetically speaking thousands of individuals in New York City could have contributed that DNA to that labial swab, ultimately?

31

A: Yes, and not only that actually any male on his paternal line. So any paternal relative of Mr. Harrell could have also contributed because they would have the same Y STR profile.

Q: And with regard to the oral swabs, swab remains fraction which I believe is 1.1.1, is that correct?

A: Which sample are you talking about again?

Q: Again we are doing the Y chromosome analysis on the oral swabs, swab remains fraction?

A: Yes.

Q: The statistics would be one in 321 African American males, correct?

A: Yes.

Q: So again thousands of people in New York City alone could have contributed that DNA?

A: That and any of Mr. Harrell's paternal relatives.

(Tamariz: 343-344)

Defense counsel effectively elicited information that made it abundantly clear the number of people who, statistically speaking, could have the same Y-STR DNA profile as defendant was significant, including not only any of his male relatives, but thousands of people in New York City alone. And, while it is unlikely the victim's attacker was from another country or another galaxy, the implication of the questions and answers was obvious: a large number of potential carriers of the same Y-STR DNA profile as defendant are statistically possible, both in New York City and the world.

Indeed, as defendant notes, in summation, trial counsel pointed out the large number of potential matches:

I just ask you to take into consideration that the Y chromosomal analysis gives you statistics that are almost meaningless, or put another way, they don't rule out Lonnie Harrell, and they don't rule out any Hispanic male

relatives, and they don't rule out any African [sic] males simply in the confines of New York City, let alone the United States or the world. (Summation: 443-444).

However, as the prosecutor said in her summation, this was <u>not</u> an identification case. The victim was a bright fifteen-year-old girl who attended a prestigious prep school, and had known the defendant as her next-door neighbor for many years. His autosomal DNA profile was on the straw and cup recovered from her home, which served both to identify the defendant and to corroborate her testimony. Her 911 call, her outcry to police, her statements to medical personnel were consistent and compelling, as were the telephone records and the fact defendant fled immediately after the crime and did not turn himself in for months. The presence of male DNA from the victim's mouth and genitalia served as evidence that the sexual assault took place, and corroborated defendant's presence, a fact that needed no further corroboration. The idea that defendant left after innocently drinking a smoothie, and that someone else then sexually assaulted the victim, and that she confabulated defendant as the perpetrator, is ludicrous, and the jury rightly found it so.

Defendant also claims his trial counsel was ineffective for failing to move to preclude the Y-STR evidence as being more prejudicial than probative. It is clear defense counsel did not move to preclude the evidence on those grounds because there was no basis in fact or in law for that motion and no chance it would succeed. Evidence is relevant if it has "any tendency in reason to prove the existence of any

material fact," that is, if "it makes determination of the action more probable or less probable than it would without the evidence." *People v. Frumosa*, 29 N.Y.3d 364, 371 (2017); *People v. Wilder*, 93 N.Y.2d 352, 356-57 (1999); *People v. Alvino*, 71 N.Y.2d 233, 241 (1987). Of course, "almost all relevant, probative evidence the People seek to admit in a trial against a defendant will be, in a sense, prejudicial." *People v. Brewer*, 28 N.Y.3d 271, 277 (2016). There can be no dispute that forensic evidence showing that defendant is included in the population of men who could have left male DNA on the victim's oral, vulvar and labial swabs is highly probative, notwithstanding that his male relatives and some number of other men in New York City or, indeed, the world, could, statistically speaking, have that same DNA profile. This is especially probative in light of the victim's positive identification of defendant and his certain identification as the source of DNA left on the cup and straw from which he drank and left in the victim's apartment shortly before the assault.

## TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO REQUEST "IMPEACHMENT TESTIMONY" DURING READBACK.

During deliberations, the jury sent a note requesting the following readback:

We, the jury, request one: Witness Cypress Smith's testimony to both prosecution and defense regarding the position of defendant's penis in relation to witness' vulva/vagina, including witness' statements that the defendant quote moved to and that she quote asked him to stop because it would hurt and he responded that quote it would not hurt if you relaxed.

34

(Proceedings: 523-524, 533; Court Ex. III).

After discussion, the Court ruled that the following pages would be read back: Page 64, lines 8-18; Page 90, line 24 to page 91, line 12; page 94, line 18 to page 95, line 6 (Proceedings: 527-529). Defendant now complains that his trial attorney was ineffective because he failed to request the readback for "impeachment testimony," thereby prejudicing him. *See* Defendant's 440 Motion, pp. 28-30. Defendant's claim should be rejected because it has no merit. The readback testimony was a "meaningful" response to the jury note, and even if the "impeachment testimony" should have been read back, defendant was not prejudiced. Thus, trial counsel provided adequate representation.

A trial court is obliged to respond "meaningfully" to a request from the deliberating jury. *People v. Almodovar*, 62 N.Y.2d 126, 131 (1984); *People v. Malloy*, 55 N.Y.2d 296, 302 (1982); *see* CPL § 310.30. Relevant factors include the form of the question, the particular issue involved, the response delivered, and whether the defendant suffered any prejudice. *Malloy*, 55 N.Y.2d at 302.

Notably, when a jury requests the readback of specific testimony, the court is "not obligated to read back testimony that f[a]ll[s] outside of the jury's specific request." *People v Nuckols*, 167 A.D.3d 473, 474 (1st Dept. 2018); *see People v. Graves*, 298 A.D.2d 270, 271 (1st Dept. 2002). Moreover, even when, in retrospect, the response appears deficient, a conviction will not be overturned unless the defendant

35

was "seriously prejudiced" as a result. *People v. Lourido*, 70 N.Y.2d 428, 435 (1987); *see People v. Ingram*, 3 A.D.3d 437, 438 (1st Dept. 2004). Prejudice in this context generally arises when a court fails to respond to a note or in some way misleads the jury. *See, e.g., People v. Faulkner*, 195 A.D.2d 384 (1st Dept. 1993) (court did not respond meaningfully to jury note asking for readback of testimony because it failed to read the cross-examination portion of the testimony). Speculation or assumptions about the jury's thought processes is not sufficient to show serious prejudice. *See People v. Agosto*, 73 N.Y.2d 963, 966 (1989).

Here, the jury's request for readback was very specific—they wanted the victim's testimony regarding the position of defendant's "penis" to her "vagina" and her statements about her "ask[ing] [defendant] to stop because it would hurt" and defendant saying "it would not hurt if [she] relaxed" (Proceedings: 523-524, 533; Court Ex. III). Notably, defendant does not take issue with the readback that was provided. He simply argues that the jury should have been read testimony that the victim did not mention defendant's penis rubbing against her vagina at the hospital.

The court provided the requisite "meaningful response" to the jury's explicit inquiry when it provided a readback of the requested testimony, and defense counsel's "failure" to request readback testimony that "fell outside of the jury's specific request" was reasonable. *Nuckols*, 167 A.D.3d at 474; *see Blackwood*, 123 A.D.3d at 469. The jury was very detailed and precise about what they wanted—the victim's testimony

regarding the positioning of defendant's penis to her vagina and her request to "stop because it would hurt" and his response that "it would not hurt if [she] relaxed." They did not request any readback pertaining to her failure to report any contact between her vagina and defendant's penis nor her statements to the medical staff or to any law enforcement officer at the hospital. Had the jury wanted such readback, they would have requested it.

Even if it could be said that the Court should have provided the readback of "impeachment testimony," there was no serious prejudice to defendant. The testimony in issue, during cross examination of the victim, is as follows:

> Q: And isn't it true that when you spoke to Susan Barbato, [D]etective Barbato, you never indicated to her – you never told her that Mr. Harrell rubbed his penis against your vagina?
> A: May you repeat the question.
> Q: Yes. I'm asking if when you were interviewed by Detective Barbato, you never mentioned to her that Mr. Harrell rubbed his penis against your vagina?
> A: I might not have told her that. I don't remember whether or not I did or didn't.
> Q: You don't recall whether you did, or you didn't?
> A: I don't remember whether or not I mentioned that he rubbed his penis against me when I was talking to her.
> (Cypress: 93)

Certainly, nothing about the exclusion of that testimony mischaracterized the evidence or misled the jury in any way. There is no indication that the jury would have reached a different result if the Court had provided such readback.

In sum, the court provided the requisite "meaningful response" to the jury's request for a readback of the victim's testimony on the specific subject of contact between the penis and the vagina, and trial counsel did not err when he did not request testimony beyond the scope of the jury's note. Besides, assuming arguendo that the Court failed to meaningfully respond to the jury note, defendant failed to establish serious prejudice. Thus, defendant's claim of ineffective assistance of counsel must fail on this ground.

## TRIAL COUNSEL DID NOT ERR WHEN HE DID NOT OBJECT TO THE PROSECUTOR'S SUMMATION REGARDING IDENTITY OF DEFENDANT

Defendant next claims that by failing to object to comments during the prosecutor's summation regarding identity and the victim's background, trial counsel allowed the prosecutor to "shift[ ] the burden to the defense" and prejudiced defendant by appealing to the jury's emotion. *See* Defendant's 440 Motion, p. 31-32. Again, there is no merit to this claim.

Under both federal and state standards, the trial counsel provided effective assistance of counsel. Contrary to defendant's current claim, the prosecutor's summation arguments did not warrant objection. It is entirely appropriate for a prosecutor to ask jurors to draw on their ordinary life experiences and common sense. *See, e.g., People v. Martinez,* 95 A.D.3d 462, 462 (1st Dept. 2012) ("in response to

counsel's summation, the prosecutor essentially asked the jurors to apply ordinary life experiences and common sense"); *People v. Scott*, 305 A.D.2d 133, 133 (1st Dept. 2003). Certainly, "[t]his is not a case where the prosecutor's comments were so 'far afield from acceptable argument' that 'there [was] no apparent strategic explanation for defense counsel's silence,' thereby depriving defendant of meaningful representation." *People v. Speaks*, 28 N.Y.3d 990. 992 (2016). At bottom, there is no ineffective assistance of counsel for failure to object to a summation argument where the comments are not so egregious that they deprived defendant of a fair trial. *See., e.g., People v. Williams*, 29 N.Y.3d 84 (2017); *Wragg*, 26 N.Y.3d at 411; *People v. Kurita*, 172 A.D.3d 503 (1st Dept. 2019); *see also People v. Funk*, 166 A.D.3d 1487 (2d Dept. 2018) (no ineffective assistance for failure to object to a prosecutor's summation when an "isolated" comment was not so egregious as to deny defendant a fair trial).

At the outset, defendant does not complain about his attorney's summation at trial. Of course, given the strength of the People's case, he cannot deny, even now,[10] that trial counsel's strategy in presenting a potential consent defense was one of the best options—possibly the only option—he had available to him (Summation: 446). During summation, counsel argued that the jury could not credit the victim's testimony because of inconsistencies in her testimony and pointed to Detective Barbato's testimony and the medical records that the victim failed to mention penis to vagina contact in her narrative at the hospital (Summation: 444). He further attacked

the victim's credibility by suggesting that there was no documentation of any injury to her neck in the medical records and that the photograph of her cheek did not clearly show an injury (Summation: 444-446). Counsel also highlighted that it was he, on cross examination, who elicited the statistics of the Y STR DNA profile and that the prosecutor failed to raise it during her direct examination. Counsel suggested that Y STR evidence was "almost meaningless" because so many other men could have contributed to that profile (Summation: 440-443).

