UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                   :

LONNIE HARRELL,                      :

                                     :       **ORDER AND OPINION**
                           Plaintiff, :       **DENYING PETITION TO**
           -against-                  :       **VACATE JUDGMENT**

                                     :

MILLER, SUPERINTENDENT OF GREEN       :          21 Civ. 6714 (AKH)
HAVEN CORRECTIONAL FACILITY,         :

                                     :
                           Defendant. :

                                     :
                                     :
-------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

           Petitioner Lonnie Harrell ("Petitioner" or "Harrell") petitions for habeas corpus

review under 28 U.S.C. §2254 of a judgment of the New York Supreme Court convicting him,

following trial and the jury's verdict, of two counts of Criminal Sexual Act in the First Degree,

N.Y. Penal Law § 130.50[1]; two counts of Sexual Abuse in the First Degree, N.Y. Penal Law §

130.65[1]; two counts of Criminal Sexual Act in the Third Degree, N.Y. Penal Law § 130.42[2];

and one count of Attempted Rape in the First Degree, N.Y. Penal Law § 130.35[1].  He was

sentenced October 25, 2015 to the concurrent maximum terms on each count for a total of 25

years incarceration, with 15 years of post-release supervision.  He remains in custody pursuant to

that sentence.  *Coram Nobis* relief by the New York State courts was denied.  Petitioner's filing

in this Court is timely.

           Petitioner pleads two grounds for relief: denial of effective assistance of counsel,

and of the due process right to be present for discussions about how to respond to a jury note

requesting testimony readback.  Memorandum in Support of Petition for Writ of Habeas Corpus

("Pet."), ECF No. 5.  Both grounds lack merit and, for the reasons discussed below, the petition for habeas corpus is denied.

## BACKGROUND

Petitioner was charged pursuant to reports by a 15-year-old girl ("Complainant") who lived in Petitioner's building and was friendly with him and with his family.  The Complainant invited Petitioner into her apartment for a snack, who then engaged in nonconsensual sexual activity with her.  According to Complainant's testimony, Petitioner first kissed the Complainant on her mouth.  State Record ("S.R.") 769.  When she refused to open her mouth, Petitioner threatened to "choke" her if she did not comply.  S.R. 769, 774.  Complainant opened her mouth and allowed Petitioner to "put his tongue inside."  Petitioner then ordered Complainant to remove her pants and underwear, and when she refused, he pulled them down himself and placed them on a nearby table.  S.R. 772–73.  Petitioner then inserted two fingers into Complainant's vagina.  S.R. 774.  When she cried in pain and told Petition "that it hurt," he refused to stop, telling her that "it wouldn't hurt if [she] relax[ed]."  S.R. 775.  Eventually, Petitioner removed his fingers, "took out his penis," "rubbed it against" Complainant's vagina, and unsuccessfully tried to penetrate her.  S.R. 775–76.  Complainant again asked him "not to put it in because it would hurt," but Petitioner again told her that it would not hurt if she "relax[ed]."  S.R. 776.  Ultimately, Petitioner stopped and put his mouth on Complainant's vagina.  S.R. 776.  Despite her pleas that he stop, Petitioner kept saying, "[y]ou wanted this," despite Complainant repeatedly telling him that she did not.  S.R. 776.

Petitioner then stepped away from Complainant, put his penis back in his pants, and ordered her to stand up.  S.R. 776.  When she did, Petitioner grabbed her by the back of her neck.  S.R. 776.  She unsuccessfully tried to grab and twist his testicles; Petitioner tightened his

grip and forced her onto her knees.  S.R. 777.  Petitioner stood directly in front of Complainant, removed his penis again, and ordered her to open her mouth.  S.R. 777.  When she did not comply, he forced her mouth open by squeezing her cheeks together and then forced her to perform oral sex on him until he ejaculated.  S.R. 778–80.  Complainant grabbed her underwear from the nearby table and spat the ejaculate into them.  S.R. 780.  Petitioner then wiped his penis with Complainant's underwear, put them in his pocket, and told her to sit in the living room. S.R. 780.