There is no question that a consent defense removes the issue of identification from jury's consideration. After all, the case did not involve parties who were strangers to each other. They were next-door neighbors and knew each other for about five years prior to the incident. Defendant, as a maintenance worker for the building, had been in the victim's home and spent time with the victim's brother. This was not a crime that happened between strangers in a dark alley or people who were so intoxicated that they were unable to perceive the event. Moreover, the coffee cup that defendant left behind and the straw he used to drink the smoothie settled any doubt that defendant was the man in the victim's apartment. Nothing about the prosecutor's comment that identity was "not really in dispute" was improper.

> I say it's easy because it's [identification] not really in dispute. This isn't a case involving a stranger. Cypress knows the defendant. He has known her from about 2009, 2010 until this incident occurs. He lived next door to her. He's been to her apartment before. He did maintenance work

inside for the family. From the very beginning, Cypress said Lonnie is my neighbor. So identification, <u>I submit to you</u>, is not really in dispute. (Summation: 448).

Defendant's assertion that this comment "shifted the burden" by suggesting that defendant should have testified and denied the sexual assault is wholly unavailing. Nowhere in the prosecutor's summation was there any kind of reference to defendant's failure to testify. In fact, defendant cannot point to a single example other than the prosecutor's argument that identification was not "really in dispute."

Likewise, the prosecutor's comments regarding the victim's background did not warrant an objection. Given that trial counsel urged the jury to discredit the victim about the forcible compulsion element of the crimes, the prosecutor was permitted to respond to defense arguments by pointing out some of the reasons why the jury should credit the victim's testimony. All of the comments noted by defendant, *see* Defendant's 440 Motion, p. 32, was relevant to determine the victim's credibility and reliability at trial.[11] The background evidence about the victim was relevant to demonstrate to the jury that they could, and should, believe her. The victim's father coming to New York from Georgia was relevant to show that the victim was sexually assaulted and that this was not a consensual sexual encounter. The victim's demeanor and her mother's demeanor was relevant to the issue of lack of consent, which was an element of the charged crimes. After all, the jurors decide witnesses' credibility based on who they are, including their background, and their testimony on the witness

stand. That is why attorneys—both prosecution and defense—typically elicit
witnesses' background and their experience during their testimony. And, commenting
about the witness' demeanor on the witness stand is a common practice among trial
attorneys.

In fact, this Court charged the jury about credibility as follows:

> There is no particular formula for evaluation the truthfulness and
> accuracy of another person's statements or testimony. You bring to this
> process all of your varied experiences. In life, you frequently decide the
> truthfulness and accuracy of statements made to you by other people.
> The same factors used to make those decisions should be used in this
> case when evaluating the testimony. Some of the factors that you may
> wish to consider in evaluating the testimony of a witness are as follows:
> Did the witness has an opportunity to see or hear the events about
> which he or [s]he testified? Did the witness have the ability to recall
> those events accurately? Was the testimony of the witness plausible and
> likely to be true, or, was it implausible and not likely to be true? Was the
> testimony of the witness consistent or inconsistent with other testimony
> or evidence in the case? Did the manner in which the witness testified
> reflect upon the truthfulness of that witness' testimony? To what extent,
> if any, did the witness' background, training, education or experience
> affect the believability of that witness' testimony? Did the witness have a
> bias, hostility or some other attitude that affected the truthfulness of the
> witness' testimony? You may consider whether a witness had or did not
> have a motive to lie.
> (Jury Charge: 485-489)

The Court's charge mirrored the Criminal Jury Instruction, which invites the jury to
consider the witness' background, education and experience in determining her
credibility. Therefore, because the summation comments were appropriate and
grounded in the evidence and common sense, trial counsel did not err when he did

not object. Trial counsel did his best to raise doubts about defendant's commission of the sexual assaults in the face of devastating proof of defendant's guilt.

Finally, even if the now-challenged comments were erroneous, failing to object to two "isolated" comments was not so egregious as to deny defendant a fair trial. *People v. Funk*, 166 A.D.3d 1487 (4th Dept. 2018). Thus, viewing trial counsel's conduct in its totality, his performance was reasonable and adequate and defendant received effective assistance of counsel.


## THE TRIAL COUNSEL WAS NOT INEFFECTIVE AT SENTENCING.

Defendant, a second violent felony offender, faced multiple consecutive sentences for each count of which he was convicted. Despite the significant prison sentence he faced—an aggregate sentence of 79 years[12], the Court imposed a maximum sentence of 25 years on only one count for defendant's heinous conduct in the sexual assault of his fifteen-year-old neighbor. Defendant claims that his attorney was ineffective for "disparage[ing]" him and not advocating for him at sentence. He claims that had the Court known about his "mental illness," he would have received a lesser sentence. *See* Defendant's 440 Motion, pages 33-35. Defendant's claim is unavailing. The Court's sentence was reasonable and eminently fair given defendant's criminal history, the nature of the crimes and defendant's conduct during trial. Thus, his trial counsel provided effective representation.

At the outset, defendant was adjudicated a second violent felony offender, based on his prior conviction for Robbery in the First Degree and Assault in the First Degree (Sentencing: 4). Thus, for each of his first-degree criminal sexual act convictions in this case, defendant was eligible for a determinate sentence in the range of nine to twenty-five years. Penal Law §§ 70.80(5)(c), 130.50(1). Additionally, for his attempted rape conviction, he faced a determinate sentence in the range of six to fifteen years, and for each of his first-degree sex abuse convictions, he was eligible for a determinate sentence range of four to seven years. P.L. §§ 70.80(5)(c), 110/130.35(1), 130.65(1). Although defendant received the maximum sentence that a predicate violent felon could have received for one of those crimes, it bears note that, the Court sentenced him to concurrent sentences. This Court could have sentenced defendant to consecutive sentences for an aggregate sentence of 79 years. The People did not request it, and the Court did not impose it, sparing defendant from a much harsher sentence.

Justice Merchan—who had presided over defendant's trial—knew the gravity of defendant's crime, as well as the extensive nature of defendant's criminal history, and he determined that the appropriate prison sentence to impose was the sentence of 25 years, followed by 15 years of post-release supervision (Sentencing: 12-15). That sentence was lenient. Defendant chose to absent himself from his own sentence proceeding, thereby forfeiting his opportunity to speak on his behalf. The Court heard

44

from the victim's mother, who read a letter from the teenage victim. In it, she expressed "living in constant cycle of fear and shame" and that she "still [felt] his hands around [her] neck." She blamed herself for "open[ing] the door" that day and spoke candidly about her inability "to feel safe again" (Sentencing: 8-10). The victim's mother continued that her daughter's memories of her first sexual encounter will "not be of some beautifully awkward moment with a person of her choosing . . . but of being unable to defend herself in her own home against a violent criminal more than twice her size and more than three times her age." She reminisced about how confident her daughter used to be and how the sexual assault turned her into a "mistrustful anxious girl who has nightmares, insomnia and flashbacks" (Sentencing: 10-11).

The Court also had an opportunity to be present during the trial and was fully familiar with the evidence and defendant's conduct in the courtroom. With respect to defendant's criminal conduct in this case, defendant forcefully attacked and violated an innocent teenage girl, who trusted defendant. Even in her 911 call for help, when the EMS operator got on the phone, the victim said, "A man who I thought I could trust, he was in my apartment and he went into places I didn't want to be" (People's Ex. 11: 911 call). Defendant, at fifty-one years old, violated a fifteen-year-old girl in every way he could: his mouth and tongue on her vagina, his penis in her mouth, his tongue in her mouth, his fingers in her vagina and rubbing his penis against her

45

vagina. He committed the heinous acts by physically overpowering the much smaller and younger victim while she was trapped in her own home and threatening to hurt her and her family. Throughout the course of the attack, defendant choked her, repeatedly shoved her to the ground, threatened to "choke [her] out," pulled her by her neck and hair, squeezed her cheeks together, pushed her head down onto his penis, threatened to "go berserk," and threatened to hurt her mother if she told anyone about the assault (Cypress: 56-60, 62, 64-69, 70-73, 90). He manipulated and lied to her when he put his fingers inside of her vagina, showed her that his fingers were "wet" and told her that that meant that she "like[d] it." (Cypress: 63). When she cried that she was in pain, defendant simply told her that it would not hurt if she "relaxed." The victim repeatedly pleaded with him to stop but defendant kept saying, "You wanted this" (Cypress: 64). When defendant was satisfied with having violated her sexually and physically, he took nude photographs of her and threatened to show it to people if she reported what he had done. The victim will undoubtedly forever carry the effects of her neighbor's abuse in her encounters with people and in her future romantic relationships. With this evidence alone, defendant's sentence was richly deserved.

Moreover, this Court was present when defendant decided to absent himself from the trial. Despite the Court's efforts to appease defendant's request to attend his

religious service on Friday, defendant remained dissatisfied and threatened to cause a scene in front of the jury. At sentence, Justice Merchan aptly noted,

> [W]e saw how he tried to intimidate the court officers in this courtroom, he tried to intimidate the sergeants, he even tried to intimidate the Court. It did not matter to him that the court officers outnumbered him or had weapons, it did not matter to him that the Court was wearing a black robe, it was still his way or the highway. So one can only imagine what it must have been like for Cypress to be alone with that man, alone in an apartment with no one to help her, no one to hear her pleas for help. And we can only speculate as to just how terrified she must have been to be at the hands of what can only be described as a bully, 210-pound bully trying to have his way with a young lady and depriving her of her innocence.
> (Sentencing: 14).

And, the timing of his decision to absent himself was "telling"—after the victim and her mother testified, as the Court pointed out (Sentencing: 13). Defendant had hoped that his presence would deter the victim from being able to testify. He knew how scared she was on July 16, 2014 and he was counting on her fear to acquit him. Unfortunately for him, the victim's courage and her ability to recount the events of that day convicted defendant.