Complainant tried to cover the bottom half of her body with her hands.  Petitioner took out his phone and told her to stop covering herself.  S.R. 781–82.  When she did not listen, he warned her "that if [she] didn't do what he said, he was going to go berserk."  S.R. 783. When she moved her hands, Petitioner used his phone to take pictures of her and told her that he "would come back and hurt [her] mom if [Complainant] told anyone."  S.R. 781, 784.  Petitioner demanded Complainant's cell phone number, and when she gave it to him, he checked the number by calling it.  S.R. 784.  After Complainant told Petitioner she would not tell anyone, he left the apartment, and Complainant immediately called the police and her mother.  S.R. 785.

The State's evidence was strong: Complainant's testimony, autosomal DNA and Y-STR-DNA evidence found in saliva, semen on Complainant's body and on a straw and cup that Petitioner used at Complainant's apartment, and cellphone records showing Petitioner made an outgoing call to Complainant's number, cell-site locational data which placed Petitioner at the scene of the events and showed his flight immediately after.  Petitioner did not testify.

During deliberations, the jury requested that a portion of the Complainant's testimony and the trial court's instructions concerning attempted rape be re-read.  The note read:

> "Witness [Complainant's] testimony to both prosecution and defense regarding the position of defendant's penis in relation to witness' vulva slash vagina, including

witness' statement that the defendant quote moved to and that she quoted asked him to stop because it would hurt and he responded that quote it would not hurt if you relaxed."

S.R. 1235–36.

At the outset, Petitioner was not present in the courtroom and remained in the holding pens. S.R. 1237. Having previously refused to come to the courtroom, the trial judge expressed skepticism that Petitioner's position would have changed but asked the Sergeant to ask Petitioner if he wanted to join. S.R. 1237. Petitioner said that he would. S.R. 1237. While Petitioner was on his way up from the pens, trial counsel and the prosecutor located the relevant portions of the direct, cross, and redirect testimony responsive to the jury's note. S.R. 1239. Trial counsel argued for a limited readback of the redirect testimony, requesting it end on one page, whereas the prosecution requested that it continue onto the next page. S.R. 1240. The court denied trial counsel's request; accordingly, trial counsel requested, and the court approved, that an additional portion of redirect testimony be included. S.R. 1240–41.

When Petitioner arrived, he was brought "up to speed . . .." S.R. 1245–46. Trial counsel showed the note to Petitioner, conferred with him, and indicated that they were ready to go forward. S.R. 1246. Before the jury was brought in, however, the prosecution identified a typographical error in the transcript, for which counsel agreed to a correction. S.R. 1247. The trial court then indicated that it would give the court reporter a minute or more to make sure that she had located everything she needed to read, and that the jury would be brought in once the court reporter indicated she was ready. S.R. 1247.

During this lull, Petitioner asked why his counsel did not tell the jury in summation that Petitioner wanted to testify but refused to do so in shackles. S.R. 1247. He also wanted to know "why all parties had a discussion in the holding pen with whether [sic] the defendant wanted to come out." S.R. 1247. The following colloquy ensued:

4

TRIAL COUNSEL: I'm trying to explain to my client the court officers, who are responsible for security, made that determination [that Petitioner could not be wholly unshackled] based upon certain conduct of [Petitioner] during the trial.

And, as a courtesy, to be – to bend over backwards to make sure you understood your options to be present for your trial, the Judge and the prosecutor and myself all came to inform you that you have a right to be present at your trial and to testify, but that if you will not agree to come in shackles that will be hidden from the jury, then you will forfeit your right to present, as well as your right to testify on your own behalf.  And that's why we came to pen area to speak with you.

THE COURT: And, so, he's asking why you didn't say those things to the jury.

He would not be permitted to say those things to the jury.  That's not permitted at a trial. If you want to communicate anything to a jury, you do so when you take the stand and you chose not to do that.