Defendant now claims that his actions in court was the result of his "mental illness" and that trial counsel was inadequate for failing to raise it at his sentence. First, defendant refused to even participate in his sentencing. When trial counsel went to visit him and asked if he wanted to be present for his sentencing, defendant walked out of the booth (Sentencing: 2). Second, Justice Merchan was aware of defendant's

47

mental health condition because he had an opportunity to review the Pre-Sentence Report prepared by the Department of Probation, which stated that "defendant reported being treated for paranoid schizophrenia and depression on a monthly basis at Metropolitan Hospital prior to his arrest" (*see* Pre-Sentence Report, p. 5). Last, the fact that defendant may had been diagnosed with a mental illness does not merit a departure from the just sentence he received. Contrary to defendant's current assertion that his misconduct during trial was the result of his mental illness and therefore warrants a more lenient sentence, this Court had an opportunity to observe defendant's behavior in court and in the pens. Defendant only became upset after the victim's testimony and when he did not get his way—to attend Friday service after representing to the Court that he could come to court on Fridays. However, it was clear that that was simply a ruse because even after the Court agreed to adjourn the Friday proceeding, defendant refused to be present for the remainder of the trial. In fact, he became agitated and threatened that if he was not excused, he could become disruptive in front of the jury. In responding to the Court, defendant said, "I don't want to be here, and I don't want to disrupt. Like you, if I disrupt these proceedings while they here, I am going to be in – I am going to have a situation on myself. Am I right? I'm not trying to do that. They are not here right now. I would like to leave, please. I am not comfortable right now. I have this problem that when I get agitated, it just blows, and I am not trying to blow. It's like you said, I'm complying to what

48

you're saying. You told me that" (Proceeding: 287).  Defendant was excused and the Court informed trial counsel to explain that we would not have trial on Friday and that defendant could testify on Monday, as he wished (Proceeding: 292-294). However, defendant still refused to return to court. At that point, the Court noted as follows:

> "[Defendant] has certainly given every indication in words and indeed [sic] that if he is in the courtroom that he is going to act out. He referred several times to a mistrial. He doesn't want to create a mistrial. I think it would be foolish for us to not heed those warnings. He's given us the warnings. He's told us, and we've seen firsthand his demeanor, his behavior, his body language. There is every reason to believe that if he is brought out today, he will act out, and perhaps we'll have a situation that we don't want to have. I'm informed by Mr. Herlich, and Mr. Herlich informed the defendant that in recognition of the fact that all that would happen tomorrow is for Mr. Harrell to testify that we are prepared to give him tomorrow off exactly as he requested. Despite that, he's still refusing to come in this afternoon. Although at the same time he's saying he wants to hear the DNA experts. Well, he can't have it both ways. He can't hear the witnesses that he wants to hear and decide he doesn't want to come in the courtroom. In essence he's highjacking the trial and directing when things are going to happen. So what we are going to do is we're going to continue this afternoon in his absence. (Proceedings: 293-295).

It did not end there. On Monday, when the trial resumed, defendant refused to be present for the trial, and Justice Merchan, the prosecutor and trial counsel went to the pens to speak to defendant about returning to court to testify on his own behalf (Proceeding: 406-410).[13] Still, defendant refused and the trial continued in his absence. Even if defendant's mental illness was a factor in his conduct during trial, nothing in

the record suggests that defendant was not criminally responsible for his crime in this case and that he knew what he was doing when he misbehaved in court, <u>outside the presence of the jury</u>. Defendant was combative with the Court and the court staff, and ultimately, managed to get his way. This Court simply cannot entertain defendant's current claim that his behavior was the result of his mental illness and he deserves mercy.

Importantly, too, when fashioning defendant's sentence, Justice Merchan was well aware that this sexual assault was not aberrational conduct for defendant. The prosecutor reminded the Court that defendant had spent about twenty years in prison for his first-degree assault and robbery convictions where he robbed and slashed a tourist in the face, causing him permanent blindness in one of his eyes. While incarcerated for that crime, defendant was convicted of possessing a metal shank in 2004 (Sentencing: 5-6).

In sum, Justice Merchan recognized that, "[i]f ever a case cried out for the maximum sentence this is it. Not only because of the conduct that he demonstrated and was proven beyond a reasonable doubt to a jury of twelve people who unanimously found him guilty, but also by the conduct that he exhibited here in this courtroom as well as his criminal history" (Sentencing: 14). Put simply, the sentence imposed was wholly justified by the facts of the case, his criminal history, his conduct in court during trial, and the lasting effect defendant's actions had upon an innocent

teenage victim. Defendant had, and still has, offered no compelling reason why he should have received any sentence less than the well-deserved 25 years in prison. Thus, trial counsel was not ineffective at defendant's sentence.

## DEFENDANT'S MOTION TO SET ASIDE THE SENTENCE PURSUANT TO CPL 440.20 SHOULD BE REJECTED.

Defendant also argues that his sentence should be set aside because his trial counsel was ineffective. A trial court may set aside the sentence upon the ground that it was "unauthorized, illegally imposed or otherwise invalid as a matter of law." CPL § 440.20(1). As demonstrated above, because defendant received effective assistance of counsel and the sentence imposed was authorized and legal, his motion to set aside his sentence must be denied.

In conclusion, defendant received the effective assistance of counsel to which he was entitled under both the state and federal standards, and his motion to vacate judgment and sentence should be denied summarily.

Cyrus R. Vance, Jr.
District Attorney
New York County

By: _____

Jung Park
Assistant District Attorney
Of Counsel
(212) 335-4126

[1] Cypress called 911 on July 16, 2014 at 2:23:29 pm (Brown: 225-226; People's Ex. 11A: Sprint report). People's exhibits can be made available for the Court's review upon request.

[2] The People and the defense stipulated that phone number 646-593-3203 belonged to defendant from July 15, 2014 to July 16, 2014 (Court Ex. 1: Stipulation; Transcript of Proceedings: 160).

[3] Ms. Alynka Jean, a criminalist at the New York City Police Department laboratory, testified that she swabbed the top of a purple straw, the rim of a coffee cup and the rim of a glass and submitted the swabs for DNA testing (Jean: 148-158; People's Exs. 15, 16, 17).

[4] Ambulance report, which was part of the medical records, noted that Cypress complained of pain to the right side of her neck and possible "redness to the right side of the neck."

[5] Dr. Singh moistened the swabs for "dry secretions" and took samples from both sides of the bilateral labia, part of the external female genitals (Singh: 359-360).

[6] There were four dried secretion swabs—labeled separately as 1.41, 1.42, 1.43, and 1.44—from the bilateral labia. Amylase was found on the dried secretion swab 1.41 and 1.43 and the vulvar swabs (Tamariz: 315-316).

[7] Autosomal DNA testing looks at "all the information," both alleles from the mother and father, except for the sex determining chromosome. Y-STR testing is the result from only the Y chromosome, which exists only in males (Tamariz: 317, 336-338).

[8] There was insufficient amount of DNA found on the glass for testing.

[9] Arguably, the Supreme Court did not decide *Carpenter* until 2018, which was after defendant submitted his pro-se CPL 440 motion. Nevertheless, the "law was clearly evolving in the appellate courts," *see* Defendant's 440 Motion, p. 19, and the cell site affirmation and order was available to the defense.

[10] In the instant motion, defendant admitted that consent defense was a valid one. *See* Defendant's 440 Motion, Page 22.

[11] Defendant begins his memorandum of law by arguing that the people's case was "weak" because it "rest[ed] exclusively on the 15-year-old complainant's testimony." *See* Defendant's 440 Motion, p. 1. Throughout his motion, defendant maintains that the People's case relied solely on the victim's testimony without any corroboration, and yet, he attempts to argue that the prosecutor should not have commented on the victim's credibility during her summation. He cannot have it both ways. Besides, the People dispute defendant's claims. The evidence against defendant was overwhelming and her testimony was amply corroborated by other independent evidence.

[12] Defendant was convicted of two counts of Criminal Sexual Act in the First Degree (a class B violent felony – 25 years), one count of Attempted Rape in the First Degree (a class C violent felony – 15 years), two counts of Sexual Abuse in the First Degree (a D violent felony – 7 years), and two counts of Criminal Sexual Act in the Third Degree (a class E felony – 4 years). PL § 70.80(5)(c). The only charges that could not run consecutively were the two counts of third-degree criminal sexual act since they constituted part of the single act with first-degree criminal sexual act. However, as to the other five counts, the First Department in *People v. Harrell*, 168 A.D.3d 591 (1st Dept. 2019), held that the sex acts were "separate and distinct, and were not merely two different body movements included in a single crime, as discussed by the Court of Appeals in *People v. Alonzo*, 16 N.Y.3d 267 (2011)." Thus, defendant could have received consecutive sentences for each of the charges for which he was convicted, totaling a maximum sentence of 79 years.

[13] Not only did Justice Merchan go to the pens to talk to defendant personally, but other court staff got involved to try to persuade defendant to be present for his trial: court officers, Sergeant Gelormino, and Captain Garele (Proceedings: 297-299, 391-393, 397-402, 406-408).

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 71

----------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

DECISION AND ORDER
IND. # 4114/17

      - against -

KEVIN BURGOS,

          Defendant.

----------------------------------------------------------------x
Laura A. Ward, J.:

        The defendant has filed a motion to suppress cellular phone location history data ("CSLI"), pursuant to the recent Supreme Court ruling in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). The People oppose the defendant's motion. For the reasons set forth below the defendant's motion is denied.

        On May 14, 2018, the People applied for an order, pursuant to 18 USC § 2703(d), directing Sprint, Corp. to provide historical cell site information, subscriber information, and call/text detail records pertaining to the defendant's cellular phone. This court issued the requested order and received the records from Sprint, Corp. on May 16, 2018. On June 22, 2018, the Supreme Court held "that the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018). Based upon the Supreme Court decision, the defendant argues that the records obtained pursuant to the court order must be suppressed.

        "The exclusionary rule 'was originally created to deter police unlawfulness by removing the incentive' to disregard the law, but also 'serves to insure that the State itself, and not just its police officers, respect the constitutional rights of the accused.'" *People v. Jones*, 2 N.Y.3d 235, 241 (2004), *quoting, People v. Payton*, 51 N.Y.2d 169, 175 (1980). "The applicability of the exclusionary rule to the cases at bar are dependent upon a balancing of its probable deterrent effect against its detrimental impact upon the truth-finding process." *People v. McGrath*, 46 N.Y.2d 12, 21 (1978).

        At the time that the People sought the court order, the Supreme Court had not issued a ruling in *Carpenter*. New York courts have consistently held that "obtaining defendant's CSLI without a warrant did not violate the Fourth Amendment because, under the Federal Constitution, defendant had no reasonable expectation of privacy while traveling in public." *People v. Hall*, 86 A.D.3d 450, 451 (1st Dept., 2011). This court concludes that "evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 241 (2011). Suppression of the CSLI would not deter unlawful searches by removing an incentive. Rather, the People acted in compliance with the governing law in New York when they requested the court order and suppression would only result in a detrimental impact upon the truth-finding process.

        In addition, New York appellate courts have permitted trial courts to examine orders to determine whether sufficient probable cause existed to support a search warrant. *People v. Sorrentino*, 93 A.D.3d 450, 451 (1st Dept., 2012). After a review of the People's application, this court concludes that

"the order was effectively a warrant" because it contained sufficient probable cause to support the issuance of a warrant. *Id.* Therefore, the defendant's motion to suppress the subpoenaed records is denied.

      The foregoing is the decision and order of the court.

Dated: New York, New York
      August 8, 2018

                            Laura A. Ward
                   Acting Justice Supreme Court

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Lonnie Harrell,

Defendant.