THE DEFENDANT: But not in no shackles.

THE COURT: Right, but we already had that discussion.

THE DEFENDANT: I mean, that wasn't fair.  There was no reason for me to be in no shackles.

THE COURT: And we discussed this yesterday, right?

THE DEFENDANT: No. We actually – just one sided.  That was, like, one sided.

THE COURT: Well, that's not true, Mr. Harrell.  That's not true.  There's at least six people who were there in the pens with me yesterday.  They all heard what happened.  It wasn't one sided.  I was trying to engage you in a conversation.  I treated you with respect.  I treated you like a man.  I was trying to appeal to your sense of logic and common sense.  You were the one who, if anything, was interrupting me and cutting me off.  And I did everything I could possibly do to bring you out here so you could testify in your behalf, and at the end of the day you said: No, if I'm in the shackles, I'm not going. That's what happened.

THE DEFENDANT: So why wouldn't they have to know that?  I don't understand.

THE COURT: Because it's not relevant. It's not relevant to the ultimate issue in this case. Why you wouldn't come out here in shackles and why you were not in the courtroom is not relevant to their findings of fact.

THE DEFENDANT: So they're not supposed to know I'm already incarcerated?

THE COURT: There is a lot of things they're not supposed to know, which we don't let them know in order to make sure you get a fair trial, yes.

THE DEFENDANT: Well, that would be fair for me seeing –

THE COURT: Mr. Harrell, we made that clear to you. They wouldn't have seen you in shackles. We made that clear to you yesterday. Every precaution that could have been taken would have been taken, including putting you on the witness stand before the jury came out.  Okay, are we ready to bring the jury in, Mr. Harrell?

THE DEFENDANT: I don't have a choice, do I?

THE COURT: Well, I just want to make sure you that you will continue to conduct yourself as a gentleman.

THE DEFENDANT: What did I do wrong the first time?  I never did anything wrong.

THE COURT: Alright, let's bring the jury in, please.

S.R. 1247–50.

The jury was recalled and received a readback of the requested testimony, redacted as agreed, and the instructions on the charge of attempted rape charge, both as requested.  S.R. 1250–54.

The jury found Petitioner guilty on all counts, rendering a partial verdict on six counts on October 5, 2015, and rendering a verdict on the remaining count on October 7, 2015 following an *Allen* charge.  S.R. 553–54, 582–83.

On October 21, 2015, Petitioner was sentenced as a second violent felony offender to concurrent maximum terms on each count totaling 25 years imprisonment followed by fifteen years of post-supervision release.  S.R. 1312–13.  At the sentencing hearing, trial counsel offered brief remarks, urging the court to impose the minimum sentence.  S.R. 1303.  Although the Pre-Sentencing Report indicated that Petitioner reported being treated for paranoid schizophrenia and depression on a monthly basis at Metropolitan Hospital prior to his arrest, S.R.

1388, trial counsel made no mention of this fact in his remarks, and later told Petitioner's present counsel that he was unaware of Petitioner's history of mental illness.

On July 29, 2017, before perfecting his appeal, Petitioner moved *pro se* in the trial court, pursuant to N.Y. CPL § 440.10, to vacate the judgment of conviction, arguing that the indictment charged multiplicitous counts, in violation of his constitutional right against Double Jeopardy. S.R. 288–300, 1407–1415. While this motion was pending, Petitioner appealed his conviction, with the assistance of counsel to the Appellate Division, First Department, arguing again that the charges were multiplicitous, and also that he was denied his right to be present at certain critical stages of the trial. S.R. 151–86. On February 2, 2018, the trial court denied Petitioner's 440 motion, finding it procedurally barred under N.Y. C.P.L § 440.10(2)(b) because his claim was record-based and could be adequately addressed on direct appellate review. S.R. 309–10, 1434 (explaining that the purpose of NY CPL § 440.10(2)(b) is to prevent CPL 440.10 from being employed as a substitute for direct appeal). Petitioner unsuccessfully sought leave to appeal the denial of his Section 440.10 motion. S.R. 311–16, 320.