**AFFIRMATION IN SUPPORT OF THE PEOPLE'S RESPONSE TO DEFENDANT'S MOTION TO VACATE THE JUDGMENT OF CONVICTION AND SENTENCE**

**IND. NO.     04258/2014**

Cyrus R. Vance, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

Jung Park
Assistant District Attorney
Of Counsel

1

**EXHIBIT H**

**Petitioner's Reply in Further Support of Motion to Vacate**

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: CRIMINAL TERM: PART 59

THE PEOPLE OF THE STATE OF NEW YORK,

    *Respondent*,

  *v.*

LONNIE HARRELL,

    *Defendant-Movant.*

N.Y. Cty. Ind. No 4258/14

Merchan, J.

### REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE THE CONVICTION AND SENTENCE.

This memorandum of law replies to the government's memorandum ("Govt. Br.") in opposition to Mr. Harrell's motion to vacate the conviction and sentence ("Opening Br.").

### Ineffective Assistance of Trial Counsel

**A. Deficient Performance**

**1. The Cell-Site-Suppression Blunder**

The government argues that counsel's failure to advance a cell-site-suppression argument[1] was effective assistance because the exclusionary rule does not apply to searches performed in good-faith reliance on a statute (here, 18 U.S.C. § 2703(d), the statute declared unconstitutional in *Carpenter v. United States*[2]). In so arguing, the government invokes the *federal* "good faith

---

[1] Opening Br. 17-23.

[2] 138 S. Ct. 2206 (2018).

exception" to the exclusionary rule adopted by *United States v. Leon* and its progeny.[3]

This argument fails because New York law rejects *Leon*'s good-faith doctrine. In *People v. Bigelow*, the Court of Appeals "decline[d], on State constitutional grounds, to apply the good-faith exception the Supreme Court stated in *United States v Leon*."[4] Thus, the *Leon* line of "good faith" cases is irrelevant to the question of whether counsel was ineffective in failing to at least preserve the cell-site-suppression claim for appellate review.

For this reason, this Court should not follow the trial-level decision in *People v. Burgos*,[5] which denied a motion to suppress cell-site data acquired before *Carpenter* was decided. *Burgos* cited *Davis*, a federal good-faith case, without addressing New York's rejection of the good-faith exception. As *Burgos* rests on a doctrine definitively rejected by New York courts, this Court should not adopt its flawed reasoning.

Nor does it matter that the § 2703(d) application, which never even claimed probable cause, may have established probable cause.[6] For a century, the Supreme Court has repeatedly held that "[s]earches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably

---

[3] Govt. Br. 23-25; *see United States v. Leon*, 468 U.S. 897 (1984) (adopting a "good faith exception" to the exclusionary rule that permits the introduction of evidence obtained in good faith reliance on a defective warrant); *Illinois v. Krull*, 480 U.S. 340 (1987) (holding that under *Leon*'s good-faith doctrine, the exclusionary rule does not apply to evidence obtained in good-faith reliance on an unconstitutional statute); *Davis v. United States*, 564 U.S. 229 (2011) (same as to a search performed in good-faith reliance on precedent).

[4] 66 N.Y.2d 417, 427 (1985).

[5] Ind. No. 4114/2017 (Sup. Ct. N.Y. 2018) (Ward, J.) (cited by Govt. Br. 24).

[6] Govt. Br. 21-22.

showing probable cause.'"[7] Thus, a judge must *find* probable cause *before* the search (which never happened here). If the government bypasses this fundamental requirement, it cannot save a search with the after-the-fact claim that the warrant affidavit revealed probable cause.[8] This Court's decision in *People v. Cutts* recognized this point as it held that the search order "complied with the [warrant] requirement under *Carpenter*" because the order specifically said that "probable cause has been established."[9]

To the extent dictum from *People v. Sorrentino*[10] suggests that a court need not *find* probable cause *before* the police perform a search, no reasonable lawyer would have been scared away by dictum that violates settled Supreme Court law dating back a century.

### 2. The Y-STR Blunders

Even if (as the government insists) it were "relevant" that Mr. Harrell and *millions* of other males could have contributed the Y-STR profiles at issue,[11] that trivial relevancy was drastically *outweighed* by the evidence's tendency to mislead.[12] The government offers no position on this prejudice/probity

---

[7] *Katz v. United States*, 389 U.S. 347, 356-57 (1967) (quoting *Agnello v. United States*, 269 U.S. 20, 33 (1925)); *Coolidge v. New Hampshire*, 403 U.S. 443, 451 (1971) (the "existence of probable cause" does not justify "noncompliance with the warrant procedure") (citing *Agnello*, 269 U.S. at 33); *Johnson v. United States*, 333 U.S. 10, 13-14 & n. 4 (1948) ("Any assumption [by police] that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . 'Belief, however well founded, that [evidence is in a] house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.") (quoting *Agnello*, 269 U.S. at 33); *Nathanson v. United States*, 290 U.S. 41, 47 (1933) (a judge "may not properly issue a warrant to search . . . unless he can *find* probable cause") (emphasis added).

[8] *E.g.*, *Coolidge*, 304 U.S. at 451; *Katz*, 389 U.S. at 356-57; *Johnson*, 333 U.S. at 13-14; *Agnello*, 269 U.S. at 33.

[9] *People v. Cutts*, 62 Misc.3d 411, 415 (2018).

[10] 93 A.D.3d 450, 451 (1st Dept. 2012) (cited by Govt. Br. 21-22).

[11] Govt. Br. 33-34.

[12] Opening Br. 23-25.

balancing question, instead only insisting that the evidence had some relevance.[13]

Nor does the government deny that counsel (1) drastically understated the total number of males that could have contributed the Y-STR profile (it was "millions" of males not just "thousands" as counsel stated) and (2) mistakenly indicated to the jury that only African-American or Hispanic males could have contributed the Y-STR profile.[14] Instead, the government's argument seems to be that the jury probably got the message that the Y-STR evidence was not particularly reliable.[15] Whatever message the jury got, it was not the message the *facts* commanded. Telling a jury that thousands of Hispanic and African American males in "New York City" could have committed the crime is drastically different than telling the jury that *millions* of males—of all races throughout the world—could have done so.[16] A defense lawyer who drastically overstates the probative value of the government's DNA evidence plays with fire.

### 3.  The summation blunders

The prosecutor claims that she permissibly argued that identity was not "an issue" and that Mr. Harrell was "not claiming that someone else did this" even though defense counsel *challenged* identity and certainly never conceded it.[17] The prosecutor cites no authority in support of that claim. None exists.

The government adds that the following comments were relevant to the question of forcible rape and were not emotional appeals:

- the complainant's father's trip to New York from Georgia "show[ed] that the victim was sexually assaulted";

- the complainant had not yet had her "Sweet 16th";

---

[13] Govt. Br. 34.

[14] Opening Br. 25-27.

[15] Govt. Br. 32-33.

[16] Opening Br. 25-27.

[17] Govt. Br. 41; Opening Br. 31-32.

- the complainant had "spent two weeks in Montana volunteering" and hoped to "go to college after she finishes high school"; and

- "[The mother] broke down on the stand when she said that she has never seen her daughter in that state before. Can you imagine what a mother must have felt at that moment? Feeling so helpless, not having been able to protect her daughter? Watching the aftermath of her daughter having gone through something so horrific? Ms. Smith's reaction speaks volumes about the non-consensual nature of the sex acts."[18]

These emotional arguments had nothing to do with logical inferences based on the evidence. Further, the comments about the parents' reactions were misleading because the parents were not witnesses to the purported assault. Their reactions to their daughter's allegations proved nothing.

### B. Prejudice

Drastically overstating the strength of its case, the government repeatedly insists that the evidence of forcible rape and identity was "overwhelming."[19] But where, as here, "[t]he prosecution's entire case rested on the credibility of the alleged victim," blunders that enhance that key witness' credibility undermine confidence in the outcome.[20]

Complainant's allegations to the 911 operator and responding officers do not disprove prejudice.[21] As the Court of Appeals has long held, prior consistent statements have minimal probative value.[22] Indeed, these prior statements are consistent with the complainant reporting an offense to the

---

[18] Govt. Br. 31-33.

[19] Govt. Br. 15, 16, 26, 29, fn. 11; *Strickland*, 466 U.S. at 693-94.

[20] *Gersten v. Senkowski*, 426 F.3d 588, 608-12 (2d Cir. 2005); *Strickland*, 466 U.S. at 693-96.

[21] Govt. Br. 26.

[22] *People v. Rosario*, 17 N.Y.3d 501, 513 (2011) ("[A]n untrustworthy statement is not made more trustworthy by repetition[.] . . . [T]he inadmissibility of an unimpeached witness's prior consistent statements is based on the theory that simple repetition does not imply veracity [and] that such statements are presumed to lack probative value.") (internal quotation marks and citations omitted).

police after feeling shame or remorse from consensual sexual activity with either Mr. Harrell or another man. The jury may very well have concluded that this is exactly how an intelligent high-school teenager who was making false allegations would behave. But counsel's failure to challenge the cell-site data, the Y-STR evidence, the summation, and the read-back[23] significantly enhanced the complainant's credibility, thus prejudicing the defense.[24]

As for identity, the government claims, without explanation, that to "suggest that someone else sexually assaulted the victim immediately after defendant was in her apartment having a smoothie would be absurd."[25] The government never explains why that is so. The odd contention that Mr. Harrell's purportedly sharing a beverage with the complainant in the middle of the day proves he committed sexual assault is baseless.

Furthermore, there is no evidence—beyond the complainant's testimony—that Mr. Harrell had a refreshment with the complainant *just before* the sexual assault was reported, as the government seems to suggest.[26] The DNA evidence found on the cup/straw may have proven that Mr. Harrell drank from the cup at *some* point, but it did not prove that he did so just before the complainant called 911 and reported a sexual assault.

---

[23] *See* Opening Br., Argument § C. As for counsel's failure to request that impeachment material be read back to the jury, the government's claim that the jury did not specifically request the impeachment material ignores that under settled law, a request for a readback presumptively includes testimony impeaching it. *Id.* Counsel, who relied heavily on an impeachment claim in summation, had no strategic reason for failing to ensure that the jury heard the impeachment testimony when deliberating. *Id.*

[24] The government's claim that Mr. Harrell's calling the complainant after the purported incident proves a sexual assault is illogical speculation that defies common sense. Govt. Br. 26. Such contentions flatly ignore that the reasonable doubt standard, which the jury was tasked with following, actually has teeth.

[25] Govt. Br. 25-26, 32-33.

[26] Govt. Br. 25-26, 32-33.

The bottom line is that this was effectively a single-witness case. Counsel's blunders, which artificially enhanced that witness' credibility, "undermine confidence" in the trial's outcome.[27]

## C. This Court should reject the government's procedural argument.

Citing Mr. Harrell's prior *pro se* motion—filed before the direct appeal's perfection and seeking dismissal on double jeopardy and due process grounds—the government invokes the discretionary successive-motion bar.[28] The claim fails.

Under C.P.L. § 440.10(3)(c), a court "may" deny a § 440.10 motion when, "[u]pon a previous motion . . . the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."[29] Further, even if this bar applies, a court may, in "the interest of justice and for good cause shown," exercise "its discretion [to] grant the motion if it is otherwise meritorious."[30]

---

[27] *Strickland*, 466 U.S. at 693-94.