The Appellate Division subsequently and unanimously affirmed the judgment of conviction on January 29, 2019, finding no double jeopardy violation and that Petitioner was not denied the right to be present at all material stages of trial. S.R. 265–68 (*People v. Harrell*, 168 A.D.3d 591 (1st Dep't 2019)). As relevant to the instant petition, the Appellate Division found that Petitioner was present for the requested readback of Complainant's testimony, and that although he was absent for a portion of the preceding discussions, the right to presence did not extend to those discussions. S.R. 265–68 (citing *People v Rodriguez*, 76 NY2d 918, 921 (N.Y. 1990)). Petitioner filed a counseled application requesting leave to appeal to the New York Court of Appeals, asking the court to review his claim that he was denied his right to be present

during the formulation of a response to a jury note seeking a readback of the victim's testimony. S.R. 269–79.  The Court of Appeals denied leave to appeal on April 8, 2019.  S.R. 287 (*People v. Harrell*, 33 N.Y.3d 976 (2019)).

On June 25, 2020, almost five years after he was sentenced, Petitioner filed another Coram Nobis motion (N.Y. C.P.L. § 440.10), this time with the assistance of counsel. Petitioner alleged that his trial counsel failed to provide effective assistance of counsel, in violation of the State and Federal Constitutions.  S.R. 321.  He claimed five errors: trial counsel's (1) failure to move to suppress cell-site location information, which placed Petitioner at the scene of the crime and showed that he fled afterwards; (2) failure to move to preclude "Y-STR" DNA evidence, purportedly linking Petitioner's DNA profile to a profile found on swabs taken from the complainant's body; (3) failure to object to the prosecutor's argument, in summation, that Petitioner had not denied engaging in sexual activity with the complainant; (4) failure to request a read-back of complainant's impeachment testimony; and (5) failure to argue on behalf of his client at sentencing, instead referring to Defendant as "angry."  S.R. 321–1434.  He also moved to set aside his sentence pursuant to N.Y. C.P.L. § 440.20, which allows a court, upon motion of the defendant, to set aside the sentence on the grounds that it was unauthorized, illegally imposed, or otherwise invalid as a matter of law.  S.R. 321.

The trial court ruled that it had the discretion to reject Petitioner's claim for ineffective assistance of counsel as procedurally barred because Petitioner could have, but did not, raise it in his first § 440.10 motion.  S.R. 1511 (citing N.Y. C.P.L. § 440.10(3)(c)). However, in its discretion, and in the interest of justice and finality, the trial court proceeded to judge Petitioner's ineffective assistance claim on its merits.

The trial court noted that federal and State law differ in their articulation and standards.  Under *Strickland v. Washington*, 466 U.S. 668 (1984), there is a two-part federal standard: a defendant must show that counsel's performance both "fell below an objective standard of reasonableness," and prejudice, that is, that "there is no reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  In contrast, the New York State standard is "meaningful representation.   "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met."  *People v. Baldi*, 54 N.Y.2d 137, 147 (1981).  The trial court observed, "New York's standard offers greater protection to a defendant than the federal test, as even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial."  S.R. 1513.

The trial court considered each of Petitioner's arguments on his ineffective assistance of counsel claim.  It rejected Petitioner's claim that trial counsel erred in failing to move to suppress cell-site data.  The trial court noted that Petitioner's crime and trial occurred in 2014 and 2015, at least three years prior to the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), which held that the government needs a search warrant supported by probable cause to obtain such information. S.R. 1514–15.   At the time of Petitioner's trial, there was little to no chance that a motion to suppress would have been successful, especially given that New York courts, prior to *Carpenter*, did not require a warrant to obtain cell-site data, *see People v. Jiles*, 158 A.D.3d 75, 81 (4th Dep't 2017) (holding that cell-site location information has no greater protection under the New York State Constitution than it has under

9

the Federal Constitution), and that the Supreme Court also made clear that the rule it announced was not retroactively applicable.  S.R. 1515.