As for the readback (*see* Opening Br. § C) and summation issues, the government misstates the applicable ineffective-assistance-prejudice standards. The government incorrectly claims we must show "serious prejudice" from an incomplete readback. Govt. Br. 35-36 (quoting *People v. Lourido*, 70 N.Y.2d 428, 435 (1987)). But that is an appellate-prejudice standard that governs preserved readback errors, not the ineffective-assistance claims raised here. *Strickland*, 466 U.S. at 693-94.

Similarly, the Supreme Court has rejected the government's theory that to prevail on a claim of ineffective assistance, a defendant must show he was deprived of a "fair trial." Govt. Br. 39, 43 (arguing that we must show that the summation deprived Mr. Harrell of a fair trial); *Williams v. Taylor*, 529 U.S. 362, 393-94 (2000) (requiring a defendant to show "fundamental unfairness" violates *Strickland*). A defendant need only show a reasonable probability of a different outcome, defined as a probability sufficient to undermine confidence in the verdict. *Williams*, 529 U.S. 362 at 391-94.

[28] Govt. Br. 12 (citing C.P.L. §440.10(3)(c)).

[29] C.P.L. §440.10(3)(c).

[30] C.P.L. §440.10(3).

This procedural bar does not apply to C.P.L. § 440.20 claims that sentencing counsel was ineffective. *See* below, pps. 9-10.

First, as Mr. Harrell was not "in a position adequately to raise" the ineffective assistance "issue[s]" presented here, the § 440.10(3)(c) bar is inapplicable. It is inconceivable that a lay defendant could identify, research, and develop this constitutional claim, especially when in prison.[31] Similarly, unlike counsel who had resources to investigate this claim, Mr. Harrell could not meaningfully interview his former lawyer from prison (whom even appellate counsel had trouble getting in contact with); efficiently request medical records; or obtain court documents (as counsel was later able to do). To claim that Mr. Harrell, an incarcerated pro se defendant, was in "position" to "adequately" raise this claim is to blink reality.

In any event, this Court should exercise its discretion to review this claim because the "interest of justice" and "good cause" justify review.[32] As the Court of Appeals held in *People v. D'Alessandro*, it would be an abuse of discretion to "refuse to entertain the second application in this case, which was brought by counsel" and "raised different and much more substantial arguments than those previously raised [pro se]."[33]

As *D'Alessandro* confirms, it would be unjust to trap a *pro se* defendant in this procedural bar. It is hard to see how any interest, let alone the "interest of justice," is served by dismissing a counseled petition simply because a pro se defendant had previously rushed into court before his direct appeal was perfected. This Court should decline to turn motion practice into a "gotcha" game.[34]

---

[31] *See People v. Page*, 115 A.D.3d 1067, 1068-69 (3d Dept. 2014); *Lancaster v. Kindor*, 98 A.D.2d 300, 307 (1st Dept. 1984) (per curiam) (a *pro se* litigant may "be granted procedural liberties not generally afforded attorneys representing clients at the bar"), *affd. on op. below*, 65 N.Y.2d 804 (1985)).

[32] C.P.L. § 440.10(3).

[33] *People v. D'Alessandro*, 13 N.Y.3d 216, 221 (2009) (analyzing a successive coram nobis claim alleging ineffective assistance of appellate counsel).

[34] *People v. Whipple*, 97 N.Y.2d 1, 7 (2001).

Further, applying the successive petition bar here would violate the purpose of that provision: efficiency. Mr. Harrell's *pro se* motion was quickly and summarily rejected on procedural grounds (because the claims were preserved and could be raised on direct appeal). As there was virtually no efficiency lost in the litigation of that *pro se* motion, it would be unfair to now block a comprehensive counseled motion that is properly brought under C.P.L. § 440.10.

Similarly, Mr. Harrell has "good cause" for his failure to raise this claim in a prior motion: he is not a lawyer trained in the law. Not only that, but, as explained above, Mr. Harrell lacked the ability to investigate this ineffective-assistance claim as a lay and incarcerated defendant.

In sum, C.P.L. § 440.10(3)(c) does not apply because Mr. Harrell was not in a position adequately to raise this claim. In any event, the interests of justice and good cause justify review of the merits.[35]

### Ineffective Assistance at Sentencing (C.P.L. § 440.20)

The government does not deny that counsel's disparagement of his own client and his failure to advance any argument in sentencing constituted deficient performance.[36] Thus, deficient performance is conceded.[37]

As for prejudice, the government glosses over our argument that prejudice is presumed because counsel did *nothing* at sentencing to advance his client's interests.[38] Instead, in denying that counsel's non-existent advocacy was prejudicial, the government illogically relies on points that were enhanced precisely *because of* counsel's deficient performance. The government emphasizes that Mr. Harrell disrupted the proceedings and absented

---

[35] C.P.L. § 440.10(3).

[36] Opening Br. 33-35.

[37] *People v. Gruden*, 42 N.Y.2d 214 (1977).

[38] Opening Br. 33-34.

himself.[39] But counsel failed to request Mr. Harrell's medical records or even call the court's attention to Mr. Harrell's mental health diagnoses, which mitigated that courtroom behavior.[40] Counsel then volunteered to the court that Mr. Harrell did not want to attend sentencing because he was angry—a senseless and prejudicial move.[41] And finally, counsel never even bothered to inform the court that disruption did not justify an extra five, ten, or fifteen years in prison.[42]

The government frivolously claims that sentencing counsel secured a good result because a maximum sentence of 25 years in prison and 15 years of PRS was "lenient." This is so, the claim goes, because a longer "consecutive" sentence was theoretically available for each purportedly discrete act underlying the sexual assault.[43] A murder-length sentence is anything but "lenient"—in fact that was the very sentence the prosecutor recommended.[44] Accordingly, there was no reasonable possibility that consecutive sentences would have been imposed in this case. Indeed, consecutive sentencing under these circumstances—which would have enhanced an already decades-long sentence—would be rather unprecedented.

In the end, Mr. Harrell needed a lawyer who would at least try to advocate for a sentence lower than 25 years. Instead, his lawyer made no arguments on his behalf and informed the court that his client was angry. This serious breakdown in advocacy "so undermined the proper functioning of the

---

[39] Govt. Br. 45-48.

[40] Opening Br. 34-35; *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (counsel was ineffective for failing to obtain records relevant to sentencing).

The government notes that a self-reported mental-health diagnosis was in the PSR. Govt. Br. 47-48. But effective counsel does not hope that a court will discover a diagnosis buried in a document. Instead, effective counsel marshalls documentary evidence in support of his client.

[41] Opening Br. 34.

[42] Opening Br. 34.

[43] Govt. Br. 44.

[44] A945; Govt. Br. 44.

adversarial process" that this sentencing proceeding cannot be "relied on as having produced a just result."[45]

## <u>Conclusion</u>

This Court should vacate the judgment in its entirety. At a minimum, this Court should hold this motion in abeyance and order a cell-site-suppression hearing and a Y-STR-preclusion hearing. Further, at a minimum, this Court should order a de novo sentencing hearing. To the extent this Court determines there are outstanding issues of fact, including issues of fact involving counsel's performance, C.P.L. § 440.30 mandates a hearing.

Respectfully Submitted,

Robert S. Dean
Center for Appellate Litigation
*Attorney for Defendant-Movant*

Matthew Bova
*Of Counsel*
October 9, 2020

---

[45] *Strickland*, 466 U.S. at 686.

# EXHIBIT I

# Motion for a Certificate Granting Leave to Appeal

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK

     *Respondent*,

     *v.*

LONNIE HARRELL,

     *Defendant-Appellant*

NOTICE OF
MOTION FOR A
CERTIFICATE
GRANTING
PERMISSION TO
APPEAL UNDER
CPL 460.15

N.Y. Cty. Ind. No.
4258/14

TAKE NOTICE that upon the affirmation of counsel, the exhibits, the record below, and all prior proceedings, Defendant-Appellant Lonnie Harrell will move a Justice of this Court, at a term for motions thereof, to be held on Monday, April 19, 2021 at the Courthouse, 27 Madison Avenue, New York, New York 10010 at 10:00 a.m., or as soon thereafter as counsel can be heard, for an order: **(1.)** issuing a certificate granting Mr. Harrell leave, under C.P.L. § 460.15, to appeal a New York County Supreme Court order, dated January 29, 2021 (Merchan, J.), which denied his C.P.L. § 440.10 motion to vacate an October 21, 2015 judgment of conviction and his C.P.L. § 440.20 motion to vacate the sentence; **(2.)** granting Mr. Harrell permission to appeal the order as a poor person,

1

assigning Robert S. Dean as counsel; and **(3.)** granting such other or further relief as the Court deems just and proper.

**DATED:**  March 25, 2021

**FROM:**   ROBERT S. DEAN
*Attorney for Defendant-Appellant*
Center for Appellate Litigation
120 Wall St, 28th Floor
New York, New York 10005

MATTHEW BOVA
*Of Counsel*
mbova@cfal.org
(212) 577-2523 (ext. 543)

**TO:** Clerk of the Court
Appellate Division First Department
27 Madison Avenue
New York, New York 10010
BY EMAIL:
AD1criminal@nycourts.gov

**CC:** New York Cty. Dist. Attorney's Office
1 Hogan Place
ATTN: Appeals Bureau
New York, New York 10013
BY EMAIL:
APPEALSMTNS@dany.nyc.gov

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

    *Respondent*,

               *v.*

LONNIE HARRELL,

    *Defendant-Appellant*.

AFFIRMATION OF COUNSEL

N.Y. Cty. Ind. No. 4258/14

STATE OF NEW YORK   )
                        ) ss:
BRONX COUNTY       )

MATTHEW BOVA, an attorney admitted to practice law in New York courts, affirms, under penalty of perjury, that the following statements of fact are true or, if stated on information and belief, that he believes them to be true:

### PRELIMINARY STATEMENT

I am an associate of the Center for Appellate Litigation, which represents Defendant-Appellant Lonnie Harrell on his appeal from a January 29, 2021 order denying his C.P.L. § 440.10/440.20 motion to vacate his October 21, 2015 judgment of conviction and sentence (New

1

York County Supreme Court; Merchan J.). Ex. A ("Decision"). That judgment convicted Mr. Harrell of first-degree criminal sexual act and related felony charges and sentenced him to an aggregate sentence of 25 years in prison and 15 years of PRS.

I make this affirmation in support of Mr. Harrell's motion for leave to appeal the January 29, 2021 order under C.P.L § 460.15. No prior application for permission to appeal that order has been made.

Mr. Harrell previously perfected his direct appeal of this judgment. This Court affirmed the judgment on January 29, 2019 (168 A.D.3d 591) and the Court of Appeals denied leave on April 8, 2019 (33 N.Y.3d 976).

This motion is timely as it was filed within 30 days of service of the underlying order. C.P.L. § 460.10(4)(a); 22 N.Y.C.R.R. 1250.11(b)(1). Ex. A (copy of notice of entry, dated February 24, 2021). That notice was received, by e-mail, on February 24, 2021, thus rendering this application timely.