As to Petitioner's argument that trial counsel failed to move to preclude Y-STR DNA evidence, the trial court found that the record showed that trial counsel consulted with a DNA expert, who did not advise trial counsel to file such a motion, and instead introduced statistical evidence to show the deficiencies of Y-STR DNA profiles.  S.R. 1515.  In addition, the court found that trial counsel effectively cross-examined the People's DNA expert and elicited that Petitioner's paternal relatives would have the same Y-STR DNA profile, and that thousands of males could have been the source of the DNA recovered from the labial and oral swabs. S.R. 1515.

As to Petitioner's claim that trial counsel failed to request readback of certain impeachment testimony in response to the jury note, the court found that trial counsel sought to limit readback to exclude the most damaging portions of her testimony, and although the court denied that request, it agreed to the strategic page numbers and lines that counsel believed responsive to the note.  S.R. 1516.

As to Petitioner's argument that trial counsel failed to object to the prosecutor's allegedly prejudicial summation remarks, the court concluded that those decisions were strategic and did not rise to the level of ineffective assistance of counsel.  S.R. 1517.

Finally, as to Petitioner's argument that trial counsel failed to argue on his behalf at sentencing, the court found that although his remarks were brief, he asked the court to impose the minimum sentence.  S.R. 1517.  The court, however, concluded that based upon Petitioner's crimes, criminal history, and conduct in the courtroom, his case "cried out for the maximum sentence."  S.R. 1517.

The court held that Petitioner's counsel made sound and strategic decisions and provided meaningful representation, citing trial counsel's motions to dismiss allegedly multiplicitous counts, suppress statements to the police, and limit witnesses, as well as his successes in persuading the court to redact portions of Complainant's narrative in her medical records, impeaching Complainant's testimony by highlighting omitted details, and eliciting testimony from the examining doctor that she did not observe any scratches on Complainant's neck. S.R. 1518. The court concluded that Petitioner "failed to establish that trial counsel was deficient or did not provide meaningful representation. The federal and state standards have been met. Accordingly, the motion to vacate the conviction on the grounds of ineffective assistance of counsel is denied on both procedural and substantive grounds." S.R. 1518. The court also denied Petitioner's motion under Section 440.20 because Petitioner had "not demonstrated that his sentence was unauthorized, illegally imposed or otherwise invalid as a matter of law." S.R. 1519. The Appellate Division denied Petitioner's application for leave to appeal on August 5, 2021. S.R. 3046.

Petitioner now petitions this Court to review and vacate his judgment of conviction and sentence. 28 U.S.C. § 2254. He timely filed his petition on August 9, 2021, less than one year after judgment in the state proceeding became final. 28 U.S.C. § 2244(d)(1)(A). Petitioner argues that (1) he was denied the effective assistance of counsel, and that the final decision of the New York State courts was "contrary to" and an unreasonable application' of *Strickland*, 28 U.S.C.; and (2) he was denied his right to be present during a colloquy between counsel and the court about how to respond to a jury note, and that the Appellate Division unreasonably applied clearly-established law when it determined that Petitioner did not have a right to be present during the preceding discussions.

11

**DISCUSSION**

I. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA), a state prisoner's application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  A decision is "contrary" to clearly established law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state-court decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner."  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Review under AEDPA is narrow, intended as "a guard against extreme malfunctions in the state criminal justice systems, [and is] not a substitute for ordinary error correction through appeal."  *Ryan v. Gonzales*, 568 U.S. 57, 75 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Court has repeatedly admonished lower courts for not affording sufficient deference to state court determinations of constitutional issues.  *See, e.g.*, *White v. Wheeler*, 577 U.S. 73, 76–77 (2015) (per curiam).