Mr. Harrell seeks permission to appeal every state constitutional and federal constitutional claim raised and/or decided below, including his claims that defense counsel was ineffective during both the pretrial, trial, and sentencing stages. *People v. Mercado*, 147 A.D.3d 613, 616 (1st Dept.

2

2017); *Strickland v. Washington*, 466 U.S. 668 (1984); U.S. Const. amends. 6, 14; N.Y. Const. art. I § 6; C.P.L. § 440.10(1)(h), 440.20(1); Exs. B (opening motion) and D (reply).

In support of this application, the following exhibits have been attached:

- Exhibit A (underlying decision with notice of entry);
- Exhibit B (opening motion and appendix);
- Exhibit C (prosecution's opposition);
- Exhibit D (reply);
- Exhibit E (excerpts of briefs in *People v. Carr*, 168 A.D.3d 551 [1st Dept. 2019]); and
- Exhibit F (decision in *People v. Rivera* (N.Y. Cty. Sup. Ct. June 26, 2019)).

## INTRODUCTION

This is an application for a certificate granting leave to appeal a supreme court order that denied Mr. Harrell's motion to vacate the judgment and sentence on the grounds of ineffective assistance of counsel.

At his 2015 sentencing hearing, Mr. Harrell was facing essentially the rest of his life behind bars. But sentencing counsel made *no* argument on his behalf. The C.P.L. § 440.20 motion court found, without even holding

3

a hearing, that counsel's silence was somehow "sound and strategic." Decision 14-15. In so holding, the motion court essentially adopted the flawed theory that the fundamental right to effective assistance of counsel requires nothing more than a "warm body" with a law license. *Patrasso v. Nelson*, 121 F.3d 297, 304 (7th Cir. 1997). On the contrary, sentencing proceedings are critical stages that demand zealous advocacy. *Mempa v. Rhay*, 389 U.S. 128, 135 (1967) ("[T]he necessity for the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case as to sentence is apparent."). This Court should grant leave to confirm that New York attorneys are held to a meaningful standard of sentencing advocacy.

The important question of whether sentencing counsel is ineffective when he fails to present anything in mitigation is—unlike in *People v. Carr*, 168 A.D.3d 551, 553 (1st Dept. 2019)—properly presented in a C.P.L. § 440.20 motion as opposed to a direct appeal. *Carr*, 168 A.D.3d at 553 (finding ineffective-assistance-of-sentencing claim unreviewable because it was raised on direct appeal); Ex. E: Carr App. Div. Br. 76-77 (arguing that sentencing counsel was ineffective because he did not

4

advocate for his client at sentencing). This Court should answer this open constitutional question here to ensure that New York attorneys are held to a meaningful standard at sentencing.

The motion court's decision regarding trial counsel's effectiveness was similarly flawed. The motion court found that trial counsel can reasonably choose to abandon a powerful motion to preclude damaging and inadmissible DNA evidence so long as he tries to challenge that evidence at trial. Decision 13. But as the Second Circuit has recently held, while challenging damaging evidence at trial is a reasonable "fallback strategy" position if a preclusion motion fails, no reasonable lawyer concludes that challenging evidence at trial is a valid substitute for outright preclusion. *United States v. Nolan*, 956 F.3d 71, 81, 83 (2d Cir. 2020). This Court should grant leave to appeal to consider whether the Second Circuit's view is correct.

## TRIAL

### <u>Indictment</u>

Based exclusively on complainant's testimony, the State indicted Mr. Harrell with seven felony sex-offense counts, including two counts of first-degree criminal sexual act (oral-vulval and oral-penile contact),

attempted first-degree rape (sexual intercourse), and two counts of first-degree sexual abuse (digital-vaginal and mouth-to-mouth contact).[1] Each of the seven counts required forcible compulsion, with the exception of the last two (third-degree criminal sexual act [mouth-to-vulval and penile-oral contact]), which required that the complainant be under 17. Mr. Harrell, age 53 at the time of trial, was facing the rest of his life in prison for these charges.

## A. The Y-STR Evidence

An OCME lab report (dated April 1, 2015) explained the results of comparing male DNA information—that is, "Y-STR"—found on swabs of the complainant's mouth and vaginal area.[2] This Y-STR analysis compared the Y-chromosomal alleles (genetic information) at 15 locations of the DNA chain. Although the Y-STR profiles uncovered were consistent with the profiles of *millions* of males, OCME reported the information much differently, stating that the Y-STR profile found on complainant's labia would be "expected to be found in approximately . . .

---

[1] Ex. B: Appendix to Motion 1-3 ("A").

[2] A1017-18.

6

1 in 685 African American males, 1 in 1330 Asian males, 1 in 562 Caucasian males [and] 1 in 400 Hispanic males."[3] And as for the oral swab, OCME reported that the Y-STR profile "is expected to be found in approximately 1 in 321 African American males, 1 in 439 Asian males, 1 in 125 Caucasian males [and] 1 in 120 Hispanic males."[4]

## B. Trial

The prosecution's case centered on complainant's testimony.[5] Complainant testified that on July 16, 2014, Mr. Harrell—who lived in her building and had been in her apartment "many times before"— knocked on her door to ask her brother to go for a bike ride.[6] Her brother was not home, but she invited Mr. Harrell inside for a refreshment and they sat on her couch and talked while she ate her lunch.[7] The

---

[3] A1017.

[4] A1018.

[5] A389-A448.

[6] A400-01, A439.

[7] A401, A407.

complainant, then 15 years old, asked Mr. Harrell to leave so she could do chores.[8]

The complainant hugged Mr. Harrell but alleged that Mr. Harrell then choked her neck, threatened her, kissed her, removed her clothing, performed oral sex on her, rubbed his penis against her vagina, and forced her to perform oral sex.[9] Complainant testified that during this encounter, she told Mr. Harrell not to penetrate her vagina, so he stopped.[10] The complainant called 911 and reported that a neighbor had sexually assaulted her.[11]

After a comprehensive physical examination, doctors found no evidence corroborating complainant's allegations of forcible compulsion, such as that she was choked. Similarly, photographs taken after the purported incident don't support such a contention.[12] Months later, Mr.

---

[8] A407.

[9] A408-21.

[10] A415-16.

[11] A425-28; Pros. Ex. 11 (audio recording of 911 call).

[12] A703-24; A1008-13.

Harrell turned himself into the police after learning of the complainant's allegations.[13]

An OCME Criminalist (Tamariz) testified the Y-STR profiles developed from swabs of complainant's mouth (semen) and vaginal area (saliva) reflected the Y-chromosomal "alleles" present at 15 locations of the DNA chain. Mr. Harrell could not be "excluded" because "all the numbers at all the [15] locations are the same."[14]

The prosecution introduced the OCME file into evidence, which contained the rates at which the recovered profile would be observed in particular demographics (summarized above).[15] Counsel objected to the admission of this DNA evidence on chain-of-custody grounds but made no other objections.[16]

Defense counsel's summation reduced, by a significant magnitude, the pool of individuals who could have matched the Y-STR profile. He told the jury that "1 in 685 *African males*, thousands of individuals in New

---

[13] A588-89.

[14] A686-87.

[15] A1017-18.

[16] A679.

York City, could have contributed that DNA to the labia and vulva of the complaining witness if you want to speak scientifically about this. . . . 1 in 321 *African* males could have contributed the DNA to the Y chromosome of DNA."[17] Counsel emphasized that the Y-STR results "don't rule out" Mr. Harrell or "any Hispanic male relatives and they don't rule out thousands of African males simply in the confines of New York City, let alone in the United States or in the world."[18]

Contrary to this flawed recap, OCME had never found that the Y-STR evidence could *only* be found in "African" or "Hispanic male relatives." Instead, OCME had summarized the rate at which this Y-STR profile would be found in four races (including Caucasian and Asian males too).[19] Also, there were millions of males globally that could have matched this profile, not just "thousands of African males."

## **Verdict**

The jury convicted Mr. Harrell of all seven charged counts.

---

[17] A793-94.

[18] A795.

[19] A1017-18.

## **Sentencing**

At sentencing, Mr. Harrell faced a minimum sentence of 10 years in prison and a maximum sentence of 25 years.

Before the sentencing hearing began, a court officer indicated that Mr. Harrell was refusing to attend the sentencing proceeding.[20] And at several earlier points during the trial, Mr. Harrell absented himself from court because (1) he was frustrated that he could not attend religious services and did not want to be disruptive in the jury's presence; and (2) he objected to being shackled.[21]

Defense counsel stated he had spoken with Mr. Harrell who was "very upset" about the shackling requirement.[22] Counsel supplied no explanation for Mr. Harrell's behavior despite (1) the pre-sentence-investigation report's reference to Mr. Harrell reporting a "paranoid schizophrenia" diagnosis;[23] and (2) Mr. Harrell's prior in-court statement

---

[20] A940.

[21] A165, A633-50, A745-46, A760, A897-98.

[22] A940.

[23] A1028 ("[Defendant] informed while at liberty he was treated for paranoid schizophrenia and depression on a monthly basis").

11

that he was on "meds" and did not want to "spaz out" in court.[24] Instead, defense counsel told the court that when he discussed Mr. Harrell's attendance at sentencing, Mr. Harrell became "angry" and exited the interview booth.[25] Sentencing continued in Mr. Harrell's absence.

Defense counsel "ask[ed] the Court to consider a sentence, the minimum of course on the B felonies are ten years, the maximum is 25 years. I ask that the sentence of this Court be in the range of ten years up to 15 years, plus the period of five years post release supervision."[26] But counsel made no argument in support of that request.[27] Nor did he share any information with the court about Mr. Harrell, his background, or his serious psychiatric condition.[28]

The prosecution sought a maximum 25-year sentence because of a prior robbery conviction, the present offense's seriousness, and Mr.

---

[24] A642.

[25] A940.

[26] A943.

[27] A943.

[28] A943.

Harrell's prior "behavior" in court.[29] Complainant's mother read complainant's statement and her own.[30]

Referring to Mr. Harrell's courtroom behavior and absences, the court stated that "the record is clear as to everything Mr. Harrell did during . . . this trial and the ways that he basically tried to highjack these proceedings."[31] The court found a maximum sentence warranted because of the seriousness of the offense, Mr. Harrell's criminal record, and the "conduct that he exhibited here in this courtroom."[32]

The court sentenced Mr. Harrell to the maximum prison sentence on each of the seven counts and ran them concurrently, thus producing an aggregate sentence of 25 years in prison and 15 years of post-release supervision.[33]

---

[29] A943-45.

[30] A945-50.

[31] A951-52.

[32] A952.

[33] A952-53.

13

## C. Direct Appeal

In 2018, Mr. Harrell appealed to the First Department, arguing that the counts were multiplicitous and that the court violated his right to be present during several stages of the trial. This Court affirmed the judgment in January 2019 and the Court of Appeals denied leave several months later.[34]

## D. Post-Conviction Investigation into Counsel's Performance

On April 23, 2020, post-conviction counsel discussed this case with defense counsel, Theodore Herlich, by phone. Mr. Herlich stated that he did not move to preclude the Y-STR evidence on the grounds that it was more prejudicial than probative because the expert he had retained—who was not an attorney—did not advise him to make such a motion. He was also unaware that Mr. Harrell had any diagnosed mental-health disorders.[35]

---

[34] 168 A.D.3d 591 (1st Dept. 2019), *leave denied* 33 N.Y.3d 976 (April 8, 2019).