Federal courts also may not review state court decisions that rest on a state law ground independent of the federal question and adequate to support the judgment.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The rule applies also to procedural issues.  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Id.* at 750.

II. Analysis

    A. Ineffective Assistance of Counsel

The trial court denied Petitioner's motion on *both* procedural *and* substantive grounds.  S.R. 1518 ("Accordingly, the motion to vacate the conviction on the grounds of ineffective assistance of counsel is denied on both procedural and substantive grounds.").  Since the procedural holding is sufficient basis for the decision and is independent of the federal ground, a federal court may not review that decision.  *Coleman v. Thompson*, 501 U.S. 722, 729, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").  This is sufficient to deny Petitioner's motion based on ineffective assistance of counsel.  No fundamental miscarriage of justice results.

Even if the procedural bar were not applicable, however, relief is not warranted.  The New York State courts reasonably applied clearly established federal law as well as New

13

York State constitutional law.  Under *Strickland*, a petitioner must show both that his attorney provided deficient representation, and that he suffered prejudice as a result.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish deficient representation, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that counsel's conduct had "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result."  *Id.* 686, 688.  A court reviewing an ineffective assistance of counsel claim is required to "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," and petitioner bears the burden of overcoming that presumption. *Id.* at 689. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Id.* at 110 (citation omitted).

Petitioner cannot establish ineffective assistance of counsel based upon any of the grounds he asserts, and the trial court did not err in concluding that trial counsel's representation was reasonable and meaningful.

First, trial counsel's failure to move to suppress the cell-site data was not unreasonable.  Petitioner's trial took place three years before the Supreme Court decided *Carpenter*.  At the time, neither federal law nor New York State law clearly established the right that Petitioner now argues trial counsel should have moved to protect.  The Supreme Court has elsewhere held that a state court does not unreasonably apply federal law by failing to extend applicable law.  *White v. Woodall*, 572 U.S. 415, 426 (2014) (holding that a state court does not unreasonably apply precedent by failing to extend it).  It is axiomatic that if a state court has no

duty to extend precedent, counsel cannot be said to have acted unreasonably by failing to anticipate or argue for such an extension.

Second, trial counsel's failure to move to preclude Y-STR DNA was not unreasonable. Petitioner argues that this was "the *only* physical evidence corroborating" Complainant's account, and therefore "[a]ny reasonable lawyer would have concluded that the defense had a lot to gain, and nothing to lose, by moving to preclude . . . ." Pet. at 36. However, this is not the test for determining whether trial counsel acted reasonably. Petitioner does not, and cannot, cite any Supreme Court (or other) authority establishing a "lot to gain, nothing to lose" standard of reasonableness. In fact, Supreme Court precedent holds to the contrary: "This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

Petitioner cites to *Kimmelman v. Morrison*, for the proposition that trial counsel acts unreasonably by failing to file a suppression motion for no valid strategic reason. *See* Pet. at 36 n.179 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986). Petitioner's reliance is misplaced. In *Kimmelman*, trial counsel failed to file a motion to suppress because he was unaware that the evidence in question existed. *See id.* And he was unaware because he failed to conduct any pre-trial discovery or investigation. *Id.* Thus, trial counsel's failure to move to suppress was not due to "strategy." *Id.* Petitioner's case is markedly different. Most notably, trial counsel was aware of the Y-STR evidence. He engaged in pre-trial investigation and due diligence, even hiring a DNA expert to assist. He also introduced statistical evidence undermining the probative value of such profiles and effectively cross-examine the People's expert. I cannot find that trial counsel acted unreasonably by pursuing this strategy, rather than as Petitioner would now have it, moving to suppress otherwise relevant evidence.

Petitioner's claims based upon trial counsel's overstatement of the value of the Y-STR DNA evidence fails for similar reasons.  Petitioner complains that trial counsel argued in summation that thousands of males in New York City, rather than millions of males in the world, shared the same profile.  Trial counsel stated the evidence accurately; his failure to adopt language or rhetoric that Petitioner now feels would have been better does not render trial counsel's representation ineffective at the time of trial.  *See Strickland*, 446 U.S. at 690 (stating that courts "must judge the reasonableness of counsel's challenged conduct . . . viewed at the time of counsel's conduct").