[35] Ex. B: Bova Aff. ¶ 14-16.

14

Defense counsel subsequently refused to sign an affidavit affirming an account of his representation in this case.[36]

## E. 440 Litigation

On June 25, 2020, Mr. Harrell moved to vacate his judgment of conviction on the grounds that trial and sentencing counsel (Herlich) was ineffective. Specifically, he argued that counsel committed a steady stream of blunders as he failed to:

- move to suppress cell-site-locational data which placed Mr. Harrell at the scene of the purported incident and indicated that he fled the scene thereafter;

- move to preclude "Y-STR" DNA evidence (purportedly linking Mr. Harrell's DNA profile to a profile found on swabs of complainant's body) on the grounds that it was more prejudicial than probative, and then drastically overstated this evidence's probative value in summation;

- object to the prosecutor's prejudicial summation, including her repeated—and incorrect—claim that Mr. Harrell was not denying he engaged in sexual activity with complainant;

- request a read back of complainant's impeachment testimony in response to an important request for a readback of her testimony even though that impeachment was an important element of his summation; and

- make any argument at sentencing, instead disparaging his own client as "angry" and then failing to convey important psychiatric-diagnosis evidence to the sentencing court.

---

[36] Ex. B: Bova Aff. ¶ 17.

In support of the motion, motion counsel supplied an affirmation confirming: (1) motion counsel's phone conversation with Mr. Herlich (summarized above); and (2) that Mr. Herlich refused to provide an affidavit. Ex. B: Bova Aff. ¶ 14-17.

## F. Decision

The motion court denied Mr. Harrell's motion without a hearing on the deficient-performance grounds. Ex. A at 13-16.[37] The court did not address prejudice. *See Strickland*, 466 U.S. at 687-88, 693-94 (a defendant must show deficient performance, that is, objectively unreasonable lawyering inconsistent with "prevailing professional norms," and a "reasonable probability" that but for counsel's blunder(s), the outcome would have been different).

As for the Y-STR-preclusion blunder, the court said nothing about the merits of the Y-STR-preclusion motion. Instead, the court stated that

---

[37] The court rejected the prosecution's argument that the C.P.L. § 440.10 motion should be denied on the grounds that Mr. Harrell previously filed a *pro se* § 440.10 motion (prior to his direct appeal), which had raised a multiplicity argument that could only be raised on direct appeal. Decision at 8-9 (invoking its discretionary power to review a successive motion under C.P.L. § 440.10(3)(c)).

16

counsel "effectively cross-examined the DNA criminalist and elicited that all paternal relatives of the Defendant would have the same Y-STR DNA profile and that thousands of males could have contributed the DNA." *Id.* at 13.

The court also, without a hearing, found counsel's silence at sentencing "sound and strategic." Decision 14-15. As for Mr. Harrell's claim that it was senseless for Mr. Herlich to inform the court that his client was "angry" and did not want to come to court, the motion court claimed we "distort[ed]" the record. Decision 14. But the court then correctly quoted the sentencing transcript, where counsel conveyed that his client was "'angry, he stood up in the small interview booth that they were in together and walked out.'" Decision 14 (quoting A940). And although Mr. Harrell specifically alleged that counsel was ineffective for failing to inform the court that Mr. Harrell's schizoaffective and bipolar-disorder diagnoses mitigated his courtroom behavior, the court did not specifically address that claim. Ex. B: Bova Aff. ¶ 18 and Memo. of Law at 34-35.

Finally, the court suggested that sentencing counsel was effective because although his advocacy was "brief," he "requested a sentence of ten to fifteen years." Decision 14.

The court ended its analysis by stating that "there is nothing to demonstrate that the decisions trial counsel made were anything less than sound and strategic." Decision 15. The court then listed numerous things counsel did during the trial (that were not the subject of the motion), such as move (unsuccessfully) to dismiss multiplicitous counts, make hearsay objections, and cross-examine some witnesses. *Id.*

This timely motion for a certificate granting leave to appeal follows.

## THIS COURT SHOULD GRANT PERMISSION TO APPEAL

### A. Failing to advocate at sentencing is not effective assistance of counsel.

#### 1. Silence is not meaningful representation.

With curt analysis, the motion court held that sentencing counsel provides competent representation even if counsel does not advocate for his client at all. Decision 14-15. Neither the prosecutor nor the court cited a single case in support of this proposition. That's because no such case

18

exists. After all, no reasonable lawyer says *nothing* in support of the client's sentencing position. *Garza v. Idaho*, 139 S.Ct 738, 744 (2019) ("Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove . . . that counsel's representation fell below an objective standard of reasonableness[.]") (alterations made); *Mempa*, 389 U.S. at 135 ("[T]he necessity for the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case as to sentence is apparent."). Such deafening silence is essentially an admission that a client deserves the maximum sentence.

Both the Second Department and the Seventh Circuit (in cases we relied upon below) have rejected the motion court's theory that non-advocacy can somehow be "sound and strategic." Decision 13-16; Ex. B: Memo. of Law 33-36. As the Second Department has held, "[a] defendant is entitled to an opportunity to be represented by counsel sufficiently familiar with the case and the defendant's background to make an effective presentation on the question of sentence." *People v. Jones*, 181 A.D.3d 714, 715 (2d Dept. 2020) (internal quotation marks omitted). It is

hard to see how counsel's non-advocacy here and his failure to review his client's mental-health history passes that test.

The Seventh Circuit has similarly held that non-advocacy at sentencing is ineffective. In *Patrasso v. Nelson*, 121 F.3d 297 (7th Cir. 1997), the Seventh Circuit found that sentencing counsel's representation was "practically non-existent." *Id.* at 303. There, as here, counsel said nothing in mitigation. *Id.* (court asked counsel if he had "anything in mitigation" and counsel said, "I have nothing"). *Patrasso* held that "'[c]ounsel must make a significant effort, based on reasonable investigation and logical argument, to mitigate his client's punishment.' . . . [W]e find deficient performance not because [counsel] failed to offer mitigating evidence but rather because he made no effort to contradict the prosecution's case or to seek out mitigating factors. He entirely failed to represent his client." *Id.* at 303-04 (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir. 1996)). Because counsel "effectively abandoned his client at sentencing," his performance was deficient. *Id.* at 303-05. Further, his non-advocacy constituted a total failure to subject the prosecution's case to "meaningful adversarial testing," thus prejudice

20

was presumed under *United States v. Cronic*, 466 U.S. 648, 658-60 (1984).

*See Patrasso*, 121 F.3d at 305.

Here too, counsel effectively abandoned his client, failing to:

- review the pre-sentence report, which indicated that Mr. Harrell "reported being treated for paranoid schizophrenia and depression on a monthly basis at Metropolitan Hospital prior to his arrest";[38]
- present significant mitigating evidence (mental-health records), which would have explained Mr. Harrell's courtroom behavior;
- argue that the court should not enhance a sentence to the maximum based on mere courtroom behavior; and
- argue that Mr. Harrell, 53 at the time, was unlikely to recidivate if released at the age of 65 (the result of a 15-year sentence).[39]

As in *Patrasso,* no "meaningful adversarial testing" occurred here.

*Patrasso*, 121 F.3d at 303-05. Instead of advocating for his client, counsel made a harmful comment that he was "angry" and did not want to appear for his own sentencing hearing. Ex. B (Opening Motion) at 34-35.

---

[38] A1208; *see* Bova Aff. ¶ 16 ("[A]lthough the pre-sentence investigation ("PSI") report indicates that Mr. Harrell was diagnosed with paranoid schizophrenia, Mr. Herlich stated that he was never aware of any mental-health diagnoses. His file does not indicate that he requested any of Mr. Harrell's medical records.").

[39] Ex. B (opening motion) at 34-35 (citing Osborne Association, *The High Costs of Low Risk: The Crisis of America's Aging Prison Population* at 5 (2014)).

The decision below also warrants further review because it essentially holds that standing mute at sentencing is consistent with "prevailing professional norms." *Strickland*, 466 U.S. at 688. New York attorneys are better than that. And this Court should hold them to a higher standard than the warm-body-with-a-law-license standard the motion court essentially adopted below. *Patrasso*, 121 F.3d at 304. Anything less ignores that sentencing hearings are not post-trial afterthoughts but critical proceedings that determine a defendant's fate. *Mempa*, 389 U.S. at 135.

The particular question of whether counsel is ineffective for failing to request medical records is also an important question of law squarely presented here. Although the pre-sentence report indicates that Mr. Harrell had reported a paranoid schizophrenia diagnosis (A1028), counsel did not even know about that diagnosis. Ex. B: Bova Aff. ¶ 16. Thus, he never bothered to request important medical records confirming that diagnosis. *See* Ex. F: *People v. Rivera* (N.Y. Cty. Sup. Ct. Ind. No. 6256/09) (Carro, J.) (sentencing counsel was ineffective for failing to request medical records that would have explained the defendant's behavior throughout the proceedings and would have refuted the

22

prosecution's claim of malingering) (citing *People v. Graham*, 129 A.D.3d 860, 862 (2d Dept. 2015)). Had sentencing counsel made this request, as motion counsel did, he would have obtained records confirming a bipolar and schizoaffective disorder diagnosis. Ex. B: Bova Aff. ¶ 18; A1037-44. In turn, sentencing counsel could have blunted the prosecutor's—and ultimately the court's—reliance on Mr. Harrell's courtroom behavior and absence as justifying an enhanced sentence.[40]

---

[40] A944 (prosecutor stated: "Many of us in this courtroom witnessed the defendant's behavior. In the middle of trial when he did not get his way, we observed his behavior. At one point he said, I have this problem that when I get agitated it just blows. And that was here before Your Honor in a room full of uniformed court officers and court personnel."); A951-52 ("But the record is clear as to everything that Mr. Harrell did during the course of this trial and the ways that he basically tried to highjack these proceedings to make them his own, he wanted things done his way and only his way. And when that did not happen, he absented himself. And this Court despite its greatest efforts to, could not compel Mr. Harrell to come back to court. . . . As [the prosecutor said,] we all had the opportunity to see Mr. Harrell during the course of this trial . . . . it did not matter to him that the court officers outnumbered him or had weapons, it did not matter to him that the Court was wearing a black robe, it was still his way or the highway . . . [This case] crie[s] out for the maximum sentence . . . Not only because of the conduct [of which Mr. Harrell was convicted] *but also by the conduct that he exhibited here in this courtroom*.") (emphasis added).

Guidance from this Court on sentencing counsel's obligations in the context of mental-health-record requests is important to ensure clear rules as courts grapple with that issue. *E.g.*, *Rivera*, *above*.