Trial counsel's failure to object during the prosecution's summation was also reasonable as a matter of strategy, instead focusing his energy on attacking the overwhelming evidence against Petitioner in the best way possible.  Petitioner argues that counsel should have objected when the prosecutor argued that identity was "not really in dispute, as well as referenced certain milestones in Complainant's life, her community involvement, and her parents' reactions.  Pet. at 40–41.  Trial counsel's failure to object does not constitute error.   The prosecutor's summation fairly represented the evidence and was proper anticipation and rebuttal of the defense's summation.  Accordingly, trial counsel had no duty to object and therefore his failure to do so did not constitute ineffective assistance.  *See United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2000).

Finally, trial counsel was not ineffective at sentencing.  His brief remarks were reasonable in light of Petitioner's offense history and the evidence presented at trial.  Petitioner argues that trial counsel failed to investigate and present evidence of Petitioner's history of mental illness.  Pet. at 51–54.  As shown by the discussion of mental history in the Pre-Sentencing Investigation Report, the evidence reflected only that which Petitioner said about

himself.  There is no indication that medical evaluations existed or that Petitioner reported such to his counsel.  Trial counsel was not remiss by not chasing after evidence that did not appear to exist or, if it did, was not likely to influence the result.  The sickness of Petitioner's conduct was made plain by the criminal acts he performed, and made Complainant perform.  Petitioner's mental history would have added nothing helpful to his case.

In sum, none of Petitioner's arguments establishes that trial counsel was ineffective.  Accordingly, Petitioner's motion based on ineffective assistance of counsel is denied.

B. Due Process Rights

Petitioner argues that his constitutional due process rights were violated because he was not present to participate in discussions with counsel how to respond to the jury's request for read-back of Complainant's testimony.

The Fourteenth Amendment entitles a defendant to be present in his own person whenever his "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934).  A defendant is entitled "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819–20 n.15 (1975); *see also Rushen v. Spain*, 464 U.S. 114, 117–18 (1983) (describing right to personal presence at all critical stages of the trial as a "fundamental right[] of each criminal defendant"). Nonetheless, the Supreme Court has emphasized "that this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U. S. 97, 106–07 (1934)).

To decide whether this right was violated, courts must consider "whether, in light of the record as a whole . . . the defendant's presence at the proceeding in question would have contributed to his opportunity to defend himself against the charges." *Contreras v. Artus*, 778 F.3d 97, 113 (2d Cir. 2015) (citations omitted). "Accordingly, the Supreme Court has held that '[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *Id.* (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985).

The Appellate Division applied federal and State law and concluded that although Petitioner had a right to be present at the readback of testimony, that right did not extend to the conversations between counsel on finding the relevant parts of the record to respond to the jury's note.  S.R. 265–68 (citing *People v Rodriguez*, 76 NY2d 918, 921 (N.Y. 1990)).  In any event, the record shows that Petitioner was made aware of all that had been discussed before he came to court, that he had ample opportunity to discuss all relevant issues with his counsel, and that he was present when the testimony was read back to the jury.  Petitioner makes no showing that any decision of the U.S. Supreme Court required more.  The decision of the Appellate Division was neither contrary to nor an unreasonable application of then-applicable federal law, as established by the Supreme Court.

Accordingly, Petitioner's motion based upon the denial of a right to be present is denied.

**CONCLUSION**

The petition to vacate the judgment and sentence is denied.  The Clerk shall

terminate the motion (ECF No. 1) and enter judgment dismissing the case.

SO ORDERED.

Dated:          January 13, 2022                    _____/s/ Alvin K. Hellerstein_____
                New York, New York                  ALVIN K. HELLERSTEIN
                                                    United States District Judge