### 2. At a minimum, a hearing was required.

At a minimum, a hearing should have been ordered here. C.P.L. § 440.30(1)(a) and 440.30(4)-(5) (when there are issues of fact, an Article 440 hearing is required); *People v. Brown*, 160 A.D.2d 256, 257 (1st Dept. 1990). The motion court could not determine that counsel's utter silence at sentencing was somehow "strategic" without holding a hearing where counsel would testify. *E.g., People v. Smith*, 301 A.D.2d 471, 473 (1st Dept. 2003).

### 3. This case is the appropriate vehicle for resolving these important issues of law.

This appeal will provide this Court with the opportunity to review this ineffective assistance claim in the proper posture: a § 440.20 motion. Unlike in *People v. Carr*, where, on direct appeal, this Court found counsel's non-advocacy at sentencing unreviewable (168 A.D.3d 551, 553 (1st Dept. 2019)), this ineffective-assistance challenge was properly brought under C.P.L. § 440.20. *See* Ex. E: Carr App. Div. Br. 76-77

24

(arguing that sentencing counsel was ineffective because all he said was, "Your Honor, I could make – I don't know it's appropriate to comment on the case. You were present, you obviously were very attentive. We'll obviously be appealing this, so comment would be foolish"); *see generally People v. Maffei*, 35 N.Y.3d 264, 269-70 (2020) (discussing the general rule that ineffective-assistance claims should be brought under Article 440 and not on direct appeal).

## B. An effective trial attorney does not substitute cross-examination of testimony for outright preclusion of that testimony.

The court committed constitutional error in holding that counsel's failure to preclude the Y-STR evidence on prejudice/probity grounds could somehow be excused because counsel cross-examined that testimony at trial. Decision 13, 15. As the Second Circuit recently held in *United States v. Nolan*, "defense counsel . . . abandoned [a *Wade*-suppression motion] on the theory that the defense would be better off impeaching the [eyewitness identification] at trial. We do not understand how he could have reached that conclusion." 956 F.3d 71, 81 (2d Cir. 2020).

*Nolan* similarly found counsel ineffective for failing to move to preclude a Facebook photograph on the grounds that it was more prejudicial than probative—exactly the theory counsel should have advanced here. *Id.* at 83. In so holding, the Second Circuit explained that while introducing evidence to counter the damaging Facebook evidence would have been a reasonable "fall-back strategy" had preclusion failed, "we fail to understand why defense counsel did not first seek" to preclude. *Id.*

*Nolan* is correct. No sensible lawyer opts for challenging testimony at trial instead of outright precluding it. That unreasonable approach violates "prevailing professional norms" and common sense. *Strickland*, 466 U.S. at 687-88.

There is also serious tension between the motion court's theory and this Court's repeated holding that counsel is ineffective for failing to advance "colorable" arguments for preclusion of evidence. *People v. Carver*, 27 N.Y.3d 418, 420-21 (2016) (quoting *People v. Garcia*, 75 N.Y.2d 973, 974 (1990)); *People v. Major*, 96 A.D.3d 677, 678 (1st Dept. 2012) (same); *People v. Cyrus*, 48 A.D.3d 150, 160 (1st Dept. 2007) (same). A rule excusing the unreasonable failure to preclude simply because

26

counsel tried to challenge the evidence at trial would swallow the holdings of *Carver*, *Major*, and *Cyrus*. After all, it will rarely be the case where, having failed to move to preclude damaging evidence, counsel won't try to challenge that evidence at trial.

In any event, this record conclusively confirms counsel was not strategically opting for cross-examination as opposed to outright preclusion. Trial counsel specifically informed motion counsel that he did not move to preclude because he unreasonably relied on a DNA expert to flag *legal* arguments for him. Ex. B: Bova Aff. ¶ 15. It was counsel's obviously-unreasonable deference to a non-legal expert, not a cross-examination-is-enough "strategy," that explains counsel's conduct here. Indeed, at the trial, counsel *did* move to preclude the Y-STR evidence, he just did so on the chain-of-custody, not prejudice/probity, grounds. A679.

Counsel's blunder was critical because there was a powerful argument for preclusion of the Y-STR evidence on the grounds that it was more prejudicial than probative. *People v. Primo*, 96 N.Y.2d 351, 355 (2001) (courts must assess whether evidence's probative value is outweighed by the possibility of "undue prejudice," confusion, or "misleading the jury"); *Major*, 96 A.D.3d at 678; *Cyrus*, 48 A.D.3d at 160. Here, millions of males

27

could have contributed the Y-STR profile. Thus, this DNA evidence had virtually no probative value.

On the other hand, the Y-STR evidence was terribly misleading. Because DNA evidence can mislead the jury into believing that the prosecution's case is airtight, DNA evidence is "the most troubling forensic [evidence] to ever be used in a court of law." *People v. Wright*, 25 N.Y.3d 769, 783 (2015) (internal quotations omitted). And as the Court of Appeals has recognized, Y-STR evidence has a particularly "powerful influence" on jurors and creates an "opportunity for juror confusion regarding [its] limited probative value." *Id.* at 769, 771. Here, captivated by DNA evidence's "aura of invincibility," *Wright*, 25 N.Y.3d at 783, the jury was likely misled by the Y-STR evidence.  OCME's "could not be excluded"[41] conclusion and statistics like "1/685" and "1/321" made it appear that the Y-STR evidence thoroughly narrowed down the suspect pool. But in reality, millions of males matched this Y-STR profile.

In sum, and especially given the "powerful influence of DNA evidence on juries," no reasonable attorney would have declined to seek preclusion

---

[41] A686-87.

on prejudice-probity grounds. *Wright*, 25 N.Y.3d at 771. Although counsel argued to the jury in summation that the Y-STR evidence was "misleading,"[42] he inexplicably failed to make the same argument in support of preclusion.[43]

### C. The hearing court violated this Court's decision in *Jones* that purported "general competency" is not the touchstone of the ineffective-assistance analysis.

The hearing court's decision also provided a laundry list of the things that counsel did throughout the trial, such as cross-examine witnesses and make objections (conduct that was not at issue in the motion). Decision 16. But as this Court held in *People v. Jones*, and as the Second Circuit has held for more than a decade, "a single prejudicial error may constitute ineffective assistance, regardless of whether counsel's overall performance 'bespoke of general competency.'" *People v. Jones*, 167 A.D.3d 443, 443 (1st Dept. 2018) (quoting *Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010)); *Rosario*, 601 F.3d at 125-26 (it would be "absurd" to suggest that a court can, under the state or federal constitutions, "look

---

[42] A795.

[43] Furthermore, counsel's actual handling of the Y-STR evidence at trial was unreasonable as counsel drastically overstated the probative value of the Y-STR evidence in summation. *See* Ex. B: Defense Motion at 25-27.

29

past" a prejudicial error if "counsel conducted himself in a way that bespoke of general competency throughout the trial"); *Henry v. Poole*, 409 F.3d 48, 72 (2d Cir. 2005) ("[R]eliance on counsel's competency in all other respects, fail[s] to apply the *Strickland* standard at all.") (quotation marks omitted omitted). The hearing court's violation of this clearly-established law justifies additional review. *See also Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (the focus is on the "'*identified* acts or omissions'" and conduct beyond that only matters if it sheds light on whether those "identified" errors were reasonable) (emphasis added) (quoting *Strickland*, 466 U.S. at 690).

### D. The court's decision contained additional errors of law.

The court's legal errors did not stop with those summarized above. As for counsel's failure to object to prejudicial comments in summation, the court stated that this omission was "strategic in nature." Decision 14. But the court could not make that determination without hearing counsel's testimony at a fact-finding hearing. *See People v. Smith*, 301 A.D.2d 471, 473 (1st Dept. 2003).

As for counsel's failure to request that the court read back testimony impeaching portions of the complainant's testimony requested by the jury

30

(impeachment testimony that counsel emphasized in summation), the court stated that this error was somehow irrelevant because counsel tried to "limit[]" the readback instead. Decision 13; Opening Motion at 27-30; *People v. Jones*, 297 A.D.2d 256, 257 (1st Dept. 2002) ("A request for a reading of testimony generally is presumed to include cross-examination which impeaches the testimony to be read back."). But counsel's attempt to limit a readback is irrelevant to whether he reasonably failed to request that impeachment testimony be read back to the jury. *See Nolan*, 956 F.3d at 81, 83.[44]

---

[44] Additionally, the court committed legal error in finding that counsel reasonably declined to, in 2015, at least preserve the argument that the prosecution could not acquire cell-site-locational data without a probable-cause warrant. Decision 12. By then, numerous cases had adopted the view ultimately adopted by *Carpenter v. United States*. 138 S.Ct. 2206 (2018) (cell-site data cannot be obtained without a probable-cause warrant); Opening Motion 17-22. Counsel had no valid strategic reason for at least preserving the issue for appeal. *People v. Santiago*, 22 N.Y.3d 740, 750 (2014); *Flores v. Demskie*, 215 F.3d 293, 305 (2d Cir. 2000); *but see People v. White*, 189 A.D.3d 634, 635 (1st Dept. 2020).

In addressing this issue, the motion court also misstated the holding of *Carpenter*. The court indicated that the Supreme Court in *Carpenter* addressed the question of whether counsel is ineffective for failing to move to suppress cell-site data. Decision 12. That is incorrect as *Carpenter* did not address ineffective assistance at all.

### E. Conclusion

Counsel's numerous and unreasonable blunders infected both the trial and sentencing outcomes. His deficient performance undermines confidence in the outcome of those proceedings and deprived Mr. Harrell of a fair trial. *Strickland*, 466 U.S. at 694. This Court should therefore issue a certificate granting leave to appeal the motion court's flawed summary denial of Mr. Harrell's 440.10/440.20 motion. This Court should either reverse the order and grant the motion or, at a minimum, remand for a hearing to resolve any issues of fact.

Respectfully Submitted,

Robert S. Dean
Center for Appellate Litigation

BY: _____

Matthew Bova, *Of Counsel*
March 25, 2021
Bronx County, New York

32

# EXHIBIT J

# Certificate Denying Leave to Appeal
# (August 5, 2021)

# Supreme Court of the State of New York
## Appellate Division, First Judicial Department

BEFORE:     Hon. Jeffrey K. Oing
            Justice of the Appellate Division

---

| | |
|---|---|
| The People of the State of New York,<br>Respondent,<br><br>-against-<br><br>Lonnie Harrell,<br>Defendant. | Motion No.  2021-01095<br>Ind. No.  4258/14<br>Case No.  2021-01014<br><br>**CERTIFICATE<br>DENYING<br>LEAVE** |

---

I, Jeffrey K. Oing, a Justice of the Appellate Division, First Judicial Department, do hereby certify that, upon application timely made by the above-named defendant for a certificate pursuant to Criminal Procedure Law, sections 450.15 and 460.15, and upon the record and proceedings herein, there is no question of law or fact presented which ought to be reviewed by the Appellate Division, First Judicial Department, and permission to appeal from the order of the Supreme Court, New York County, entered on or about January 29, 2021 is hereby denied.

Dated: July 30, 2021
       New York, New York

Hon. Jeffrey K. Oing
Associate Justice

Entered: August 5, 2021